Vol. 1 - 1

1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF NEVADA

3    UNITED STATES OF AMERICA,    )
                                  )    Case No. 2:16-cr-00046-GMN-PAL
4               Plaintiff,        )
                                  )    Las Vegas, Nevada
5         vs.                     )    February 13, 2017
                                  )    2:00 p.m.
6    ERIC J. PARKER (11), O.      )
     SCOTT DREXLER(12), RICHARD   )
7    LOVELIEN (13), STEVEN A.     )
     STEWART (14), TODD C. ENGEL  )
8    (15), and GREGORY P.         )
     BURLESON (16),               )
9                                 )    Day 4
                Defendants.       )    Testimony of Rand Stover
10   _____ )

11                      TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE GLORIA M. NAVARRO
12          UNITED STATES DISTRICT COURT CHIEF JUDGE, AND A JURY

13

14   APPEARANCES:

15   For the Government:

16            STEVEN W. MYHRE, AUSA
              ERIN M. CREEGAN, SAUSA
17            NADIA JANJUA AHMED, AUSA
              NICHOLAS D. DICKINSON, AUSA
18            United States Attorney's Office
              District of Nevada
19            501 Las Vegas Boulevard South, Suite 1100
              Las Vegas, Nevada 89101
20

21   Appearances continued on next page.

22

23   Court Reporter:  Katherine Eismann, CSR, CRR, RDR
                       (702)431-1919 ke@nvd.uscourts.gov
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.

```
1   APPEARANCES CONTINUED:

2   For the Defendant Eric J. Parker (11):

3           JESS R. MARCHESE, ESQ.
            Law Office of Jess R. Marchese
4           601 South Las Vegas Boulevard
            Las Vegas, NV 89101
5           marcheselaw@msn.com

6   For the Defendant O. SCOTT DREXLER (12):

7           TODD M. LEVENTHAL, ESQ.
            Leventhal and Associates
8           626 South Third Street
            Las Vegas, NV 89101
9           leventhalandassociatescmecf@gmail.com

10  For the Defendant Richard Lovelien (13):

11          SHAWN R. PEREZ, ESQ.
            Law Office of Shawn R. Perez
12          626 South Third Street
            Las Vegas, NV 89101
13          shawn711@msn.com

14  For the Defendant Steven A. Stewart (14):

15          RICHARD E. TANASI, ESQ.
            601 South Seventh Street, 2nd Floor
16          Las Vegas, NV 89101
            rtanasi@tanasilaw.com
17
    For the Defendant Todd C. Engel (15):
18
            TODD C. ENGEL, PRO SE
19          18427-023
            Nevada Southern Detention Center
20          2190 Ease Mesquite Avenue
            Pahrump, NV 89060
21
            JOHN G. GEORGE, ESQ. (Standby Counsel)
22          600 South 8th Street
            Las Vegas, NV 89101
23          johngeorgejr@fastmail.fm

24

25
```

1    APPEARANCES CONTINUED:

2    For the Defendant Gregory P. Burleson (16):

3              TERRENCE M. JACKSON, ESQ.
               Law Office of Terrence M. Jackson
4              624 South Ninth Street
               Las Vegas, NV 89101
5              Terry.Jackson.Esq@gmail.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Monday, February 13, 2017, 2:00 p.m.)

 2                            --oOo--

 3                    P R O C E E D I N G S

 4              THE COURT:  You are free to go.  Please be careful

 5    with the steps on the way down.

 6              Government may call its next witness.

 7              MR. MYHRE:  Thank you, Your Honor.  The government

 8    calls Special Agent Rand Stover.

 9              THE COURT:  Good afternoon, Special Agent Stover.

10              You will be stood right here.  Please be careful with

11    the steps on your way up.

12              MR. LEVENTHAL:  Your Honor, could we -- could we have

13    a sidebar just the attorneys at this point?  My client would

14    waive the sidebar.

15              THE COURT:  Could we do it at the bathroom break at

16    3:00?

17              MR. LEVENTHAL:  I guess.  Yes, I guess we could.

18              THE COURT:  Okay.  Let's do it at -- we'll just take

19    a little longer bathroom break than usual.

20                            RAND STOVER,

21    having been duly sworn, was examined and testified as follows:

22              COURTROOM ADMINISTRATOR:  State your full name and

23    spell it for the record.

