1          UNITED STATES DISTRICT COURT
              DISTRICT OF NEVADA
2       BEFORE THE HONORABLE GLORIA M. NAVARRO
           UNITED STATES DISTRICT CHIEF JUDGE
3

4

UNITED STATES OF AMERICA,          :
5                                    :
          Plaintiff,                :
6                                    :No. 2:16-cr-46-GMN-PAL
      vs.                           :
7                                    :
ERIC J. PARKER (11),               :
8  O. SCOTT DREXLER (12),            :
   RICHARD R. LOVELIEN (13),         :
9  STEVEN A. STEWART (14),           :
   TODD C. ENGEL (15),               :
10 GREGORY P. BURLESON (16),         :
                                    :
11         Defendants.              :
                                    :
12 _____

13

14            TRANSCRIPT OF JURY TRIAL - DAY 11

15

16                    MARCH 2, 2017

17

18                   Las Vegas, Nevada

                     Courtroom 7C
19

20

21  Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
                           Certified Realtime Reporter
22                         400 South Virginia Street
                           Reno, Nevada  89501
23                         (775) 329-0132
                           DD@nvd.uscourts.gov
24

25   (Proceedings reported by machine shorthand.
     Transcript produced by computer-aided transcription.)

```
 1                      A P P E A R A N C E S

 2
      For the Plaintiff:
 3
      STEVEN W. MYHRE, AUSA
 4    NICHOLAS D. DICKINSON, AUSA
      NADIA JANJUA AHMED, AUSA
 5    ERIN M. CREEGAN, SAUSA
      United States Attorney's Office
 6    501 Las Vegas Boulevard South, Suite 1100
      Las Vegas, Nevada 89101
 7    (702) 388-6336

 8    For Defendant Eric J. Parker (11):

 9    JESS R. MARCHESE, ESQ.
      Law Office of Jess R. Marchese
10    601 Las Vegas Boulevard South
      Las Vegas, Nevada 89101
11    marcheselaw@msn.com
      (702) 385-5377
12
      For Defendant O. Scott Drexler (12):
13
      TODD M. LEVENTHAL, ESQ.
14    Leventhal and Associates
      626 South Third Street
15    Las Vegas, Nevada 89101
      leventhalandassociatescmecf@gmail.com
16    (702) 472-8686

17    For Defendant Richard R. Lovelien (13):

18    SHAWN R. PEREZ, ESQ.
      Law Office of Shawn R. Perez
19    626 South Third Street
      Las Vegas, Nevada 89101
20    shawn711@msn.com
      (702) 485-3977
21
      For Defendant Steven A. Stewart (14):
22
      RICHARD E. TANASI, ESQ.
23    Tanasi Law Offices
      601 South Seventh Street, 2nd Floor
24    Las Vegas, Nevada 89101
      rtanasi@tanasi.com
25    (702) 906-2411
```

```
 1                 A P P E A R A N C E S  (Continued)

 2    For Defendant Todd C. Engel (15):

 3    TODD C. ENGEL, PRO SE
      18427-023
 4    Nevada Southern Detention Center
      2190 East Mesquite Avenue
 5    Pahrump, Nevada 89060

 6    JOHN G. GEORGE, ESQ. (Standby Counsel)
      600 South Eighth Street
 7    Las Vegas, Nevada 89101
      johngeorgejr@fastmail.fm
 8    (702) 561-7855

 9    For Defendant Gregory P. Burleson (16):

10    TERRENCE M. JACKSON, ESQ.
      Law Office of Terrence M. Jackson
11    624 South Ninth Street
      Las Vegas, Nevada 89101
12    Terry.Jackson.Esq@gmail.com
      (702) 386-0001

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              LAS VEGAS, NEVADA, MARCH 2, 2017, 8:14 A.M.

 2                              --oOo--

 3                    P R O C E E D I N G S

 4           (Outside the presence of the jury.)

 5              COURTROOM ADMINISTRATOR:  All rise.

 6              THE COURT:  Thank you.  You may be seated.

 7              COURTROOM ADMINISTRATOR:  This is the time set for

 8   jury trial, Day 11, in Case No. 2:16-cr-46-GMN-PAL, United

 9   States of America versus Eric Parker, O. Scott Drexler, Ricky

10   Lovelein, Steven Stewart, Todd Engel, and Gregory Burleson.

11              THE COURT:  All right.  Well, good morning

12   everyone.

13              Before we bring in the jury and have all the

14   attorneys and Mr. Engel represent themselves and report on

15   the record, I do want to remind everyone about the

16   expectations for the hearing today.

17              This is not a sporting event, it is a courtroom,

18   so it is never appropriate for anyone to express their

19   opinion verbally or through body language when something is

20   said that you agree or disagree with.  So please refrain from

21   making any expressions of opinion.  I have advised the

22   marshals and the court security officers that they do have

23   authority to remove anyone who makes any inappropriate

24   expression.

25              Also, no one is permitted to be speaking out of
```

```
1    turn.  We will make sure that everyone has an opportunity to

2    speak, and any outbursts or improper remarks will likely lead

3    to having defendants have to watch -- or listen to, rather,

4    listen to the audio of the proceedings in the holding cell if

5    they make any kind of outbursts or expressions of their

6    opinion.

7               As for the folks in the public, please be careful

8    and double check to make sure that you don't have a cell

9    phone or an iPad or any other kind of electronic device with

10   you.  They're not permitted in the courtroom.  Even if

11   they're on stand-by, private mode, vibration mode, whatnot,

12   they're not allowed in the courtroom.  There's no audio or

13   visual recording allowed in federal courts.

14              And as far as the microphones, we have them at

15   every table; so, counsel, you're welcome to stay at the table

16   whenever you need to so that you have access to your notes,

17   or come up to the podium which is positioned towards the

18   witness.

19              And thank you, Agent Swanson, for being here this

20   morning so we can proceed with your direct.

21              THE WITNESS:  Yes, Your Honor.

22              THE COURT:  Let's go ahead and bring in the jury.

23   And we'll stand for the jury when they come in.  They are the

24   judge of the facts.

25              COURTROOM ADMINISTRATOR:  All rise.
```

```
 1                (Jurors enter courtroom at 8:19 a.m.)
 2                THE COURT:  Everyone may be seated.  We're joined
 3      by the jury.
 4                And we have Agent Swanson back on the witness
 5      stand.  Thank you, sir.
 6                Ms. Ahmed, you can continue with your direct
 7      examination if you'd like.
 8                MS. AHMED:  Thank you, Your Honor.
 9                THE COURT:  I'm sorry.  I forgot to allow the
10      attorneys to represent their appearance on the record.  Let's
11      go ahead and do that.
12                MR. MYHRE:  Good morning, Your Honor.  Steve
13      Myhre, Erin Creegan, Nadia Ahmed, and Nick Dickinson on
14      behalf of the United States.
15                THE COURT:  Good morning.
16                MR. TANASI:  Good morning, Your Honor.  Rich
17      Tanasi for Steven Stewart, who is present.  And also at
18      counsel table is Gwen Wilson and Brian Glynn.
19                MR. MARCHESE:  Good morning, everyone.  Jess
20      Marchese on behalf of Eric Parker.
21                MR. LEVENTHAL:  Good morning.  Todd Leventhal on
22      behalf of Mr. Drexler.
23                MR. ENGEL:  Good morning, Your Honor.  Todd Engel
24      representing myself.
25                MR. PEREZ:  Good morning, Your Honor.  Shawn Perez
```

1    on behalf of Ricky Lovelein.

2             MR. JACKSON:  Good morning, Your Honor.  Terrence

3    Jackson on behalf of Greg Burleson.  Also with me is

4    Christine Abbott.

5             THE COURT:  Good morning.  Thank you very much.

6             All right.  Now, Ahmed, you can continue.

7             MS. AHMED:  Thank you, Your Honor.

8                          SCOTT SWANSON

9         called as a witness on behalf of the Government,

10                   having been previously sworn,

11              was examined and testified as follows:

12                   DIRECT EXAMINATION (Resumed)

13   BY MS. AHMED:

14   Q.   Agent Swanson, when Special Agent Opper came over to you

15   in the wash and asked the officers to put their weapons down,

16   what were the reasons that you provided to him for why you

17   did not want to do that?

18   A.   I told him that I had an immediate threat right in front

19   of me and that there was two people up on the bridge directly

20   at the furthest bridge and they were right in the middle of

21   the bridge, they had all of us covered, and that I was

22   keeping an eye on them, and I couldn't put my weapon down.

23   Q.   Just so the jury understands, can you explain to them

24   what you meant when you said "they had all of us covered"?

25   A.   So they were in a position to where they could basically

```
 1   see every law enforcement officer that was present under the
 2   wash that day.
 3                MR. LEVENTHAL:  Objection.  Speculation.
 4                MR. TANSANI:  Stewart joins.
 5   BY MS. AHMED:
 6   Q.   This is just what you understood their view to be?
 7   A.   Yes.  It appeared that they had --
 8                MR. LEVENTHAL:  Objection.  Speculation.
 9                MS. AHMED:  Your Honor, it was his understanding
10   at the time, and this is what his explanation to Agent Opper
11   was.
12                THE COURT:  Overruled.
13                THE WITNESS:  So it appeared to me they had an
14   excellent field of fire and could cover where we were.
15   BY MS. AHMED:
16   Q.   Now, shortly after that did you observe Special Agent
17   Love walk to the gate?
18   A.   Yes.
19   Q.   Did you watch what he was doing at the gate?
20   A.   No, I didn't.
21   Q.   What did you do instead?
22   A.   I kept -- after he passed and -- I looked back up where
23   the threat was, where the black hat and the tan hat threats
24   were.
25   Q.   When Agent Love was at the gate, was your concern as to
```

1   black hat and tan hat the same or did it change?

2   A.    Well, it seemed like, just peripherally, the -- there

3   was kind of a commotion when he went down there, and

4   almost --

5   Q.    A commotion where?  Excuse me.  A commotion where?

6   A.    Down in the wash in front of us.  Although I was

7   watching up here, it just seemed like there was a lot of

8   movement down there.  I didn't look to see what was

9   happening, just with my peripheral vision I could see.

10           And I remember the crowd getting louder as he

11   was -- when he -- I would assume that he made it down to the

12   gate.  And as I was watching, I -- my attention was drawn

13   back up to the bridge, and I noticed the person in the tan

14   hat and body armor moving -- how I would term moving

15   tactically to my right to -- across the bridge.

16           And that person came from the general vicinity of

17   the black hat.

18   Q.    What, if anything, did you do when you observed that?

19   A.    I kept my scope on him.  As he moved, just because of

20   the way he was moving, he was carrying his gun in what we

21   term the low ready position, not just slung down with a hand

22   on it, but he was carrying his gun in the low ready position,

23   and because I knew Special Agent Love had just went down to

24   the gate, that concerned me.  I would term it a flanking-type

25   motion that he was doing and even expanding more the view

1    from up on the bridge.

2              So I kept my scope trained on him.  And then he

3    intermingled with a larger group that was on the side of the

4    bridge on the -- actually on the highway, and I kind of -- I

5    lost him in that crowd.

6              MS. AHMED:  I'd ask that the record reflect that

7    the witness is making a hand gesture of his hands at about

8    chest height when he explained low ready.

9    BY MS. AHMED:

10   Q.   Could you explain to the jury what the significance to

11   you was of seeing him carry his weapon in the low ready?

12   A.   Well, we're trained to carry our weapons in different

13   positions for different reaction.  So the low ready allows

14   the person using the weapon to get on target -- lift the

15   weapon up and get on target within less than a second,

16   where -- as opposed to when the weapon's just slung low and

17   you have to grab it and bring it up, and it's much -- it's a

18   much longer reaction time.

19             So that's -- to us that's an immediate threat when

20   they carry a weapon like that.

21   Q.   What did you do after that?

22   A.   I think I told my partner, Special Agent Richardson --

23   I'd called it out.  I said, "Hey, the guy with the tan hat's

24   moving, he's moving to the right."

25             And when I lost him, I said, "I lost him."  And

1    Special Agent Richardson told me he picked--

2              MR. LEVENTHAL:  Objection.  Hearsay.

3              MS. AHMED:  Your Honor, this information is being

4    offered for the effect on the listener.  He doesn't know

5    whether Agent Richardson had it.  We're not offering it for

6    the truth of the matter.

7              THE COURT:  I can't hear you.

8              MS. AHMED:  We're not offering Agent Richardson's

9    statement for the truth of the matter, but rather for the

10   effect it had on him, and that was his present sense

11   impression.

12             THE COURT:  I'll admit it as a present sense

13   impression.

14             THE WITNESS:  So he -- Agent Richardson told me,

15   "I picked him up.  I got him."  And when he said that, I

16   immediately went back to where the black hat -- black-hatted

17   person was.

18   BY MS. AHMED:

19   Q.   Did you observe whether -- did you observe the black

20   hat -- or black hat, as you were calling him, did you observe

21   black hat do anything at that time?

22   A.   Yes.

23   Q.   What did you see him do?

24   A.   When I got back to his location, I could see he was in a

25   crouch, or a peeping position I called it, kind of, almost

1    like you'd see my body right here over the stand would be

2    where his body was over the rail.  And then he quickly stood

3    up and raised his weapon up and brought it up to his shoulder

4    and aimed in at me.  And then just in a split second, he

5    slung his weapon and dropped it back down.

6    Q.   When you observed him doing that, what, if anything, did

7    you think his intention was?

8    A.   I thought he was going to shoot.

9              MR. LEVENTHAL:  Objection.  Calls for speculation.

10             MS. AHMED:  Your Honor, it's what he thought, his

11   assessment at the time as he was responding to that

12   situation.  It's the effect it had on him.

13             THE COURT:  The contribution to the fear?

14             MS. AHMED:  It's what he does next in response to

15   what he thinks the individual's intention is.

16             THE COURT:  All right.  Overruled.

17             THE WITNESS:  I believed that he was going to fire

18   just because of the furtive movement that he made and how

19   fast he brought that weapon up.

20   BY MS. AHMED:

21   Q.   And what led you to believe that he was aiming toward

22   you?

23   A.   I could see the rifle aimed towards me.

24   Q.   Were you using your scope on your rifle?

25   A.   Yes.

1    Q.   What, if anything, did you do when you saw that?

2    A.   I took the safety off my weapon and took the slack out

3    of the trigger and just waited.

4    Q.   And then what did you do?

5    A.   As soon as I saw the sling go up and the weapon lower, I

6    took the -- put the safety back on my weapon, took my finger

7    off the trigger, and just observed him.

8    Q.   Why did you do that?

9    A.   Directly -- directly after seeing him drop his weapon

10   down, after I perceived he was no longer an immediate threat,

11   I took the safety off.

12   Q.   When you initially began to press down on your trigger,

13   what was your intention?

14   A.   To fire at him, if he fired at me.

15   Q.   What caused -- why did you decide not to fire at him?

16   A.   Because he didn't fire.

17   Q.   Now, is that -- based on your training and experience,

18   would that have been an appropriate time for you to use

19   force?

20   A.   Yes.

21   Q.   What made you decide not to in that situation?

22   A.   A couple reasons.  I knew that if anyone shot their

23   weapon at any time on either side that I felt like it was

24   going to be a blood bath, that both sides would start

25   shooting.  And I think that is what they were waiting for is

1    one of us to shoot.

2              MR. LEVENTHAL:  Objection.  Calls for speculation.

3    Move to strike, Judge.

4              MR. TANSANI:  Stewart joins.

5              MR. LEVENTHAL:  How can he --

6              MS. AHMED:  Your Honor, can I ask a question to

7    clarify that?

8              THE COURT:  Sure.

9    BY MS. AHMED:

10   Q.   Was it your assessment at the time when you were in the

11   wash, based on your training and experience, that -- and what

12   you were seeing of the crowd, that it was -- that was what

13   you thought was their intention?

14   A.   Yes.

15             MR. LEVENTHAL:  Same objection.

16             MR. JACKSON:  I would join in that objection.

17             MR. LEVENTHAL:  And I would move to strike.  The

18   question was leading.

19             THE COURT:  Overruled.

20   BY MS. AHMED:

21   Q.   Did you at any time observe Agent Love do anything else

22   while he was in the wash?

23   A.   No.

24   Q.   What did you do after you put your -- put the safety

25   back on your weapon?

1    A.    I asked for the -- I asked someone to try to get ahold

2    of dispatch to get the freeway shut down again because the

3    traffic again was still just rolling at a snail's pace.

4              And that had been a couple times where I had

5    believed that we were going to take fire.  And I knew it

6    still would be almost impossible to return fire because of

7    our backdrop.  And I just remember being very frustrated and

8    angry that the highway wasn't being shut down.

9    Q.    Did you, after that, at any point, observe black hat

10   again?

11   A.    Yes.

12   Q.    What did you observe, if anything, black hat do?

13   A.    I observed the person in the black hat would -- I just

14   kept trained on that location.  And I could see his head

15   peeping over the barrier, and then he would just disappear

16   down, and I didn't know what he was doing.

17             And that happened a couple times.  And then I

18   observed him drop down below the jersey barrier.  And this

19   time there was a couple female people that looked like they

20   were just civilian, unarmed civilians, walked towards that

21   spot that the black-hatted person went down.

22             And there was also a person to my left that

23   appeared to be, like, a cameraman or maybe a journalist, and

24   he had a camera.  And they were kind of hovering over that

25   spot, taking --

1    Q.    Did you --

2    A.    -- pictures.  It appeared to be they were taking

3    pictures.  I couldn't tell exactly, but it appeared they had

4    cameras or cell phone in their hand taking those pictures.

5    Q.    Did you then continue to observe what they were doing in

6    relation to black hat?

7    A.    Yeah.  Well, the last spot I saw him go down they were

8    kind of hovered over, and it appeared they were taking

9    pictures.

10   Q.    So what did you do then?

11   A.    I continued to watch that spot --

12   Q.    I'm sorry.  What did you see?

13   A.    I continued to watch that spot because they had been

14   taking pictures of both the area that the tan-hatted person

15   was in and black hat.  But this is the first time I kind of

16   saw people hovering over; so that heightened my level a

17   little bit.

18   Q.    Your level of what?

19   A.    Just my level of, like, what's going on?  Why would they

20   be doing that now?

21             And I thought to myself, well, maybe he's loading

22   his weapon or charging it or doing something that caused them

23   to come over and start taking pictures.

24   Q.    What, if anything, did you observe in that area then?

25   A.    I observed that the two women abruptly turned around and

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1    just started walking away at, like, a normal and -- faster

2    than normal pace, walking back towards the right where the

3    crowd was.

4              And then I observed the cameraman just drop his

5    camera and put both fingers in his ears.

6    Q.   What, if anything, did that make you think at that

7    point?

8    A.   I thought that there was -- he was going to pop back up

9    and start shooting.

10   Q.   What, if any, action did you take?

11   A.   I put my -- the reticle on my scope back on the spot

12   where I last saw him, because I figured if he was going to

13   pop up and start shooting that he would appear, hopefully, at

14   the last point I saw him.  So I just kept my reticle on

15   there.  And he didn't pop up initially.

16   Q.   Did you see him emerge from that spot thereafter at any

17   point?

18   A.   Well, I scanned to the left a little bit, and I noticed

19   that the cameraman that I had seen before put his fingers in

20   his ears just kind of dropped them down.

21             And I kept my weapon pointed in that direction.

22   And later on he came up, but he -- I could see that he had

23   the stock of his weapon kind of up here, and I could see it.

24   So I just continued to watch after that.

25             MS. AHMED:  Your Honor, may we publish Exhibit

```
 1    109, which was previously admitted into evidence?
 2              THE COURT:  Yes, you may.
 3              MS. AHMED:  Can we advance it to approximately
 4    12:27.
 5              THE COURT:  The number again?
 6              MS. AHMED:  12:27.  To the timestamp.
 7          (Videotape played.)
 8              MS. AHMED:  Can we stop it here?
 9    BY MS. AHMED:
10    Q.   Agent Swanson, do you see yourself in this frame?
11    A.   I see my right elbow.
12    Q.   Can you just circle it on the screen.
13              And do you see Agent Richardson in this screen?
14    A.   Yes.
15    Q.   Can you circle where he is.
16              MS. AHMED:  The witness has placed a circle to the
17    far left to indicate where he was and relatively in the
18    center to indicate where Agent Richardson was.
19    BY MS. AHMED:
20    Q.   Do you know who the individual next to Agent Richardson
21    is?
22    A.   Yes.
23    Q.   Who is that?
24    A.   That's Agent Gandiaga.
25    Q.   And at this time do you know what you are doing in this
```

1    scene?

2    A.    I'm watching up on the bridge.  At this point, I think

3    maybe I have -- just watching with my naked eyes just to see

4    movement.

5    Q.    I can play that -- we can continue to play the video.

6              (Videotape played.)

7              MS. AHMED:  Can you pause it there.  Paused at

8    12:27:41.

9    BY MS. AHMED:

10   Q.    Agent Swanson, can you explain to the jury -- was that

11   your voice that we heard on that clip?

12   A.    Yes.

13   Q.    And can you explain to the jury what it was you were

14   seeing there?

15   A.    I noticed movement, brought my scope up, and observed

16   the individual with the tan hat, in the general vicinity of

17   where the black hat was, moving to the right of the bridge.

18   And I told -- initially I think I told Agent Richardson that

19   the guy in the tan hat was moving.

20             And then I told the truck that was to my left --

21   and they had guys over there also observing, and I let them

22   know that the guy in the tan hat was moving, as well, because

23   they were -- they were watching as well.

24   Q.    Do you know whether they had a better or same or worse

25   view of that area where you saw tan hat move than you did?

```
 1    A.    No.   I never moved from my spot, so I don't know exactly
 2    what their perspective was.
 3              MS. AHMED:  Can we continue to play.
 4          (Videotape played.)
 5              MS. AHMED:  Stop it there.  Stopped at 12:30:11.
 6    BY MS. AHMED:
 7    Q.    Agent Swanson, can you explain to the jury -- again, was
 8    that your voice that we heard toward the end of that --
 9    A.    Yes.
10    Q.    -- segment?
11              And what were you saying?
12    A.    I think I had voiced at one point, "Where is NHP at?"
13    maybe an expletive.  I apologize for that.
14              But then I was pointing out a long gun, body
15    armor.  And then I think at the end there I said that he
16    turned his hat backwards.
17    Q.    When you say "he turned his hat backwards," whom were
18    you talking about?
19    A.    The person in the black hat.
20    Q.    What was it that you had just seen?
21    A.    I saw him just over the barrier.  And then he turned his
22    hat backwards and then disappeared.
23    Q.    At that time, based on your training and experience,
24    what did you assess from the movement of his hat?
25    A.    From having done a lot of shooting, especially behind a
```

1    long gun, when you're up -- a lot of times the bill of the

2    hat will interfere with either the scope or the sights; so

3    when a person turns their hat backwards, it's to get closer

4    up or press in closer to the sights.

5    Q.   What, if anything, did you assess was his intention at

6    that time then?

7    A.   Again, that's one of the indicators that there was an

8    immediate threat that they might, you know, start firing.

9    Q.   Now, you previously mentioned, yesterday, that you felt

10   fear for your safety while you were in the wash?

11   A.   Yes.

12   Q.   Did that fear manifest itself in any way physically

13   while you were down there in the wash?

14   A.   Yes.

15   Q.   How so?

16   A.   Well, I had a -- there was a lot of fatigue just

17   staying, you know, on that area behind that -- behind my

18   scope for such a long time.  My leg would shake.  I couldn't

19   stop it from shaking.

20             You saw where I was bracing my arm on the window

21   sill just because it was -- I was fatigued and just -- just

22   parts of my body would shake uncontrollably.

23   Q.   At some point after the clip that we just saw, were you

24   given any information that caused you to change your

25   position?

1    A.    No.

2    Q.    Not ever, or not at that point?

3    A.    I think I might at one point used the window of the

4    driver's side and was peering through the passenger's side of

5    the truck at one point.

6    Q.    Did you -- at some point, did you see the vehicles in

7    front of you change their position in the wash?  The BLM

8    vehicles in front of you?

9    A.    Just at the -- when they asked us to head back up to the

10   ICP, that's the only time.

11   Q.    Before that happened, did you -- from the time of the

12   video clip, did you continue to watch the spot where you

13   observed the black hat on the --

14   A.    Yes.  Yes.

15            MS. AHMED:  Your Honor, may we publish what's been

16   previously admitted as Exhibit 258?

17            THE COURT:  Yes, you may.

18   BY MS. AHMED:

19   Q.    Agent Swanson, do you see yourself in this photograph?

20   A.    Yes.

21   Q.    Can you circle yourself?

22            MS. AHMED:  The witness has placed a circle on the

23   sort of right center of the picture.

24   BY MS. AHMED:

25   Q.    Is this -- to your knowledge, is this scene taking place

```
 1    before or after the clip that was just played?

 2    A.    I'm sorry.  Before what?

 3    Q.    Before or after the clip -- what we just saw in the

 4    previous exhibit?

 5    A.    I don't know.

 6    Q.    Do you recall the other officers around you in the

 7    previous exhibit, all of them being there?

 8    A.    No.

 9    Q.    And, to your knowledge, what are you doing in this

10    exhibit?

11    A.    I'm glassing the bridge.

12    Q.    What does "glassing" mean?

13    A.    I'm just using my scope to look in the general vicinity

14    where the threats were.

15    Q.    Do you know what the other officers are doing in this

16    picture?

17    A.    No, I don't.

18    Q.    Agent Swanson, I'd like to turn your attention to what

19    has been premarked for identification as Exhibit 417.

20             MS. AHMED:  Your Honor, may we publish it on the

21    screen just to counsel and the witness?

22             THE COURT:  Yes, you may.

23             MS. AHMED:  Thank you.

24             And it's going to show up on your screen.

25
```

```
 1    BY MS. AHMED:
 2    Q.   Agent Swanson, do you see Exhibit 417?
 3    A.   Yes.
 4    Q.   Do you recognize what's depicted in this first frame?
 5    A.   Yes.
 6    Q.   Is this something that you observed yourself on April
 7    12, 2014?
 8    A.   Yes.
 9              MS. AHMED:  And can we advance to the next, 417-2.
10    BY MS. AHMED:
11    Q.   Agent Swanson, do you recognize what's depicted in this
12    screen?
13    A.   Yes.
14    Q.   And does it also fairly and accurately depict what you
15    observed on April 12, 2014?
16    A.   Yes.
17              MS. AHMED:  Can we advance to the next screen of
18    Exhibit 417.
19    BY MS. AHMED:
20    Q.   Agent Swanson, do you recognize what's in this screen?
21    A.   Yes.
22    Q.   And does it fairly and accurately depict what you
23    observed on April 12, 2014?
24    A.   Yes.
25    Q.   And were these, all three of these screenshots that we
```

```
 1   just went through, what you observed from your position in
 2   the wash on April 12, 2014?
 3   A.   Yes.
 4             MS. AHMED:  Your Honor, the government moves to
 5   admit Exhibit 417.
 6             THE COURT:  Any objection to Exhibit 417?
 7             MR. MARCHESE:  None from Parker.
 8             MR. TANASI:  None from Stewart, Your Honor.
 9             MR. LEVENTHAL:  I'm going to object as to the
10   foundation as to time.  I understand that it was while he was
11   in the wash, but something more specific?  Because these
12   pictures are not from the angle that he was at.
13             THE COURT:  Anyone else?
14             MR. ENGEL:  None from Engel.
15             MR. PEREZ:  No objection, Lovelein.
16             MR. JACKSON:  I have no objection from Burleson.
17             THE COURT:  All right.  Do you want to see if you
18   can set a time?
19             MS. AHMED:  Sure, Your Honor.
20   BY MS. AHMED:
21   Q.   Were you observing what is depicted in this exhibit from
22   your vantage in the wash at the blue truck?
23   A.   Yes.
24   Q.   And were you at that blue truck for the entirety of the
25   time you were in the wash until you left?
```

Case 2:16-cr-00046-GMN-PAL   Document 1777   Filed 03/29/17   Page 26 of 321

Day 11 - 26


```
 1   A.    Yes.
 2              MS. AHMED:  Your Honor, government moves to admit
 3   Exhibit 417.
 4              THE COURT:  That's sufficient.  Exhibit 417 will
 5   be admitted.
 6         (Government's Exhibit 417 received.)
 7              MS. AHMED:  Your Honor, may we publish it to the
 8   jury?
 9              THE COURT:  Yes, you may.
10   BY MS. AHMED:
11   Q.   Agent Swanson, can you explain to the jury, what is
12   depicted in the first frame that we're looking at right here
13   on Exhibit 417?
14   A.    This is my view of -- or this is how I saw the
15   black-hatted person.  To me it appeared that he had his rifle
16   kind of slung in front and the butt of the rifle up towards
17   his right shoulder.
18              That person to our left --
19   Q.   Can you circle -- I'm sorry.  Can you circle where you
20   see that --
21   A.    Sure.
22   Q.   -- black hat?
23              MS. AHMED:  The witness has placed a circle on the
24   upper right-hand corner.
25
```

1    BY MS. AHMED:

2    Q.   Can you continue?

3    A.   That person to the black hat's right, our left, is the

4    person that I observed taking pictures and then putting their

5    finger in their ears.

6              MS. AHMED:  Can we advance to the second screen of

7    Exhibit 417.

8    BY MS. AHMED:

9    Q.   Agent Swanson, can you explain what you see in this

10   screenshot?

11   A.   Yes.  That's black hat aimed in at me.

12   Q.   Can you circle where you see that?

13             Is this screenshot -- was this immediately after

14   the one that we previously saw?

15   A.   Yes.

16   Q.   And can you explain to the jury what -- where, if you

17   can tell, his rifle was at this time?

18   A.   Shouldered.  He's kneeling down and shouldered and aimed

19   in.

20             MS. AHMED:  The witness has circled in the upper

21   center of the page.  I'm clearing your markings.

22             Can we zoom in on that area?

23   BY MS. AHMED:

24   Q.   Is that -- can you indicate where the rifle is in this

25   picture?

```
 1              MS. AHMED:  The witness has drawn an arrow
 2    pointing to the center of the screen.
 3              Can we advance to 417-3.
 4    BY MS. AHMED:
 5    Q.   Can you explain what's depicted in this screenshot?
 6    A.   Again, the rifle is dropped down off of the -- off his
 7    shoulder and back in a front slung position, and you can see
 8    the butt of his rifle facing up.
 9    Q.   And can you circle where you see that?
10              And this is 417-3.
11              Now, this is at a different time; correct?
12    A.   I'm not sure.
13    Q.   It's -- let me clear that.
14              MS. AHMED:  Can you zoom in on the area where
15    Agent Swanson indicated.  Thank you.
16    BY MS. AHMED:
17    Q.   Now, is this posture that you see black hat in, would
18    you see him like this when you were out -- did you see him
19    like this when you were in the wash observing him?
20    A.   I did.
21              MS. AHMED:  You can take this exhibit down.  Thank
22    you.
23              And I would like to turn your attention to Exhibit
24    419.
25              And, Your Honor, this has been premarked for
```

```
 1   identification.  It has not been admitted.
 2               And, Your Honor, may we publish it just to the
 3   witness and to counsel?
 4               THE COURT:  Yes.
 5   BY MS. AHMED:
 6   Q.   Agent Swanson, do you see what's depicted in Exhibit
 7   419?
 8   A.   Yes.
 9   Q.   Did you observe what is depicted in this image from your
10   vantage from the wash when you were in the blue truck on
11   April 12, 2014?
12   A.   Yes.
13   Q.   Does it fairly and accurately depict what you observed
14   from the truck that day?
15   A.   Yes.
16               MS. AHMED:  Your Honor, the government moves to
17   admit Exhibit 419.
18               THE COURT:  Any objection to 419?
19               MR. TANSANI:  No objection, Stewart.
20               MR. MARCHESE:  No, Your Honor, Parker.
21               MR. LEVENTHAL:  No objection, Drexler.
22               MR. ENGEL:  None Engel.
23               MR. PEREZ:  None Lovelein.
24               MR. JACKSON:  No objection from Burleson.
25               THE COURT:  All right.  Exhibit 419 will be
```

1    admitted.

2              MS. AHMED:  Your Honor, may we publish it to the

3    jury?

4              THE COURT:  Yes, you may.

5    BY MS. AHMED:

6    Q.   Agent Swanson, can you explain to the jury what you

7    observed in Exhibit 419 on April 12, 2014?

8    A.   This is the tan-hatted person that I called out that was

9    moving away from the black-hatted person.  And he would move.

10   And you could see he's holding his weapon in low ready

11   position and periodically stop and turn and then kept moving

12   to the right.  And that's when I lost him.

13   Q.   Can you circle where you see the individual that you

14   were just describing.

15             MS. AHMED:  And the witness has placed a circle on

16   the slight left center of the screen.

17             I'm going to clear that.  And can we zoom in on

18   that area?

19   BY MS. AHMED:

20   Q.   Agent Swanson, is this from -- based on your training

21   and experience, are you able to discern whether this is low

22   ready or high ready in terms of how he's carrying the rifle?

23   A.   That's low ready.

24   Q.   Now, do you know whether you saw one or more tan hats in

25   the northbound bridge that day?

1    A.   I saw more than one person with tan hat, but that's who

2    I saw moving.

3              MS. AHMED:  You can take Exhibit 419 down.  Thank

4    you.

5              Agent Swanson, I'd like to turn your attention to

6    the screen to look at what's been premarked for

7    identification as 416, Exhibit 416, Government's Exhibit 416.

8              And, Your Honor, this has not been admitted yet.

9    May we just publish it to the witness and counsel?

10             THE COURT:  Yes.

11             MS. AHMED:  Thank you.

12   BY MS. AHMED:

13   Q.   Agent Swanson, do you see Exhibit 416 --

14   A.   Yes.

15   Q.   -- on your screen?

16             Looking at 416-1, the first screenshot in the

17   exhibit, do you recognize what is depicted here?

18   A.   Yes.

19   Q.   And is this something that you observed from your

20   vantage point at the blue truck in the wash on April 12,

21   2014?

22   A.   Yes.

23             MS. AHMED:  May we turn to 416-2.

24   BY MS. AHMED:

25   Q.   Do you recognize what is depicted in Exhibit 416-2?

1    A.    Yes.

2    Q.    Is this something that you observed from your vantage

3    point in the wash at the blue truck on April 12, 2014?

4    A.    Yes.

5              MS. AHMED:  Can we turn to 416-3.

6    BY MS. AHMED:

7    Q.    Is this something -- do you see 416-3?

8    A.    Yes.

9    Q.    Do you recognize it?

10   A.    Yes.

11   Q.    Is this something you observed from your vantage point

12   at the blue truck on April 12?

13   A.    Yes.

14             MS. AHMED:  And can we turn to 416-4.

15   BY MS. AHMED:

16   Q.    Do you recognize what is depicted here?

17   A.    Yes.

18   Q.    Is it also something that you observed from your vantage

19   point on the blue truck?

20   A.    Yes.

21             MS. AHMED:  And can we turn to 416-5.

22   BY MS. AHMED:

23   Q.    Do you recognize what is depicted here?

24   A.    Yes.

25   Q.    And did you observe this from your vantage at the blue

1    truck on April 12, 2014?

2    A.   Yes.

3    Q.   Now, do all five of these screenshots that I just showed

4    you fairly and accurately reflect what you observed on April

5    12, 2014?

6    A.   Yes.

7              MS. AHMED:  Your Honor, government moves to admit

8    Exhibit 416.

9              MR. TANSANI:  No objection, Stewart.

10             MR. MARCHESE:  None from Parker.

11             MR. LEVENTHAL:  None on behalf of Mr. Drexler.

12             MR. ENGEL:  None from Engel.

13             MR. PEREZ:  None from Lovelein.

14             MR. JACKSON:  No objection, Burleson.

15             THE COURT:  All right.  Exhibits 416, screenshots

16   1, 2, 3, 4, 5 may be admitted.

17        (Government's Exhibit 416 received.)

18             MS. AHMED:  Thank you, Your Honor.

19             May we publish it to the jury?

20             THE COURT:  Yes, you may.

21   BY MS. AHMED:

22   Q.   Agent Swanson, looking at 416-1, can you explain to the

23   jury what is depicted here that you observed on April 12th?

24   A.   This is where I observed the black-hat person, like I

25   said, kind of at a bust level and observed his long arm in a

```
 1    tactical position, slung tactically in front.

 2    Q.   Now, can you circle where you see black hat?

 3    A.   Again, my circles --

 4    Q.   Circle with a line through it.

 5            MS. AHMED:  The witness has circled a spot in the

 6    lower center portion -- lower left center portion of the

 7    screen.

 8            THE COURT:  It's the right, not the left.

 9            MS. AHMED:  You're right.  The lower right portion

10    of the screen.  Thank you, Your Honor.

11            Clear your marking.  And can we zoom in on that

12    area.  Can we actually -- okay.

13    BY MS. AHMED:

14    Q.   Can you explain to the jury with this close-up where the

15    rifle is?

16    A.   Again, slung down in front.

17    Q.   Can you mark it on the screen.

18            MS. AHMED:  And the witness has placed an arrow

19    above the center of that zoomed-in portion of the screen.

20            Now, moving on to 416-2.

21    BY MS. AHMED:

22    Q.   Do you see black hat in this screen?

23    A.   Yes.

24    Q.   Can you circle where you see him.

25            What is he doing in this screen?
```

```
1    A.    He's standing up in what we call blading off.

2    Q.    Did you see him go from the position in 416-1 to this

3    position in 416-2?

4    A.    Yes.

5              MS. AHMED:   The witness has circled in the lower

6    right portion of the screen.   I'm going to clear your mark.

7              And can we zoom in on that area.

8    BY MS. AHMED:

9    Q.    And can you draw an arrow where the individual's weapon

10   is.

11             Now, can you explain to the jury what the term

12   "blading off" means?

13   A.    Blading off means to turn your body to create a lower

14   profile.   It's generally done so that if someone is shooting

15   back at you, that you have less of a target.   Here's a bigger

16   target with your body facing frontward.   Blading off creates

17   a smaller silhouette.

18   Q.    Where are his hands in terms of his rifle in this

19   picture?

20   A.    One of -- his left hand appears to be on the rails of

21   his weapon, the front part of his weapon.

22   Q.    And where is the right hand, to your knowledge, to the

23   extent you saw it that day?

24   A.    It was on his -- the stock of his weapon.   So like this.

25   Q.    When you observed Exhibit 416-2, what, if anything, did
```

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

```
 1   you think was black hat's intention at that time?

 2             MR. LEVENTHAL:  Objection.

 3             THE WITNESS:  Well, this is the very first --

 4             MR. LEVENTHAL:  Objection.  Speculation.

 5             THE COURT:  Sustained.

 6   BY MS. AHMED:

 7   Q.   What was your -- what, if anything, did you do in

 8   response to what he was doing?

 9   A.   I took my weapon off safe and put my finger on the

10   trigger and stayed aimed in at his position.

11   Q.   And why did you do that?

12   A.   It was a very furtive movement.  He came up very quickly

13   from here to here and bladed off, and it was just like a

14   split second.

15   Q.   Moving on to 416-3, does this -- what you see in 416-3,

16   is this -- did you observe this -- excuse me.  Do you see

17   black hat in 416-3?

18   A.   Yes.

19   Q.   And can you circle where he is.

20             MS. AHMED:  The witness has circled in the lower

21   right-hand corner of the frame.

22   BY MS. AHMED:

23   Q.   What is black hat doing in this frame?

24   A.   It appeared to me he was bringing his weapon up to his

25   shoulder.
```

1              MS. AHMED:  And I'm going to clear your circle.

2      Can we zoom in on that area.

3      BY MS. AHMED:

4      Q.   Can you draw an arrow as to where his weapon was at this

5      time?

6              Now, is this frame -- did this happen after 416-2?

7      A.   Yes.

8      Q.   Sequentially after?

9      A.   Yes.

10     Q.   Was it all one fluid movement or different movements?

11     Did he stop?

12     A.   No, it was all one fluid movement.

13     Q.   And what did you -- what, if anything, did you do when

14     you saw his weapon being brought up to that position?

15     A.   I remained aimed in.  As you can see, I noticed that

16     there was heavy traffic behind him.

17     Q.   Why did you remain aimed in?

18     A.   Because I thought he was going to shoot.

19     Q.   Moving on to 416-4, do you see black hat in this

20     picture?

21     A.   Yes.

22     Q.   Can you circle where you see him?

23              MS. AHMED:  The witness has placed a circle over

24     the lower right-hand corner of this screenshot.

25              I'm going to clear your marking.  Can we zoom in

1   on that area.

2   BY MS. AHMED:

3   Q.   Can you tell the jury what black hat is doing in this

4   picture?

5   A.   To me it looked like he was, again, bringing the weapon

6   up to his shoulder.  And this is all one fluid thing.  So I

7   wasn't seeing it in these screenshots.  To me it was like he

8   was bringing -- stood up quickly and was bringing his weapon

9   up to his shoulder to fire.

10  Q.   And can you draw an arrow where his weapon is in this

11  screenshot?

12          MS. AHMED:   The witness has drawn an arrow in the

13  center of this zoomed-in portion of the screen.

14          And then can we go to 416-4.  Excuse me, 416-5.

15  BY MS. AHMED:

16  Q.   Do you see black hat in this screenshot?

17  A.   Yes.

18  Q.   Can you circle where you see him?

19          MS. AHMED:   The witness has drawn a circle over

20  the lower right-hand portion of the screen.

21          Clear your mark.  Can we zoom in on that area.

22  BY MS. AHMED:

23  Q.   Now, what did you observe black hat doing in this

24  screenshot?

25  A.   To me it appeared, because I saw the silhouette of his

```
 1    rifle over here, and it appeared that he was moving his arms
 2    up to sling his rifle somehow.
 3    Q.   What did you think -- what, if anything, did you do when
 4    you saw him doing that?
 5    A.   I took the -- I put the safety on my rifle and took my
 6    finger off the trigger.
 7    Q.   Why did you do that?
 8    A.   Because it appeared like he was slinging his weapon and
 9    wasn't -- it was no longer a threat.
10    Q.   Can you explain to the jury how -- over what amount of
11    time did that sequence of events take place?
12    A.   Seconds.
13             MS. AHMED:  You can take that down.  Thank you.
14    BY MS. AHMED:
15    Q.   Now, Agent Swanson, at some point were you told that you
16    would -- anything about leaving the wash?
17    A.   Yes.
18    Q.   What were you told?
19    A.   We were told that we were to pull back -- go to your
20    vehicles and pull back to the incident command post, to the
21    ICP.
22    Q.   Were you told why you were doing that?
23    A.   No.
24    Q.   Did you have an understanding at that point of why you
25    were doing that?
```

1    A.    No.

2    Q.    What, if anything, did you do in response to that

3    information?

4    A.    I had slowly made my way back to my vehicle.  I was

5    walking backwards pretty much the whole way, or sideways.

6    Q.    Did you -- why did you walk backwards from the blue

7    truck?

8    A.    Because I still felt like there was a threat out in

9    front of us and that there was a possibility that there was

10   still going to be shooting coming from that side.

11   Q.    What, if anything, did you do -- did you reach your

12   vehicle when you did that?

13   A.    Yes, I eventually reached my vehicle.

14   Q.    And what, if anything, did you do from there?

15   A.    I got in my vehicle with Special Agent Richardson, and

16   we made our way back to the parking area of the ICP.

17   Q.    At that point were you told anything about what would

18   happen next?

19   A.    Yeah, we were told that we were leaving and that we were

20   to try to hook up to the trailers that were there, the ATV

21   trailers, the small trailers that people brought ATVs or UTVs

22   on.  And people started lining up to convoy out.

23   Q.    Were you given any timeframe in which you needed to do

24   that?

25   A.    They said, "You guys got to get out of here."  I think

```
 1    there was a timeframe given, but I don't know exactly what it
 2    was.  I think it was not doable, like 30 minutes or something
 3    like that.
 4    Q.   And so what did you do?
 5    A.   Well, I noticed that people were lining up.  And I
 6    noticed that no one was hooking up to trailers.  So I went --
 7    I changed modes from this person that was keeping an eye on
 8    and that threat to -- back to team leader mode.
 9    Q.   Did you at that point feel that your level of fear for
10    your safety changed?
11    A.   No.
12    Q.   Why not?
13    A.   Well, because I knew that the same people that I had
14    just been engaged in a standoff with were just right over the
15    hill still.  And I knew from what they told us that they were
16    coming to where we were at.
17            MR. JACKSON:  Objection.  That's based on hearsay.
18    Move to strike it.
19            MS. AHMED:  Your Honor, it's being offered just to
20    explain the fear that he had in his mind-set -- the mind-set
21    he had and why he felt fear at that moment.
22            THE COURT:  So it's not offered for the truth of
23    the matter asserted, just the effect that it had on him?
24            MS. AHMED:  Yes, Your Honor.
25            THE COURT:  All right.  Overruled.
```

```
 1              MS. AHMED:   Thank you.
 2   BY MS. AHMED:
 3   Q.   Now, when you switched back into team leader mode, what
 4   happened next for you?
 5   A.   Well, people weren't hooking up to their trailers.  And
 6   I understood that because I felt like nobody wanted to have
 7   something on the back, you know, pulling something, they just
 8   wanted to get out of there, so they wanted to abandon those
 9   trailers.
10              We were told to hook up to them.  So I started
11   calling out on the radio and getting anyone with a ball hitch
12   to come and hook up to trailers.  And begrudgingly people
13   came up and started -- and were just loading trailers -- or
14   putting trailers or trucks and lining -- getting them lined
15   back up to leave.
16   Q.   At some point did you leave the ICP?
17   A.   Yes.
18   Q.   And when you left the ICP, what, if anything, did you
19   observe as you were leaving?
20   A.   Well, we were -- we came out where everyone was gathered
21   that I had just been pointing a -- had a rifle pointed at me
22   and pointing back, and we had to drive over that same bridge.
23              And as we were coming out, people were just lined
24   up, just screaming at us, flipping us off, telling us to get
25   the F out, and waving signs at -- right on our windshields.
```

```
 1    And we slowly made our way back over the bridge.

 2    Q.   Did that cause you any concern for your safety --

 3    A.   Yes.

 4    Q.   -- as a law enforcement officer?

 5    A.   Yes.

 6    Q.   Why?

 7    A.   Because I didn't think that the threats had just

 8    disappeared in the time that it took us to hook up a few

 9    trailers.

10    Q.   Where did you go from there?

11    A.   We went back to Mesquite, to our hotel.

12    Q.   What did you do there?

13    A.   They told us, "Go get your stuff, we're going to convoy

14    back to Vegas."

15            And so I went up and just grabbed what I could

16    carry.  I left a Keurig coffee machine there.  I left what I

17    couldn't carry and just went and threw it in my truck and got

18    ready to go.

19    Q.   Why did you leave behind your personal effects?

20    A.   Because I was afraid that they were going to come to our

21    hotel because everyone knew where we were staying.  The whole

22    time we were there, we had people driving around our hotels

23    trying to get in the hotel.

24            So I knew that there was bad guys out there that

25    knew where we were staying, and I knew that we were pretty
```

```
 1    vulnerable at that time.  So I wanted to be down at my
 2    vehicle.  And I still had my AR on.  And I thought that they
 3    may take the fight to us there.
 4    Q.   At that point did the fear for your personal safety
 5    change? lessen? increase?
 6    A.   No.
 7    Q.   At some point did you feel less -- that you were no
 8    longer in danger?
 9    A.   Maybe when we got to the Las Vegas city limits.  Just a
10    little drop.
11    Q.   Now, taking you back to the time that you were in the
12    wash, in terms of the fear that you felt for your safety as a
13    law enforcement officer, did you at some point think that you
14    might not survive the events that were taking place there?
15    A.   Yes.
16              MR. TANASI:  Objection.  Leading.
17              THE COURT:  Overruled.
18    BY MS. AHMED:
19    Q.   What, if anything, did you do to come to terms with that
20    fear while you were in the wash?
21    A.   At one point I said a prayer and asked God to take care
22    of my wife and children if I didn't make it out.  Then I said
23    "Our Father," and I got back to work.
24              MS. AHMED:  Your Honor, Court's indulgence?
25              THE COURT:  Yes.
```

```
 1              MS. AHMED:  Your Honor, no further questions.
 2              I'll pass the witness.  Thank you.
 3              THE COURT:  Thank you.
 4              Cross, Mr. Marchese?
 5              MR. MARCHESE:  Thank you, Your Honor.
 6                         CROSS-EXAMINATION
 7   BY MR. MARCHESE:
 8   Q.   How are you doing, sir?
 9   A.   Good, sir.
10   Q.   Just give me a second.  Us lawyers like to grab a lot of
11   things to make ourselves look important.
12   A.   No problem.
13   Q.   When did you first get to the Bunkerville area for this
14   mission?
15   A.   I believe it was April 5th.
16   Q.   Can you give me an approximate date, if you remember?
17   A.   Approximately April 5th.
18   Q.   That's 2014, of course?
19   A.   Yes.
20   Q.   Okay.  And you did some other things.  I'm not going to
21   get into that too much.  I just want to fast forward to April
22   11, 2014.
23              You obviously remember that timeframe; correct?
24   A.   Yes.
25   Q.   Okay.  And in that particular timeframe, let's talk
```

```
1    about the night of April 11, 2014.  Where were you at that
2    time?
3    A.   Myself and my team members were posted at what they
4    refer to as post 6, which would be -- I get my directions in
5    that area mixed up.  But it was behind where the cattle were
6    penned up.  There's a large dirt mound.  We were on the other
7    side of that towards the wash facing out.  I think it's
8    north.
9    Q.   Is that where all the trailers are and everything like
10   that?
11   A.   Yes, the greater distance up the wash from that.
12   Q.   Okay.  Pretty far back; correct?
13   A.   Yes.
14   Q.   From post 2.  Fair to say?
15   A.   Yes.
16   Q.   All right.  And the reason that you were stationed there
17   on that particular evening is that there was a heightened
18   security level; is that correct?
19   A.   Correct.
20   Q.   Somewhere, someone gave some sort of order to go there
21   that night and guard the compound; correct?
22   A.   Correct.
23   Q.   Because there was a threat assessment that people were
24   going to come and possibly take the cattle or do some harm or
25   something along those lines; is that correct?
```

1    A.    Exactly.

2    Q.    Long night; correct?

3    A.    Yes.

4    Q.    Get much sleep?

5    A.    No.  We went up and down in, like, two-hour shifts; so

6    stayed up for two and went down for two.

7    Q.    Okay.

8    A.    With our partner.

9    Q.    And your partner at that time, I believe you said, was

10   Mr. -- or, I'm sorry, Agent Richardson?

11   A.    Yes, sir.

12   Q.    You guys were together for the entirety on April 11th

13   and the 12th; is that correct?

14   A.    Yes.  Yes, sir.

15   Q.    2014?

16   A.    Yes, sir.

17   Q.    Fortunately nothing happened on the night of the 11th,

18   though; correct?

19   A.    No, sir.

20   Q.    Okay.  Now, let's turn to the early morning hours of

21   April 12th of 2014.

22            Are you still at the post 6 in that general

23   vicinity?  Or where are you?

24   A.    Yes, sir.

25   Q.    Okay.  And what are you doing at that time?  Still the

 1    same thing?

 2    A.    Yes, sir.

 3    Q.    Okay.  At some point in time, did you move from post 6

 4    to another location?

 5    A.    Yes.

 6    Q.    Okay.  Where was that other location?

 7    A.    Post 2.

 8    Q.    Okay.  Approximately when did you get to post 2?

 9    A.    Approximately around 11:45 a.m.

10    Q.    Okay.  Now, that is -- that was a call that came over

11    the radio; correct?

12    A.    Yes.  At about 11:30.

13    Q.    Okay.  You geared up and then went to post 2 ten,

14    fifteen minutes later?

15    A.    Yes, sir.

16    Q.    Okay.  That call that came out over the radio was

17    basically, "Everybody get over to post 2"; fair to say?

18    A.    Yeah, everyone that was available, yes.

19    Q.    And you were available, so you went?

20    A.    Yes -- well, yeah.  We left one guy back at post 6, and

21    everyone else went.

22    Q.    Okay.  Who is everyone else?  It's you, it's Richardson;

23    right?

24    A.    Yes.  And --

25    Q.    Who else?

```
 1    A.    -- another team member that had been assigned to me,

 2    Ranger Buchanan.

 3    Q.    Okay.

 4    A.    He was in his own vehicle and went down there.

 5    Q.    All right.  You say he was assigned to you.  So you're

 6    not really too familiar with Buchanan?

 7    A.    Well, during that operation he wasn't on my team until

 8    that night of the 11th.

 9    Q.    Okay.

10    A.    So he was attached to us.

11    Q.    All right.  Well, there are different agents and rangers

12    from all different areas, correct, that came into the area of

13    Overton/Bunkerville area?

14    A.    Yes, sir.

15    Q.    Okay.  And had you worked with Buchanan before?

16    A.    Yes, sir.

17    Q.    Oh, you had.  Okay.  Richardson seems like you guys were

18    close?

19    A.    I worked with him before.  We're stationed at different

20    places, but --

21    Q.    All right.  You knew him?

22    A.    Yes.

23    Q.    All right.  How about Agent Love?  You know him;

24    correct?

25    A.    Yes.
```

```
 1    Q.   You guys are somewhat close; fair to say?

 2    A.   Well, I worked for him.

 3    Q.   All right.

 4    A.   At one point.

 5    Q.   How long did you work for him?

 6    A.   For about a year.  Actually about two years.

 7    Q.   Okay.  At the time of this event were you working for

 8    him?

 9    A.   No, I wasn't.

10    Q.   Okay.  So were you working for him before or after that?

11    A.   I was working for him before.

12    Q.   Before?

13    A.   Yes.

14    Q.   Okay.  So you have history together?

15    A.   That's fair to say, yeah.

16    Q.   All right.  So you go to the wash, and it's the three of

17    you; correct?

18    A.   The three of us show up together as echo team, yes.

19    Q.   All right.

20    A.   But there was already people down there.

21    Q.   Oh, sure.  But the three of you went from the post 6 up

22    to post 2; and that would be you, Mr. Richardson, and

23    Mr. Buchanan?

24    A.   Yes, sir.

25    Q.   You didn't really have a necessary destination, you were
```

1    just going to post 2; is that correct?

2    A.    Yes, sir.

3    Q.    And I believe Ms. Ahmed asked you some questions.  You

4    picked out a blue Chevy pickup that we've seen some pictures

5    of, and that's where you were for the entirety of this event;

6    is that fair to say?

7    A.    That's fair to say, yes.

8    Q.    Okay.  One of the reasons that you picked it out was

9    that you felt that this would be good cover, I think was what

10   you had mentioned; correct?

11   A.    Yes.

12   Q.    You were towards the windshield and towards the engine

13   block.  And you're right handed; correct?

14   A.    Yes, I am.

15   Q.    Okay.  So that gave you a good opportunity to rest your

16   right hand on the windshield of that vehicle and scan the

17   crowd with your ACOG scope, I believe you said it was?

18   A.    Yes.

19   Q.    Okay.  Now, when you get there, the pickup is -- there's

20   no one there; correct?

21   A.    I don't think anyone was standing there.  Maybe one

22   person.

23   Q.    Okay.

24   A.    I don't remember.

25   Q.    You don't remember who that one person was?

1    A.    No.

2    Q.    All right.  What was the plan when you got there?

3    You're going to scan the crowd or what was it?

4    A.    Well, there was a team down at the bottom of the wash,

5    right by the barrier, the temporary barrier; and we were just

6    going down to augment them, so there wasn't really a plan

7    when we got there.

8    Q.    Okay.  So when you're talking about that team, you're

9    talking about the three pickups up front; correct?

10   A.    Yes.

11   Q.    Fair amount of officers around that pickup; fair to say?

12   A.    Yes.

13   Q.    All right.  So you were better off going a little bit

14   back, because you had your scope and it gave you a better

15   vantage point of the wash; fair to say?

16   A.    Yes.

17   Q.    All right.  So you get there.  When you get there, about

18   11:45-ish people are starting to arrive into the wash;

19   correct?

20   A.    Correct.

21   Q.    Now, you're hearing things called out over the radio; is

22   that right?

23   A.    Yes.

24   Q.    Some of the things would be called out on the radio is

25   that there's going to be horses coming; correct?

1    A.    Correct.

2    Q.    Did you have a radio on that particular day?

3    A.    Yes.

4    Q.    Okay.  That would be normal in the course of your duties

5    to carry a radio; is that right?

6    A.    And -- as a -- yeah, as a uniformed officer it would --

7    Q.    Sure.

8    A.    -- yes.

9    Q.    Okay.  If you're in plainclothes obviously it kind of

10   sort of gives it away --

11   A.    Right.

12   Q.    -- if you've got a radio on?

13   A.    Yeah, sometimes, yes.

14   Q.    All right.  That day you were in uniform though; right?

15   A.    I was.

16   Q.    All right.  How does the radio work?  Is it like a big

17   walkie-talkie?  Is it on your shoulder?  Explain to the

18   Court.

19   A.    I can't remember if I had a shoulder mic or not that

20   day.  I generally have -- I generally do have a shoulder mic

21   that runs from the radio to a shoulder -- what they would

22   call a lapel mic or a shoulder mic.

23   Q.    Okay.  If you didn't have a lapel mic or a shoulder mic,

24   what would you have?

25   A.    I would have to take the radio out and just depress the

 1   button on the side of the radio to transmit.
 2   Q.   Okay.  But to your recollection, that wasn't the case?
 3   You actually had the shoulder mic on that particular day?
 4   A.   I don't remember.
 5   Q.   Okay.  Now, sounds like a pretty obvious question, but
 6   the reason you use the radio is to communicate to other
 7   officers; correct?
 8   A.   Correct.
 9   Q.   Because the ICP was kind of a big compound; right?
10   A.   Yes.
11   Q.   If you were to yell something at the top of your lungs,
12   very good chance that someone way in the back or maybe even
13   way in the front of the ICP wouldn't be able to hear you?
14   A.   Probably not.
15   Q.   So at first -- on direct examination, I believe your
16   testimony is, that at first you just started scanning the
17   crowd with your eyes?
18   A.   Yes.
19   Q.   But you have your weapon out; correct?
20   A.   Yes.
21   Q.   All right.  Richardson is at the bed of the pickup
22   truck.  That would be to your right; correct?
23   A.   Correct.
24   Q.   And he's just scanning with binoculars; is that fair to
25   say?

1    A.   I don't think he had binoculars at first.  I think he

2    was just scanning with his eyes.

3    Q.   Okay.  So he's kind of doing the same thing that you

4    are?

5    A.   Yes.

6    Q.   You're just sitting tight, just assessing the situation,

7    seeing what's going to happen next; fair to say?

8    A.   Yes.

9    Q.   Okay.  Anyone else there with you?

10   A.   I mean from the videos, you know, that we saw, there's

11   obviously people coming up and leaving.

12   Q.   Sure.

13   A.   But most of the time my attention was right here.  So I

14   remember just bits and pieces of people coming and going.

15   Q.   Right.

16   A.   I think I remember SA Richardson was pretty much there

17   the whole time.

18   Q.   Okay.  And you two were working together as echo team;

19   correct?

20   A.   We had been echo team the whole gather, but there we

21   were just augmenting.  I mean, I don't think we were echo

22   team at that --

23   Q.   Well, okay.  Right.  You're partners that day, I guess?

24   A.   I would say we were all partners down in the wash,

25   but --

1    Q.    Right.

2    A.    Yeah.

3    Q.    But we'll get to that point.  But at one point in time

4    Agent Richardson had the binoculars and you had the rifle

5    with the scope, and you were working in concert with one

6    another --

7    A.    Yes.

8    Q.    -- in order to do your jobs?

9    A.    Yes.

10   Q.    Okay.  Was there anyone else, while you were in the wash

11   at post 2 at that Chevy blue pickup, that you were working in

12   concert with?  Or was it just mainly just you and Richardson

13   teamed up?

14   A.    No, there was other people there calling out threats.

15   Q.    Okay.  Who were those other people?

16   A.    I know for sure Ranger Whitworth was there.  Some of the

17   threats were coming from the radio that was on in the

18   vehicle.  And I think they were coming from either the front

19   vehicles or the other truck that was over to our left.  So

20   there was a lot of stuff being called out.

21   Q.    Okay.  So there were threats being called out over the

22   radio is your testimony?

23   A.    Some of them, yes.  And some of them were coming

24   locally.

25   Q.    Right.  So there's both people in your immediate

1    vicinity yelling things out and then over the radio people

2    are yelling --

3    A.    Yes.

4    Q.    Yelling, or calling, whatever you want to call it, out;

5    fair to say?

6    A.    Yes.

7    Q.    Okay.  So things start getting a little bit more

8    heightened.  There's more people in the wash, there's more

9    people on the northbound bridge, there's more people on the

10   southbound bridge; correct?

11   A.    Correct.

12   Q.    It doesn't seem that you focused a whole lot on the

13   southbound bridge, more on the northbound bridge; fair to

14   say?

15   A.    Yes.

16   Q.    Okay.  And that would be a multitude of factors, things

17   called out over the radio, what you're personally perceiving,

18   what other people around you are telling you as well;

19   correct?

20            MS. AHMED:  Objection.  Misstates his testimony on

21   direct.

22            MR. MARCHESE:  It's a yes or no.  He can just say

23   no if it's not.

24            THE COURT:  Rephrase it.

25

1    BY MR. MARCHESE:

2    Q.   You're looking mainly at the northbound bridge based

3    upon everything that you've taken in; correct?

4              MS. AHMED:  Objection.  Misstates the witness's

5    testimony.

6              MR. MARCHESE:  It's a yes or a no question.  If he

7    doesn't agree, he can say no.

8              THE COURT:  Overruled.

9    BY MR. MARCHESE:

10   Q.   You're looking at the northbound bridge, based upon your

11   personal perceptions; correct?

12   A.   Initially, no.

13   Q.   Well, and part of your personal perception is everything

14   that you're taking in, what you're hearing, whether it be

15   from someone else, and what you're seeing from you,

16   personally?

17   A.   Yeah.  I was looking at the -- underneath the southbound

18   bridge, as well, as those targets were being called out; and

19   then eventually the northbound bridge was, like you said,

20   where a lot of the threats were being called out.

21   Q.   Okay.  Now, at some point in time there were a lot of

22   things being called out at once, and that was -- I believe

23   your testimony, correct me if I'm wrong, that was at the

24   point where you and Richardson started working together as a

25   team; correct?

1   A.   Yes.  I asked him --

2   Q.   Because it was just getting too confusing?  You're

3   getting way too many things at one time; so Richardson was

4   going to use the binoculars, you're going to use the scope

5   and that's how you're going to work it?  Is that fair to say?

6   A.   Yeah, my scope and my eyes, yes.

7   Q.   Sure.  Right.  Because I believe you had explained it

8   yesterday on direct examination that sometimes it's easier to

9   actually look with your eyes, locate the general target, then

10  use your scope to kind of focus in and really see what's

11  going on --

12  A.   Yes.

13  Q.   -- fair to say?

14  A.   Yes.

15  Q.   Okay.

16          MR. MARCHESE:  Could we get Exhibit 364 up,

17  please.  And this has previously been published.

18  BY MR. MARCHESE:

19  Q.   You see that exhibit; correct?

20  A.   Yes, sir.

21  Q.   Now, this particular exhibit, is this your vantage point

22  on the 14th from that blue pickup -- or the 12th, excuse me,

23  from that blue pickup truck?

24  A.   No.

25  Q.   Okay.  But it's your general vicinity; correct?

```
1    A.    Yes, sir.
2    Q.    If you were exactly where you were, what would be
3    different?  Would you be further right, closer, further back,
4    what?
5    A.    I believe further right.
6    Q.    Further to the right?
7    A.    Yes, sir.
8    Q.    Okay.  Let's get to black hat and tan hat.  You
9    obviously remember those individuals.  There was a lot of
10   testimony about them; correct?
11   A.    Yes, sir.
12   Q.    Okay.  At some point in time someone calls out over the
13   radio, "Guys on the bridge with long guns," and, just for
14   brevity purposes, we'll call them black and tan hat.
15              You remember that; correct?
16   A.    Yes, sir.
17   Q.    Where did you first see those individuals when it was
18   called out?
19              MS. AHMED:  Objection.  Misstates the witness's
20   testimony.  Lack of foundation as to whether or not he first
21   saw them in response to what was called out on the radio.
22   BY MR. MARCHESE:
23   Q.    You saw --
24              THE COURT:  Rephrase the question.
25
```

1    BY MR. MARCHESE:

2    Q.   You saw black and tan hat, didn't you?

3    A.   Yes.

4    Q.   Okay.  And it was called out to you over the radio;

5    correct?

6    A.   I believe Special Agent Richardson told me that he had

7    spotted two individuals; one with a black hat, one with a tan

8    hat.

9    Q.   Okay.  So it was called out to you --

10   A.   Yes, sir.

11   Q.   -- correct?

12   A.   Yeah.

13   Q.   Okay.  And when it was called out to you, you located

14   those individuals; correct?

15   A.   Yes, sir.

16   Q.   All right.  Please indicate to me where you saw those

17   individuals, if it is depicted in this picture.

18   A.   Do you want me to circle it?

19   Q.   If you can.  Or X it.  Whatever works for you.

20   A.   I believe it was either out there or -- you know, my

21   view wasn't exactly that, so maybe just on the left side of

22   that pillar.  But that pillar wouldn't have been

23   obstructing --

24   Q.   Sure.

25   A.   -- maybe --

```
 1    Q.    So it actually --

 2    A.    -- a little further left.

 3    Q.    Sorry.  I don't mean to cut you off.

 4    A.    I'm sorry.

 5    Q.    I apologize.  So it actually might have been behind the

 6    pillar, but from your vantage point you could see behind the

 7    pillar, but obviously from this one you can't?

 8    A.    Correct.

 9    Q.    Okay.  And that's just --

10              THE COURT:  Mr. Marchese, I'm sorry to interrupt.

11    But you had said Exhibit 364, and that's what I wrote down,

12    and that's what it says on the top left-hand corner.  But the

13    sticker looks like it says 354 on the bottom right-hand

14    corner.

15              Is that the photo that you meant to call up, or is

16    that --

17              MS. AHMED:  Your Honor, I believe that is 364.

18    It's just a kind of a -- there's a poor quality copy of the

19    6.

20              THE COURT:  Okay.

21              MR. MARCHESE:  See this is why she's the judge and

22    I'm the lawyer.  She picks out these things.

23    BY MR. MARCHESE:

24    Q.    Okay.  So that general vicinity is where you located

25    these individuals?
```

1    A.    Yes.

2    Q.    They showed you a video of black hat.  You remember

3    that, I'm not going to play it, but you remember the video;

4    correct?

5    A.    Yes.

6    Q.    And that video is, to your recollection, what depicts

7    who black hat was on that particular day; is that correct?

8    A.    Correct.

9    Q.    That video, have you actually seen that video?  I mean

10   other than in court today?

11   A.    Yes.

12   Q.    Okay.  When did you see that video?

13   A.    The first time was two days ago.

14   Q.    Okay.  Now, you also indicated on direct examination

15   that at this point traffic had slowed down; correct?

16   A.    Yes.

17   Q.    I believe the testimony in the notes that I took said

18   something to the effect of traffic was bumper to bumper;

19   correct?

20   A.    It seemed like that, yes.

21   Q.    Okay.  And what you mean by bumper to bumper is it's

22   barely moving?

23   A.    Correct.

24   Q.    I mean, five, ten miles an hour; fair to say?

25   A.    Fair to say.

```
 1    Q.   Okay.  Probably at some point it might even be stopped?
 2    A.   Yes.
 3    Q.   Okay.  And to your knowledge, that was because one lane
 4    of traffic was shut down?  Or what was your knowledge in
 5    reference to that, if you know?
 6    A.   I don't.
 7    Q.   Okay.  You just know it was moving really slow?
 8    A.   Yeah.  I was just seeing what I was seeing.  I had no
 9    contact with any NHP or anything up there.
10    Q.   Okay.  At some point in time, though, you wanted the
11    freeway to be shut down; correct?
12    A.   Yes.
13    Q.   How did you do that?  How did you make that request?
14    A.   I -- I believe I asked someone to get on the radio.
15    I -- I called on the radio at least one time, maybe two
16    times.  I can't remember exactly how I did that, if I had a
17    lapel mic or I used the vehicle radio to do that.
18    Q.   Okay.  But you personally called in to say, "Hey, shut
19    the traffic down"; correct?
20    A.   I believe so.
21    Q.   Okay.  And the reason for that is you had some testimony
22    yesterday, is you were concerned -- and correct me if I'm
23    wrong, you were concerned about your backdrop; is that
24    correct?
25    A.   Yes.
```

1    Q.   You said something that was very interesting yesterday.

2    I believe you said something to the effect of "law

3    enforcement officers are responsible for every bullet we

4    fire," something along those lines; correct?

5    A.   That's paraphrased, yes.

6    Q.   And what I took from that is that if I was to fire -- if

7    I was law enforcement and I was to fire at someone and I was

8    to miss and hit an innocent person, then obviously that's not

9    what you're trying to accomplish; correct?

10   A.   Absolutely.

11   Q.   You want as clear a backdrop as possible; correct?

12   A.   Yes.

13   Q.   And at this particular point there's a lot of people

14   gathering on the bridge; correct?

15   A.   Yes.

16   Q.   How many would you guesstimate were on that bridge?

17   A.   200.

18   Q.   So the bridge is packed with people; correct?

19   A.   Yes.

20   Q.   And now you've also got this problem of this backdrop

21   where there's cars just going by and trucks and vans and all

22   this; correct?

23   A.   Yes.

24            MS. AHMED:   Your Honor, objection just as to the

25   exhibit still being here.   I don't think the witness is

```
 1    testifying to the time that is depicted in this exhibit.  I
 2    think this is confusing.  I don't know --
 3                 MR. MARCHESE:  Take the exhibit down.
 4                 MS. AHMED:  I just want to be clear for the jury
 5    that he's not talking about what's on the exhibit at that
 6    point.
 7                 MR. MARCHESE:  I didn't ask him any specific
 8    times.  If I did, I apologize.
 9                 THE COURT:  All right.
10    BY MR. MARCHESE:
11    Q.   Okay.  So we're all clear.  I'm just talking generally,
12    if you were, God forbid, to have to take a shot at a target,
13    you want the backdrop to be clear; correct?
14    A.   Yes, sir.
15    Q.   Because, listen, I'm sure you're a great shot, I'm sure
16    you're excellent at your job, but you're human, and we all
17    make mistakes; correct?
18    A.   Yes.
19    Q.   And on that particular day from the blue Chevy pickup to
20    the bridge, how far do you think you were?
21    A.    I think I estimated 200 yards that day.
22    Q.   And I think we've even heard some of the body cam from
23    Officer Apley, Ranger Apley.  You heard some of that, and
24    there was actually some wind on that particular day too;
25    correct?
```

1    A.    Yes.

2    Q.    That's going to affect the shot, won't it?

3    A.    It will.

4    Q.    Okay.  So it's going to be very difficult for you to hit

5    someone from that particular range; fair to say?

6    A.    I wouldn't say -- I'm sorry.  Could you repeat the

7    question?

8    Q.    You couldn't guarantee you're going to hit someone from

9    that range?

10             MS. AHMED:  Objection as to someone.  At what

11   distance?

12             MR. MARCHESE:  200 yards.  On the bridge.

13             THE COURT:  Overruled.  He can answer the

14   question.

15             THE WITNESS:  Well, it's not an impossible shot,

16   but it's a difficult shot.

17   BY MR. MARCHESE:

18   Q.    Right.  But you wouldn't want to bet the farm, so to

19   speak, on that; right?

20   A.    I guess.  I don't have a farm.

21   Q.    All right.  Well, your house.  Who knows.

22             So let's go back to this particular time.  Let's

23   go back to black hat and tan hat.  At some point in time you

24   said that -- yesterday on direct, that you were continuing to

25   watch black hat.

```
 1              Do you remember that?
 2   A.   Yes.
 3   Q.   Okay.  And that was based on a number of factors,
 4   probably the biggest, I would say, and correct me if I'm
 5   wrong, was that he had a long gun?
 6   A.   That's one of the factors.
 7   Q.   Correct.  There were other things.  I think you might
 8   have said he had some sort of a vest on; correct?
 9   A.   Yes.
10   Q.   He had a plaid shirt.  That probably didn't bug you;
11   right?
12   A.   No.  No.
13   Q.   And then I think you also said something to the effect
14   of he's kind of bobbing up and down; correct?
15   A.   Yes.
16   Q.   So that was a little bit concerning to you.  You thought
17   that was a little bit odd.  I think you even described it
18   maybe as tactical movements; is that correct?
19   A.   That's correct.
20   Q.   Okay.  So you're keeping an eye on this individual.  And
21   then at some point in time it's your testimony that you saw
22   him bring his rifle up; is that correct?
23   A.   Yes.
24   Q.   And that he -- he got behind the rifle, and he aimed it
25   at you; correct?
```

1    A.   Yes.

2    Q.   Now, it's fair to say -- I mean, you don't know that he

3    aimed it at you, but it was certainly in your general

4    vicinity; correct?

5    A.   Yes.

6    Q.   Certainly got your attention; correct?

7    A.   Yes, it did.

8    Q.   Because at this point I believe you testified that he

9    took the slack off of -- you took the slack off of the

10   trigger; correct?

11   A.   Yes.

12   Q.   Okay.  And some of the members of the jury might not be

13   shooters.  What do you mean by taking the slack off of the

14   trigger?

15   A.   So there's a certain slack.  I mean, there's a certain

16   give in the trigger until you hit -- it's basically a solid

17   part, and then from there you have to put -- it's -- I guess

18   that increases your accuracy, is basically what it is,

19   because you don't have that long trigger pull.

20             It wouldn't mean, like if it was a revolver, that

21   the hammer was actually going back.  The hammer would still

22   be there.  It would just be an easier trigger pull if you

23   needed to shoot.

24   Q.   Okay.  So when you released the slack you're

25   basically -- you bring your trigger finger back a little bit,

```
1    and at that point you just have to add a little bit more

2    pressure, and then that's when the shot goes off; is that

3    correct?

4    A.    That's correct.

5    Q.    Okay.  And you did that because you thought at this

6    point you are in an imminent position of threat and you might

7    have to fire?

8    A.    Yes.

9    Q.    Now, obviously, thank goodness, you didn't fire on that

10   date; correct?

11   A.    Correct.

12   Q.    There also went into a lot of factors as to why you

13   didn't fire at that point; correct?

14   A.    Yes.

15   Q.    You stated you saw a white van passing behind your

16   backdrop; correct?

17   A.    Yes.

18   Q.    At this point is the traffic still slowed down quite a

19   bit?

20   A.    Yes.

21   Q.    Okay.  Is it still as we described earlier as bumper to

22   bumper?

23   A.    Yes.

24   Q.    Okay.  So it's moving very slowly.  As a matter of fact,

25   I think you were very descriptive.  You were able to say
```

```
 1    something about a soccer ball and a windshield and some
 2    children.  You specifically remember all that; correct?
 3    A.    Yes.
 4    Q.    Okay.  Is the bridge at this point, is the bridge still
 5    crowded with people as well?
 6    A.    Yeah, it's crowded more on the sides than it is the
 7    middle.  So where that threat was, it was a lot less crowded.
 8    There's only a few people standing around.
 9    Q.    Okay.  Now, when you say "a few people standing around,"
10    what do you mean by that?
11          And just if you can give me a number.  And if
12    it's -- you know, I understand it's going to be a
13    guesstimate, you're not going to know exactly.  But I'm not
14    sure what "a few" is.
15    A.    I don't -- I couldn't tell you what -- an exact number.
16    But it just seemed to me like there was large crowds on both
17    sides and it just kind of tapered down as it got closer to
18    the middle.
19          I don't know the reason for that, but there was
20    less people in the middle, so they weren't shoulder to
21    shoulder.  There's people just randomly standing around from
22    what I remember.
23    Q.    Okay.  How about tan hat, can you see tan hat at this
24    point, or you're not focusing on this individual?
25    A.    Oh, when the van's there?
```

1    Q.    Right.  At this --

2    A.    No.

3    Q.    I'm sorry.  I should have clarified.  Right.  When the

4    individual's -- the plaid guy's raising the weapon?

5    A.    I cannot see tan hat in the picture, no.

6    Q.    All right.  Now, you stated that he raised his rifle up.

7    Was this when it was placed on the jersey barrier, the

8    concrete barrier, or -- and just correct me if I'm wrong,

9    because I want to make sure I get it right.

10   A.    I don't know if it was -- I believe he had placed it on

11   the barrier at that time.

12   Q.    Okay.  And to be clear, on direct examination there were

13   two specific instances in which you believed, in your mind,

14   that black hat pointed his weapon at you; correct?

15   A.    Yes.

16   Q.    Okay.  One was when it was placed on the jersey barrier;

17   is that correct?

18   A.    Yes.

19   Q.    And the other was when there was that -- I think you

20   used the word furtive, that furtive movement, and it was your

21   belief that he was raising the weapon at you at that time;

22   correct?

23   A.    Yes.

24   Q.    Okay.  Now, let's get back to the jersey barrier, okay?

25              And I -- are you sure that this -- the first time

```
 1    that the weapon was raised was when it was on the jersey
 2    barrier?
 3    A.    I'm not a hundred -- I know that the picture that she
 4    showed me as an exhibit was one of the times, but I don't
 5    believe that that was the time that I saw the van.
 6    Q.    Okay.
 7              MR. MARCHESE:  Brian, can we get 5022.
 8              And this is a defense exhibit that was brought in
 9    yesterday.  I belive it's a series of pictures.  I think it
10    was A through E, Aaron?
11              COURTROOM ADMINISTRATOR:  Correct.
12    BY MR. MARCHESE:
13    Q.   Sir, is this one of the pictures -- now, this isn't the
14    exact picture that Ms. Ahmed showed to you, but it's a very
15    similar picture of that event or timeframe.
16              Do you recognize that?
17    A.    Yes.
18    Q.    And is that a depiction of when this individual, you
19    believed, pointed his weapon at you?
20    A.    That's -- yes, that's one of the times.
21    Q.    Okay.
22              MR. MARCHESE:  Can you zoom in?
23    BY MR. MARCHESE:
24    Q.    Can you show me, if you can, in this picture, where the
25    point of the rifle is?
```

```
 1    A.    No.

 2    Q.    Okay.  Can you see the rifle in this picture?

 3    A.    No.

 4    Q.    Okay.  You can see the top of the jersey barrier,

 5    though; correct?

 6    A.    Yes.

 7    Q.    Okay.  So would you agree with me at this particular

 8    juncture that this individual is not pointing the weapon at

 9    you; correct?

10    A.    Correct.

11    Q.    Okay.

12              MR. MARCHESE:  Brian, can we go to the next one.

13    BY MR. MARCHESE:

14    Q.    Now, in this particular timeframe, that -- you see that

15    motorhome?

16    A.    Yes.

17    Q.    Okay.  And that's a -- that's that same motorhome, just

18    in a different angle, obviously; correct?

19    A.    Yes.

20    Q.    All right.  And you see black hat again; correct?

21    A.    Yes.

22    Q.    Okay.  And you would agree with me at this point,

23    he's -- I think you described it as the low ready position,

24    or something along those lines?

25    A.    Yes.
```

1    Q.   Okay.  And he's not pointing his weapon at you in this

2    particular screenshot; correct?

3    A.   Correct.

4    Q.   Okay.

5         MR. MARCHESE:  Next one?  Can you zoom in a little

6    bit, Brian.

7    BY MR. MARCHESE:

8    Q.   Okay.  Same photo, for the most part.

9         You recognize that big RV in the back?

10   A.   Yes.

11   Q.   Okay.  And would you agree with me that this individual

12   has his left hand up to somewhere in his neck region; is that

13   fair to say?

14   A.   Yes.

15   Q.   And you can see the rifle in this particular picture.

16   It's a little bit blurry, but you can see it, and it's

17   pointed in a downward trajectory.

18        Would you agree with me there?

19   A.   Correct.

20   Q.   And would you agree with me at this particular juncture

21   this individual is not pointing his weapon at you; correct?

22   A.   That's right.

23   Q.   Okay.

24        MR. MARCHESE:  And then the next one, Brian.

25

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

```
 1   BY MR. MARCHESE:

 2   Q.   Same picture, a little bit further out, same RV's there;

 3   correct?

 4   A.   Yes.

 5   Q.   Same individual, black hat, depicted to the bottom right

 6   of the exhibit; correct?

 7   A.   Yes.

 8   Q.   And in that particular picture, although a little bit

 9   blurry, still appears to be in the same position, left hand

10   up to the neck; correct?

11   A.   Yes, sir.

12   Q.   Okay.  Right -- the rifle on the right side of his body;

13   correct?

14   A.   It appears so, yes.

15   Q.   Okay.  And it appears to be pointed in a downward

16   trajectory; right?

17   A.   Yes.

18            MR. MARCHESE:  And then one more.  Is that all of

19   them?

20   BY MR. MARCHESE:

21   Q.   Okay.  How long -- the first time the individual pointed

22   his weapon at you, how long would you approximate that was

23   for?

24   A.   On this instance?

25   Q.   No.  Let's take your mind off the exhibit for a second
```

1    because obviously we're taking screenshots and we're slowing

2    things down.

3            Just in your mind from what you personally

4    perceived and remember from April 12, 2014, how long was this

5    individual pointing his weapon at you, the first time?

6    A.   I don't -- I didn't time it.  So I -- I mean, to me,

7    when I'm looking at someone pointing a weapon, it seemed like

8    eternity, but --

9    Q.   Sure.

10   A.   -- I couldn't tell you if it was 20 seconds, 10 seconds.

11   I don't know.

12   Q.   Okay.

13   A.   It seemed like a long time.

14   Q.   Right.  You're kind of in a spot at this point; fair to

15   say?  I mean -- and what I mean by that is he's pointing his

16   weapon at you; correct?

17   A.   Yes.

18   Q.   You believe he's going to fire; correct?

19   A.   Yes.  Not -- yes.

20   Q.   I mean, he's pointing it at you, and -- I mean, I guess

21   there would be other reasons, but most likely if they're

22   going to point a weapon at you is they're going to fire;

23   correct?

24   A.   Yes.

25   Q.   All right.  But you can't fire because of your backdrop;

1    correct?

2    A.    Correct.

3    Q.    You are a responsible law enforcement officer that

4    doesn't want to put innocent people in harm's way; fair to

5    say?

6    A.    Correct.

7    Q.    And by shooting someone with that sort of a backdrop

8    could be very problematic; correct?

9    A.    Yes.

10   Q.    Okay.  Based upon that, what was your next step?

11   A.    I just stayed aimed in on him.  You know, the threat

12   eventually went away.  I took the -- put the safety back on,

13   but I just stayed aimed in un -- you know, unable to return

14   fire, obviously, if he fired.

15   Q.    Okay.

16   A.    Initially.

17   Q.    Did you radio it that there's an individual pointing

18   long guns at the BLM behind post 2?

19   A.    No.

20   Q.    Okay.  You didn't duck for cover and get down, did you?

21   A.    Well, I was behind the engine block, so --

22   Q.    Correct.  But you're still -- you weren't 100 percent

23   obstructed; correct?  I mean, your -- I would assume your

24   upper body is still out in the open to be fired upon; fair to

25   say?

1    A.    Yes.

2    Q.    Now, at some point in time, and I believe it was during

3    this or shortly after, Special Agent Dan Love came by;

4    correct?

5    A.    Yes.

6    Q.    Okay.  Now --

7    A.    I believe it was before this.  But I'm not a hundred

8    percent sure on that.

9    Q.    Okay.  And yesterday on direct examination what I -- I

10   was writing it -- were you telling the story in a

11   chronological order yesterday, the way you remembered it?

12   A.    As best I can recall because I don't -- because of the

13   way that day went down, it was very hard to recall everything

14   in a chronological order.  And I didn't -- I didn't look at

15   my watch.  I didn't keep track.  I didn't take a log.

16          So everything that happened just kind of happened.

17   And that's why when I wrote my report, I didn't put times on

18   it because I didn't remember it as times.

19   Q.    Sure.  Well -- and that's unfair.  It's almost three

20   years ago; correct?

21   A.    Yes.

22   Q.    And I would imagine -- and I don't want to put words in

23   your mouth, but I would imagine you have other things on your

24   mind than to sit and look at your watch while all these

25   protestors are yelling and people have guns and all this

1    crazy commotion is going on; fair to say?

2    A.    Yes.

3    Q.    But as to events, I just want to know -- and if you

4    don't know, that's fine.  I just want to know when Dan Love

5    walked by your pickup.

6    A.    When you say when --

7    Q.    When he walked by the first time.  Let me just hone in

8    on it.  I believe you said something yesterday you gave him a

9    nod or something along those lines.

10   A.    Right.

11   Q.    When was that?

12   A.    When you say when, I don't know what you're asking for.

13   Like a time or --

14   Q.    I don't want a time.  I want in the order of events of

15   that day, when was it?

16   A.    It was shortly before the person with -- I explained

17   that the tan hat moved across the bridge.  And then I believe

18   that shortly after that is when the black-hatted person stood

19   up.

20   Q.    And pointed the weapon?

21   A.    Yes.

22   Q.    Maybe from a kneeling position; maybe from a standing

23   position?

24   A.    From a standing position.

25   Q.    It was from a standing position?

1   A.   Yes.

2   Q.   Okay.  Now, when you say shortly before, what do you

3   mean by that?  And -- I mean, guesstimate?  Obviously I don't

4   want you to give me an exact, you know, 11:52 p.m., or

5   something like that.

6   A.   I couldn't tell you because time kind of warped down

7   there.

8   Q.   Sure.  Well, I also wrote down yesterday, based on your

9   notes, that you were told to lower your weapons; correct?

10  A.   Yes.

11  Q.   Was that Dan Love that told you to lower the weapon?

12  A.   I -- no, not him.

13  Q.   Okay.

14  A.   Specifically.

15  Q.   Who was it then?

16  A.   I believe it was Assistant Special Agent in Charge

17  Opper.

18  Q.   I'm sorry.  What was that name?

19  A.   Opper.

20  Q.   O-p-e-r, or something like that?

21  A.   Yeah.

22  Q.   Now, was he next to you or did he come out over the

23  radio or how did that transpire?

24  A.   I believe he came around to the different vehicles and

25  was telling us.  I don't recall if it went over the radio or

1    not.

2    Q.   Okay.  He told you to lower your weapon, and you didn't

3    want to lower your weapon because black hat had previously

4    pointed his weapon at you; correct?

5    A.   Correct.

6    Q.   Okay.  When that transpired, where is Dan Love, if you

7    know?

8    A.   I don't know.

9    Q.   Now, are you familiar with Dan Love getting up to the

10   gate?

11   A.   I didn't see him go all the way to the gate.

12   Q.   Okay.

13   A.   But, yeah, I mean, I assumed that's where he was going.

14   And, yes, he did.

15   Q.   All right.  All right.  Now, today you've also given

16   another example of black hat pointing his weapon at you.

17               You remember that; correct?

18   A.   Yes.

19   Q.   When was that in relation to Dan Love being at the gate,

20   if you remember?

21   A.   I believe it was prior to him going down to the gate.

22   Q.   Okay.  Now, how much earlier was it when you saw black

23   hat pointing his weapon at you for the second time that Dan

24   Love went over to the post 2 gate?

25   A.   Can you repeat that?  I'm sorry.

```
 1    Q.    Okay.  Well, we saw -- you saw Dan Love close to the
 2    gate; correct?
 3    A.    Yes.
 4    Q.    Okay.  And you gave the nod; correct?
 5    A.    Yes.
 6    Q.    All right.  Prior to that you've testified, both on
 7    direct and now cross-examination, that black hat pointed his
 8    weapon at you a second time; correct?
 9    A.    After that.  After Dan went down to the gate.
10    Q.    Okay.  So the first time was before Dan went to the
11    gate; correct?
12    A.    Yes.
13    Q.    Dan goes to the gate, obviously, at some point.  And
14    then the second time was -- where is Dan Love, to your
15    knowledge?
16    A.    I'm not sure because I didn't see him come back from the
17    gate, so I don't know if he's still down there, or if he had
18    already come back.
19    Q.    Okay.  Did you witness Dan Love come back?
20    A.    No.
21    Q.    Now, you gave, or authored, a memorandum of activity in
22    this particular case; correct?
23    A.    Yes.
24    Q.    Very detailed document.  I think I have it as about
25    five, six pages, single spaced?
```

```
 1                    MS. AHMED:  Objection.  Relevance.
 2                    MR. MARCHESE:  It's just foundational, Your Honor.
 3                    THE COURT:  Ask your question.
 4                    MR. MARCHESE:  Okay.
 5        BY MR. MARCHESE:
 6        Q.   It was a detailed document; correct?
 7        A.   It was -- yeah, it was fairly detailed as a report.
 8        Q.   Right.  And that's what you're taught to do.  You're
 9        taught to put in all the details that are important in
10        reference to an investigation; correct?
11        A.   Yes.
12        Q.   Because at some point in time, you might need to come in
13        to court and testify, maybe even three years later, like in
14        this particular case; correct?
15        A.   Yes.
16        Q.   And you would agree with me that your recollection of
17        events are usually going to be better closer in time than
18        later in time; correct?
19        A.   I don't know about this case.  I wrote the report I
20        think two days after this had happened, so it was --
21        everything was still pretty foggy.
22        Q.   It was foggy two days later?
23        A.   Yes.
24        Q.   Okay.  In those two days -- well, actually would you --
25        if I told you that it was written on April 15th, would you
```

1    have any reason to disbelieve me?

2    A.    No.

3    Q.    I mean, you -- in those three days you obviously had to

4    evacuate the facility; correct?

5    A.    Yes.

6    Q.    I would imagine probably once you got to Las Vegas,

7    probably got a good feel and got some sleep, because you

8    hadn't slept very much the night before; fair to say?

9    A.    Didn't sleep, no.

10   Q.    Okay.  Then I believe the next day there was some sort

11   of BLM crisis management that is required for everyone to go

12   to?

13   A.    Yes.  It was offered.  I don't know if it was required.

14   Q.    Okay.  Did you attend that?

15   A.    Well, I attended the meeting that -- if that's what

16   you're talking about, there was a large, like, meeting of

17   everyone.

18   Q.    Okay.  Just kind of a debriefing or something like that?

19   A.    Yes.

20   Q.    Okay.  And when you say everyone.  How many people

21   approximately were at that?

22              MS. AHMED:  Objection.  Relevance.

23              MR. MARCHESE:  It's very relevant, Your Honor.

24              THE COURT:  Overruled.  He can answer the question

25   if he knows.

```
 1              THE WITNESS:  I don't -- I'm not sure.
 2   BY MR. MARCHESE:
 3   Q.   Okay.  A lot of people?
 4   A.   Yeah.
 5   Q.   Okay.  You weren't exactly -- you weren't the hall
 6   monitor taking attendance or anything like that?
 7   A.   I was not, no.
 8   Q.   It's below your pay grade; right?
 9   A.   Yes.
10   Q.   Okay.  And at that meeting, I would imagine you talked
11   about various things about what transpired the day before and
12   before that and all that; correct?
13   A.   Yes.
14   Q.   Okay.  At some point in time you also had some
15   independent knowledge of black hat, whether it be from seeing
16   things on the media; correct?
17   A.   Yes.
18   Q.   Okay.  Maybe even talking with your fellow officers
19   about that; correct?  Because it's a pretty major event;
20   correct?
21   A.   Yes.
22   Q.   Okay.  Now, in that particular MOA, isn't it true that
23   you only memorialized one incident of black hat allegedly
24   pointing his weapon at you; correct?
25   A.   I'm not sure.  I don't have my report in front of me.
```

```
 1    Q.   Okay.  You haven't reviewed that report before coming to
 2    court today?
 3    A.   I did.
 4              MS. AHMED:  Objection.
 5              MR. MARCHESE:  I'm laying foundation.
 6              THE COURT:  Overruled.
 7    BY MR. MARCHESE:
 8    Q.   If you were to see a copy of that report, would that
 9    refresh your recollection?
10    A.   Yes.
11    Q.   Okay.  Just give me a second, sir.  I've got a clean
12    copy here without all my chicken scratch notes.
13              Now, you're welcome to look at the whole report,
14    sir.  But it's kind of long.  I'm going to just focus in on a
15    certain area.  But, like I said, you look at whatever you
16    want.  But please review it.  And if it refreshes your
17    recollection, let me know.  Do not read from it, though,
18    please.
19    A.   Okay.
20    Q.   Just look at it.  And let me know if it refreshes your
21    recollection or if it doesn't.  Okay?
22    A.   Okay.
23              MR. MARCHESE:  May I approach, Your Honor?
24              THE COURT:  Yes, you may.
25              MR. MARCHESE:  Thank you.
```

1                    THE WITNESS:  Okay.

2    BY MR. MARCHESE:

3    Q.   Does that refresh your recollection, sir?

4    A.   Could you -- I don't know the question again.

5    Q.   Yes, absolutely.  So the question, the line of

6    questioning that I was getting into was, isn't it true that

7    in your MOA that you only mentioned one instance of black hat

8    allegedly pointing his weapon at you?  That was my question.

9                    MS. AHMED:  Your Honor, objection.  This is

10   improper impeachment.  He has it in here twice generally.

11                   MR. MARCHESE:  Well, he said it refreshed his

12   recollection.  Then he actually asked me --

13                   THE COURT:  Overruled.  He can answer the

14   question.

15                   MR. MARCHESE:  I'll ask it again, sir.  Because I

16   know there's been a lot of cross-fire here.

17   BY MR. MARCHESE:

18   Q.   So isn't it true -- after reading or reviewing your

19   report and your memory being refreshed, isn't it true that --

20   in your MOA dated April 15th, 2014, isn't it true that you

21   only mentioned one instance of black hat pointing his weapon

22   at you, allegedly?

23   A.   I believe there's -- I believe I read that there was

24   two.

25   Q.   Okay.  Well, there was one instance in which you

1    indicated that he rested his weapon on the jersey barrier;
2    correct?
3    A.   Yes.
4    Q.   Okay.  And from previous on cross-examination you're not
5    exactly sure how long that was because in a stressful
6    situation, you said, I think, it's like an eternity when
7    someone would be pointing a weapon at you; correct?
8    A.   Yes.
9    Q.   Okay.  So that's the first instance.
10                  And then the second instance was your speculation
11   when the individual went down; correct?
12                  MS. AHMED:  Objection.  Argumentative.  And
13   mischaracterizes the witness's testimony.
14                  MR. MARCHESE:  It's a yes or a no.  You can't
15   mischaracterize it when you give him the opportunity to say
16   so.
17                  THE COURT:  It's because your sentence is so long,
18   it includes so many adverbs and adjectives.  Why don't you
19   just rephrase it, break it down a little bit.
20                  MR. MARCHESE:  And then she'll object to
21   foundation.  I'm trying.
22   BY MR. MARCHESE:
23   Q.   Okay.  What's the second event that you wrote in your
24   memorandum of activity where you're claiming black hat
25   pointed his weapon at you?

1    A.    I -- I'm sorry.  I just reviewed that and -- I'm sorry.

2    I scanned it.  And it seemed as if there was two instances

3    where I --

4    Q.    Okay --

5    A.    I felt he pointed his weapon at me.

6    Q.    And, listen, I'm not trying to confuse you.  This is not

7    what this is about.  This is about the truth.

8              Do you want to look at it again?  Would that

9    refresh your recollection?

10   A.    Yes.

11   Q.    Okay.

12             MR. MARCHESE:  Your Honor, maybe if we took a

13   break, so then he can have ample opportunity, because I know

14   we're getting close to our bathroom break.  Is that okay?

15             THE COURT:  Yes, that's fine.

16             MR. MARCHESE:  Great.

17             THE COURT:  All right.  So we'll go ahead and take

18   our morning break.

19             Remember, members of the jury, that you are not to

20   discuss this case with anyone nor permit anyone to discuss it

21   with you.  You may speak to your fellow jurors about other

22   things, but not anything touching upon this case.

23             Please do not read or listen to or view anything

24   regarding any issues in this case, and do not perform any

25   research or attempt to perform any research or any

1    independent investigation about this case.

2              And do not form any opinion until after you have

3    heard all the testimony, received all the evidence, been

4    provided with the written jury instructions of law, and then

5    you will hear closing arguments, and then I will release you

6    to begin your deliberation process.

7              So we'll go ahead -- it's 10:05.  So we'll take

8    about a 15-minute break.  Plan to be back here at 10:20.

9              Please stand for the jury because they are the

10   judges of the fact.

11             And after they exit the courtroom, then, Agent

12   Swanson, you can also take your break.  I know you need to

13   review that document, but feel free to take your break also,

14   your bathroom break and stretch.  We'll just start again at

15   10:20.

16             THE WITNESS:  Okay.  Thank you.

17         (Jurors exit courtroom at 10:05 a.m.)

18             THE COURT:  All right.  Off record.

19         (Recess from 10:05 a.m. until 10:29 a.m.)

20             COURTROOM ADMINISTRATOR:  All rise.

21             THE COURT:  Thank you.  You may be seated.

22             Agent Swanson, did you have enough time to both

23   use the restroom and to review the report?

24             THE WITNESS:  I did, Your Honor.  Thank you.

25             THE COURT:  All right.  Can we go ahead and call

 1    in the jury?  Is everyone else ready?

 2              All right.  Let's go ahead and do that.

 3              COURTROOM ADMINISTRATOR:  All rise.

 4          (Jurors enter courtroom at 10:32 a.m.)

 5              THE COURT:  All right.  Everyone may be seated.

 6              We're joined by the jury.

 7              We have Agent Swanson back on the witness stand.

 8              We'll proceed now with cross-examination by

 9    Mr. Marchese on behalf of Mr. Parker.

10    BY MR. MARCHESE:

11    Q.   How are you doing?

12    A.   Good, thanks.

13    Q.   All right.  So you've had an opportunity to review your

14    report; correct?

15    A.   Yes.

16    Q.   And actually in the report it does say two separate

17    instances, which either you or somebody from the government

18    was nice enough to highlight.

19    A.   I highlighted them for you, yes, sir.

20    Q.   Okay.  You did.  Okay.

21    A.   Yes, sir.

22    Q.   So you were obviously aware --

23    A.   For myself actually.

24    Q.   Okay.  So based upon this, then, the first instance in

25    which the black hat pointed his weapon at you, was when he

```
 1    was standing; is that what it -- your recollection now?
 2    A.   Yes.
 3               MS. AHMED:  Objection.  Misstates the --
 4               THE COURT:  He can answer the question.  That's
 5    fine.  Overruled.
 6               THE WITNESS:  Yes.
 7    BY MR. MARCHESE:
 8    Q.   Okay.  And then -- you're in your report, and at that
 9    point you were concerned about the traffic, as we went
10    through all that, I'm not going to go through that, and you
11    wanted it to be shut down; correct?
12    A.   Yes.
13    Q.   NHP did not comply; correct?
14    A.   As far as I know.  I didn't talk to NHP.
15    Q.   But you didn't see the traffic cease; correct?
16    A.   No, I didn't.
17    Q.   If anything, it got worse?  It was bumper to bumper,
18    like we talked about?
19    A.   Yes.
20    Q.   At some point in time did you ever see NHP on the bridge
21    walking around?
22    A.   No.
23    Q.   Never did?  Okay.
24               Now, Dan Love, has he passed you yet, or has he
25    not passed you yet at this point?  If you remember?
```

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

```
 1              MS. AHMED:  Objection.  Vague as to "at this

 2    point."

 3    BY MR. MARCHESE:

 4    Q.   At the point when the black hat stood up and pointed his

 5    weapon at you?

 6    A.   I believe he had passed us already.

 7    Q.   Okay.  So there's a second portion of time.

 8              Now, based upon your recollection, that's when

 9    black hat points his weapon at you from the concrete jersey

10    barrier; correct?

11    A.   Yeah.  I don't know if that was before or after that.

12    Q.   Okay.  Well, chronologically in your report, at least,

13    it goes after; correct?

14              MS. AHMED:  Objection.  Misstates the witness's

15    testimony.  He said he didn't --

16    BY MR. MARCHESE:

17    Q.   Okay.  Do you remember reading your report?

18    A.   Yes, I do.

19    Q.   Okay.  And in your report, chronologically, the standing

20    pointing the weapon goes before the kneeling pointing the

21    weapon from the jersey barrier?

22              MS. AHMED:  Objection.  Calls for hearsay as to

23    what's in the report.  It's irrelevant, the order in the

24    report.

25              THE COURT:  It's proper cross-examination, an
```

```
 1    attempt to impeach with a prior recorded statement.  It's
 2    fine.
 3              THE WITNESS:  Yes, in the report it's after it.
 4              MR. MARCHESE:  Okay.
 5              THE WITNESS:  But there's no times.
 6    BY MR. MARCHESE:
 7    Q.   Right.  Right.  Because, like you said, you're not
 8    looking at your watch, you have other things on your mind.
 9              Could you guesstimate a timeframe?  I mean, five
10    minutes, ten minutes?
11    A.   No.
12    Q.   Okay.
13              Give me just a second, here, sir.  I'm just
14    pulling up an exhibit.  And I'm publishing what's been
15    previously admitted as Government's 108A, clip 3.  I'll play
16    this just briefly for you, sir.
17         (Videotape played.)
18    BY MR. MARCHESE:
19    Q.   Do you recognize that individual to the far right with
20    the black shirt and the vest?
21    A.   Yes.
22    Q.   Okay.  Hat on backwards?
23    A.   Yes.
24    Q.   Okay.  And who is that individual?
25    A.   Special Agent in Charge Love.
```

1    Q.   Okay.  I'm going to play this just for a little bit.

2         (Videotape played.)

3    BY MR. MARCHESE:

4    Q.   I'm going to stop for a moment.  You still see Special

5    Agent Dan Love in the picture?

6    A.   Yes.

7    Q.   And to your knowledge he's proceeding towards post 2 at

8    this particular juncture; correct?

9    A.   Yes, sir.

10   Q.   Okay.  Now, I guess kind of in the middle right of the

11   screen you see a blue Chevy pickup depicted; correct?

12   A.   Yes.

13   Q.   Okay.  Is that the blue pickup that you were stationed

14   at on the date in question?

15   A.   Yes.

16   Q.   Okay.  Let me back up just slightly.  Okay.

17        That's a better viewpoint of your location?

18   A.   Yes.

19   Q.   Okay.  Kind of hard to make you out, but based on your

20   recollection of the instance and your memory of the day,

21   that's you on the windshield; correct?

22   A.   Yes, sir.

23   Q.   And maybe you're looking through a scope, maybe not, but

24   your weapon is up pointed in the general vicinity of the

25   bridge?

1    A.    Yes, sir.

2    Q.    Okay.   Now, the particular time there is 12:14; correct?

3    A.    Yes.

4    Q.    Okay.   And I apologize.   I probably should have taken

5    better notes.

6            The time when black hat stood up and pointed in

7    this direction was prior to this occurring?

8    A.    No, after.

9    Q.    Okay.   It was after?

10   A.    To my recollection --

11   Q.    That's fine.

12   A.    Recollection.   Again, I don't know any times.

13   Q.    Okay.

14   A.    Okay.

15   Q.    So when he first pointed his weapon at you, you had the

16   traffic issue; correct?   With the shooting at him, correct,

17   at black hat?

18   A.    I'm sorry.   Can you repeat that?

19   Q.    The first time -- we went through all this --

20   A.    Okay.

21   Q.    -- and I'm just doing foundation.   I'm sorry to keep

22   asking the same questions.   But I'll move on quickly.

23            The first time he pointed his weapon at you, you

24   indicated that there was an issue in reference to traffic;

25   correct?

1    A.    Yes.

2    Q.    All right.  And then same thing the second time in which

3    he pointed his weapon at you, there was also an issue in

4    reference to traffic; correct?

5    A.    Yes.

6    Q.    Okay.

7    A.    The whole time.

8    Q.    And I'm going to put up -- if you could put up -- this

9    is 93 for the record.  I've fast forwarded.  And we went

10   through this the other day.  It's about 12:14.

11          Okay.  Do you recognize this?  This is the dash

12   cam.  Have you seen this before?

13   A.    Yes, I've seen bits of it, yeah.

14   Q.    Okay.  I'm going to play it just briefly.  We don't need

15   to go through the whole thing.  And this is at 12:14:08 p.m.

16          (Videotape played.)

17   BY MR. MARCHESE:

18   Q.    Now, would you agree with me that traffic is, in fact,

19   moving at this point in time; correct?

20          MS. AHMED:  Objection.  He's looking at a still.

21   It's not playing.

22          MR. MARCHESE:  What was the objection?

23          MS. AHMED:  Withdrawn.  It's fine.

24          THE COURT:  Thank you.

25          MR. MARCHESE:  I mean, I can keep playing it.

```
 1    BY MR. MARCHESE:

 2    Q.   You would agree with me that the traffic is, in fact,

 3    moving at this particular juncture; correct?

 4    A.   Moving slowly, yes.

 5    Q.   Yes.  You agree with me that there's a huge actual gap

 6    in the traffic?  There's three vehicles getting to the

 7    pillar.  In front of that, there's absolutely nothing that

 8    really can be seen; correct?

 9    A.   That we can see from this angle, yeah.

10    Q.   Okay.  Move it up to maybe another minute or two.

11         (Videotape played.)

12    BY MR. MARCHESE:

13    Q.   Sir, same thing, you would agree with me that traffic is

14    moving somewhat swiftly?  It's not bumper to bumper; correct?

15    A.   I can't really tell there.  It's definitely not 75 miles

16    an hour.

17    Q.   Okay.  But it's definitely not bumper to bumper, though,

18    is it?

19    A.   It doesn't appear to be.  But, like I said, it's a weird

20    angle there, so --

21    Q.   Okay.  We'll move up another two or three minutes.

22         (Videotape played.)

23    BY MR. MARCHESE:

24    Q.   Appears there's no traffic on the bridge; correct?

25              Just one -- I don't know what that is, RV, maybe.
```

```
 1    A.    Yeah, there's --

 2    Q.    You agree --

 3    A.    -- traffic.

 4    Q.    -- with me the traffic is still flowing; correct?

 5    A.    Slowly, yes.

 6    Q.    Okay.  I'll do just one more, sir.  12:20, just to make

 7    it easy.

 8              (Videotape played.)

 9    BY MR. MARCHESE:

10    Q.    Okay, sir, same question.  There's -- traffic is still

11    moving freely; correct?

12    A.    Correct.

13    Q.    All right.  The government had showed you some pictures

14    on direct examination, I believe, in which you had testified

15    that there were pictures of black hat pointing his weapon at

16    you.

17              Do you remember that?

18    A.    Yes.

19    Q.    And I don't want to mischaracterize your testimony.  Is

20    that your belief that he was pointing a weapon in some of

21    those pictures?

22    A.    Yes.

23    Q.    Okay.

24              MR. MARCHESE:  Can we get 416 up, please.

25
```

1    BY MR. MARCHESE:

2    Q.   Okay.  You see black hat there in the middle in the

3    front of the RV; correct?

4    A.   Yes.

5    Q.   You can see the top of the jersey barrier; correct?

6    A.   Yes.

7    Q.   So you would agree with me there's no rifle laying on

8    the top of that jersey barrier; correct?

9    A.   Correct.

10   Q.   Okay.  So in that particular picture he's not kneeling

11   and pointing at you; correct?

12   A.   Correct.

13   Q.   And obviously he's not standing and pointing at you

14   because he's kneeling; correct?

15   A.   Correct.

16   Q.   417.  Same line of question.  Oh, sorry.  Same line of

17   questioning, sir.

18            In this particular picture you can see the top of

19   the jersey barrier; correct?

20   A.   Yes.

21   Q.   Based upon that, common sense and logic would dictate

22   that there's no weapon on the top of that jersey barrier;

23   correct?

24   A.   Correct.

25   Q.   So he's not pointing in this particular picture;

1    correct?

2    A.    Correct, sir.

3    Q.    And obviously because he's kneeling, he's not standing

4    and pointing his weapon at you, as well; correct?

5    A.    Correct.

6              MR. MARCHESE:  Could we do 418.

7              MS. AHMED:  Your Honor, for the record, I'd just

8    ask that it be noted that was 417-1.

9              MR. MARCHESE:  Oh, yeah.  I apologize.  Can we do

10   the 2 or A or B or whatever it is.

11   BY MR. MARCHESE:

12   Q.    Okay.  This is the next line of pictures in that

13   particular exhibit.  You can see the top of the jersey

14   barrier, once again, in this particular screenshot; correct?

15   A.    Yes.

16   Q.    Based upon that, there's no weapon resting upon the top

17   of the jersey barrier; correct?

18   A.    Correct.

19   Q.    Based upon that, it's obvious that it cannot be pointed

20   since it's not resting on top of the jersey barrier; correct?

21   A.    No, it's pointed.

22   Q.    It's not pointing in your general vicinity, it points to

23   the blue pickup truck in this particular screenshot; correct?

24   A.    I believe it is.

25   Q.    It is.  Where -- please point out to me on this

```
 1   particular screenshot where the end, the tip of the rifle is.
 2              MR. MARCHESE:  Can you blow that up, Brian.  Okay.
 3   That's a little bit better.
 4   BY MR. MARCHESE:
 5   Q.   Can you show me the tip of the rifle in that particular
 6   picture.
 7              How long is that rifle?
 8   A.   I don't know.
 9   Q.   Okay.  Well, you perceived it; correct?
10   A.   Yes.  I don't know how long the rifle is.
11   Q.   Okay.  Well, you were able to identify this individual
12   with the black trucker hat; correct?
13   A.   Correct.
14   Q.   Wire-rimmed glasses; correct?
15   A.   Yes.
16   Q.   Black tactical vest; correct?
17   A.   Yes.
18   Q.   Red plaid shirt; correct?
19   A.   Yes.
20   Q.   Dark beard of some sort; correct?
21   A.   Yes.
22   Q.   Blue jeans; correct?
23   A.   Yes.
24   Q.   But you can't tell me how long his weapon is; correct?
25   A.   No.
```

```
 1              MR. MARCHESE:  Next screenshot, please.
 2   BY MR. MARCHESE:
 3   Q.   On this particular picture you can see the top of the
 4   jersey barrier; correct?
 5   A.   Yes, sir.
 6   Q.   All right.  In this particular picture the weapon is not
 7   pointing on top of the jersey barrier; correct?
 8   A.    Correct.
 9   Q.   In this one is he is pointing the weapon at you?
10   A.   No, sir.
11   Q.   Okay.  And actually in this particular screenshot the
12   bottom of the -- next to his head, would you agree that's the
13   butt of the weapon?
14   A.   I do, yes, sir.
15   Q.   Okay.
16              THE COURT:  And that was 417-3?
17              MR. MARCHESE:  I believe so, Your Honor.  Yes.
18              THE COURT:  I can't see.
19              MR. MARCHESE:  And is there one more, Brian?
20   Okay.  Good.
21   BY MR. MARCHESE:
22   Q.   Just one last question.
23              Previously you've testified that you were unable
24   to get a shot off against black hat because the traffic was
25   moving too slowly and there wasn't a clear backdrop; is that
```

1    correct?

2    A.    That's one of the reasons, yes.

3    Q.    Okay.  You would agree with me, however, though, that

4    the traffic was moving freely on the bridge on the date in

5    question; is that correct?

6              MS. AHMED:  Objection.  Calls for speculation.

7    Freely.

8              MR. MARCHESE:  We just showed him an exhibit.

9    It's not speculation.

10             MS. AHMED:  Misstates the witness's testimony.  He

11   said he couldn't clearly see from that video.

12             MR. MARCHESE:  I'll withdraw the question.

13             THE COURT:  You can ask him the question.

14   BY MR. MARCHESE:

15   Q.    We just showed you some clips of the video from Agent

16   Sones' dash cam; correct?

17   A.    Yes, sir.

18   Q.    Okay.  And based upon that dash cam, you saw that

19   traffic was moving freely; correct?

20   A.    No, sir.

21   Q.    You didn't see that?

22   A.    No.  Up on Interstate 15 moving freely is 75 miles an

23   hour.

24   Q.    Okay.  But it wasn't bumper to bumper, was it?

25   A.    I think it was at points --

1    Q.    Okay.

2    A.    -- that you showed me, yes.

3    Q.    Okay.  All right.

4              MR. MARCHESE:  No further questions.

5              THE COURT:  Mr. Tanasi?

6              MR. TANASI:  Thank you, Your Honor.

7                         CROSS-EXAMINATION

8    BY MR. TANASI:

9    Q.    Good morning, Agent Swanson.

10   A.    Good morning, sir.

11   Q.    I'm Rich Tanasi.  I represent Steven Stewart.  I have a

12   few questions for you on cross, okay?

13   A.    Yes, sir.

14   Q.    All right.  So when you're in the wash on the 12th, you

15   see the northbound bridge; correct?

16   A.    I'm sorry.  The what?

17   Q.    On the 12th you see the northbound bridge --

18   A.    Oh, yes --

19   Q.    -- from the wash; correct?

20   A.    -- sir.

21   Q.    And you know that Metro is up there; right?

22   A.    I don't know that Metro is up there.

23   Q.    You know at post 1 Metro SWAT was up there; correct?

24   A.    I didn't know that.

25   Q.    You didn't know that?

1    A.    No, sir.

2    Q.    You radioed for SWAT or for Metro to help you, though,

3    while you were in the wash; correct?

4    A.    Yes, sir.  I don't know if specifically Metro SWAT, but

5    someone to come and clear the bridge.

6    Q.    Okay.  But you did radio for Metro to help clear the

7    bridge; correct?

8    A.    Okay.

9    Q.    Was that a yes?

10   A.    I don't recall seeing Metro, but if I -- if you heard

11   it, then I'm not denying it.

12   Q.    I don't want to put words in your mouth.  I can show you

13   a copy of your report to refresh your recollection.

14              Would that help?

15   A.    No.  I don't recall it, but -- I don't recall seeing

16   Metro.

17              MR. TANASI:  Court's indulgence?

18              THE COURT:  Of course.

19              MR. TANASI:  Your Honor, may I approach?

20              THE COURT:  Yes.

21   BY MR. TANASI:

22   Q.    Sir, I'm going to show you a copy of your report.

23   Particularly just the copy that we're speaking about.  Let me

24   know when you look at it, and let me know if it refreshes

25   your recollection.

```
 1    A.    I'm sorry.  What part -- what are you talking about,
 2    that I requested Metro SWAT down in the wash?
 3    Q.    Yes, sir.
 4    A.    I only see Nevada Highway Patrol in here.
 5    Q.    Can I have that back, please?
 6    A.    Sure.
 7    Q.    I'm going to point you directly to what I've highlighted
 8    there on the bottom.
 9    A.    Thank you.
10    Q.    There you go.
11    A.    SWAT, yes.
12    Q.    Okay.  So seeing a copy of that report, does it refresh
13    your recollection?
14    A.    Yes.  Thank you.
15    Q.    And you in fact radioed SWAT; correct?
16    A.    I radioed dispatch.
17    Q.    Fair enough.  You pleaded for the northbound lanes to be
18    closed and asked SWAT assets to take the subjects on the --
19    A.    Yes.
20    Q.    -- bridge down; correct?
21    A.    Through dispatch, yes.
22    Q.    And those requests, those were ignored; right?
23    A.    Yes.
24    Q.    Okay.  Same thing.  You radioed NHP and -- or asked NHP
25    to shut the northbound lane down; correct?
```

```
 1                    MS. AHMED:  Objection.  Misstates the witness's
 2      testimony.  He didn't directly ask NHP.
 3                    MR. TANASI:  Your Honor, I'm asking the question
 4      yes or no.
 5                    THE COURT:  Overruled.  He can answer the
 6      question.
 7                    MR. TANASI:  Thank you.
 8                    THE WITNESS:  No.
 9      BY MR. TANASI:
10      Q.   No, you didn't contact NHP?
11      A.   Directly, no, I did not.
12      Q.   Okay.  Did you notice NHP on the highway?
13      A.   Yes.
14      Q.   Okay.  And it's your testimony that there was no contact
15      to NHP?
16      A.   Correct.
17      Q.   Nothing from you, nothing from anybody else who was down
18      there in the wash with you?
19      A.   That's correct.
20      Q.   Okay.  But, again, you saw NHP up on the wash or up on
21      the bridge, and they, you know, did nothing to stop any of
22      the folks that you say are pointing weapons at you on the
23      bridge; correct?
24      A.   Not --
25                    MS. AHMED:  Objection.  Calls for speculation.  He
```

1    does not know what NHP did.

2    BY MR. TANASI:

3    Q.   You noticed NHP on the bridge; correct?

4    A.   Yes.

5    Q.   And also on the bridge, we've heard testimony from you

6    that there's folks who you say are pointing weapons at you;

7    correct?

8    A.   Correct.

9    Q.   And NHP did nothing with respect to those folks who are

10   pointing weapons, as you say, at you; correct?

11             MS. AHMED:   Objection.   Calls for speculation.

12             THE COURT:   Overruled.   He can answer the

13   question.

14             THE WITNESS:   Not to my knowledge.   They did

15   nothing.

16   BY MR. TANASI:

17   Q.   Okay.   And let's just be clear on this.

18             Is it your testimony that you never contacted NHP?

19   A.   That is correct.

20   Q.   Okay.   Is it your testimony that you didn't repeatedly

21   request the northbound lane to be shut down?

22   A.   It is my testimony that I did.

23   Q.   Okay.   And is it your testimony that those requests were

24   ignored?

25   A.   Yes.

1    Q.    And were those requests ignored by NHP?

2    A.    As far as I know.  Because they didn't do any action.

3    That's the only -- that's the only way I know is by looking

4    up there.  They didn't tell me because I didn't contact them.

5    Q.    Okay.  I'm going to show you another copy of your

6    report.  And what I'm trying to establish here is, from what

7    I understand, you're saying that you never contacted NHP.  Is

8    that fair?  I don't want to mischaracterize your testimony.

9    But is that your testimony right now?

10   A.    Correct.  All our communication was done through our

11   dispatch.

12   Q.    Okay.  And, again, you prepared a report in this case;

13   correct?

14   A.    Yes.

15   Q.    And it was on April 15, 2014; correct?

16   A.    Yes.

17   Q.    A couple days after the event; correct?

18   A.    Yes.

19   Q.    When the event was fresh in your mind; correct?

20   A.    Fairly fresh, yes.

21             MR. TANASI:  Your Honor, may I approach for

22   impeachment?

23             THE COURT:  Yes.

24             MS. AHMED:  That's not impeachment, Your Honor.

25             THE COURT:  Are you refreshing or impeaching?

```
 1              MR. TANASI:  I'm impeaching, Your Honor.  He --
 2    and with the document that I have.
 3              THE COURT:  So you don't need to approach.
 4              MR. TANASI:  Okay.
 5    BY MR. TANASI:
 6    Q.   Isn't it true that you indicate in your report that "As
 7    I was scoping both subjects, I noticed Nevada Highway
 8    Patrol" --
 9    A.   Yes.
10    Q.   Okay.  -- "officers driving across the bridge directly
11    behind the two armed suspects" -- correct?
12    A.   Yes.
13    Q.   -- "and they never stopped"; correct?
14    A.   Correct.
15    Q.   Isn't it true that you repeatedly requested the
16    northbound lane be shut down because the cars were driving by
17    slowly and you feel the fire was such that you if needed to
18    take a shot you could not assure that the round would not
19    strike a civilian crossing the bridge; correct?
20    A.    I requested through my dispatch, yes.
21    Q.   Correct.  And those requests, your own words, were
22    ignored; correct?
23    A.   Yes.
24    Q.   Those requests to NHP through your dispatch; correct?
25    A.   Yes.
```

```
 1    Q.   Okay.

 2              MS. AHMED:  Just for the record, Your Honor, I

 3    don't -- that was not impeachment.  He was consistent with

 4    what he testified to.

 5              MR. TANASI:  Your Honor, I'll move on.  I think

 6    the testimony speaks for itself.

 7              THE COURT:  Sustained.  Just -- I'll let the jury

 8    make of it the weight that it thinks that it deserves,

 9    whether or not they think it's impeachment or not.

10              There is an attempted impeachment, which is

11    appropriate to attempt.

12              MR. TANASI:  Okay.  Fair enough.

13    BY MR. TANASI:

14    Q.   You used words to describe the subject in your -- the

15    folks on the bridge as suspects.

16              Do you remember that?

17    A.   Yes.

18    Q.   Okay.  Those suspects were not arrested, to your

19    knowledge; correct?  They weren't arrested on the 12th;

20    correct?

21    A.   Correct.

22    Q.   Okay.  Now, prior to being in the wash on the 12th, you

23    had a briefing on the 11th; correct?

24    A.   Yes.

25    Q.   Okay.  It was a briefing with team echo?
```

1    A.    Yes.

2    Q.    Okay.  You went over intelligence reports; correct?

3    A.    Yes.

4    Q.    Okay.  You discussed threat level was going up on the

5    12th; right?

6    A.    Yes.

7    Q.    Okay.  And so this was the threat level that's affecting

8    your state of mind on the 11th; correct?

9    A.    Yes.

10   Q.    Before you even go into the wash on the 12th; correct?

11   A.    Correct.

12   Q.    Okay.  And you discussed the different natures of that

13   threat level and specifics that led to that threat level;

14   correct?

15   A.    Yes.

16   Q.    Okay.  You discussed that it was based on events that

17   occurred before April 12th; correct?

18   A.    Yes.

19   Q.    Okay.  In fact, you discussed one of those events was a

20   taser incident, right, involving Ammon Bundy; correct?

21            MS. AHMED:  Objection.  Relevance.

22            MR. TANASI:  Your Honor, it's relevant to his

23   state of mind going into the wash on the 12th.

24            THE COURT:  Overruled.  He can answer the

25   question.

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

```
 1                    THE WITNESS:  I think that went to the overall
 2      threat.  But that didn't have anything to do with the 11th or
 3      12th.
 4      BY MR. TANASI:
 5      Q.   But your testimony, though, is in part that taser
 6      incident on the 9th involving Ammon Bundy, that went to the
 7      threat level that you discussed on the 11th, which you then
 8      took with you to the 12th; correct?
 9      A.   The overall, yeah, the overall threat level.
10      Q.   Understood.  And you were actually at that incident,
11      right, with Ammon Bundy getting tased?
12                    MS. AHMED:  Objection.  Relevance.
13                    MR. TANASI:  Goes to his state of mind, Your
14      Honor.
15                    MS. AHMED:  He just testified it didn't affect
16      what happened on the 11th and 12th as to his state of mind.
17                    MR. TANASI:  Your Honor, I think the testimony is
18      the exact opposite.
19                    THE COURT:  He said overall but not to the 11th
20      and 12th.  I'm trying not to comment on any of the facts.
21      That's the province of the jury to decide how much weight to
22      give the facts, but it's not relevant to his state of mind on
23      the 12th, which is what's in issue for purposes of fear.
24                    MR. TANASI:  All right.  So I just want to make
25      sure I understand the Court's ruling before I ask the next
```

```
 1   question.
 2              Is anything related -- anything that occurred on
 3   the 9th that was discussed on the 11th that affected the
 4   threat level not relevant to his state of mind on the 12th?
 5              THE COURT:  If it's discussed on the 11th, it
 6   could be.  You have to ask him.
 7   BY MR. TANASI:
 8   Q.   On the 11th did you discuss the events that occurred on
 9   April 9th, namely the Ammon Bundy taser incident?
10   A.   No.
11   Q.   You did not discuss that?
12   A.   No.
13   Q.   What events did you discuss on the 11th that lend
14   themselves or contributed to the threat level?
15   A.   We --
16              MS. AHMED:  Objection.  Vague as to time.
17              MR. TANASI:  Your Honor, I asked on the 11th.
18              THE COURT:  On the 11th?
19              MR. TANASI:  Yes.
20              THE COURT:  All right.  As to the night of the --
21   or the nighttime of the 11th?
22              MR. TANASI:  Sure.
23              THE COURT:  That's fine.
24   BY MR. TANASI:
25   Q.   Nighttime of the 11th when you're discussing the threat
```

1   level, are you with me?

2   A.   Yes.

3   Q.   All right.  What events did you discuss that contributed

4   to the threat level?

5   A.   We discussed intelligence reports that there were

6   militia members showing up at the Bundy gathering site and

7   that they were possibly going to attempt an incursion of the

8   ICP on the night of the 11th.

9   Q.   Okay.  And did you discuss any events specifically prior

10  to the 11th?

11  A.   No.

12  Q.   Because you had been there -- if I have your testimony

13  right, you were there on April 5th, right, you arrived in

14  Bunkerville on April 5th, 2014, roughly?

15  A.   Yes.

16  Q.   Okay.  Did you discuss any of the events that took place

17  that you were involved in, or maybe you learned about,

18  between April 5th, 2014, and April 11, 2014, that contributed

19  to the threat level that you discussed on the 11th?

20  A.   No.

21  Q.   Okay.

22        MR. TANASI:  All right.  Brian, if we could play

23  Government Exhibit 109 at 12:27:33.

24        (Videotape played.)

25        MR. TANASI:  Okay.

1    BY MR. TANASI:

2    Q.   Sir, we see you in this frame; correct?

3    A.   Yes.  The right side there.

4    Q.   Just a portion of you?

5    A.   Yes.

6    Q.   Okay.  And that's you pointing your weapon; correct?

7    A.   Yes.

8    Q.   And you're pointing your weapon towards the bridge;

9    correct?

10   A.   Yes, sir.

11   Q.   Pointing your weapon at folks that you claim are

12   pointing weapons back at you; correct?

13   A.   Yes, sir.

14   Q.   All right.  And in this picture, we have who in the far

15   right?

16   A.   That's Dan Love out in front.  And I don't know who's

17   behind him.  It looks like the camera crew or something.

18   Q.   Okay.  You agree with me there's four people there who

19   are walking with their backs to the people that you're

20   claiming are pointing weapons at you; correct?

21   A.   Yes.

22   Q.   Okay.

23             MR. TANASI:  If we could also go to 12:31:11.

24        (Videotape played.)

25             MR. TANASI:  All right.  If we actually keep it

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

1    freezed right there.

2    BY MR. TANASI:

3    Q.   We don't actually see you in this picture; right?  But

4    you're to the left of these folks; correct?

5    A.   Yes, sir.

6    Q.   Okay.  And we can back it up if we need to, but you're

7    pointing your weapon at this point at the bridge?

8    A.   Yes.

9    Q.   Right?

10   A.   Yes.

11   Q.   Again at the folks that you claim are pointing weapons

12   at you; right?

13   A.   Yes.

14   Q.   And then who do we have here in the far -- in the

15   right -- far right?

16   A.   That is Special Agent Richardson would be on the left

17   and Assistant Special Agent in Charge Zach Opper on the

18   right.

19   Q.   Fair to say that at least from the chest up or so,

20   they're fully exposed to the people that you claim are

21   pointing weapons at you; right?

22   A.   Yes, sir.

23   Q.   Prior to today's testimony, how many times have you met

24   with the US Attorney's Office?

25   A.   I'm sorry.  One more time?

1    Q.   Sure.  Prior to testifying today, how many times did you

2    meet with the US Attorney's Office?

3    A.   Two times, and then one on the phone.

4    Q.   One on the phone?

5    A.   Yes.

6    Q.   Okay.  And did you meet with the FBI, as well, at some

7    point?

8    A.   The case agents were there when I met with the US

9    Attorney's Office.

10   Q.   Sure.  How many US attorneys were with you when you were

11   meeting with them?

12   A.   Well, there was different numbers every time.

13   Q.   Okay.  The first time how many people were there?

14   A.   I think four or five total, including the case agents.

15   Q.   Four or five US attorneys --

16   A.   No --

17   Q.   -- or four or five total?

18   A.   -- four or five total, including the two case agents.

19   Q.   And when you met with them, did you prepare for today's

20   testimony?

21   A.   Yes.

22   Q.   Okay.  And in preparing for today's testimony, what did

23   you go over?  What did you discuss?

24   A.   Just my reports, the facts.

25   Q.   Sure.

```
1    A.    That's pretty much it.

2    Q.    Did you go over assault and the elements of assault?

3              MS. AHMED:  Objection.  Relevance.

4              MR. TANASI:  Goes to bias, Your Honor.

5              THE COURT:  I'll allow it.

6              THE WITNESS:  No.

7    BY MR. TANASI:

8    Q.    Didn't discuss assault or the elements of assault?

9    A.    No.

10   Q.    Didn't discuss fear?

11   A.    No.

12   Q.    No?  Okay.

13             MR. TANASI:  Nothing further.  Thank you.

14             THE WITNESS:  Okay.  Thanks.

15             THE COURT:  Mr. Engel, Mr. Leventhal, or Mr. Perez

16   or Mr. Jackson?  No particular order.  Whoever wants to go

17   next.

18                      CROSS-EXAMINATION

19   BY MR. PEREZ:

20   Q.    I think it's still morning.  Good morning, Agent.  My

21   name is Shawn Perez.  I represent Mr. Ricky Lovelien.

22             Have you ever met Mr. Lovelien?

23   A.    No, I have not.

24   Q.    You've never seen him in person at all?

25   A.    I couldn't point him out, no.
```

1    Q.   Okay.  Great.  You said in conversation with Mr. Tanasi
2    that there was some word that militia members were going to
3    show up on the night of the 11th and potentially there might
4    be an incursion into the ICP?
5    A.   Yes, sir.
6    Q.   Was there ever any movement towards the ICP on Friday,
7    the 11th?
8    A.   Not that I'm aware of.
9    Q.   So no attempt?
10   A.   Not that I'm aware of, no.
11   Q.   Okay.  Now, as far as radio chatter that you might pick
12   up, if you heard something referencing blue units, what would
13   that mean?
14   A.   I'm sorry.  Can you repeat --
15   Q.   Blue units.  Have you ever heard the term "blue units"?
16   A.   I have not.
17   Q.   Or something blue in the crowd or anything like that?
18   A.   No, I have not.
19   Q.   Okay.  And then as far as radio traffic, if you were to
20   identify yourself, would you identify yourself as echo team 1
21   or echo 1 or --
22   A.   Yes, sir.
23   Q.   What was your --
24   A.   Call sign.
25   Q.   -- moniker or whatever?

1    A.    Echo 1.

2    Q.    Echo 1.  Okay.

3              MR. PEREZ:  I have nothing further.  Thanks.

4              THE WITNESS:  Thank you.

5              THE COURT:  Mr. Jackson?

6              MR. JACKSON:  Just a couple questions.

7                         CROSS-EXAMINATION

8    BY MR. JACKSON:

9    Q.    Mr. Swanson, do you know my client, Greg Burleson?

10   A.    No, I don't.

11   Q.    Okay.  Did you ever see him on April 12th, 2014, to your

12   knowledge?

13   A.    Can you point him out to me?

14   Q.    The gentleman sitting right -- would you stand up, Greg.

15              To your knowledge, did you see him?

16   A.    I don't recall seeing him.

17   Q.    All right.  Now, your supervisor that day was Dan Love;

18   is that correct?

19   A.    The overall incident supervisor was Dan Love, yes, sir.

20   Q.    Do you remember what he was wearing that day?

21   A.    Generally, yes, sir.

22   Q.    What was he wearing?

23   A.    He was wearing a baseball cap, a -- I believe it was a

24   tan vest carrier and, as I recall, tan pants and tan boots.

25   Q.    Now, looking at the video, it looked to me like baseball

1    cap was turned backward; is that right?

2    A.   It looked to me too like that.

3              MR. JACKSON:  I have no further questions.

4              THE COURT:  Mr. Leventhal or Mr. Engel?

5                      CROSS-EXAMINATION

6    BY MR. ENGEL:

7    Q.   Good morning, Agent Swanson.  Thank you for being here.

8    My name is Todd Engel.  I'm representing myself.

9              You stated that -- in your direct, that you were

10   not a trained sniper; correct?

11   A.   Correct.

12   Q.   Okay.  And you stated that you had an ACOG scope that

13   had about a three-and-a-half power scope on it; correct?

14   A.   Yes.

15   Q.   And you used that for observation; correct?

16   A.   Yes.

17   Q.   Okay.  And your fellow officers had what's called

18   peep-sight scopes with no magnification; correct?

19   A.   Correct.

20   Q.   And they're probably not very good for doing any type of

21   observation; correct?

22   A.   Well --

23   Q.   With no magnification it's the same as looking through

24   your eyes; right?

25   A.   Generally, yes.

```
 1    Q.    Yeah.

 2    A.    As far as I know.

 3    Q.    It doesn't make anything bigger?

 4    A.    Not that I know.  I don't have one, so --

 5    Q.    And a magnifying scope just makes -- it's like a

 6    magnifying glass, it makes it a little bit bigger so you can

 7    see a little closer up?

 8    A.    Yes, sir.

 9    Q.    Okay.  So you stated at approximately 11:45 you arrived

10    in the wash; correct?

11    A.    Yes.

12    Q.    When you saw a large crowd gathering; correct?

13    A.    Yes.

14    Q.    Okay.  Where was that large crowd?  Was it down under

15    the wash or up on top of the bridge?

16    A.    I'm sorry.  Can you ask one more time?  I missed the

17    first part.

18    Q.    The large crowd, was it under the -- was it up on the

19    bridge in the northbound lane or was it under the bridge?

20    A.    The crowd was gathering more towards the bridge that was

21    further away.

22    Q.    Okay.

23    A.    And there was a crowd on -- some people were gathering

24    up on top on the sides and people were coming down, but not

25    as large of crowd up front.
```

```
 1    Q.    Okay.  So you have an estimate on how many people were

 2    up on the bridge at approximately 11:45?

 3    A.    Oh, on the bridge?

 4    Q.    Yeah.

 5    A.    Not really.  I don't think there was a whole lot of

 6    people there yet.

 7    Q.    Okay.  Do you recall what time you started to observe

 8    the crowd gathering underneath the bridge?

 9    A.    No.

10    Q.    Do you recall what time you used your three-and-a-half

11    power ACOG to begin to observe the people underneath the

12    bridge?

13    A.    No.

14    Q.    Was it five minutes after you got there or ten minutes

15    after you got there?

16    A.    I don't know.

17    Q.    Okay.  Do you know what time approximately you started

18    to observe the people through your weapon sight of the people

19    on top of the bridge?

20    A.    No.  As I testified before, I didn't keep track of time

21    at all.

22    Q.    Okay.

23              MR. ENGEL:  Brian, will you pull up Exhibit 258,

24    please.

25
```

```
 1    BY MR. ENGEL:
 2    Q.   Agent Swanson, do you recognize yourself in this
 3    photograph?
 4    A.   Yes.
 5    Q.   Is this you right here?
 6    A.   It is.
 7    Q.   And you have a magnified scope; correct?
 8    A.   Yes.
 9    Q.   And your fellow officers are using the peep sight, ones
10    with no magnification; correct?
11    A.   Yes.
12    Q.   Can you tell me what they're doing at that point in
13    time?
14              MS. AHMED:  Objection.  Calls for speculation.
15    BY MR. ENGEL:
16    Q.   Are they aiming their rifle in the same direction you're
17    aiming your rifle?
18    A.   I don't know.
19    Q.   Now, they're --
20    A.   You mean same, like, general direction?
21    Q.   Correct.
22    A.   Yes.
23    Q.   And at this point you're aiming your rifle at somebody
24    up on the bridge who you think is aiming his rifle at you;
25    correct?
```

```
 1    A.    Yes.
 2    Q.    Okay.  And you could see him because you have a
 3    magnified scope; correct?
 4    A.    Well, you could see him with a naked eye, but I could
 5    see him better with a magnified scope.
 6    Q.    Okay.  And are these gentlemen -- do you know who
 7    they're aiming their weapons at?
 8    A.    No.
 9    Q.    The protestors under the bridge?
10    A.    I don't know.  I don't know who they're aiming at.
11    Q.    Okay.
12              MR. ENGEL:  No further questions.  Thank you.
13              THE COURT:  Mr. Leventhal.
14                      CROSS-EXAMINATION
15    BY MR. LEVENTHAL:
16    Q.    Good afternoon.
17    A.    Good afternoon.  Is it?
18    Q.    My name is Todd Leventhal, and I represent Mr. --
19              THE COURT:  It's still morning.
20    BY MR. LEVENTHAL:
21    Q.    Good morning, afternoon, later on, if you're still here.
22    I represent Mr. Drexler.
23              I understand that timing was an issue, so I'm
24    going to run through some videos, and let's see if we can't
25    put some things together.  Is that okay with you?
```

1    A.    Sure.

2    Q.    Thank you.  All right.

3          But before we get to that, I'd like to know

4    something about this tan -- the tan-hat person.  You

5    indicated that it was a tan hat that was a pulldown hat.  I'm

6    not sure what you meant by that.  What did you mean by a

7    pulldown hat, sir?

8    A.    It was pulled down further, like down on the brow.  And

9    I guess they call it, like, a shorter crown or smaller crown.

10   More like an old-time baseball hat.

11   Q.    An old-time baseball hat.  Okay.

12         Do you remember if there -- you indicated there

13   was insignia or something on the black hat.

14         What was on the white hat, or the tan hat?

15   A.    Nothing that I could see.

16   Q.    Nothing?  Okay.

17         Now, you said that the person was wearing tan body

18   armor; correct?

19   A.    It appeared to be tan.

20   Q.    Okay.  And he had a high-powered rifle that was slung.

21         Do you remember --

22   A.    Correct.

23   Q.    Okay.  Do you remember what color shirt he had on?  Was

24   it a dark shirt, a light-colored shirt?

25   A.    I don't remember.

1    Q.   Do you remember if he had any tattoos anywhere?

2    A.   No, I don't.

3    Q.   How about clean shaven?  Was he clean shaven, if you

4    remember?

5    A.   I don't recall that.

6    Q.   Glasses?  Was he wearing glasses?

7    A.   I seem to remember he was wearing glasses when I

8    initially saw him.

9    Q.   Did that change at some point?

10   A.   Not that I recall.  I don't --

11   Q.   You indicated that was when you initially saw him.  I'm

12   just figuring out if that changed at some point.  No?

13   A.   I don't think so.

14   Q.   Okay.  Did he have any special attachments to his gun

15   that you remember, anything specific points out?  Did he have

16   a scope, say?

17   A.   Not that I recall.

18   Q.   So --

19   A.   I couldn't tell.

20   Q.   So there was no scope, or you couldn't tell?

21   A.   I couldn't tell.

22   Q.   Is that because the gun -- you never actually saw the

23   gun?

24   A.   No.  The -- when I saw him with the gun, it was slung

25   tactically.  So it was silhouetted against his body, which

```
1   was dark -- you know, darker colored clothing; so I

2   couldn't -- it was just I could see it was a gun.  I couldn't

3   see if it had a scope or anything like that.

4   Q.   Okay.  So it wasn't pointed down when you saw it?

5   A.   Yes.

6   Q.   Okay.  And you never indicated on direct that I heard

7   you say it was ever pointed at you or you ever announced it

8   was pointed at you by this tan-hat person; correct?

9   A.   Correct.

10  Q.   Okay.

11            MR. LEVENTHAL:  Brian, if we could pull up picture

12  419, please.  Government.  Thank you.

13  BY MR. LEVENTHAL:

14  Q.   Okay.  You were shown this picture on direct exam, do

15  you remember?

16  A.   Yes.

17  Q.   And that picture right there, you indicated that it

18  was -- sorry, it went blank.  This person right here;

19  correct?

20  A.   Yes.

21  Q.   Okay.  So this gentleman has a hat that you identified

22  as being the low hat; correct?

23  A.   Yes.

24  Q.   He's got somewhat tan clothing.  Can you figure out what

25  color shirt it is now?
```

1    A.    It looks like darker colored --

2    Q.    Dark -- darker shirt.

3    A.    -- short-sleeve shirt.

4    Q.    Okay.  All right.  And he's got his gun low and ready?

5    A.    Yes.

6    Q.    Okay.  And you don't know which time this picture was

7    taken at; right?

8    A.    No, I don't.

9    Q.    Okay.  Now, you indicated that when you first arrived

10   behind the blue vehicle -- do you remember this?

11   A.    Yes, sir.

12   Q.    -- Dan Love was not approaching.  And I know we've been

13   through this, but Dan Love had not approached yet when you

14   got there; right?

15   A.    Yes, sir.

16   Q.    And you don't remember how long after he then came into

17   and approached the gate, you don't remember how long that

18   was?

19   A.    I'm sorry.  Can you --

20   Q.    Certainly.  I apologize.  If I ask a question you don't

21   understand, ask me.

22         You don't remember how long you were at the

23   vehicle, the blue vehicle, when Dan Love actually passed you?

24   A.    I don't.

25   Q.    You don't.  And you have no approximation?

```
1    A.    No, I don't.
2    Q.    Okay.  But during this time you were seeing black hat
3    and tan hat; correct?
4    A.    Yes.
5    Q.    Okay.  And then when Dan Love -- and I'll use that as
6    sort of a baseline, if I can, for now, then when Dan Love
7    went ahead of you and approached the gate, you were still
8    seeing tan hat and black hat; right?
9    A.    Well, when I looked over at him, then I looked back
10   up --
11   Q.    "Him" -- I'm sorry.  We have a record.  "Him" being who?
12   Love?
13   A.    Love, sorry, yes.
14   Q.    That's okay.
15   A.    When I looked over towards Love and then back up, I
16   believe that's when I started to call out that the -- from
17   the general vicinity of black hat, that tan hat was moving
18   right.
19   Q.    Right or left?
20   A.    My right on the bridge.
21   Q.    Your right on the bridge.
22   A.    So westbound.
23   Q.    Okay.  Now, when Agent Love got to the gate, he was
24   there for, let's say, approximately, I don't know, about 10
25   minutes, approximately?  I know you don't know, but
```

1    approximate?

2    A.   I would say, yeah --

3    Q.   Okay.

4    A.   -- I don't know.

5    Q.   Were you still seeing tan hat and black hat during this

6    time when he was at the gate?

7    A.   Black hat.

8    Q.   Black hat.  Tan hat was gone?

9    A.   Yes.

10   Q.   Okay.  Now, at --

11   A.   I wasn't --

12   Q.   I'm sorry.

13   A.   Go ahead.

14   Q.   No, that's okay.

15   A.   I didn't see him.

16   Q.   Okay.

17   A.   I saw black hat.

18   Q.   Okay.  Then you've only identified black -- so basically

19   tan hat was gone from there on out?

20   A.   As far as I remember, yes.

21   Q.   Okay.  So after -- and I just want to clarify this --

22   after Dan Love walked away from the Bundys -- you remember

23   that?  Or one of the Bundys?  You remember that?

24   A.   I --

25             MS. AHMED:  Objection.  Misstates the witness's

1    testimony in direct.

2              MR. LEVENTHAL:  I just asked him if he remembered.

3    He's indicated he did.

4    BY MR. LEVENTHAL:

5    Q.   Do you remember that?

6    A.   I stated I wasn't -- I didn't notice when he walked back

7    up.

8    Q.   Okay.  That's fine.  But you didn't notice him at all

9    walking past you?

10   A.   No.

11   Q.   No?

12   A.   I was looking up.

13   Q.   Okay.  While you were looking up, you never saw tan hat

14   again?

15   A.   I don't recall seeing tan hat again after -- after the

16   movement to the right of the bridge, which was shortly after

17   Dan Love, what I just told you, I don't recall seeing him

18   near the black-hatted person again because I was concentrated

19   right on him.  I never went back to where I saw him.

20   Q.   Okay.  And you indicated that tan hat kind of, you'd say

21   he was kneeling down once in a while?

22   A.   Most of the time I was -- I only saw the top of his head

23   or he was totally gone.

24   Q.   Okay.  But you don't know what he was doing; right?

25   A.   I --

```
 1   Q.   I mean, you can't see what I'm doing if I go under here;
 2   right?
 3   A.   No.
 4   Q.   You have no clue; right?
 5   A.   Correct.
 6   Q.   I could be tying my shoe?  I could do a lot of things;
 7   right?  Okay.
 8             MR. LEVENTHAL:  You know what, Judge, thank you, I
 9   have nothing further.
10             Thank you very much.
11             THE WITNESS:  Thank you, sir.
12             THE COURT:  All right.  So I think everyone has
13   had an opportunity.
14             Ms. Ahmed, any redirect?
15             MS. AHMED:  Yes, Your Honor.  May I just have one
16   moment?
17             THE COURT:  Yes.
18                       REDIRECT EXAMINATION
19   BY MS. AHMED:
20   Q.   Agent Swanson, can you explain to the jury when you were
21   requesting, through your dispatch, that the freeway be shut
22   down what you meant by the term "shut down"?
23   A.   That the lanes be blocked off so that the travel over
24   the bridge was blocked.  So I wanted both lanes of north --
25   or east, west, both bridges shut down so that traffic would
```

```
 1    stop and there would no longer be any vehicles driving over
 2    that -- either of those bridges.
 3    Q.   So you wanted the bridges clear of all vehicles; is that
 4    right?
 5    A.   Yes.
 6              MS. AHMED:  Your Honor, the Court's indulgence?
 7              THE COURT:  Yes.
 8              MS. AHMED:  Thank you, Your Honor.  No further
 9    questions of the witness.  Thank you.
10              THE WITNESS:  Thanks.
11              THE COURT:  Any recross?
12              MR. MARCHESE:  Nothing from Parker.
13              MR. TANSANI:  None from Stewart, Your Honor.
14              MR. LEVENTHAL:  None from Drexler.
15              MR. ENGEL:  None from Engel.
16              MR. PEREZ:  None from Lovelein.
17              MR. JACKSON:  No question from Burleson.
18              THE COURT:  All right.
19              So thank you, Agent Swanson.  You are excused.
20    Thank you for coming over.  Please be careful on the way down
21    with the steps.
22              THE WITNESS:  Okay.  Thank you, Your Honor.
23              THE COURT:  The government may call its next
24    witness.
25              MS. CREEGAN:  Your Honor, the United States calls
```

```
 1       Ranger David Keltner.
 2                   THE COURT:  Good morning, Ranger Keltner.  You'll
 3       be seated right here to my right.  Please be careful with the
 4       steps up.
 5                   COURTROOM ADMINISTRATOR:  Please raise your right
 6       hand.
 7                   You do solemnly swear that the testimony you shall
 8       give in the cause now before the Court shall be the truth,
 9       the whole truth, and nothing but the truth, so help you God?
10                   THE WITNESS:  Yes.
11                   COURTROOM ADMINISTRATOR:  Thank you, sir.  You may
12       be seated.
13                   Please state and spell your full name for the
14       record.
15                   THE WITNESS:  My name is Dave Keltner.  My last
16       name is spelled K-e-l-t-n-e-r.
17                             DAVE KELTNER
18                   called as a witness on behalf of the
19            Government, was examined and testified as follows:
20                          DIRECT EXAMINATION
21       BY MS. CREEGAN:
22       Q.   Good morning, Ranger Keltner.
23       A.   Good morning.
24       Q.   Could you please describe your current post?
25       A.   I currently work for the National Park Service as the
```

```
 1    West District Ranger in Mt. Rainier National Park.  I'm a
 2    supervisory ranger.  I supervise about 10 people, both law
 3    enforcement officers as well as EMTs.
 4    Q.   How long have you been with the Park Service?
 5    A.   My National Park Service career began in 2004 as a law
 6    enforcement officer.
 7    Q.   Have you been a law enforcement officer the entire time?
 8    A.   Yes.
 9    Q.   What are some other positions that you've held while
10    you've been within the Park Service?
11    A.    I was a law enforcement officer at Yellowstone National
12    Park, Klondike Gold Rush National Historical Park in Alaska,
13    Organ Pipe Cactus National Monument on the US/Mexico border,
14    Redwood National and State Parks in far northern California,
15    and most recently Mt. Rainier.
16    Q.   And, I'm sorry, when did you say that you began as a law
17    enforcement officer with the Park Service?
18    A.   2004.
19    Q.   When you entered into service, did you receive some
20    training?
21    A.   Yes.  I attended the Federal Law Enforcement Training
22    Center in Glynco, Georgia.
23              I'm a graduate of the Land Management Police
24    Training Program.  It's an 18-week program.
25              And I also participated in the Field Training and
```

1    Evaluation Program, which is 11-week field training program

2    after graduation.

3    Q.   And subsequent to that time, have you received

4    additional training as a law enforcement officer?

5    A.   Yes.  I'm required to attend a minimum of 40 hours of

6    annual training per year.  I average probably close to about

7    100 hours per year.

8    Q.   Why is yours so much over the mandatory?

9    A.   I attend both the annual training provided by my park

10   and I also am on the Pacific West Region's Special Event Team

11   and that -- we have a 40-hour annual training accompanying

12   that as well.

13   Q.   Could you explain what the Pacific Region Special Events

14   Team is?

15   A.   Yes.  The Pacific West Region has three Special Event

16   Teams.  They're three 11-person teams.  And these teams train

17   together annually.  We deploy to a variety of missions that

18   occur within the National Park system.

19        We went to Yosemite and Kenai Fjords for

20   presidential visits within the last year to support the

21   Secret Service in providing security for the President of the

22   United States and his family.

23        We provided security at the 75th members of the

24   attack in Pearl Harbor this winter.

25        We've provided security in national parks in

```
 1    recreation areas during outlaw motorcycle events.
 2                We've participated in the raiding of marijuana
 3    gardens.
 4    Q.   Did you participate at all in the impoundment operation
 5    which occurred in the Bunkerville, Nevada, area in April
 6    2014?
 7    A.   Yes.
 8    Q.   Did you participate as a member of the Special Events
 9    Team?
10    A.   Yes.
11    Q.   Is that called the SET team for short?
12    A.   Yes.
13    Q.   Were you present at the incident command post in the
14    Bunkerville area on April 12, 2014?
15    A.   Yes.
16    Q.   And when were you first present there on April 12, 2014?
17    A.   I spent the night above -- the night of the 11th and
18    12th above the command post.
19    Q.   When you say "above the command post" --
20    A.   Yeah.
21    Q.   -- where were they located?
22    A.   Between the flat top mesa and the command post.  And I
23    spent it with a thermal camera.
24    Q.   And why were you stationed at that area?
25    A.   We were told at our night shift briefing that the
```

```
 1    intelligence reports were that we were going to be imminently
 2    attacked by the militia.
 3    Q.    And when you say "we," "we were at this position between
 4    flat top and the ICP," who is "we"?
 5    A.    The BLM and National Park law enforcement officers and
 6    supporting personnel who were present.
 7    Q.    And who was -- was anybody with you at the position that
 8    you were holding between the ICP and the flat top?
 9    A.    Yes.  US Park Ranger Mike Alongi was there with me as
10    well.
11    Q.    Was he also a member of the SET team?
12    A.    Yes.
13    Q.    Did you supervise any of the SET teams?
14    A.    Yes.  I was a squad leader during the mission.  I served
15    as the night shift supervisor supervising between four and
16    eight people.
17    Q.    And do you know why the SET team was used for the
18    impoundment operation?
19    A.    We provided the only law enforcement team on the west
20    coast within the Department of the Interior, and we were
21    tasked with providing support to the BLM and National Park
22    Service in the roundup.
23    Q.    When you say you're the only team, you're the only group
24    that works together consistently?
25    A.    We're the only group that trains together on a
```

1    consistent basis.

2    Q.   And you mentioned that you were at this intermediate

3    position between the ICP and the mesa.  Did there come a time

4    when you left that position?

5    A.   Yeah.  We dug in about sunset and spent the night up

6    there.  And then at daybreak we were ordered to come down,

7    down to the ICP and clean up and rehab our gear.

8              We did that, drank some coffee, and were told to

9    go back to our hotel.

10   Q.   Did you, in fact, go back to your hotel?

11   A.   Yes.

12   Q.   And did you go back to your hotel for any specific

13   purpose?

14   A.   We were instructed to go back to the hotel and report

15   back sometime later in the day for our normal night shift.

16   Q.   And did there come a time later that day that you did

17   return to the ICP area?

18   A.   Yes.  At 11:19 in the morning I received a phone call

19   from National Park Service Special Agent Neil Akana.  And he

20   told me that there were cowboys with guns at the front gate

21   and he needed my squad to get there as quickly as we could.

22   Q.   And did you make an effort to comply with that request?

23   A.   Yes.

24   Q.   And what did you do from there?

25   A.   I woke all of my squad up, I think there were eight or

1    nine of us, and we drove to the ICP together.

2    Q.   Did you -- did there come a time when you arrived at the

3    ICP?

4    A.   Yes.  So we headed down 15 from Mesquite.  About a mile

5    away, we sort of bumped into a lot of traffic.  And I turned

6    my emergency lights on in my patrol vehicle.  And then when

7    traffic stopped, essentially, we moved into the left lane,

8    the center lane, and drove across the bridge or bridge --

9    yeah, the bridge across the wash.

10   Q.   And did you enter the ICP through a point that's known

11   as post 1?

12   A.   Yes.

13   Q.   And what did you observe when you were at post 1?

14   A.   As I was driving in, there were lots of people yelling

15   and screaming.  I noticed a lot of adult men with handguns on

16   their hips and holsters.

17            And specifically when I was at post 1, Las Vegas

18   Metro Police Department had a number of police cars in the

19   area blocking entrance into the area.  And I had to talk to

20   them to let -- to get them to move a police car so that I

21   could get in.

22            And I looked over to my right, and I saw two

23   gentlemen in tan tactical combat vests both with AR-15-style

24   rifles.

25   Q.   And did you observe anything distinctive about those

1     gentlemen's demeanor?

2     A.    Yes.   They -- they were giving me the thousand-yard

3     stare, which I know to be a preassault indicator.

4                   MR. LEVENTHAL:  Objection.

5                   MR. TANSANI:  Stewart joins, Your Honor.

6                   MR. PEREZ:  Lovelein joins.

7                   MR. ENGEL:  Engel joins.

8                   MR. MARCHESE:  Parker joins.

9                   MR. JACKSON:  I'd join that objection.

10                  MS. CREEGAN:  The officer's --

11                  THE COURT:  Ms. Creegan, is it offered for the

12    truth of the matter asserted, or does this go to his

13    perception on the steps that he took in response?

14                  MS. CREEGAN:  I think he's not testifying to what

15    they said, he's testifying to what he observed them doing.

16    And in his training and experience as a law enforcement

17    officer, he has knowledge of what's called a preassault

18    indicator, which I believe he was explaining why -- what he

19    observed and why he considered it to be a preassault

20    indicator.

21                  MR. JACKSON:  What the objection is is it's a

22    conclusion that he's not -- he can't make a -- from the

23    distance he was and from simply a stare.

24                  THE COURT:  Sustained.  Why don't you lay the

25    foundation for his knowledge if he's stating an opinion.

1    BY MS. CREEGAN:

2    Q.   Ranger Keltner, have you received training in

3    recognizing threats as a law enforcement officer?

4    A.   Yes.  I'm a use-of-force instructor for the National

5    Park Service.

6    Q.   Does a part of that training include training as to

7    determining whether any specific individual is a threat?

8    A.   Yes.

9    Q.   Are there factors that you're taught to consider that

10   they may be an indicator that a person is a threat?

11   A.   Yes.  The size of the subject, the training of the

12   subject, the demeanor of the subject, all facts associated

13   with the *Graham versus Connor* decision.

14   Q.   And is one of the things you're taught to recognize

15   whether the person is giving you a blank stare?

16              MR. TANASI:  Objection.  Leading, Your Honor.

17              MS. CREEGAN:  Laying a foundation for his --

18              THE COURT:  Yeah.  He already testified to the

19   blank stare.  We just don't know what that means.

20              She laid the foundation for his training.  So he

21   can provide his opinion.

22              THE WITNESS:  Yes.  I've learned about the blank

23   stare, thousand-yard stare, both in a classroom setting as

24   well as through my experience as a federal law enforcement

25   officer.

```
 1                  I've seen it in the field a handful of times,
 2      maybe five or six times.  And it's always preceded a violent
 3      encounter.
 4      BY MS. CREEGAN:
 5      Q.   And are these factors that you're trying to consider,
 6      they're called preassault indicators?
 7      A.   Yes.
 8      Q.   And was it your prior testimony that you observed one of
 9      those indicators on the day?
10      A.   Yes.
11      Q.   What was that indicator?
12      A.   I observed the two men wearing the tan vests with the
13      rifles giving me the thousand-yard stare.
14      Q.   And you'd had personal experience in seeing that stare
15      in the past?
16      A.   Yes.
17      Q.   And what was that experience?
18      A.   It involved a violent encounter with a subject in the
19      field that resulted in the use of force.
20      Q.   And that violent encounter was preceded by a blank stare
21      or a thousand-yard stare?
22      A.   Yes.
23      Q.   At the time that you observed these individuals giving
24      you that stare, did you make any assessment of the threat at
25      that time?
```

1    A.    Yes.   I believed that we were -- this was an extremely

2    serious incident; that we were on the cusp of a deadly force

3    incident; that there were men with rifles staring at me like

4    I had seen people stare at me in the past before violent

5    encounters with the police.

6    Q.    And this is an observation that you made at post 1?

7    A.    Yes.

8    Q.    Did there come a time when you left post 1?

9    A.    We immediately left.  After Las Vegas Metro Police moved

10   out of the way, we drove down to the ICP area and then down

11   into the wash.

12   Q.    And I know that you might not have a recollection as to

13   exact times, but you received this call, I think you

14   mentioned, about 11:19.

15           Do you have a sense when you arrived down in the

16   wash area?

17   A.    Roughly shortly after noon, I believe.

18   Q.    And when you arrived in the wash area, where about in

19   the wash area did you come to a stop, if you did come to a

20   stop?

21   A.    We were about a quarter mile upstream of the bridge.

22   Q.    And when you say "we," who is we?

23   A.    The folks assigned to me on the night shift squad.

24   Q.    And were you travelling via vehicle?

25   A.    We were in three vehicles.  We stopped and got out of

1    our vehicles at that point.

2    Q.   When you got out of your vehicles, did you take any

3    further steps from there?

4    A.   I got on the radio, and I asked US Park Police Sergeant

5    Scott Huther, who was the SET team leader for the assignment,

6    I asked Sergeant Huther what he'd like me to do.  And I told

7    him I had my designated marksman team available.

8              And he said, "Deploy them and come down into the

9    wash and meet us."

10   Q.   And did you follow that instruction?

11   A.   Yes.

12   Q.   Where did you travel to on that instruction?

13   A.   We patrolled down the wash to where the rest of the SET

14   team was at the time.

15   Q.   And whereabouts was the rest of the SET team?

16   A.   They're probably about a hundred yards upstream of the

17   southbound bridge.

18   Q.   And from that position could you see either the north or

19   southbound bridge?

20   A.   I could see both.

21   Q.   And about how far were you from the southbound bridge?

22   A.   Somewhere in the neighborhood of 50 to 100 yards.

23   Q.   About --

24   A.   I'm not exactly sure.

25   Q.   I'm sorry to interrupt you.

```
 1                  About how far away were you from the northbound
 2      bridge?
 3      A.    Probably about 200 yards.
 4      Q.    So the northbound bridge is the farther away bridge?
 5      A.    Yes.
 6      Q.    And from your position, were you able to observe whether
 7      there were any people around, under, or on top of those
 8      bridges?
 9      A.    There were numerous people on both bridges.
10      Q.    Did you observe whether there were any people in the
11      wash?
12      A.    There were numerous people in the wash.  I would say
13      collectively there were hundreds of people present.
14      Q.    And starting with the wash, can you just describe for
15      the jury what it is that you observed?
16      A.    Down in the wash there were a lot of people on
17      horseback.  There were people milling around.  There were
18      dogs.  There was a lot of dust in the air.
19                  It was really loud and hard to hear things.  There
20      were people yelling.  There were flags waving.  There were
21      people with holster -- pistols on their hips walking around.
22                  There were women and children and unarmed men
23      amongst the armed men in the wash.  I saw one gentleman with
24      a rifle in the wash on the right side of the wash.
25                  MS. CREEGAN:  Your Honor, may I publish what's
```

1    been previously admitted as Government's Exhibit 93?

2                 THE COURT:  Yes, you may.

3                 MS. CREEGAN:  And could I advance that to 12:16,

4    about.

5             (Videotape played.)

6                 MS. CREEGAN:  Could you please stop it?

7    BY MS. CREEGAN:

8    Q.   Does this vantage point -- it may not be exact, but did

9    you have a view on to the bridges that are depicted here?

10   A.   Yes.  I was -- when I made it down to where the rest of

11   the SET was, we were a little further back.  But that is what

12   I saw was the two bridges.

13   Q.   And you mentioned that you saw an individual with a

14   rifle.  Where did you say that you saw that person?

15   A.   It would have been to the right of the lighting trailer.

16   Q.   Are you able to make a mark, to the best of your memory,

17   where you saw that individual?  You can write on the screen.

18   A.   Somewhere in that general area.

19   Q.   So in describing your observations in the wash, did you

20   also observe whether there were any people on some of the

21   cement pillars which are underneath the bridges?

22   A.   So when I arrived, there were numerous people on the

23   cements pillars.  In particular there was three people who

24   appeared to be working together.  They all had the same

25   uniform on and appeared to be working as a marksman/observer

1    team.

2    Q.   And where did you see those individuals?

3    A.   They were on the left side of the southbound wash.

4    Q.   And could you mark that with a circle.

5    A.   Okay.

6              MS. CREEGAN:  And for the record, on Exhibit 93,

7    at about 12:16:08, the X is to the far right center and the

8    circle is about a third from the left at about -- just north

9    of middle of the exhibit.

10   BY MS. CREEGAN:

11   Q.   And you mentioned that you saw a group of three people

12   wearing the same uniform.  Did you observe anything

13   distinctive about them?

14   A.   One of them had a pair of binoculars, or a range finder,

15   and the other had a long -- a large long gun that appeared to

16   be a semi-automatic long gun.

17   Q.   Did you ever observe whether any individual in the wash

18   pointed a firearm at you?

19   A.   The gentleman on the -- two gentlemen near the circle

20   waved the gun across SET several times and over towards the

21   BLM rangers that were further back behind us.

22   Q.   And taking your attention to the bridges, did you

23   observe whether there were any people on top of the bridges

24   that were above the wash?

25   A.   Yes, I was told by one of my teammates that there was

 1    people on the --

 2              MR. JACKSON:  I'm going to object as hearsay what

 3    his teammates told him.

 4              MR. MARCHESE:  Parker joins.

 5              MR. TANSANI:  Stewart joins.

 6              MR. ENGEL:  Engel joins.

 7              MR. LEVENTHAL:  Drexler joins.

 8              MS. CREEGAN:  I'll rephrase the question.

 9              THE COURT:  All right.

10    BY MS. CREEGAN:

11    Q.    Did you personally observe people on the bridges above?

12    A.    Yes.

13    Q.    And did you observe people on the southbound bridge?

14    A.    I observed numerous people on the southbound bridge.

15    Q.    Generally what did you observe that they were doing?

16    A.    Yelling.

17    Q.    Did you observe that there were people on the northbound

18    bridge?

19    A.    I did.

20    Q.    What did you observe on the northbound bridge?

21    A.    There were a lot of people up there yelling.  But

22    interspersed in the folks who were yelling was one person

23    that I noticed who appeared to be taking a position of cover

24    and concealment behind the jersey barriers on the bridge who

25    had a rifle.

```
 1    Q.   And what -- what drew your attention initially to this
 2    person?
 3    A.   I saw a head pop up on the jersey barrier, and when I
 4    saw that head pop up, I saw the butt of a rifle up against
 5    their shoulder, and that person went down and came back up
 6    several times.
 7    Q.   Did you observe anything distinctive about this
 8    individual's appearance?
 9    A.   A couple things.  One was that they had a dark-colored
10    hat on.  Another was that the rifle was on the right
11    shoulder.  The butt stock, the end of the -- the nonbarrel
12    end of the rifle came up to their right shoulder, and I saw
13    that silhouetted in the sky.  And I remember where they were.
14    Q.   Could you indicate, if it's present on this view, where
15    you saw that individual.
16             MS. CREEGAN:  And the witness has marked with a
17    triangle an area over to the right-most pillar of the
18    northbound bridge.
19    BY MS. CREEGAN:
20    Q.   And, Ranger Keltner, what, if anything, did you observe
21    this individual do at the time that you were present in the
22    wash?
23    A.   I believe they were target glancing at us and looking
24    up.
25             MR. LEVENTHAL:  Objection.  Calls for speculation.
```

```
 1                    MR. JACKSON:  Speculation.

 2                    MS. CREEGAN:  This is his own observations of what

 3       he observed the person doing.

 4                    MR. LEVENTHAL:  That's not what --

 5                    THE COURT:  Sustained.  I'm sorry.  I heard

 6       something, but I didn't hear what you said.

 7                    MR. LEVENTHAL:  That's okay.  It was sustained?

 8                    THE COURT:  Yes.

 9                    MR. LEVENTHAL:  Thank you.  Then I --

10       BY MS. CREEGAN:

11       Q.   Can you describe what you saw the person doing?

12       A.   I saw the person pop up above the jersey barrier and

13       look at groups of law enforcement officers.

14       Q.   Did you ever observe the person doing anything with

15       their rifle?

16                    MR. JACKSON:  I would object as leading.

17                    MR. LEVENTHAL:  Join.

18                    MR. MARCHESE:  Join.

19                    MR. TANSANI:  Stewart joins.

20                    MR. PEREZ:  Lovelein joins.

21                    MR. ENGEL:  Engel joins.

22                    THE COURT:  Overruled.

23       BY MS. CREEGAN:

24       Q.   Did you ever observe the person doing anything with

25       their rifle?
```

```
 1              MR. JACKSON:  Objection.  Leading.  It's the same
 2    question.
 3              THE COURT:  Overruled.  I already overruled it.
 4              MR. JACKSON:  I didn't hear the Court's ruling.
 5              THE COURT:  Okay.
 6              THE WITNESS:  I saw that the person had the rifle
 7    up against their shoulder, and it was in a position where it
 8    could be very quickly transitioned to being pointed at us,
 9    and then the person would disappear.
10    BY MS. CREEGAN:
11    Q.   When you say "disappear," what do you mean?
12    A.   They would disappear behind the jersey barrier.
13    Q.   Ranger Keltner, what emotion, if any, were you
14    experiencing when you were observing all of this in the wash
15    and on the bridges?
16    A.   I was scared that -- as a leader of my team, that I
17    wasn't going to be able to get everybody out.
18    Q.   What made you concerned for that?
19    A.   There were multiple people pointing long guns at us.
20    Q.   You say -- did you personally see multiple people point
21    long guns in the direction of the law enforcement officers?
22    A.   Yes.
23    Q.   And was there anything else that you observed that gave
24    you concern?
25              MR. MARCHESE:  Objection.  Vague.
```

```
 1              THE COURT:  Overruled.  He can answer the
 2    question.
 3              THE WITNESS:  There were a whole bunch of people
 4    on horseback.  And I was very worried that the people on
 5    horseback would break through the fence and come charging at
 6    us.
 7              And I was worried that the militia would open fire
 8    on us.  I thought I was going to see one of my friend's head
 9    explode.
10    BY MS. CREEGAN:
11    Q.    Were you afraid at this time?
12    A.    I didn't have time to be afraid.  I had time to worry
13    about making sure that I made good decisions so that we could
14    try to get out of there without dying down there.
15    Q.    What effect, if any, has this experience had on you as a
16    law enforcement officer?
17    A.    It's been hard.  I think about this a lot.  And
18    sometimes it affects my ability to focus on other things.
19              But at the same time, I try to use that energy to
20    try to make sure that as a team leader on SET that I provide
21    the best equipment and the best training and the best
22    leadership that I can to the folks who work for me and --
23    both in my day job at Mt. Rainier, as well as all the various
24    SET assignments I go on, and try to make sure that we never
25    end up in a position like this again.
```

```
 1                MS. CREEGAN:  Court's indulgence.
 2                Thank you, Ranger Keltner.  I have no further
 3    questions.
 4                THE COURT:  Cross?
 5                     CROSS-EXAMINATION
 6    BY MR. MARCHESE:
 7    Q.   Hello, sir.  Just a few questions for you.
 8    A.   Good morning.
 9    Q.   So initially on April 11th of 2014, you were serving as
10    the night shift supervisor at the ICP; is that correct?
11    A.   I was the night shift supervisor for SET at the ICP,
12    sir.
13    Q.   Okay.  So you were a night shift supervisor; right?
14    A.   Yes.
15    Q.   How many people under your command?
16    A.   I believe it was eight.
17    Q.   Okay.  Heightened sense of security; correct?
18    A.   Yes.
19    Q.   Okay.  You were expecting something to go down based
20    upon intelligence reports previously given to you; correct?
21    A.   Yes.
22    Q.   Okay.  Fortunately nothing happened that evening;
23    correct?
24    A.   We weren't assaulted that evening.
25    Q.   Okay.  So that's a yes.  Nothing negative happened to
```

1    you guys that evening; correct?

2              MS. CREEGAN:  Asked and answered.

3              THE WITNESS:  I spent the night in a foxhole in

4    the United States.

5    BY MR. MARCHESE:

6    Q.   Okay.  You weren't assaulted; correct?  Nobody shot at

7    you that evening; correct?

8    A.   No one shot at me that evening.

9    Q.   And then at some point in time you left your mission,

10   and you went back to the hotel; correct?

11   A.   Yes.

12   Q.   About what time was that?

13   A.   I'm not sure.

14   Q.   Okay.  You did get back to the hotel; correct?

15   A.   Yes.

16   Q.   And then you received a phone call from, I believe,

17   Ranger Akana; is that correct?

18   A.   Special Agent Akana, yes.

19   Q.   Okay.  And when Special Agent Akana called you, did he

20   wake you up, or were you already up?  How was that?

21   A.   I believe I was asleep.

22   Q.   Okay.  How long had you been asleep for, if you

23   remember?

24   A.   A very short time.

25   Q.   All right.  And at that point he says, "Wake up, you got

1    to get back to the ICP"; correct?

2    A.    No.

3    Q.    Okay.  What did he tell you?

4    A.    He said, "There's cowboys with guns at the gate.  Get

5    down here."  And then he hung the phone up.

6    Q.    Okay.  So he did tell you to get back to the ICP;

7    correct?

8              MS. CREEGAN:  Asked and answered.

9              MR. MARCHESE:  Well, he said "No," and I'm just

10   clarifying his testimony.

11             THE COURT:  Overruled.

12   BY MR. MARCHESE:

13   Q.    Correct?  He told you to get back to the ICP, yes?

14   A.    Yes.

15   Q.    All right.  You went back to the ICP; correct?

16   A.    Yes.

17   Q.    All right.  You got there -- you left about 11:45 from

18   the hotel; correct?

19   A.    Approximately.

20   Q.    All right.  Approximately what time did you get there?

21   A.    Approximately noon.

22   Q.    All right.  So you get there at noon.  There's a lot of

23   traffic, correct, slowed down?

24   A.    Yes.

25   Q.    All right.  So a lot of NHP officers?  Is that fair to

1    say?

2    A.    Nevada Highway Patrol?

3    Q.    Yes.

4    A.    Yes.

5    Q.    All right.  And then you went to post 1; correct?

6    A.    Yes.

7    Q.    All right.  Was there a lot of Las Vegas Metropolitan

8    Police officers at post 1 at that time; correct?

9    A.    Yes.

10   Q.    How many, approximately?

11   A.    I have no idea.

12   Q.    All right.  More than ten?

13   A.    Most likely.

14   Q.    Okay.  Any NHP officers at that particular location?

15   A.    Not that I recall.

16   Q.    Any BLM officers at that particular location?

17   A.    Probably.

18   Q.    Probably?  Well, do you remember seeing any or not?

19   A.    I remember seeing some BLM vehicles.

20   Q.    Okay.  But you don't remember if you saw agents, just

21   vehicles?

22   A.    I don't remember.

23   Q.    Okay.  How many people were in your team that arrived

24   with you?

25   A.    I believe there were eight or nine of us.

1    Q.   Okay.  Now, at this point in time, and correct me if I'm

2    wrong, you saw two individuals with, I think it was,

3    coyote-colored vests; is that correct?

4    A.   Yes.

5    Q.   And that caused you some concern; is that correct?

6    A.   Yes.

7    Q.   The reason that they caused you concern was a myriad of

8    factors.  Number one, they were -- were they both carrying

9    long guns?

10   A.   I believe so.

11   Q.   Okay.  Did they both have vests on?

12   A.   Yes.

13   Q.   You'd never met those individuals before; is that

14   correct?

15   A.   Correct.

16   Q.   All right.  So they had vests and they had weapons.  And

17   then they gave you what you had indicated was the

18   thousand-yard stare.

19            That was your testimony; correct?

20   A.   Yes.

21   Q.   You've indicated that you've only had this thousand-yard

22   stare directed in your vicinity only five or six times

23   before; right?

24   A.   Correct.

25   Q.   And this heightened your sense of concern because those

```
 1    five or six times had always preceded, I think you said it
 2    was, a violent encounter; is that correct?
 3    A.   Yes.
 4    Q.   Okay.  Now I'm a little vague as to what a thousand-yard
 5    stare is.  Is it kind of a blank stare?
 6    A.   I would describe it as when somebody is glaring at you
 7    and staring through you.
 8    Q.   Okay.  Am I giving you a thousand-yard stare right now?
 9    A.   No.
10    Q.   Okay.  Well, can you demonstrate what a thousand-yard
11    stare is to the Court, what you perceived on that day?
12    A.   It's actually really challenging, for a couple reasons.
13    Q.   So the answer is no, you can't?
14    A.   I can't demonstrate it because --
15    Q.   Okay -- -
16    A.   -- part of it is --
17    Q.   If you can't demonstrate it, I understand.  It was a yes
18    or no question.  I'll move on.
19              So you get into the wash approximately what time?
20    A.   Sometime between 12:00, probably 12:15, somewhere in --
21    Q.   Okay.
22    A.   -- there.
23    Q.   You got there and you went to these three pickups in the
24    front; is that a correct statement?
25    A.   The three pickups had already started to move back when
```

```
 1    we arrived down there.
 2    Q.   Okay.  So the BLM was, I guess, leaving as you got
 3    there?
 4    A.   Not that I'm aware of.
 5    Q.   Okay.  But the pickups were backing up is your
 6    testimony?
 7    A.   They -- they backed up some.
 8    Q.   Okay.  How far did they back up?
 9    A.   I don't know.  I wasn't there when they backed up.
10    Q.   So if you weren't there when they backed up, how do you
11    know they backed up?
12    A.   I've seen video.
13    Q.   Okay.  So you're not testifying from your personal
14    knowledge when you say that?
15    A.   No.
16    Q.   Okay.
17              MR. MARCHESE:  Now, has 394 been admitted into
18    evidence?  I believe it has.
19              COURTROOM ADMINISTRATOR:  No, it has not.
20              MR. MARCHESE:  Okay.  Can we just show that to the
21    witness.
22    BY MR. MARCHESE:
23    Q.   Now, sir, are you in this frame?
24    A.   No.
25    Q.   Okay.  And can we show him 393.
```

1   A.   Sir, they're not appearing on the screen over there.

2   Q.   No, it's -- they're not published yet.  They haven't

3   been admitted.  So it's just for our eyes only, if you will.

4   A.   Okay.

5   Q.   Okay.  Are you depicted in this frame?

6   A.   No.

7   Q.   Okay.

8          MR. MARCHESE:  And lastly, number 400, please.

9   BY MR. MARCHESE:

10  Q.   Same question.  Do you see yourself in there?

11  A.   Hold on.

12  Q.   Okay.  I know there's a few people in there.

13  A.   No.

14  Q.   Okay.  Now, while you were down in the wash -- the

15  government had showed you Exhibit 93 at about 12:16.  And

16  that was the dash cam.

17          Do you remember seeing that?

18  A.   Yes.

19  Q.   Okay.  And that was when the government had asked you

20  some questions in reference to seeing some individuals coming

21  down, I believe it was your testimony, maybe they were

22  flanking you or working in concert or something along those

23  lines.  I don't want to put any words in your mouth.

24          Do you remember that testimony?

25  A.   I described the position as three groups of people.

1    Q.   Okay.  And it was your belief, based on their actions,

2    based upon their clothing, one had a range finder, the other

3    one had a rifle, that they might be working together; is that

4    a correct --

5    A.   Yes.

6    Q.   -- statement?

7              Okay.  At some point in time one of the

8    individuals who would be to your left, I believe your

9    testimony was something to the effect of he waved his weapon

10   across you or something along those lines?

11   A.   Yes.

12   Q.   Okay.  Just a quick wave, or was it held, or how was

13   that?

14   A.   I would describe it as being at the high ready.

15   Q.   Okay.

16   A.   As their weapon moved across the groups of law

17   enforcement officers.

18   Q.   Now, I assume you had some sort of a firearm with you on

19   that day; correct?

20   A.   Yes.

21   Q.   Okay.  What were you carrying?  Was it some sort of a

22   rifle or what?

23   A.   My government-issued AR-15 as well as my government-

24   issued handgun.

25   Q.   Okay.  But you were probably carrying the long rifle;

```
 1    correct?

 2    A.    I had both.

 3    Q.    Okay.  Well, what were you carrying mainly, if either?

 4    A.    My rifle.

 5    Q.    Okay.

 6    A.    I mean, I had both of them on me.

 7    Q.    Right.  But one was holstered.  I assume your sidearm

 8    was holstered; right?  Your handgun?

 9    A.    Correct.

10    Q.    Okay.  And you were holding your AR; correct?

11    A.    Yes.

12    Q.    All right.  What position did you have the AR out in?

13    A.    The AR was in front of my body.

14    Q.    Okay.  Would that be considered the low ready position?

15    A.    No.

16    Q.    Okay.  How did you have it -- describe to the Court.

17    Just show us.  Stand up, please.

18    A.    It was in the patrol carry position, which would be

19    slung in the front.

20    Q.    Okay.  So about 45 degrees?

21    A.    Yeah.

22    Q.    Pointed at the ground?

23    A.    And there were various times where I didn't -- I wasn't

24    holding on to the rifle --

25    Q.    Okay.
```

1    A.    -- while I was pointing things out.

2    Q.    Do you have some sort of a shoulder harness or anything?

3    A.    A sling.

4    Q.    Okay.  Were you using binoculars, or were you just using

5    your regular eyesight?

6    A.    Just -- I didn't have binoculars.

7    Q.    Okay.  You had indicated on direct examination there was

8    some questions about an individual I believe might have had a

9    dark hat on the northbound bridge.

10             Do you remember that?

11   A.    Yes.

12   Q.    Okay.  You had testified that -- from your vantage point

13   about 200 yards away, that you saw him with the rifle up

14   against his shoulder; correct?

15   A.    Yes.

16   Q.    And you also indicated that -- from your position

17   without binoculars, that it was in a position that it could

18   be quickly brought up.

19             Is that a fair and accurate assessment of your

20   testimony?  Is that correct?

21   A.    Yeah.

22   Q.    Okay.

23   A.    The rifle was in a patrol carry position.

24   Q.    But it's not your testimony that he pointed that weapon

25   at you; isn't that right?

1    A.   I did not see that rifle pointed at me.

2    Q.   So that's a yes?

3              MS. CREEGAN:  Asked and answered.

4              MR. MARCHESE:  Well, I just asked a yes or no

5    question, he gives a statement.  I just want to clarify.

6    BY MR. MARCHESE:

7    Q.   You didn't see that individual point the weapon at you;

8    correct?  Yes or no?

9    A.   Yes.

10             MR. MARCHESE:  No further questions.

11             THE COURT:  All right.  Why don't we go ahead and

12   take our lunch break now.  It's 12:04.

13             And I do remind the jury, as always, please be

14   careful not to discuss this case with anyone, nor allow

15   anyone to discuss it with you.  You can speak to your fellow

16   jurors about other things, but not anything that touches upon

17   this case.

18             Do not read or listen to or view anything that

19   touches upon this case.  If anyone should attempt to talk to

20   you about the case, or if you inadvertently hear something

21   about the case, please bring it to the Court's attention

22   right away.

23             Do not research or attempt to research any

24   independent fact and perform any investigation regarding

25   anything in the case.

```
 1                   And do not form any opinion until we're all done
 2       and I submit the case to you for your deliberation.
 3                   It's 12:05.  So can we plan to be back here,
 4       Aaron, what, 1:05?  Or is that too soon?
 5                   COURTROOM ADMINISTRATOR:  No, that's fine.
 6                   THE COURT:  Okay.  1:05.  We'll plan to be back
 7       here at 1:05.
 8                   We'll stand for the jury, as they are the judge of
 9       facts.
10                   And then, Ranger Keltner, this is your lunch break
11       as well.  We just need you to be back here at 1:05.  You can
12       stretch, walk around.
13                   THE WITNESS:  Thank you.
14            (Jurors exit courtroom at 12:05 p.m.)
15                   THE COURT:  The ranger is excused.
16                   I just want to tell the lawyers -- you can sit
17       down.  Just to let you know what I observed, and then -- you
18       don't have to tell me if you observed it too, but just to
19       give you information.
20                   So after Mr. Marchese started his cross-
21       examination I was looking at Juror No. 12, because I thought
22       she was falling asleep, because there wasn't anything on the
23       screen for her to be looking at.  And she seemed to kind of
24       be going like -- her head was tilting slowly off to the side
25       as if it's, you know, falling.
```

1          And then Juror No. 14 is the lady in the red and

2     black, she noticed that I was staring.  So she kind of pushed

3     a few times at the gentleman sitting next to her, which is

4     Juror No. 13, and then he looked over, and she pointed past

5     him to Juror No. 12, and then he poked No. 12 to wake her up.

6          It was very quick.  I don't know that she was out

7     for very long.  But I think that's fair to put that on the

8     record for you all to be made aware of it if you didn't see

9     it.

10          If you did see it and you think she was out for

11     longer, or if you think it's important, I'm absolutely

12     willing to entertain any kind of motion you want to make.

13     Like I said before, you can chew on it over lunch and think

14     about it.

15          She said she wasn't working nights the last time I

16     asked her about it.

17          MR. MARCHESE:  So it's the same gal?

18          THE COURT:  Yes.

19          MR. MARCHESE:  Okay.  When you said that, I just

20     wanted to make sure it wasn't me that put her to sleep.

21          MS. CREEGAN:  It's one of us, Jess.

22          THE COURT:  I'm not going to comment on that.  I'm

23     just telling you what I saw just in case you didn't see it.

24     And if you did see -- Mr. Leventhal, you saw it too?

25          MR. LEVENTHAL:  No, I said I'd doze too during

1    Jess's cross.

2              THE COURT:  Motion to remove Mr. Leventhal then?

3    Is that what we're considering?

4              Okay.  Well, go ahead and enjoy your lunch.  We'll

5    see you back here at 1:05.

6              COURTROOM ADMINISTRATOR:  Off record.

7         (The noon recess was taken at 12:07 p.m.)

8                         *    *    *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LAS VEGAS, NEVADA, MARCH 2, 2017, 1:21 P.M.

 2                              --oOo--

 3          (Outside the presence of the jury.)

 4              COURTROOM ADMINISTRATOR:  All rise.

 5              THE COURT:  Thank you.  You may be seated.  We'll

 6   go ahead and have the jury come in.  We'll wait until Aaron

 7   tells us that they're out the door so you don't need to be

 8   standing the whole time.

 9              Did you all have time to think about the situation

10   with Juror No. 12?  Does anyone want to make a motion?

11              MR. LEVENTHAL:  We spoke about it.  We have no

12   objection to her staying.  We didn't see anything.

13              MR. TANASI:  That's correct, Your Honor.

14              THE COURT:  All right.

15              MS. CREEGAN:  Same thing from the United States.

16              THE COURT:  Okay.

17              COURTROOM ADMINISTRATOR:  All rise.

18          (Jurors enter courtroom at 1:25 p.m.)

19              THE COURT:  All right.  Everyone may be seated.

20              We are joined by the jury after lunch.

21              And we have Ranger Keltner back on the witness

22   stand.  Thank you, sir.

23              And we were --

24              MR. TANASI:  Starting with me, Your Honor.

25              THE COURT:  Oh, Mr. Marchese, did he rest?
```

```
 1                    MR. MARCHESE:  I'm done.  Yes.
 2                    THE COURT:  Oh, thank you.  Okay.  Thank you very
 3      much.
 4                    So, Mr. Tanasi, do you want to go ahead?
 5                    MR. TANASI:  Yes, Judge, thank you.
 6                              CROSS-EXAMINATION
 7      BY MR. TANASI:
 8      Q.   Good afternoon, Ranger Keltner.  How are you?
 9      A.   Good afternoon.
10      Q.   I'm Rich Tanasi.  I represent Steven Stewart.  I've got
11      a few questions for you on cross, okay?
12      A.   Yes.
13      Q.   All right.  So let's go back to the 11th, April 11,
14      2014.
15      A.   Yes, sir.
16      Q.   And particularly the evening.  There was a night shift
17      briefing; correct?
18      A.   Yes.
19      Q.   Okay.  During that briefing, what kind of things did you
20      talk about?
21      A.   The first night shift briefing I attended, we were told
22      that the cattle impound operation was on hold for the
23      weekend.
24      Q.   Okay.  And so that was on the 11th you learned that the
25      impound operation was on hold; correct?
```

1    A.    Yes.

2    Q.    Okay.  Did you also discuss different threat levels?

3    A.    Shortly after that briefing, I received another briefing

4    from Sergeant Scott Huther, and he told us that we were going

5    to be attacked by the militia.

6    Q.    Okay.  And in that threat briefing, did you discuss any

7    of the events that took place before April 11, 2014?

8    A.    I do not recall.

9    Q.    You don't recall.

10              When did you first get to Bunkerville?

11   A.    The end of March of 2014.

12   Q.    Okay.  And so is it your testimony that during that

13   briefing on the 11th, the evening of the 11th you didn't

14   discuss any events that took place between when you first got

15   to Bunkerville and that evening of the 11th?

16   A.    I do not recall having any discussions that night.

17   Q.    Okay.  So at some point on the 12th -- let's jump ahead

18   to the 12th -- you approach the ICP from the southbound

19   Interstate 15; correct?

20   A.    Yes.

21   Q.    Okay.  And you hear a lot of radio traffic about

22   protestors on the I-15 bridges; correct?

23   A.    I heard radio traffic about people on the bridge.

24   Q.    You heard traffic about protestors, as well, on the

25   bridge; correct?

1   A.    I heard traffic about people impeding traffic.

2   Q.    Okay.  Those people you heard were called protestors;

3   correct?  Yes or no?

4   A.    I don't believe they were called protestors on the

5   radio.

6   Q.    Okay.  You authored a report in this case on April 15,

7   2014; correct?

8   A.    Yes.

9   Q.    Okay.  It's a memorandum of activity; correct?

10  A.    Yes.

11  Q.    Okay.  April 15th is three days after the 12th; correct?

12  A.    Yes.

13  Q.    Okay.  So the events are fresh in your mind when you

14  author this report; correct?

15  A.    Yes.

16  Q.    Okay.

17        MR. TANASI:  May I approach, Your Honor?

18        THE COURT:  Yes, you may.

19        MR. TANASI:  Okay.

20  BY MR. TANASI:

21  Q.    Okay, sir.  I'm going to have you look down here now at

22  your first sentence where you say, "As we approached the ICP

23  for southbound Interstate, I heard a lot of radio traffic

24  about protestors on the I-15 bridges and under the bridges."

25        That's your statement; correct?

```
 1                    MS. CREEGAN:  Objection to reading from the
 2       report.
 3                    MR. TANASI:  Your Honor, I'm impeaching with his
 4       prior report.
 5                    THE COURT:  All right.  So if you're going to
 6       refresh his recollection, you show him the report.  If you're
 7       going to impeach, you just go ahead and impeach.  So I think
 8       that's what our confusion was.
 9                    But I understood now that you're impeaching.
10       That's fine.
11                    MR. TANASI:  Okay.
12       BY MR. TANASI:
13       Q.  All right.  Sir, so fair to say in your report from
14       April 15th, 2014, you called the folks that you saw on the
15       bridges protestors; correct?
16       A.  Yes.
17       Q.  Okay.  You also saw several NHP, right, Nevada Highway
18       Patrol, on those bridges; correct?
19       A.  Yes.
20       Q.  Okay.  And they were in and around the 50 to 100 or so
21       people that you saw; correct?
22       A.  Yes.
23       Q.  Okay.  And you also saw Metro; correct?
24       A.  Yes.
25       Q.  Okay.  Now, prior to the 12th, did you -- were you
```

1    involved in any canine training?

2              MS. CREEGAN:  Objection.  Relevance.

3              MR. TANASI:  Your Honor, he's testified that

4    he's -- he's testified on direct that his training and

5    experience, he was involved in canine training.  That would

6    be relevant to his training and experience.

7              MS. CREEGAN:  But not relevant to this case.

8              THE COURT:  Not relevant to this case.  Sustained.

9              MR. TANASI:  Let me ask you this way.

10   BY MR. TANASI:

11   Q.   When you're there on the 12th in the wash, are there any

12   canine with you, any canine units, any dogs with you in the

13   wash on the --

14   A.   Not to my knowledge.

15   Q.   Not to your knowledge.  Okay.

16              Prior to your testimony today, how many times have

17   you met with the US Attorney's Office?

18   A.   Twice in person.

19   Q.   Twice in person.  So let's break that down.  When was

20   the first time?

21   A.   September of '16.

22   Q.   Okay.  And who was there?

23   A.   Ms. Ahmed, Mr. Myhre, and FBI Agent Abercrombie.

24   Q.   Okay.  And in that meeting, did you prepare for today's

25   testimony?

```
 1   A.    We reviewed evidence.

 2   Q.    Okay.  What kind of evidence did you review?

 3   A.    Video surveillance evidence.

 4   Q.    Did you discuss your testimony today?

 5   A.    We discussed it yesterday.

 6   Q.    Okay.  So fast forward to yesterday, when -- who was at

 7   that meeting?

 8   A.    Ms. Creegan.

 9   Q.    I'm sorry?

10   A.    Assistant US Attorney Creegan.

11   Q.    Okay.  And in that discussion did you talk about your

12   testimony here today?

13   A.    Yes.

14   Q.    Okay.  Did you go over what you were going to be saying?

15   A.    We reviewed my testimony.

16   Q.    Okay.  And did you talk about assault and the elements

17   of assault?

18             MS. CREEGAN:  Objection.  Relevance.

19             THE COURT:  Sustained.

20   BY MR. TANASI:

21   Q.    Did you talk at all about fear?

22   A.    Yes.

23   Q.    Okay.

24             MS. CREEGAN:  Objection.  Relevance.

25             MR. TANASI:  All right.  Thank you.  Nothing
```

```
 1   further.

 2              THE COURT:  Mr. Engel?

 3              MR. ENGEL:  Yes, Your Honor.

 4                      CROSS-EXAMINATION

 5   BY MR. ENGEL:

 6   Q.   Hi, Ranger Keltner.  My name is Todd Engel.  I'm

 7   representing myself here.  I have a couple questions for you.

 8              What time, approximately, did you get to post 1

 9   from Mesquite?

10   A.   Around noon.

11   Q.   Around noon.  Okay.

12              And when you arrived at post 1, you looked across

13   the street and could see people parked over on the other side

14   of the northbound lane; correct?

15   A.   I don't recall looking at the northbound lane at the

16   time.

17   Q.   Okay.

18              MR. ENGEL:  Brian, will you put up Government

19   Exhibit 385.  It's not published yet.

20   BY MR. ENGEL:

21   Q.   Do you recall seeing anything similar to this scene?

22              MS. CREEGAN:  Objection.  Anything similar?

23   BY MR. ENGEL:

24   Q.   Do you recall seeing this scene when you pulled up to

25   post 1?
```

1    A.    That appears to be the northbound lane.  I don't recall

2    looking at the northbound lane.

3    Q.    Okay.

4              MR. ENGEL:  Put up 389 for us also, please.

5    BY MR. ENGEL:

6    Q.    Do you recall seeing this scene?

7    A.    That also appears to be the northbound lane, and I don't

8    recall looking at the northbound lane.

9    Q.    Okay.  You stated that when you -- was it a phone call

10   that you received that there was cowboys with guns at the

11   front gate?

12   A.    Yes.

13   Q.    Okay.  Which front gate were you talking about?

14   A.    Post 1.

15   Q.    At post 1.  So that would be where all the -- your

16   fellow BLM officers were parked; correct?

17   A.    Yes.

18   Q.    Okay.

19             MR. ENGEL:  Brian, will you put up 65, please.

20   Government Exhibit 65.  Go ahead and play it from the start.

21   BY MR. ENGEL:

22   Q.    And tell us to stop when you recognize cowboys at the

23   front gate, please.

24             (Videotape played.)

25             MR. ENGEL:  Fast forward a little, please, Brian,

1    until we can get into post 1 where the gate is.

2                MS. CREEGAN:  Objection, Your Honor.  There's no

3    foundation for this exhibit with this witness at this time.

4    He's not present at 11:23.

5                MR. ENGEL:  Go ahead and stop it, Brian.

6                THE COURT.  Okay.  Can you pause it.  There's an

7    objection.  What is the objection?

8                MS. CREEGAN:  There's no foundation for this with

9    this witness.  He's not present at this time.  I'm not sure I

10   understand the relevance of going thorough this exhibit.

11               MR. ENGEL:  Your Honor, I received a call --

12               THE COURT:  Well, he can be shown a video that

13   he's not in, if it's something that he can see or remember or

14   somehow is relevant to his point of view.

15               But I was looking through my notes, because I

16   thought that he said he wasn't there when everything started,

17   that he was back at the hotel sleeping because he had been up

18   all night and he didn't arrive until later.

19               So I'm just looking at the time here, and it looks

20   like we're going to be watching this for a long time before

21   he even gets here.  Unless you believe he was actually

22   here --

23               MR. ENGEL:  Well, he received a call.

24               THE COURT:  -- earlier because of the time change.

25   Then I'll let you play it, if you think that's the

```
 1    discrepancy.  But --
 2              MR. ENGEL:  He received a call, "Cowboys with guns
 3    at the front gate."  So we're just trying to clarify was
 4    there cowboys with guns at the front gate.  So --
 5              THE COURT:  But I don't think there's any
 6    testimony that he's here at this time.
 7              MR. ENGEL:  Okay.  There's not.  So we'll move on.
 8              THE COURT:  So, again, if you think there was --
 9    the time difference is causing a misconception, I'm happy to
10    let you go there and figure that out.
11              MR. ENGEL:  I won't bore us.  I'm sorry.
12    BY MR. ENGEL:
13    Q.   When you arrived at post 1, you stated that there was
14    people yelling and screaming; correct?
15    A.   Yes.  On the bridge.
16    Q.   Okay.  And that there was a guy or two guys with tan
17    tactical combat vests; correct?
18    A.   Yes.  I believe we just saw them in the video.
19    Q.   Oh, we did.  Okay.
20              MR. ENGEL:  Can you go back a little bit to that,
21    Brian, until you find those guys?
22         (Videotape played.)
23              MR. ENGEL:  Go to the very beginning of that,
24    please.  Very beginning.  There we go.  Okay.  11:24 at 10
25    seconds in.
```

```
 1                    MS. CREEGAN:  Objection.  Counsel's testifying.
 2                    MR. ENGEL:  Go up until we find the guys with the
 3      tan tactical vests.
 4              (Videotape played.)
 5                    MR. ENGEL:  Right there.  Stop.
 6      BY MR. ENGEL:
 7      Q.   Did that look like the gentleman?
 8      A.   That appears to be the guys that I saw approximately 40
 9      minutes later.
10      Q.   40 minutes later.  Okay.  And these are the guys that
11      gave you the thousand-yard stare; correct?
12      A.   Yes.
13      Q.   Okay.  How far away were they when they gave you the
14      thousand-yard stare?
15      A.   Maybe 50 yards.  I'm not exactly sure.
16      Q.   From 50 yards you could distinguish the thousand-yard
17      stare?
18      A.   Yes.
19      Q.   Okay.  And did they have weapons on them?
20      A.   Yes.
21                    MR. ENGEL:  Can we go and take a peek and see if
22      these guys were ever carrying weapons, Brian.
23                    MS. CREEGAN:  Objection to this question and who
24      it's directed to.
25                    THE COURT:  Is there a question, Mr. Engel, for
```

1    this witness?

2    BY MR. ENGEL:

3    Q.   Have you seen -- right there, does it look like these

4    gentlemen are carrying weapons?

5    A.   At that time, no.

6    Q.   No?  Do you have any photographic or video evidence --

7            MS. CREEGAN:  Objection.

8            THE COURT:  Sustained.  The witness doesn't need

9    to have the evidence.  It's not the witness's burden, it's

10   the government's burden to have the evidence.

11   BY MR. ENGEL:

12   Q.   So these guys were right at the front gate, to your

13   testimony, standing there with weapons; correct?

14   A.   Yes.

15   Q.   Okay.  At 12:00 p.m., you say?

16   A.   About 12:00 p.m.

17   Q.   Did they do anything with their weapons?  Did they aim

18   their weapons at you?

19   A.   No.

20   Q.   So standing there with their weapons in their shorts and

21   their vests is consistent with the Second Amendment to the US

22   Constitution?

23            MS. CREEGAN:  Objection to any legal questions to

24   any witness.

25            THE COURT:  Sustained.

1    BY MR. ENGEL:

2    Q.   You stated when you got down in to post 2 you deployed

3    what's called a designated marksman team; correct?

4    A.   Yes.

5    Q.   Okay.  Can you explain what that is?

6    A.   It's a two-person team.  One of them has a .308 caliber

7    bolt-action rifle with a scope on it.

8              And then the other officer, who is with the

9    marksman, is the observer.  The observer has binoculars, or

10   spotting scope, and a range finder and is scanning the area

11   looking for threats to people.

12   Q.   Okay.  And you stated that you deployed the team --

13   A.   Yes.

14   Q.   -- correct?

15             MR. ENGEL:  Brian, can you pull up --

16   BY MR. ENGEL:

17   Q.   Do you know exactly where you deployed the team to?

18   A.   I gave them the directive to find a high piece of ground

19   that was safe and deploy.

20   Q.   Okay.  So you wouldn't know exactly where they went if I

21   pulled something up for you to look at?

22   A.   I wouldn't.  I don't know exactly where they went.

23   Q.   Okay.  So a designated marksman team is similar to,

24   like, a sniper team; correct?

25   A.   Yes.

1    Q.   Okay.  So you also stated that down there there was

2    people yelling, flags waving, and holstered pistols; correct?

3    A.   Yes.

4    Q.   Okay.  And the yelling and the flag waving is consistent

5    with the First Amendment; correct?

6              MS. CREEGAN:  Objection to any legal question to

7    any witness.

8              THE COURT:  Sustained, Mr. Engel.  The Court will

9    give the jury the written instructions of law.

10             You're not to ask any of the witnesses what they

11   believe the law is.  They may be right; they may be wrong.

12   It just creates more problems.  I will tell the jury what the

13   law is when the time comes.

14             MR. ENGEL:  Can I say is it consistent with

15   freedom of speech?

16             THE COURT:  No, you may not.

17             MR. ENGEL:  Okay.  Sorry.

18   BY MR. ENGEL:

19   Q.   You stated that you saw multiple people pointing long

20   guns at us; correct?

21   A.   Yes.

22   Q.   And were those people down there in the wash milling

23   around?

24   A.   They were up on the side of the southbound bridge.

25   Q.   Up on the side?

```
 1    A.    Yes.

 2    Q.    Okay.

 3              MR. ENGEL:  Brian, will you pull up Government

 4    367, please.

 5         (Videotape played.)

 6              MR. ENGEL:  Stop right there.

 7    BY MR. ENGEL:

 8    Q.    So you're stating that at this point you -- these --

 9    there was folks up on the side pointing weapons at you;

10    correct?  Somewhere up --

11    A.    I did not believe I was on scene at the time of this

12    video.

13    Q.    Okay.  Can you tell me --

14              MR. ENGEL:  Brian, will you pull up 399, please.

15    This has not been published.

16    BY MR. ENGEL:

17    Q.    Are you in that photo?

18    A.    No, sir.

19              MR. ENGEL:  Can you pull up 400, please, Brian.

20    BY MR. ENGEL:

21    Q.    Are you in that photo?

22    A.    No, sir.

23              MR. ENGEL:  402, please.

24    BY MR. ENGEL:

25    Q.    Are you in that photo?
```

```
 1    A.    Hold on.  No, sir.

 2              MR. ENGEL:  411, please.

 3    BY MR. ENGEL:

 4    Q.    Are you in that photo?

 5    A.    Hold on.  It's likely that I am.  The rest of my squad

 6    is there.  But I can't find myself.

 7    Q.    So would you state that this is a fair and accurate

 8    description of the events concerning the 12th and your fellow

 9    officers?

10    A.    It's part of an accurate depiction.

11    Q.    Okay.  But you state that you're most likely in the

12    photograph; correct?

13    A.    Yes.

14    Q.    And you would recognize these as your fellow officers;

15    correct?

16    A.    Yes.

17              MR. ENGEL:  Defense moves to publish Exhibit 411,

18    please.

19              THE COURT:  Did you want to move to have it

20    admitted?

21              MR. ENGEL:  Yes, please.

22              THE COURT:  Any objection to 411?

23              MS. CREEGAN:  None from the United States.

24              THE COURT:  Any objection from any of the

25    defendants to the admission of 411?
```

```
 1                    MR. TANSANI:  No objection.

 2                    MR. MARCHESE:  No, Your Honor.

 3                    MR. LEVENTHAL:  No, Your Honor.

 4                    MR. JACKSON:  No objection, Burleson.

 5                    THE COURT:  Thank you.  411 will be admitted.

 6                    And, yes, you may publish it.

 7               (Government's Exhibit 411 received.)

 8     BY MR. ENGEL:

 9     Q.   Can you tell me in this photograph which one you think

10     is you?

11     A.   I believe I'm behind one of the vehicles, and that's why

12     I'm not visible.

13     Q.   Okay.  Can you tell me if your sniper team is in this

14     video -- in this photo --

15                    MS. CREEGAN:  Objection.  Mischaracterizes his

16     testimony.  He referred to it as a designated marksman team.

17                    THE COURT:  Sustained.

18     BY MR. ENGEL:

19     Q.   Can you tell me if your designated marksman team is in

20     this photograph?

21     A.   They are not.

22     Q.   They have already been deployed?

23     A.   Yes.

24     Q.   Okay.

25                    MR. ENGEL:  No further questions, Your Honor.
```

```
 1                    THE COURT:  Mr. Leventhal?

 2                         CROSS-EXAMINATION

 3   BY MR. LEVENTHAL:

 4   Q.   Good afternoon.

 5   A.   Good afternoon, sir.

 6   Q.   My name is Todd Leventhal.  I represent Mr. Drexler.

 7              I want to go back a little bit and talk about when

 8   you got there on March 31st.  Or the end of March, you

 9   indicated; correct?  Around that time; correct?

10   A.   Yes.

11   Q.   Okay.  And you got there in what you knew to be was a

12   cow gather, gathering of cows; correct?

13   A.   I was -- the operation was called the Gold Butte Cattle

14   Impoundment.

15   Q.   Cattle impoundment.  Okay.  So to that, that indicated

16   to you that there were going to be some people out there

17   gathering cows?

18   A.   Yes.

19   Q.   Okay.  But that -- you weren't part of that team to

20   gather cows, were you?

21   A.   No.

22   Q.   No.  Okay.  You were there to do a multiple of other

23   things, run security, for example, for the cow gatherers;

24   correct?

25   A.   My specific job is -- night shift was to provide
```

 1    security to the ICP at night.

 2    Q.   Okay.  Now, while you were there, did you do any

 3    training in terms of your -- any type of threat assessment at

 4    that time?  Did you do any training?

 5    A.   Did we do any training?  Is that the question?

 6    Q.   Yes.

 7    A.   Yes.

 8    Q.   Okay.  What type of training did you do while you were

 9    there?

10    A.   We did some officer rescue training and a small amount

11    of crowd management training.

12    Q.   Now, had you been involved in any officer rescue

13    training in the past?

14    A.   Yes, sir.

15    Q.   Okay.  And where would you receive the officer rescue

16    training from in the past?

17    A.   I believe I received officer rescue training at the

18    Federal Law Enforcement Training Center.

19         I also received it as part of the FBI SWAT school

20    that I attended.

21    Q.   Okay.  And what was the other one you did?  Crowd

22    management?

23    A.   We did some crowd management tactics.

24    Q.   Crowd management tactics.  Okay.

25         And so -- and you did -- so that -- you were

1    training yourself as well as other officers in your group for

2    crowd management as well as the officer rescue training;

3    correct?

4    A.   I did not teach any of the training.

5    Q.   Okay.  Who sort of ran that?  Was it a different officer

6    who was there, or did somebody come in from the outside?

7    A.   I believe it was a different officer.

8    Q.   Okay.  So would it be fair to say that based upon these

9    two trainings, you guys were maybe expecting some protests or

10   some things happening during your time out at Bunkerville;

11   correct?

12               MS. CREEGAN:  Objection.  Speculative.

13               MR. LEVENTHAL:  Well, I'm asking --

14               THE COURT:  No, overruled.  He can answer the

15   question.  If he knows why he had to participate in this

16   training.

17   BY MR. LEVENTHAL:

18   Q.   Do you know why you had to do this training?  Were you

19   aware?

20   A.   We were told to expect some protest.

21   Q.   Okay.  So did you -- when you first got there at the end

22   of March, was it something that you did immediately, or did

23   you do it towards the end, or do you remember when you did

24   these trainings that you had, specifically?

25   A.   I believe we did it the day prior to the briefing.

1    Q.    The briefing.  The briefing being the 11th briefing?

2    A.    No, the main operational briefing that occurred on or

3    about the 1st of April.

4    Q.    Okay.  So it would have been, like, the next day that

5    you actually arrived in Bunkerville, or two days later,

6    somewhere around that?  At the beginning?

7    A.    Yes, at the beginning of the operation.

8    Q.    Okay.  How many people -- when you got there, how many

9    other officers did you know?  Because I know a lot of you

10   guys came in from all over.  Did you know anyone specifically

11   there?

12   A.    I knew essentially everybody who was on the Special

13   Event Team.

14   Q.    Okay.  Had you worked with them before?

15   A.    Most of them, yes.

16   Q.    Okay.  And you're all from all over the country;

17   correct?

18   A.    No, we're from the Pacific West Region of the National

19   Park Service; so Washington, Oregon, Hawaii, and California,

20   Nevada.

21   Q.    Okay.  So just the western side --

22   A.    Just the -- yeah.

23   Q.    I apologize.  I didn't mean to cut you off.  Go ahead.

24   A.    Yes, you're correct.

25   Q.    Just like six or seven states in the western --

1    A.    Yes.

2    Q.    Okay.  All right.  And so you all came down here.  And

3    you've worked with each other before; correct?

4    A.    Yes.

5    Q.    Have you taken any training with these other officers

6    before?

7    A.    Yes.  I've been a member of SET, the Special Event Team,

8    since the spring of 2010 and had participated in annual

9    trainings every year.

10   Q.    Okay.  Now, as part of your training in crowd

11   management -- and I would assume that's sort of along the

12   lines as a protest, if you will; correct?  Or kind of the

13   same thing?

14   A.    Yes.

15   Q.    Okay.  As part of your training during that, did you --

16   would you use -- do you know what a baton is?

17   A.    Yes.

18   Q.    Did you have batons?

19   A.    Yes.

20   Q.    You did.  Okay.  How about shields?  Did you have

21   shields?

22   A.    Yes.

23   Q.    Did you use shields?

24   A.    During the training?

25   Q.    Yeah.  Were you trained in shields and batons?

```
 1    A.    Yes.

 2    Q.    You were?

 3    A.    Yes.

 4    Q.    Okay.  Did -- do you know if those were easily

 5    accessible or in everybody's vehicles that would go out

 6    during the day?

 7    A.    Yes.

 8    Q.    They were?  Okay.  Great.

 9          What about -- and I know you were asked this.

10    There was an objection to it.  I hope I laid a foundation on

11    it.  But what about dogs?  Were you trained in dogs, dog

12    usage; specifically German Shepherds?

13    A.    I've never trained with a German Shepherd.

14    Q.    Okay.  You haven't trained -- was that part of your

15    training in crowd management during this time that you were

16    there?

17          MS. CREEGAN:  Objection.  Relevance.

18          THE COURT:  Sustained.

19    BY MR. LEVENTHAL:

20    Q.    Okay.  So you were trained with batons?

21    A.    Yes.

22    Q.    Okay.  I didn't know if you were looking over --

23          You were trained with shields?

24    A.    Yes.

25    Q.    Okay.  Were you trained to line up in a formation?
```

1    A.    Yes, sir.

2    Q.    And I ask that because I think you said that you worked

3    with these people --

4              MS. CREEGAN:  Objection.

5    BY MR. LEVENTHAL:

6    Q.    -- but --

7              MS. CREEGAN:  Counsel's testifying.

8    BY MR. LEVENTHAL:

9    Q.    -- but --

10              MR. LEVENTHAL:  I'm not testifying.

11              THE COURT:  You are.  Ask a question.

12              MR. LEVENTHAL:  Okay.

13    BY MR. LEVENTHAL:

14    Q.    All these people came in from all over; right?  It's not

15    just people that you work with day in and day out?

16    A.    Correct.

17    Q.    Okay.  And for safety -- for officer safety, you would

18    want to know what your other officers are doing; correct?

19    A.    Yes.

20    Q.    Okay.  So hopefully everyone gets on the same page

21    during this time; right?

22    A.    Yes.

23    Q.    Okay.  Now, you indicated about a thousand-yard stare.

24    And I had to -- I'm not -- did you know that it also means

25    the victim of trauma, someone could have that?  Were you

1    aware of that?

2              MS. CREEGAN:  Objection.  Assumes facts not in

3    evidence.

4              MR. LEVENTHAL:  Well, okay.

5    BY MR. LEVENTHAL:

6    Q.   Your definition of a thousand-yard stare is someone

7    who's prepared to use force against you?

8    A.   Yes.

9    Q.   Okay.  And that force would be, I think you said, deadly

10   force?

11   A.   What I said was that -- what I believed at the time, was

12   that the -- when I saw the two men give me the thousand-yard

13   stare, that a violent encounter was about to occur.

14   Q.   Okay.  You also indicated that you assessed that with

15   their size; correct?

16   A.   Yes.

17   Q.   And their training; correct?

18   A.   Yes.

19   Q.   As well as you recognized their demeanor; correct?

20   A.   Yes.

21   Q.   Okay.  So those taken in conjunction with the stare told

22   you before you went in to the post 1 that something was going

23   to happen that day; correct?

24   A.   Yes.

25   Q.   Okay.  It also was part of your psyche, too, that prior

```
 1    to you going in to post 1, the night before, you were told
 2    that there was an imminent attack from the militia; correct?
 3    A.   Yes.
 4    Q.   Okay.  So that also weighed in on your psyche that
 5    something was going to happen; correct?
 6    A.   Yes.
 7    Q.   Okay.  And the morning that you got up and you were told
 8    to come out to the post 1 or ICP, or wherever you went, you
 9    were told that cowboys were coming with guns; correct?
10    A.   Correct.
11    Q.   And that also went into your threat assessment; right?
12    A.   Yes.
13    Q.   Okay.  So there were things that were part of your
14    psyche prior to you getting there that also you took into
15    consideration; yes?
16              MS. CREEGAN:  Objection.  Vague.  There?
17    BY MR. LEVENTHAL:
18    Q.   The ICP, post 1, the impound --
19    A.   Can you repeat the question?
20    Q.   Yes.  Other than what you saw when you arrived that
21    morning, there were other factors that went to your psyche
22    that -- while you were driving, let's say, that you thought
23    maybe something was going to happen that day?  You just
24    indicated that.
25    A.   Yeah, the information supplied by fellow officers and
```

1    the state of my team.

2    Q.   Okay.  Now, the thousand-yard stare, would you agree

3    that it could also be a victim of trauma?  Would you agree

4    with that?

5    A.   It could be.

6    Q.   Okay.  Could being tased be a victim of trauma?

7              MS. CREEGAN:  Objection.

8    BY MR. LEVENTHAL:

9    Q.   Getting tased?

10             MS. CREEGAN:  Relevance.

11             MR. LEVENTHAL:  I'm asking him why -- he -- okay.

12   So he indicated -- if I may, he indicated that he was -- his

13   threat assessment was because of a thousand-yard stare.  He

14   indicated that you could have a victim of trauma walking by,

15   there's other multiple reasons.  And I'm asking him what

16   could those reasons be?  It could be a multiple of reasons.

17             THE COURT:  He explained to you what he meant by

18   the thousand-yard stare and what it meant to him at the time.

19             MR. LEVENTHAL:  And he also agreed --

20             THE COURT:  So any other definitions of the

21   word --

22             MR. LEVENTHAL:  But --

23             THE COURT:  -- how are they relevant?

24             MR. LEVENTHAL:  Okay.

25             THE COURT:  It's not that he heard the word from

```
 1    someone else and misunderstood what it meant.  It's his word,
 2    and he's telling you what he meant by it.
 3              MR. LEVENTHAL:  I understand.
 4              THE COURT:  If it was somebody else's word, then,
 5    yeah, it could have multiple meanings, and we should go get
 6    into them.  I don't see how it's relevant here.
 7              MR. LEVENTHAL:  And I asked him if it could also
 8    mean a victim of trauma, and he said yes.
 9              MS. CREEGAN:  Same objection.  Relevance.
10    BY MR. LEVENTHAL:
11    Q.   You indicated that you lived in a foxhole -- or you
12    slept in a foxhole.  Was that literal?
13    A.   I didn't sleep in a foxhole, I spent the night in a
14    foxhole, sir.
15    Q.   Was that literal?  I'm not sure what a foxhole is.
16    A.   I -- US Park Ranger Mike Alongi and I carried our
17    thermal camera up to a ridge between ICP and the flat top
18    mesa that's near the ICP.  And we dug a hole in the ridge --
19    Q.   Okay.
20    A.   -- like similar to what a soldier would dig to protect
21    themselves.
22              MR. LEVENTHAL:  Brian, can you put up defense
23    proposed exhibit 5028.
24              MR. GLYNN:  (Inaudible.)
25              MR. LEVENTHAL:  5033?
```

```
1                    MR. GLYNN:  5033, yes.

2    BY MR. LEVENTHAL:

3    Q.   Do you see that?

4    A.   Yes.

5    Q.   Is that the -- what you were talking about, the hole?

6    A.   No.

7    Q.   No?  That's not it?

8    A.   That's not a hole in a ridge that was dug by hand.

9    Q.   Oh, okay.  This was done by a machine, if you know?

10                   MS. CREEGAN:  Objection.  Relevance.

11                   THE COURT:  It actually says 5028 on that picture.

12   Just so you know.  Is that the one you wanted to see?

13        (Discussion held off the record.)

14                   MR. LEVENTHAL:  I said 5028.  He's in charge.

15   It's 5033 now?

16                   MR. GLYNN:  Yes.

17                   MR. LEVENTHAL:  Okay.

18   BY MR. LEVENTHAL:

19   Q.   You've identified two people that gave you the thousand-

20   yard stare; correct?

21   A.   Yes.

22   Q.   Okay.  Looking around this room, right there,

23   Mr. Drexler.  Do you recognize him?

24   A.   Not from my time at post 1.

25   Q.   Okay.  So after you left?
```

1    A.    Yes.

2    Q.    Okay.  But during that time, you did not see him, you

3    did not recognize him; correct?

4    A.    I don't know if I saw Mr. Drexler that day.

5    Q.    You don't know?

6              MS. CREEGAN:  Asked and answered.

7    BY MR. LEVENTHAL:

8    Q.    The government didn't ask you to identify him; correct?

9    A.    No.

10             MR. LEVENTHAL:  Thank you.

11             THE COURT:  Mr. Perez?

12             MR. PEREZ:  Nothing from Lovelien, Your Honor.

13             THE COURT:  All right.

14             Mr. Jackson?

15             MR. JACKSON:  Just a couple questions.

16                          CROSS-EXAMINATION

17   BY MR. JACKSON:

18   Q.    Officer, you said you do training every year, about a

19   hundred hours a year; is that right?

20   A.    About.

21   Q.    And you go to seminars regularly to brush up on your

22   skills that you need to know so you can be an effective

23   agent; is that right?

24   A.    Yes, sir.

25   Q.    And did you ever study or learn about the thousand-yard

```
 1   stare in any of your seminars that you've attended?

 2   A.   Yes.

 3   Q.   Did you have videos about that thousand-yard stare,

 4   showing you what the thousand-yard stare looked like?

 5   A.   We had a section on it in my use-of-force instructor

 6   class.

 7   Q.   On your use-of-force instructor class?

 8   A.   Yes, sir.

 9   Q.   There's a video of that?

10   A.   I don't believe there was a video.  There was a section

11   in the class.  But I don't believe there was a video.

12   Q.   So there was no one that demonstrated that thousand-yard

13   stare to you that -- so you could see exactly what it looked

14   like?

15   A.   I believe that you can't demonstrate it because it's a

16   combination of both the look and the hormonal response that

17   happens during the fight-or-flight --

18   Q.   It would --

19   A.   -- response.

20   Q.   I'm sorry.  I'll let you finish.

21            The stare would be different in different people?

22   Wouldn't that be true?  One person might stare differently

23   than another person; so you just kind of have to use your gut

24   feeling whether someone was staring at you in a mean way or

25   in an unhappy way or in angry way?  Isn't that fair to say?
```

```
 1    A.    I didn't understand the question.

 2    Q.    All right.  Let me rephrase it.

 3          Some stares would mean some thing and other stares

 4    would mean something else; isn't that fair to say?

 5          MS. CREEGAN:  Objection.  Vague.

 6          THE COURT:  He can answer the question.

 7          THE WITNESS:  Different stares could mean

 8    different things.

 9    BY MR. JACKSON:

10    Q.    In other words, I could be angry about you -- for being

11    late to court, and I could stare at you, but that wouldn't

12    necessarily mean that I was going to shoot you on the way

13    home; isn't that true?

14    A.    Yes.

15    Q.    All right.  And unless you knew me really well, or knew

16    how I was going to react, you wouldn't know exactly what my

17    stare meant; isn't that right?

18    A.    Not exactly.

19    Q.    Okay.  Now, from 50 yards away or 100 yards away, when

20    you're looking at somebody stare, are you telling me that you

21    know what's going on in their head by the way they're staring

22    at you?

23    A.    The way that people stare and coupled with the way their

24    face looks because of the muscle tension, because of the

25    hormones in people's blood that affects their human
```

1    performance, you can see a thousand-yard stare.

2    Q.   You've only seen that five times in your life before

3    this incident on 4/12/14?

4    A.   Approximately.

5    Q.   Okay.  And on those five times before, were you

6    criminally assaulted or attacked by those five individuals?

7    A.   Yes.

8    Q.   Did you arrest those people?

9    A.   Yes.

10   Q.   Did you -- you got physical violence to your body on

11   those times?  Is that what happened?

12   A.   It depended upon the circumstance.

13   Q.   All right.  But you didn't arrest anybody on 4/12/14; is

14   that correct?

15   A.   No.  No one was arrested.

16          MR. JACKSON:  All right.  I have no further

17   questions.

18          THE COURT:  Redirect?

19                 REDIRECT EXAMINATION

20   BY MS. CREEGAN:

21   Q.   Ranger Keltner, I believe you got a question about where

22   you deployed your designated marksman team to?

23   A.   Yes.

24   Q.   Were they deployed within the wash or somewhere else?

25   A.   They were deployed between where the SET vehicles were

```
 1   parked and post 1, kind of like on the edge of the wash.

 2   Q.   Between post 1 and post 2?

 3   A.   Yes.

 4   Q.   And then you also got some questions on cross about how

 5   many times you've met with the US Attorney's Office.

 6   A.   Yes.

 7   Q.   Have I, or anybody else from the FBI or the US

 8   Attorney's Office, ever asked you to be anything other than

 9   truthful?

10   A.   No.

11            MS. CREEGAN:  Thank you.

12            THE COURT:  Any recross?

13                     RECROSS-EXAMINATION

14   BY MR. MARCHESE:

15   Q.   Just briefly.

16   A.   Yes, sir.

17   Q.   You were asked some questions about the designated

18   marksman team.

19   A.   Yes, sir.

20   Q.   Okay.  You're their supervisor, I believe you testified

21   to; correct?

22   A.   Yes.

23   Q.   And you just testified something to the effect of

24   they're between post 1 and post 2 in the wash?

25   A.   Along the edge of the wash.
```

1    Q.    Okay.

2    A.    If you have a map, I could point you to the rough area

3    that they were.

4    Q.    I think 348, I think that's the overhead.

5              Okay.  Is the location where they were deployed

6    to, is that depicted on 348?

7    A.    I would need a bigger map.

8    Q.    Okay.  So it's not depicted on here?

9    A.    I'm not sure.  I would need to see the whole area.

10   Q.    Okay.  Well, let me ask you this question.

11             As their supervisor, I would imagine that you're

12   aware of the gear that they normally would have with them;

13   correct?

14   A.    Yes.

15   Q.    Okay.  What sort of optics did they have on the date in

16   question?

17   A.    I'm not exactly sure.  I believe they had a range

18   finder, a pair of binoculars, and then the scope on the

19   rifle.

20   Q.    Okay.  Do you know what kind of scope that would be?

21   A.    I don't.

22   Q.    All right.  Do you know what kind of binoculars they

23   would have?

24   A.    I don't.

25   Q.    How about the range finder?

```
1    A.   I don't know.

2              MR. MARCHESE:  Okay.  No further questions.

3              THE COURT:  Anyone else?  Recross?

4              MR. TANASI:  Just briefly, Your Honor.

5                    RECROSS-EXAMINATION

6    BY MR. TANASI:

7    Q.   Sir, you were asked on redirect whether you were asked

8    to be anything other than truthful today; correct?

9    A.   Yes.

10   Q.   Were you putting the truth in your reports?

11   A.   Yes.

12   Q.   So everything that was in your report was the truth;

13   correct?

14   A.   Yes.

15             MR. TANASI:  Okay.  Thank you, sir.

16             THE COURT:  Anyone else?

17             MR. LEVENTHAL:  No, Your Honor.

18             MR. PEREZ:  No, Your Honor.

19             MR. ENGEL:  No, Your Honor.

20             THE COURT:  All right.

21             And any redirect?

22             MS. CREEGAN:  No, Your Honor.

23             THE COURT:  All right.  Thank you very much,

24   Ranger Keltner, for coming in today.

25             THE WITNESS:  Thank you.
```

1           THE COURT:  You're excused.  Please be very

2    careful on the way down with those steps.

3           And the government may call its next witness.

4           MS. AHMED:  Thank you, Your Honor.  The government

5    calls Officer Brandon Novotny.

6           THE COURT:  Good afternoon, officer.

7           You're going to be seated to my right.  Please be

8    careful with those steps up.

9           COURTROOM ADMINISTRATOR:  Please raise your right

10   hand.

11          You do solemnly swear that the testimony you shall

12   give in the cause now before the Court shall be the truth,

13   the whole truth, and nothing but the truth, so help you God?

14          THE WITNESS:  I do.

15          COURTROOM ADMINISTRATOR:  Thank you.  You may be

16   seated.

17          Please state and spell your full name for the

18   record.

19          THE WITNESS:  Officer Brandon Novotny,

20   B-r-a-n-d-o-n N-o-v-o-t-n-y.

21   ///

22   ///

23   ///

24   ///

25   ///

```
 1                      BRANDON NOVOTNY

 2              called as a witness on behalf of the

 3         Government, was examined and testified as follows:

 4                      DIRECT EXAMINATION

 5    BY MS. AHMED:

 6    Q.   Good afternoon, Officer Novotny.

 7    A.   Good afternoon.

 8    Q.   Are you currently an officer with the United States Park

 9    Police?

10    A.   Yes, ma'am.

11    Q.   How long have you held that position?

12    A.   Since August of 2012.

13    Q.   Are you also, within that organization, a member of the

14    SET team?

15    A.   Yes, ma'am.

16    Q.   And what is that?

17    A.   The Special Event Team that responds to assist agencies,

18    as well as National Park Service, with special events where

19    extra staffing is needed.

20    Q.   Generally speaking, what are your duties as park police

21    officer?

22    A.   I'm in the patrol unit.  So I do standard patrol around

23    the national parks in the Golden Gate Recreation Area and

24    Presidio.

25    Q.   And as a park police officer, are you a sworn law
```

1    enforcement officer with the National Park Service?

2    A.    Yes, ma'am.

3    Q.    And authorized to enforce federal law on public land?

4    A.    Yes, ma'am.

5    Q.    Were you involved in the impoundment operation in the

6    Bunkerville, Nevada, area on April -- in April of 2014?

7    A.    I was.

8    Q.    Were you performing your duties in that operation on the

9    morning of April 12, 2014?

10   A.    I was.

11   Q.    On the morning of April 12, 2014, were you at the

12   impoundment at the ICP?

13   A.    Yes, ma'am.

14   Q.    And where at the ICP were you generally located that

15   morning, initially?

16   A.    In the area of our SET operation post where we had a

17   couple of trailers set up.

18   Q.    Was that near post 1?  Generally?

19   A.    Generally, yes.

20   Q.    On the morning of April 12, 2014, were you provided any

21   information about the impound operation going forward?

22   A.    We were.

23   Q.    What information were you provided?

24   A.    That the level of the operation was going to be reduced

25   and we were going to cease the impoundment operation and

```
 1    remove the cattle that we had impounded already to a separate

 2    location.

 3    Q.   Subsequent to that information, were you provided other

 4    information that caused you to change your post in the

 5    wash -- I mean the impoundment site?

 6    A.   Yes.  We received information that militia and

 7    protestors were moving towards the ICP with intent to overrun

 8    it.  So we were sent to the wash, post 2, to prevent anyone

 9    from coming into the closed area.

10    Q.   Do you recall approximately what time you were sent into

11    the wash?

12    A.   Just after 11:00 a.m.

13    Q.   Did you, in fact, proceed then to the wash?

14    A.   We did.

15              MS. AHMED:  Your Honor, may I publish to the

16    witness and counsel what's been marked for identification as

17    Exhibit 400?

18              THE COURT:  Yes, you may.

19    BY MS. AHMED:

20    Q.   Officer Novotny, do you recognize what is depicted in

21    Exhibit 400?

22    A.   I do.

23    Q.   Is this -- does this exhibit -- are you included in this

24    exhibit?

25    A.   Yes, ma'am.
```

1    Q.   And does this fairly and accurately depict the scene

2    that you were at on April 12, 2014?

3    A.   This was us as we were approaching the wash when we

4    first arrived.

5              MS. AHMED:  Your Honor, the government moves to

6    admit Exhibit 400.

7              THE COURT:  Any objection?

8              MR. TANSANI:  No objection, Stewart.

9              MR. MARCHESE:  None from Parker.

10             MR. LEVENTHAL:  No objection for Drexler.

11             MR. ENGEL:  None from Engel.

12             MR. PEREZ:  None from Lovelein.

13             MR. JACKSON:  No objection from Burleson.

14             THE COURT:  All right.  Exhibit 400 will be

15   admitted.

16             Did you want to publish it?

17         (Government's Exhibit 400 received.)

18             MS. AHMED:  Yes, Your Honor.

19             THE COURT:  You may.

20             MS. AHMED:  Thank you, Your Honor.

21   BY MS. AHMED:

22   Q.   Officer Novotny, do you see yourself in this, Exhibit

23   400?

24   A.   Yes, ma'am.

25   Q.   And can you circle where you are located in this

```
 1    exhibit?

 2              MS. AHMED:  The witness has circled in the center

 3    of this exhibit screen.

 4    BY MS. AHMED:

 5    Q.   Can you just generally describe what it is that you are

 6    wearing in this exhibit?

 7    A.   We're wearing our green uniform with our tactical Kevlar

 8    vest and our Kevlar helmet.

 9    Q.   Is this a standard issue uniform that's part of your

10    park police?

11    A.   As part of the SET team, yes.

12    Q.   So was this something that you -- this is not something

13    you acquired specifically for this event?

14    A.   No.  This is our standard uniform for SET missions.

15              MS. AHMED:  Your Honor, may we publish to the

16    witness what has been previously admitted as Exhibit 348?

17              COURTROOM ADMINISTRATOR:  Did you want the witness

18    and jury?

19              MS. AHMED:  Everybody.  Thank you.

20              THE COURT:  Yes.

21    BY MS. AHMED:

22    Q.   Officer Novotny, can you indicate, once you got into the

23    wash, where you ended up going?

24    A.   We moved to the forward three vehicles of the BIA.

25              MS. AHMED:  The witness has circled at the top
```

1   center, slightly right.

2            THE WITNESS:  Correction.  BLM.

3            MS. AHMED:  Top center, slightly right.

4   BY MS. AHMED:

5   Q.   And is that the position that you stayed at while you

6   were in the wash that day?

7   A.   For the majority of the time, yes.

8            MS. AHMED:  You can take this exhibit down.  Thank

9   you.

10  BY MS. AHMED:

11  Q.   Once you got into that position, what, if anything, did

12  you do?

13  A.   We observed the wash underneath the two overpasses that

14  were outside of the closed area.  We noticed a large group of

15  protestors and mounted horsemen starting to move into the

16  area.

17  Q.   What did you say, protestors and what?

18  A.   Mounted horsemen.  Cowboys.

19  Q.   What did you see them do when they entered the area?

20  A.   Start to form into a large wide line blocking the entire

21  route of the wash.

22  Q.   Based on your training and experience as a law

23  enforcement officer, what, if anything, did you assess that

24  formation to mean?

25  A.   They were moving into a line as if they were ready to

1    overtake and overrun the area that we were in.

2    Q.   What, if any --

3              MR. JACKSON:  Objection.  Conclusion.

4              MS. AHMED:  Your Honor, it was his assessment, his

5    present sense impression of what was happening at the time.

6              MR. JACKSON:  I still object to it as a

7    conclusion.

8              THE COURT:  Overruled.

9              MS. AHMED:  Your Honor, may we publish to the jury

10   what's been previously admitted as Exhibit 414?

11             THE COURT:  Yes.

12   BY MS. AHMED:

13   Q.   Officer Novotny, do you recognize what is depicted in

14   this exhibit?

15   A.   I do.

16   Q.   And is this the line you were just speaking of that you

17   observed on April 12th?

18   A.   It is.

19             MS. AHMED:  You can take that exhibit down.  Thank

20   you.

21   BY MS. AHMED:

22   Q.   In addition to the line in the wash, did you observe

23   anyone else moving in the wash at that time?

24   A.   We began to notice several individuals who were carrying

25   sidearms and long arms moving throughout the wash as well as

1    up onto the hillsides towards the overpasses, gaining what

2    appeared to be a position of advantage over us.

3    Q.   And why was that a position of advantage over where you

4    were?

5    A.   They had better angle of fire over us as well as the

6    high ground.

7    Q.   What -- at this point, were you -- how -- did you have

8    any tools that you were using to observe the crowd, or were

9    you looking with your naked eye?

10   A.   I was using the naked eye.  I did not have any

11   magnification.

12   Q.   Would the presence of individuals -- of the individuals

13   with long arms moving into those positions, did that cause

14   you --

15            MR. MARCHESE:  Objection.  Leading.

16            THE COURT:  Sustained.

17   BY MS. AHMED:

18   Q.   Did the observations you made of the people in the wash

19   cause you concern as a law enforcement officer?

20   A.   It did.

21   Q.   Why?

22   A.   Because I know that a firearm is an extreme threat to my

23   safety.  And if someone is opposing me with a firearm, it is

24   a danger to my safety.

25   Q.   What, if anything, did you do at that point?

1    A.   I returned to the vehicle and obtained a CS launcher as

2    we were instructed to move forward with less lethal

3    munitions.  In case the group decided to move forward, we

4    would be able to use those less lethal resources to hopefully

5    disperse the crowd to prevent being overrun.

6    Q.   And can you explain what a CS launcher is?

7    A.   It is a launcher that is designed to disperse CS gas,

8    which is similar to tear gas, that is an irritant to the eye

9    and throat that would cause individuals to want to leave the

10   area.

11   Q.   Once you'd retrieved it, what, if anything, did you do?

12   A.   Myself and three other officers performed what's called

13   a heavy head and moved ourselves into a four-person stack up

14   at the front, where we would be able to deploy those

15   munitions of less lethal if need be.

16            MS. AHMED:  Your Honor, may we publish to the jury

17   what's been previously admitted as Exhibit 257?

18            THE COURT:  Yes.

19   BY MS. AHMED:

20   Q.   Officer Novotny, do you see yourself in this exhibit?

21   A.   I do.

22   Q.   Can you indicate in this exhibit by circling yourself

23   where you are?

24            MS. AHMED:  The witness has circled the center,

25   slight left in this picture, second person from the left.

1    BY MS. AHMED:

2    Q.   Can you explain -- you used the term a four-person

3    stack.  Can you explain what that means to the jury?

4    A.   Yes, ma'am.  The individual in the front is holding a

5    ballistic shield that would give us small level of protection

6    from fire from firearms.

7              The second individual in the stack is holding a

8    pepper ball launcher, which would be used to launch things

9    that are similar to paint balls that have powdered pepper

10   inside that is also an irritant to the eyes and throat.

11             I'm third in line with the CS launcher as I

12   described earlier.

13             And then the final individual in the line is our

14   lethal cover with a rifle.

15   Q.   Is there a particular reason that it is organized in

16   that way?

17   A.   The individual in the front is there as a protective

18   layer; the two individuals in the middle are the less lethal

19   munitions; and the person in the back is lethal cover.

20             It's the way it's set up to best protect those in

21   the stack from anything that could be launched or thrown or

22   fired from the crowd.

23   Q.   Is this stack formation something that is utilized by

24   the park police regularly?

25   A.   It is.

1    Q.    And generally what is this position used for?

2    A.    Crowd control and officer-down retrievals.

3              MS. AHMED:   You can take that exhibit down.   Thank

4    you.

5    BY MS. AHMED:

6    Q.   Once you moved into that position -- well, first, can

7    you explain to the jury where you set up that stack in the

8    wash?

9    A.    On the passenger's side of the front-most vehicle, the

10   center vehicle.

11   Q.    So within those three vehicles you had previously

12   indicated, you're next to one of those?

13   A.    Yes, ma'am.

14   Q.    Once you were there, what, if anything, did you do?

15   A.    We continued to observe the crowd and monitor as we saw

16   more and more individuals entering the wash.

17   Q.    Did you observe anything that the individuals had with

18   them?

19   A.    I observed several individuals carrying long guns, both

20   at the low ready and high ready and moving around.

21   Q.    And can you explain to the -- well, was the way that

22   they were carrying their weapons significant to you as a law

23   enforcement officer?

24   A.    There were some individuals that had their weapons at

25   the low ready, which would be in this position, barrel

```
 1    pointed down towards the ground.  Then I would see
 2    individuals that would raise their weapon, look over to the
 3    high ready, low ready, high ready, as they moved around the
 4    wash.
 5    Q.   As a -- based on your training and experience as a law
 6    enforcement officer, did that cause you concern at that time?
 7    A.   It did.
 8    Q.   Why?
 9    A.   It shows intent to use the weapon as more than something
10    you're just carrying.  If you raise it up, it shows that
11    you're ready and imminently about to use it.
12    Q.   What, if anything, did you think -- well, at that time
13    did you fear for your personal safety?
14    A.   I did.
15    Q.   And did you fear for the safety of your fellow officers?
16    A.   I did.
17    Q.   What, if anything, did you do with respect to that fear
18    for your safety?
19    A.   We were instructed to deploy the less lethal, but we
20    chose not to, as we were afraid if we did, it would be seen
21    as an offensive move, and they would use their lethal arms
22    against us, and we would not walk away from the wash that
23    day.
24    Q.   At some point did you withdraw from the position that we
25    observed in Exhibit 257?
```

1    A.   We made several requests to fall back, and then once --

2    so once multiple requests were made to fall back, we fell

3    back to the rear of the vehicles with the remaining members

4    of our team.

5    Q.   Before you fell back, were you -- did you continue to

6    observe the individuals in the wash?

7    A.   We did.

8    Q.   Did you notice anyone in particular in the wash?

9    A.   I did.

10   Q.   And who was that?

11   A.   I noticed an individual with orange sunglasses carrying

12   a long rifle; there was another individual moving around in a

13   blue T-shirt and a black hat with a long rifle; as well as

14   two groups of about four individuals wearing camo and

15   tactical uniforms carrying long guns that were moving in a

16   tactical manner, both the east and west end of the south

17   overpass.

18   Q.   And was the south overpass the one closer to where you

19   were positioned?

20   A.   It was.

21   Q.   And when you say the east and west end, what are you

22   talking about?

23   A.   Where the hillside of each side of the bridge met with

24   the overpass.

25              MS. AHMED:  Your Honor, may we publish to the jury

         1    what's been previously admitted as Exhibit 93?

         2              THE COURT:  Yes.

         3              MS. AHMED:  Can we advance it to the 12:36 mark.

         4    12:36 and -- close to 12:35.

         5         (Videotape played.)

         6              MS. AHMED:  Can you continue to play it.

         7         (Videotape played.)

         8              MS. AHMED:  Can you pause it there.  Paused at

         9    12:36:48.

        10    BY MS. AHMED:

        11    Q.   Using this just as a reference, with respect to the

        12    southbound bridge and not that this is when you saw these

        13    individuals, can you circle on this where it is that you did

        14    observe the people that you just described?

        15              MS. AHMED:  The witness has placed a circle on the

        16    upper right and upper left portion of this exhibit at this

        17    time.

        18              You can clear it and take it down.  Thank you.

        19    Oh, I can clear it.

        20    BY MS. AHMED:

        21    Q.   Based on your training and experience, did the position

        22    that the individuals in camouflage take cause you concern for

        23    your safety at that time?

        24    A.   Very much so.

        25    Q.   Why?

1    A.    They had long guns capable of what appeared to be taking

2    the high ground and having advantage over us by having a

3    better vantage point as well as being able to look down upon

4    us and have a better ability to gauge what we were doing as

5    opposed to what we were doing -- to what we were able to see

6    of them.

7              And they also had concrete pillars and concrete

8    abutments that they were able to hide behind to not only use

9    as cover but concealment that we were unable to know their

10   exact movement at any given time.

11   Q.    Did you observe them hiding behind those pillars at

12   times?

13   A.    I observed them disappear behind the pillars at times,

14   yes.

15   Q.    Did you observe anything else about them when they were

16   up in corners that you circled?

17   A.    That they were moving as what appeared to be a unit,

18   with hand signals for communication, and that they were going

19   from low ready to high ready as they moved from position to

20   position.

21   Q.    When they went from low ready to high ready, where were

22   the weapons pointed?

23   A.    In the direction of myself and other officers.

24   Q.    Once you pulled back from the stack that we previously

25   saw in Exhibit 257, where did you go?

1    A.    Back to the rear of those three BLM vehicles with the

2    remaining members of the SET team that were in that location.

3              MS. AHMED:  Your Honor, may I publish to the

4    witness and counsel Exhibit 3 -- what's been premarked for

5    identification as Exhibit 396?

6              THE COURT:  Yes.

7              COURTROOM ADMINISTRATOR:  Was that 396?

8              MS. AHMED:  396.

9              COURTROOM ADMINISTRATOR:  Thank you.

10   BY MS. AHMED:

11   Q.    Officer Novotny, do you recognize what is depicted in

12   Exhibit 396?

13   A.    I do.

14   Q.    Are these -- is this a position that you took after you

15   fell back on April 12, 2014?

16   A.    It is.

17   Q.    Does it fairly and accurately depict the events that you

18   participated in on that day?

19   A.    Yes.

20             MS. AHMED:  Your Honor, the government moves to

21   admit Exhibit 396.

22             THE COURT:  Any objection to 396?

23             MR. TANSANI:  No objection, Stewart.

24             MR. MARCHESE:  None from Parker.

25             MR. LEVENTHAL:  No, Your Honor.  Thank you.

```
1              MR. ENGEL:  None from Engel.

2              MR. PEREZ:  None from Lovelein.

3              MR. JACKSON:  No objection from Burleson.

4              THE COURT:  All right.  Exhibit 396 will be

5       admitted.

6          (Government's Exhibit 396 received.)

7              MS. AHMED:  Your Honor, may we publish it to the

8       jury?

9              THE COURT:  Yes, you may.

10             MS. AHMED:  Thank you.

11      BY MS. AHMED:

12      Q.  Officer Novotny, do you see yourself in Exhibit 396?

13      A.  Yes.

14      Q.  Can you circle where you are in this picture?

15             MS. AHMED:  The witness has placed a circle on the

16      lower left center portion of the screen.

17      BY MS. AHMED:

18      Q.  Now, can you explain to the jury what -- where you are

19      in this picture?  Where you are in the wash?

20      A.  We are behind the three vehicles that are the closest to

21      the overpasses.

22      Q.  And what are you doing at this moment?

23      A.  We have taken cover behind the vehicles, as best we can,

24      and we are continuing to observe the crowd and armed men as

25      they move throughout the wash.
```

1    Q.    When you initially pulled back from that stack
2    formation, did you do anything in particular back behind this
3    vehicle?
4    A.    It was a hot day.  We each took turns kneeling down to
5    have some water behind cover.
6    Q.    Did you do anything else at that moment?
7    A.    While I was knelt down, I took a moment to think about
8    my family and the fact that I didn't think I was ever going
9    to see them again; and I made my peace with God and was
10   expecting to die in that wash that day.
11   Q.    And what did you do after that?
12   A.    Stood back up and continued observing with the rest of
13   my unit.
14             MS. AHMED:  You can take that exhibit down.  Thank
15   you.
16   BY MS. AHMED:
17   Q.    While you were behind those vehicles, did you continue
18   to observe the crowd?
19   A.    Yes, we did.
20   Q.    Did you see whether they stayed in the same position or
21   moved forward or back?
22   A.    They continued to move throughout the wash and going
23   from low ready to high ready still as we continued to
24   observe.
25             MS. AHMED:  Your Honor, may I publish to the

```
 1    witness what's been marked for identification as Exhibit 402,
 2    the witness and counsel?
 3              THE COURT:  Yes.
 4              MS. AHMED:  402.
 5    BY MS. AHMED:
 6    Q.   Officer Novotny, do you recognize what is depicted in
 7    this exhibit?
 8    A.   I do.
 9    Q.   Does it fairly and accurately depict events that you
10    participated in on April 12, 2014?
11    A.   Yes, ma'am.
12              MS. AHMED:  Your Honor, the government moves to
13    admit Exhibit 402.
14              THE COURT:  Any objection to 402?
15              MR. TANSANI:  No objection, Stewart.
16              MR. MARCHESE:  No objection.
17              MR. LEVENTHAL:  No objection.
18              MR. ENGEL:  None Engel.
19              MR. PEREZ:  None Lovelein.
20              MR. JACKSON:  No objection from Burleson.
21              THE COURT:  All right.  Exhibit 402 will be
22    admitted.
23         (Government's Exhibit 402 received.)
24              MS. AHMED:  And, Your Honor, may we publish it to
25    the jury?
```

```
 1                    THE COURT:  Yes, you may.

 2                    MS. AHMED:   Thank you.

 3     BY MS. AHMED:

 4     Q.   Officer Novotny, can you explain to the jury, just

 5     generally, what's going on in this picture?

 6     A.    This is our unit as well as some BLM rangers that are

 7     positioned behind the vehicles, utilizing them for cover to

 8     the best of our ability, observing the crowd.

 9                    And we had some officers mixed in that had

10     magnification, and they were calling out locations to us so

11     we could keep an eye on those locations where the long rifles

12     were known to be.

13                    MS. AHMED:  You can take this one down.  Thank

14     you.

15     BY MS. AHMED:

16     Q.   At some point were you -- did you receive information

17     that caused you to move from the location that we just saw in

18     that picture?

19     A.    Yes.  BLM Dan Love, as well as some members of the Las

20     Vegas Sheriff's Department, moved forward and had a meeting

21     at the fence with some of the Bundy brothers.

22                    And then once they were done with their meeting,

23     they came back and informed us that we were to leave the wash

24     and return to our ICP.

25     Q.   And so what, if anything, did you do at that point?
```

1    A.    We moved out of the wash backwards towards our other

2    vehicles that were staged some distance behind us.  We moved

3    back in phases, the less lethal officers being the last phase

4    to move back.

5    Q.    Why was that?

6    A.    If the crowd decided to move forward, we were to deploy

7    less lethal to slow them down so others could make it back.

8              MS. AHMED:  Your Honor, may I publish to the

9    witness what has been marked for preidentification as Exhibit

10   410 -- Government's Exhibit 410?

11             THE COURT:  Yes.

12   BY MS. AHMED:

13   Q.    Officer Novotny, do you recognize what is depicted in

14   Exhibit 410?

15   A.    I do.

16   Q.    Is this a scene that you participated in on April 12th,

17   2014?

18   A.    Yes.

19   Q.    Is it fairly and accurately depicted in Exhibit 410?

20   A.    Yes.

21             MS. AHMED:  Your Honor, may we move to admit

22   Government's Exhibit 410?

23             THE COURT:  Any objection to 410?

24             MR. TANSANI:  No objection, Stewart.

25             MR. MARCHESE:  No objection, Parker.

```
 1                 MR. LEVENTHAL:  No objection, Drexler.

 2                 MR. ENGEL:  None Engel.

 3                 MR. PEREZ:  No objection, Lovelein.

 4                 MR. JACKSON:  No objection, Burleson.

 5                 THE COURT:  All right.  Exhibit 410 will be

 6      admitted.

 7             (Government's Exhibit 410 received.)

 8                 MS. AHMED:  Thank you, Your Honor.  May we publish

 9      it to the jury?

10                 THE COURT:  Yes.

11      BY MS. AHMED:

12      Q.   Officer Novotny, can you explain to the jury what is

13      depicted in Exhibit 410?

14      A.   That's myself and other officers moving backwards away

15      from the three forward vehicles towards the other vehicles we

16      had staged as we left the area.

17      Q.   Why did you move backwards at that time?

18      A.   To be able to continue having eyes on the threat that

19      was ahead of us and not turn our backs to them.

20                 MS. AHMED:  Your Honor, may we publish to the jury

21      what's been previously admitted as Government's Exhibit 411?

22                 THE COURT:  Yes.

23      BY MS. AHMED:

24      Q.   Officer Novotny, can you explain to the jury what's

25      depicted in this exhibit?
```

1    A.   This is our unit as we had returned to our vehicles, and

2    we were loading our equipment back into them, as we were

3    entering the vehicles to head back into the ICP from the

4    wash.

5             MS. AHMED:  You can take this exhibit down.  Thank

6    you.

7    BY MS. AHMED:

8    Q.   Once you got to your vehicle, what, if anything, did you

9    do?

10   A.   I was driving the vehicle as well as Officer Ewing in my

11   passenger seat.  I was the third vehicle of three fox units

12   in a line.

13             As we were pulling out the vehicle in front of me

14   started to get stuck in the stand.

15             And Officer Ewing stepped out of the vehicle.  And

16   I said, "Get back in the truck."

17             And he said, "Why?"

18             I said, "This ain't my truck.  We're going to ram

19   him.  We ain't going to stand around here any longer than we

20   have to.  We're going to get out of here."

21   Q.   Did you understand why Officer Ewing was getting out of

22   the vehicle at that time?

23   A.   He was going to attempt to push the vehicle so he could

24   get out of the sand.

25   Q.   And why did you say you were going to ram it rather than

1    have him get out?

2    A.    It wasn't my truck, and a damaged front end of a truck

3    is better than a dead officer on the ground.

4    Q.    Was that vehicle eventually able to get moving again?

5    A.    Yes.  I assume it was able to switch into four-wheel

6    drive and was able to get out of the sand before I was

7    needing to ram him.

8    Q.    What did you do then?

9    A.    We were able to drive back to the ICP and had to hastily

10   load our gear into a trailer and our vehicles and prepare to

11   leave the wash -- or prepare to leave the ICP in a

12   convoy-style line of vehicles.

13   Q.    At that time did the fear that you felt for your safety

14   and your fear for your officers' safety, did it alleviate, or

15   did it stay the same or --

16   A.    It was still elevated.

17   Q.    Why is that?

18   A.    Based on my training and experience, I know the capacity

19   of long rifles, and I knew that we were still well within the

20   range of a long rifle.

21   Q.    Did you then -- what did you do then?

22   A.    We loaded up our vehicles, and we lined up with the BLM

23   and civilian vehicles and awaited the command to pull out of

24   the ICP.

25   Q.    Did you pull out of the ICP at that point?

1   A.   We did.

2   Q.   What, if anything, did you see as you were pulling out?

3   A.    There was still a large crowd of agitated individuals on

4   the highway that were screaming and yelling at us, throwing

5   rocks at us, at our vehicles, and they were within arms reach

6   of the vehicle.

7              The vehicle in front of me was a large pickup

8   truck with a heavy trailer that was unable to accelerate

9   quickly, and I was afraid that they were attempting to

10  surround our vehicle and slow us down, to overrun us on the

11  highway.

12  Q.   Did anyone do anything to your vehicle in particular?

13  A.    A rock was thrown at my vehicle that contacted on the

14  driver's side.

15  Q.   Did you fear for your safety at that time?

16  A.    I did.

17  Q.   Where did you go from there?

18  A.    We went back to the hotel we had been staying at to grab

19  the rest of our gear.

20  Q.    Where was that?  In Mesquite?

21  A.    Mesquite.

22  Q.    And at that time did the fear that you felt, based on

23  the experiences you just had, had it -- did it change?

24  A.    It did not.  We were told there was intelligence that a

25  firebomb --

```
 1              MR. JACKSON:  I would object to hearsay what he
 2   was told.
 3   BY MS. AHMED:
 4   Q.   Without going into what you were told --
 5              MS. AHMED:  Actually, Your Honor, it goes to the
 6   fear that he felt.  It was his present sense impression, and
 7   it's the effect it had on him --
 8              MR. JACKSON:  After he went back to the hotel,
 9   it's irrelevant.  I object to it.
10              MR. MARCHESE:  Parker joins.
11              MR. TANSANI:  Stewart joins.
12              MR. ENGEL:  Engel joins.
13              MR. LEVENTHAL:  Drexler joins.
14              MR. PEREZ:  Lovelein joins.
15              THE COURT:  So it's relevant to show the fear that
16   he still had, that it hadn't waned?  Is that what your --
17              MS. AHMED:  Well, the fear that he still had that
18   was --
19              THE COURT:  Continued?  So it's relevant.
20              MS. AHMED:  Thank you, Your Honor.
21              THE COURT:  Overruled.
22              THE WITNESS:  We received intelligence that
23   individuals either from the protest or associated with the
24   protest were going to be making a planned attack on the
25   hotel.  We had --
```

1           MR. JACKSON:  Object to that as hearsay --

2           THE WITNESS:  -- to get everything out of the

3    hotel as quickly as possible.

4           MR. JACKSON:  And I also object to it as

5    prejudicial under Federal Rule of Evidence 403, more

6    prejudicial than probative.

7           And I would ask the Court to strike it and

8    instruct the US Attorney not to get into prejudicial evidence

9    that is irrelevant and prejudicial.

10          THE COURT:  Ms. Ahmed?

11          MR. JACKSON:  I renew my objection.

12          MS. AHMED:  Your Honor, I'll withdraw the question

13   and ask just as to the event at the wash, April 12th, the

14   ICP.

15          THE COURT:  All right.

16   BY MS. AHMED:

17   Q.   Officer Novotny, when you returned to the hotel, at that

18   time did the fear from the events that you experienced at the

19   wash, did you continue to feel that fear at that time?

20   A.   I did.

21   Q.   At what point, if any, did that feeling go down?

22   A.   The fear slowly subsided in the coming week as we were

23   out of the area, but we still had fear that we were being

24   looked for and attempted to be found by the individuals from

25   the wash.

1    Q.   Based on your experience as a law enforcement officer,

2    where would you rank this event in terms of the danger that

3    you felt to yourself and your fellow officers on a scale of

4    one to ten, ten being the most extreme?

5    A.   Ten.

6              MS. AHMED:  Your Honor, the Court's indulgence?

7              THE COURT:  Yes.

8              MS. AHMED:  Nothing further.

9              Thank you, officer.

10             THE COURT:  Cross, Mr. Tanasi?

11             MR. TANASI:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   BY MR. TANASI:

14   Q.   Good afternoon, Ranger Novotny.

15   A.   Good afternoon.

16   Q.   I'm Rich Tanasi.  I represent Steven Stewart.  I have a

17   few questions for you on cross, okay?

18             All right.  So when did you first get to

19   Bunkerville?

20   A.   The end of March, early April.

21   Q.   All right.  And prior to the 11th, what did you do?

22   April 11th, prior to April 11th?

23             MS. AHMED:  Objection.  Relevance.  Beyond the

24   scope.

25             MR. TANASI:  Your Honor, he arrives in Bunkerville

```
1    and eventually gets to a briefing.  And what I'm getting at
2    or getting to is what occurs in that briefing and events he
3    may or may not have learned about that contributed to that
4    briefing.
5              THE COURT:  All right.  Overruled.  He may answer
6    the question.
7              MR. TANASI:  Thank you.
8    BY MR. TANASI:
9    Q.  So, sir --
10             MS. AHMED:  Your Honor, I would say lack of
11   foundation.  He has not established that he attended a
12   briefing on April 11th, or what briefing he's talking about.
13             MR. TANASI:  Well, I was trying to lay a
14   foundation, so I could avoid this objection, but I'll just
15   jump right into it.
16   BY MR. TANASI:
17   Q.  On the 11th, did you get to a briefing?
18   A.  We had a briefing every day.
19   Q.  Okay.  Did you have a briefing on the 11th?
20   A.  Yes.
21   Q.  Okay.  April 11, 2014, you had a briefing; fair?
22   A.  Yes.
23   Q.  All right.  In that briefing, did you learn about a
24   threat level?
25   A.  Yes.
```

```
 1    Q.   Okay.  And did you learn at that time that the threat
 2    had increased?
 3    A.   Yes.
 4    Q.   And what was the basis for the threat increasing on the
 5    11th?
 6              MS. AHMED:  Objection.  Calls for speculation.
 7              MR. TANASI:  Your Honor, it would be the effect on
 8    his understanding of the threat level.
 9              THE COURT:  Overruled.
10              THE WITNESS:  There was intelligence given to us
11    that the FBI had received that there was a large influx of
12    individuals on an FBI domestic terrorism watch list in
13    amongst the protestors that were camped out at the Bundy
14    compound.
15    BY MR. TANASI:
16    Q.   Okay.  Now, did you learn about any events that led to
17    that discussion prior to the 11th?  Any specific events
18    occurring on, say, the 9th, April 9th?
19              MS. AHMED:  Objection.  Relevance.  Vague.
20              MR. TANASI:  I'm asking him whether there's any
21    specific event that he learned about that contributed to his
22    understanding of the threat level.
23              MS. AHMED:  Your Honor, he just explained -- Your
24    Honor, he's answered what he understood contributed to the
25    threat level.
```

 1                    THE COURT:  Yeah, I'm not sure how it's relevant.

 2                    MR. TANASI:  Okay.  I'll move on.

 3       BY MR. TANASI:

 4       Q.   So on the 11th you had a -- you had worked a 12-hour

 5       shift; correct?

 6       A.   Correct.

 7       Q.   All right.  So you were getting tired; right?

 8       A.   As is normal.

 9       Q.   Understood.  Fair.  You were tired after working a long

10       shift; right?

11       A.   Yes.

12       Q.   Okay.  Anxious?

13       A.   No.

14       Q.   You weren't worrying and you didn't have anxiety setting

15       in on the 11th?

16       A.   After the briefing the anxiety started to set in.

17       Q.   Okay.  It had nothing to do with your lack of sleep?

18       A.   No.

19       Q.   Okay.  All right.  So ultimately at 0800 hours on the

20       11th, do you learn that the operation has ceased, all

21       operations have ceased?

22                    MS. AHMED:  Objection as to the date.

23                    I withdraw that objection, Your Honor.  I'm sorry.

24                    THE WITNESS:  I do not recall what exactly

25       happened at 8:00 a.m. on the 11th.

1    BY MR. TANASI:

2    Q.   Okay.  You prepared a report in this case; correct?

3    A.   Yes.

4    Q.   Prepared a report on April 14, 2014; correct?

5    A.   Correct.

6    Q.   All right.  And that report contained what you

7    understood to happen on the 11th, 2014; correct?

8              May I approach, Your Honor?

9              THE COURT:  Yes.

10   BY MR. TANASI:

11   Q.   And just backing up, would seeing a copy of that report

12   refresh your recollection?

13   A.   Yes.

14   Q.   All right.

15             Why don't you take a look at your report,

16   particularly that area I've highlighted, and let me know if

17   that refreshes your recollection.

18   A.   Correct, I was -- I was having trouble remembering the

19   date, but, yes, it was the 11th.

20   Q.   Okay.  So you had another briefing at 0800 hours on the

21   11th; correct?

22   A.   Yes.

23   Q.   Okay.  And in that briefing, that particular briefing,

24   you learned that the threat level was much lower; correct?

25   A.   Correct.

1    Q.   Okay.  And you also learned that all operations were

2    going to be ceased; correct?

3    A.   The impoundments would be ceased, yes.

4    Q.   Okay.  In your report, all operations were to be

5    creased?

6    A.   Right.

7    Q.   All; correct?

8    A.   Yes.

9    Q.   All operations ceased on the 11th; correct?

10   A.   Yes.

11   Q.   All right.  And, in fact, you learned that there was

12   going to be a press release that would basically state that,

13   that all operations would be ceased?  You learned that in

14   that briefing; correct?

15   A.   Yes.

16   Q.   All right.  And you learned that because, from what you

17   understood, it would give the protestors reason to stand

18   down; correct?

19   A.   Yes.

20   Q.   Okay.  It would also allow for the BLM to egress from

21   the ICP; correct?

22   A.   Yes.

23   Q.   Basically leave; right?

24   A.   Yes.

25   Q.   All operations are done; right?

```
 1    A.    Yes.

 2    Q.    All right.

 3              MR. TANASI:  Brian, if you could bring up Exhibit

 4    257, please.

 5    BY MR. TANASI:

 6    Q.    Okay.  Sir, do you see that exhibit?

 7    A.    Yes.

 8    Q.    All right.  So in this picture if you could just one

 9    more time circle yourself.

10              Okay.  Now, the folks in this picture, they have,

11    including you, a plastic riot shield; right?

12    A.    That is a ballistic shield.

13    Q.    Okay.  And that's actually not you, and the guy in the

14    front, he has a riot shield; correct?

15    A.    She has a ballistic shield, that is correct.

16    Q.    Okay.  I understood it's a riot shield though; right?

17    A.    Ballistic shield.  A riot shield is made of plastic.

18    Q.    Okay.  It is -- it's your testimony, though, that this

19    isn't a ballistic riot shield?

20    A.    It is used in riots, but a riot shield is generally

21    plastic.  This is called a ballistic shield.

22    Q.    Okay.  Were there any ballistic plastic -- I'm sorry.

23    Were there any plastic riot shields in the wash with you?

24    A.    In the truck bed.

25    Q.    Okay.  So this is not a riot shield, this, again, for
```

1    the record, is what?

2    A.    A ballistics shield.

3    Q.    Okay.  And you were -- it looks like also there were --

4    there was a gas launcher of some kind, a 37 millimeter CS gas

5    launcher?

6    A.    CS gas launcher, correct.

7    Q.    Okay.  And, again, this is when you're in the wash,

8    after you're told that the whole operation is ceased and

9    over.  You're in the wash now with folks who have a shield

10   and pepper spray essentially; correct?

11   A.    Correct.

12   Q.    Pepper balls; correct?

13   A.    Correct.

14   Q.    After the operation is over; right?

15   A.    Yes.

16   Q.    Okay.  And at one point two Clark County Sheriffs

17   approached the wash, essentially; right?  They approached the

18   gate; correct?

19   A.    Yes.

20   Q.    Okay.  Two Clark County Sheriffs out in the open

21   approaching the gate; right?

22   A.    Yes.

23   Q.    Okay.  When you guys look like that in that picture;

24   right?

25   A.    Yes.

```
 1                    MS. AHMED:  Objection.  Assumes facts not in
 2      evidence.
 3                    MR. TANASI:  Your Honor, he just answered yes.
 4      BY MR. TANASI:
 5      Q.   Now, after Metro approaches the gate, and after your --
 6      Special Agent in Charge Love approaches the gate, you're
 7      instructed to remove your tactical vests; right?
 8      A.   Yes.
 9      Q.   You're told to take your helmets off; correct?
10      A.   Yes.
11      Q.   You're told to pull rifles out of sight; correct?
12      A.   Yes.
13      Q.   All right.  And now let's talk about NHP.
14                    NHP, they're up on the overpass; right?
15      A.   Yes.
16      Q.   And NHP is Nevada Highway Patrol; correct?
17      A.   Yes.
18      Q.   All right.  And they're up on the overpass.  And they
19      didn't stop traffic; right?
20      A.   No.
21      Q.   They didn't clear the bridge of the so-called threats;
22      correct?
23      A.   No.
24                    MS. AHMED:  Objection as to "so-called."
25      Argumentative.
```

```
 1                MR. TANASI:  Your Honor, he answered the question
 2    "No."
 3                MS. AHMED:  Argumentative.
 4                THE COURT:  Sustained.
 5    BY MR. TANASI:
 6    Q.   And, in fact, NHP didn't assist you on that day in
 7    making any arrests; correct?  Of the threats that are up on
 8    the bridge; correct?
 9    A.   Correct.
10    Q.   All right.  Prior to today's testimony, did you have an
11    opportunity to meet with the US Attorney's Office?
12    A.   Yes.
13    Q.   How many times, sir?
14    A.   A few times.
15    Q.   How many times is a few?
16    A.   Two to three.
17    Q.   All right.  When was the first meeting?
18    A.   I don't recall.
19    Q.   Was it over a year ago?
20    A.   Possibly.
21    Q.   Okay.  Who was at that first meeting?
22    A.   It was a phone meeting with individuals from the US
23    Attorney's Office.
24    Q.   Okay.  And then you said there was a few.  So was there
25    another opportunity you had to meet with the United States
```

1  Attorney's Office?

2  A.   I've had two or three phone calls as well as in-person

3  meeting.

4  Q.   Who was at the in-person meetings?

5  A.   Nadia.

6  Q.   Okay.  And what did you discuss in those meetings?

7  A.   The events of the day.

8           MS. AHMED:  Objection.  Relevance.

9           MR. TANASI:  Your Honor, it goes to his bias.

10           THE COURT:  Overruled.

11  BY MR. TANASI:

12  Q.   What did you discuss in those meetings, sir?

13  A.   Just the events of the day in the wash.

14  Q.   Okay.  And did you essentially prepare for today's

15  testimony?

16  A.   Essentially.

17  Q.   Okay.

18           MR. TANASI:  Thank you, sir.

19           Nothing further.

20           THE COURT:  Mr. Marchese?

21           MR. MARCHESE:  Mr. Engel will go.

22           THE COURT:  Okay.

23           MR. MARCHESE:  Thank you.

24

25

1                        CROSS-EXAMINATION

2    BY MR. ENGEL:

3    Q.   Good afternoon, Mr. Novotny.

4    A.   Good afternoon.

5    Q.   I've just got a couple questions for you.  My name is

6    Todd Engel.  I'm representing myself here.

7              You stated that the protestors had the high ground

8    on you; correct?

9              MS. AHMED:  Objection.  Misstates the witness's

10   testimony.

11   BY MR. ENGEL:

12   Q.   You stated that "they had a better angle of fire over us

13   and had the high ground"; correct?

14   A.   Yes.

15             MR. ENGEL:  Brian, would you pull up Exhibit 346,

16   please.

17   BY MR. ENGEL:

18   Q.   Does that look to you to be federal law enforcement

19   officers up on that mesa?

20   A.   I don't know who those individuals are.

21   Q.   Okay.  Do you know where that mesa was on that day?

22   A.   I do not recognize it.

23             MR. ENGEL:  Can you pull up 132, please.  It's in

24   the videos.

25        (Videotape played.)

```
 1              MR. ENGEL:  Just kind of fast forward through it

 2   until you get that mesa on there, Brian.  There you go.

 3   Okay.

 4              Keep watching this a little bit, see if he backs

 5   out of it.

 6         (Videotape played.)

 7              MR. ENGEL:  Okay.  You've seen that now.  And now

 8   you're seeing the ground underneath and there's the freeway.

 9   That's good, Brian.

10   BY MR. ENGEL:

11   Q.   Would you agree that that --

12              MS. AHMED:  Objection.  He's testifying.

13   BY MR. ENGEL:

14   Q.   Did you see the vehicles parked up on that mesa?

15   A.   Yes.

16   Q.   Did they look like they had higher ground than what the

17   freeway was?

18   A.   It appears so.

19              MS. AHMED:  Objection.  Argumentative.

20   BY MR. ENGEL:

21   Q.   Was the ground on the mesa higher than the freeway?

22              MS. AHMED:  Objection.  Relevance.

23              THE COURT:  Overruled.  He can answer the

24   question.

25              THE WITNESS:  Yes.
```

DONNA DAVIDSON, RDR, CRR, CCR #318    (775) 329-0132

```
 1    BY MR. ENGEL:

 2    Q.   Okay.  So that ground seemed to be higher than the

 3    freeway; correct?

 4    A.   Yes.

 5    Q.   Thank you.

 6              MR. ENGEL:  Brian, would you go to Exhibit --

 7    Government Exhibit 77, please.  And go to approximately the 2

 8    minute mark.  And play it to about 2:10 and stop.

 9         (Videotape played.)

10              MR. ENGEL:  That's good.

11    BY MR. ENGEL:

12    Q.   You stated that there were individuals with weapons in

13    these areas; is that correct?

14    A.   Yes.

15    Q.   Do you see anybody up in those areas with weapons, Agent

16    Novotny?

17    A.   It's officer, and not at that time.

18    Q.   I'm sorry.  Officer Novotny.  Okay.

19              MR. ENGEL:  And go ahead and keep playing it,

20    please.

21         (Videotape played.)

22              MR. ENGEL:  And stop at 2:27, Brian.

23         (Videotape played.)

24              MR. ENGEL:  That's good right there.  Back up a

25    little bit.  Go forward just a little bit.  Right there.
```

1    BY MR. ENGEL:

2    Q.    Now, this is -- Officer Novotny, you guys are right in

3    there; correct?

4    A.    Yes.

5    Q.    And at this time you stated that you were feeling fear;

6    correct?

7    A.    Yes.

8    Q.    Can you tell me what this agent right here is doing?

9              MS. AHMED:   Objection.   Calls for speculation.

10   BY MR. ENGEL:

11   Q.    Is that agent standing out in the open, Officer Novotny?

12   A.    It would appear so.

13   Q.    Has that agent got his back turned and walking away from

14   you, Officer Novotny?

15   A.    It appears so at this time.

16   Q.    Officer Novotny, do you recall seeing me that day?

17   A.    I did not have any magnification.   I do not remember

18   faces.

19   Q.    So you don't recall seeing me that day?

20   A.    I do not remember faces.

21   Q.    That's not the question.   Do you recall seeing me that

22   day?

23             THE COURT:   He just told you he doesn't remember

24   any faces.

25

1    BY MR. ENGEL:

2    Q.   So then you wouldn't recall seeing me with a firearm

3    that day; correct?

4             MS. AHMED:  Objection.  Asked and answered.

5             THE COURT:  Sustained.

6    BY MR. ENGEL:

7    Q.   Do you recall me opposing you and being a danger to

8    your --

9             THE COURT:  Mr. Engel, he just said he doesn't

10   recognize any faces.

11           MR. ENGEL:  No further questions.

12           Thank you, officer.

13           THE COURT:  Mr. Leventhal?

14           MR. LEVENTHAL:  No, Your Honor.

15           THE COURT:  Mr. Jackson?

16           MR. JACKSON:  Just a couple points.

17                   CROSS-EXAMINATION

18   BY MR. JACKSON:

19   Q.   Officer Novotny, my name is Terrence Jackson.  I

20   represent Gregory Burleson.

21           You don't know him either?  You didn't see him

22   either that day; is that correct?

23   A.   I don't remember faces.

24   Q.   You've been a law enforcement officer for how long, is

25   it?

1    A.    Since August 2012.

2    Q.    And before that, what line of work were you in?

3    A.    I was in several lines of work, from construction to

4    truck driving.

5    Q.    All right.  But you were a law enforcement officer for

6    the last -- you've been a law enforcement officer for

7    approximately four and a half years then; is that right?

8    A.    Yes.

9    Q.    And on April 12, 2014, you'd been a law enforcement

10   officer for about two years at that time; is that correct?

11   A.    Correct.

12   Q.    And you had had training at that time as a law

13   enforcement officer before you went to Bunkerville, Nevada,

14   to participate in this operation; is that correct?

15   A.    Yes.

16   Q.    Now, one of the things inherent in being a law

17   enforcement officer is you deal with fear as part of your job

18   as a daily basis; isn't that correct?

19   A.    On some days.

20   Q.    You have to confront fear sometimes; isn't that correct?

21   A.    Yes.

22   Q.    Do you get training for that, training in how to deal

23   with fearful things you might have to confront in doing your

24   job?

25   A.    Yes, we have training on how to deal with threats.

```
 1   Q.   In fact, you get training so that fear doesn't overwhelm
 2   you when you are performing your duties; isn't that correct?
 3   A.   That's correct.
 4   Q.   And fear isn't always a bad thing because it helps you
 5   focus your energy and be able to recognize what threats are
 6   and things like that; isn't that correct?
 7              MS. AHMED:  Objection.  Argumentative.
 8              MR. JACKSON:  Well, he talked a lot about fear.
 9   I'd want to ask him what his -- whether or not his feelings
10   are about that.
11              Government brought it up on almost every witness.
12              THE COURT:  You want to know what his feelings are
13   about fear?
14   BY MR. JACKSON:
15   Q.   Well, is fear sometimes a good thing?
16   A.   I do not like fear, no.
17   Q.   All right.  But you get training in order to control
18   your fear so you can function; isn't that correct?
19   A.   This is true.
20   Q.   Now, you testified on direct examination that this, on a
21   scale of one to ten, was the most fearful thing that you ever
22   experienced; is that right?
23   A.   Yes.
24   Q.   Is that what you testified to?  I'm paraphrasing, but on
25   a scale of one to ten you rated this a ten?
```

1    A.    I did say ten.

2    Q.    Bo Derick's a ten, and this was a ten in your scale of

3    one to ten; is that right?

4    A.    Rephrase, please.

5    Q.    All right.  I may be a lot older than you.  I'll

6    withdraw that question.

7               You weren't so paralyzed with fear that day that

8    you couldn't do your duty; is that correct?

9    A.    Correct.

10   Q.    You were able to understand and remember what happened?

11   You weren't so paralyzed with fear that you couldn't have a

12   good understanding of what was going on around you?

13   A.    Correct.

14   Q.    But you couldn't identify anybody that was there; so you

15   didn't have that good of remembrance or ability to perceive

16   what was going on?

17              MS. AHMED:  Objection.  Argumentative.

18              MR. JACKSON:  All right.  I'll withdraw the

19   question.  No further questions.

20              THE COURT:  Mr. Perez?

21              MR. PEREZ:  Nothing from Lovelien, Your Honor.

22              THE COURT:  All right.  Mr. Leventhal?

23              MR. LEVENTHAL:  No, Your Honor.  Thank you.

24

25

1                           CROSS-EXAMINATION

2    BY MR. MARCHESE:

3    Q.    Good afternoon, sir.

4    A.    Good afternoon.

5    Q.    You indicated on direct examination that you got into

6    the wash on April 12, 2014, and then you started walking

7    towards post 2.  That would be the front; is that correct?

8    A.    Towards the front three vehicles, correct.

9    Q.    Correct.  So at that particular time, were the horses in

10   the wash yet?

11   A.    They were just starting to approach.

12   Q.    Okay.  Now, when you say "approach," they were

13   approaching into the wash, or are they going forward towards

14   post 2 gate?

15   A.    Approaching the wash.

16   Q.    Okay.  And then at some point in time, I believe you

17   testified on direct examination, that they got into a line.

18              And actually if we can get 414 up, I think that

19   depicts it.

20              Do you remember that, though?

21   A.    Yes.

22   Q.    And it was your testimony that you believed something to

23   the effect of that when you saw them get into that line, that

24   you believed that they were going to try to overtake the

25   compound; is that correct?

```
 1    A.    Correct.
 2    Q.    Okay.  At some point in time, did you ever see anyone
 3    kneel down?
 4    A.    I may have.
 5    Q.    Okay.  At some point in time, did you ever see anyone in
 6    that line praying?
 7    A.    Not that I recall.
 8    Q.    Okay.  You also indicated on direct examination that at
 9    some point in time, you made the decision to get the CS
10    launcher?
11    A.    Correct.
12    Q.    Okay.  Now, was that your decision, or was that a group
13    decision, or were you told to do that?  How did that work?
14    A.    We were told that we were going to set up a system to
15    use less lethal resources.  And as I was our designated CS
16    launcher operator, I made the move to go get the launcher.
17    Q.    Okay.
18               MR. MARCHESE:  So now if we can get up 257,
19    please, Brian.
20               COURTROOM ADMINISTRATOR:  Counsel, what was that
21    number?
22               MR. MARCHESE:  257.
23               COURTROOM ADMINISTRATOR:  257.
24    BY MR. MARCHESE:
25    Q.    All right.  Now, we've already identified you.  You're
```

1    the third individual back; correct?

2    A.    Correct.

3    Q.    You've got this probably very warm -- I don't know.

4    What is that?  A scarf?  Or what is that around your neck?

5    A.    It's a balaclava-style neck thing to keep my neck from

6    dusting inside my shirt.

7    Q.    Okay.  I can understand why you want something to drink.

8              And the individual in front of you, what is that

9    individual holding?

10   A.    A pepper ball launcher.

11   Q.    Okay.  And you had described that.  So is that sort of

12   like an airborne tool when it shoots?  How does that work?

13   A.    If you're familiar with a recreational paint ball, it is

14   plastic little capsules similar to paint balls, but instead

15   of paint inside is a very fine powder, the same powder that

16   is used to make aerosol pepper spray.  And it floats in the

17   air.  When they break it causes irritant to the eye and

18   mouth.

19   Q.    Okay.  So you shoot it, it explodes, and goes into the

20   air?

21   A.    It breaks.  It does not explode.

22   Q.    Okay.  Well, it breaks and then goes into the air?

23   A.    Correct.

24   Q.    All right.  And the last individual, that's the

25   individual with the lethal weapon?

1    A.    That's correct.

2    Q.    Okay.  Now, at what point in time did you move from that

3    position to the backs of the trucks?

4    A.    At some point during our time in the wash.  Time was

5    slightly distorted.  I don't know exact times and --

6    throughout the timeline.

7    Q.    Okay.  Were you given an order, or is it just something

8    that you did?

9    A.    It was something that we did.

10   Q.    Okay.  You saw Dan Love get to the gate; correct?

11   A.    Yes.

12   Q.    Was it before or after Dan Love got to the gate?

13   A.    I don't recall the exact time.  I believe it was before

14   we saw him at the gate.

15   Q.    Okay.  Now, you've given some testimony in reference to

16   there's people in the wash and they have weapons and they're

17   moving all around; correct?

18   A.    Correct.

19   Q.    I believe somewhere in the vicinity of maybe a dozen or

20   so people you saw in the wash with these weapons; correct?

21   A.    Correct.

22   Q.    At some point in time -- you testified on direct

23   examination that you saw them communicating or what you

24   believed to be communicating with one another with hand

25   signals.

```
 1                  Do you remember that?
 2   A.    Yes.
 3   Q.    Okay.  You also indicated that there was an individual
 4   with orange sunglasses.
 5                  Do you remember that individual?
 6   A.    I remember.
 7   Q.    Okay.  And you had indicated that at some point in time
 8   this individual raised a firearm at you or in your vicinity
 9   at least?
10   A.    He was in possession of a long rifle.  I did not say he
11   raised the rifle.
12   Q.    Okay.  So he did not, he just -- an individual with
13   orange sunglasses that had a rifle but didn't point it; is
14   that correct?
15   A.    Correct.
16   Q.    Okay.  Were there any individuals that actually pointed
17   a firearm at you on April 12th, 2014?
18   A.    Yes.
19   Q.    Okay.  And would that be the individual with the blue
20   shirt?  In the -- I think it was a black hat I wrote in my
21   notes.
22   A.    The main individuals pointing guns in my direction were
23   the ones up in the corners and up on the overpass area.
24   Q.    Okay.  So let's stop for a second.
25                  So this -- I put down blue shirt and black hat.
```

1    Am I incorrect in stating that?

2    A.    That's correct.  He was -- there was --

3    Q.    Okay.

4    A.    -- an individual with a long rifle wearing that clothing

5    description.

6    Q.    Okay.  And this was one of the individuals that pointed

7    a weapon at you?

8    A.    He was an individual with a rifle.  I do not remember

9    him specifically pointing the rifle.  I just know he was in

10   there with the rifle.

11            I was more keyed in on the individuals with the

12   high ground.

13   Q.    Okay.  So these would be the individuals kind of, I

14   think, up on the cement embankments --

15   A.    Correct.

16   Q.    -- in those areas that you were circling?

17   A.    Yes.

18   Q.    Okay.  Now, you authored a report in this particular

19   case on -- memorandum of activity that was on April 14th,

20   2014; correct?

21   A.    Correct.

22   Q.    And you authored that; correct?

23   A.    Correct.

24   Q.    You made sure that it was important -- it was correct,

25   it was accurate in all the details that you put in there; is

1     that correct?

2     A.    Yes.

3     Q.    And you reviewed it before you submitted it to your

4     superior officer; is that correct?

5     A.    Quickly, yes.  We are only permitted a short amount of

6     time to write them, but yes.

7     Q.    Okay.  You signed it; correct?

8     A.    Yes.

9     Q.    All right.  And isn't it true that nowhere in that

10    report did you put in there that anyone on April 12, 2014,

11    were pointing a weapon at you?

12    A.    That is correct.

13              MR. MARCHESE:  No further questions.

14              THE COURT:  All right.  We're going to go ahead

15    and take our afternoon break.  It's 3:08.

16              I do remind the jury, please do not discuss this

17    case with anyone, nor allow anyone to discuss it with you.

18              Do not read or listen to or view anything that

19    touches upon this case in any way.

20              And do not attempt to perform any research or any

21    independent investigation, and do not form any opinion about

22    the case.

23              We're going to take about a 15-minute break.  So

24    it's 3:10.  Be back here at 3:25.

25              We'll stand for the jury.

```
 1              And then after the jury exits, then, Officer

 2   Novotny, you can also take your stretch break, go use the

 3   restroom, whatever you need to do.  And please be back here

 4   by 3:25.

 5         (Jurors exit courtroom at 3:09 p.m.)

 6              THE COURT:  Off record.

 7         (Recess from 3:09 p.m. until 3:23 p.m.)

 8              COURTROOM ADMINISTRATOR:  All rise.

 9              THE COURT:  Bring in the jury.

10              COURTROOM ADMINISTRATOR:  All rise.

11         (Jurors enter courtroom at 3:25 p.m.)

12              THE COURT:  All right.  Everyone may be seated.

13              We're joined by the jury.  And everyone's back

14   from the afternoon break.

15              We have Officer Novotny on the witness stand.

16              And, Mr. Leventhal --

17              MR. LEVENTHAL:  No.

18              THE COURT:  -- do you have any cross?

19              MR. LEVENTHAL:  No, thank you, Your Honor.

20              THE COURT:  All right.

21              Any redirect?

22              MS. AHMED:  Yes, Your Honor.  Thank you.

23                    REDIRECT EXAMINATION

24   BY MS. AHMED:

25   Q.  Officer Novotny, with respect to the operations ceasing
```

1   on April -- the information you received on April 11th about

2   the operations ceasing, what was your understanding as to

3   what operations were concluding at that time?

4   A.   The actual impound of further cattle.

5   Q.   What was your understanding with respect to the cattle

6   that had already been impounded?

7   A.   They would be transported to a facility where they would

8   be auctioned off.

9   Q.   What did you understand your role was to be in relation

10  to their transport?

11  A.   We would be transferring to convoy escort to protect

12  convoys en route to the auction facility.

13          MS. AHMED:  Your Honor, may we publish what's been

14  previously admitted as Government Exhibit 93?

15          THE COURT:  Yes.

16          MS. AHMED:  And the 12:36:46 mark.

17  BY MS. AHMED:

18  Q.   Officer Novotny, utilizing this exhibit, can you

19  indicate for the jury where you saw gunmen on the high

20  grounds.

21          The third circle that you just placed in the

22  middle, slightly over to the right, is that depicting gunmen

23  you observed on the northbound bridge?

24  A.   Yes.

25          MS. AHMED:  And, Your Honor, for the record, the

```
 1    witness has placed three circles: one on the far right,

 2    relatively middle; and left middle; and then a third in

 3    the -- toward the right third of the screen, middle.

 4              You can take that exhibit down.  Thank you.

 5    BY MS. AHMED:

 6    Q.   Officer Novotny, you were asked some questions about

 7    your report.

 8              Do you recall those questions?

 9    A.   Yes.

10    Q.   With respect to your report, why don't you have every

11    detail of what occurred in the wash that day in your report?

12    A.    It's nearly impossible to write every detail in a

13    report, especially when you're in a still-elevated level of

14    threat or -- we were just unable to get everything in to the

15    report.

16    Q.   With respect to meeting with the US Attorney's Office,

17    have either I or anyone else in the US Attorney's Office ever

18    told you to be anything but truthful in your testimony?

19    A.   You have not.

20    Q.   Has anyone else told you to be anything but truthful in

21    your testimony?

22    A.   No.

23    Q.   With respect to staying in the wash, despite the

24    impoundment operation, the cattle gather being ceased, why

25    did you stay in the wash on April 12, 2014?
```

```
 1    A.    Not only to remove the cattle that had already been

 2    impounded but to be there to protect the civilian employees

 3    that were still in the ICP.

 4              MS. AHMED:  Your Honor, the Court's indulgence?

 5              THE COURT:  Yes.

 6              MS. AHMED:  No further questions.

 7              Thank you, officer.

 8              THE COURT:  Any recross?

 9              MR. TANASI:  None from Stewart, Your Honor.

10                      RECROSS-EXAMINATION

11    BY MR. MARCHESE:

12    Q.    You were asked some questions on redirect about your

13    report, specifically omitting facts out of the report.  One

14    of the things that you mentioned was that it's impossible to

15    get everything into a report.

16              Is that your testimony?

17    A.    Yes.

18    Q.    You agree with me, though, that you want to put the

19    important things into a report; correct?

20    A.    Yes.

21    Q.    You would agree that someone pointing a weapon at you

22    would be an important item to put into a report; correct?

23    A.    Yes.

24              MR. MARCHESE:  No further questions.

25              THE COURT:  Mr. Engel?  Mr. Leventhal?
```

1              MR. ENGEL:  No, Your Honor.

2              MR. LEVENTHAL:  No, Your Honor.  Thank you.

3              THE COURT:  Mr. Perez?  Mr. Jackson?

4              MR. PEREZ:  No, Your Honor.

5              MR. JACKSON:  I have no questions for Mr.

6    Burleson.

7              THE COURT:  All right.  Thank you.

8              Any other redirect?

9              MS. AHMED:  No, Your Honor.  Thank you.

10             THE COURT:  All right.  Thank you very much,

11   Officer Novotny, for coming in today.  You're excused.

12             THE WITNESS:  Thank you.

13             THE COURT:  And please be careful with the steps

14   on your way down there.

15             The government may call its next witness.

16             MR. DICKINSON:  The government calls Officer Tara

17   McBride, Your Honor.

18             THE COURT:  Good afternoon, Officer McBride.

19   You'll be seated to the right.  But please be careful with

20   the steps up.

21             COURTROOM ADMINISTRATOR:  Please raise your right

22   hand.

23             You do solemnly swear that the testimony you shall

24   give in the cause now before the Court shall be the truth,

25   the whole truth, and nothing but the truth, so help you God?

```
 1              THE WITNESS:  I do.
 2              COURTROOM ADMINISTRATOR:  Thank you.  You may be
 3    seated.
 4              Please state and spell your full name.
 5              THE WITNESS:  Tara McBride, T-a-r-a,
 6    M-c-b-r-i-d-e.
 7              MR. DICKINSON:  May I proceed, Your Honor?
 8              THE COURT:  Yes, you may.
 9                        TARA MCBRIDE
10           called as a witness on behalf of the
11        Government, was examined and testified as follows:
12                     DIRECT EXAMINATION
13    BY MR. DICKINSON:
14    Q.   Good afternoon, Officer McBride.
15    A.   Good afternoon.
16    Q.   Where do you work?
17    A.   I work for the United States Park Police in San
18    Francisco.
19    Q.   And how long have you worked for the United States Park
20    Police?
21    A.   For eight years.
22    Q.   And prior to working for the United States Park Police,
23    did you have any prior law enforcement?
24    A.   No.
25    Q.   What's your educational background?
```

1    A.    I received a BA at the University of Chico.

2    Q.    And as a United States Park Police officer, are you a

3    federal law enforcement officer?

4    A.    Yes.

5    Q.    And do you enforce federal laws on federal public land?

6    A.    Yes.

7    Q.    And as part of your duties as United States Park Police

8    officer, do you also participate on what is commonly referred

9    to as the SET team?

10   A.    Yes.

11   Q.    And, briefly, what's the SET team?

12   A.    It's a Special Event Team for the National Park Service.

13   And we go for any kind of big events that occur when we're

14   requested.

15   Q.    And were you requested to work the cattle impoundment

16   near around Bunkerville, Nevada, in April of 2014?

17   A.    Yes.

18   Q.    And were you part of a specific SET team?  Let me start

19   there.  Were you part of a specific SET team?

20   A.    I'm part of SET Team 3.

21   Q.    And how many SET teams -- was there another SET team

22   that also worked the impoundment event?

23   A.    Yes, all three SET teams were at the impoundment.

24   Q.    And approximately how many members per SET team?

25   A.    There's about 11 members per SET team, give or take.

```
 1    Q.    Okay.  And I want to take you to the day of April 11,
 2    2014.  What shift did you work that day?
 3    A.    The dayshift.
 4    Q.    And approximately what time did you end the dayshift?
 5    A.    About 1800.
 6    Q.    And for members of the jury that aren't completely
 7    familiar with the 24-hour clock?
 8    A.    6:00 p.m.
 9    Q.    And at 6:00 p.m., what did you do when you got off your
10    shift?
11    A.    Typically we head back to the hotel.  But on that day we
12    were requested for a briefing in the center of the ICP.
13    Q.    And after that briefing, were you able to go back to
14    your hotel?
15    A.    No.
16    Q.    Why not?
17    A.    During the briefing, we were told that there is an
18    imminent threat to the ICP and that we were to remain in
19    place.
20    Q.    And did you remain in place?
21    A.    Yes.
22    Q.    And while you remained in place, were you assigned any
23    duties?
24    A.    Yes.  At about 0 -- at about 3:00 a.m., I was requested
25    to respond to an overwatch post at the southernmost part of
```

1    the ICP.

2    Q.    And --

3    A.    It was basically a gravel mound.

4    Q.    Did you do that?

5    A.    Yes.

6    Q.    And did you do that with somebody else?

7    A.    Yes, with Officer Cox.

8    Q.    And how long were you and Officer Cox manning that

9    overwatch position?

10   A.    From 3:00 a.m. to about 7:00 a.m.

11   Q.    And during that time, were you wearing a specific

12   uniform?

13   A.    Yes, I was wearing my SET-issued uniform.

14   Q.    Is that the green one?

15   A.    Yes.

16   Q.    And what caused you and Officer Cox to leave the

17   overwatch position?

18   A.    We were requested to head back to ICP for another

19   briefing.

20   Q.    And what time did that briefing take place?

21   A.    At about 8:00 a.m.

22   Q.    And after that briefing, did you have a new

23   understanding of what your duties would be?

24   A.    Yes.  We were told that a statement was released, the

25   cattle impoundment was currently over, but we were to remain

1    with our current schedule that we had prior to the night of

2    the 11th, to act as security for the ICP until they could

3    remove all the cattle and all the government property out of

4    the area.

5    Q.   And did you go home then?

6    A.   No.

7    Q.   Or go back to your -- where were you staying?

8    A.   I was still in the ICP.  They said that we were going to

9    continue our same tours of duty; so I was back on my normal

10   tour of duty.

11   Q.   So even though you had stayed up all night, you were

12   still going to now work your normal duty, which was the

13   dayshift?

14   A.   Yes.

15   Q.   Okay.  Did there come a time, a few hours later, when

16   you received some information regarding some action you took?

17   A.   At about 11:00 they said that people were coming into

18   the ICP.

19   Q.   And were you told to do anything?

20   A.   Yes.  I was told to go ahead and tack up, get our riot

21   gear, and head down into the wash near post 2.

22   Q.   And when you say "we" at this time, who do you mean?

23   A.   There was a squad of us.  It was myself, Officer Cox,

24   Officer Cole, and Officer Novotny.

25   Q.   And were they all on your team?

```
 1    A.    Yes.

 2    Q.    Your SET team?

 3    A.    Yes.

 4    Q.    And where did you go after you got your riot stuff and

 5    put your gear on?

 6    A.    We parked down near -- we drove down to near post 2 and

 7    walked up to the three BLM trucks that were parked at post 2.

 8              MR. DICKINSON:  Your Honor, can we publish what's

 9    been admitted as Government Exhibit 348?

10              THE COURT:  Yes.

11    BY MR. DICKINSON:

12    Q.    And, officer, it will come up on your screen to your

13    right.

14              Looking at this, will you be able to demonstrate

15    where you parked and then where you went to?

16    A.    Yes.

17    Q.    And you can write on the screen.

18    A.    Okay.  Parked in this area, and then we walked up to

19    these trucks.

20    Q.    And starting with the white vehicles that are circled,

21    were those Park Service vehicles?

22    A.    Yes.  They were unmarked.  Some of them are unmarked and

23    some were marked Park Service vehicles.

24    Q.    And then the three vehicles you walked up to, what

25    agencies did they belong to?
```

1    A.    BLM.

2    Q.    And approximately what time did you arrive to those

3    vehicles, those BLM vehicles?

4    A.    Within a few minutes of us getting the request.

5    Q.    11:15, 11:20?

6    A.    Yes.

7    Q.    And where did you position yourself when you first got

8    to those vehicles?

9    A.    We were standing behind the trucks.

10   Q.    And what did you observe in front of you, if anything,

11   when you were standing behind those trucks?

12   A.    There was a group gathering about 50 yards away from the

13   fence that was underneath the northern overpass and it was,

14   like, slowly growing.

15   Q.    At some point were you given an order to do something

16   else?

17   A.    Yes.  At one point Ranger Akana requested us to move up

18   with some less than lethal.

19   Q.    If you recall, how long were you standing behind the

20   trucks before Ranger Akana gave you the order to move up with

21   less than lethal?

22   A.    Five to ten minutes.

23   Q.    And did you, in fact, move up with less than lethal?

24   A.    Yes.  We moved up to the front of the middle truck right

25   here.

1    Q.   So were you in between the middle truck and the truck to

2    the right?

3    A.   Yes.

4            MR. DICKINSON:  Originally the officer has drawn a

5    circle around the white parked vehicles and then a line going

6    to back of the three BLM trucks and now has drawn a line in

7    between the middle truck and the truck to the right.

8            Can we bring up Government's Exhibit 257.

9    BY MR. DICKINSON:

10   Q.   Officer McBride, do you recognize this picture?

11   A.   Yes.

12   Q.   What is this picture?

13   A.   That picture is myself, Officer Cole, Officer Novotny,

14   and Officer Ewing.

15   Q.   And where are you?

16   A.   I am the one in front holding the ballistic shield.

17   Q.   So you're kneeling?

18   A.   Yes.

19   Q.   And you state "ballistic shield."  What is a ballistic

20   shield?

21   A.   It's a shield that can help deflect ammo, bullets.

22   Q.   And at this -- during this day, did you have other types

23   of shields with you?

24   A.   Yes.  We were all told to bring up our riot shields,

25   which are plastic shields.

1    Q.    And nonballistic?

2    A.    Nonballistic.

3    Q.    All right.  And the individual behind you, I apologize,

4    you stated that is?

5    A.    Officer Cole.

6    Q.    And he appears to be holding something?

7    A.    Yes.  He's holding a pepper ball.

8    Q.    And behind him?

9    A.    That's Officer Novotny.  And he's holding a 37

10   millimeter launcher.

11   Q.    And what was that -- what does that launch?

12   A.    He had it loaded with CS gas.

13   Q.    And behind him?

14   A.    That's Officer Ewing.  And he was holding his rifle.

15             MR. DICKINSON:  And you can take down 257.

16   BY MR. DICKINSON:

17   Q.    Is that a position that you train on?

18   A.    Yes.

19   Q.    Specifically to deploy less than lethal?

20   A.    Yes.

21   Q.    Now, when you got into that position, you were in front.

22   Were you able to see in front of you, even though you had

23   that ballistic shield?

24   A.    Yes.

25   Q.    And what did you see in front of you?  Let's start with

1    sort of directly in front of you.

2    A.    Directly in front of me there was a large group that was

3    continuing to grow.  It was probably, at that point, about

4    100 people.

5            There's also people up on the overpass above us,

6    probably about 50 people, that were yelling --

7    Q.    Let me stop you there.  The people in front of you, the

8    hundred people --

9    A.    Yes.

10   Q.    -- where were they?

11   A.    They were still in that same position when we rolled up,

12   about 50 yards away from that fence that was underneath the

13   overpass, the northern overpass.

14   Q.    Did you observe any horses?

15   A.    Yes.

16   Q.    Approximately how many?

17   A.    Approximately about 20 horses or so.

18   Q.    And when you say that same position, were they in a

19   certain position?

20   A.    They were still standing in, like, a line.

21   Q.    And so that's what's directly in front of you.

22            Now, you mentioned a bridge.  Was there -- were

23   you -- how far away were you from the first bridge in front

24   of you?

25   A.    Probably about 20 to 30 yards.

1    Q.    And what did you observe on top of the bridge?

2    A.    There was about 50 people.  And they were all standing

3    basically directly over us yelling at us and throwing rocks

4    at us, spitting on us.

5    Q.    And then you mentioned the sides of the bridge.  What

6    did you see on the sides of the bridge?

7    A.    Underneath the overpass there were two groups of three

8    on either side in military clothing with vests on and long

9    guns.

10   Q.    And based on your training and experience as a law

11   enforcement officer, did that give you any concern?

12   A.    Yes.

13   Q.    Why?

14   A.    They were moving in a tactical manner, moving from post

15   to post taking cover, and moving towards the closest post to

16   us to get the best angle on us.

17   Q.    At any time when you were in the stacking position, did

18   any of those individuals point their weapon at you?

19   A.    Yes.

20          MR. DICKINSON:  Can we bring up Exhibit 93 at

21   approximately 36:48.

22          (Videotape played.)

23          MR. DICKINSON:  You can stop it there.

24   BY MR. DICKINSON:

25   Q.    Just for demonstrative purposes, not at this specific

 1    time where the people were, but when you were up in your

 2    stacking formation, would this help you demonstrate to the

 3    jury where you saw those two groups of three?

 4    A.    Yes.

 5    Q.    Can you circle where that is.

 6    A.    Yes.

 7              MR. DICKINSON:  The witness has drawn circles on

 8    the southbound bridge where the abutment meets the bridge.

 9    BY MR. DICKINSON:

10    Q.    And how long were you in the sort of stacked formation

11    where you were holding a ballistic shield?

12    A.    I do not recall.

13    Q.    When you -- eventually did you move back?

14    A.    Yes.

15    Q.    And when you moved back, where were the people in front

16    of you, the people on the horses?  Were they still in the

17    line?  Did they move forward?

18    A.    They were still in the line, slowly making their way

19    closer to us.

20    Q.    Okay.  Now, before you moved back, was -- did your team

21    deploy less than lethal force?

22    A.    No.

23    Q.    Why not?

24    A.    The four of us were given the okay to go ahead and

25    deploy less than lethal.  And while we were standing in a

```
 1    stack, we discussed it, and we felt that if Officer Cole had
 2    gone ahead and released some pepper ball that someone would
 3    have mistaken the pop that comes from the pepper ball as
 4    shots fired and then we would have had shots fired at us.
 5    Q.   Now, before you pulled back, did you make any requests
 6    to fall back?
 7    A.   Yes.
 8    Q.   And who did you make those requests to?
 9    A.   To Ranger Akana.
10    Q.   And was he your supervisor on the ground?
11    A.   Yes.
12    Q.   And your first request, did Ranger Akana say it was okay
13    to fall back?
14    A.   No, we were denied.
15    Q.   Were you denied subsequent requests?
16    A.   Yes, we were denied three times.
17    Q.   And was there a fourth request?
18    A.   No.  At that time our group made the decision to fall
19    back.
20    Q.   And where did you fall back to?
21    A.   We fell back to the rear of the trucks again.
22    Q.   The same three trucks?
23    A.   The same three trucks.
24              MR. DICKINSON:  Can we bring up Exhibit 396.
25              I apologize, Your Honor.  May I have a second?
```

DONNA DAVIDSON, RDR, CRR, CCR #318     (775) 329-0132

```
 1                    THE COURT:  Of course.
 2    BY MR. DICKINSON:
 3    Q.   Officer McBride, do you recognize this picture?
 4    A.   Yes.
 5    Q.   And can you barely see yourself?
 6    A.   Yes.
 7    Q.   Can you circle where you are?
 8              You're circling the helmet just in front of the
 9    white top of the BLM vehicle; correct?
10    A.   Yes.
11    Q.   And is this where you remained until you were told to go
12    somewhere else?
13    A.   Yes.
14              MR. DICKINSON:  You can take that down.  Thank
15    you.
16    BY MR. DICKINSON:
17    Q.   About approximately how long did you remain in that
18    position?
19    A.   I do not recall.
20    Q.   When you were in that position, what were you doing?
21    A.   We were sitting there calling out guns and people that
22    we observed, just letting each other know where we were
23    seeing the threats.
24    Q.   And did you -- were you using any sort of optics?
25    Binoculars?  Scope?
```

```
 1   A.    I was not.
 2   Q.    Was someone near you using anything like that?
 3   A.    Yes, Officer Cox.
 4   Q.    So were you hearing him call out firearms?
 5   A.    Yes.
 6   Q.    Were you able to see individuals with the firearms with
 7   your own eyes?
 8   A.    Yes.
 9   Q.    And where were you seeing these individuals?
10   A.    They were in the crowd, walking in and around people in
11   the crowd; they were still up underneath the overpass; and
12   they were also on the furthest overpass up above.
13   Q.    Not the one directly in front of you, but the far --
14   A.    Yes.
15   Q.    -- overpass?
16         Did the individuals in the crowd with firearms
17   give you concern?
18   A.    Yes.
19   Q.    Why is that?
20   A.    Because the way that they kept moving around, in and
21   around the crowd.
22   Q.    And then how about the individuals on the side of the
23   bridge?
24   A.    Yes.  They were continually pointing their guns at us.
25   Q.    And how about the people on the far bridge?
```

1    A.    Yes.  We could see them slung with rifles.  And they

2    were moving up and down in new areas, seemed to be using the

3    overpass as protection.

4    Q.    And did that cause you concern?

5    A.    Yes.

6    Q.    Why?

7    A.    We could no longer see them, and they were popping up in

8    new areas.  We don't know what they were doing when they were

9    disappearing.

10   Q.    And based on the totality of what you were seeing, did

11   you fear for your safety?

12   A.    Yes.

13   Q.    And did you fear for the safety of your fellow officers?

14   A.    Yes.

15   Q.    Now, focusing your attention on what you saw on the

16   northbound bridge, is there anybody you saw that stuck out in

17   your mind?

18   A.    There was an individual in a plaid shirt with a black

19   tactical vest and a long gun and a black hat with a white

20   insignia on it.

21              MR. DICKINSON:  Can we bring up Exhibit 83, the

22   first few seconds.

23         (Videotape played.)

24              MR. DICKINSON:  You can pause it.

25

1    BY MR. DICKINSON:

2    Q.   Do you recognize that individual?

3    A.   Yes.

4    Q.   Who do you recognize that individual as?

5    A.   He was the individual on the overpass that kept popping

6    up and down.

7              MR. DICKINSON:   Thank you.   You can take that

8    down.

9    BY MR. DICKINSON:

10   Q.   Did you ever see that individual point a gun at you?

11   A.   I did not see him.

12   Q.   Did there come a time when you saw Special Agent Love in

13   the wash?

14   A.   Yes.

15   Q.   And what was he doing?

16   A.   He walked down to the fence underneath the overpass to

17   talk to the crowd.

18   Q.   And was that before or after you were in the stack with

19   your -- with the ballistic shield?

20   A.   It was after.

21   Q.   Do you recall how far after you pulled back?

22   A.   I don't recall.

23   Q.   Okay.  And do you recall how long -- did you ever see

24   Special Agent Dan Love leave the gate?

25   A.   Yes.

1    Q.   Approximately how long was he up there at the gate
2    talking with the crowd?
3    A.   I don't recall.
4    Q.   Do you recall seeing any other law enforcement
5    officer -- nonfederal law enforcement officers in the wash
6    near or around the time that Special Agent Love got to the
7    wash?
8    A.   Dan -- Officer Love approached them at first by himself,
9    and then later on there was a Metro officer down there with
10   him.
11   Q.   When Agent Love approached by himself, how close were
12   you when you saw him walk?
13   A.   I was still standing behind those trucks, about 30 yards
14   away.
15   Q.   And did you have -- at that point, did you have fear for
16   his safety?
17   A.   Yes.
18   Q.   And did your team have fear for his safety?
19   A.   Yes.
20   Q.   And did you do anything?
21   A.   Yes.  We made a rescue plan to go and retrieve him in
22   case that he was taken.
23   Q.   Is that something put together rather quickly, I take
24   it?
25   A.   Yes.

```
 1    Q.   At some point were you told -- were you given an order

 2    to leave where you were posted at?

 3    A.   Yes.

 4    Q.   Approximately when was that?  Do you recall?

 5    A.   It was shortly after Dan Love went down and had a talk

 6    and left.

 7    Q.   And what were you told to do?

 8    A.   We were told to go back, pack up, and leave.

 9    Q.   And how did you go back from the BLM cars up front to

10    your white Park Service vehicles?

11    A.   The BLM trucks backed up as we walked backwards back to

12    our vehicles.

13    Q.   And why were you walking backwards?

14    A.   Because you always want to keep your threat in front of

15    you.

16    Q.   At that point did you still feel a threat -- did you

17    still feel that -- for your safety?

18    A.   Yes.

19    Q.   And after you got back to your car, where did you go?

20    A.   Went back to the SET operating base.

21    Q.   So the SET team had its own little area in the

22    incident -- at the ICP?

23    A.   Yes.

24    Q.   And were you given a period of time to pack up your

25    stuff?
```

1    A.    They told us we had an hour.

2    Q.    And were you able to do that in an hour?

3    A.    Give or take.

4    Q.    And what happened after the hour?

5    A.    After the hour, Nevada Highway Patrol shut down the

6    freeway, and we were given police escort back to our hotel,

7    where we were told we had 30 minutes to pack up and leave.

8    Q.    Take you back, I apologize, to when you were down at the

9    gate.

10           When you were looking or behind the three -- when

11   you were behind the BLM vehicles, so after you had pulled

12   back, did you see any law enforcement on that far bridge

13   where you saw the gentleman with the black hat?

14   A.    Yes.

15   Q.    And do you know that -- what agency they were with?

16   A.    Nevada Highway Patrol.

17   Q.    And do you -- are you aware if anyone -- your team was

18   trying to make requests to have the bridge shut down?

19   A.    Yes, we requested multiple times.

20   Q.    And based on what you observed, did that happen?  Or did

21   you still see cars moving?

22   A.    Cars were still moving.

23   Q.    Okay.  Going back to when you packed up, how did you

24   leave the ICP?

25   A.    We drove out in pairs, basically.

1    Q.   Did you drive out through post 1?

2    A.   Yes.

3    Q.   On to the 15?

4    A.   Yes.

5    Q.   What did you observe when you were driving out of post

6    1?

7    A.   There was at least 100, 200 people up on the freeway

8    yelling and throwing things at us.

9    Q.   And where did you go from there?

10   A.   We went back to our hotel in Mesquite.

11   Q.   And did you stay there?

12   A.   No.

13   Q.   How long were you in Mesquite?

14   A.   About 30 minutes to pack up our things.

15   Q.   And then where did you go?

16   A.   And then we went to Vegas.

17   Q.   When did you stop feeling threatened?

18   A.   When I got to Vegas.

19   Q.   And why is that?

20   A.   We were still -- we were still under threat.  We felt

21   that an ambush could be planned at some point up ahead.  We

22   felt we had no support from the local law enforcement.

23   Q.   And you've been a federal law enforcement officer for

24   eight years?

25   A.   Yes.

DONNA DAVIDSON, RDR, CRR, CCR #318     (775) 329-0132

1    Q.   Where do the events of April 12th rank in how much fear

2    you had, from a one to a ten, in anything you've been a part

3    of in your law enforcement career?

4    A.   It's the most threatened I've ever felt.

5              MR. DICKINSON:  One second, Your Honor?

6              THE COURT:  Yes.

7              MR. DICKINSON:  Thank you, Officer McBride.

8              Thank you, Your Honor.  I'll pass the witness.

9              THE COURT:  Cross-examination, Mr. Tanasi?

10             MR. TANASI:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12   BY MR. TANASI:

13   Q.   Good afternoon, Officer McBride.

14   A.   Good afternoon.

15   Q.   I'm Rich Tanasi.  I represent Steven Stewart.  I have a

16   few questions for you on cross, okay?

17   A.   Okay.

18   Q.   All right.  So on the 11th, April 11, 2014, at 1800

19   hours, you're informed by Dan Love that there was an imminent

20   threat at the ICP -- to the ICP, and that all operations had

21   ceased; correct?

22   A.   Correct.

23   Q.   All operations had ceased, all operations were done;

24   correct?

25   A.   Correct.

```
 1    Q.   All right.  And that's on the 11th, April 11, 2014;
 2    correct?
 3    A.   Correct.
 4    Q.   All right.  In fact, there's a press release of some
 5    kind that basically says the same thing, to your knowledge,
 6    that, in fact, all operations had ceased on the 11th;
 7    correct?
 8    A.   As far as I know, it was released on the 12th.
 9    Q.   Okay.  All right.
10              MR. TANASI:  Now, if we could take a look at
11    Exhibit 257, please, Brian.
12    BY MR. TANASI:
13    Q.   Is this a picture of you?
14    A.   Yes.
15    Q.   Okay.  And are you in the front?
16    A.   Yes.
17    Q.   Okay.  And this is when you're down in the wash on the
18    12th; correct?
19    A.   Correct.
20    Q.   After all operations had ceased; correct?
21    A.   Correct.
22    Q.   All right.  And in this particular picture, was this the
23    time that you had made a request to your boss or your
24    superior, Ranger Akana?  Was it about this time, to fall
25    back?
```

1    A.    At some point, yes, while we were in that stack.  I do

2    not recall.

3    Q.    All right.  Understood.

4            So when you're in that stack, you're making one

5    request to Ranger Akana to fall back; correct?

6    A.    Correct.

7    Q.    And that's denied?

8    A.    Correct.

9    Q.    By your own boss; correct?

10   A.    Correct.

11   Q.    You make another request to Ranger Akana to fall back,

12   and that's denied; correct?

13   A.    Yes.

14   Q.    Your own boss; correct?

15   A.    Correct.

16   Q.    And then a third request was made to your boss to fall

17   back?

18   A.    Correct.

19   Q.    And that one was also denied?

20   A.    Correct.

21   Q.    Okay.  Despite the operations being over and despite you

22   being down there in that wash, you were making these requests

23   to fall back, and your boss was telling you "No, stay in that

24   formation, stay right there"; correct?

25   A.    Correct.

```
 1   Q.   You testified that you saw Nevada Highway Patrol on the
 2   bridge; correct?
 3   A.   Correct.
 4   Q.   And that was on the northbound bridge, the further
 5   bridge away from where you were; right?
 6   A.   Yes.
 7   Q.   Okay.  And fair to say you feel like those folks didn't
 8   help you out; correct?
 9   A.   Correct.
10   Q.   Those folks didn't necessarily feel the same threat you
11   felt; correct?
12        MR. DICKINSON:  Objection, Your Honor.
13   Speculation.
14        THE COURT:  Sustained.
15   BY MR. TANASI:
16   Q.   You testified as far as threats are concerned, you
17   always want to keep them in front of you; right?  I think
18   that was your testimony.
19   A.   That's correct.
20   Q.   You don't want to turn around and have a threat at your
21   back; correct?
22   A.   Correct.
23   Q.   Prior to today's testimony, have you had a chance to
24   meet with the US Attorney's Office?
25   A.   Yes.
```

1    Q.    How many times, ma'am?

2    A.    Twice by phone and once in person.

3    Q.    Okay.  When was the first time?

4    A.    I do not recall the exact days.  Approximately a month

5    ago.

6    Q.    Understood.  And that was the first time that you had a

7    conversation with the US Attorney's Office?

8    A.    Correct.

9    Q.    Okay.  About the events that unfolded on the 12th;

10   correct?

11   A.    Yes.

12   Q.    In that conversation, who was it with?

13   A.    One of the prosecutors.  Nadia -- I'm sorry.  I don't

14   recall her last name.

15   Q.    Understood.  Here at counsel table, though; correct?

16   A.    Correct.

17   Q.    You spoke with them about a month or so ago, you said?

18   A.    Yes.

19   Q.    Okay.  And then you spoke with the prosecutors here

20   today at some point after that as well?

21   A.    Yes.

22   Q.    Okay.  When was that?

23   A.    About two weeks ago.

24   Q.    Okay.  Did you have a conversation with them about your

25   testimony here today?

1   A.   Yes.

2   Q.   Okay.  Did you kind of go over what the plan was?

3   A.   We went over what occurred --

4            MR. DICKINSON:  Objection to plan, Your Honor.

5   That's argumentative.

6            THE COURT:  Sustained.

7   BY MR. TANASI:

8   Q.   Did you go over what your testimony would be here today?

9   A.   We went over what occurred.

10  Q.   Okay.  Did you go over where some questions from

11  cross-examination might come from?

12  A.   Correct.

13  Q.   Okay.  Were there any FBI agents at that meeting?

14  A.   I do not know if there was any on the phone

15  conversation.

16  Q.   Okay.  And just so I have it clear, there were two phone

17  conversations?

18  A.   Correct.

19  Q.   Okay.

20           MR. TANASI:  Thank you.  Nothing further.

21           THE COURT:  Mr. Marchese?

22           MR. MARCHESE:  Sure, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. MARCHESE:

25  Q.   So you got into the wash, and the first place that you

```
 1    went -- or your eventual destination was down at those three

 2    pickup trucks; is that a correct statement?

 3    A.    Correct.

 4    Q.    Okay.

 5              MR. MARCHESE:  And, Brian, could we get 348

 6    overhead.

 7    BY MR. MARCHESE:

 8    Q.    Okay.  So you see on the screen Government's Exhibit

 9    348.  You see those three pickups; correct?

10    A.    Yes.

11    Q.    All right.  And then initially you were in that stack

12    formation with the four of you kind of in between the two

13    pickup trucks.  When I mean the two pickup trucks, I mean the

14    one furthest to the right and in the center.  Is that a

15    correct statement?

16    A.    Correct.

17    Q.    Okay.  You're in that stacked position; is that right?

18    A.    Yes, sir.

19    Q.    Okay.  And what was the reason for going into the

20    stacked position?  Were you ordered, or was that just

21    something that you and your team decided to do?

22    A.    That's something that we have learned in training when

23    we're told to go with less than lethal.

24    Q.    Okay.  And at that time, you were told to go with less

25    than lethal; correct?
```

1    A.    Yes.

2    Q.    Who had given you that order?

3    A.    Ranger Akana.

4    Q.    Okay.  I assume, and correct me if I'm wrong, Ranger

5    Akana is on site at this time?

6    A.    Yes, he was in the area.

7    Q.    Okay.  Do you know where he was in the area?

8    A.    I do not know where he was exactly.

9    Q.    Okay.  Did you see him on that day?

10   A.    I saw him after we fell back, yes.

11   Q.    Okay.  When you saw him when you fell back, where was

12   he, on this overhead, if you can show?

13   A.    He was in the area near the rear of the pickup trucks.

14   Q.    Okay.  Did you ever hear him at some point when you were

15   in the stacked formation?  Did you hear his voice?

16   A.    Yes.  He -- when we asked to fall back, he -- we could

17   hear him denying us --

18   Q.    Okay.

19   A.    -- because it was all verbally.

20   Q.    All right.  Well you're getting to my next point.  So

21   when you asked him -- that's how you asked him, you asked him

22   verbally, not via telephone or radio or anything like that?

23   A.    Correct.

24         MR. MARCHESE:  Now, can we get 257 up, please,

25   Brian.

1    BY MR. MARCHESE:

2    Q.   Okay.  So we've established you're in the front of the

3    stack position, and you have the ballistic shield.

4             Is that what you call that?

5    A.   Yes.

6    Q.   Okay.  And that ballistic shield, do you know what

7    that's made of?

8    A.   I don't know the exact material it's made of.  I know

9    it's a level 3 ballistic shield.

10   Q.   Okay.  Sounds important.

11            But what I'm getting at is this -- it's black, and

12   then it has a -- like a clear material towards the top of it.

13   Is that -- you would agree with me on that?

14   A.   Yes.

15   Q.   And you would agree with me that the black portion of

16   it, you can't see through that; correct?

17   A.   Correct.

18   Q.   Okay.  How big is that clear portion that you're able to

19   see through?

20   A.   About this big.

21   Q.   Okay.  So maybe the size of a license plate, maybe

22   slightly wider; is that fair to say?

23   A.   Correct.

24   Q.   Okay.  You indicated on direct examination that some

25   point in time when you're in that stacked position that --

```
 1    you indicated that you saw two groups of three on each side
 2    with military clothes, vests, wearing long guns.
 3              Is that a correct statement of your testimony?
 4    A.   Correct.
 5    Q.   Okay.  And they would be up in a -- and I think
 6    Mr. Dickinson had put it on the overhead, kind of on those
 7    cement embankments there.  That's where you saw them;
 8    correct?
 9    A.   Correct.
10    Q.   Now, at -- and you might have answered this, and I
11    apologize.  I know you're being peppered with a lot of
12    questions.
13              But at what point in time did you fall back?  Do
14    you remember?  I mean, I don't expect you to give me a time
15    with watch time, but do you remember what was going on?
16    A.   The group up on our right side had moved to a point
17    where their guns were pointed at us, and the shield that I
18    was holding was providing no protection.
19    Q.   Okay.  Now, when you say "the group on the right," did
20    all three of them have long guns?
21    A.   Yes.
22    Q.   And all three were pointed in your direction --
23    A.   All three --
24    Q.   -- is your testimony?
25    A.   -- had been pointing them at some point.  They would --
```

DONNA DAVIDSON, RDR, CRR, CCR #318     (775) 329-0132

1    they would point, and then they would move behind cover, and

2    we would lose sight of them.

3    Q.   Okay.  So at that point in time, you fell back; correct?

4    A.   Correct.

5    Q.   And that would be to that picture -- I believe if we can

6    maybe get either 396 or 402 up.

7              That's the general depiction of where you were?

8    Once it comes back up.  Sorry.

9    A.   Yes, sir.

10   Q.   Okay.  There we go.

11             So now you're at the back of the pickup; correct?

12   A.   Correct.

13   Q.   And at this point, you stated that you don't have any

14   optics; correct?

15   A.   Correct.

16   Q.   By optics we mean you don't have binoculars; correct?

17   A.   Correct.

18   Q.   Did you have a rifle out at that part?  I know you only

19   showed your helmet.  There's not really a whole lot to show

20   of you there.  But from your recollection, did you have a

21   rifle out?

22   A.   Yes, I had a rifle slung.

23   Q.   Okay.  So at this point you're scanning the crowd,

24   you're seeing multiple people with long guns is your

25   testimony; correct?

 1    A.    Correct.

 2    Q.    And you also stated that you saw someone on the

 3    northbound bridge with a plaid shirt and a vest and a long

 4    gun; correct?

 5    A.    Correct.

 6    Q.    You also testified that this individual had a black hat

 7    with a white insignia; is that correct?

 8    A.    Correct.

 9    Q.    Okay.

10            MR. MARCHESE:  Can we get 93 up, Brian, just any

11    point in time, it doesn't matter.

12            (Videotape played.)

13            MR. MARCHESE:  Okay.  And just stop it wherever.

14    It doesn't matter.

15    BY MR. MARCHESE:

16    Q.    Okay.  This is -- do you recognize this?

17    A.    Yes.

18    Q.    Okay.  So this is the general vicinity in which you were

19    in originally when you were in the stacked position; correct?

20    A.    Yes.

21    Q.    Now, obviously -- I would imagine you've seen dash cams

22    before, correct, being in law enforcement?

23    A.    Yes.

24    Q.    Okay.  So this is the front of the pickup truck;

25    correct?

1    A.    Correct.

2    Q.    All right.  And you're in the back of the pickup

3    truck -- I don't know if this is the one that you're in the

4    back of, but you're in the back of one of those three.  I

5    think it was in the middle maybe?

6    A.    Yes.

7    Q.    Okay.  And it's your testimony that from this vantage

8    point, or at least from behind the pickup truck, you're able

9    to see this individual with the plaid shirt, the black vest,

10   and the long gun; is that correct?

11   A.    Correct.

12   Q.    Okay.  Now, you also -- you authored a report in this

13   particular case?

14   A.    Yes.

15   Q.    Okay.  And that was -- I think you guys call them a

16   memorandum of activity, which was dated April 15th of 2014?

17   A.    Correct.

18   Q.    Okay.  And that just memorialized what you remembered on

19   the dates regarding the events in question; correct?

20   A.    Correct.

21   Q.    And it's something that you author and you make sure

22   that it's accurate, to the best of your knowledge; correct?

23   A.    Correct.

24   Q.    And you review it and sign it at the end; correct?

25   A.    Correct.

1    Q.   Isn't it true that nowhere in that report did you

2    indicate that that individual, meaning the individual with

3    the plaid shirt and the vest and the long gun, had a black

4    hat with a white insignia?

5    A.   I did not include that in my report, correct.

6              MR. MARCHESE:  No further questions.

7              THE COURT:  Mr. Engel?

8                        CROSS-EXAMINATION

9    BY MR. ENGEL:

10   Q.   Good afternoon.  Is it Officer McBride or agent or --

11   A.   I'm an officer.

12   Q.   Oh, okay.  Good afternoon, Officer McBride.  My name is

13   Todd Engel.  I'm representing myself here.  I've just got a

14   couple of questions.  It should be pretty painless.

15             You stated that during the stack, which is that

16   formation, there was two groups of three under the southbound

17   bridge; is that correct?

18   A.   Correct.

19             MR. ENGEL:  Brian, would you go to Exhibit 77,

20   please.  And go to about 1:45 and just play it.

21        (Videotape played.)

22             MR. ENGEL:  Stop right there.  Back up a little.

23   Trying to get that stack in this.

24   BY MR. ENGEL:

25   Q.   Officer McBride, is that -- is this the stack you're

1    talking about?

2    A.   Yes, sir.

3    Q.   Okay.  Can you tell me what this gentleman right here is

4    doing, in the green?

5    A.   He's standing.

6    Q.   Which way is his back facing the camera?

7    A.   His back is facing towards the camera.

8    Q.   And at this point in time, you testified that there was

9    two groups of three underneath each one of the abutments

10   underneath the southbound bridge; correct?

11             MR. DICKINSON:  Objection, Your Honor.  She didn't

12   testify to this specific point in time.

13   BY MR. ENGEL:

14   Q.   During the stack two groups of three under the bridge

15   continually pointing their guns at us under the southbound

16   bridge?

17   A.   Yes.

18   Q.   Can you tell me what this gentleman right here is doing?

19   A.   He's walking towards us.

20   Q.   Standing in the open?  Is he taking cover?

21   A.   He's walking towards us.

22   Q.   But he's walking in the open?

23   A.   Correct.

24             MR. ENGEL:  Go ahead and play it, Brian.  And stop

25   at 2:10, please.

```
 1              (Videotape played.)
 2    BY MR. ENGEL:
 3    Q.   Can you show me under the -- in this area, where those
 4    three guys are standing pointing rifles towards you, please?
 5              You can see them there?
 6    A.   I cannot see them.  But that is where they were.
 7    Q.   That's where they were?
 8    A.   Yes, sir.
 9    Q.   Okay.
10              MR. ENGEL:  And go ahead and play it to 2:27,
11    please.
12              (Videotape played.)
13              MR. ENGEL:  There you go.  Stop right there.
14    BY MR. ENGEL:
15    Q.   And what is this gentleman doing right here?
16    A.   He's walking away.
17    Q.   What is this gentleman doing right here?
18    A.   He's standing there.
19    Q.   So your testimony is there's two groups of three
20    underneath the southbound bridge all pointing rifles at you,
21    this gentleman right here is walking away in the open, this
22    gentleman right here is standing in the open; correct?
23    A.   Correct.
24              MR. ENGEL:  I have no further questions.  Thank
25    you.
```

```
 1                THE COURT:  Mr. Leventhal?

 2                MR. LEVENTHAL:  No, thank you, Judge.

 3                THE COURT:  Mr. Perez?

 4                MR. PEREZ:  No, Your Honor.

 5                THE COURT:  Mr. Jackson?

 6                MR. JACKSON:  I have no questions.

 7                THE COURT:  Mr. Leventhal, did you have questions?

 8                MR. LEVENTHAL:  No, Your Honor.  Thank you.

 9                THE COURT:  All right.

10                Redirect?

11                        REDIRECT EXAMINATION

12   BY MR. DICKINSON:

13   Q.   Just a couple questions, officer.

14                MR. DICKINSON:  Can we bring up Exhibit 77.  Take

15   it up to about 1:50.

16           (Videotape played.)

17                MR. DICKINSON:  Pause it.

18   BY MR. DICKINSON:

19   Q.   Can you see these people up here, Officer McBride?

20   A.   Yes, sir.

21   Q.   Mr. Tanasi asked you some questions about what you were

22   told on the evening of the 11th.

23                What was your understanding of the status of the

24   operation on the morning of the 12th?

25   A.   Our understanding was that they were ceasing from
```

```
 1    gathering any more cattle but that we were to remain in place

 2    as security for the ICP.

 3                MR. DICKINSON:  Thank you for your time.

 4                No further questions.

 5                THE COURT:  Any recross?

 6                MR. TANASI:  None from Mr. Stewart, Your Honor.

 7                MR. MARCHESE:  None from Parker.

 8                MR. ENGEL:  None from Engel.

 9                MR. LEVENTHAL:  Not on behalf of Mr. Drexler.

10                MR. PEREZ:  None from Lovelein.

11                MR. JACKSON:  None from Burleson.

12                THE COURT:  All right.

13                Thank you, Officer McBride.  You're excused.

14    Please be careful on the way down those steps.

15                All right.  So we're going to take our overnight

16    break.  We'll be back here on Monday, March 6th, at 8:00 a.m.

17                I remind the jury that during this overnight break

18    that you are not to discuss this case with anyone, nor permit

19    anyone to discuss it with you.  You may talk to your fellow

20    jurors about other things but not about this case.

21                Please do not read or listen to or view anything

22    that touches upon this case in any way.  Should anyone

23    attempt to speak to you about this case, or should you

24    inadvertently, accidentally overhear something about the

25    case, you are required to tell the Court about that right
```

1    away.

2              Likewise, please do not attempt to perform any

3    research or any independent investigation about anything

4    related to this case.

5              And do not form an opinion until after you have

6    heard all the testimony, been provided all the evidence.  I

7    will give you the written jury instructions of law.  Then you

8    will hear the closing arguments, and then you can begin your

9    deliberation process.

10             So we thank you for your service.  We hope you

11   have a good weekend.  We'll see you back here Monday morning

12   at 8:00 a.m.

13             (Jurors exit courtroom at 4:19 p.m.)

14             THE COURT:  All right.  The door's closed.  You

15   may be seated.  The jury is gone.

16             We have a couple minutes left over.  So I just

17   wanted to inquire about Juror No. 12 and what your thoughts

18   are about whether or not we should consider letting her go

19   or --

20             MR. LEVENTHAL:  Not on behalf of the defense.  I

21   don't think it's necessary.

22             MR. MARCHESE:  Has the Court perceived anything

23   new than -- other than what you brought up to us before

24   lunch?

25             THE COURT:  No.

```
 1              MR. MARCHESE:  Okay.

 2              MR. LEVENTHAL:  Then we've already --

 3              THE COURT:  But it's not the first time.

 4              MR. MARCHESE:  No, I understand, yeah.

 5              MR. MYHRE:  Your Honor, without further

 6    canvassing, the government really isn't in a position to make

 7    a judgment at this point.

 8              We didn't witness what the Court did.  Not that we

 9    question what the Court saw, but it's not clear to us what it

10    was that was occurring.

11              So perhaps it might be best to canvass the juror

12    Monday morning, before any proceedings, and then go determine

13    from there.

14              THE COURT:  All right.  And so then should we

15    bring in 13 and 14, as well, because they're the ones that

16    poked her back awake.

17              MR. MYHRE:  Perhaps that would be best, Your

18    Honor.

19              THE COURT:  All right.  So we'll do that in the

20    morning, before we begin with the next witness on Monday.

21              MR. MYHRE:  You're going to do that separately,

22    though, right, Your Honor, 13 and 14 separately?

23              THE COURT:  Yes.  And if you want, Aaron can run

24    back and see if they're still there.

25              Do you want to see if you can catch them.
```

         1                    COURTROOM ADMINISTRATOR:  They should still be
         2          here.
         3                    THE COURT:  Do you mind running?
         4                    COURTROOM ADMINISTRATOR:  Would you like to start
         5          with 12?
         6                    MR. MYHRE:  12, 13, 14?
         7                    THE COURT:  Yes, let's start with 14 --
         8                    COURTROOM ADMINISTRATOR:  14?
         9                    THE COURT:  -- because -- yes, because she's the
        10          one who told him, and then he told her.
        11                    Do it in chronological order.
        12               (Pause in the proceedings.)
        13               (Juror No. 15 enters the courtroom.)
        14               (Discussion held off the record.)
        15                    THE COURT:  For the record, that was 15 who was
        16          brought.
        17               (Juror No. 14 enters the courtroom.)
        18                    THE COURT:  So you're Juror No. 14; is that right?
        19                    JUROR NO. 14:  Yes.
        20                    THE COURT:  You can go ahead and sit down.
        21                    I'm sorry to call you back in, but it's better we
        22          do this while your memory is fresh.
        23                    Do you remember something that happened right
        24          before lunch today?
        25                    JUROR NO. 14:  Not specifically.

1                    THE COURT:  Do you remember us locking eyes, and

2      you attempting to get the attention of the male juror sitting

3      to your left?

4                    JUROR NO. 14:  Yes.

5                    THE COURT:  All right.  And why were you trying to

6      get his attention?

7                    JUROR NO. 14:  To get the attention to the person

8      next to him.

9                    THE COURT:  Okay.  And were you able to get the

10     attention of the male juror next to you?

11                   JUROR NO. 14:  Finally, yes.

12                   THE COURT:  All right.  And so then did you say

13     anything to him, or indicate something to him?

14                   JUROR NO. 14:  No, he knew what I was -- what I

15     meant.

16                   THE COURT:  All right.  And then so what did he

17     do?

18                   JUROR NO. 14:  He touched the person next to him.

19                   THE COURT:  And why is that?

20                   JUROR NO. 14:  I guess she was dozing off.

21                   THE COURT:  Okay.  Have you seen her dozing off

22     before?

23                   JUROR NO. 14:  Yes.

24                   THE COURT:  Do you know how many times?

25                   JUROR NO. 14:  Excuse me?

DONNA DAVIDSON, RDR, CRR, CCR #318     (775) 329-0132

```
 1                    THE COURT:  Do you know how many times?  More than

 2      once?

 3                    JUROR NO. 14:  Yes.

 4                    THE COURT:  So including today, another time too?

 5                    JUROR NO. 14:  Yes.

 6                    THE COURT:  So a total of two times, or more than

 7      two?

 8                    JUROR NO. 14:  Probably around three.

 9                    THE COURT:  Okay.  And so she sits right to your

10      left.  As you're looking at the witness, you really can't

11      help but see her; right?  She's in your line of vision the

12      whole time --

13                    JUROR NO. 14:  Yes, more or less --

14                    THE COURT:  --- you're looking at the witness?

15                    JUROR NO. 14:  Yes.

16                    THE COURT:  Okay.  Well, thank you.  I really

17      appreciate your help in getting his attention to wake her up.

18      I appreciate that.

19                    And I'm sorry to put you on the spot.  I just

20      wanted to make sure that we were all understanding what was

21      happening because there's so many things happening in the

22      courtroom at the same time.

23                    So I thank you very much.

24                    JUROR NO. 14:  Thank you.

25              (Juror No. 14 exits the courtroom.)
```

1             COURTROOM ADMINISTRATOR:  Are you ready for 13,

2    Your Honor?

3             THE COURT:  Yes, please.

4         (Pause in the proceedings.)

5         (Juror No. 13 enters the courtroom.)

6             THE COURT:  Welcome back.  Take a seat.

7             Sorry we have to call you back, but we realized it

8    was probably better to talk to you about this today rather

9    than wait until Monday so we make sure it's still clear in

10   your mind.

11            Do you remember an incident that came up right

12   before lunch today regarding a fellow juror?

13            JUROR NO. 13:  I remember things happening, but

14   when I perceived that something was going to be said that I

15   didn't want to hear, I put my headphones on, and I kind of

16   walked away.

17            I know there was some sort of commotion, and then

18   later I heard some comments from other jurors.  But I really

19   don't know specifically what happened.

20            THE COURT:  And so what -- was this out in the

21   room where you all stay with the food and the chairs and all

22   that?

23            JUROR NO. 13:  Correct.

24            THE COURT:  The jury room?

25            JUROR NO. 13:  Yes.

```
 1                    THE COURT:  Or out in the hallway?  In the jury
 2     room?
 3                    JUROR NO. 13:  It was in the jury room, yes.
 4                    THE COURT:  Okay.  And do you know -- was the
 5     commotion right after lunch?
 6                    JUROR NO. 13:  Yes, yes, because I had had my
 7     lunch.  Correct.
 8                    THE COURT:  Okay.  Did it have to do with Juror
 9     No. 12?
10                    JUROR NO. 13:  I don't know them by number.
11                    THE COURT:  Oh, okay.  The lady sitting next to
12     you today, she's wearing red and black?
13                    JUROR NO. 13:  Yes.
14                    THE COURT:  Okay.  So right before we broke for
15     lunch, did the juror sitting to your immediate right, which
16     we know is Juror No. 14, the lady with the blonde hair --
17                    JUROR NO. 13:  Yes.
18                    THE COURT:  -- did she get your attention, do
19     something to try to get your attention?
20                    JUROR NO. 13:  Yes, she did.
21                    THE COURT:  All right.  And then when she got your
22     attention, did she communicate something to you verbally,
23     or with some kind of body language?
24                    JUROR NO. 13:  Yeah.  I knew she wanted me to wake
25     up the person next to me.
```

```
 1                    THE COURT:  Okay.  And when you say wake up the
 2     person next to you, is that Juror No. 12, the lady that --
 3     she was wearing black and white today, sitting to your left?
 4                    JUROR NO. 13:  Yes.
 5                    THE COURT:  Okay.  And so did you see her
 6     sleeping?
 7                    JUROR NO. 13:  Yes.
 8                    THE COURT:  And is this the first time you've seen
 9     her sleeping, or have you seen her sleeping before?
10                    JUROR NO. 13:  No, I've seen her sleeping before.
11                    THE COURT:  Okay.  So how many more times have you
12     seen her sleeping besides today?
13                    JUROR NO. 13:  Several times throughout the whole
14     trial.  More than five.
15                    THE COURT:  Okay.  And she sits directly to your
16     left, so in between yourself and the witness stand; is that
17     right?
18                    JUROR NO. 13:  Yes.  Right directly to my left.
19                    THE COURT:  Okay.  You're pretty much looking at
20     her the whole time you're looking at the witness?  She's in
21     your --
22                    JUROR NO. 13:  Yes.  Sometimes I get tapped by the
23     guys in back.  We all know to wake her up.
24                    THE COURT:  Okay.  So sometimes the juror behind
25     you taps you so that you can wake up No. 12?
```

```
 1                    JUROR NO. 13:  Or make some sort of comment or,
 2       you know.
 3                    THE COURT:  Okay.
 4                    JUROR NO. 13:  As low as they can.
 5                    THE COURT:  Okay.  Well, I appreciate that.  I
 6       hate to put you on the spot.  But we needed to find out what
 7       we're dealing with, what the situation is.  So I do
 8       appreciate that.
 9                    And I thank you very much for your time.
10               (Juror No. 13 exits the courtroom.)
11                    THE COURT:  For the record, I'm going to go and
12       excuse her.  If you need to make a record afterwards, you can
13       do so, if you need to make an objection of any kind.  But I
14       don't see how I can allow her to stay.
15                    MR. JACKSON:  There's no objection from
16       Mr. Burleson based on the Court's questions of the
17       prospective jurors.
18                    And although I think she may have been a
19       satisfactory juror under other circumstances, I don't wish
20       the appellate record to have that the juror missed some vital
21       testimony.  So I --
22                    MR. PEREZ:  Lovelein, as well, Your Honor.
23                    MR. JACKSON:  -- won't make any objection to the
24       Court's exercising the Court's discretion.
25               (Juror No. 12 enters the courtroom.)
```

```
 1              THE COURT:  All right.  Thank you for coming back
 2   in.  I think you know what I'm going to tell you.
 3              JUROR NO. 12:  I already know.
 4              THE COURT:  Okay.  We appreciate so much you being
 5   here and taking the time to fill out the questionnaire and
 6   all of the things you had to do to rearrange your life to be
 7   able to be available for this, we really, really do.
 8              This has been a very difficult thing for us.  This
 9   is not personal in any way at all, but we realize -- actually
10   I said "we," I'm not even going to put it -- I realize that
11   it's a difficulty for you to stay awake.
12              And I'm not going to ask you to explain to me why
13   it is, because that's your personal -- I don't need to know.
14   It's private.  I don't need to know why it is that you're
15   having trouble staying awake.  But it's been clear to me that
16   you are.
17              And so I need to ask you -- well, I need to excuse
18   you from the jury.  But I also need to ask you to remain in a
19   confidential -- with confidentiality about anything that you
20   may be thinking about this case or the evidence or anything
21   like that until the deliberation process is over.  All right?
22              I can't thank you enough for your time and for
23   trying.  I know you were trying to stay awake.  I noticed
24   actually even at one point you weren't even looking down at
25   the monitor anymore, you were looking up at the screen, I
```

```
 1    think it was, so that I wouldn't think that you were
 2    sleeping.  And I know that you've been very truthful about
 3    this and trying to do everything you can.  And we really
 4    appreciate it.  I can't tell you how much.
 5              This is not personal at all.  But we just have to
 6    keep our record as clean as possible for whatever happens.
 7    We don't want to have to do this again.
 8              And so I really appreciate your time.  Sorry.
 9              JUROR NO. 12:  That's fine.
10              THE COURT:  Okay.  So just to make sure, you're on
11    notice that it would potentially be contempt of court if we
12    found out that you were having any kind of communications
13    with anyone about the case.
14              So please wait until the deliberation process is
15    over.  We'll have Aaron give you a call right away.  We can
16    even invite you to come back and watch the verdict if there
17    is one.
18              JUROR NO. 12:  Okay.
19              THE COURT:  All right.
20              JUROR NO. 12:  Thank you.
21         (Juror No. 12 exits the courtroom.)
22              THE COURT:  All right.  So you were in the middle,
23    and I believe I interrupted you because she was coming in.
24              But, Mr. Leventhal, did you want to put anything
25    on the record?
```

```
 1                    MR. LEVENTHAL:  No, Your Honor.

 2                    THE COURT:  All right.

 3                    Mr. Engel, anything?

 4                    MR. ENGEL:  No, Your Honor.

 5                    THE COURT:  Mr. Marchese?

 6                    MR. MARCHESE:  No record from Parker.

 7                    THE COURT:  Mr. Tanasi?

 8                    MR. TANASI:  No, Your Honor.  Thank you.

 9                    THE COURT:  And from the government, do you want

10      to put anything on the record?

11                    MR. MYHRE:  Nothing further, Your Honor.

12                    THE COURT:  All right.  Thank you.

13                    We'll see you back here on Monday morning at 8:00

14      a.m.

15                    COURTROOM ADMINISTRATOR:  All rise.

16                    Off record.

17                 (The proceedings adjourned at 4:36 p.m.)

18                           *    *    *

19

20

21

22

23

24

25
```

1                          I N D E X

2     GOVERNMENT'S WITNESSES:
                                                      PAGE
3     SCOTT SWANSON
          Direct Examination (Resumed) By Ms. Ahmed      7
4         Cross-Examination By Mr. Marchese             45
          Cross-Examination By Mr. Tanasi              106
5         Cross-Examination By Mr. Perez               121
          Cross-Examination By Mr. Jackson             123
6         Cross-Examination By Mr. Engel               124
          Cross-Examination By Mr. Leventhal           128
7         Redirect Examination By Ms. Ahmed            136
      DAVE KELTNER
8         Direct Examination By Ms. Creegan            138
          Cross-Examination By Mr. Marchese            158
9         Cross-Examination By Mr. Tanasi              174
          Cross-Examination By Mr. Engel               180
10        Cross-Examination By Mr. Leventhal           191
          Cross-Examination By Mr. Jackson             203
11        Redirect Examination By Ms. Creegan          206
          Recross-Examination By Mr. Marchese          207
12        Recross-Examination By Mr. Tanasi            209
      BRANDON NOVOTNY
13        Direct Examination By Ms. Ahmed              211
          Cross-Examination By Mr. Tanasi              238
14        Cross-Examination By Mr. Engel               249
          Cross-Examination By Mr. Jackson             253
15        Cross-Examination By Mr. Marchese            257
          Redirect Examination By Ms. Ahmed            264
16        Recross-Examination By Mr. Marchese          267
      TARA MCBRIDE
17        Direct Examination By Mr. Dickinson          269
          Cross-Examination By Mr. Tanasi              290
18        Cross-Examination By Mr. Marchese            295
          Cross-Examination By Mr. Engel               303
19        Redirect Examination By Mr. Dickinson        306

20                        E X H I B I T S

21    GOVERNMENT'S                              ADMITTED
      396                                            227
22    400                                            214
      402                                            229
23    410                                            232
      411                                            190
24    416                                             33
      417                                             26

25

321

1                          -o0o-

2          I certify that the foregoing is a correct

3          transcript from the record of proceedings

4          in the above-entitled matter.

5

6          _____        3/29/17

7          Donna Davidson, RDR, CRR, CCR #318     Date
           Official Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25