24              THE WITNESS:  Good afternoon, Your Honor, members of

25    the Court, ladies and gentlemen of the jury.
```

Rand Stover - Direct

1       My name is Rand Stover, R-A-N-D, S-T-O-V-E-R.

2            MR. MYHRE:  Thank you, Your Honor.

3                       DIRECT EXAMINATION

4  BY MR. MYHRE:

5  Q.   Good afternoon, Agent -- Special Agent Stover.  You are

6  currently serving as a Special Agent with the Bureau of Land

7  Management; is that correct?

8  A.   Correct.

9  Q.   How long have you been serving in that capacity?

10 A.   I have been with the BLM since August of 2009.

11 Q.   And the -- you were involved, were you not, as the that

12 Operations Section Chief for the impoundment operation

13 involving the removal of Cliven Bundy's cattle from public

14 lands in April of 2014; is that correct?

15 A.   Yes, that's correct.

16 Q.   And you were involved not only in the execution of that

17 impoundment operation, but you were also involved in the

18 planning of that operation; is that correct?

19 A.   That's correct.

20 Q.   And we're going to talk about each of those different

21 sections of the impoundment operation.  Before I do, I'd like

22 to first ask a little few questions about your background.

23       Before becoming an agent with the Bureau of Land

24 Management, did you have any prior law enforcement experience?

25 A.   I did.

Rand Stover - Direct

1   Q.   What was that?

2   A.   I was a special agent with the United States Secret

3   Service.

4   Q.   If you could pull that microphone a little closer to you.

5   Thank you.

6   A.   Is that better?

7   Q.   I'm having difficulty hearing you, but it just may be my

8   advanced years.  The -- so, with respect to your Secret Service

9   time, when did you begin service there?

10  A.   I started as a special agent with the Secret Service in

11  February of 20 -- excuse me -- May of 2004.

12  Q.   And before being with the Secret Service, did you have any

13  prior law enforcement experience?

14  A.   No, I did not.

15  Q.   To become an agent with the Secret Service, did you have

16  to undergo some basic training?

17  A.   I did.

18  Q.   What type of training did you undergo?

19  A.   I was a -- attended the Criminal Investigator Training

20  Program at the Federal Law Enforcement Training Center in

21  Glencoe, Georgia.  And after that, I attended the US Secret

22  Service Special Agent Training Academy in Beltsville, Maryland.

23  Q.   Now, the Federal Law Enforcement Training -- is it

24  Institute or --

25  A.   Federal Law Enforcement Training Center.

Rand Stover - Direct

1    Q.    Center, so that's typically referred to as FLETC?

2    A.    FLETC, yes.  They use the acronym FLETC.

3    Q.    How long does the FLETC course last?

4    A.    The course I went to was approximately 10 weeks.

5    Q.    And your follow-on training from there for agency-specific

6    training for Secret Service was how long?

7    A.    That was about 16 weeks.

8    Q.    And just generally speaking, what types of topics of law

9    enforcement did you cover in the course of that training?

10   A.    At the training center in Georgia, legal training, arrest

11   techniques, serving a search warrants, report writing,

12   interviewing, defensive driving, firearms, general training

13   that most law enforcement academies go through.

14   Q.    And then as your time as a Secret Service agent, generally

15   speaking, what types of duties did you perform?

16   A.    As an agent, what type of duties?  Can you repeat that?

17   Q.    Yes.  As a Secret Service agent, what types of duties did

18   you perform?

19   A.    I did both criminal investigations and protective

20   assignments as a Secret Service agent.

21   Q.    And in your experience doing protection assignments, did

22   you have occasion to protect heads of state?

23   A.    I did.

24   Q.    How about public officials?  US public officials?

25   A.    Yes.

Rand Stover - Direct

1   Q.   What types of officials would you provide protection for?

2   A.   I assisted in protection of the President of the United

3   States, the Vice President, First Lady, presidential

4   candidates, and cabinet-level members.

5   Q.   So you decided to move to the Bureau of Land Management;

6   is that correct?

7   A.   That's correct.

8   Q.   What prompted that decision?

9   A.   I had an opportunity to stay in a part of the country that

10  I really enjoyed working in if I transferred to the BLM, and so

11  I decided to take that opportunity.

12  Q.   Do you have to undergo different training or further

13  training in order to become an agent for the BLM?

14  A.   No, just some on-the-job training.

15  Q.   Now, you are a federal agent; correct?  Federal law

16  enforcement agent?

17  A.   Yes.

18  Q.   Okay.  Is there a particular designation within the

19  federal government for a law enforcement officer?

20  A.   I'm considered a 18-11 in the federal government realm,

21  which means I'm a certified criminal investigator.

22  Q.   Now, as an 18-11 or as a federal law enforcement officer,

23  I suspect you take an oath of office in order to perform your

24  duties?

25  A.   Yes.

Rand Stover - Direct

1    Q.   Are you authorized as a special agent with the BLM to make

2    arrests?

3    A.   Yes.

4    Q.   Conduct investigations?

5    A.   Yes.

6    Q.   And to enforce the laws that apply to the public lands; is

7    that correct?

8    A.   Yes.  Federal laws that apply to public lands.

9    Q.   Now, what is your current position with the Bureau of Land

10   Management?

11   A.   I'm a special agent.

12   Q.   And back in October -- excuse me -- April of 2014, what

13   was your assignment then?

14   A.   I was an assistant special agent in charge for the law

15   enforcement program in Utah.

16   Q.   So, from 2014 to today, it's a different assignment.  Is

17   it -- as an assistant special agent in charge, do you have

18   supervisory responsibilities?

19   A.   I did.

20   Q.   What were those generally speaking?

21   A.   In general, I supervised the other special agents in the

22   Utah program.

23   Q.   Now, in your current position, are you in a supervisory

24   capacity?

25   A.   No, I am not.

Rand Stover - Direct

1   Q.   What was the reason for moving from a supervisory to a
2   non-supervisory position?
3   A.   Similar to my move from the Secret Service, I had an
4   opportunity to work in an area of Utah that I really enjoyed
5   and wanted to be in, and so I took that opportunity.
6   Q.   So a position somewhere else opened up that allowed you to
7   enjoy the lifestyle you wanted to enjoy; is that correct?
8   A.   That's correct.
9   Q.   Now, I want to talk a little bit about how the BLM is
10  organized.
11  A.   Okay.
12  Q.   Especially in the law enforcement community.  You talked
13  about the special agents.  Are there other law enforcement
14  officers within the Bureau of Land Management as well?
15  A.   Yes, the BLM essentially has two groups of law enforcement
16  officers.  We have a uniformed ranger group, and we have a
17  special agent group.
18  Q.   With respect to the uniformed rangers, they -- obviously
19  you refer to them as uniforms.  They wear some sort of uniform;
20  correct?
21  A.   They do.  They drive marked patrol vehicles with police
22  markings on the outside of the vehicles, and they wear marked
23  police-type uniforms.
24  Q.   Do they wear a badge?
25  A.   They do.

Rand Stover - Direct

1    Q.   What are generally the duties and responsibilities for a

2    BLM ranger?

3    A.   One of the primary duties of a BLM ranger is to be out

4    patrolling on public lands.  Each ranger is assigned a patrol

5    district.  So much as you would imagine a police officer in a

6    city has a beat or regular area that they patrol, a BLM

7    uniformed ranger has an area assigned to them that they do

8    active patrol in that area.

9    Q.   Do they have a set of regulations and rules that apply to

10   how they conduct their business?

11   A.   They do.

12   Q.   Does it differ from the rules and regulations that you

13   have?

14   A.   No, we fall under the same what we call the general orders

15   or -- and those are our law enforcement guidelines for our

16   agency.

17   Q.   Do you -- within law enforcement, do you have a chain of

18   command that you report to?

19   A.   Yes, sir.

20   Q.   Does it differ between a special agent and a BLM ranger?

21   A.   Yes, it does.

22   Q.   Walk us through what a special agent -- how -- what that

23   chain of command is?

24   A.   A special agent, myself, for example, I -- my immediate

25   supervisor is an assistant special agent in charge.  And then

Rand Stover - Direct

1    that assistant special agent in charge reports to a regional

2    special agent in charge, which goes up to a deputy director and

3    then a director of law enforcement.

4              A uniformed ranger, depending on the state -- some

5    states have -- have a uniformed law enforcement district

6    supervisor that the ranger might report to, and then that

7    person reports to a civilian district manager.

8              In some states, we do not have supervisory district

9    ranger, so the ranger in the various areas would report

10   directly to a civilian district manager or a field office

11   manager.

12   Q.   So for each, regardless of whether it's an agent or

13   ranger, they report to someone who supervises their duties;

14   correct?

15   A.   That's correct.

16   Q.   You've mentioned a number of times public lands, and we're

17   all generally aware of what public lands are.  But I would like

18   to be a little more specific in terms of with the designation

19   or the reference to public lands and the duties and

20   responsibilities of a BLM law enforcement officer.

21             So, first of all, public lands -- federal public

22   lands are lands belonging to whom?

23   A.   Public lands are lands belonging to the United States.

24   Q.   Do you have a rough estimate of how many -- how many acres

25   of lands are -- fall into that category of lands belonging to

1   the United States?

2   A.   Well, the BLM administers approximately 245 million acres

3   of public land on behalf of all American people.

4   Q.   So when you say 245 million, that's just BLM.  Are there

5   other land management agencies besides BLM?

6   A.   Yes.

7   Q.   What are those?

8   A.   It could be the United States Forest Service, the National

9   Park Service, Bureau of Indian Affairs.

10  Q.   Okay.  And are these lands located throughout the United

11  States or are they specific to particular regions of the United

12  States?

13  A.   Well, the BLM administered lands are primarily in 12

14  western states including Alaska.

15  Q.   How about east of the Mississippi?

16  A.   Very few.  Just a -- maybe one or two small pockets.

17  Q.   So it's mostly west of the Mississippi?

18  A.   Correct.

19  Q.   Now, in connection with the law enforcement duties of a

20  ranger or a special agent, do the laws that you enforce, do

21  they relate to those lands designated as the public lands?

22  A.   They do.

23  Q.   In what -- in what way -- excuse me.  What is the scope of

24  the enforcement authority then of a BLM ranger, for example?

25  A.   A BLM ranger has the authority to investigate certain

Rand Stover - Direct

1   federal laws on those BLM lands that I was just talking about.

2   So BLM lands that are -- or public lands that are administered

3   by the BLM, a ranger has a duty and responsibility to

4   investigate certain laws on those lands or laws that might have

5   a nexus to those public lands.

6   Q.   And is it often sometimes -- or is it sometimes the case

7   that the BLM ranger may be cross-deputized by a state agency as

8   well?

9   A.   Yes, that happens from time to time.

10   Q.   But regardless of whether they are cross-deputized or not,

11   they have the authority under law to perform those duties

12   within the scope as we've just defined it?

13   A.   Correct.

14   Q.   I would like to move forward a little bit and now talk

15   about the impoundment action in 2014.  You already mentioned

16   you were the ASAC -- or, excuse me -- the assistant special

17   agent in charge in Utah; is that correct?

18   A.   That's correct.

19   Q.   And did you become assigned to planning for the

20   operation -- the impoundment operation regarding Mr. Cliven

21   Bundy?

22   A.   I did.

23   Q.   How did that come about?

24   A.   I was assigned by the special agent in charge of our

25   region.

Rand Stover - Direct

1    Q.   And essentially what were your duties and responsibilities

2    in a general way in term of planning for that operation?

3    A.   For planning of that operation, I was designated as the

4    Operations Section Chief.  So my job was to try and plan and

5    prepare for the day-to-day security operations that would go on

6    during the cattle impound.

7    Q.   And what type of information did you review or consult as

8    you were going about planning for this particular operation?

9    A.   I consulted the Court orders that were in place.  I

10   consulted the previous administrative file and the history of

11   Mr. Bundy's activities and the cattle that were trespassing on

12   the public lands in the area of Nevada that we were planning to

13   conduct this operation.

14        We reviewed prior open-source media information

15   online sources, consulted with BLM employees who had expertise

16   in grazing and rangeland management and the -- the previous

17   history of Mr. Bundy's activities.

18        Consulted the file on any permitting that had

19   previously been allowed in the area that was no longer allowed.

20   Q.   Okay.  Let's -- let me just walk through a couple of

21   those.  So you looked at the Court orders; correct?

22   A.   Yes.

23   Q.   Did you have any previous encounters or previous

24   experiences with Mr. Bundy?  Previous to becoming the

25   Operations Section Chief.

Rand Stover - Direct

1   A.   In 2012, yes.

2   Q.   And that was in connection with a previous impoundment

3   operation that you were going to commence; is that correct?

4   A.   That's correct.

5   Q.   And that impoundment operation did not occur; is that

6   correct?

7   A.   That's correct.

8   Q.   And as a result of that, the BLM went back to court?

9          MR. LEVENTHAL:  Object as to leading, Your Honor.

10         THE COURT:  Sustained.

11         MR. LEVENTHAL:  Thank you.

12         MR. MYHRE:  I'm just trying to direct him, Your

13   Honor, but I appreciate that.  I will rephrase.

14   Q.   So in 2013; correct?

15   A.   Yes.

16   Q.   In those, the BLM went back to court; is that correct?

17   A.   That's correct.

18   Q.   And in connection with the 2014 impoundment, what orders

19   did you consult?

20   A.   We consulted the 1998 Court order and the 2000 -- the

21   summer of 2013 and the fall of 2013 Court order.

22   Q.   Right.  Now, my question with respect to your previous

23   experience with Mr. Bundy, did you ever meet him personally?

24   A.   No, I did not.

25   Q.   Did you ever have any discussions with him?

Rand Stover – Direct

1   A.   No.

2   Q.   And this is in connection now with the 2014 impoundment;

3   correct?

4   A.   Correct.

5   Q.   In preparing for the 2014 impoundment, did you consult a

6   map and determine what the area of operation was going to be?

7   A.   Yes.

8   Q.   If you wouldn't mind turning to area -- excuse me --

9   Exhibit 323, please.

10          Agent Stover, what is Exhibit 323?

11  A.   I've got to get it to pull up here, sir.

12  Q.   Oh, I'm sorry.  I thought you were -- no, in the exhibit

13  book.

14  A.   Oh, I'm sorry.

15  Q.   I apologize.

16  A.   I thought it was coming on the screen.  Can you give me

17  the number again, please?

18  Q.   Sure, 323.  They have moved the books.  I think if you'd

19  look, there should be on the front cover the range of exhibit

20  numbers.

21  A.   Okay.

22  Q.   Okay.  So what is 323?

23  A.   323 is an overview map including some land status

24  coloration of the area that we were going to be operating in.

25  Q.   And does this map show the relative location of

Rand Stover - Direct

1    Mr. Bundy's property?

2    A.    Yes, it does.

3    Q.    Does it also show the location of the public lands that

4    are affected by the 2013 Court orders?

5    A.    It does.

6    Q.    And does it also show the -- something known as the cattle

7    distribution?

8    A.    Yes.

9    Q.    And was this map something that you used and consulted in

10   connection with the planning of the 2014 operation?

11   A.    Yes, it was.

12            MR. MYHRE:  Your Honor, we offer Exhibit 323.

13            THE COURT:  Any objection to Exhibit 323?

14            MR. TANASI:  No objection from Mr. Stewart, Your

15   Honor.

16            MR. MARCHESE:  None from Parker.

17            MR. LEVENTHAL:  No, Your Honor, from Mr. Drexler.

18            MR. ENGEL:  None from Engel.

19            MR. PEREZ:  None from Lovelien.

20            MR. JACKSON:  No objection from Mr. Burleson.

21            THE COURT:  All right.  Exhibit 323 will be admitted.

22   Did you want to publish it?

23            MR. MYHRE:  Yes, Your Honor.

24            THE COURT:  You may go ahead.

25        (Exhibit 323 admitted.)

Rand Stover - Direct

1    BY MR. MYHRE:

2    Q.   On your monitor, you should see Exhibit 323 now, Agent

3    Stover.

4    A.   I see it.

5    Q.   In the lower right-hand corner, do you see a little map

6    insert there?

7    A.   Yes, I do.

8    Q.   That's the state of Nevada; correct?

9    A.   That's correct.

10   Q.   And the -- the square on that map indicates what?

11   A.   That indicates the area that is enlarged that we were

12   previously looking at to show a close-up view of the

13   operational area.

14   Q.   So that's the area that was affected by the Court orders

15   relative to the state?

16   A.   That's correct.

17   Q.   Okay.  If we take a look at the broader map, I'd like to

18   ask you to explain.  We see a number of dots on this map.  What

19   do those dots represent?

20   A.   The small red dots indicate a distribution of the cattle

21   in the area.

22   Q.   And when we are talking about in the area, are we talking

23   about the area of public lands that are related to the 2013

24   Court orders?

25   A.   Yes, we're talking about an area in the 2013 Court orders

Rand Stover - Direct

1  was described as the "new trespass lands."

2  Q.   So we talked -- and there are also "old trespass lands,"

3  or "original trespass lands"; is that correct?

4  A.   That's correct.

5  Q.   How are original trespass lands or the first Court

6  order -- how are those depicted on this map?

7  A.   From the first Court order in the slightly green shaded

8  area.  Right there, the slightly green shaded area, that

9  boundary indicates the former Bunkerville allotment.

10 Q.   Now, how about with respect to the new Court orders?

11 A.   The new --

12 Q.   The trespass lands.  Excuse me.

13 A.   The new trespass lands expanded outside the former

14 Bunkerville allotment.

15 Q.   And what would they include on this map?

16 A.   They would include the area outside of that former

17 Bunkerville allotment where the cattle are trespassing or

18 indicated to be trespassing.

19 Q.   Now, I'd like to just use my finger here and draw a circle

20 around this area of the map which appears to be a small square

21 on that map.  What does that represent?

22 A.   That square outlined in a -- kind of a pink color

23 represents Cliven Bundy's private property.

24 Q.   Now, when you say "private property," what -- what do you

25 mean by that?  What does that signify?

Rand Stover - Direct

1  A.   That was a -- private property owned by Mr. Cliven Bundy,

2  his private residence.

3  Q.   And do you recall how many acres approximately he owned?

4  A.   I believe it was approximately 160.

5  Q.   And how many acres surround his private property that

6  belong to the federal public lands that are affected by the two

7  Court orders?

8  A.   Say it again.

9  Q.   Sure.  We talked about the new trespass lands and the old

10  trespass lands.

11  A.   Correct.

12  Q.   How many acres comprised that area?

13  A.   It was approximately 578,000 acres.

14  Q.   570,000?

15  A.   578,000.

16  Q.   Now, this area toward the bottom here I'm circling on the

17  map for you, what is that area depicted as?

18  A.   The area shaded in purple and adjacent to the blue body of

19  water that is National Park Service land and the Lake Mead

20  National Recreation Area.

21  Q.   Is the Virgin River depicted on this map as well?

22  A.   Yes, it is.

23  Q.   And what is that -- where is that located on that map?

24  A.   Can I draw on this?

25  Q.   Yes, if you just hit up in the right-hand corner.  You are

1   going to see a little -- like a pencil there.

2               So the record should reflect that the witness has

3   drawn a line extending north from the Lake Mead area, north and

4   to the east.

5               And what color is that depicted on there?

6   A.   The red line I -- on the map is approximately where the

7   Virgin River is.

8   Q.   Okay.   Thank you.   If you could clear that for us, please.

9               Where is Mesquite located on this map?

10  A.   There you can see Mesquite labeled on the map.

11  Q.   And that's north and east of the Bundy property?

12  A.   Correct.

13  Q.   And it's toward the Nevada -- is that the Nevada/Arizona

14  state line?

15  A.   Yes.

16  Q.   And, of course, Las Vegas is to the south; is that

17  correct?

18  A.   That's correct.

19  Q.   If we could enlarge the area where the dots are for a

20  minute, please.

21              Now we see that these dots extend all over the --

22  sort of that area.   Can you give us a sense of just the scope

23  of the geographical area encompassed by these dots as

24  represented on this map?

25  A.   Sure.   So that -- the area encompassed by those dots,

Rand Stover - Direct

1  which represent areas where the cattle were located, is

2  approximately 578,000 acres.

3  Q.   Right.  But how many -- how many miles does that -- does

4  that area, from the Bundy Ranch, for example -- if we were to

5  draw a circle around all these red dots, what would be the

6  radius of that?

7  A.   I don't know that.

8  Q.   Okay.  How far is it to Lake Mead from the Bundy residence

9  approximately?

10 A.   I don't know.

11 Q.   Okay.  More than 10 miles?

12 A.   Yes.

13 Q.   Okay.  Now, in terms of the planning for this operation,

14 given the distribution of cattle and given the area over which

15 it was, did you then have to choose a site to conduct the

16 impoundment operations?

17 A.   We needed a -- we needed a base of operations, yes.

18 Q.   Now, what was your general concept in terms of how you

19 were going to go about collecting these cattle?

20 A.   The -- the BLM knew that we did not have enough employees

21 that were well-versed in this area to do it themselves as an

22 agency.  So the BLM went through a regular government

23 contracting process to hire an outside contractor to assist

24 with the impound operation.

25 Q.   So you were going to use a private contractor to help

Rand Stover - Direct

1  gather the cattle?

2  A.   Correct.

3  Q.   What is the terrain like in the area that we see on the

4  map?

5  A.   Generally, it's -- it's arid desert terrain.  It's a very

6  vast area, quite rugged country, with some pretty high

7  elevation areas relative to the Virgin River base.

8  Q.   Are these -- obviously, these dots represent the cattle,

9  their distribution.  But are they all together in one group or

10  are they spread out over this terrain?

11  A.   No, they were spread out over that terrain.

12  Q.   So, in terms of hiring contractors, what type of

13  capability do they need in order to conduct an impoundment

14  operation given this situation?

15  A.   The contractors had to be able to use personnel on

16  horseback and helicopters, and also they needed to be able to

17  have trucks and trailers to transport the cattle.

18  Q.   So did you then -- understanding that you would need to

19  use trucks and trailers and so forth, then did you select a

20  site where you would conduct the impoundment operation from?

21  A.   Yes.  We selected a central location to -- to set up a

22  base of operations.

23  Q.   And the base of operations, where was that going to be

24  located?

25  A.   We -- the BLM selected a location called the Toquop Wash.

Rand Stover - Direct

1    Q.   And if I could ask you to turn to Exhibit 329 in the

2    notebooks, please.  Have you got that?

3    A.   I do.

4    Q.   Yeah.  Could you tell us what Exhibit 329 is?

5    A.   That's an overview depiction of the Toquop Wash and

6    Interstate 15.

7    Q.   And is that the general location of the impoundment site

8    or the area where you were conducting impoundment operations?

9    A.   Yes.

10   Q.   And it's a fair and accurate depiction as it appeared in

11   April of 2014?

12   A.   Yes, it is.

13            MR. MYHRE:  Your Honor, we offer Exhibit 329.

14            THE COURT:  Any objection to 329?

15            MR. TANASI:  No objection from Mr. Stewart.

16            MR. MARCHESE:  None from Parker.

17            MR. MYHRE:  May we publish?

18            THE COURT:  Mr. Leventhal?

19            MR. LEVENTHAL:  No, Your Honor, on behalf of

20   Mr. Drexler.

21            MR. ENGEL:  No from Engel.

22            MR. PEREZ:  No on behalf of Mr. Lovelien.

23            MR. JACKSON:  No objection from Mr. Burleson.

24            THE COURT:  Thank you.  So, Exhibit 329 will be

25   admitted, and you may publish it.

Rand Stover - Direct

1        (Exhibit 329 admitted.)

2            MR. MYHRE:  Thank you, Your Honor.

3   Q.   And just generally looking at Exhibit 329, this -- we see

4   here on this map -- we see the Interstate 15; is that correct?

5   A.   That's correct.

6   Q.   Where were you going to -- well, first of all, show the

7   area of the Toquop Wash if you would.

8   A.   This line here would represent the general flow of the

9   Toquop Wash.

10  Q.   And the witness has drawn a red line from the top to

11  bottom of the screen outlining the general vicinity of Toquop

12  Wash.

13            Where was the actual area where the impoundment

14  operations would be conducted?  Where was that located?

15  A.   We chose this area here as the location for our base of

16  operations.

17  Q.   And the witness has indicated with a circle drawn on

18  Exhibit 329 about approximately middle of the top of the page.

19            And if I could ask you if you could clear that for

20  me, please.  How -- how would one gain access to that

21  particular area?

22  A.   There were two primary ways to access the area.  If you

23  were traveling from Mesquite, you would travel on southbound

24  Interstate 15.

25            Now, as you can tell from this map, Interstate 15

1   runs more in an east/west direction here, but it's still

2   considered north or southbound Interstate 15.  So if you were

3   coming from Mesquite, you would travel on southbound Interstate

4   15 and exit right there.

5   Q.   Okay.  The witness has drawn a red line approximately

6   where the entrance is to the -- off of 15 about three-quarters

7   of the way down the page and a little bit left of center.

8            What is the second means of access?

9   A.   The second means would be if you were coming from the Las

10  Vegas area, you would travel on northbound Interstate 15.  You

11  would have to cross over the median here and into the main

12  entrance to the -- to the Toquop Wash area.

13  Q.   Thank you.  And the witness has indicated with a red line

14  that route of entrance as well.  Again, about three-quarters of

15  the way down the page to the left of center.

16           Now, if you would clear that.  Now, where the 15

17  crosses over the area of the Toquop that you indicated, is that

18  a natural access into that area?

19           MR. LEVENTHAL:  I'm going to object as to "natural,"

20  Your Honor.  I don't know what that means.

21           THE COURT:  Do you want to rephrase that?

22  BY MR. MYHRE:

23  Q.   Sure.  Is that an access -- a means of access to that

24  area?

25  A.   It could be, yes.

Rand Stover - Direct

1    Q.   Is it normally accessible by automobile?

2    A.   It would depend on the terrain.  The terrain changes if

3    there's a storm.  But it -- it potentially could be accessed by

4    an automobile.

5    Q.   Well, I asked a poor question.  I apologize.

6             Is that area under that bridge, is that -- is that

7    improved surface, unimproved surface, something you would

8    expect for just normal, everyday vehicles?

9    A.   No.  And a normal street vehicle would not access the area

10   through that direction.

11   Q.   Now, in selecting this particular site, did you have in

12   mind how security would be provided for the site?

13   A.   Yes.

14   Q.   And what was the general concept in terms of providing

15   security for the site?

16   A.   The general concept was that this area was enclosed or

17   encompassed in part of the closed area for the operation, and

18   it would need to be secured by -- by controlling the access

19   points so unauthorized individuals didn't come into that area

20   while we were operating.

21   Q.   Now, if I could ask you to look at Exhibit 328 in the

22   book, please.

23   A.   Okay.

24   Q.   And do you see that before you?  What is depicted in

25   Exhibit 329?

1  A.    That's a bit of a closer-up view from the previous exhibit

2  we were looking at, and it shows the -- the gravel pit area of

3  the Toquop Wash where we set up our base of operations.

4             MR. MYHRE:  Okay.  Your Honor, we would offer

5  Exhibit 328 as well.

6             THE COURT:  Any objection to Exhibit 325 [sic]?

7             MR. TANASI:  No objection from Mr. Parker, Your

8  Honor.  Mr. Stewart, Your Honor.

9             MR. MARCHESE:  None from Parker.

10            MR. LEVENTHAL:  None from Mr. Drexler.

11            MR. ENGEL:  None from Engel.

12            MR. PEREZ:  None from Lovelien.

13            MR. JACKSON:  No objection from Mr. Burleson.

14            THE COURT:  All right.  Exhibit 325 will be admitted.

15            MR. MYHRE:  Exhibit 328, Your Honor.  I'm sorry.  I

16  may have misspoken.

17            THE COURT:  Oh, 328.  Any objection to 328?

18            MR. TANASI:  No objection from Mr. Stewart, Your

19  Honor.

20            MR. MARCHESE:  None from Parker.

21            MR. LEVENTHAL:  No, Your Honor.  Not from

22  Mr. Drexler.

23            MR. ENGEL:  None from Engel.

24            MR. PEREZ:  None for Mr. Lovelien.

25            MR. JACKSON:  None from Mr. Burleson.

Rand Stover - Direct

1          THE COURT:  All right.  So Exhibit 328 will be

2    admitted.

3          MR. MYHRE:  Thank you, Your Honor.  May we publish?

4          THE COURT:  Yes, you may.

5      (Exhibit 328 admitted.)

6    BY MR. MYHRE:

7    Q.   As you mentioned, Agent Stover, this is more of a close-up

8    of the area where the impoundment was going to be conducted.

9    You mentioned this was a gravel pit area, so I was going to ask

10   you, what is just the general makeup of the terrain in this

11   area?

12   A.   Most of that terrain there in the -- in the -- the

13   semi-gray shaded area was a flat -- mostly flat, level, graded

14   area consisting of gravel and dirt.

15   Q.   And there were no -- nothing, at least in this exhibit,

16   depicts any permanent structures of any sort?

17   A.   No.  There are a few berms of gravel kind of pushed up

18   that you can see, but there were no permanent structures.

19   Q.   And was there -- were there any utilities there, for

20   example, water, or electricity, or anything of that nature?

21   A.   No.

22   Q.   So in order to conduct this operation, what would you have

23   to do in order to use buildings or use structures in this

24   particular area?

25   A.   The BLM had to bring in temporary buildings, portable

Rand Stover - Direct

1    toilets, generators, lights, things of that nature.

2    Q.   How far was this site located from where Mr. Bundy's

3    property was located as we saw in the previous map?

4    A.   The entrance to the Toquop Wash off of Interstate 15, as I

5    was describing, to Mr. Bundy's property is about 7 miles.

6    Q.   Was that a factor -- that is the distance from Mr. Bundy's

7    property, was that a factor in choosing this particular site?

8    A.   Yes.

9    Q.   And how was it a factor?

10   A.   It was one of the factors that we considered, because we

11   knew that this issue had been going on for a long time, that

12   there were contentious issues with this issue, and we did not

13   want to set up a base of operations right next to where

14   Mr. Bundy's residence was located.

15           We wanted to make every consideration we could for

16   the Bundy family to set up our base of operations a distance

17   away from their private property.

18   Q.   Was it part of the plan that you would be collecting or

19   gathering cattle from Mr. Bundy's property?

20   A.   That was part -- not from his private property, no.

21   Q.   So it would not -- your operation would not affect his

22   private property; is that correct?

23   A.   No, it would not.

24   Q.   It would only -- and in terms of your concept of

25   operation, not in terms of just the -- what actually occurred,

1    but in terms of the concept of operations, did any of those

2    concepts include entering upon Mr. Bundy's property?

3    A.    No.

4    Q.    Now, this area that's depicted on 328, is this high ground

5    or low ground?

6    A.    That's relatively low ground compared to the surrounding

7    area.

8    Q.    In terms of providing security for that, is that an

9    advantage or disadvantage for providing security?

10   A.    Generally speaking, securing low ground is a disadvantage.

11   Q.    And why is that?

12   A.    Because there are several elevated points around you where

13   people could see down into the base of operations, it's not as

14   ideal as securing an area of higher ground.

15   Q.    Okay.  And you knew that going into this particular

16   operation?

17   A.    Yes.

18   Q.    Knowing that, why would you still choose to use the lower

19   ground here?

20   A.    Well, there were several factors that led to us choose

21   this site, and some of the factors we could not -- not every

22   factor was ideal, so we had to weigh the -- a balance of the

23   various needs of the operation.

24   Q.    Where this site is located in 328, is this easily seen

25   from the Interstate 15, for example?

Rand Stover - Direct

1   A.   You -- if you are driving at freeway speed past this area,

2   you see it for -- for a brief moment as you pass by.

3   Q.   Would you call it -- would you describe it as conspicuous

4   or inconspicuous from the freeway?

5   A.   I would generally characterize it as inconspicuous.

6   Q.   Okay.  I'd like to talk then a little bit about the plan

7   itself, your security plan, not only for this site but for the

8   operation.  Okay?

9   A.   Okay.

10  Q.   You talked about the concept of using contractors.  Who

11  would provide security for the contractors?

12  A.   The various federal law enforcement agencies that were

13  assigned to the operation would provide security for the

14  contractors.

15  Q.   And who would -- what agencies were going to be assigned

16  to security?

17  A.   We had BLM law enforcement officers and National Park

18  Service law enforcement officers as well as a small number of

19  US Forest Service law enforcement officers.

20  Q.   Where were Park Service officers assigned to this

21  operation?

22  A.   Some of this operation involved cattle that had encroached

23  on to National Park Service land around the Lake Mead National

24  Recreation Area.  So some of their lands were affected.

25  Q.   So, because those lands were affected, then they were

Rand Stover - Direct

1  involved as well?

2  A.   That's correct.

3  Q.   How many officers did you estimate you would need for this

4  to provide security for this operation?

5  A.   Well, we had approximately 83 BLM law enforcement

6  officers, approximately 23 Park Service law enforcement

7  officers, three Forest Service officers, and then for a few

8  days during the operation, there were also approximately 25 FBI

9  officers, special agents.

10 Q.   All right.  So, that's well -- that's over 100 law

11 enforcement officers; is that correct?

12 A.   Correct.

13 Q.   Okay.  Did you believe that was too many, insufficient,

14 just right?  What was your estimate based on for your planning?

15 A.   Well, based on all the planning that we did, I personally

16 felt that it was low, but it was what we had, and that's -- and

17 that's what we built the operation around.

18 Q.   When you say "that is what we had," what are you referring

19 to?

20 A.   Those were the personnel that were available.

21 Q.   Well, how many law enforcement officers are there within

22 the BLM?

23 A.   Well, if we are -- if BLM is fully staffed, which to my

24 knowledge, since I've been with the BLM in 2009, we have never

25 been fully staffed.  We would have -- if we were fully staffed,

Rand Stover - Direct

1   we would have 200 and -- approximately 254 uniformed rangers

2   and approximately 90 special agents.

3   Q.   So, and that covers the -- that number of officers covers

4   the 245 plus million acres you talked about before?

5   A.   Yes.  Correct.

6   Q.   So of the 83 of BLM resources, that included both special

7   agents and rangers; is that correct?

8   A.   It did, yes.

9   Q.   Did they all come from the state of Nevada or did they

10  come from elsewhere?

11  A.   They came from various states.

12  Q.   How were they assigned to this operation?

13  A.   Some of them were -- we asked for volunteers.  Some of

14  them volunteered.  Others were assigned by their supervisors.

15  Q.   With respect to the Park Service, where did they come

16  from?

17  A.   They came from various states in the Western Region as

18  well.

19  Q.   So is it -- is it fair to say that the vast majority of

20  people involved in this did not have that much familiarity with

21  the area?

22  A.   That's fair to say, yes.

23  Q.   Now, in order to effect the operation, you talked about

24  hiring contractors.  Did you, in fact, enter -- did you, being

25  the BLM -- did the BLM actually enter into a contract with an

Rand Stover - Direct

1    organization to collect the cattle or gather the cattle?

2    A.    Yes, the BLM did.

3    Q.    And who did they contract with?

4    A.    They contracted with a company call Sampson Livestock.

5    Q.    And Sampson Livestock is located where?

6    A.    In Utah.

7    Q.    Now, once the cattle were collected, how were you going to

8    dispose of them?

9    A.    The cattle would be -- would be transported to an auction

10   facility in Utah.

11   Q.    And did the BLM enter into a contract with that auction

12   facility?

13   A.    They did.

14   Q.    And what was the name of that facility?

15   A.    It's -- the name of the facility is 'R' Livestock

16   Exchange.

17   Q.    And you said 'R' Livestock was located in Utah; is that

18   correct?

19   A.    That's correct.

20   Q.    Were both of these contracts in place then before April of

21   2014 when the operation actually began?

22   A.    Yes, they were.

23   Q.    Now, when cattle were to be gathered and collected off of

24   the public lands, did the -- how would the contractors go about

25   finding out where they are going to be finding -- locating

Rand Stover - Direct

1    these cattle and gathering them?

2    A.   Well, as the operation was about to start, the contractors

3    did three-days' worth of aerial and ground surveillance, for

4    lack of a better term, to make a best guess estimate of where

5    the cattle would be when we started operating.

6    Q.   Was there a -- did they publish a plan or were there

7    discussions in terms of where they would be operating and when

8    they would be operating?

9    A.   I'm sorry.  I don't understand the question.

10   Q.   Sure.  So, you said they did this aerial surveillance;

11   right?  Located the cattle?

12   A.   Correct.

13   Q.   Okay.  From there, was there any planning done in terms of

14   how they would go about -- excuse me -- when and where they

15   would do the collection?  Was that something they discussed

16   every day, or was there, like, a written plan?

17   A.   Yes, it was discussed.  They had a daily briefing amongst

18   the contractors and the BLM representative that was working

19   directly with the contractors.  And they would make a

20   determination on where they would operate on any given day.

21   Q.   Now, once that determination was made, how would security

22   be provided for these contractors?

23   A.   Once the contractors decided where they wanted to operate,

24   the BLM representative that was working closely with them would

25   come to me and let me know the area, the general area of

Rand Stover - Direct

1    operation, and then it was my job to develop a security plan

2    for that area where they were going to be working on that

3    particular day.

4    Q.   Now, I want to talk a little bit about in terms of

5    physical security on the ground.  How would these be done?

6    How -- would the officers accompany the contractors to the

7    field?

8    A.   Yes, the -- we had officers that were assigned to escort

9    the contractors in to and out of the operational area every

10   day.

11   Q.   Did you develop a plan for concentric rings of security?

12   A.   I did.

13   Q.   What was that plan?

14   A.   The general plan of our security operation was to -- to

15   have concentric rings of security.  In -- on a typical day, the

16   contractors would identify an area where they wanted to gather

17   cattle, and they would estimate approximately how far out

18   distance-wise that they could gather cattle.

19        They would set up an area known as a temporary trap

20   site, meaning that's where they were going to try and get the

21   cattle to congregate and load them into -- load them into

22   trucks.  So, we developed concentric rings of security around

23   that designated temporary trap site.

24   Q.   So, a trap -- you had mentioned the word "trap site."  Is

25   this like a trap we see for wild game, or is it a corral, or

Rand Stover - Direct

1   what exactly do you describe as a trap site?

2   A.   No, what they did was they used temporary cattle fencing.

3   They would set up panels.  Or if there was an existing historic

4   corral out in that area, they might use that.  But they would

5   set up, most often, temporary cattle fencing to move the cattle

6   into and get them to congregate into one spot.

7   Q.   Would they use anything to attract the cattle to this

8   area?

9   A.   I'm sorry.  To track?

10  Q.   Sure.  Would they -- would they use bait for the trap

11  site?

12  A.   The contractors did do what's called bait trapping on

13  occasion.

14  Q.   Okay.  So, once -- just so we can conceptualize this --

15  how this trap system worked.  Why were traps used as opposed to

16  just going out there and roping the cattle and bringing them

17  in?

18  A.   Well, these cattle were not domesticated cattle.  They

19  were not used to human contact as you might think of most --

20          MR. MARCHESE:  Objection.  Foundation.

21  BY MR. MYHRE:

22  Q.   Were you, as part of --

23          THE COURT:  You can reask it.

24  BY MR. MYHRE:

25  Q.   As part of your planning process -- as part of your

Rand Stover - Direct

1   planning process, did you consult with the contractors about

2   the nature of these cattle?

3   A.   I did.

4   Q.   And were you -- as a result of that consultation, were you

5   familiar with how these cattle behaved?

6   A.   I was informed by the contractors a general idea of how

7   they behaved.

8              MR. JACKSON:  Objection.  Hearsay.

9              MR. MYHRE:  It wasn't offered for the truth of the

10  matter asserted, Your Honor.  It was his understanding as to

11  the nature of these cattle.

12             MR. MARCHESE:  Your Honor, that's --

13             THE COURT:  Mr. Marchese.

14             MR. MARCHESE:  The understanding of the nature of the

15  cattle is not an exception to hearsay rule.  It is offered for

16  the truth of the matter asserted.

17             MR. MYHRE:  It's whatever he understood, Your Honor.

18  We're trying to advance proof of what the security plan was and

19  why it operated the way it did.  And this agent is the direct

20  planner in that, so his understanding of what he had to prepare

21  for is -- is relevant.

22             THE COURT:  All right.  So I will admit it as

23  evidence of the effect that this information had on the hearer

24  of the information, which is the witness, not whether or not --

25  it's not offered for the truth of the matter asserted, but it

Rand Stover - Direct

1    is offered for the effect that it had on this particular person

2    who was in charge with planning something, and so in order to

3    establish what it was he did and why.

4            MR. MYHRE:  Thank you, Your Honor.

5    Q.   So, moving forward, we -- you talked about the corral; the

6    trap site if you will.

7            Now the concentric rings, how close and or far away

8    from the corral what the first inner ring be?

9    A.   It varied from day to day depending on the terrain of

10   where the contractors was going on operate.

11   Q.   And what would be the variance?  Would it be -- would they

12   be close in?  Far away?

13   A.   The general rule we tried to follow was that the inner

14   ring of security would be fairly close in close proximity to

15   where the actual trap site was.

16           The middle ring of security would be approximately 1

17   to 2 miles out from the trap site dictated by terrain.

18   Sometimes it was a little less.  Sometimes it was a little

19   more.

20           The outer ring of security would be pushed out to

21   where major potential access points into that area would --

22   were located whether it be a paved road, or a major gravel

23   road, or a scenic byway, or something to that effect.

24   Q.   So what was then the purpose of the -- you discussed that

25   they were near or located near egress and ingress areas.  What

Rand Stover - Direct

1    was their purpose?

2    A.   Their purpose was primarily to educate people that the

3    area was closed, that there was a cattle gather operation going

4    on, that there was a temporary closure order in place, and to

5    ask them to depart the area while -- for their own safety while

6    this was going on.

7    Q.   And with respect to the second ring in from that, what was

8    their purpose?

9    A.   Their purpose was in the event that someone, whether

10   knowing or unknowing, got past the outer ring of security and

11   got a little bit closer, the inner ring of security, their job

12   was to try and intercept them on their course of travel.  Stop

13   them.  Again, educate them.  Let them know what was going on,

14   that they couldn't come into the area because of the trapping

15   operation, and for safety concerns, and to prevent them from

16   getting any closer to where the cattle were being trapped.

17   Q.   So, and the last ring was -- what was their purpose?

18   A.   The last ring was the -- the last ring of security closest

19   to where the cattle operation was, that was the -- essentially

20   the last line of security defense, if you will.

21          And if somebody were to get past those first two

22   rings of security, that inner ring would also do the same

23   thing.  It would try and stop people from encroaching into

24   where the cattle were operating, to keep them away from the

25   contractors, the employees that were working there, the cattle

Rand Stover - Direct

1    that may be in the trapping location.

2    Q.   Now, how many officers -- combined for these three rings,

3    how many officers would typically be assigned to that detail?

4    A.   Oh, for the inner ring of security, we had approximately

5    four individuals.  The intermediate ring of security was, I

6    believe, 12, approximately 12 officers.  And the outer ring of

7    security was also probably approximately 10 to 12 officers.

8    Unless there were more ingress/egress routes and we needed more

9    officers to cover them, we would add more.

10   Q.   So it a fair estimate between 20 to 30 officers depending

11   on where they are operating?

12   A.   I think that's probably a fair estimate.

13   Q.   Now, I want to talk a little bit about the actual

14   commencement of the operation.  And we talked about -- you

15   mentioned closure orders or closure of the land.

16          When you say that the area is "closed" what is --

17   does that have a particular specific meaning to the BLM and to

18   those involved with public lands?

19   A.   It does.

20   Q.   And what is that meaning?

21   A.   Well, under the BLM regulations and the Code of Federal

22   Regulations, the BLM -- an authorized officer of the BLM has

23   the authority to temporarily close an area of public lands for

24   public safety purposes, to provide for the safety of the

25   public, or the safety of government employees, or the safety of

Rand Stover - Direct

1    contractors that might be working in the area.

2    Q.   When you say they close it to the public, does that mean

3    the public just can't go in?

4    A.   It would depend on the particular situation.  But

5    sometimes it does mean that, yes.

6    Q.   For this situation, with the 500,000 acres we were talking

7    about, was there a closure order issued?

8    A.   Yes, there was.

9    Q.   Okay.  Where was that -- where could the public find that

10   order?

11   A.   The -- the order was published in the Federal Register.

12   It was also available at the controlling BLM --

13           MR. MARCHESE:  Objection.  Hearsay.

14           MR. MYHRE:  It's a matter of public record, Your

15   Honor.

16           THE COURT:  Overruled.

17   BY MR. MYHRE:

18   Q.   Where could they -- where could the public find this

19   order?

20   A.   They could find it at the local BLM office.  They could

21   also find it on the BLM website.

22   Q.   Now, with respect to the impoundment operation of 2014,

23   was -- what was the duration for this particular closure?

24   A.   The temporary closure order went into effect on

25   March 27th, 2014, and was scheduled to expire May 12th of 2014.

Rand Stover - Direct

1   Q.   So, about six weeks or so?  Somewhere in there?

2   A.   Correct.

3   Q.   Well, with respect to this particular closure, you've

4   discussed how the gather would move from place to place or at

5   least that was the plan; correct?

6   A.   That's correct, yeah.

7   Q.   Did the closure order apply just to the area where they

8   were gathering or to the entire area?

9   A.    It was listed in the closure order that it would be

10  enforced in -- only in the areas where the operation was taking

11  place.  Because it was such a vast area, even though all

12  578,000 -- approximately 578,000 acres were listed in the

13  closure order, it specifically said that the enforcement of

14  that closure order would -- would be primarily enforced in the

15  areas where the -- where the operation was occurring on any

16  given day.

17  Q.   Now, in connection with an impoundment operation such as

18  this, before you start, do you also issue a notice to the

19  public that you will be conducting an impoundment operation?

20  A.    Yes.

21  Q.   If you'd look at Exhibit 8 for me, please.

22  A.    Okay.

23  Q.   What is Exhibit 8?

24  A.   Exhibit 8 is a Notice of Intent to Impound Unauthorized

25  Livestock.

1   Q.   The date?

2   A.   It's dated March 19th, 2014.

3   Q.   And does this apply to the impoundment of Mr. Bundy's

4   cattle?

5   A.   It does.

6   Q.   And was this generally published to the public?

7   A.   It -- yes, it was.

8            MR. MYHRE:  Your Honor, we offer Exhibit 8.

9            THE COURT:  Any objection to Exhibit 8?

10           MR. TANASI:  No objection from Mr. Stewart, Your

11   Honor.

12           THE COURT:  Mr. Marchese?

13           MR. MARCHESE:  Same objection, Your Honor.  I think

14   there's been a lack of foundation.  I don't think this

15   individual -- he's not the author of this particular document.

16   He doesn't have the personal knowledge to testify as to its

17   authenticity.

18           THE COURT:  Mr. Myhre.

19   BY MR. MYHRE:

20   Q.   Do you have personal knowledge of Exhibit 8?

21   A.   During the planning process, I was shown this document by

22   the -- some of the civilian staff at the Southern Nevada

23   District Office -- the BLM Southern Nevada District Office.

24   Q.   And you testified that your understanding was that this

25   notice of intent would have to be published before you could

1    commence your operations; is that correct?

2    A.    That's correct.

3    Q.    So this would have been a document necessary for you to

4    conduct the impoundment operation?

5    A.    It's consistent with the regulations that the BLM operates

6    under, yes.

7              MR. MYHRE:  Your Honor, we still offer Exhibit 8.

8              THE COURT:  All right.  Anyone else have an

9    objection?  Mr. Leventhal?

10             MR. LEVENTHAL:  No objection on behalf of

11   Mr. Drexler.

12             MR. ENGEL:  No objection from Engel.

13             MR. PEREZ:  No objection on behalf of Lovelien.

14             MR. JACKSON:  Just objection as to relevance as to my

15   client.

16             THE COURT:  The objections are overruled.  Exhibit 8

17   is admitted.

18        (Exhibit 8 admitted.)

19   BY MR. MYHRE:

20   Q.    And if I could, again, just direct your attention -- oh,

21   may I publish, Your Honor?

22             THE COURT:  Yes, you may.

23             MR. MYHRE:  Thank you.

24   Q.    In directing your attention to page 2, do you see about

25   the third paragraph down, is that -- do you see that paragraph?

Rand Stover - Direct

1    A.    Yes, I do.

2    Q.    And are those the areas that are affected by the

3    impoundment operation?

4    A.    Yes.  They are.

5    Q.    Now, at the bottom, it states that a map shows the areas

6    subject to this impoundment may be obtained by contacting the

7    BLM.  Is that correct?

8    A.    That's correct.

9    Q.    So, if someone -- if a member of the public wanted to know

10   what this was all about, they could -- could they go to a

11   particular office of the BLM?

12   A.    They could.  They could go to the office that's listed

13   there on that -- on that paper.

14   Q.    And if they went to that office, would they be able to

15   obtain this document we're looking at?

16   A.    Yes.

17   Q.    Turning to page 3.  Now, there appears to be a number of

18   locations on page 3.  Do you see that?

19   A.    I do.

20   Q.    It says US Post Office locations and courthouse locations;

21   is that right?

22   A.    That's correct.

23   Q.    And what is -- what does this portion of the notice refer

24   to?

25   A.    This refers to physical locations where a copy of this

1    notice of intent to impound were physically posted.

2    Q.   So if a member of the public went to one of the locations

3    listed on page 3, they would be able to find a copy of this

4    document?

5              MR. LEVENTHAL:  Your Honor, I am going to object as

6    to first-hand knowledge of actually where these were.  He

7    indicated that he saw this later on when he was putting his

8    operational plan together, not as to each and every individual

9    that he's now testifying to whether this was there.

10             THE COURT:  You can ask him if he can lay a

11   foundation for the availability of these documents.  We know

12   that he saw it himself, and I'm letting the -- I'm admitting

13   it, because this is the document that he's testifying that he

14   said that he used during the operation.

15             But as far as whether -- where it's available, which

16   library, which website, if he knows, that's okay.  But just

17   generally that's not sufficient.

18   BY MR. MYHRE:

19   Q.   Well, Agent, is -- looking at this list, in the normal

20   course of business, would -- the notice of impoundment has to

21   list where it's going to be published, or excuse me, posted; is

22   that correct?

23             MR. MARCHESE:  Objection.  Leading.

24             MR. MYHRE:  Well, I'm trying to lay the foundation,

25   Your Honor.  I'm not certain this is absolutely critical

1    testimony.  It seems rather pedestrian, but I can rephrase.

2              THE COURT:  All right.  Go ahead and rephrase.

3    BY MR. MYHRE:

4    Q.   So looking at page 3, do you see these locations there?

5    A.   Yes, I do.

6    Q.   Okay.  Are you personally aware of whether this document

7    was posted at these particular locations?

8    A.   I did not visit these locations to see them physically

9    posted.

10   Q.   All right.  Now, in the normal course of business, would a

11   document like this list these locations if they weren't going

12   to be posted there?

13   A.   No.

14   Q.   Now, turning to the next page, page 4, it says "Mesquite

15   Local News Proof of Publication."  What is this document?

16   A.   It's -- this document indicates that a lady named Stacey

17   Lewis authorized the -- this document was published on behalf

18   of the Bureau of Land Management in the Mesquite local news.

19   Q.   So in addition to physical locations -- this document

20   being posted -- would it also have to be published in

21   publications available to the public?

22   A.   Yes.

23   Q.   Now, did BLM make any attempts -- aside from in the notice

24   that we just talked about and the closure order, were there any

25   attempts to reach out, on your behalf, to the Bundy family?

Rand Stover - Direct

1  That is for BLM to reach out to the Bundy family that you are

2  aware of?

3  A.   Yes.

4  Q.   Yes.  And so -- and did they -- did the BLM attempt to

5  reach out to the Bundy family to let them know that an

6  impoundment operation would be commencing in their area?

7           MR. LEVENTHAL:  I am going to object, Your Honor.

8  He's being asked about what BLM has done not what he's

9  personally done.

10          THE COURT:  Sustained.  If it's something that he, in

11  the ordinary course of his duties, needs to know about before

12  he takes the next step, then maybe he has some personal

13  information.  Otherwise, I think it is hearsay at this point.

14          MR. MYHRE:  Thank you, Your Honor.

15 Q.   So as the Operations Security Chief -- excuse me --

16 Operations Section Chief for the impoundment operation, did you

17 supervise a number of law enforcement officers?

18 A.   I did.

19 Q.   And as part of those supervisory responsibilities, did

20 you -- did you become aware of any attempts to reach out to the

21 Bundy family members?

22 A.   Yes.

23 Q.   And were these attempts made by people who directly worked

24 for you?

25 A.   Yes.

Rand Stover - Direct

1    Q.   And did they report back to you?

2    A.   Yes.

3    Q.   And did you receive reports back that they attempted to

4    reach out to the Bundy family?

5    A.   Yes.

6    Q.   And did you receive reports back as to whether or not the

7    attempts to reach out to the Bundy family members were well

8    received or not well received?

9           MR. MARCHESE:  Objection.  Hearsay.

10          MR. MYHRE:  Again, showing the effect on the

11   listener, Your Honor.  To show what steps he would take in

12   connection with providing security operations.

13          THE COURT:  Overruled.  You may go ahead and answer

14   the question.

15          THE WITNESS:  Yes, it was not well received.

16   BY MR. MYHRE:

17   Q.   Now, in conducting an operation of this type and providing

18   security for an operation of this type, would you normally put

19   together or create a threat assessment?

20   A.   Yes.

21   Q.   And what is a threat assessment?

22   A.   In general terms, it's an analysis of the potential for

23   interference or impedence of the operation weighed against all

24   the factors that were available to us at that time.

25   Q.   And you talked about earlier some of the information that

Rand Stover - Direct

1    you would access for conducting this threat assessment;

2    correct?

3    A.   Correct.

4    Q.   Now, did you have members -- assigned to your staff or the

5    staff of the impoundment operation -- who would be responsible

6    for gathering this information to compile to create a threat

7    assessment?

8    A.   Yes.

9    Q.   Would this be a living document or a living process or

10   would it just be a single point in time?

11   A.   It was an ongoing process until a certain point, and then

12   it had to be finalized before we went operational.

13   Q.   Now, before going operational, what was -- how would you

14   normally characterize a threat of an area or a threat to an

15   operation?  What are the various categories of threats?

16   A.   Well, in this particular operation, we looked at three

17   categories.  We looked at potential threats that -- that might

18   come from Mr. Bundy or his immediate family or relatives in the

19   local area.

20        We looked at potential threats that might come from

21   outside entities or outside groups.  And we looked at potential

22   threats that might come from antigovernment extremist-type

23   groups or animal activist-type groups, animal rights groups.

24   That sort of thing.

25   Q.   And in terms of coming to a level of threat, do you

Rand Stover - Direct

1    evaluate it by intensity?  By some other means?

2           So in other words, is it -- do the terms "low-risk,

3    high-risk threat"?  Does that have any significance?

4           MR. LEVENTHAL:  Your Honor, it's leading.  All he has

5    to do is ask him what was the threat.

6           THE COURT:  Rephrase your question.

7           MR. LEVENTHAL:  Object as to leading.

8           MR. MYHRE:  Okay.

9           THE COURT:  Sustained.  Please rephrase.

10   BY MR. MYHRE:

11   Q.   So in assessing the threat or coming up with the threat

12   assessment, if you will, how do you categorize the threat?

13   A.   We used our threat assessment, and we -- the final rating

14   was either going to be a low, a moderate, or a high.  And

15   our -- the final threat assessment was rated at a moderate

16   level.

17   Q.   So when you say it was moderate, what does that mean to

18   you when conducting security operations?

19          MR. JACKSON:  I'm going to object, Your Honor.  What

20   moderate means is moderate.  There's no -- you can't, you know,

21   characterize what it means now any more than that.

22          THE COURT:  Overruled.  He can characterize what it

23   means if he's the person who assessed as moderate to explain

24   why it's moderate and not severe and not minor.

25

Rand Stover - Direct

1    BY MR. MYHRE:

2    Q.   So, again, the question is, what does that mean when you

3    say "We assessed it at a moderate level"?

4    A.   We assessed it at a moderate level meaning that on the

5    full spectrum of potential threats to the operation, low being

6    virtually no threat or minimal interference, high being an

7    absolute likelihood that some kind of interference or violent

8    encounter would occur, a moderate was in the middle, meaning

9    that there was definitely the possibility of interference with

10   our operation, but it could not be definitively classified as

11   absolutely going to happen.

12   Q.   I want to go back to one other concept that we talked

13   about with respect to the closure areas.

14          In conducting this operation, did you designate or

15   devise the areas known as First Amendment zones?

16   A.   Those were listed in the closure order, yes.

17   Q.   And what is a First Amendment zone?

18   A.   Those -- generally speaking, those were -- there were two

19   areas that were identified as being places in close proximity

20   to the area that was closed, the boundary of the area that was

21   closed, where members of the public, if they wished, could go

22   to those areas and potentially view some of the operational

23   activities, express their opinions, if they wished, see what

24   was going on and, at the same time, not be in violation of the

25   area that was closed.

Rand Stover - Direct

1   Q.   Were these First Amendment zones -- was this something

2   unique to this operation?

3   A.   No.

4   Q.   Are they used in other operations?

5   A.   Yes.

6   Q.   What's the purpose behind them?

7   A.   Generally speaking, similar to what I just described.

8   It's an opportunity to provide an area that's safe for the

9   public, or members of the media, or someone that might be

10  affected by the operation that could get close to an area that

11  was closed, by BLM regulations, but they could still be in an

12  area where they could potentially see what was going on and

13  view the activity.

14  Q.   Well, you mentioned it would be an area that was safe.

15  What were the safety considerations behind the First Amendment

16  zone?

17  A.   Well, we -- first of all, the general public could not be

18  in the closed area when operations were going on, simply

19  because we had contractors working in the area.  We had people

20  on horseback.  We had helicopters flying, and we did not want

21  to put the public at risk by moving them into the closed area

22  and having them too close to those employees working or

23  contractors working where they would be at risk.

24  Q.   Well, did you have trucks involved as well?

25  A.   Yes.

Rand Stover - Direct

1    Q.   So, in addition to helicopters, what -- how would the --

2    why would it be a safety issue for the trucks in a First

3    Amendment zone?

4    A.   Could you rephrase that?

5    Q.   Sure.  It was a poor question on my part.

6         Okay.  Were there safety considerations in connection

7    with the use of trucks during the impoundment operation?

8         MR. MARCHESE:  Objection.  It's leading.

9         THE COURT:  Well, he's already stated that there are

10   safety concerns.  We're just trying to figure out what they

11   are.

12        MR. MYHRE:  Trying to get to what they are.  Yes,

13   Your Honor.

14        THE COURT:  Overruled.  He can answer the question.

15        THE WITNESS:  Yes, there were concerns about the

16   trucks.

17   BY MR. MYHRE:

18   Q.   Okay.  The trucks, what was the -- how were the trucks

19   going to be used during the impoundment operation?

20   A.   The trucks would be used to transport the cattle that were

21   gathered at a particular trap site, from that trap site, back

22   to the base of operations, also called the incident command

23   post.

24   Q.   Okay.  And these trucks, are they big trucks or little

25   trucks?

Rand Stover – Direct

1    A.   They were -- some of them were trucks with horse trailers,

2    or most of them were trucks with horse trailers pulled behind

3    them.

4    Q.   And these trucks, what types of roads would they go over?

5    Would they go over paved, unpaved?  What types of roads?

6    A.   Well, they were -- they would have to try and go over

7    areas where the cattle were to be trapped, so some of them were

8    paved.  Some of them were not paved.

9    Q.   In the areas where they were trapped, would they be out in

10   the rural areas?

11   A.   Yes.

12   Q.   Would they be some distance from where the paved highways

13   were?

14   A.   They -- they could be, yes.

15   Q.   Were these First Amendment zones -- were they near or

16   close to these areas where these trucks would be traveling?

17   A.   They were -- they were very close to areas that the trucks

18   would be driving in and out of.

19   Q.   But what about in terms of out in the rural areas, the

20   unpaved areas?

21   A.   No, they were not close to those areas.

22   Q.   Okay.  Let's take a look at Exhibit 330, please.

23   A.   Okay.

24   Q.   Do you see 330?

25   A.   Yes.

Rand Stover - Direct

1    Q.   And what is this?

2    A.   That's an overview map of some of the general operational

3    area.

4    Q.   So, it depicts some of the operational area for your

5    impoundment operation?

6    A.   Yes, it does.

7    Q.   Does it show State Route 170?

8    A.   Yes.

9    Q.   And does it show the Interstate 15?

10   A.   Yes.

11   Q.   And would these be routes of travels for your convoy?

12   A.   Yes.

13   Q.   And by convoy, I mean for the trucks.

14   A.   Yes, that's correct.

15   Q.   Would trucks -- would these trucks, during the -- during

16   the impoundment operation, would they move, you know, together?

17   Would they move separately?  How -- what was the concept or the

18   plan for moving these trucks?

19   A.   The concept was that they would move together.  When they

20   were ready to go out and operate for the day, they would move

21   together.  And then when they were done operating for the day,

22   they would come back together.

23   Q.   Would there be officers providing security for those

24   trucks?

25   A.   Yes.

Rand Stover – Direct

1    Q.   Typically, how many trucks would be involved in a -- in

2    any -- on the average in a gather?

3    A.   It varied from day to day depending on how many cattle the

4    contractors thought they could gather that day and how many

5    trucks they thought they would need.

6    Q.   And when they gathered the cattle and put them in the

7    trucks, they would take them where?

8    A.   They would transport them back to the base of operations

9    or what we called the incident command post.

10   Q.   Okay.  And so 330 is a map that helps depict some of those

11   routes of travel; is that correct?

12   A.   That's correct.

13            MR. MYHRE:  Your Honor, we offer Exhibit 330.

14            THE COURT:  Any objection to Exhibit 330?

15            MR. MARCHESE:  None from Parker.

16            MR. TANASI:  None from Stewart, Your Honor.

17            MR. LEVENTHAL:  Only foundationally, Your Honor, on

18   behalf of Mr. Drexler.  I'd like to know foundationally when

19   these maps were created, if this is what he apparently used for

20   his operational plan, or are these created after the fact.  I

21   know he said --

22            THE COURT:  You can ask him that on

23   cross-examination.  He's laid some foundation.

24            MR. LEVENTHAL:  It's foundational.  I can't say

25   whether I object to it or not, because I don't know whether he

1    used these to determine whether or not he -- they were put in

2    his operational plan.  So it's a foundational question.

3              MR. MYHRE:  Well, perhaps I can just clear it up,

4    Your Honor.

5              MR. LEVENTHAL:  That would be great.  That's all I'm

6    asking.

7    BY MR. MYHRE:

8    Q.   Does this map, is it a fair and accurate depiction of that

9    area in April of 2014?

10   A.   Yes.

11   Q.   Okay.  And again, this shows the general area of

12   operations where the impoundment was being conducted; is that

13   correct?

14   A.   Yes, it shows part of the area.

15   Q.   It's part of the area.  It's not the entire area; correct?

16   A.   Correct.  Not the entire area.

17             MR. LEVENTHAL:  With that, I have no objection.

18   Thank you.

19             THE COURT:  Mr. Engel, any objection?

20             MR. ENGEL:  None from Engel.

21             THE COURT:  Mr. Perez?

22             MR. PEREZ:  No objection of behalf of Lovelien.

23             MR. JACKSON:  No objection on behalf of Mr. Burleson.

24             THE COURT:  Thank you.  So Exhibit 330 will be

25   admitted.  Did you want to publish it?

1      (Exhibit 330 admitted.)

2           MR. MYHRE:  Yes, if we may, Your Honor.

3           THE COURT:  Go ahead.

4    BY MR. MYHRE:

5    Q.   Okay.  Referring to Exhibit 330, generally speaking, could

6    you just outline for us where State Route 170 is depicted on

7    this map?

8    A.   Yes, I can.  Sorry.  Not a very good drawing there.  This

9    line here follows Highway 170.

10   Q.   Okay.  And the record should reflect the witness has

11   depicted it with a red line, cutting through the middle of the

12   map, generally following the outline of the -- of the road.

13           Now, this area where I'm circling, which intersects

14   the State Route 170, what is that area there?

15   A.   That's part of Highway 170, and there -- inside that

16   circle you drew, there's a bridge that goes over the Virgin

17   River.

18   Q.   Now, down from that area where the bridge is crossing the

19   Virgin River, we see a square or a box there.  What is depicted

20   in that box?

21   A.   The area inside that purple box indicates Mr. Cliven

22   Bundy's private property.

23   Q.   And if you could draw a circle around the area generally

24   where the impoundment site or the operation is located.

25   A.   Can you refer to a particular day?  Because it varied.

Rand Stover - Direct

1    Q.    No, I meant for the entire operation.  Where was your

2    impoundment site located?

3    A.    Oh, the incident command post?

4    Q.    Okay.  We will work on our terminology here.  Okay?  You

5    refer to incident command post.  What is -- what does that

6    mean?

7    A.    That was the permanent location that we had our -- the --

8    our base of operations.

9    Q.    When we drew that little circle around that wash area, do

10   you remember that a couple of exhibits ago?

11   A.    Yes.

12   Q.    That's what you refer to as the incident command post?

13   A.    That's correct.

14   Q.    What would be located at the incident command post?

15   A.    At that location, we would have the temporary buildings

16   that I discussed, some corrals to hold the cattle that were

17   gathered and transported back there.  There was feed and water

18   for the cattle.  The temporary restrooms that we brought in for

19   the employees, vehicles.

20   Q.    So that's where the cattle were kept?

21   A.    Correct.

22   Q.    Now, if you could, could you just circle that on this map

23   here?

24   A.    Yes.

25   Q.    Great.  Thank you.  And, of course, just south of that

Rand Stover - Direct

1    area is the Interstate 15; is that correct?

2    A.   That's correct.

3    Q.   So, now you talked, I believe earlier, in terms of the

4    location of that site relative to the Bundy Ranch was

5    approximately how far?

6    A.   From that area that I just circled to the Bundy Ranch,

7    approximately 7 miles.

8    Q.   Now, how about from the area where we've circled, which is

9    that bridge on State Route 170, to the incident command post?

10   A.   That distance is about five and a half miles.

11   Q.   And that's five and a half miles following State Route 170

12   to the north toward 15?

13   A.   Correct.

14   Q.   Because it looks like State Route 170 also goes off to the

15   east and north; is that correct?

16   A.   That's correct.

17   Q.   And does that end up where?

18   A.   That will end up in Mesquite.

19   Q.   So that's a longer route to get to the incident command

20   post?

21   A.   Correct.

22   Q.   Now, is the area that you designated as a First Amendment

23   zone, is that located on this map?

24   A.   Yes, one of the areas is.

25   Q.   Okay.  Would you please just draw a circle around that as

Rand Stover – Direct

1    well.

2              And the record should reflect that you have drawn a

3    circle around what appears to be entrance and exit ramps off/on

4    to the 15?

5    A.    Correct.

6    Q.    Do you know -- does that entrance area have a particular

7    number?

8    A.    It's exit number 112.

9    Q.    Exit 112?

10   A.    Exit 112, yes.

11   Q.    Now, how was the First Amendment zone -- how was that

12   demarcated or designated?  How was it marked?

13   A.    It was -- it was marked by some temporary orange snow

14   fencing.  I think it's commonly referred to as snow fencing.

15   Q.    And there was a sign on it?

16   A.    And there was a sign, yes.

17   Q.    How large of area was encompassed by this fencing?

18   A.    I don't know.

19   Q.    Was it more than 10 acres?

20   A.    No.

21   Q.    Was it substantially smaller than 10 acres?

22   A.    Yes.

23   Q.    Was it located under the bridges there, or at the entrance

24   ramp, or toward the entrance ramp, just generally speaking?

25   A.    Generally speaking, if you were traveling on southbound

Rand Stover - Direct

1  Interstate 15 towards Las Vegas, and you exit, and you took the

2  exit number 112, as you came to the bottom of the ramp, that's

3  where the area was located.

4  Q.   Now, was there any -- you said there was a second area.

5  Is that not depicted on this map?

6  A.   No, it's not on here.

7  Q.   Just generally speaking, where was that second area?

8  A.   It was generally at the intersection of Highway 170 and

9  White Rock Road.

10 Q.   Would that be north and east?

11 A.   That would be north and east on Highway 170 towards

12 Bunkerville and Mesquite.

13 Q.   And 170 is also known as Riverside Road?

14 A.   Yes.

15 Q.   So if you could just generally describe once cattle were

16 gathered, at least in this area, the general route of travel to

17 get to the incident command post?

18 A.   Sure.  If -- may I draw on this?

19 Q.   Yes.

20 A.   If, for example, cattle were gathered from up in this area

21 here --

22 Q.   And the record should reflect drawing a circle in the

23 lower right-hand corner of the map.

24 A.   Once the operation was concluded, the contractors and the

25 law enforcement officers working with them would drive on a

Rand Stover - Direct

1    route back towards Highway 170, and then they would either

2    drive -- they would either turn left on Highway 170 and head

3    towards Interstate 15 and back to the incident command post, or

4    they could turn right on Highway 170 and go towards Mesquite,

5    eventually end up back on the interstate and drive back to the

6    incident command post.

7    Q.   So now from this circle that you've drawn, if the

8    operation were conducted there, how would the truck get from

9    that circle to the -- to the Riverside Road area?

10   A.   I'm sorry.

11   Q.   How would the trucks -- what would be the route of travel

12   for the trucks from this circle that you've drawn to the

13   Riverside Road?  Was there --

14   A.   Depending on -- depending on exactly where they were,

15   there are some gravel roads in this area, that go towards

16   Highway 170, that they could take to get back on Highway 170,

17   and then make a turn left or right once they reached Highway

18   170.

19   Q.   So you've drawn a series of three lines.  And are these --

20   where these lines meet up with Riverside Road, are those

21   typically called -- what?  Egress points?  Ingress points?

22   A.   They could be termed that.

23   Q.   What did you term them?

24   A.   I termed them in the plan ingress or egress routes.

25   Q.   Now, did the areas of ingress and egress from the area of

Rand Stover - Direct

1   operations -- did those post any particular security issues

2   from a planning standpoint?

3   A.   Yes.

4   Q.   What were those security concerns or factors?

5   A.   Well, one of the -- one of the concerns was that when the

6   contractors were finished, they had to get the cattle

7   transported back to the incident command post.

8          Once they left the area and would be traveling

9   towards the state highway, there's always the potential,

10  especially if they took a route closer to the Bundy residence,

11  that they could be interfered with.

12  Q.   Okay.  Interfered how?

13  A.   Attempt -- attempt -- an attempt to stop the convoy, an

14  attempt to block the convoy, an attempt to impede the convoy.

15  Q.   How would -- if someone wanted to block in this area that

16  you gave as an example, how difficult would it be to block a

17  convoy coming out of that area?

18          MR. JACKSON:  Objection.  Speculation.

19  BY MR. MYHRE:

20  Q.   Based on your knowledge and assessment of the area.

21          MR. JACKSON:  Objection.  Irrelevant and speculative.

22          THE COURT:  It is relevant.  The objection is

23  overruled as to speculation.  He's preparing the security for

24  these contractors.  He has to take into consideration what the

25  possible things that can happen to impede that operation.  So

Rand Stover - Direct

1    he can testify about what he believed.

2           Whether or not it's true, it's up to the jury to

3    decide how much weight to give to his testimony.

4    BY MR. MYHRE:

5    Q.   For your security plan and for the concerns that you've

6    expressed, what was your assessment or your understanding of

7    how someone could block at an egress or ingress point?

8    A.   The -- if we used this example here, if the cattle were

9    gathered in that area, there are only a finite number of usable

10   dirt roads that a truck hauling a trailer could travel on.

11          So, there was not an unlimited route or unlimited

12   option of travel for the contractors.  There were just a few

13   options.  So if someone did want to block the convoy or

14   interfere with the convoy, they would only have a few dirt

15   roads that they would know inherently the contractors had to

16   use.

17          So they could -- if they wanted to, someone could use

18   a vehicle to block those dirt roads.  Use a line of people to

19   block those dirt roads.  Use a machine of some sort to block

20   those dirt roads.

21   Q.   And if the convoy were blocked on that dirt road, what

22   type of security risk would that present to the civilian

23   contractors with that convoy?

24   A.   It presented a serious security risk.

25   Q.   In what way?

Rand Stover - Direct

1    A.   In what ways?  There --

2             MR. LEVENTHAL:  Objection, Judge.  It calls for

3    speculation.  I -- just a simple block?  He's speculating to

4    the worst.  It could be just a block.  I'm not sure how he can

5    answer that.

6             MR. MYHRE:  Your Honor, we're asking the witness to

7    weigh the risk factors that went into the security plan.  And

8    the factors -- one of the risk factors is what type of security

9    issues would be presented for the civilian contractors if the

10   convoy were blocked.  It helps the jury to understand the

11   actions of the BLM.

12            THE COURT:  All right.  I'll permit it.  The

13   objection is overruled.  He can answer the question.

14            THE WITNESS:  Well, the goal was to get the

15   contractors out of the area without any obstruction or without

16   any interference in their execution of this operation and

17   execution of the Court orders.

18   BY MR. MYHRE:

19   Q.   Was this area in these -- in the general area, would it

20   be -- did -- was it difficult for a convoy, if it were blocked,

21   to just simply turn around and go another route?

22   A.   Yes.  In this -- in this area, very difficult.

23   Q.   And why is that?

24   A.   Because the terrain is very rough off of those dirt roads.

25   A vehicle or truck hauling a livestock trailer could not just

Rand Stover - Direct

1    simply turn around.  It was not as if there were many nice flat

2    areas that the vehicle could just turn around and go the other

3    way.

4    Q.   So, was it your goal, then, in devising a security plan,

5    to ensure that this convoy would not have a blocking incident

6    or have some free access to the State Route 170?

7    A.   Yes.

8    Q.   You talked about the outer rings of security; correct?

9    A.   Yes.

10   Q.   Where would those outer rings of security be placed, in

11   your example here, that you used on Exhibit 330.

12   A.   In this particular example, we would have -- if I -- if

13   you will permit me to draw on this again.  Let's just say that

14   the trap location was right here.

15   Q.   Okay.  You are drawing a circle within the circle you drew

16   before.  Okay?

17   A.   Right.  The inner ring of security would be very close to

18   that area there.  The middle ring of security depended on where

19   the -- that team's team leader put his or her personnel would

20   be in these types of areas here.

21   Q.   Okay.  You have drawn a circle about -- a little bit more

22   than midpoint between your outer circle and the Riverside Road

23   area; is that correct?

24   A.   Correct.  And then our outer ring of security would be at

25   the -- some of the significant ingress or egress points

Rand Stover - Direct

1   perhaps.  This map isn't large enough, but perhaps to the south

2   of the Bundy residence.  Perhaps here.  Perhaps here at some of

3   these major intersections with Highway 170 and the dirt roads

4   coming out of the area.

5   Q.   Okay.  And you have drawn a series of diagonal lines

6   across the area depicted by State Route 170; is that correct?

7   A.   That's correct.

8   Q.   And again, the purpose of this was for that -- to protect

9   the egress and ingress; is that right?

10  A.   Correct.

11  Q.   Now, with respect to the First Amendment area, was the

12  goal to keep the public there in order to avoid the areas that

13  you have depicted on this map?

14  A.   No, the goal is not to keep them there.

15  Q.   Not to keep them there, but was your goal to ensure that

16  people would not congregate --

17            MR. LEVENTHAL:  Objection as to leading.

18            MR. MYHRE:  I haven't finished the question yet.

19            MR. LEVENTHAL:  Objection as to leading.

20            THE COURT:  Sustained.  You can rephrase that.

21            MR. LEVENTHAL:  What was the goal?

22            MR. MYHRE:  I'm sorry?

23            MR. LEVENTHAL:  No, go ahead.

24            THE COURT:  He was rephrasing it for you.  "What was

25  the goal?" he says.

Rand Stover - Direct

1              MR. MYHRE:  Thank you, counsel.

2              MR. LEVENTHAL:  No problem.

3     BY MR. MYHRE:

4     Q.   What was the goal in terms of setting of -- having the

5     public have access to these areas of egress and ingress?  Was

6     it --

7     A.   I'm sorry.  I'm not --

8     Q.   No, that's fine.

9     A.   I'm not sure what you are asking.

10    Q.   Well, I'm asking you, was it important, in terms of the

11    security of this operation -- we talked about closure.  Okay.

12    And we've talked about how you couldn't have a blockage at that

13    these points.  Okay?

14              Did you want to keep the public out of this area

15    during operations so that these convoys could move?

16              MR. LEVENTHAL:  Judge, asked and answered at this

17    point.

18              MR. MYHRE:  I don't think, Your Honor, it has been.

19              THE COURT:  I will allow one last question on it.

20              THE WITNESS:  The goal was to -- to keep the public

21    out of the closed area where operations were going on for

22    public safety purposes.

23    BY MR. MYHRE:

24    Q.   Thank you.  Okay.  So, now that you are -- let's go

25    forward in time a little bit now.  We are past the planning

Rand Stover - Direct

1    stage.  We are past the notification stage, and we getting

2    ready to execute the plan.

3              Do the -- directing your attention to around the end

4    of March of 2014, do the contractors begin to move equipment

5    into this area?

6    A.   Yes.

7    Q.   In the area you've referred to as the ICP?

8    A.   Correct.

9    Q.   And how are they moving that equipment?

10   A.   They -- they came in a convoy of trucks from Utah.

11   Q.   And they follow the interstate?

12   A.   They followed Interstate 15.

13   Q.   Did you receive any reports of interference with that

14   convoy?

15   A.   Yes.

16   Q.   And what generally -- without going into detail, just

17   generally what was the -- the report of the nature of the

18   interference?

19   A.   When the contractors arrived to set up the incident

20   command post on March 28th, 2014, as they were pulling into the

21   entrance to the Toquop Wash, they were -- they were blocked.

22   Q.   Did you investigate that event?

23   A.   Yes.

24   Q.   In the course of your investigation, did you also happen

25   to view a video that was generally available on YouTube?

Rand Stover - Direct

1  A.   I did.

2  Q.   Yeah.  What was the nature of this video?

3  A.   It was a -- it was a video that showed the contractors

4  pulling into the entrance to the Toquop Wash area and riders on

5  horseback riding in front of their vehicles as they were

6  attempting to drive into the Toquop Wash area.

7  Q.   And was there any messaging or messages attached to this

8  video?

9  A.   Yes, there were.

10  Q.   Okay.  And just the general nature of those messages?

11  A.   The general message was that these were contractors hired

12  by the government.  That they were there to steal Mr. Bundy's

13  cattle.  That they had been paid a lot of money, and that they

14  were -- this was Mr. Bundy's private property.

15  Q.   And did -- you found this video where?

16  A.   It was on YouTube.

17  Q.   Is that generally available to the public?

18  A.   Yes.

19  Q.   You had no special access to this?

20  A.   No, I did not.

21  Q.   And if you could look at Exhibit 14 in your binder,

22  please.

23  A.   Okay.

24  Q.   Okay.  And Exhibit 14 appears to be a disc; is that

25  correct?

Rand Stover - Direct

1    A.    Yes.

2    Q.    And you've had -- outside the courtroom, you've had an

3    opportunity to review that recording that you observed around

4    the end of March of 2014; is that correct?

5    A.    That's correct.

6    Q.    And when you reviewed that recording, you did so at the US

7    Attorney's Office?

8    A.    That's correct.

9    Q.    And was that the fair and accurate depiction of what you

10   viewed on March of 2014?

11   A.    Yes.

12          MR. MYHRE:  Your Honor, we would offer Exhibit 14.

13          THE COURT:  Any objection to Exhibit 14?

14          MR. MARCHESE:  None from Parker.

15          MR. TANASI:  None from Stewart, Your Honor.

16          MR. LEVENTHAL:  None on behalf of Mr. Drexler.  Thank

17   you.

18          MR. ENGEL:  None from Engel.

19          MR. PEREZ:  Not on behalf of Lovelien.

20          MR. JACKSON:  Not on behalf of Mr. Burleson.

21          THE COURT:  So Exhibit 14 will be admitted.

22          Are you planning to publish that?

23          MR. MYHRE:  Yes.

24        (Exhibit 14 admitted.)

25          THE COURT:  All right.  Let's take a bathroom break

Rand Stover - Direct

1    first, because it's almost 3:40.

2            So during this break, I'll remind the jury.  You are

3    not to discuss this case with anyone or permit anyone to

4    discuss it with you.  You are not to read or listen to or view

5    anything touching upon this case in any way.

6            Do not perform any research or make any independent

7    investigation.  If anyone should try to speak to you about the

8    case or if you accidentally overhear someone speaking about the

9    case, please let us know right away.

10           And do not form any opinion until you have heard all

11   the evidence, the closing arguments, received the written jury

12   instructions, and been released to begin your jury

13   deliberations.

14           Let's go ahead and stand for the jury.  And after

15   they leave, then Special Agent Stover may also take a quick

16   break.  We will plan to be back here in about 15 minutes, so

17   just before 4:00, 3:55.  Okay.

18       (Jury out.)

19           THE COURT:  All right.  The jury has now left.

20           Mr. Stover, you can go ahead and stretch and use the

21   restroom.

22           Mr. Leventhal, you had an issue earlier this morning.

23   Are we -- is this a good time to talk about it or does it not

24   relate to this particular witness?

25           MR. LEVENTHAL:  It actually does, and it goes into

1    cross-examination.  So depending on how far Mr. Myhre gets

2    today with Mr. Stover, it might be a good time or after

3    Mr. Stover is done with direct, it will be just as good of a

4    time if not tonight or tomorrow morning.  Whatever the Court

5    wants.

6              THE COURT:  Mr. Myhre --

7              MR. LEVENTHAL:  It may take --

8              THE COURT:  -- are you aware, because you were going

9    to get together at some point to discuss --

10             MR. MYHRE:  That was my understanding is that we

11   would meet after the court session and determine exactly what

12   it is.

13             We've had some brief discussions.  I have a general

14   understanding, but I'm not sure it's going to be that useful

15   for the Court's time now to address it.  We could address it in

16   the morning or at the Court's pleasure.

17             THE COURT:  Let's go ahead and take our bathroom

18   break.

19             MR. LEVENTHAL:  Judge, just -- and I don't have a

20   problem with that.  We can get together.  That's what we spoke

21   of.  However, just prior to cross-examination, either we can

22   deal with it or we can have the Court deal with it.  That's

23   all.

24             THE COURT:  Okay.  Well, you try to deal with it

25   first, and if you have a problem that you want me to resolve,

Rand Stover - Direct

1    I'm happy to do that.  But you guys try and deal with it first.

2              MR. LEVENTHAL:  Thank you.

3              COURTROOM ADMINISTRATOR:  Off record.

4         (Recess, 3:41 p.m.  Resumed 4:01 p.m.)

5              THE COURT:  Thank you.  Let's go ahead and call in

6    the jury.

7         (Jury in.)

8              THE COURT:  All right.  Everyone may be seated.  We

9    are joined by the jury, and we have Mr. -- I'm sorry -- Special

10   Agent Stover back on the stand.

11             I remind you, sir, you are still under oath.  All

12   right?

13             THE WITNESS:  Yes, ma'am.

14             THE COURT:  And Mr. Myhre, you may go ahead and

15   continue with your direct examination.  We did admit Exhibit

16   No. 14.  Did you wish to publish it now?

17             MR. MYHRE:  Yes, Your Honor.  Thank you.  Before I

18   do, I would like to ask just a couple more preliminary

19   questions.

20             THE COURT:  Sure.

21   BY MR. MYHRE:

22   Q.   Agent Stover, in the course of reviewing Exhibit 14, were

23   you able to identify certain individuals in that video?

24   A.   Yes.

25   Q.   And was your identification based upon information you

Rand Stover - Direct

1  knew beforehand?

2  A.   It was.

3  Q.   Okay.  What type of information did you consult?

4  A.   Photographs and documents that we had compiled as part of

5  our planning.

6        MR. MYHRE:  Okay.  With the Court's permission, I

7  would like to publish Exhibit 14.

8        THE COURT:  You may.

9        (Exhibit 14 being played.)

10 BY MR. MYHRE:

11 Q.   I would stop it for a moment.  If you would, just -- I

12 want to play this almost through in its entirety.  So, if

13 you -- there are going to be a number of words and images on

14 here which is in plain view of the jury.

15       I just want to preface this in terms of the image you

16 see now on the screen, we don't have a time stamp on it.  But

17 what does it -- what does this say in this part?

18 A.   It says, "The BLM set up their million-dollar compound."

19 Q.   Thank you.  Please proceed.

20       (Exhibit 14 being played.)

21 Q.   Stop the video there.  And what does this read now?

22 A.   It says, "Paid contract cowboys.  Cattle wrestlers to

23 steal Cliven's cattle."

24 Q.   Okay.  In the images we see depicted here, in the

25 foreground, we see what appears to be a truck; is that correct?

Rand Stover - Direct

1   A.   Correct.

2   Q.   And do you recognize that truck as belonging to the

3   contractors?

4   A.   I recognize it as one of the contractor's trucks, yes.

5   Q.   Now, recall the maps that we consulted earlier.  Where

6   exactly is this area that we see depicted in the video?  Where

7   is that?  Where is this area in relationship to the ICP?

8   A.   This is the entrance area into the Toquop Wash.  And in

9   the background there, kind of a gray line, you can see what is

10  southbound Interstate 15 on the left of the screen.

11  Q.   And will the 15 come into view further on in this video?

12  A.   Yes.

13  Q.   Please continue.

14       (Exhibit 14 being played.)

15  Q.   And in this image we see what?

16  A.   We see another one of the contractor's trucks pulling a

17  livestock trailer and an RV trailer.

18  Q.   Okay.  Does there appear to be someone in front of them?

19  A.   Yes.

20  Q.   And do you know who -- were you able to identify who that

21  individual is?

22  A.   That is Ryan Bundy.

23  Q.   And Ryan Bundy is what relationship to Cliven Bundy?

24  A.   He's a son of Cliven Bundy.

25  Q.   And does Mr. Ryan Bundy here appear to be doing something

Rand Stover - Direct

1    with his hand?

2    A.    He appears to be making a -- some kind of a hand gesture

3    towards the driver or the occupants of the -- that truck.

4    Q.    Do you know what that truck is pulling in this particular

5    frame?

6    A.    That truck is -- are you asked me about the livestock

7    trailer?

8    Q.    Yes.  We see the truck and there appears to be a trailer.

9    What are those trailers?

10   A.    That's a livestock trailer and an RV trailer.

11   Q.    Now, do there appear to be other vehicles behind that

12   trailer?

13   A.    Yes.

14   Q.    Please proceed.

15         (Exhibit 14 being played.)

16   Q.    And what are the words on this frame that we see?

17   A.    "Thousands of" -- it was a dollar sign.  "Thousands of

18   dollars in equipment."

19   Q.    And what type of vehicle do we see depicted here?

20   A.    It looks like a semi-trailer.

21   Q.    And the individual on the horse is?

22   A.    That's Ryan Bundy.

23   Q.    Now, we talked about the Interstate 15.  Do you now see

24   that in the frame?

25   A.    Yes, in the background.

Rand Stover - Direct

1   Q.   And how -- and that is the southbound lane?

2   A.   That's correct.

3   Q.   Do you see any vehicles on the Interstate 15?

4   A.   The white truck is on the shoulder of Interstate 15.

5   Q.   Now, this is the area entering into the ICP that we talked

6   about earlier; correct?

7   A.   Correct.

8   Q.   Now, is there a -- in that area of the 15, is there a

9   turnout lane there, or any deceleration lane or anything of

10   nature?

11   A.   No, there is not.

12   Q.   If a truck were to be stopped here at this point, what

13   happens to the trucks that are on the 15 behind it?

14   A.   The trucks would have to go around them.

15   Q.   And in terms of the trucks that are part of this convoy,

16   what would they be doing?

17   A.   Which trucks?

18   Q.   Sure.  That white truck, for example, that we see in this

19   image here to the -- the approximately left side of the screen,

20   is that truck on or off the 15?

21   A.   It looks like they are partially on and partially off the

22   15.

23   Q.   And does that present any hazard with respect to the

24   traffic on the 15?

25   A.   Yes.

Rand Stover - Direct

1    Q.   And what type of hazard?

2    A.   That truck would be partially hanging out into the

3    right-hand lane of travel on southbound Interstate 15.

4    Q.   Thank you.  Please continue.

5         (Exhibit 14 being played.)

6    Q.   Okay.  If we could stop there for a moment, please.  Now

7    we just heard a voiceover of this video; is that correct?

8    A.   Correct.

9    Q.   And that -- we're not going -- I'm not going to ask you to

10   repeat the words there, but just in general, what was the

11   message that was conveyed in that voiceover?

12   A.   The general message was that Cliven Bundy was taking care

13   of the land, that he bought the grazing rights to the land, and

14   he was -- yeah.

15   Q.   Was that message -- you reviewed the Court orders before

16   this impoundment; is that correct?

17   A.   I did.

18   Q.   Was that message consistent or inconsistent with what the

19   Court orders had said?

20   A.   Inconsistent.

21   Q.   Please continue.

22        (Exhibit 14 being played.)

23   Q.   Stop right there for a moment.  Now, in this image, we

24   see -- we're looking in which direction approximately?

25   A.   Now the camera is pointed towards the northeast.

Rand Stover - Direct

1   Q.   And is this a fair and accurate depiction of what that

2   convoy was like that day?

3   A.   Yes.

4   Q.   And we saw -- in a few frames before this, we saw an image

5   of the southbound 15; is that correct?

6   A.   Correct.

7   Q.   And we were -- which direction were we looking?

8   A.   We were looking out -- the view that was looking towards

9   I-15, it was a view towards the south and a little bit to the

10  west.

11  Q.   Okay.  Now, was it looking at the oncoming traffic or the

12  traffic moving away?

13  A.   It was looking at the traffic moving away towards Las

14  Vegas.

15  Q.   Please proceed.

16       (Exhibit 14 being played.)

17  Q.   In this frame here, we see someone appearing to hold up

18  something; is that correct?

19  A.   Correct.

20  Q.   And do you recognize that individual?

21  A.   The individual in the blue shirt is Cliven Bundy.

22  Q.   And what does he appear to be doing in this frame?

23  A.   Appears to be taking a photo with a cell phone.

24  Q.   And taking a photo of what?

25  A.   The occupants of that truck.

Rand Stover - Direct

1    Q.   Thank you.  Please proceed.

2         (Exhibit 14 being played.)

3    Q.   Stop it.  In this image, we see the words what?  How do

4    they read?

5    A.   "They have locked us out."

6    Q.   Now, we see an individual here on a horse; is that

7    correct?

8    A.   Correct.

9    Q.   And what does this individual appear to be doing?

10   A.   He appears to be taking a photograph of that truck or the

11   truck's license plate.

12   Q.   Is he inside or outside of his route of travel?  The

13   truck's route of travel?

14   A.   He is in the truck's route of travel.

15        MR. MARCHESE:  I am going to object to relevance as

16   to this line of questioning.  This particular witness was not

17   there on this day.

18        The foundation that was laid was that he saw this go

19   viral on YouTube.  So, basically, all we're doing is we're

20   having him watch television and tell the jury what they can

21   perceive and whatever conclusions they can make on their own.

22   If we want to have him identify certain people, now that's

23   something he has particular knowledge about.

24        But simply playing this video and having -- and

25   giving a play-by-play, we can literally pull anyone off the

Rand Stover - Direct

1  street to do this.  It's a waste of time for the jury, Your

2  Honor.

3          MR. TANASI:  And, Your Honor, I'd join and just say

4  it's not the best evidence.  The video is the best evidence.

5  It speaks for itself.

6          THE COURT:  Mr. Myhre.

7          MR. MYHRE:  Yes, Your Honor.  Special Agent Stover

8  has indicated he had done an investigation in connection with

9  this.  This was part of his investigation.  It will go to -- as

10  we will see, it helps him form his decisions going forward in

11  terms of security for the operation of the impoundment.

12          So, his knowledge of these images goes directly to

13  that point.

14          THE COURT:  All right.  Objection's overruled.  You

15  may continue.

16          MR. MYHRE:  Please continue the video, please.

17      (Exhibit 14 being played.)

18  Q.  Stop there for a moment, please.  And just the frame

19  before this one, we saw a gate -- what appeared to be a gate;

20  is that correct?

21  A.  Correct.

22  Q.  And without naming names, who were those individuals

23  behind that gate?  Who were they affiliated with?

24  A.  Those were two BLM law enforcement rangers.

25  Q.  Please continue.

1        (Exhibit 14 being played.)

2   Q.   And at the end of that video, did it reference the rights

3   to land and so forth?

4   A.   It did.

5   Q.   What was the general reference?

6   A.   It said "And you are also locked out from your public

7   lands."

8   Q.   Now, after viewing this video, did this inform your

9   decisions or your assessment of the risk presented to the

10  operation?

11  A.   It did.

12  Q.   And in what way?

13  A.   It -- it showed me that Cliven Bundy and his family

14  members were willing to impede the operation or interfere with

15  the contractors from day one.

16  Q.   And the operation had yet to begin; is that correct?

17  A.   Correct.

18  Q.   Did that translate for you, in terms of the -- now you've

19  seen an expression, a willingness.  Did that change your method

20  of operation at all in terms of numbers of officers or the

21  configuration of the officers?

22  A.   It did.

23  Q.   In what way?

24  A.   During this particular time, we had a small number of

25  officers that were assigned to secure the incident command post

Rand Stover - Direct

1    after the contractors got there and set up their equipment.

2              Because of this incident, I increased the number of

3    officers that were present on that -- that preoperational

4    security force.

5    Q.   Now, the operation itself started on the 5th of April; is

6    that correct?

7    A.   That was the first day that we gathered cows; correct.

8    Q.   Did you have any -- did you receive any reports of

9    potential interference before the 5th of April?

10   A.   Yes.

11   Q.   And approximately when?

12   A.   On March 31st, there was a report.

13   Q.   And without going into the details of the report, what was

14   the general nature of the report that you received?

15   A.   Cliven Bundy and Ryan Bundy went to the Arizona/Utah --

16   Q.   In terms of first --

17   A.   I'm sorry.

18   Q.   I worded the question poorly.  I'm sorry.  From where did

19   you receive this report?

20   A.   From a supervisor at the Arizona/Utah Port of Entry.

21   Q.   And what -- just for record purposes, what is the Port of

22   Entry?

23   A.   The Port of Entry is at the state line between Arizona and

24   Utah where various semi-trucks or livestock trailers pull off

25   to get weighed.  You would think of it as a weigh station

Rand Stover - Direct

1   sometimes.

2   Q.   Now, was there any report of any actual interference with

3   any BLM trucks or BLM convoys?

4   A.   On which date?

5            MR. JACKSON:  Objection.  Leading.

6            THE REPORTER:  Who said that?

7            THE COURT:  That was Mr. Jackson.

8            MR. JACKSON:  I'm going to object as leading for

9   Mr. Burleson.

10           MR. MYHRE:  I was trying to get to the general nature

11   of the threat, but I can phrase it differently, Your Honor.

12           THE COURT:  All right.  Go ahead.

13           MR. MYHRE:  It may take a little longer to get to the

14   point, but that's fine.

15           MR. JACKSON:  Your Honor, I object to him saying it

16   will take a little longer to get it right.  Ask non-leading

17   questions is always proper even if it takes longer.

18           THE COURT:  You can ask leading questions to lay a

19   foundation.  Go ahead.

20           MR. MYHRE:  Thank you, Your Honor.

21   Q.   So it came from the Port Authority.  Okay.  What was the

22   general nature of the report that you received from the Port

23   Authority?

24   A.   The supervisor at the Arizona/Utah Department of

25   Transportation Port of Entry called me and said that Cliven

Rand Stover - Direct

1    Bundy and Ryan Bundy drove to the port and told the supervisor

2    that --

3              MR. LEVENTHAL:  Objection as to hearsay.

4              MR. MARCHESE:  And I join as to double hearsay.

5              MR. TANASI:  Stewart joins as well.

6              MR. PEREZ:  Joined by Lovelien.

7              MR. ENGEL:  Joined by Engel.

8              MR. JACKSON:  I'll join in, too.

9              THE COURT:  Thank you, Mr. Jackson.

10             MR. MYHRE:  Your Honor, again, it goes to the effect

11   on the listener.  Again, the threat or the reports of threats

12   that this listener -- or excuse me -- that Agent Stover

13   receives again directly affects his decision making and his --

14   not only the threat assessment that he's making but informs his

15   decisions with respect to security operations.

16             THE COURT:  All right.  So you are not offering it as

17   coconspirator statements?

18             MR. MYHRE:  Correct, Your Honor.  I'm not offering

19   for the truth of the matter.

20             THE COURT:  All right.  I'll allow it.  You may

21   continue.

22             MR. MARCHESE:  But, Your Honor, my objection was as

23   to double hearsay.  It's what someone is saying to an agent

24   that then says to it Mr. Stover.  So I want to hear what the

25   other level of hearsay -- what the other exception is.

Rand Stover - Direct

1           MR. MYHRE:  None of it is offered for the truth of

2    the matter asserted, Your Honor.

3           THE COURT:  All right.  It's offered for the effect

4    that it had on the listener.

5           MR. MARCHESE:  On both listeners?

6           THE COURT:  On this listener that's here, this

7    witness.  What he did as a result of what he heard.  So I will

8    allow it for that limited purpose only.

9           MR. MYHRE:  Thank you, Your Honor.

10   Q.   So, you received information about Cliven and Ryan Bundy;

11   correct?

12   A.   Correct.

13   Q.   And what was that information?

14   A.   The supervisor I was talking about at the Port of Entry

15   called me and told me that Ryan Bundy and Cliven Bundy drove to

16   the Port of Entry, asked her if she had seen on that day,

17   March 31st, truckloads of stolen cattle come to her Port of

18   Entry.

19   Q.   When -- would that area, that -- where the Port of Entry

20   is located, would that have been a transit point for cattle

21   moving to the Utah auction barn?

22   A.   It would have been, yes.

23   Q.   Now, did you later that same week receive any reports of

24   threats or interference or threats of interference from the

25   auction barn in Utah?

1   A.   Yes.

2           MR. JACKSON:  I'm going to object again to leading

3   questions.  I'm sorry if it takes extra time.

4           THE COURT:  Thank you, Mr. Jackson.  Overruled.  You

5   may continue.

6   BY MR. MYHRE:

7   Q.   And the owner of the auction barn was who again?

8   A.   His name is Scott Robbins.

9   Q.   What was the business relationship at this -- on

10  April 2nd, between the BLM and Scott Robbins?

11  A.   He had been hired as a contractor to accept the cattle

12  that were gathered and to auction them off at his business.

13  Q.   Now, on April 2nd, did he call you?  Did he write you?

14  How did you have contact with him?

15  A.   He called me.

16  Q.   And did he indicate to you that he had any issues with

17  respect to interference?

18  A.   Yes, he did.

19  Q.   And what were those?

20  A.   Mr. Robbins --

21          MR. JACKSON:  Object as hearsay, what he may have

22  said.  I think that the standard response -- I don't know what

23  he's going to make.  Maybe I'm guessing what it's going to be.

24  But just say that it goes to his threat assessment is not a

25  valid response to a hearsay objection.

Rand Stover - Direct

1        I don't know what other exception he's going to come

2   up with, but I still object that what he said would be hearsay,

3   and also I object on confrontation grounds.

4        MR. MARCHESE:  Your Honor, and I'm going to join.

5   I'm also going to add as to relevance.  I mean, the cumulation

6   of this evidence, that has absolutely nothing to do with these

7   gentlemen, their names have barely been mentioned at all in

8   this trial, it's just simply -- they are pulling it out to

9   inflame the jury.

10        If they wanted to say that I increased the threat

11   level based upon things that I heard, that's fine.  But getting

12   into these specific instances, time, and time, and time again,

13   when these gentlemen aren't even part of it, it's more

14   prejudicial than probative.  I think we should move on, Your

15   Honor.

16        THE COURT:  All right.  Mr. Myhre.

17        MR. MYHRE:  Yes, Your Honor.  We offer it for the

18   same reason as we did before.  But even more than that, the --

19   as we understand it, from the defense opening statements and so

20   forth, they believe one of the issues is, is how the BLM was

21   configured security-wise out in the field.

22        In other words, that they were a militarized force at

23   some level.  We are trying to advance proof of the rationale

24   behind what -- why the BLM was doing what it was doing in the

25   field during the gathering operations.

1          And these instances of conduct, this information is

2     directly relevant to how the BLM assessed the threat and how

3     they conducted their operation.

4          THE COURT:  So this goes to why there were so many

5     BLM agents out there or other agents and the security level

6     that these individuals --

7          MR. MYHRE:  Yes.

8          THE COURT:  -- used.  All right.

9          MR. MYHRE:  Yes, Your Honor.  It helps explain that.

10    It's not the only thing, but it helps explain that.

11         THE COURT:  Well, that is relevant.  I will allow it.

12    BY MR. MYHRE:

13    Q.   And so Agent Stover, I just want you to generally

14    characterize it.  I don't want to go into precisely what he

15    said.  I just want to know the general nature of what it was

16    that he was reporting to you.

17    A.   Mr. Robbins reported to me that on that day, April 2nd,

18    during his regularly scheduled livestock auction, Ryan Bundy

19    and -- the reports were -- the report he said was between 30

20    and 40 other individuals interrupted his auction and caused him

21    to shut down his auction for 45 to 60 minutes.

22    Q.   And did this affect your relation -- not your, but the

23    relationship -- the business relationship between BLM and

24    Mr. Robbins?

25    A.   In what way?

Rand Stover - Direct

1  Q.   Did it cause him not to want to do business with BLM, or

2  did it effect it any other way?  Did he continue to want to do

3  business?

4  A.   He expressed he was very upset, but he said he was a man

5  of his word, and he would -- he would continue with the

6  contract.

7  Q.   Now, so we have those two reports to you.  Do you later

8  get a report, later in the week on the April 6th, that of an

9  arrest concerning David Bundy?

10 A.   Yes.

11 Q.   And what were the general nature -- what's the general

12 nature of the charges or the bases for the arrest?

13 A.   Dave -- Dave Bundy was arrested on April 6th for failure

14 to disburse and resisting arrest.

15 Q.   Okay.  Now, when you say "failure to disburse," where

16 approximately did the arrest occur?

17 A.   He was located on the shoulder of Highway 170 at about

18 mile marker four and a half wherein he was arrested.

19 Q.   So if we go back to Exhibit 330 for a moment.

20 A.   Okay.

21 Q.   Is the general area of where his arrest occurred

22 depicted -- it's on your monitor, Agent.  Is the general area

23 of where this arrest occurred depicted anywhere on Exhibit 30?

24 A.   Yes.

25 Q.   Okay.  Could you, using the marker on your screen, just

1   generally mark the general area where this occurred?

2   A.   It was approximately in the location -- oops.

3   Q.   Okay.

4   A.   May I clear that line that I accidentally made?

5   Q.   Sure.  Just clear that.  That's fine.

6        Okay.  So you have drawn a circle around an area of

7   State Route 170?

8   A.   Yes.

9   Q.   Okay.  Now, did this -- at the time of this arrest, did

10  this occur in or near an area where a convoy was operating?

11  A.   Yes.

12  Q.   Now, with these incidents, did that affect your assessment

13  of the security risk in that area?  In the area of the

14  impoundment operations?

15  A.   Yes, it did.

16  Q.   How did it affect it?

17  A.   It affected my security assessment by reaffirming that the

18  Bundy family or supporters of the Bundy family were going to

19  continue to interfere with the execution of these Court orders

20  and potentially impede the work that the contractors were

21  doing.

22  Q.   Now, we talked a little earlier about, you know, the

23  number of officers that were involved in the security operation

24  and so forth.  And they worked in shifts; is that correct?

25  A.   That's correct.

Rand Stover - Direct

1    Q.   Just generally speaking, what were the shifts?

2    A.   We had two shifts; a day shift and a night shift.

3    Q.   And when generally would day shift begin and end?

4    A.   It depended on the area that the contractors were

5    operating in that day.  Typically between 4:00 a.m. and

6    7:00 a.m. is when they would begin.

7    Q.   Now, with each change of shift during the course of the

8    impoundment operations, would the officers receive briefings?

9    A.   Yes.

10   Q.   And what would those briefings consist of?

11   A.   They would consist of an overview of the area of operation

12   for that particular day and any updates of incidents that had

13   happened the previous day when they weren't on shift.  It would

14   include the specific incidents, such as arrests, or citations,

15   or instances of interference.

16   Q.   And so what -- what was the purpose behind the briefings?

17   A.   To ensure that our personnel were updated on any relevant

18   security concerns and the general area where we were going to

19   be operating in that day.

20   Q.   Who would conduct these briefings?

21   A.   There were a number of people.  Myself, sometimes the

22   contractor or the -- excuse me -- the BLM employee that worked

23   closely with the contractor.  Occasionally the special agent in

24   charge would speak at the briefings.

25          THE COURT:  Mr. Myhre, is this a good place to break?

Rand Stover – Direct

1    Because it's 4:34.  We were going to end at 4:30.

2                 MR. MYHRE:  Yes, Your Honor.

3                 THE COURT:  Is that all right?

4                 MR. MYHRE:  This is fine.

5                 THE COURT:  So, for this overnight break, again I

6    remind the jurors that you are not to discuss this case with

7    anyone or permit anyone to discuss it with you.

8                 You may speak to your fellow jurors about other

9    things, but until the case is submitted to you, you are not to

10   talk about the case.  If you need to talk to your work to let

11   them know, "Yes, I'm still in trial.  I'm going to be in trial

12   every day except Friday of this week," you can tell them that.

13   But don't tell them anything else if they ask you, "How is it

14   going?  What did you do today?"  Please do not talk to anyone

15   about the case.

16                You are also not to read or listen to or view

17   anything that touches upon the case in any way.  Do not perform

18   any research or any independent investigation, and do not form

19   an opinion until after you have received all the evidence,

20   heard the closing arguments, received the written jury

21   instructions, and then are released to go begin your

22   deliberations.

23                So we will welcome you back here at 8:00 a.m.

24   tomorrow morning.  And we will stand for the jury.  And after

25   they exit, then Agent Stover, you may also take your evening

1    break, and we will need you back here at 8:00 a.m. tomorrow

2    morning as well.

3         (Jury out.)

4              THE COURT:  All right.  So can we go ahead and recess

5    for the night?

6              MR. MYHRE:  Yes.

7              MR. MARCHESE:  Yes.

8              THE COURT:  All right.  We will see you tomorrow

9    morning at 8:00.

10             COURTROOM ADMINISTRATOR:  Off record.

11        (Recess, 4:36 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATIONS

2    For the Plaintiff:

3    Witness Name              Direct  Cross   RD    RX    Voir Dire

4       Rand Stover              5

5

6                        PLAINTIFF'S EXHIBIT INDEX

7    Exhibit No.                              Marked     Admitted

8    8                                                      47
     14                                                     76
9    323                                                    18
     328                                                    30
10   329                                                    26
     330                                                    62
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              --oOo--

2                  COURT REPORTER'S CERTIFICATE

3

4      I, KATHERINE EISMANN, Official Court Reporter, United

5  States District Court, District of Nevada, Las Vegas, Nevada,

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8

9  Date:  March 2, 2017.

10                              /s/ *Katherine Eismann*

11                          Katherine Eismann, CSR CRR RDR

12

13

14

15

16

17

18

19

20

21

22

23

24

25