1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4    UNITED STATES OF AMERICA,      )
                                    )   Case No. 2:16-cr-046-GMN-PAL
5                    Plaintiff,     )
                                    )   Las Vegas, Nevada
6             vs.                   )   Wednesday, March 22, 2017
                                    )   8:42 a.m., Courtroom 7C
7    ERIC PARKER, O. SCOTT          )
     DREXLER, RICKY LOVELIEN,       )   JURY TRIAL DAY TWENTY-ONE
8    STEVEN STEWART, TODD ENGEL     )
     and GREGORY BURLESON,          )
9                                   )
                     Defendants.    )
10                                  )   C E R T I F I E D   C O P Y

11

12                REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

     BEFORE:        THE HONORABLE GLORIA M. NAVARRO,
14               UNITED STATES DISTRICT JUDGE, CHIEF

15

16

17

18   APPEARANCES:

19           See next page

20   COURT REPORTER:

21           Heather K. Newman, RPR, CRR, CCR #774
             United States District Court
22           333 Las Vegas Boulevard South, Room 1334
             Las Vegas, Nevada  89101
23           (702) 471-0002

24

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

2

1    APPEARANCES:

2    For the Plaintiff:

3            UNITED STATES ATTORNEY'S OFFICE
             BY:   STEVEN W. MYHRE
4                  ERIN M. CREEGAN
                   NADIA JANJUA AHMED
5                  NICHOLAS D. DICKINSON
             501 Las Vegas Boulevard South, Suite 1100
6            Las Vegas, Nevada 89101
             (702) 388-6336
7
     For Defendant Parker:
8
             LAW OFFICE OF JESS R. MARCHESE
9            BY:   JESS R. MARCHESE
             601 South Las Vegas Boulevard
10           Las Vegas, NV  89101
             (702) 385-5377
11
     For Defendant Drexler:
12
             LEVENTHAL AND ASSOCIATES
13           BY:   TODD M. LEVENTHAL
             626 South Third Street
14           Las Vegas, NV  89101
             (702) 472-8686
15
     For Defendant Lovelien:
16
             LAW OFFICE OF SHAWN R. PEREZ
17           BY:   SHAWN R. PEREZ
             626 South Third Street
18           Las Vegas, NV  89101
             (702) 485-3977
19
     For Defendant Stewart:
20
             TANASI LAW OFFICES
21           RICHARD E. TANASI
             601 South Seventh Street, 2nd Floor
22           Las Vegas, NV  89101
             (702) 906-2411
23

24

25

3

1    APPEARANCES (Con't):

2    For Defendant Engel:

3            TODD C. ENGEL, PRO SE
             Henderson Detention Facility
4            18 East Basic Road
             Henderson, NV  89015
5
             JOHN G. GEORGE, Standby Counsel
6            600 South Eighth Street
             Las Vegas, NV  89101
7            (702) 625-1183

8    For Defendant Burleson:

9            LAW OFFICE OF TERRANCE M. JACKSON
             BY:  TERRENCE M. JACKSON
10           624 South Ninth Street
             Las Vegas, NV  89101
11           (702) 386-0001

12   Also present:

13           Gwen Wilson
             Bryan Ginn
14           Christine Abbott

15

16

17

18

19

20

21

22

23

24

25

4

I N D E X

WITNESSES:                                                  PAGE

Joel Willis          Cross-Examination by Engel -            9
                     Cross-Examination by  Perez -          73
                     Cross-Examination by Jackson -         88
                     Cross-Examination by Leventhal -       99
                     Redirect-Examination by Myhre -       122

Michael Caputo       Direct Examination by Creegan -       167
                     Cross-Examination by Jackson -        172


Charles Johnson      Direct Examination by Dickinson -     181




E X H I B I T S

                                                      RECEIVED
                                                         IN
EXHIBIT NO:                                           EVIDENCE

    164A, D and E                                       169

    334A - F                                            191

    333A - R                                            196

   5049                                                  46

1        LAS VEGAS, NEVADA; WEDNESDAY, MARCH 22, 2017; 8:42 A.M.

2                              --oOo--

3                    P R O C E E D I N G S

4        (Outside the presence of the jury at 8:42 a.m.:)

5            COURTROOM ADMINISTRATOR:  All rise.

6            THE COURT:  All right.  You maybe seated.

7            COURTROOM ADMINISTRATOR:  This is the time set for

8    Jury Trial Day Twenty-One in Case Number 2:16-cr-046-GMN-PAL,

9    United States of America vs. Eric Parker, O. Scott Drexler,

10   Ricky Lovelien, Steven Stewart, Todd Engel, and Gregory

11   Burleson.

12           THE COURT:  All right.  I see everyone except for

13   Ms. Ahmed.  Can we go forward without her?

14           MR. MYHRE:  Yes, Your Honor.

15           THE COURT:  All right.  So before we bring in the

16   jury, I just want to make some preliminary remarks to remind

17   everyone about what is expected behavior and acceptable in a

18   courtroom.

19           Please remember this is not a sporting event, which

20   means there are no expressions permitted, whether verbally or

21   orally.  When you hear something or see something that you

22   disagree with or agree with, approve of, disprove of, it's not

23   a sporting event.

24           Also, people are not to speak out of turn and the

25   defendants, who make any outbursts or any inappropriate

6

1    expressions, may be asked to be taken into the room next door

2    where the marshals have a cell there with the audio

3    communication so they can hear the rest of the hearing, but not

4    be present if they're not able to behave as expected.

5         We do have a no-electronic-device rule in the

6    courtroom, so please double-check and make sure that you do not

7    have a cell phone, iPad, laptop, or any other electronic

8    device.  They're not permitted.  Even if they're turned off or

9    on vibrate mode or private mode, that doesn't matter.  They

10   will be taken away or you will be asked to leave.  The marshals

11   have been authorized by the Court to do that if they see anyone

12   with an electronic device, even if it's turned off.

13        Also, the attorneys are able to use electronic

14   devices, but they are using them only to review evidence and

15   present evidence.  No one, not even the attorneys, is permitted

16   to record any of the proceedings.  No audio recordings and no

17   video recordings are permitted in federal court.

18        All right.  So we have the podium set up for the

19   witness.  All of the attorneys have long neck microphones.  So,

20   you are welcome to stay at your seat rather than coming up to

21   the podium if you'd like to address the Court in that manner.

22        And I think that we're ready to proceed.  Ms. Ahmed

23   is back and we have the witness on the witness stand so can we

24   call in the jury or is there anything that you need me to

25   address before we bring them in?

1          MR. MYHRE:  Not from the Government, Your Honor.

2          MR. TANASI:  Nothing from defense, Your Honor.

3          THE COURT:  All right.  So let's go ahead and bring

4   in the jury, please.

5      (Brief pause in proceedings.)

6          THE COURT:  Just so you know, we have a problem in

7   the room and they're doing some work on the wall where there

8   was some dripping, like a little bit of a waterfall from

9   something that happened on the rooftop.  So we've got a ladder

10  set up in there and some folks who are fixing that.  So two of

11  the bathrooms are out of commission for the jury.  So now they

12  only have two instead of four.  Breaks might take a little

13  longer.  We're going to play it by ear and see.

14     (Brief pause in proceedings.)

15         COURTROOM ADMINISTRATOR:  All rise.

16    (Jury returned to courtroom at 8:47 a.m.)

17         THE COURT:  All right.  Everyone may be seated.  The

18  jury has entered the courtroom and we have our witness, FBI

19  Special Agent Willis, on the stand.  Thank you, sir, for coming

20  back.

21         I think, Mr. Marchese, you were done with your cross

22  and had passed; is that right?

23         MR. MARCHESE:  That's correct, Your Honor.  Thanks.

24         THE COURT:  All right.  Mr. Leventhal do you want to

25  cross next?

8

1          MR. LEVENTHAL:  No, I -- do you want us to make our

2   appearances, Your Honor?

3          THE COURT:  Oh, yes.  Go ahead, please.

4          MR. MYHRE:  Good morning, Your Honor, ladies and

5   gentlemen.  Steve Myhre, Erin Creegan, Nadia Ahmed,

6   Nick Dickinson on behalf of the United States.

7          MR. TANASI:  Good morning, Your Honor.  Good morning,

8   folks.  Rich Tanasi for Steven Stewart.  Also with us at

9   counsel table is Gwen Wilson and Bryan Ginn.

10          Thank you.

11          MR. MARCHESE:  Good morning everyone.  Jess Marchese

12   on behalf of Eric Parker.

13          MR. LEVENTHAL:  Good morning.  Todd Leventhal on

14   behalf of Mr. Drexler.

15          PRO SE ENGEL:  Good morning, folks.  Todd Engel on

16   behalf of myself.

17          MR. PEREZ:  Good morning.  Shawn Perez on behalf of

18   Ricky Lovelien.

19          MR. JACKSON:  Good morning.  Terry Jackson on behalf

20   of Greg Burleson.  Also with me is Christine Abbott.

21          THE COURT:  All right.  Good morning, counsel.

22          And now we can go ahead and continue with

23   cross-examination.

24          Mr. Engel?

25          ///

CROSS-EXAMINATION OF JOEL WILLIS

BY PRO SE ENGEL:

Q.   Good morning, Agent Willis.  You know my name.  I'm Todd
Engel.

A.   Good morning.

Q.   And I'm representing myself, as you're aware.

So, you've been here for the entirety of the trial;
is that correct?

A.   Every day I've been here, yes.

Q.   Okay.  So you've been able to hear all of the witnesses
and be able to listen to all the evidence?

A.   Most of the witnesses and I'm familiar with all the
evidence.

Q.   Okay.  And you've been able to go through all the evidence
pertaining to the 12th, all the way back to possibly even when
the BLM arrived?

A.   Yes, I have.

Q.   Okay.  And were you able to take a look at the documents
pertaining to when the BLM did their press release?  Were you
ever able to read their press release on stating we're not --
we're done with this operation?

MR. MYHRE:  Objection.  Relevance.

THE COURT:  He can answer the question whether he's
reviewed a press release.

THE WITNESS:  I don't recall reviewing the press

1    release, but I'm aware that there was something, yes.

2    BY PRO SE ENGEL:

3    Q.   Okay.  But you don't recall if you ever read it or saw it?

4    A.   I've read a lot of documents with this case.  I just don't

5    recall that specific document.

6    Q.   Okay.  We've gone through a bunch of my Facebook stuff

7    during the course of the last few days.  Isn't that right?

8    A.   Yes.

9    Q.   And I made a couple posts while -- between the time that

10   everybody left the stage area and was heading to the parking

11   area.

12            Do you recall those?

13   A.   Yes.

14   Q.   Okay.  And it looked like I made a post -- and would you

15   agree that we were leaving the stage area around 11:00 a.m.?

16   10:55 a.m.?  Somewhere around there?

17   A.   When you say "we," is --

18   Q.   I -- were you aware that I had a friend with me in my

19   vehicle?

20   A.   Yes.

21   Q.   Okay.  So when we were leaving, we left around 10:55 to

22   11:00 a.m.?

23   A.   I -- I think that that's probably logical --

24   Q.   Okay.

25   A.   -- based on the video footage we have of you arriving or

1   appearing to arrive in your truck.

2   Q.   Okay.  And you saw a video of me getting out at the

3   parking area.  I was driving; correct?

4   A.   I didn't see you driving the vehicle.  I see -- I saw you

5   getting out of the driver's side front passenger compartment of

6   the truck.

7   Q.   Okay.  So, you would agree that I was driving from the

8   stage area to the protest area?

9   A.   Yes.  That's logical.

10  Q.   Okay.  And at 11:05 I updated my status and I said,

11  "Heading -- heading out to block freeway and take cows back";

12  correct?

13          MR. MYHRE:  Objection, Your Honor.  Could we have

14  some foundation as to the documents that are being referred to,

15  the exhibits?

16          THE COURT:  Yeah.  Do you have an exhibit number,

17  Mr. Engel?

18          PRO SE ENGEL:  Yeah, I do.  I'm sorry.

19          It is . . . Exhibit No. 300.

20  BY PRO SE ENGEL:

21  Q.   Do you recall me making that statement?

22          MR. MYHRE:  Objection, Your Honor.  Foundation.

23  BY PRO SE ENGEL:

24  Q.   It's on Page 199 of my Facebook.

25  A.   Page 199.  I don't recall.  I don't think that's Exhibit

1    300.

2    Q.    Is it in 297?

3    A.    298.

4    Q.    Okay.  I'll take your word for it.

5    A.    If you'd like to see it, if I have it here.

6    Q.    Okay.

7    A.    Okay.

8    Q.    So do you recall me making that statement, "Headed out to

9    block freeway and take cows back"?

10   A.    Yes, sir.

11   Q.    And then at 11:17, "Leaving now to shut the freeway down

12   by force of arms."

13            Do you remember that?

14            MR. MYHRE:  Objection.  Your Honor.  Again,

15   foundation.

16            PRO SE ENGEL:  I'm just --

17            THE COURT:  It's the same page or a different page?

18            PRO SE ENGEL:  Same page.  Right above it.

19   BY PRO SE ENGEL:

20   Q.    And it says I added a new video.

21            Do you -- can you see that there, added a new video

22   and made that statement?

23   A.    Yes.

24   Q.    Okay.  So, but you would agree that I was driving my

25   vehicle and at the same time I'm taking video, posting video,

13

1   and commenting on video.  Would you agree there's a possibility

2   that I wasn't handling my phone at that time?

3            MR. MYHRE:  Objection, Your Honor.  Argumentative.

4            THE COURT:  Sustained.

5   BY PRO SE ENGEL:

6   Q.   Is there any chance that my friend was handling my phone

7   at the time?

8            MR. MYHRE:  Objection.  Argumentative.

9            PRO SE ENGEL:  Okay.

10            THE COURT:  Sustained.

11   BY PRO SE ENGEL:

12   Q.   So, in Exhibit 457-9, at 11:29 I arrive; correct?

13   A.   May I refer to the --

14   Q.   Absolutely.  Absolutely.

15   A.   And, I'm sorry.  What --

16   Q.   457-9.

17   A.   I have you getting out of your truck in 457-7 at 11:29.

18   Q.   Okay.

19   A.   And yes, the next three slides, 8 and 9 -- 7 and 8 and 9

20   are all of you and it's all at 11:29.

21   Q.   Okay.  11:29?

22   A.   Yes.

23            PRO SE ENGEL:  And Ryan [sic], will you pull up

24   457-10, please.

25            Court's indulgence.  I got to get some water, please.

1          THE COURT:  Sure.

2      (Brief pause in proceedings.)

3  BY PRO SE ENGEL:

4  Q.   So in this clip -- in 457-9 would you agree that I was on

5  the freeway when I got out of my truck?

6  A.   Yes.

7  Q.   Okay.  And in this clip where do I look like I am?

8  A.   You're in the parking area, assembly area.

9  Q.   And is that -- did I -- does it look like I'm from my

10  truck and on the freeway towards the BLM or away from the BLM?

11  A.   Towards the Toquop Wash where the BLM was, yes.

12  Q.   Okay.

13          PRO SE ENGEL:  Could we pull up 132, Ryan, please.

14  And go to . . . 1831:35, please.

15          Right there.  Go ahead.  Stop right there.

16  BY PRO SE ENGEL:

17  Q.   So, Agent Willis, would you agree that I got out of my

18  truck right in this area (indicating) and then went back to

19  this area (indicating)?

20  A.   Your starting point is on I-15.

21  Q.   I'm sorry.

22  A.   Yeah.  You would have been just a little bit, actually

23  further west on the south side of I-15.

24  Q.   Okay.  But --

25  A.   Yes.

1   Q.   You remember that I got out --

2   A.   In that general area.

3   Q.   -- in that general area.

4            COURT REPORTER:  Wait.  Wait.  Wait.  Wait.

5            THE COURT:  One at a time, please.

6            PRO SE ENGEL:  I'm sorry.

7   BY PRO SE ENGEL:

8   Q.   You would agree that I got out in that general area there

9   in the emergency lane?

10  A.   Yes.

11  Q.   And then I went that direction into the parking area?

12  A.   Yes.

13  Q.   Okay.  And would you agree that the BLM is in this

14  direction (indicating)?

15  A.   There are BLM vehicles in that direction as well as Metro

16  police vehicles, yes.

17  Q.   So would you agree that I went the opposite direction of

18  where the BLM were staging at Post 1?

19  A.   At that time in this slide --

20  Q.   Um-hmm.

21  A.   -- you were . . . you had moved from your truck.

22  Distance-wise, I'm not exactly sure that it was any closer or

23  further away to the foot --

24  Q.   Okay.  But --

25  A.   -- but you definitely moved east towards the bridge.

16

1    Q.   But in that -- in that picture I didn't -- I got out of my

2    truck and I didn't stay on the freeway; I went into the parking

3    area.  Doesn't -- wouldn't that --

4    A.   Yes.

5    Q.   So it would look like I went and moved into the parking

6    area away from Post 1 where the BLM were staged?

7    A.   Yes.

8    Q.   Okay.  So, at 11:36, in Exhibit 457-11, we have a picture

9    of people praying in the wash.

10   A.   Yes.  As far as I know, it was a prayer circle.

11   Q.   Okay.  And since you were here, you heard Hugh Gourgeon's

12   testimony where he said that he took cover and went over behind

13   the concrete.

14           MR. MYHRE:  Objection, Your Honor.  Raising testimony

15   of another witness.

16           THE COURT:  Sustained.

17   BY PRO SE ENGEL:

18   Q.   Do you recall if Dennis Michael Lynch, in his video, asked

19   if the BLM were going to shoot these people?

20           MR. MYHRE:  Objection, Your Honor.  Confronting him

21   with evidence.

22           THE COURT:  He can answer the question.

23           THE WITNESS:  Yes, I do remember that.

24   BY PRO SE ENGEL:

25   Q.   Okay.  And in -- in his Exhibit 430F he came back under

1  the bridge and the people asked him what did they say.

2            Do you remember that clip?

3  A.   Yes.

4  Q.   And Dennis Michael Lynch said, "They said they will

5  shoot."

6            Do you remember that clip?

7  A.   He said something like that, yes.

8  Q.   Okay.  And do you recall then when Alex Ellis stated that

9  he heard a lady say, "BLM is pointing guns at civilians"?

10            MR. MYHRE:  Objection, Your Honor.  Argumentative.

11  He's -- he's mis -- he's characterizing [sic] evidence that's

12  already been admitted.  The jury --

13            THE COURT:  Sustained.

14            There's a difference, Mr. Engel.  If it's something

15  that's heard on a video which is an exhibit, that's fine, but

16  you can't ask questions about --

17            PRO SE ENGEL:  Okay.  What he testified to?

18            THE COURT:  -- testimony that's already been provided

19  by someone else if -- because the logic in there is then asking

20  him to weigh in on whether someone is being credible or not.

21  So just stick to the evidence.

22            PRO SE ENGEL:  Okay.

23  BY PRO SE ENGEL:

24  Q.   And then in Exhibit 297, on Page 196, which is my

25  Facebook --

1    A.   Yes.

2    Q.   -- I state, "Just then someone came running up and said,

3    'They -- BLM -- were pointing guns at people under the

4    bridge.'"

5              MR. MYHRE:  Can we have some foundation, Your Honor,

6    as to where we're referencing?

7              PRO SE ENGEL:  It's the post from 1815:53, about

8    middle of the way down.

9              MR. MYHRE:  Page 196?

10             PRO SE ENGEL:  196, correct.

11             THE WITNESS:  I see what you're referring to, yes.

12   BY PRO SE ENGEL:

13   Q.   Okay.  And would you read that -- that -- is it -- as I

14   stated, "Just then someone came running up and said, 'They --

15   BLM -- were pointing guns at people under the bridge'"?

16   A.   Yes.

17   Q.   Okay.  And that's what I wrote in my Facebook post?

18   A.   Yes, that's part of the sentence.

19   Q.   So that would be as I remembered it?

20             MR. MYHRE:  Objection, Your Honor.  Argumentative.

21             PRO SE ENGEL:  Okay.

22   BY PRO SE ENGEL:

23   Q.   So, in Exhibit 457-15, at 11:50 according to Flynn time,

24   you see people begin to move down the freeway.

25   A.   Yes.

19

1  Q.   Okay.  So that would mean that I arrived at 11:29 and

2  stood in the parking area for approximately 21 minutes.

3         MR. MYHRE:  Objection, Your Honor.  Argumentative.

4         THE COURT:  Sustained.

5  BY PRO SE ENGEL:

6  Q.   And in Exhibit 457-19 . . .

7  A.   Yes.

8  Q.   This is at 11:53; correct?

9  A.   Yes.  That's the time I --

10  Q.   What does it look like I have in my hand in that?

11  A.   It looks like you have a camera or a smartphone.

12  Q.   So I'm filming or taking pictures?

13  A.   Yes.  That's possible.

14  Q.   Okay.  Now . . . Ryan, will you go to Exhibit 132, please.

15  And go to the 11:57 and 20 seconds, please.  So 1857 and 20

16  seconds.

17         Right there.  Stop.

18     (Photo displayed.)

19  BY PRO SE ENGEL:

20  Q.   Okay.  Agent Willis, what does that -- what vehicle does

21  that look like right there standing with the people on the

22  bridge?

23  A.   That appears to be a Las Vegas Metropolitan Police

24  Department SUV.

25  Q.   Okay.  And according to Flynn time, we're a couple minutes

20

1   behind, so it would be about 1850, 11:50 in the morning?

2   A.   Yes.

3   Q.   Okay.  And then in Exhibit 297, which is my Facebook post,

4   I state, on Page 195, "A little while later a Metro PD officer

5   pulled up" --

6        MR. MYHRE:  Objection, Your Honor.  May we have some

7   foundation as to where we're reading from.

8        THE COURT:  Yeah.  Which exhibit?  I know you gave us

9   a page number, but which exhibit.

10        PRO SE ENGEL:  Exhibit 297.  I'm sorry.

11        THE COURT:  Okay.  So Exhibit 297, Page 195?

12        PRO SE ENGEL:  Page 195; correct.

13        THE COURT:  Thank you.

14   BY PRO SE ENGEL:

15   Q.   Right in the middle of that paragraph.

16   A.   Yes.

17   Q.   Okay.  And I state in my Facebook page, "A little while

18   later a Metro PD officer pulled up to us and one of the Bundy

19   boys and we were talking to him."

20        Do you see that part?

21   A.   Yes, I do.

22   Q.   Okay.  So, would that coincide with this Metro officer

23   pulling up to us when we're down there on the freeway?

24        MR. MYHRE:  Objection.  Argumentative.

25        THE COURT:  Well, he can testify as to the timing and

1    the calculation, whether it's consistent or not.

2              MR. MYHRE:  Well, this was -- Your Honor, this was

3    written . . . eight days later.  The document he's referring

4    to, the post was written on 4-20-2014.

5              THE COURT:  Oh.

6              MR. MYHRE:  It's not a contemporaneous post.

7              THE COURT:  All right.  Thank you.

8              Sustained.

9    BY PRO SE ENGEL:

10   Q.   So, I state . . . also, in Exhibit 297 on Page 196, right

11   at the bottom of that top post, "The whole time the BLM is --

12   the BLM is yelling at them to back off, that they had a lawful

13   court order and that they would fire."

14             MR. MYHRE:  Again, Your Honor, objection.  This is a

15   very long document and there are two entries here and I -- we

16   would like some foundation as to precisely where he's reading

17   from.

18             PRO SE ENGEL:  It's Page 196.  You've got the four

19   lines at the top, then a space, and it's the post from 1815:53

20   at the bottom.

21             THE WITNESS:  Yes.  I see what you're referring to.

22   BY PRO SE ENGEL:

23   Q.   And I state, "The whole time the BLM, yelling at them to

24   back off, that they had a lawful court order and that they

25   would fire?"

1          Do you see -- is that how it reads?

2     A.   Yes, I do.  Yes.

3     Q.   Okay.  So in Exhibit 457-21, at approximately 11:58, the

4     horses enter the wash; correct?

5     A.   Yes.

6     Q.   Okay.  And in Exhibit 22, the exact same time, it looks

7     like the BLM is stacked on the side of their vehicle.

8     A.   National Park Service officers, but yes, they are stacked

9     on the side of the vehicle.

10    Q.   Okay.

11          PRO SE ENGEL:  Pull that up for us, please, Ryan.

12    457-22.

13          (Photo displayed.)

14    BY PRO SE ENGEL:

15    Q.   And would you agree that we could see this from the

16    freeway?

17    A.   When you say "we," who are you referring to?

18    Q.   The people on the bridge.  Me -- could I see this, them do

19    this?  Come around the vehicle and come into this position?

20          MR. MYHRE:  Objection, Your Honor.  Foundation for

21    personal knowledge.

22          THE COURT:  And which bridge?  I think you need to be

23    a little more specific.

24          You can ask him can you see it from here, from here,

25    from here, but I'm not clear --

23

1    BY PRO SE ENGEL:

2    Q.   Well, you've been out --

3            THE COURT:   -- what you're asking.

4    BY PRO SE ENGEL:

5    Q.   -- to the wash and stood up on the bridge.

6    A.   Yes.

7    Q.   From the bridge, would I have been able to see these guys

8    come around and stack on the side of the vehicle?

9            MR. MYHRE:   Objection, Your Honor.

10           THE COURT:   Again, it depends on where you are at

11   that time so I'm not sure that's been established.  But you

12   don't have to establish it.  If you want to ask him could you

13   see this from this position, or this position or, you know, the

14   parking lot, or the ranch or the north --

15           PRO SE ENGEL:   Okay.

16           THE COURT:   -- bridge versus the south bridge.  You

17   just need to be a little more specific with the question so he

18   can answer.  Otherwise, it's vague and objectionable.

19   BY PRO SE ENGEL:

20   Q.   Could you -- could I have seen this from the northbound

21   freeway?

22           MR. MYHRE:   Objection, Your Honor.

23           He's asking whether he could see it?

24           THE COURT:   You can ask if he can see it from a

25   particular point, but now you're asking something that's

1   argumentative, which means it's something you can argue in

2   closing, but you have to ask the facts for the witness, not --

3   you can't argue in front of the witness.

4           PRO SE ENGEL:  Okay.  I'll move on a little bit here.

5   BY PRO SE ENGEL:

6   Q.   So . . .

7           THE COURT:  I don't want to discourage you.  If

8   you've got a particular point, you can ask him --

9           PRO SE ENGEL:  I just --

10          THE COURT:  -- you know, from this particular point

11  on the bridge, left side, right side, east side, whatever,

12  could you -- is there a vantage point.  Can that stack be seen.

13  BY PRO SE ENGEL:

14  Q.   From where you were able to ascertain my location from the

15  airplane flying over would I have been able to see that?

16          MR. MYHRE:  Objection, Your Honor.  Again, the

17  problem is, is this witness was not there on that day.  So, the

18  only --

19          THE COURT:  Well, he's looked at photographs.

20          Mr. Engel, you can ask him -- okay.  This image,

21  according to the witness, was taken -- was happening at 11:58.

22  You can ask him, Do you know where I was at 11:58?" and from

23  there, is -- is it obscured or is there a view of this.

24          PRO SE ENGEL:  Okay.

25          ///

25

1   BY PRO SE ENGEL:

2   Q.   Do you know where I was at 11:58?

3   A.   Your approximate position, yes.

4   Q.   Okay.

5   A.   Based on the dash cam footage.

6   Q.   Okay.  And from that position would I have been able to

7   see these guys stacked on the side of the vehicle?

8               MR. MYHRE:  Objection.  Argumentative.

9               THE COURT:  Yeah.  You can't ask him would I be able

10  to see.  You can ask is there a vantage point from there.

11  BY PRO SE ENGEL:

12  Q.   Is there a vantage point from there?

13  A.   To be able to see where these officers are, yes.

14  Q.   Yes.  Okay.

15          And in Exhibit 297, on -- at the post 1847:46, about

16  halfway down --

17  A.   Okay.

18  Q.   -- you see where I said --

19               THE COURT:  Is that one page or multiple pages?

20               PRO SE ENGEL:  It's just the front page with the

21  exhibit number on it.

22               THE COURT:  Okay.  Thank you.

23  BY PRO SE ENGEL:

24  Q.   You said at that -- I stated in my Facebook, "At that

25  point I began screaming at the officer in his vehicle" -- so

1    that would be the Metro officer I stated that I was talking

2    to -- "to tell them to stand down."

3    A.    Yes.

4    Q.    Okay.  I didn't tell the protestors to open fire, did I?

5              MR. MYHRE:  Objection.  Argumentative.

6    BY PRO SE ENGEL:

7    Q.    I told -- I said to the officer, "Tell them to stand

8    down."

9              MR. MYHRE:  Objection, Your Honor.  Argumentative.

10             PRO SE ENGEL:  Did I state --

11             THE COURT:  He can answer whether or not that's

12   what's represented on the exhibit.

13             MR. MYHRE:  Well, then he asked whether -- he said I

14   stated -- I told that the officer.  He was referencing this

15   where he wrote what he wrote on April the 20th.

16             THE COURT:  All right.  So this is not a video --

17   audio/video.  This is -- we're back to the Facebook page posts?

18             PRO SE ENGEL:  Correct.

19             THE COURT:  Okay.

20             PRO SE ENGEL:  I'll move on, Your Honor.

21             So, Ryan, at Exhibit 132 also, please.  And go to

22   1901:07 in the video.

23             Right there.  And stop.

24        (Photo displayed.)

25             ///

27

1    BY PRO SE ENGEL:

2    Q.   Agent Willis, what type of vehicle did you see that looks

3    like to you?

4    A.   That looks like a Metro SUV.

5    Q.   Okay.

6             PRO SE ENGEL:  And go ahead and play the rest of the

7    clip, Ryan, please.

8         (Video played.)

9    BY PRO SE ENGEL:

10   Q.   And what's it look like he's doing?

11   A.   Moving eastbound on northbound I-15.

12   Q.   Okay.

13            PRO SE ENGEL:  That's good, Ryan.  Thank you.

14   BY PRO SE ENGEL:

15   Q.   So it looks like he's leaving the area possibly?

16            MR. MYHRE:  Objection.  Argumentative.

17   BY PRO SE ENGEL:

18   Q.   Does it look like he's moving northbound on the

19   northbound -- or eastbound on the northbound lane?

20   A.   Yes.

21   Q.   Okay.

22            PRO SE ENGEL:  Ryan, go to Exhibit 111, please.

23            Stop right there.

24            Play a little bit more.

25       (Video played.)

1          Do we have audio?

2          Go back to the beginning.  Go back to the beginning,

3    please.  And turn it up if you could a little bit.  Thank you.

4       (Video played.)

5          And stop right there.

6          Oh, back up a little bit.  A little bit more.

7          Stop right there.

8    BY PRO SE ENGEL:

9    Q.   Okay.  So 12:04 hours local, according to Flynn time,

10   would be 12:02?

11   A.   Yes.

12   Q.   And you saw that the officer left the -- was leaving --

13   moving northbound in the northbound lane, or eastbound in the

14   northbound lane at approximately 11:59, which was 1901 in this

15   screenshot -- in the 132 exhibit?

16   A.   Yes.

17   Q.   Okay.  So 11:59 Metro begins to pull away.  This is at

18   12:02.  What do you see this gentleman right there (indicating)

19   doing?  Can you tell?

20   A.   He appears to be holding a rifle over the windshield or

21   hood area of that truck.

22   Q.   And in which direction would he be aiming that rifle?

23   A.   South.

24   Q.   And which direction were the protestors?

25   A.   The people in the wash and the people on horseback and the

1   people on the bridge --

2   Q.   From here?

3   A.   -- south.

4   Q.   Okay.

5          PRO SE ENGEL:  And go ahead and move up to the 1

6   minute mark, please.

7          And stop right there.

8      (Photo displayed.)

9   BY PRO SE ENGEL:

10  Q.   You're going to see a gentleman right in there

11  (indicating) somewhere.  I want you to take a look and see if

12  you can tell me what he's doing.  He's going to be moving and I

13  won't tell you which direction.

14         PRO SE ENGEL:  Go ahead and play the clip, please.

15     (Video played.)

16         PRO SE ENGEL:  Stop right there.

17  BY PRO SE ENGEL:

18  Q.   See that gentleman right there (indicating)?

19  A.   Yes.

20  Q.   And who would you describe that gentleman to be?

21  A.   You.

22  Q.   Okay.

23         PRO SE ENGEL:  Back that up to 1 minute, please.

24         Okay.  And go ahead and play it, please.

25     (Video played.)

1           PRO SE ENGEL:  Go ahead and stop.

2    BY PRO SE ENGEL:

3    Q.   In which direction does it look like I'm moving on the

4    freeway?

5    A.   West.

6    Q.   West.

7    A.   So . . . yes, west.

8    Q.   Okay.

9    A.   On northbound I-15.

10   Q.   Okay.  So, in which direction was the majority of the

11   protestors?

12   A.   Are you talking about the people on the bridge and the

13   people in the wash or the people on the --

14   Q.   On the bridge.  Yeah.  When I'm moving -- I'm moving to

15   the right in the video.

16   A.   Yes.

17   Q.   Were the majority of the people to the right or were they

18   to my left -- behind me to my -- to the left in the video?

19   A.   In these images that you showed me --

20   Q.   Um-hmm.

21   A.   -- you are passing behind the majority of the people that

22   were on the bridge at that time.

23   Q.   In your opinion, does it look like I'm moving away from

24   where the majority of the protestors on the bridge are?

25           MR. MYHRE:  Objection as for opinions, Your Honor.

1          THE COURT:  Sustained [sic].  He can answer the

2    question.

3          THE WITNESS:  You were --

4          THE COURT:  If he knows.

5          THE WITNESS:  You were moving -- I can't hear.  Do I

6    answer?

7          I'm sorry.  Did you say something?

8          THE COURT:  Do you want to repeat the question for

9    him?

10   BY PRO SE ENGEL:

11   Q.   Does it look like I'm moving away from where a majority of

12   the protestors are on the bridge?

13   A.   You were moving behind the majority of the people that I

14   see in this video on the bridge.

15   Q.   Am I walking at a casual pace or I look to be in a hurry?

16   A.   You look to be moving quickly.

17   Q.   Okay.  And . . . in Exhibit -- well, let's go to Exhibit

18   132, please, Ryan.  And go to 12:05, please.  Which was 1905.

19   I'm sorry.  I got the UTCs and the Flynn times.  1905, please.

20   1905:30.  And leave it -- let it go.

21        (Video played.)

22   BY PRO SE ENGEL:

23   Q.   Okay.  Right -- okay.  Stop it right there, please.

24          Right in here (indicating) there's going to be

25   somebody begin to move.  Would you tell me who that person you

1  think it is and which direction they're going and at what rate

2  of speed.

3          MR. ENGEL:  Go ahead and play the video, please.

4      (Video played.)

5  BY PRO SE ENGEL:

6  Q.   And you see that gentleman moving?

7  A.   Yes.

8          PRO SE ENGEL:  And go ahead and stop.

9  BY PRO SE ENGEL:

10  Q.   He's right in that area; correct?

11  A.   Yes.

12          PRO SE ENGEL:  Okay.  Go back another five or six

13  seconds, please.  And let's . . . watch this one more time.

14      (Video played.)

15  BY PRO SE ENGEL:

16  Q.   And he's moving which direction?

17  A.   West.

18  Q.   Towards the majority of the protestors or away from them?

19  A.   Again, behind a large group of people that were on the

20  northbound side of I-15.

21          PRO SE ENGEL:  Go ahead and stop right there, Ryan.

22  BY PRO SE ENGEL:

23  Q.   And would you agree that this is the majority of the

24  protestors (indicating)?

25          MR. MYHRE:  Objection.  Argumentative, Your Honor.

33

1          THE COURT:  Sustained.

2    BY PRO SE ENGEL:

3    Q.   Are most of the protestors standing right here

4    (indicating)?

5          MR. MYHRE:  Same objection, Your Honor.

6          THE COURT:  Do you mean not counting the people in

7    the wash?

8          PRO SE ENGEL:  No.  Just that -- just on the bridge.

9          THE COURT:  I mean, there's other people that aren't

10   in this photo, too.

11         PRO SE ENGEL:  Just on the bridge.

12         THE COURT:  So on the northbound bridge?

13   BY PRO SE ENGEL:

14   Q.   On the northbound bridge are the majority of the

15   protestors in this area, Agent Willis?

16   A.   In this image there are several people, a large number of

17   people on the northbound bridge --

18   Q.   Okay.  And --

19   A.   -- in this area (indicating).

20   Q.   And -- I'm sorry.  And the person that was moving to the

21   left, who do you know that to be?

22   A.   That was you.

23   Q.   Okay.  At what pace was I moving?

24   A.   You were running.

25   Q.   I was running?

34

1    A.   Yes.

2    Q.   Okay.

3    A.   In this video.

4    Q.   And we just looked at Exhibit 111 where you stated a BLM

5    agent had a rifle pointed southbound towards the protestors;

6    correct?

7              MR. MYHRE:  Objection.  Argumentative, Your Honor.

8              THE COURT:  Sustained.

9    BY PRO SE ENGEL:

10   Q.   So, we know that at 12:03 I was running away from the

11   majority of the protestors on the northbound bridge?

12             MR. MYHRE:  Objection.  Argumentative.

13             THE COURT:  Well, he can answer whether he knows --

14   whether he calculated that time correctly.

15             You're referring to what we just saw?

16             PRO SE ENGEL:  Yeah.  Yeah.  On that video.

17             THE COURT:  Yeah.  You can ask him to calculate what

18   time that would be according to his syncing calculations.

19             THE WITNESS:  I can tell you that you were moving

20   westbound at that time on northbound I-15.

21             PRO SE ENGEL:  Okay.  That's fine.  Thank you.

22             All right.  Ryan, pull up, please, 457-50.

23        (Photo displayed.)

24   BY PRO SE ENGEL:

25   Q.   And this gentleman right here (indicating), on the right

1    of those two gentleman, what does he seem to be doing in that

2    screenshot?

3    A.   It appears he is holding a rifle over the windshield or

4    hood area of that pickup truck.

5    Q.   And according to Flynn time, what time would this be?

6    A.   This would be 12:12 p.m.

7    Q.   12:12.  So you would agree he is still aiming his rifle

8    southbound, south -- in a southward direction and the

9    protestors were south of his position?

10   A.   The people who had formed the skirmish line and the people

11   on the bridges, yes, were south of his location.

12   Q.   Okay.

13              PRO SE ENGEL:  And 457-54, please, Ryan.

14        (Photo displayed.)

15   BY PRO SE ENGEL:

16   Q.   And at this point you see the skirmish line is broken up

17   and is moving forwards the gate.  Is that accurate?

18   A.   Yes.  Yes.

19   Q.   Okay.  And this is approximately, according to Flynn time,

20   12:15?

21   A.   Yes, sir.

22   Q.   Okay.  And in Exhibit 366, at the 4:40 mark Michael Flynn

23   makes a video clip.

24              Do you recall what he says in that video clip when

25   he's up on the side of the freeway skirting?

36

1    A.   Can you be more --

2            MR. MYHRE:   Objection as to foundation, Your Honor.

3    What time in the clip?

4            THE COURT:   He's -- it's Exhibit 366 at 4:40 in the

5    clip.

6            PRO SE ENGEL:   Yeah.   Go ahead and go to Exhibit 366

7    at 4:40.

8        (Video played.)

9    BY PRO SE ENGEL:

10   Q.   Can you tell us what Michael Flynn was saying in that

11   video?

12   A.   He said, "Lethal force, and they're telling us we got to

13   move."

14   Q.   Okay.   Approximately what time would you state this video

15   was made in according to Flynn time?

16   A.   At approximately 12:15, 12:16 p.m.

17   Q.   Okay.   And it -- and Exhibit 457-50, at 12:12, you stated

18   that a BLM agent was still pointing a rifle southbound --

19   south -- in a southward direction and the protestors were south

20   of where he was.

21   A.   The people in the wash?

22   Q.   Yes.

23   A.   And the people on the bridge, yes --

24   Q.   Okay.

25   A.   -- were south of his location.

1    Q.   Okay.  So, in Exhibit 457-60 -- would you please pull that

2    up, Ryan -- now, you have testified that this is Eric Parker;

3    correct?

4    A.   Correct.

5    Q.   Now, did you see what time he laid down?  Do you know what

6    time he laid down in the prone position?

7    A.   At this time, no.

8    Q.   Um-hmm.

9    A.   No.

10   Q.   So it could have been two or three minutes before this;

11   correct?

12            MR. MYHRE:  Objection.  Argumentative.

13            THE COURT:  Sustained.

14   BY PRO SE ENGEL:

15   Q.   Is it possible that he didn't lay down at 12:18?  Is it

16   possible that he laid down at 12:16?

17            MR. MYHRE:  Same objection, Your Honor.

18            THE COURT:  Sustained.

19   BY PRO SE ENGEL:

20   Q.   So you don't know if Eric Parker was able to hear the BLM

21   stating they were going to use lethal force at the exact same

22   time that Michael Flynn did?

23            MR. MYHRE:  Objection, Your Honor.  Argumentative.

24            THE COURT:  Sustained.

25            PRO SE ENGEL:  457-75, please, Ryan.

38

1          (Photo displayed.)

2     BY PRO SE ENGEL:

3     Q.   Can you tell me, Agent Ellis [sic], what that gentleman is

4     doing right there (indicating)?

5     A.   He appears to be holding a rifle over the windshield or

6     hood area of that pickup truck.

7     Q.   And what time is it?

8     A.   12:26 p.m.

9     Q.   Okay.

10          PRO SE ENGEL:   457-77, please, Ryan.

11          (Photo displayed.)

12    BY PRO SE ENGEL:

13    Q.   What do these gentlemen look to be doing, Agent Ellis

14    [sic]?

15    A.   They appear to be pointing their weapons south.

16    Q.   From their location, which direction was the horses and

17    the people that were protesting in the wash?

18    A.   The people on horseback, the people in the wash, and the

19    people on the bridges were south of their location.

20    Q.   Okay.  I'm going to take you and we're going to digress a

21    little bit here and . . . we are going to go to Exhibit 102,

22    please.

23          And go to 12:18.  Right -- okay.  Stop -- back up a

24    little bit.  Just a little bit more, please.

25          That's good.  Stop right there.

1         So we have Exhibit 102 pulled up on the screen and

2    then Exhibit 297, which is my Facebook, once again, and it is

3    the time stamp of 1847:46.

4    A.   Yes.

5    Q.   And I state, about the third line down, "I had a -- I had

6    my friend and another patriot observing BLM gun locations with

7    binoculars and they were able to find two, both pointing their

8    fingers and weapons at me.  The gentleman that was working the

9    other bino said I was target Number 1.  So with that

10   information, I moved down the freeway to the south to get out

11   of their line of fire, then walked up to two Nevada state

12   troopers and told them about the sniper teams, gave them a

13   description of the vehicles they were using as hides, and

14   asked, or told him, to get those guns off of us.  He got on his

15   cell phone and within a few minutes the sniper team pulled

16   their weapons down.'

17        Do you see that?

18   A.   Yes.

19   Q.   Okay.

20        PRO SE ENGEL:  Let's go ahead and play the video,

21   please, Ryan.

22      (Video played.)

23        PRO SE ENGEL:  And stop right there.

24   BY PRO SE ENGEL:

25   Q.   What did those two gentlemen seem to be doing in that

1   picture, in that frame?

2   A.   They were kneeling or squatting down.   Now this individual

3   is walking towards the NHP vehicle.

4   Q.   What did it look like they had in their hands?

5   A.   Binoculars --

6   Q.   Okay.

7   A.   -- the gentleman with the dark shirt.

8   Q.   Okay.

9            PRO SE ENGEL:   Go ahead and play some more, Ryan.

10           (Video played.)

11           PRO SE ENGEL:   Stop right there.

12   BY PRO SE ENGEL:

13   Q.   And you see me right here (indicating) in this video?

14   A.   Yes.

15   Q.   Okay.   And which way are these gentleman, the highway

16   patrol officers, facing?

17   A.   I would say they're facing north.

18   Q.   Do they have their back to me?

19   A.   No.

20   Q.   No?

21           PRO SE ENGEL:   Go ahead and play some more, please.

22           (Video played.)

23           PRO SE ENGEL:   And stop right there.

24   BY PRO SE ENGEL:

25   Q.   What do I seem to be doing in that video?

41

1   A.   Seem to be pointing.

2   Q.   Okay.

3         PRO SE ENGEL:  Go ahead and play some more, please,

4   Ryan.

5        (Video played.)

6         PRO SE ENGEL:  Stop right there.

7   BY PRO SE ENGEL:

8   Q.   What do I seem to be doing?  What does the officer seem to

9   be doing?

10  A.   Pointing.

11  Q.   Okay.  In what general direction would you say they're

12  pointing?

13  A.   North.

14  Q.   Okay.

15        PRO SE ENGEL:  Go ahead and play some more, please.

16       (Video played.)

17        PRO SE ENGEL:  Stop right there.

18  BY PRO SE ENGEL:

19  Q.   And that last frame, what were -- what was I doing and

20  what was the officer doing?

21  A.   Seemed to be interacting with each other.

22  Q.   Okay.

23        PRO SE ENGEL:  And go ahead and keep playing and,

24  we'll keep an eye on the officer, please, that I was talking

25  to.

1        (Video played.)

2             PRO SE ENGEL:  Go ahead and stop right there.

3    BY PRO SE ENGEL:

4    Q.   What did he seem to be doing at that point?

5    A.   He appeared to take out a phone and looks to be dialing a

6    phone.

7    Q.   Okay.

8             PRO SE ENGEL:  Go ahead and keep playing, Ryan,

9    please.

10        (Video played.)

11            PRO SE ENGEL:  Stop right there.

12   BY PRO SE ENGEL:

13   Q.   And which -- did he have his back turned to me in any of

14   those clips?

15   A.   Yes.  At moments, yes.

16   Q.   Okay.

17            PRO SE ENGEL:  Go ahead and keep playing, Ryan,

18   please.

19        (Video played.)

20            PRO SE ENGEL:  Stop right there.

21   BY PRO SE ENGEL:

22   Q.   What did he seem to be doing in that clip?

23   A.   Appeared -- appeared to move his right hand up to his ear.

24   Q.   As in maybe using the phone?

25   A.   Possibly, yes.

43

1   Q.   Okay.  So, does that video correlate with what I wrote in

2   Facebook?

3           MR. MYHRE:  Objection.  Argumentative.

4           THE COURT:  Sustained.

5   BY PRO SE ENGEL:

6   Q.   Let's read it again.  Exhibit 297, about halfway down.

7   "Then I walked up to two Nevada state troopers and told them

8   about the sniper teams, gave them a description of the vehicles

9   they were using as hides, and asked, or told him, to get those

10  guns off us.  He got on his cell phone and within a few minutes

11  the sniper teams pulled their weapons down."

12          Is that what I wrote?

13  A.   Yes.

14          PRO SE ENGEL:  So . . . in Defense Exhibit -- hang

15  on.  Let's see.  In Exhibit 102, Ryan, please, we'll go to the

16  12:51 mark.  Same one.  I'm sorry.  12:51.  If it's still on

17  there.  You'll have to go all the way to the end.

18          It's not going to be on this one, Ryan.  Is there

19  another 102?  If not, we have Defense Exhibit 5049.  Or 5043.

20          Yeah.  Go to Defense Exhibit 5043 and just play it

21  for the witness.

22          Has that been admitted, do you know?

23          COURTROOM ADMINISTRATOR:  That was admitted.

24          PRO SE ENGEL:  It was.  Yeah.

25          Go ahead to 5043, please.

44

1          Oh.  I'm sorry.  5049.

2          Has that one been admitted?  It has not.

3          COURTROOM ADMINISTRATOR:  No.

4          PRO SE ENGEL:  Okay.  Play it -- would you play it

5  for the witness, please.

6  BY PRO SE ENGEL:

7  Q.   Agent Ellis [sic], do you recognize this as being the

8  events that occurred on April 12?

9  A.   Yes.  This did occur on April 12, 2014.

10  Q.   Northbound lane of the I-15?

11  A.   Yes.

12  Q.   And these are the same officers that you just saw in

13  Exhibit 102?

14  A.   I see one of the officers and maybe the other one further

15  down from him at that point.

16  Q.   And do you see me in the video?

17  A.   Yes, I do.

18          PRO SE ENGEL:  Okay.  Ryan, would you go to 12:51,

19  please.  Right there.

20       (Video played.)

21          PRO SE ENGEL:  And go ahead and stop.

22  BY PRO SE ENGEL:

23  Q.   Do you see the two officers in this video?

24  A.   Yes.

25  Q.   Do you see me in this video?

1    A.   Yes.

2    Q.   Okay.

3         PRO SE ENGEL:  Go ahead and keep playing.

4         (Video played.)

5         PRO SE ENGEL:  Go ahead and stop right there, please.

6    BY PRO SE ENGEL:

7    Q.   And in Government's Exhibit 297, at the time stamp of

8    1856:22, do you see -- are you there?

9    A.   Yes.

10   Q.   About the third line down it says so . . . well, let's

11   read from the top.  "I continued to observe him and then he

12   moved and I could see a scoped rifle leaning over the seat, the

13   outside desert being very bright behind him and the inside of

14   the vehicle dark.  It was very evident as to what it was.  So I

15   walked back to the troopers and told [sic] to get F'ing rifle

16   off me and I described its location.  The officer immediately

17   got on his phone to the Metro officer that was parked at the

18   barricade and had him back his cruiser up."

19        Do you see those parts?

20   A.   Yes.

21        PRO SE ENGEL:  Okay.  Go ahead and play that, please,

22   Ryan.

23        COURTROOM ADMINISTRATOR:  What exhibit is that?

24        PRO SE ENGEL:  That was 102 -- or Exhibit 5049.

25        THE COURT:  It hasn't -- oh, you just want to play it

46

1    for the witness?

2              PRO SE ENGEL:  Yeah.

3              THE COURT:  Okay.

4              PRO SE ENGEL:  Yeah.

5              I'm sorry, Ryan.  I should have had you keep that up

6    there.

7         (Video played.)

8              PRO SE ENGEL:  So, go ahead and stop.

9    BY PRO SE ENGEL:

10   Q.   What do you see me doing in this video, Agent Ellis [sic]?

11             MR. MYHRE:  Objection, Your Honor.  He's having him

12   testify to an exhibit that's not been admitted into evidence.

13             PRO SE ENGEL:  Oh, shoot.  I'm sorry.

14             Can I -- can I admit this, please?

15             THE COURT:  Any objection?

16             MR. MYHRE:  No objection, Your Honor.

17             THE COURT:  All right.  So, Exhibit 5049 will be

18   admitted.

19        (Defense Exhibit 5049 received.)

20             PRO SE ENGEL:  May I publish?

21             THE COURT:  Yes.

22        (Video played.)

23             PRO SE ENGEL:  Back it up just a skosh, would you?  A

24   little bit -- no, go ahead forward a little bit more.

25             That's good.

47

1          Okay.  Go ahead and play it, please.

2      (Video played.)

3  BY PRO SE ENGEL:

4  Q.   So, Agent Ellis [sic], you can see -- go ahead and stop

5  right there.

6          You can see the officers right here (indicating);

7  correct?

8  A.   Yes.

9  Q.   And you see me just off to the left kind of approaching

10  them; correct?

11  A.   Yes.

12          PRO SE ENGEL:  Go ahead and play it, Ryan, please.

13      (Video played.)

14          PRO SE ENGEL:  Stop right there.

15  BY PRO SE ENGEL:

16  Q.   What did I seem to do in that shot?

17  A.   You seemed to move your left arm out to your side like

18  you're pointing.

19  Q.   Okay.  And it looks like the officers are standing there

20  with me?

21  A.   Yes.

22  Q.   And I'm talking to them?

23  A.   You appear to be interacting with them, yes.

24  Q.   Okay.  And what time is this, according to Flynn time?

25  A.   So, this would be subtracting 2 minutes and 49 seconds, so

48

1  approximately 3 minutes.  So, 12:49.

2  Q.   Okay.  Almost 12:50.

3  A.   Yes.

4  Q.   Okay.

5       PRO SE ENGEL:  Go ahead and play the video, please.

6       (Video played.)

7       PRO SE ENGEL:  Go ahead and stop right there.

8  BY PRO SE ENGEL:

9  Q.   What did the officers seem to be doing right there?

10 A.   They appear to be walking in the direction you're walking.

11 Q.   Okay.  So they're walking -- would you agree they're

12 walking with me?

13 A.   Yes.

14 Q.   Okay.  And I state, once again, in Exhibit 297, at the

15 1856:22 mark, ". . . so I walked back to the troopers and told

16 to get F'ing rifle off me and I described its location."

17 A.   Yes.

18 Q.   Okay.  And I go on, "So the officer immediately got on his

19 phone to the Metro officer that was parked at the barricade and

20 had him back his cruiser up to the Silverado but he went too

21 far and we had to bring him back to the right vehicle.  He

22 rolled his passenger side window down and I don't know what he

23 said, but the BLM didn't like it.  At that point they all

24 turned around disgusted and walked away."

25       So, I'm describing the highway patrol is contacting

49

1   Metro; correct?

2           MR. MYHRE:   Objection, Your Honor.   Argumentative.

3           THE COURT:   Sustained.

4   BY PRO SE ENGEL:

5   Q.   So you would agree that at 12:49 these officers are

6   working with me?

7           MR. MYHRE:   Objection, Your Honor.   Argumentative.

8           THE COURT:   Sustained.

9   BY PRO SE ENGEL:

10  Q.   Would you agree that these officers are walking with me?

11  A.   Yes.

12  Q.   So . . . as you have stated, Metro pulled up to where the

13  protestors were at approximately 11:55 Flynn time.

14  A.   There was a Metro vehicle on the northbound I-15 bridge

15  near several people that were along the north Jersey barrier of

16  the bridge.

17  Q.   And left at 11:59, approximately, Flynn time?

18  A.   I -- I think that's correct by what we saw today.

19  Q.   And I stated, in Exhibit 297, that a Metro PD officer

20  pulled up to us and we were talking to him.

21  A.   Yes.

22  Q.   Okay.   And I also stated that I then walked up to two

23  Nevada state troopers and told them about the sniper teams.

24          MR. MYHRE:   Objection, Your Honor.   This has been

25  asked and answered and covered.

1          PRO SE ENGEL:  Okay.

2     BY PRO SE ENGEL:

3     Q.   And . . . we have Dennis Michael Lynch stated that they

4     said they'll shoot prior to us going down the freeway.  Isn't

5     that correct?

6          MR. MYHRE:  Objection, Your Honor.  That's

7     argumentative.

8          THE COURT:  Sustained.

9          PRO SE ENGEL:  Exhibit 457-83, please, Ryan.

10          MR. MYHRE:  I believe that was withdrawn, Your Honor.

11          PRO SE ENGEL:  Pardon me?

12          COURTROOM ADMINISTRATOR:  That's correct.  That's not

13     admitted into evidence.  It was withdrawn by the Government.

14          PRO SE ENGEL:  Oh, it was.  Okay.  I'm sorry.

15          Then let's go back to Defense Exhibit 5049, please,

16     Ryan.  And go to 1307.

17          No.  I apologize, Ryan.  5043.  And go to 1307.

18          There you go.  Go forward a little bit more so we

19     don't have to . . .

20        (Video played.)

21          PRO SE ENGEL:  And go ahead and stop right there.

22     BY PRO SE ENGEL:

23     Q.   And in that screenshot and in that video clip did you

24     see -- what did you see in that screen?

25     A.   There's a NHP vehicle -- vehicles passing.  There is

1    people on the left side of the vehicle and an individual with a

2    black shirt on and a rifle across his -- the front of his body

3    walks by the trooper's vehicle.

4    Q.   Okay.

5          PRO SE ENGEL:  And go ahead and play the rest of it,

6    Ryan, please.

7       (Video played.)

8          PRO SE ENGEL:  Go ahead and stop.

9    BY PRO SE ENGEL:

10   Q.   What did the gentleman in that clip just say?

11   A.   He said, Everything down here, or here, is peaceful and

12   then something else I couldn't --

13          PRO SE ENGEL:  Go ahead and play that again, please.

14   Just couple seconds.  That's good.

15          Go ahead and play it, please.

16      (Video played.)

17          PRO SE ENGEL:  Go ahead and stop.

18   BY PRO SE ENGEL:

19   Q.   Can you tell us what he said in that?

20   A.   He says, "Everything down here is peaceful and I think so

21   far everybody is happy," or something like that, "everybody's

22   happy."

23   Q.   Was that the highway patrol officer that stated that?

24   A.   I believe it was.

25   Q.   Okay.

1              PRO SE ENGEL:  Go to the 1320 mark, please.

2              Stop right there.  There you go.

3              Okay.  Go ahead and stop -- no.  Don't.

4         (Photo displayed.)

5    BY PRO SE ENGEL:

6    Q.   And in this shot who do you see?

7    A.   There's an NHP trooper, there's the head of another

8    individual, and then you are standing there with the trooper.

9    Q.   Okay.

10             PRO SE ENGEL:  Go ahead and play the clip, please.

11        (Video played.)

12             PRO SE ENGEL:  Go ahead and stop.

13   BY PRO SE ENGEL:

14   Q.   What did that NHP trooper just do?

15   A.   He appeared to slap you on the right shoulder with his

16   right hand.

17   Q.   Kind of --

18   A.   Patted you --

19   Q.   -- patted me on the --

20   A.   Yeah.

21   Q.   Patted me on the shoulder?

22   A.   Yeah.

23   Q.   Okay.

24             PRO SE ENGEL:  We're done with that one, Ryan.

25             ///

1    BY PRO SE ENGEL:

2    Q.   So, after he -- that -- that interaction where he pats me

3    on the shoulder, do you know where I went?

4    A.   No, I do not.

5    Q.   Okay.  Would you agree that the video that I made was

6    after that incident, after that -- that interaction with

7    highway patrol?

8            MR. MYHRE:  Objection, Your Honor, as to foundation

9    of what video.

10            THE COURT:  That's what I was wondering.

11   BY PRO SE ENGEL:

12   Q.   The video where the BLM is leaving.

13   A.   Yes.

14   Q.   Okay.  And would you agree that I'm extremely upset in

15   that video?

16            MR. MYHRE:  Objection.  Objection.  Argumentative,

17   Your Honor.

18   BY PRO SE ENGEL:

19   Q.   Do I say a lot of vulgar words in that video?

20   A.   Yes.

21   Q.   Okay.  So, it would seem that I'm very upset in that

22   video?

23            MR. MYHRE:  Same objection.  Argumentative.

24            PRO SE ENGEL:  Ryan, go to Exhibit 297, please.

25            And scroll down a little ways, please.  Right there.

54

1          (Facebook page displayed.)

2     BY PRO SE ENGEL:

3     Q.   In the middle of this screenshot can you tell me what that

4     word is (indicating)?

5               MR. MYHRE:  Objection.

6     BY PRO SE ENGEL:

7     Q.   Can you read from right here (indicating) and read through

8     that sentence, please.

9     A.   Yes, I can.

10    Q.   Please.

11    A.   "So I walked back to the troopers and told [sic] to get

12    F*-+-*G rifle off me and I described it [sic] location."

13    Q.   Okay.  So I didn't actually write the word in this post,

14    did I?

15              MR. MYHRE:  Objection, Your Honor.  Again,

16    speculation.  It's irrelevant.

17              PRO SE ENGEL:  Go up -- go to the next page, Ryan,

18    please.  A little bit more.

19              Right there.

20    BY PRO SE ENGEL:

21    Q.   Once again, I wouldn't even write the word in that

22    screen -- in that Facebook post, would I, Agent Ellis [sic]?

23              MR. MYHRE:  Objection, Your Honor.

24              THE COURT:  Sustained.

25              ///

55

1    BY PRO SE ENGEL:

2    Q.   So, in the video of me where I'm very upset --

3            MR. MYHRE:  Objection, Your Honor.  Misstates the

4    evidence.

5            THE COURT:  Sustained.

6    BY PRO SE ENGEL:

7    Q.   Where I am -- where the BLM is leaving, did you see me

8    throw a single rock at the BLM?

9            MR. MYHRE:  Are we -- objection, Your Honor.

10   Foundation.  If we're talking about the video?

11           PRO SE ENGEL:  Yes.  The video where the BLM is

12   leaving and I have my camera.

13           THE WITNESS:  I -- it does not appear in the video

14   that you threw anything.

15   BY PRO SE ENGEL:

16   Q.   Okay.  Does it look like I threw -- I didn't throw a water

17   bottle, a fire extinguisher, a Molotov cocktail?

18   A.   No.

19   Q.   Okay.  Does it look like in that video I pointed a gun at

20   them?

21   A.   No.

22   Q.   Does it look like I put any obstructions in their way?

23   A.   No.

24   Q.   Did I block them with my vehicle?

25   A.   Not that I could see in the video.

1    Q.   Did I run out in front of them and try to stop them?

2    A.   No.

3    Q.   So, you would agree that I didn't obstruct them?

4              MR. MYHRE:   Objection, Your Honor.  Calls for a

5    conclusion.

6              THE COURT:   Sustained.

7              MR. MYHRE:   And argumentative.

8    BY PRO SE ENGEL:

9    Q.   Did -- during that video did I put any impediments in

10   their way?

11   A.   Can you be more specific to "impediments"?

12   Q.   Did I roll giant boulders out in the road for them to hit?

13   A.   Nothing physically that you did obstructed their travel.

14   Q.   So you would agree that I didn't impede them?

15             MR. MYHRE:   Objection, Your Honor.  Conclusion.

16   Argumentative.

17             THE COURT:   Calls -- sustained.

18             PRO SE ENGEL:   I'll move on, Your Honor.

19   BY PRO SE ENGEL:

20   Q.   Before I ever arrived there, Agent Ellis [sic], the BLM

21   had called off their operation.  Isn't that correct?

22             MR. MYHRE:   Objection, Your Honor.  Foundation.

23             THE COURT:   You want to rephrase the question?

24   BY PRO SE ENGEL:

25   Q.   Did the BLM end their operation on the 11th?

1    A.    Yes.

2    Q.    Their cattle impoundment operation.

3    A.    They were no longer impounding cattle as of the 11th,

4    that's correct.

5    Q.    Okay.  And you're familiar with the events of the

6    beginning of this cattle impoundment operation to -- you're

7    probably up to till our arrest.  Wouldn't you agree?

8    A.    Yes.

9    Q.    Okay.  And . . . on the 6th of April a gentleman was

10   arrested; correct?

11            MR. MYHRE:  Objection.  Relevance, Your Honor.

12            THE COURT:  Sustained.

13   BY PRO SE ENGEL:

14   Q.    On the 9th a grandmother was body-slammed; correct?

15            MR. MYHRE:  Objection.  Relevance, Your Honor.

16            THE COURT:  Sustained.

17            MR. MYHRE:  Move to strike.

18            THE COURT:  The jury will disregard the statement.

19   BY PRO SE ENGEL:

20   Q.    In one of the videos I talk about the resistance.  Isn't

21   that correct?  One of my Facebook videos.

22   A.    That we viewed here in court --

23   Q.    Yes.

24   A.    -- yes.

25   Q.    Yes.  Would you agree that voting is a form of resistance?

1              MR. MYHRE:  Objection, Your Honor.  Calls for a legal

2     conclusion.

3              THE COURT:  Sustained.

4     BY PRO SE ENGEL:

5     Q.   Writing your Congressman is a form of resistance?

6              MR. MYHRE:  Objection, Your Honor.  Argumentative and

7     legal conclusion.

8              THE COURT:  Sustained.

9     BY PRO SE ENGEL:

10    Q.   On the 12th did you see me go up to the gate where

11    Dan Love was when he approached the gate?

12    A.   No.

13    Q.   Did I go -- did I even go down in the wash?

14    A.   No.

15    Q.   In these videos you just saw, you saw me running away;

16    correct?

17             MR. MYHRE:  Objection, Your Honor.  Mischaracterizes

18    what the witness testified to.  This has been asked and

19    answered.

20             THE COURT:  You want to rephrase the question?

21    BY PRO SE ENGEL:

22    Q.   In the video from the airplane, you saw me moving to the

23    left at a run basically.

24             MR. MYHRE:  Asked and answered, Your Honor.

25             ///

1    BY PRO SE ENGEL:

2    Q.   So I actually went the opposite direction of the majority

3    of the protestors on the northbound bridge.

4    A.   You were running behind the people on the northbound

5    bridge.

6    Q.   Okay.

7            PRO SE ENGEL:  Let's take a real quick peek here.  I

8    forgot one thing.  I'm sorry.

9        (Brief pause in proceedings.)

10           PRO SE ENGEL:  Ryan, would you pull up Government's

11   Exhibit 457-78, please.

12       (Photo displayed.)

13   BY PRO SE ENGEL:

14   Q.   Would you agree, Agent Ellis [sic], that these

15   (indicating) are the two highway patrol officers' vehicles?

16   A.   Yes.

17   Q.   And would you agree that I was standing in front of their

18   dash cams during the course of that day?

19   A.   Yes.  At times.

20   Q.   And would you agree that the northbound lanes in the

21   northbound freeway, that's the majority of the protestors?

22   A.   Majority of the people that I see in your circle are

23   there --

24   Q.   Okay.

25   A.   -- on that northbound freeway.

1   Q.   And you would agree that I stood right in there

2   (indicating) in front of their vehicles; correct?

3   A.   At some point in the day, yes.

4   Q.   Okay.  And . . . so go -- I'm done with that one, Ryan.

5   Thank you.

6           So I wasn't in the wash, you've answered that, with

7   Dan Love standing at the gate.  I know it's asked and answered.

8           I was -- would you agree I was standing on the

9   freeway majority of the time during the 12th?

10  A.   During the time that the horsemen and people had formed

11  the skirmish line and then after the BLM had pulled back --

12  Q.   Yes, sir.

13  A.   -- yes.

14  Q.   Yeah.  Okay.  And once I got down on the bridge in the

15  northbound lane, I never went towards the BLM; correct?

16  A.   From that -- that point --

17  Q.   No.  Yeah.

18  A.   -- until they left, that's correct.

19  Q.   I didn't go down in the wash and I didn't go up to the

20  gate?

21  A.   Correct.

22  Q.   Do you have any evidence that I had contact with Ryan or

23  Dave Bundy via phone, text, e-mail, any type of media?

24           MR. MYHRE:  Objection, Your Honor.

25           THE COURT:  Again, Mr. Engel, we've talked about

1    this.  The witness does not have a burden to produce evidence;

2    the Government has the burden to produce evidence.

3               PRO SE ENGEL:  Okay.

4    BY PRO SE ENGEL:

5    Q.   The Government has not provided any evidence where I had

6    contact with Dave or Ryan Bundy; correct?

7               MR. MYHRE:  Objection, Your Honor.  It's

8    argumentative and this witness can't answer that question.

9               PRO SE ENGEL:  I'll move on, Your Honor.

10   BY PRO SE ENGEL:

11   Q.   Was I with either Ryan or Dave Bundy when they were

12   talking to Dan Love about the cattle being released?

13              MR. MYHRE:  Objection, Your Honor.  Foundation.

14              THE COURT:  When are you talking about?

15   BY PRO SE ENGEL:

16   Q.   Are you familiar with the events where Ryan and Dave Bundy

17   were talking to Dan Love about the cattle being released?

18   A.   Ryan Bundy talking to Dan Love at Post 1?

19   Q.   Um-hmm.

20   A.   Yes.

21   Q.   Do -- was I -- was I at that conversation?

22   A.   Not that I'm aware of.

23   Q.   So, I couldn't have known what they were talking about;

24   correct?

25              MR. MYHRE:  Objection, Your Honor.  Speculation and

1    argumentative.

2            THE COURT:  Sustained.

3    BY PRO SE ENGEL:

4    Q.   Do you know if I was anywhere near that conversation?

5    A.   No, I don't.

6    Q.   Was Dan Love the special agent in charge of this

7    operation?

8    A.   Yes, he was.  He was an incident commander.

9    Q.   And in any video or audio do -- have you seen anywhere

10   where I had any discussions with him?

11   A.   No.

12           MR. MYHRE:  Again, found -- well -- again, foundation

13   if we're talking about which video and audio.

14           THE COURT:  He's answered the question.

15   BY PRO SE ENGEL:

16   Q.   Isn't it true that Dan Love's under criminal

17   investigation for --

18           MR. MYHRE:  Objection, Your Honor.

19           THE COURT:  Mr. Engel . . .

20           MR. MYHRE:  Move to strike.

21           THE COURT:  The jury will disregard Mr. Engel's --

22           PRO SE ENGEL:  No further questions.

23           THE COURT:  All right.  So I'm not trying to torture

24   you.  Aaron just went to check and see if the workers are done

25   with the bathroom wall issue and they are, they're gone.  So

63

1    now everyone can use all four of the bathrooms.  You're not

2    restricted to just two of the bathrooms.  So we're going to go

3    ahead and take our bathroom break.

4         I remind everyone that you are not to discuss this

5    case with anyone nor permit anyone to discuss it with you.

6         You are not to read, view, or listen to anything that

7    touches upon this case in any way.  And please do not attempt

8    to perform any research or any independent investigation

9    concerning this case.  And also do not form an opinion

10   regarding this case until after you have heard all the

11   testimony, received the evidence.  I will provide you with the

12   written jury instructions and then you'll hear closing

13   arguments.  After that, the deliberation process will begin.

14        It's 10:05, so let's try to do a 15-minute break and

15   be back here by 10:20.

16        We'll go ahead and stand for the jury, and Special

17   Agent Willis, you may take your break as well.  Please try to

18   be back here by 10:20.

19        Is that what I said?  Yeah.  15-minute break.  It's

20   10:05.  Be back here by 10:20.

21        THE WITNESS:  Yes, Your Honor.

22      (Jury excused from courtroom at 10:05 a.m.)

23        MR. MYHRE:  Your Honor, may we -- may the Government

24   make a record here?

25        THE COURT:  Yes.

1          So, you may be seated.  Or you can take your break if

2    you want to, Mr. Ellis [sic].

3          So the jury has left the room.

4          Go ahead, Mr. Myhre.

5          MR. MYHRE:  Your Honor, during the cross-examination,

6    obviously the record reflects what was stated.  Mr. Engel asked

7    a completely objectionable question.  This is an issue that the

8    Court has addressed.  It is not to be raised before the jury.

9          I would note for the record that after this -- after

10   Mr. Engel asked that question and the Court admonished him

11   about the impropriety of the question, he walked back to his --

12   his seat; he began laughing in front of the jury.  He clearly

13   raised this to prejudice the Government.  He should be

14   sanctioned for it and his pro se status should be revoked.

15         He clearly knew that was an area that could not be

16   gone into --

17         THE COURT:  Mr. Engel?

18         MR. MYHRE:  -- and it was clearly designed to

19   prejudice the Government's case.

20         PRO SE ENGEL:  Your Honor, I didn't laugh.  I

21   apologize.

22         I want Dan Love to come into this courtroom,

23   Your Honor.  He has sworn a Grand Jury testimony against me and

24   I'm not even going to be able to talk to him.  So I didn't

25   laugh, and I apologize for the question.

1          THE COURT:  All right.  It's an improper question and

2     I agree with the Government.  I'm going to have Mr. John

3     George, who's here, represent you for the remainder of the day

4     and we'll see -- I'll go back and . . . consider whether . . .

5     I'll let you do your own closing argument or not.

6          PRO SE ENGEL:  Oh, Your Honor, please.

7          THE COURT:  But, I'm not going to ask you -- I'm not

8     going to permit you to do any more cross-examination.  You can,

9     of course, give Mr. John George the questions that you want to

10     ask and he can decide whether or not to ask them for you.  I

11     know that he's not going to violate the orders of the Court and

12     ask inappropriate questions.  So that way you'll still have

13     your opportunity to ask your questions, but I'm not going to

14     risk any more that you're going to say something in front of

15     the jury that is not permitted and that would potentially cause

16     me to call a mistrial.

17          PRO SE ENGEL:  Okay.  I'm sorry.

18          THE COURT:  So we'll go ahead and take our restroom

19     break . . . and I don't know that we'll be back by 10:20, but,

20     we'll be back as soon as we can.

21          COURTROOM ADMINISTRATOR:  All rise.

22        (Recess was taken at 10:08 a.m.)

23        (Outside the presence of the jury at 10:27 a.m.:)

24          COURTROOM ADMINISTRATOR:  All rise.

25          THE COURT:  All right.  Everyone may be seated.

66

1          We're back on the record outside the presence of the

2     jury.  I'm not sure everybody's here yet though.  Let me see.

3     We've got . . . I think we're missing Mr. Tanasi and

4     Mr. Marchese, right?  That's it.  The defendants are here.  So

5     we can wait for them to come back.

6          (Brief pause in proceedings.)

7               MR. TANASI:  Sorry, Your Honor.

8               THE COURT:  All right.  So Mr. Marchese, Mr. Tanasi

9     are here as well.

10              All right.  So we're all here outside the presence of

11    the jury.  We're back on the record and Mr. John George, did

12    you want to make a statement.

13              MR. GEORGE:  I do.

14              THE COURT:  Okay.  Go ahead.

15              MR. GEORGE:  Okay.  So, I'm more than happy to

16    represent Mr. Engel for the rest of this trial, but I believe

17    under *Faretta* the United States Supreme Court says that he has

18    a right to represent himself and I think up until today he's

19    done a fairly remarkable job doing so.  So, I think the jury

20    can be admonished regarding his comment and I would suggest

21    that maybe he should be permitted to continue to represent

22    himself.

23              MR. MYHRE:  I didn't hear the last part at all.  I'm

24    sorry.

25              MR. GEORGE:  I said that I think he should be able to

1   continue to represent himself.  He's done a fairly good job

2   until today and his comment can be -- the jury can be

3   admonished regarding his comment.

4           THE COURT:  Admonishing the jury about the comment

5   would just call more attention to it.  I'm already doing

6   research on mistrial, so that's where we're at.

7           So, no.  He's already indicated that he's not going

8   to order -- he's not going to follow my court order.  We have

9   talked about Special Agent Love more than I think anyone else

10  that we've talked about, more than any other witness in this

11  entire trial, and he knew very well that that question could

12  not be asked, that that was not an area that he could explore.

13  Mr. Leventhal even said he spent two whole days over the

14  weekend researching information to be able to figure out how to

15  call Special Agent Love.  We had numerous documents, motions,

16  and reconsideration motions and such filed regarding this

17  particular issue.  So, no.  There's no question in my mind that

18  he intentionally asked this question.  He was very smug about

19  it afterwards when he went back and sat down, very proud of

20  himself for sliding that in.

21          I was honestly aghast with my mouth, you know, flung

22  open when that happened trying to figure out how exactly to

23  caution the jury without calling more attention to it.  So, I

24  think just the striking of the question is sufficient.  I don't

25  want to restate it for the jury.

1          First of all, Special Agent Love is not under

2    criminal investigation.  So it wasn't even an allegation about

3    a fact that actually is true.  So, it was just so beyond words

4    for me what was done that I cannot permit him to continue to

5    represent himself.  I think that we'll just permit John George

6    to represent him from now.  I'm not even going to have

7    Mr. Engel go sit in the cell so listen to the rest of the

8    hearing; I'm going to permit him to stay in here and I will

9    still keep it under consideration whether or not to permit him

10   to perform his own closing argument or not, depending on what

11   his conduct is from here on out.

12          If you'd like, I can say something to the jury, but I

13   don't know that it's necessary at this point unless -- unless

14   you want me to just let the jury know that Mr. John George is

15   going to be representing Mr. Engel from here on out and that's

16   it.  I wouldn't comment on anything else.

17          I think saying it now would even call more attention

18   to the statement.  He's finished his closing argument so, he

19   really doesn't have to say anything any more.  We have three

20   more closing arguments.  Might take us through lunch, possibly,

21   and with the passage of time, maybe then I can say something

22   at -- afterwards so that it won't be -- I'm sorry -- cross.  We

23   have three more cross-examinations, which might take us to

24   lunch and then after lunch, if you want me to, I can let the

25   jury know that Mr. George is representing him.  But, I don't

1   even want to say that right away because I think that will call

2   more attention to it as well.

3              All right.  So, anything else anybody wants to put on

4   the record?

5              PRO SE ENGEL:  Yes, Your Honor.  I'm not --

6              THE COURT:  Mr. Engel, you're not permitted to speak

7   anymore.  You can -- you're represented now by Mr. John George.

8   If there's anything else that you want the Court to know, you

9   can let him know and if he thinks that it's appropriate, as an

10  officer of the court, he understands the Rules of Evidence and

11  what can and can't be asked of the witnesses and . . . so

12  we're -- we're not going to take any more chances.

13             All right.  So let's go ahead and call in the jury.

14             MR. TANASI:  Your Honor --

15             THE COURT:  Yes.

16             MR. TANASI:  -- if I may just briefly speak to this.

17             THE COURT:  Mr. Tanasi, yes.

18             MR. TANASI:  Without kind of pointing the spotlight

19  on Mr. George, I just -- again, I'm looking at this and from

20  the sole perspective of how it affects Mr. Stewart and I'm

21  trying to kind of think through this and so, what I see

22  potentially, I guess, is an issue with Mr. George jumping in at

23  this stage of the game.  This isn't a two-day robbery case with

24  one video and --

25             THE COURT:  He's not jumping in.  He's been assigned

1    to this case from the beginning and he's -- I see him.  He's

2    sitting right there next to Mr. Engel.  They're discussing

3    things constantly.  He's been provided with all the discovery.

4    I sign off on the vouchers, so I'm not going to put on the

5    record all the work that he's done, but I know that he has done

6    work on this case and is familiar enough and I feel comfortable

7    that he can represent Mr. Engel.

8                MR. TANASI:  And that's -- and it's not my position

9    or my assertion to challenge any of that.  I guess even just

10   kind of in the short term, you know, with the remainders of the

11   witnesses, is he ready to cross-examine them as they come up?

12   I mean, I know that I don't prepare my cross-examinations in

13   court; I prepare them a night or two before and sometimes even

14   weeks before.  So, I mean, I would think we would need to just

15   have a better understanding that he's ready to go just on a

16   just short-term practical witness-by-witness basis on who's

17   coming up.  And again, I -- it's kind of an odd issue because I

18   don't know whether -- if he's not ready, I guess the point is,

19   then potentially that could have some spillover effect on my

20   client and it's hard for me to articulate what that is because

21   I don't know how ready he is, how ready he isn't, and if it

22   really would even happen, but it's just an issue that I want to

23   make sure is on the record that I see.

24               MR. MARCHESE:  That's correct.  Parker would join in

25   that and Mr. Tanasi is being rather diplomatic in the way he's

1    saying it.  I don't have any personal knowledge because I don't

2    speak to all of counsel on a regular basis.  We're not meeting.

3    You know, obviously Mr. Leventhal and Mr. Tanasi and I, as the

4    Court has probably seen and figured out by now, we worked very

5    closely together throughout the last few months on this case,

6    but based on things I have been told by outside sources, I have

7    that concern as well and it's -- you know, Mr. Engel, I am not

8    going to defend the question.  It should never have been asked.

9    That's -- there's no question there.  My only concern is, as

10   Mr. Tanasi brought out, is to Mr. Parker and the possible

11   spillover effect that it may or may not have should Mr. Engel

12   not be allowed to represent himself.

13            MR. LEVENTHAL:  And, Your Honor, on behalf of

14   Mr. Drexler, I'm going to join in on both of those arguments

15   and then further state that we just don't have another day or

16   two left; we have our whole case and we're calling witnesses.

17   We've interviewed witnesses, and Mr. George -- no offense,

18   because he's standby -- has not been involved in any of that.

19   And, you know, so there is much more to this case than just the

20   last two Government witnesses and a closing.  We have a lot

21   more to go here.  I mean, and a lot of witnesses and a lot of

22   ground to cover, and we've done a lot -- lot of work up to this

23   point and at this late stage, based on the one question -- and

24   again, I'll join, I don't know the spillover effect, but I

25   don't know whether or not Mr. George is prepared right now to

1   even know who's coming up.  I don't know that.  I don't, you

2   know --

3               THE COURT:  All right.

4               MR. LEVENTHAL:  -- he hasn't been called in yet, but

5   there's a lot more things coming.

6               THE COURT:  All right.  So I realize that you all are

7   not privy to his vouchers and that you don't see the day-to-day

8   or week-to-week submissions of what he is doing, and so the

9   Court is satisfied that from the beginning he's understood that

10  his assignment as a standby counsel is to be ready to jump in

11  at any moment if need be and that's what a standby counsel

12  does.  So essentially, without getting into too much of it, I'm

13  paying him just as much as I'm paying everybody else.  So, I'm

14  very comfortable with the fact that he's competent and capable.

15              I agree that since we're done with Mr. Engel's

16  cross-examination, that puts us in a little bit of a better

17  position because we won't be getting around to

18  cross-examination to the next -- of the next witness for a bit

19  and then we can reassess the point if we need to.  Likewise,

20  before the defense starts calling witnesses, there's going to

21  be a whole nine days that we're not even in court because we're

22  taking a week break in between.  So that's certainly plenty of

23  time to get up to speed if there's any questions that Mr. John

24  George and Mr. Engel have to consider as to what questions can

25  be asked of the defense witnesses that they plan to call, or

73

1    whether or not they want to ask any questions of the defense

2    witnesses that you -- that the other defendants want to call.

3            So the Court's satisfied that there's not an issue at

4    this point in time.  There could be later and I'll revisit it

5    once we know more information about it, but I'm -- I'm not

6    concerned with whether or not Mr. John George is prepared to

7    proceed.

8            All right.

9            MR. LEVENTHAL:  Thank you, Your Honor.

10           MR. TANASI:  Thank you, Your Honor.

11           THE COURT:  So let's go ahead and call in the jury,

12   and, I think, Mr. Leventhal, are you next up for cross?

13           MR. LEVENTHAL:  No.  Mr. Perez is.

14           THE COURT:  Mr. Perez will be.  Okay.  Thank you.

15      (Brief pause in proceedings.)

16      (Jury returned to courtroom at 10:40 a.m.)

17           THE COURT:  All right.  Everyone may be seated.

18           We're back from our bathroom -- morning bathroom

19   break and we have FBI Special Agent Willis back on the stand,

20   and Mr. Perez, you may begin with your cross-examination.

21           MR. PEREZ:  Thank you, Your Honor.

22

23              CROSS-EXAMINATION OF JOEL WILLIS

24   BY MR. PEREZ:

25   Q.   Agent Willis, my name is Shawn Perez and I represent

74

1     Mr. Lovelien, one of the defendants.

2             I don't know if it was on direct or on cross, you

3     said that you spent approximately a thousand hours reviewing

4     Facebook and photos and things of that nature; correct?

5     A.   Yes.

6     Q.   And of that thousand hours, do you have an estimation of

7     how many photos you reviewed?

8     A.   Thousands.

9     Q.   Thousands of photos?

10    A.   Yes.

11    Q.   And -- and Facebook pages, not Facebook accounts, but just

12    sheer number of Facebook pages?

13    A.   Like, public Facebook pages?

14    Q.   Right.

15    A.   I don't know, hundreds.

16    Q.   Hundreds of pages?

17    A.   Yes.

18    Q.   Okay.  And -- and how many different Facebook accounts?

19    A.   That's one in the same to me, so hundreds.

20    Q.   Okay.  So you're not referring to -- well, strike that.

21    Let's start over.

22            For example, Mr. Lovelien's Facebook, there is, you

23    know, like a thousand pages of Facebook pages inside his

24    account.  So, what I'm trying to get at is how many actual

25    pages of -- did you review of over all the accounts that you

1    looked at?

2    A.   Facebook is like a website.

3    Q.   Right.

4    A.   So, it's hard to determine as I'm scrolling down a page,

5    how many pages that is.

6    Q.   Right.

7    A.   I don't think I'm following you.

8    Q.   Well, like, for example, I think in your book, I think

9    it's Exhibit 213, if you could just take a look that for just

10   one second.

11        And then if I'm not mistaken, I think just the first

12   page, there should be a blue box up at the top and it's got the

13   Facebook page?

14   A.   Yes.  It's a Facebook business record page.

15   Q.   Okay.  And then if you flip the page to the next document,

16   I would assume that that page is in succession; correct?

17   A.   Yes.

18   Q.   Okay.  Now, with that in mind, I mean, approximately how

19   many of those Facebook record pages did you look at?

20   A.   That I assisted in during this --

21   Q.   Right.

22   A.   -- investigation?

23        I would say 500,000 pages.

24   Q.   So half a million pages of documents?

25   A.   Yes.

1    Q.    Okay.  And then you synthesized those pages into what you

2    found to be relevant.  Is that fair to say?

3    A.    Yes.  I was involved in that process.

4    Q.    Okay.  And now, the same thing with photos.  You said

5    there were thousands of photos.  And we've seen in Exhibit 457

6    there's approximately 80 photos -- no.  Excuse me.  I think

7    it's 86.

8    A.    There -- there are photos and screenshots of videos, yes.

9    Q.    Right.  Correct.  But, essentially photos from -- from the

10   PowerPoint?

11   A.    Yes.

12   Q.    Okay.  And then obviously you made some sort of a

13   determination on how -- which photos to use to establish your

14   timeline?

15   A.    Yes.

16   Q.    Okay.  Now, as far as -- and I want to deal specifically

17   with Mr. Lovelien.  There's -- I believe there are six photos

18   of Mr. Lovelien in those 86 pages, two of which are the same

19   from different angles.  So there's actually five different

20   shots, five photos.

21                We can go through it.

22                Bryan, pull up 457.  First one would be Number 20.

23        (Photo displayed.)

24   BY MR. PEREZ:

25   Q.    Number 20, you got that?

77

1    A.   Yes.

2    Q.   Okay.

3         MR. PEREZ:  And then Bryan, Number 63.

4      (Photo displayed.)

5         THE COURT:  And just for the record, these are all in

6    the series of the Exhibit 457.

7         MR. PEREZ:  457, Your Honor.

8         And then 64.

9      (Photo displayed.)

10   BY MR. PEREZ:

11   Q.   That's three right there; correct?

12   A.   Correct.

13        MR. PEREZ:  And Number 69.

14     (Photo displayed.)

15        MR. PEREZ:  And 70

16     (Photo displayed.)

17        MR. PEREZ:  Actually, let me see 71 for a second,

18   Bryan.

19     (Photo displayed.)

20        MR. PEREZ:  Okay.  No.  That's it.  Go back.

21        And then 85.

22     (Photo displayed.)

23   BY MR. PEREZ:

24   Q.   Is that correct?  So, I mean, we have --

25   A.   Those are six photos.

1    Q.    -- the six photos?

2    A.    But you're missing two of them that are in this

3    presentation, but those are six photos that you just referred

4    to.

5    Q.    And which photos would that be?

6    A.    That would be slide Number 2 and slide Number 4.

7    Q.    Okay.  Let's take slide Number 2.

8          Actually, let's go to slide Number 1.  I have a

9    question about slide Number 1.

10         (Photo displayed.)

11   BY MR. PEREZ:

12   Q.    Can you tell me who's driving that truck?  Can you -- no.

13   Strike that.

14         Can you see the driver?

15   A.    No, I cannot.

16   Q.    Okay.

17         MR. PEREZ:  Go to Number 2, Bryan.

18         (Photo displayed.)

19   BY MR. PEREZ:

20   Q.    Okay.  Now that's Mr. Lovelien.  So I guess I missed one;

21   correct?

22   A.    Two.

23   Q.    And what would be the other one?

24   A.    Also slide 4.

25   Q.    Slide 4.

79

1   A.   Where he's standing with his arms crossed where we can see

2   his tattoo.

3   Q.   Okay.  Correct.  So he's standing with his arms crossed.

4              In any of those photos is Mr. Lovelien pointing a gun

5   at anyone?

6   A.   He -- he is holding a gun in some of them, but not

7   pointing it at anyone that we could see.

8   Q.   He's holding -- can you tell me which photo he's holding a

9   gun.

10             And you're -- by "holding," you mean with his hands;

11  correct?

12  A.   Yes.  Or one of his hands, yes.

13             I did not bookmark which ones you had referred to.

14  So, it will just take me a second.

15             MR. PEREZ:  Court's indulgence, Your Honor.

16             THE COURT:  Yes.

17         (Brief pause in proceedings.)

18             THE WITNESS:  I could give you an example of one

19  right now, 63, while I look for the others.

20  BY MR. PEREZ:

21  Q.   63?

22  A.   Yes.

23             MR. PEREZ:  Okay.  Pull up 63.

24         (Photo displayed.)

25             ///

1    BY MR. PEREZ:

2    Q.    Okay.  Let's talk about 63.

3    A.    Yes.

4    Q.    The gun is over his shoulder; correct?

5    A.    It appears to be slung over his neck over his left

6    shoulder and slung down and he's holding it next to his right

7    hip.

8    Q.    Okay.  And then what is the other photo?

9    A.    I think -- well, it would be the next one in the order

10   there.  We also have 64.  20.

11        (Photo displayed.)

12   BY MR. PEREZ:

13   Q.    Okay.  Let's talk about Number 20.  I asked you if you had

14   any photos of Mr. Lovelien pointing a gun.  Who is he pointing

15   it at in picture Number 20?

16   A.    Again, he appears to just have it slung on his right side.

17   Q.    So -- so did he -- in fact, there is no picture of

18   Mr. Lovelien pointing a gun at anyone, is there?

19   A.    I -- I don't have a picture of Mr. Lovelien pointing a gun

20   at anyone.

21   Q.    And you've looked at thousands of photos and half a

22   million pages of Facebook posts; correct?

23   A.    Yes, I have.

24   Q.    And yet, you found six photos of Mr. Lovelien and not one

25   of them he's pointing a gun?

81

1    A.   Well, again, several of these --

2    Q.   Well, that's yes or no.  I mean, is that true?

3         MR. MYHRE:  Objection.  Argumentative, Your Honor.

4    BY MR. PEREZ:

5    Q.   It's a yes or no question.

6    A.   No.  I disagree with you.

7    Q.   You disagree with me?

8    A.   Yes.  These are videos.  I --

9    Q.   Okay.

10   A.   This is a snapshot of a video, not a photo.

11   Q.   All right.  Well, in any of these snapshots of video you

12   don't have any snapshots, photos, or anything of him pointing a

13   weapon; correct?

14        MR. MYHRE:  Objection.  Argumentative.

15        THE COURT:  Well, I think he can answer the question.

16        Overruled.

17        THE WITNESS:  That's correct.

18   BY MR. PEREZ:

19   Q.   Okay.  Now, as far as Facebook posts, I believe it was the

20   first day that you testified --

21        THE COURT:  Just to be clear, I think -- because I

22   think the second time when you posed the question you said "you

23   don't have."

24        MR. PEREZ:  Well, --

25        THE COURT:  So, again, the witness doesn't have the

82

1    burden of producing any evidence.  I think what you meant is

2    you didn't see --

3              MR. PEREZ:  Right.  You didn't see.

4              THE COURT:  -- because that's how you asked it the

5    first time.

6              MR. PEREZ:  You didn't see.  In those half a million

7    pages, you didn't see any photos of Mr. Lovelien pointing a

8    weapon?

9              THE WITNESS:  Correct.

10   BY MR. PEREZ:

11   Q.   Okay.  Now, I believe that this was on direct.  You talked

12   about Facebook a little bit and how it works and we were

13   talking about tagging and untagging.

14   A.   Yes.

15   Q.   Okay.  Now, correct me if I'm wrong, but I believe you

16   said that in order -- you can -- a person can untag themselves;

17   correct?

18   A.   Yes.

19   Q.   Okay.  But in order to untag themselves, they would have

20   to see the post; correct?

21   A.   Yes.  They would receive a notification --

22   Q.   So, if --

23   A.   -- that they were tagged.

24   Q.   If you didn't --

25              MR. MYHRE:  Objection, Your Honor.  Let him finish

1    the answer.

2                    THE COURT:  Yeah.  Let him finish, please.

3    BY MR. PEREZ:

4    Q.   If you didn't look at your Facebook every day, the way

5    that Facebook populates, you might not see that tag; correct?

6    A.   Depending on your notification settings, you could receive

7    a text message or an e-mail, something like that, that would

8    notify you that there was activity on your --- a Facebook

9    account like that.  So you wouldn't necessarily have to log

10   into your Facebook account.

11   Q.   Right.  But if you didn't have those settings, then you'd

12   have no idea?

13   A.   That -- that is possible.

14   Q.   Okay.  Now, as far as, like, if someone posts something on

15   their website and you're their friend, that posts to your wall,

16   correct, as well?

17   A.   Depending on your settings, yes.

18   Q.   Okay.  So it's not something necessarily that you post

19   there?

20   A.   On your wall?

21   Q.   Right.

22   A.   You can allow people to post things on your wall, yes.

23   Q.   Okay.  But it's not necessarily something that you've

24   written?

25   A.   No.  But it is on your wall.

84

1    Q.   Right.

2    A.   Yes.

3    Q.   Okay.  Now, as far as some of the Facebook things that you

4    went through, that many pages and I assume you went through the

5    private conversations between Facebook friends?

6    A.   Yes.  That was within the scope and parameters of the

7    warrants.

8    Q.   Okay.  And did you find any Facebook messages between

9    Mr. Lovelien and Mr. Parker?

10   A.   I -- I don't recall at this time without reviewing.

11   Q.   How about with Mr. Engel?

12   A.   Between who?

13   Q.   Mr. Lovelien and Mr. Engel.

14   A.   Mr. Engel and Mr. Lovelien.  I don't recall at this time.

15   Q.   How about with Mr. Stewart and Mr. Lovelien?

16   A.   Again, I don't recall.

17   Q.   Okay.  And I'm assuming you don't recall about

18   Mr. Burleson either?

19   A.   Correct.

20   Q.   Okay.  Do you know if Mr. Lovelien was friends with any of

21   the other four individuals that I just named?

22   A.   During what time frame?

23   Q.   At any time.

24   A.   After April 12th?

25   Q.   Before April 12th.

85

1    A.    Not that I'm aware of.

2    Q.    Okay.  Now . . . Bryan, pull up 78.

3          (Photo displayed.)

4    BY MR. PEREZ:

5    Q.    Explain to me what we're looking at right here in slide

6    78.

7              THE COURT:  And again, this is 457-78.

8              MR. PEREZ:  Yes.

9              THE WITNESS:  Yes.

10             This is FBI aerial surveillance footage of the Toquop

11   Wash, including the southbound and northbound I-15 bridges.

12   There are several people on horseback, close to the southbound

13   I-15 overpass, vehicles on both bridges, and also BLM vehicles

14   on the left side of the image in the Toquop Wash.

15   BY MR. PEREZ:

16   Q.    Okay.  Now, on the far right side of that particular image

17   do you see a semitruck and two other vehicles sort of like

18   side -- next to it?

19   A.    Yes.

20   Q.    Okay.  Now, from some of the other pictures and videos and

21   things that we've seen in the last two days, would it be fair

22   to say that the vehicle that was sort of at a diagonal to the

23   semi is the NHP . . . I believe it's Madsen's vehicle?

24   A.    Yes.

25   Q.    Okay.  And that's -- in relationship to the wash, I mean,

1   how far away is that?  Do you know?

2   A.   I could approximate.  I -- I -- I would say down that road

3   maybe 80 to a hundred yards, but then down to actually get onto

4   ground level into the wash, so maybe another 20 yards after

5   that, 30 yards.

6   Q.   Okay.  Do you have any -- or strike that.

7           In your perusal of this half a million pages of

8   Facebook and countless photos, do you have any photos of

9   Mr. Lovelien in the wash?

10  A.   No.

11  Q.   Do you know if Mr. Lovelien went into the wash?

12  A.   I'm not aware of that.

13          MR. PEREZ:  Bryan, 457-70.

14      (Photo displayed.)

15  BY MR. PEREZ:

16  Q.   Can you tell me what you see in that photo?

17  A.   Yes.

18          There's Mr. Engel and he is kneeling holding a rifle.

19  A little bit further west down northbound I-15 is Mr. Lovelien.

20  He's standing next to an individual with a white shirt and a

21  light-colored hat and then behind them is an NHP trooper pickup

22  truck.

23          MR. PEREZ:  Okay.  And Bryan, go back to the previous

24  . . . number.  I believe that was . . . the bridge.  That one.

25      (Photo displayed.)

1    BY MR. PEREZ:

2    Q.   So, we're talking about this area (indicating) right in

3    front of the vehicle on the right-hand side of the screen

4    that's at a diagonal; correct?

5    A.   Yes.

6    Q.   And how far -- going back to the previous one again, how

7    far would you say Mr. Lovelien is from that -- that trooper's

8    vehicle?

9    A.   Maybe 20, 30 feet.

10        MR. PEREZ:  Okay.  And then Bryan, back again.

11        (Photo displayed.)

12   BY MR. PEREZ:

13   Q.   And -- now from this angle, I -- it's sort of hard to tell

14   but, from your perusal of other photographs and things that

15   you've seen -- and you've seen a lot of them -- can you tell me

16   what the viewpoint is looking towards the -- over in this area

17   (indicating)?  I mean, what is the line of sight?  Do you have

18   any idea, or have you seen any photos from that particular

19   angle looking down into the wash?

20   A.   Are you referring to --

21        MR. PEREZ:  Bryan -- what happened here?

22        THE WITNESS:  -- this photo?

23   BY MR. PEREZ:

24   Q.   From -- from approximately here (indicating), what would

25   be his line of sight?  Do you have any photos that depict that

88

1   line of sight?

2   A.   That I've reviewed?

3   Q.   Yeah.  That you've reviewed.

4   A.   I have photos from a similar vantage point, yes.

5   Q.   Okay.  So then you might be remotely familiar with whether

6   or not the . . . I guess you'd call it the abutment on this

7   bridge, this right here (indicating), would obstruct any view

8   of anything that was going on back in this area (indicating);

9   correct?

10  A.   Yes.  That's logical.

11  Q.   Because you don't have a clear line of sight back there?

12  A.   No.

13          MR. PEREZ:  Okay.  You can take that down, Bryan.

14          Actually, I have nothing further.  Thank you.

15          THE WITNESS:  Okay.

16          THE COURT:  Mr. Leventhal?  Or Mr. Jackson?

17

18              CROSS-EXAMINATION OF JOEL WILLIS

19  BY MR. JACKSON:

20  Q.   Agent Willis, you spent over a thousand hours preparing

21  for this case; is that right?

22  A.   Yes.

23  Q.   And most of that time was reviewing videos; is that right?

24  Or reviewing Facebook pages or reviewing photos; is that right?

25  A.   No.  I wouldn't say most of the time.  A large chunk of

1  the time, yes.

2  Q.   You spent a thousand hours, you said, reviewing film and

3  reviewing video and reviewing documentary-type evidence; is

4  that right?

5  A.   Yes, sir.

6  Q.   Did you spend any time actually talking to live witnesses,

7  interviewing witnesses?

8  A.   Yes.

9  Q.   And which -- which eyewitnesses did you interview or -- or

10 go out and --

11           MR. MYHRE:  Objection, Your Honor.  Relevance.

12           MR. JACKSON:  Well, I think it's relevant.  If he's

13 trying to compare videos with what witnesses saw or whatever

14 who he talked to as live witnesses I think is important.

15           MR. MYHRE:  That would be calling for hearsay,

16 Your Honor.

17           THE COURT:  It would be hearsay.

18           MR. JACKSON:  I'm sorry, what?

19           THE COURT:  It would be hearsay.

20           MR. JACKSON:  I just want to know who he talked to

21 because if he's comparing video evidence with -- with things

22 and drawing up a time chart, which witnesses he talked to and

23 what they said is -- is relevant.

24           THE COURT:  No.  What they said is hearsay.  If you

25 want to ask him about particular people --

1          MR. JACKSON:  I just asked who; I didn't ask what

2     they said.  I just want to know who he talked to.

3          THE COURT:  You said what they said.

4          You can ask him specifically about witnesses, not --

5     not entire lists.

6          MR. JACKSON:  I think it goes to his bias and other

7     things.  I just want to know which witnesses, if any, he talked

8     to.

9          THE COURT:  Right.  You can ask him specifically.

10    BY MR. JACKSON:

11    Q.   How many witnesses did you speak to, live witnesses,

12    concerning this case?

13         MR. MYHRE:  Objection, Your Honor.

14         MR. JACKSON:  What's the objection?

15         MR. MYHRE:  The objection is what is the relevance,

16    number one.  Number two is that whether the -- to count

17    witnesses is -- it's beyond the scope of anything that this

18    witness has testified about.

19         MR. JACKSON:  This is cross-examination, Your Honor.

20    I'm not --

21         THE COURT:  Overruled.  I think he can -- he can

22    ask --- he can answer the question -- if he has the

23    information, he can answer the question.

24         THE WITNESS:  Can you repeat the question, sir?

25              ///

1    BY MR. JACKSON:

2    Q.   Approximately how many witnesses -- you might not have an

3    exact count, but, approximately, live witnesses did you speak

4    to in preparing this case?

5    A.   By -- by witnesses, are you saying anybody that was

6    involved with the 12th or anybody that had any information?

7    Q.   Right.

8    A.   That -- that would be hard to say.  I -- between a hundred

9    and 200.

10   Q.   So you actually spoke to a hundred witnesses about this

11   case?

12   A.   I would say approximately, yeah.

13   Q.   And you talked to people that were specifically on the

14   videos that you observed and people on the Facebook accounts

15   and things like that to follow up what was on those Facebook

16   accounts and on those videos to correlate them, correlate them

17   with your time kind of approximations you've made?

18   A.   Did I correlate -- I'm sorry.  Did I correlate people's

19   statements with what they had provided as digital evidence?

20   Q.   Right.

21   A.   Yes.  At times, yes.

22   Q.   All right.  Now, you said that you looked at over 500,000

23   video images or photographs or whatever in your investigation?

24   A.   No.  Probably -- thousands of video/photo evidence and

25   then 500,000 pages of business records from Facebook search

1   warrant responses, approximately.

2   Q.   So you -- you scanned those or you actually read those or

3   what -- how much -- how much time did you take -- it took you

4   to do that?  You were doing that 10 hours a day, how many weeks

5   of doing that -- were you doing that?

6   A.   I couldn't say.

7   Q.   Was that off of a computer screen or were you reading

8   papers, or how were you doing that?

9   A.   Both.

10  Q.   Did you get a headache from looking at that many --

11  500,000 pages of computer data?

12          THE COURT:  Mr. Jackson -- Mr. Jackson --

13          MR. MYHRE:  Objection, Your Honor.

14          MR. JACKSON:  All right.

15  BY MR. JACKSON:

16  Q.   Now, in those -- all those images you looked at, you saw

17  my client Gregory Burleson on some of those images; is that

18  correct?

19  A.   Yes.

20  Q.   And you brought those into court with you the other day.

21  You brought into court the images that you thought were most

22  relevant; is that correct?  On Mr. Burleson.

23          MR. MYHRE:  Objection, Your Honor.  The witness is

24  not testifying as to what's relevant or irrelevant.  It's a

25  legal conclusion.

1          MR. JACKSON:  All right.  I'll rephrase the question.

2    BY MR. JACKSON:

3    Q.   Did you have any images or pictures that showed

4    Mr. Burleson pointing a weapon at anybody?

5          MR. MYHRE:  Objection to "you have," Your Honor.

6    BY MR. JACKSON:

7    Q.   Did you bring with you any images that -- of Mr. Burleson

8    pointing a weapon at anybody?

9          MR. MYHRE:  Objection as to what he brought.

10         THE COURT:  You can ask him if he -- in his review of

11   all of these photos and videos did he see.

12   BY MR. JACKSON:

13   Q.   In reviewing all the video and images and Facebook posts

14   and whatever, were there any pictures of Mr. Burleson pointing

15   a weapon at one of the BLM agents?

16   A.   Yes.

17   Q.   Which one?

18   A.   The . . . is it the Fox News video that we -- we included

19   a snapshot of.  Mr. Burleson is -- has his weapon pointing in

20   the direction of where the cattle gate was underneath the

21   southbound overpass briefly and then as he's squatting down.

22   Q.   Well, he was pointing it in the direction; is that right?

23   But he --

24   A.   Yes.

25   Q.   Is that -- your inference was that he was pointing it at

1    someone; is that right?

2              MR. MYHRE:  Objection.  Argumentative.

3    BY MR. JACKSON:

4    Q.   Did you actually see who he was pointing it at?

5    A.   I -- I -- I'm aware that there were people at the cattle

6    gate at that time, including SAC Dan Love.

7    Q.   Okay.  You can't see a person in that photo though, can

8    you?

9    A.   Other than Mr. Burleson, no.

10   Q.   All right.  So you -- you just draw a conclusion that he's

11   pointing at someone because it's somewhere in the direction of

12   where people are; is that right?

13   A.   Yes.

14             MR. MYHRE:  Objection.

15             MR. JACKSON:  Well, what's the objection?

16             THE COURT:  He's answered the question.  That's fine.

17             MR. JACKSON:  All right.

18   BY MR. JACKSON:

19   Q.   Now, you testified that Mr. Burleson moved around a lot

20   when he was at the scene; is that right?  He moved from left to

21   right, back and forward; is that correct?

22   A.   At the scene on -- in the wash or . . .

23   Q.   At -- at -- yes.  Your video showed that; is that right?

24   A.   Yes.

25   Q.   And he moved towards the cameraman on numerous occasions;

1   is that right?

2   A.   No.

3   Q.   Cameraman moved towards him; is that right?

4   A.   In one of the exhibits that we showed, yes.

5   Q.   That was a Channel 8 News cameraman?

6   A.   Yes.

7   Q.   And there was some pictures taken of him by a Channel 8

8   News photographer?

9   A.   Video that we reviewed, yes.

10   Q.   All right.  And that -- that photo was posted on

11   Mr. Burleson's website soon after this event occurred; is that

12   right?

13   A.   Yes.

14   Q.   In fact, one of the photos looks like Mr. Burleson was

15   actually posing for the Channel 8 News man.  Isn't that

16   correct?

17          MR. MYHRE:  Objection.  Argumentative, Your Honor.

18          THE COURT:  And I think we have two different things

19   going on.  The witness keeps talking about a photo and

20   Mr. Jackson, you keep talking about a video.

21   BY MR. JACKSON:

22   Q.   Well, it was a -- a photo that went on the -- his Facebook

23   page; right?

24   A.   Yes.

25   Q.   And it's of him holding a gun, kind of like this

1    (indicating).  I think it's Exhibit No. 276.

2              Do you have that with you?

3    A.   276?

4              MR. JACKSON:  Can we show that?

5         (Photo displayed.)

6              THE WITNESS:  Slide 44?  Is that the one you're

7    referring to?

8              MR. JACKSON:  No.  I think it's -- 2 -- 278.  278.

9              THE COURT:  276 is on the screen.

10   BY MR. JACKSON:

11   Q.   That's the one that he -- Mr. Burleson posted on his

12   video.  Isn't that correct?

13   A.   On his Facebook page?

14   Q.   276.

15   A.   On his Facebook page, sir?

16   Q.   Yes.

17   A.   Yes.

18   Q.   And that one was taken by the news photographers; is that

19   right?

20   A.   Yes.

21   Q.   And apparently Mr. Burleson was proud of that photo; is

22   that right?

23             MR. MYHRE:  Objection, Your Honor.  Speculation.

24             MR. JACKSON:  Well --

25             THE COURT:  Sustained.

1   BY MR. MARCHESE:

2   Q.   All right.  He put it on his video just a few days

3   after -- or on his Facebook page a few days after this

4   happened.  Isn't that correct?

5   A.   Yes.

6   Q.   What was the date that it first appeared on his Facebook

7   page?

8   A.   It's slightly cut off on my screen but I believe it's

9   April 15th, 2014.

10  Q.   Now, the first video or -- or -- or image that you had of

11  Mr. Burleson at the scene in Bunkerville was approximately

12  11:59 a.m., wasn't it?  That you brought -- or that you were

13  able to discover; is that right?  In your research of all these

14  photos that you looked at.

15  A.   I think you're referring to the Dennis Michael Lynch video

16  where he runs from the skirmish line up to the concrete

17  embankment.  Yes, that would be approximately 11:59.

18  Q.   But of all the photos of the 500,000 video images and

19  whatever you looked at, you didn't find any other photos of

20  Mr. Burleson before that time; is that right?

21  A.   That I could time stamp?

22  Q.   Yes.

23  A.   That is correct.

24  Q.   And the last one that you had in your series of photos

25  that you had was, I think, time stamped about 1:30 or 1:25; is

1    that correct?

2    A.    On this project, that -- that sounds correct.

3    Q.    All right.  So there's about a one and a half hour time

4    period that you have photos of Mr. Burleson; is that right?

5    A.    Yes.

6            MR. MYHRE:  I'm going to object to "you have,"

7    Your Honor.  What he's viewed?

8    BY MR. JACKSON:

9    Q.    All right.  So of the -- of all the videos that you viewed

10   of Mr. Burleson, in the thousand hours or so that you were

11   viewing videos, there's only one and a half hours that you were

12   able to find pictures or videos of him during that April 12th

13   incident at -- in Bunkerville that day; is that right?

14   A.    Approximately, yes.

15   Q.    All right.

16   A.    That's correct.

17   Q.    Now, in none of those videos you saw Mr. Burleson shooting

18   anyone; is that correct?

19   A.    That is correct.

20   Q.    And he didn't throw a rock at anyone in any of those

21   videos or photos; is that right?

22   A.    That's correct.

23   Q.    And he didn't verbally threaten anyone; is that correct?

24   You don't have any -- any audio of him threatening a police

25   officer, do you?

1    A.    That's correct.

2    Q.    He didn't do any damage to a police car that you know of?

3    A.    Not that I know of.

4    Q.    And you don't have any video showing where Mr. Burleson

5    went after 1:30 on April 12th of 2014; is that correct?

6    A.    From approximately that time, no.

7    Q.    You don't know who he -- who he left with or who he went

8    home with or who he drove off with; is that correct?

9    A.    I have no video or photo evidence of that, correct.

10              MR. JACKSON:  The Court's indulgence for a minute.

11              THE COURT:  Sure.

12         (Counsel conferring.)

13              MR. JACKSON:  I have no further questions,

14   Your Honor.  Thank you.

15              THE COURT:  All right.

16              Mr. Leventhal.

17              MR. LEVENTHAL:  Thank you, Judge.

18

19              CROSS-EXAMINATION OF JOEL WILLIS

20   BY MR. LEVENTHAL:

21   Q.    Good morning --

22   A.    Good morning.

23   Q.    -- Agent Willis.  My name is Todd Leventhal.  I represent

24   Mr. Drexler.  You know that.

25   A.    Yes.

1   Q.   I'm going to run you through sort of a timeline that --

2   and see if you agree with everything if that's okay.

3   A.   Yes.

4           MR. LEVENTHAL:  Bryan, can you pull up Government's

5   132 that's already been admitted.  That's going to be the

6   aerial photos.  I know you --

7           And can you go to 1852.

8   (Photo displayed.)

9   BY MR. LEVENTHAL:

10  Q.   Okay.  So, you see this -- the aerial photo here; right?

11  A.   Yes, sir.

12  Q.   Okay.  And that's the -- that's a high ridge; correct?

13  A.   It is a ridge of -- yes, higher than the Toquop Wash, yes.

14  Q.   Okay.  So it's above the wash and it's above the north and

15  southbound I-15; correct?

16  A.   That's correct.

17  Q.   Okay.  And there's some vehicles up there; correct?

18  A.   Yes, there are.

19  Q.   Okay.  And now you investigated this; you indicated how

20  long you spent investigating.  During your investigation or

21  during the course of your investigation had you heard that some

22  of the protestors had thought that there were snipers --

23  whether it was true or not -- thought that those were snipers

24  up there?

25          MR. MYHRE:  Objection, Your Honor.  Relevance --

1          MR. LEVENTHAL:  Goes to state of mind.

2          MR. MYHRE:  -- and calls for hearsay.

3          MR. LEVENTHAL:  It goes to state of mind and it would

4    -- of my client because that was what was -- whether it was

5    true or not, that's what was thought of at the time when people

6    looked up on the ridge.

7          MR. MYHRE:  Objection, Your Honor.  We'd move to

8    strike this argument.

9          THE COURT:  Sustained.

10          MR. LEVENTHAL:  Okay.

11          Go ahead and play 8 -- from there, Bryan.

12       (Video played.)

13          MR. LEVENTHAL:  Okay.  Now, stop, Bryan.

14   BY MR. LEVENTHAL:

15   Q.   You see in the middle here it seems like this airplane's

16   following another one; correct?  Is that what I circled

17   (indicating)?

18   A.   Yes.  At that time, yeah.  Well, it's capturing images of

19   that other aircraft, yes.

20   Q.   Okay.  Thank you.

21          MR. LEVENTHAL:  Go ahead, Bryan.

22       (Video played.)

23          MR. LEVENTHAL:  Okay.  Go ahead and stop.

24   BY MR. LEVENTHAL:

25   Q.   So, we've got -- now we've got this image here

1    (indicating) of an airplane that's flying around; correct?

2    A.   Yes.

3    Q.   And obviously the airplane -- I don't know if it's a

4    helicopter or an airplane -- that's above it that's actually

5    taking, so that's two that we know of, airplanes or -- that's

6    flying around; correct?

7    A.   Correct.

8    Q.   Okay.

9         MR. LEVENTHAL:  Go ahead and play -- and now, if we

10   stop right here.

11   BY MR. LEVENTHAL:

12   Q.   At this point traffic is moving on the southbound and

13   northbound; correct?

14   A.   I -- I do not see any traffic at this time moving on the

15   northbound.

16   Q.   Okay.  Fair enough.

17        Southbound is moving?

18   A.   It appears to be, yes.

19   Q.   Okay.  And it's 1829:29 and I apologize, I don't know how

20   to do your Flynn -- what is it, Flynn baseline calculation?

21   A.   Conversion.  Yes.

22   Q.   Okay.  So, could you tell us what that would be in terms

23   of your Flynn baseline calculation?

24   A.   Yeah.  Yes.  It would be approximately 11:26 a.m.

25   Q.   Okay.  All right.  And clearly there's nobody underneath

1   the northbound bridge (indicating)?

2   A.   No.   I do not see anybody under the northbound bridge.

3   Q.   Nobody's in the middle the wash; correct?

4   A.   That's correct.

5   Q.   Okay.   But we do have some BLM agents' vehicles up on

6   that -- the other side; correct?

7   A.   Yes.

8   Q.   Okay.

9          MR. LEVENTHAL:   You can keep playing it.

10         (Video played.)

11         MR. LEVENTHAL:   And stop right there.

12  BY MR. LEVENTHAL:

13  Q.   I want to pay attention to this little area right over

14  here (indicating).   Looks like ants.

15         MR. LEVENTHAL:   Go ahead, Bryan.

16         (Video played.)

17  BY MR. LEVENTHAL:

18  Q.   Seems to be some movement there; correct?

19  A.   Yes.

20  Q.   Okay.   And those would be protestors coming?

21         MR. LEVENTHAL:   Stop, Bryan.

22         Can you back it up just for a second?

23         Thank you.   More than a second.

24         (Video played.)

25         MR. LEVENTHAL:   Okay.   Stop.   Perfect.

1   BY MR. LEVENTHAL:

2   Q.   All right.  So, we're right here (indicating).  These are

3   where you see this line of sort of people are walking; correct?

4   A.   Yes, I do see that.

5   Q.   Okay.  Now, from their vantage point, they'd have -- and

6   you've been out there, these hills (indicating), this is a

7   pretty high ridge; correct?

8   A.   It -- no.  I would not say that.

9   Q.   Would these people -- if you've been out there, would

10  these people, in your opinion, be able to see way over here

11  (indicating)?

12  A.   From --

13  Q.   Go ahead.

14  A.   No.  They would not be able to see.

15  Q.   Okay.  So as they're moving along this -- sort of this

16  trail here (indicating) as they get here (indicating), there

17  would be no way to see over that (indicating); correct?  To

18  I-15, south and north?

19  A.   That's correct.

20  Q.   Okay.  All right.

21          MR. LEVENTHAL:  If we can go to 28:20.

22          Okay.  Stop.

23  BY MR. LEVENTHAL:

24  Q.   All right.  Now we're a little bit ahead.  I think we're

25  about 10 minutes -- we're at 1839:19, which would be 11

1    approximately . . .

2    A.   35.

3    Q.   11:35.  Okay.

4          We see a lot more cars, vehicles there; correct?  BLM

5    vehicles?

6    A.   Yes.

7    Q.   Okay.  And I would assume -- and you've done a lot of

8    investigation -- each one of these people who drove these

9    vehicles would be armed; correct?

10   A.   As far as I know, yes.

11   Q.   Okay.

12   A.   Yes.

13   Q.   Okay.  They'd have lethal weapons on them; right?

14   A.   They have firearms on them.

15   Q.   Okay.  And we don't see anybody on the northbound bridge;

16   correct?

17   A.   I do not see anybody on the northbound bridge at that

18   time.

19   Q.   Okay.  We don't see anybody on the southbound bridge;

20   correct?

21   A.   There might be one person, but yeah, generally speaking,

22   there's nobody on the bridge.

23   Q.   Okay.

24         MR. LEVENTHAL:  If you can go ahead and play that,

25   Bryan, just for a second.

1      (Video played.)

2            MR. LEVENTHAL:  Stop.  Right there.

3   BY MR. LEVENTHAL:

4   Q.   Okay.  Now we got a better view of sort of how many BLM

5   agents are here; correct?

6   A.   There are law enforcement officer -- officers.

7   Q.   Okay.  Law enforcement:  Park police, BLM law enforcement

8   officers?

9   A.   Yes.

10  Q.   Okay.  And again, you would assume that every one of these

11  individuals would be armed; correct?

12  A.   Yes.

13  Q.   Okay.

14            MR. LEVENTHAL:  Go ahead, Brian, real quick.

15      (Video played.)

16            MR. LEVENTHAL:  Okay.  Stop.  Oh, back it up just for

17  a second.

18      (Video played.)

19            MR. LEVENTHAL:  Stop.

20  BY MR. LEVENTHAL:

21  Q.   All right.  So, now what we're looking at is now the

22  camera has panned away from all of the vehicles over here

23  (indicating), which would be the BLM vehicles; correct?

24  A.   Yes.

25  Q.   Okay.  And now we see a cluster down here (indicating).

1    And you've indicated, through Exhibit 457-11, that that would

2    be the protestors; correct?

3              I can put it up for you if you want.

4    A.   I got it.

5    Q.   You got it?

6    A.   That picture depicts people that we refer to as the prayer

7    circle in the wash, or near the wash.

8    Q.   Okay.  And I'm showing you what's been marked as 457-11 --

9    is that on?

10             COURTROOM ADMINISTRATOR:  Turn it.  There you go.

11             This is 457, slide 11?

12             MR. LEVENTHAL:  Slide 11.

13        (Photo displayed.)

14   BY MR. LEVENTHAL:

15   Q.   All right.  So, as we went to sort of a bird's-eye view,

16   now we're down at ground level; correct?

17   A.   Yes.

18   Q.   Okay.  And I think -- I don't know -- you've identified

19   this person here as being Mr. Lynch; correct?

20   A.   Yes.

21   Q.   Okay.  And Mr. Gourgeon would be standing on the other

22   side in a yellow shirt; correct?

23   A.   Yes.

24   Q.   Okay.

25             MR. LEVENTHAL:  All right.  If we could just go ahead

1    and play that again.

2         (Video played.)

3             MR. LEVENTHAL:  All right.  And now we get a

4    close-up -- stop right there.

5    BY MR. LEVENTHAL:

6    Q.   And now we get a close-up of that prayer; correct?

7    A.   The prayer circle, yes.

8    Q.   Okay.  All right.

9             MR. LEVENTHAL:  If we can go to 29:25.

10            24 is fine, Bryan.  There you go.

11        (Video played.)

12            MR. LEVENTHAL:  All right.  Stop.

13   BY MR. LEVENTHAL:

14   Q.   Okay.  So, now, just to get us where we're at.  Again, we

15   have prayer -- the prayer group as you call them; right?  And

16   we still don't see anybody on the northbound bridge; correct?

17   A.   Correct.

18   Q.   Okay.  Nobody's on the -- in the middle of the wash at

19   this point; correct?

20   A.   Correct.

21   Q.   Okay.  And I can't see the southbound bridge, but you

22   wouldn't -- and so you wouldn't be able to tell me whether or

23   not you know if there's somebody there now; right?

24   A.   Not in this image; correct.

25   Q.   Okay.

1          MR. LEVENTHAL:  If we can go to 34:42 real quick.

2      (Video played.)

3          MR. LEVENTHAL:  Stop.  All right.

4  BY MR. LEVENTHAL:

5  Q.   This individual in the middle there (indicating), that

6  person's been identified as Mr. Lynch; is that correct?

7  A.   Yes.

8  Q.   He's holding a camera?

9  A.   Yes.

10  Q.   And he's walking out to the middle of the wash; correct?

11  A.   Yes.

12  Q.   All right.  So, now we start to see maybe a person here

13  (indicating).  That would be the northbound bridge; correct?

14  A.   Yes.

15  Q.   Okay.  So there's two people here, and now there's still

16  some -- some of the protestors down here (indicating); correct?

17  A.   Yes.

18  Q.   Clearly there's nobody in the middle of the northbound

19  bridge at this point; correct?

20  A.   No.  There is no other people --

21  Q.   Okay.

22  A.   -- in that screenshot.

23  Q.   All right.

24          MR. LEVENTHAL:  If we can go to 430B.

25          430B.  To Lynch's video.

1        (Video played.)

2              MR. LEVENTHAL:  Okay.  Stop.

3    BY MR. LEVENTHAL:

4    Q.   All right.  So, again, we've got Mr. -- just to -- get our

5    bearings.  We've got . . . Mr. Gourgeon indicated he's in the

6    yellow shirt there; correct?

7    A.   Yes.

8    Q.   Okay.  And this is the prayer group.

9              MR. LEVENTHAL:  Go ahead, Bryan, play it.

10        (Video played.)

11             MR. LEVENTHAL:  Okay.  Stop, Bryan.

12             Okay.  Well you can -- go a little bit further.

13        (Video played.)

14             MR. LEVENTHAL:  Stop.

15   BY MR. LEVENTHAL:

16   Q.   Okay.  So, you've indicated, or did you indicate that

17   there were weapons or there were a lot of weapons in this group

18   or any weapons in this group, did you know?

19   A.   There were weapons in that group.

20   Q.   There were.  Okay.  And I assume that this (indicating)

21   would be a little pink gun of some sort?

22   A.   That's what that appears to be.

23   Q.   Okay.  And there's either maybe another rifle in there;

24   correct?

25   A.   At least one, yes.

1    Q.   Okay.  All right.

2              MR. LEVENTHAL:  Go ahead and go to 54 seconds, Bryan.

3         (Video played.)

4              MR. LEVENTHAL:  Stop.

5    BY MR. LEVENTHAL:

6    Q.   So as Mr. Lynch is moving forward, he's got his camera;

7    correct?

8    A.   Yes.

9    Q.   Okay.  And he's panning up and down; correct?

10   A.   Yes.

11   Q.   Okay.  And we still don't see anybody here on the

12   southbound -- underneath the southbound bridge; correct?

13   A.   Yes.

14   Q.   We don't see anybody underneath the northbound -- or the

15   other side of the southbound bridge; correct?

16   A.   From this shot I don't see anybody.

17   Q.   Okay.

18              MR. LEVENTHAL:  Go ahead.

19        (Video played.)

20              MR. LEVENTHAL:  Stop.

21   BY MR. LEVENTHAL:

22   Q.   Again, this is the northbound bridge; correct?

23   A.   Yes.

24   Q.   Underneath?

25   A.   Yeah.  The east side of the northbound bridge.

1    Q.   Okay.  Nobody's there yet; correct?

2    A.   That I could see from this shot, correct.

3    Q.   Okay.  All right.

4         MR. LEVENTHAL:  And go ahead, Bryan, and play it.

5         (Video played.)

6         MR. LEVENTHAL:  Stop right there.

7    BY MR. LEVENTHAL:

8    Q.   Okay.  So these, again, are the prayer group that --

9    they're just praying; I mean, a group -- it's the protestors,

10   the prayer group; right?

11   A.   People in the wash.

12   Q.   People in the wash.  Okay.

13        MR. LEVENTHAL:  Go ahead, Bryan.

14        (Video played.)

15        MR. LEVENTHAL:  Can you turn it up?

16        Okay.  Stop.

17   BY MR. LEVENTHAL:

18   Q.   Now, apparently they're doing some kind of advancing;

19   correct?

20   A.   They're moving north.

21   Q.   Moving north and -- and I don't know if you can hear it,

22   can you hear where they're saying, We want to get under the

23   shade?

24   A.   I did hear that.

25   Q.   You did.  Okay.

113

1          MR. LEVENTHAL:  Go ahead, Bryan.

2       (Video played.)

3          MR. LEVENTHAL:  Okay.  Stop right there, Bryan.

4    BY MR. LEVENTHAL:

5    Q.   I think I heard -- did you hear her say, "Sit when you get

6    to the shade" --

7    A.   Yes.

8    Q.   -- correct?  The lady's voice said that?

9    A.   Yes.

10          MR. LEVENTHAL:  Okay.  Go ahead, Bryan.

11       (Video played.)

12          MR. LEVENTHAL:  Okay.  Stop.

13    BY MR. LEVENTHAL:

14    Q.   All right.  And again, we don't see anybody underneath the

15    southbound; correct?  The bridge, on either side?

16    A.   From this image, that's correct.

17    Q.   Okay.  And I don't know if we got an image of the

18    northbound, but still clearly nobody's around yet; correct?

19    Underneath, other than the protestors.

20    A.   From the images you've showed me, other than the people

21    that have advanced north, I -- I did not see anybody else.

22    Q.   Okay.

23          MR. LEVENTHAL:  Can we go to Government's 76, please,

24    Bryan.

25          ///

1    BY MR. LEVENTHAL:

2    Q.   And while he's pulling that up, we were watching Lynch as

3    he was progressively going out into the middle of the wash;

4    correct, Agent Willis?  That's correct?

5    A.   He appeared to be moving out to the wash, yes.

6    Q.   Okay.  And at some point he is here (indicating).  We now

7    have a different view.  He's now in the middle of the wash;

8    correct?

9    A.   Yes.

10   Q.   So, sequentially, we're in sort of the same time frame.

11   He's walked into the middle -- do you want me to clear that?

12            Do you see him?

13   A.   I believe that is him.  It's . . .

14            MR. LEVENTHAL:  Do you want to back up for me?

15   BY MR. LEVENTHAL:

16   Q.   Well, can you -- do you want to see it again?

17   A.   Oh, no.  No.  I agree.

18   Q.   Okay.

19            MR. LEVENTHAL:  Go ahead and play this.

20        (Video played.)

21            MR. LEVENTHAL:  Stop right there.

22   BY MR. LEVENTHAL:

23   Q.   Okay.  So you've heard that now that some -- people are

24   starting to show up; correct?

25   A.   There are definitely people on the northbound bridge.

115

1   Q.   Definitely more than just a few minutes ago; correct?

2   A.   Absolutely.

3   Q.   Okay.  And they're a little bit surprised.  "This ain't

4   BLM," somebody indicates.  "They were supposed to leave."

5           Did you hear that?

6           MR. MYHRE:  Objection.  Calls for speculation,

7   Your Honor.

8   BY MR. LEVENTHAL:

9   Q.   Did you hear somebody say, "This ain't BLM.  The sheriff

10  said they were going to leave"?

11  A.   Yes.

12  Q.   You heard that?

13  A.   I heard -- I heard that general statement, yes.

14  Q.   Okay.  And a gentleman then responded, "This ain't BLM";

15  correct?

16  A.   Yes.

17  Q.   Okay.  And at that time did you see where it panned up

18  over the northbound bridge?  Did you see anybody in the middle

19  of the northbound bridge at that point?

20  A.   Not from this vantage point I did not see that.

21  Q.   Okay.

22          MR. LEVENTHAL:  If we can go back to 430B.

23          MR. GINN:  430B?

24          MR. LEVENTHAL:  Yes.

25          ///

1    BY MR. LEVENTHAL:

2    Q.   And before we get there, Agent Willis, did you know

3    whether or not any of the BLM agents had pointed their weapons

4    at any of these protestors at this point?

5             MR. MYHRE:   Objection, Your Honor, as to "did you

6    know."

7    BY MR. LEVENTHAL:

8    Q.   During your investigation, have you come across anything

9    to suggest that BLM had pointed their weapons at these

10   protestors?

11   A.   At the people in the prayer circle at this point?

12   Q.   Yes.  Yes.

13   A.   No.

14   Q.   No?  Okay.

15            MR. LEVENTHAL:   Go ahead and 430B, if we can go to

16   2:21.

17        (Video played.)

18            MR. LEVENTHAL:   Okay.  Stop.

19   BY MR. LEVENTHAL:

20   Q.   All right.  You see this image right there (indicating)?

21   A.   Yes.

22   Q.   Okay.

23   A.   Yes.

24   Q.   If I showed you 457-22 . . .

25        (Photo displayed.)

117

1    BY MR. LEVENTHAL:

2    Q.   You indicated that this picture was taken at 11:58;

3    correct?

4    A.   Yes.

5    Q.   Okay.  And we see here this shield (indicating); correct?

6    A.   Yes.

7    Q.   Okay.  And we have a person here with a -- I guess that's

8    a non-lethal weapon, or it's paint, or some kind of chemical or

9    something?

10   A.   Yeah, it's --

11   Q.   Do you know?

12   A.   A pepper ball gun.

13   Q.   A pepper ball gun.  Okay.

14             And we have this weapon here (indicating) at -- and

15   that's -- what is that?

16   A.   Appears to be a gas cannister launcher gun.

17   Q.   Okay.  And we've got this weapon here (indicating).

18             What does that appear to be?

19   A.   Like an AR-style rifle.

20   Q.   Okay.  And that's lethal?

21   A.   Yes.

22   Q.   Okay.  And we've got a weapon here (indicating); correct?

23   A.   Yes.

24   Q.   And that's lethal?

25   A.   Yes.

1   Q.   And a weapon here (indicating).

2        Can you see that?  Do you want me to --

3   A.   Yes.

4   Q.   Right there (indicating).

5        That's lethal?

6   A.   Yes.

7   Q.   Okay.  And I don't know if you could see it on this

8   gentleman here (indicating) -- I don't think you can -- all

9   right.

10  A.   I would agree that -- I mean, that these law enforcement

11  officers all have firearms on them.

12  Q.   Okay.  And that was at 11:58.

13       MR. LEVENTHAL:  If we can go back to 221.

14       (Photo displayed.)

15  BY MR. LEVENTHAL:

16  Q.   Now, it appears that that's the same shield; correct?

17  A.   That could be.

18  Q.   Okay.  And again, you've got a person here (indicating)

19  that looks to be aiming something; correct?

20  A.   I -- I can't tell that, no.

21  Q.   Okay.

22       MR. LEVENTHAL:  If we can go to 430D.  Again, this is

23  one of Mr. Lynch's videos.  And go to 5 seconds in.

24       (Video played.)

25       MR. LEVENTHAL:  Stop.

119

BY MR. LEVENTHAL:

Q.   This gentleman right here (indicating), he appears to be
pointing something; correct?

A.   I -- I cannot tell that from this screenshot.

Q.   Okay.

        MR. LEVENTHAL:  Can we go to 430F.

     (Video played.)

        MR. LEVENTHAL:  Stop it.

BY MR. LEVENTHAL:

Q.   At some point Mr. Lynch then exited from the center of the
wash; correct, Agent Willis?

A.   He exited --

Q.   He left.  He went back to the protestors?

A.   He went back to the people under the northbound I-15
bridge, yes.

Q.   Okay.

        MR. LEVENTHAL:  If we can go ahead and play 430F.

     (Video played.)

        MR. LEVENTHAL:  Can you turn it up?

     (Video played.)

        MR. LEVENTHAL:  Stop right there.  Stop.

BY MR. LEVENTHAL:

Q.   Okay.  Did you hear Mr. Lynch come back and say that he
said if we do anything, we will be shot?

A.   He said that they're breaking an order and if we do

1   anything, you could get shot, something to that effect.

2   Q.   Okay.  But he said that twice; correct?

3   A.   Some -- yes.  In general, yes.

4   Q.   All right.  So the word that got back was that someone was

5   going to get shot; correct?

6            MR. MYHRE:  Objection, Your Honor.  Argumentative.

7   BY MR. LEVENTHAL:

8   Q.   That's what he came back and said; correct?

9   A.   Along with you're breaking an order, yes.

10  Q.   Okay.  When you say, "you're breaking an order," I'm not

11  sure what you mean.  You want to play that again?  I didn't

12  hear "you're breaking an order."

13           MR. LEVENTHAL:  Can we play that again, and turn it

14  up, please.

15       (Video played.)

16           MR. LEVENTHAL:  Okay.  Stop.

17  BY MR. LEVENTHAL:

18  Q.   "If you're breaking an order, you could be shot."

19  A.   No.  He said, "You're breaking an order, or whatever, and

20  you can be shot."

21  Q.   Okay.  Now, you put Mr. Drexler in your timeline as being

22  in the parking lot at 11:43; correct?  That would be 457-19 --

23  no. 14.

24           MR. LEVENTHAL:  Can you bring that up, Bryan.

25       (Photo displayed.)

121

BY MR. LEVENTHAL:

Q.   Okay.  You put Mr. Drexler there at 11:43; correct?

A.   Yes.

Q.   Okay.  And that would be at the parking lot, which would

be about quarter of a mile, half a mile to the under -- where

the bridge is, the Toquop Wash?

A.   To the Toquop Wash.

Q.   Yes.

A.   Approximately, yes.

Q.   Half a mile maybe?

A.   You said -- I would agree a quarter mile.

Q.   A quarter mile?

A.   Yes.

Q.   Okay.  All right.  And the protestors, you indicated, were

protesting or had gotten there at approximately 11:36; correct?

A.   The first time I see vehicles based on the aerial --

Q.   You know what, I'm sorry.  It was a wrong question.

          The protest -- the prayer group, that would be at

11:36; correct?

A.   The prayer circle, yes.

Q.   Okay.  All right.

          MR. LEVENTHAL:  I have nothing further.  Thank you.

          THE COURT:  Redirect, Mr. Myhre?

          MR. MYHRE:  If I may have just one moment,

Your Honor.

1           THE COURT:  Yes.

2       (Counsel conferring.)

3           MR. MYHRE:  Yes.  Briefly, Your Honor.

4       (Brief pause in proceedings.)

5           MR. MYHRE:  Your Honor, may I call up 457-45, please.

6           THE COURT:  Yes.

7

8               REDIRECT EXAMINATION OF JOEL WILLIS

9   BY MR. MYHRE:

10  Q.   Agent Willis, you were asked yesterday about the time

11  stamping of 457-45.

12          Do you recall that yesterday?

13  A.   Yes.

14  Q.   And specifically, you were asked about the bar that runs

15  along at the lower part of this image.

16          Do you see that?

17  A.   Yes.

18  Q.   And you were about to explain what that bar meant and you

19  discussed using a viewer.  Can you please describe what you

20  meant by using a particular viewer.

21  A.   Yes.  When I view videos on my computer, evidence in this

22  case, I would use a number of different viewers.  So, VLC

23  Player, Windows Media Player, QuickTime Player, Windows Movie

24  Player to determine which one plays it in the most clarity, in

25  the clearest fashion.  For example, the Shilaikis videos would

1  play the best on Windows Media Player as far as clarity.

2  Q.   So, when you have the media itself, it's -- it's digital

3  data essentially; is that correct?

4  A.   Yes.

5  Q.   And that digital data can play in different types of

6  programs to view the images?

7  A.   Yes.

8  Q.   When you were conducting your investigation and you were

9  reviewing these images, what type of viewer did you use to

10 derive the images that we see on 457-45?

11 A.   This is Windows Media Player.

12 Q.   Now yesterday, you were shown Exhibit 111, I believe; is

13 that correct?

14 A.   Yes.

15          MR. MYHRE:  And may we draw up 111.

16          And if we could advance 111 to the time frame that

17 was indicated on the exhibit, which is 8:09.

18          If you could just advance it from there and just stop

19 at 8:09.

20          Okay.  Thank you.

21      (Photo displayed.)

22 BY MR. MYHRE:

23 Q.   And you were asked whether the image that was on your

24 PowerPoint presentation and on your summary, at 45, whether

25 that image appears at 8:09 in the image in Exhibit 111.

1            Do you recall that?

2   A.   Yes, I do recall that.

3   Q.   And what was your answer to that?

4   A.   No.  It was different than what I have in 45.

5   Q.   Is the viewer that is used -- first of all, is -- does

6   Exhibit 111 have -- use a viewer as well?

7   A.   Yes.

8   Q.   In other words, to see the images we see in Exhibit 111,

9   it requires a viewer to be used; is that right?

10  A.   Yes.

11  Q.   Is that viewer the same or different than the one you

12  used?

13  A.   It is different.

14  Q.   And as a result of that difference, does that affect the

15  time bar that was depicted in 457-45?

16  A.   In my experience, yes, it does.

17            MR. MYHRE:  Now, if we could move that back to about

18  7:50.  And if we could play forward from there and stop at

19  7:57.

20       (Video played.)

21  BY MR. MYHRE:

22  Q.   Now, in this view, at 7:57, we see the truck; is that

23  correct?

24            MR. MYHRE:  If you can -- just move it back just a

25  little bit and continue to play forward.

125

1        (Video played.)

2            Okay.  Stop there.

3            Just back a little bit.

4            And forward from there.

5            There we go.

6    BY MR. MYHRE:

7    Q.   Now -- and if I can get a time stamp on that.

8            At 7:58, does that view match with the view that you

9    have at 457-45?

10   A.   It's -- it's -- yes.  Very similar, yes.

11   Q.   Very similar.  Perhaps a couple of milliseconds off?

12   A.   Exactly.

13   Q.   So, with respect to Exhibit 111, are you confident that

14   the images that you have derived in constructing Exhibit 457

15   are contained in the exhibit, Exhibit 111?

16   A.   Yes.

17   Q.   And the time differential here, using the image that we've

18   captured here is -- at 7:58; is that correct?

19   A.   Yes.

20           MR. MYHRE:  Now, if we could just advance just a

21   little bit further from there.

22       (Video played.)

23           MR. MYHRE:  Stop.  And time stamp.

24           And continue on.

25       (Video played.)

1          MR. MYHRE:  And stop.  And time stamp?

2          A little bit -- right there.  Right there.  At 8:07.

3          If you can move just . . . a little bit back from

4     there, please.

5          There.  Thank you.

6     BY MR. MYHRE:

7     Q.   Now, this is at 8:06.7; is that correct?

8     A.   Yes.

9     Q.   And at 8:06.7 do you recognize the individual in this

10    particular image?

11    A.   Yes.

12    Q.   And who is that?

13    A.   Todd Engel.

14    Q.   And the individual in 457-45 is who?

15    A.   That's Todd Engel.

16    Q.   Now, comparing that image that you have -- are you

17    referring to your paper copy of 457?

18    A.   Yes, I am.

19    Q.   In comparing the image of 457-45 to the image captured in

20    Exhibit 111, off to your left, how do they compare?

21    A.   They appear to be identical.  I don't see any differences

22    between the two.

23    Q.   So what is the difference then on the time bar depicted in

24    Exhibit 457-45 and the time bar depicted in the image of 111?

25    A.   Approximately 1.27 seconds.

Q.   So, in terms of the derivation of your time stamping for Exhibit 257-45 and the other Shilaikis videos, is that significant?

A.   No.  We were rounding down to the nearest minute.

Q.   That was my next question.

In doing this project and completing this project, were you asked to derive times down to seconds?

A.   No, I was not.

Q.   When you derived your time stamping for these images, the methodology used, where -- what was the closest that you could get to?

A.   Through my methodology was to the second, but as far as the timeline for this exhibit it was to the minute.

Q.   Now, would that same issue, with respect to the viewer, hold true for 257-46 -- 250 -- 460 -- I'm sorry -- 457-46 and 48, which were Exhibits 111 -- or derived from Exhibits 111?

A.   Yes.

Q.   So with respect to 111 and the images that you captured in Exhibit 457, there would be a 2 second time differential, or somewhere in there?

A.   Yes.  Approximately.

MR. MYHRE:  May I have just a moment, Your Honor?

THE COURT:  Yes.

(Counsel conferring.)

MR. MYHRE:  I don't know, Your Honor, if you wanted

1  to -- yesterday --

2            THE COURT:  Yeah, the --

3            MR. MYHRE:  -- you had indicated you were taking

4  under advisement a Motion to Strike.

5            THE COURT:  Right.  The motion was in regards to

6  457-45, 46, and 48, not 47.  So we just clarified 45, but we

7  haven't clarified 457-46 or 457-48.

8            MR. MYHRE:  46, 45, and 48.

9            THE COURT:  Yes.

10  BY MR. MYHRE:

11  Q.   Okay.  Agent Willis, looking at 457-45, 46, and 48, are

12  those all derived from Exhibit 111?

13  A.   Yes, they are.

14  Q.   And the viewer used when you did your analysis, was that

15  the same viewer for each of those slides?

16  A.   Yes.

17  Q.   And is the viewer that is depicted in Exhibit 111 that has

18  been shown in court, is that the same viewer?  In other words,

19  is it the same time differential for each of those slides?

20  A.   Yes.

21            THE COURT:  And what was the time differential?  I

22  note down 1.27 seconds, but I'm not sure if that's what you

23  said.

24            THE WITNESS:  Yes.  For the example that Mr. Myhre

25  showed between Exhibit 457-45 and where he had stopped the

1    exhibit that played on the display.

2              THE COURT:  So is it 1 minute and 27 seconds or 1.27

3    seconds?

4              THE WITNESS:  1.27 seconds.

5              THE COURT:  Okay.

6              Anything else, Mr. Myhre?

7              MR. MYHRE:  No, Your Honor.

8              We believe that we've established the time and

9    therefore the Motion to Strike should be denied.  The only --

10   the differential is 1.2 seconds as to each of the exhibits that

11   were challenged.

12             THE COURT:  I thought I remember Mr. Marchese playing

13   an entire minute of -- of the video.

14             MR. MYHRE:  I'm sorry, Your Honor?

15             THE COURT:  I thought I recalled Mr. Marchese playing

16   an entire minute of the video.

17             MR. MYHRE:  I believe he was playing --

18             THE WITNESS:  He played a little bit before the time

19   stamp and then played it -- well, maybe he didn't get --

20   actually, maybe he didn't get through the whole minute because

21   I think Agent Willis interrupted him, but I thought it was more

22   than one second so, I . . .

23             MR. MYHRE:  No.  I believe the issue was whether the

24   image appeared on the counter or -- excuse me -- the time bar

25   that was used --

 1          THE COURT:  In the photo.

 2          MR. MYHRE:  -- in the photo as when viewed through

 3   Exhibit 111.  And that image does not appear in Exhibit 111 at

 4   the time bar in the photo, but the time bar used in the photo

 5   was different than the viewer that's used in 111.  And the

 6   agent has explained, and as we've demonstrated, there's only

 7   1.2 second differential between the two.  So if you move from

 8   8:09 in the -- as depicted in the exhibit, and you move it back

 9   1.2 seconds before that time period, the image appears on

10   Exhibit 111.  And that would hold true for 45, 46, and 48,

11   which are all derived from the same exhibit.

12          THE COURT:  Well, let's see 46 and 48 to make sure.

13          MR. MYHRE:  If we could draw up Exhibit 111, please,

14   again.  And if we advance to about 8.18 and play forward.

15      (Video played.)

16          MR. MYHRE:  8.18, please.

17      (Video played.)

18          MR. MYHRE:  Okay.  Stop.

19          I'm sorry.  Back up just a little bit.

20          Okay.  Thank you.

21   BY MR. MYHRE:

22   Q.  And Agent Willis, if you could look at your paper version

23   of 457-46, that's Exhibit 111 -- or derived from 111; correct?

24   A.  Yes.

25   Q.  And what does the time bar read in the image that you've

1    captured for this particular slide?

2    A.   This is 8 minutes and 18 seconds.

3    Q.   No.  I'm talking about in --

4    A.   Oh.  My time?  I'm sorry.

5    Q.   -- Exhibit 457-46.  I'm sorry.  That was a bad question on

6    my part.

7             457-46, there's a time bar in the image that you've

8    captured for this particular exhibit.

9    A.   So, 8 minutes, 21 seconds.

10   Q.   All right.  Now looking at that exhibit and looking at

11   what's been -- what's been displayed on your screen as Exhibit

12   111 at about 8.18; is that correct?

13   A.   Yes.

14   Q.   Okay.  Do those images -- do those images appear to be the

15   same?

16   A.   Yes.

17   Q.   And who is -- this is rather blurry.  I don't know if we

18   can get a better shot.

19            In -- thank you.  That's good.  And that's at

20   8:18:26.

21            On 111, looking at your screen, who is depicted --

22   who have you identified as being depicted in this image?

23   A.   Eric Parker.

24   Q.   In Exhibit 457-46, at 8:21, using the viewer that you used

25   to construct this exhibit, who is depicted at that frame?

1    A.    Eric Parker.

2    Q.    Turning to Exhibit 457-48 in your exhibit -- if we could

3    advance this Exhibit 111 to about 9 --

4           THE COURT:  Well, before we get to 48, we're still on

5    46.  So, on the exhibit it states it's 8:21, but on the video

6    we're seeing now you're saying that it's 8:18.  So 21 minus 18

7    is 3; it's not 1.

8           MR. MYHRE:  I'm sorry, Your Honor?

9    BY MR. MYHRE:

10   Q.    So the difference -- what's the difference between the

11   8:21 and the 18 -- 8:18?

12   A.    Approximately 3 seconds.

13   Q.    Does that affect the time derivation that you've

14   calculated for Exhibit 2 -- 457-46?

15   A.    No, it does not.

16   Q.    And the reason?

17   A.    Because I was instructed based on this timeline to round

18   down to the nearest minute.

19   Q.    And the images are identical between the two?

20   A.    Yes.

21          THE COURT:  All right.  So let's go to 48 and see

22   where we find on the video the image that's depicted in 456-48.

23   BY MR. MYHRE:

24   Q.    So moving forward to 457-48, referring to your paper

25   version of that exhibit, what does the time bar indicate in the

1    image you've captured?

2    A.   9 minutes and 18 seconds.

3    Q.   And that's the viewer that you used to capture this image;

4    correct?

5    A.   Yes.

6              MR. MYHRE:   Now, referring to Exhibit 111, if we

7    could advance to 9 minutes, 15 seconds or so.

8         (Video played.)

9              MR. MYHRE:   That's good.   Thank you

10             And a time stamp there.   That's at 9:14:41.   I think

11   we're a little bit . . . there we go.

12             It's at 9:15:29.

13   BY MR. MYHRE:

14   Q.   Agent Willis, looking at 457-48 and comparing that to the

15   screenshot on Exhibit 111 at 9:15.296, what is the differential

16   there?

17   A.   What you have here on the display is a little bit before

18   48, but the differential currently is approximately 3 seconds,

19   less than 3 seconds.

20   Q.   So -- so going now -- comparing the images that are

21   captured, how does -- does this image that we've captured or

22   stopped at Exhibit 111, how does it compare to the image that

23   you captured at 457-48?

24   A.   It is very similar.   Close to the same, yes.

25   Q.   Perhaps not at the precise time?

1    A.    Like, a millisecond, you know.  Milliseconds difference.

2    Q.    Now, when calculating the difference between the counter

3    used in Exhibit 111 -- or the time bar in 111, and the time bar

4    used to capture the image, does that affect the time derivation

5    or time stamp that you arrived at in constructing Exhibit

6    457-48?

7    A.    No, it does not.

8            THE COURT:  Can you put 457-48 up so we can see and

9    compare it to the video Exhibit 111 --

10           MR. MYHRE:  I don't know if I can --

11           THE COURT:  -- at 9:15:29.

12           MR. MYHRE:  If I could borrow the exhibit, I could

13   put it on the ELMO perhaps.

14           THE COURT:  Sure.

15       (Brief pause in proceedings.)

16           MR. MYHRE:  I'm trying to think of a way to do it

17   side by side, Your Honor.  Since they're coming from -- one's

18   coming from --

19           THE COURT:  Oh, you don't have to do it side by side.

20   I mean, we can just put one right after the other and see --

21           MR. MYHRE:  Oh, I see.

22           THE COURT:  Yeah.  Just wanted to see if they're --

23   last time I saw it was yesterday, so . . .

24           MR. MYHRE:  All right.

25       (Discussion between counsel and courtroom administrator.)

1    BY MR. MYHRE:

2    Q.   Agent Willis, is this the screen capture you captured for

3    457-48?

4    A.   Yes.

5         (Photo displayed.)

6              MR. MYHRE:  Now if we could go back to 111.

7    BY MR. MYHRE:

8    Q.   And is this the image at Exhibit 111 at 9:15.296?

9    A.   Yes.

10             THE COURT:  All right.  That -- that clarifies it for

11   the Court as to those three exhibits.

12             Exhibit 456-45, 457-46, and 457-48, Motion to Strike

13   is denied.

14             MR. MYHRE:  If I may have just one moment,

15   Your Honor.

16        (Counsel conferring.)

17             MR. MYHRE:  We have nothing further, Your Honor.

18   Thank you.

19             THE COURT:  All right.  Any re -- recross?

20             MR. TANASI:  Not from Stewart, Your Honor.

21             MR. LEVENTHAL:  Not on behalf of Mr. Drexler.  Thank

22   you.

23             MR. PEREZ:  None on behalf of Lovelien.

24             MR. JACKSON:  None from Burleson.

25             THE COURT:  Mr. Tanasi or Mr. Marchese?

1          MR. TANASI:  None from Stewart, Your Honor.

2          THE COURT:  All right.

3          MR. MARCHESE:  We would just renew our motion,

4    Your Honor.  The exhibit is not what -- I don't know anything

5    about video players.  All I know is they entered an exhibit

6    that isn't what it purports to be.

7          THE COURT:  All right.  Well, he explained the

8    differential; it's seconds and he is rounding to the minute.

9    So it will be -- it's not . . . the difference is not

10   sufficient to affect the admissibility of the exhibit and

11   that's up to the jury to decide how much weight to give it and

12   the fact that it's off by 3 seconds, depending on which video

13   player you're using.  So the motion is denied.

14         All right.  Well let's go ahead then and take our

15   lunch break.  It's 12:06.  We'll plan to be back here by 1:10.

16         I do remind the jury during this time that you are

17   not to discuss this case with anyone nor permit anyone to

18   discuss it with you.  You can talk to your fellow jurors about

19   other things but not about this case.

20         Please do not read, or listen to, or view anything

21   that touches upon this case in any way, and do not attempt to

22   perform any research or any independent investigation regarding

23   anything concerning this case.

24         And please do not perform any opinion until after you

25   have heard all the testimony, been provided with -- seen all

1    the evidence, been provided with the written jury instructions.

2    After that you'll hear closing arguments.  Then you can begin

3    your deliberations.

4            So as I understand it, no one has any more questions

5    for Special Agent Willis and he can be excused; is that right?

6            MR. TANASI:  That's right, Your Honor.

7            THE COURT:  Okay.  So we'll go ahead and excuse

8    Agent Willis.  You don't have to come back this afternoon.

9        (Witness excused.)

10            THE COURT:  We'll go ahead and stand for the jury so

11   they can go have lunch and we'll plan to all be back here at

12   1:10 for the next witness.

13       (Jury excused from courtroom at 12:07 p.m.)

14            THE COURT:  All right.  Off record.

15            MR. MYHRE:  Your Honor, could we -- I'm sorry.  Could

16   we have just one brief thing?

17            THE COURT:  Sure.

18            Back on record.

19            MR. MYHRE:  I apologize.

20            We are anticipating calling Agent Caputo and then the

21   Charles Johnson witness as well.

22            THE COURT:  Um-hmm.

23            MR. MYHRE:  And we don't know whether the defense has

24   any issues raised with the cuts or the portions of the audios

25   that we've provided to them.

1              THE COURT:  Are these just coming in with Johnson or

2     prior to that with . . . did you say Lugo?

3              MR. MYHRE:  Agent Caputo.

4              THE COURT:  Caputo.  Okay.

5              MR. MYHRE:  Yes.  He has some brief recordings to

6     play.  I believe we've provided excerpts that we intend to

7     introduce through him as well to defense counsel, so either

8     one.  And we don't anticipate Agent Caputo's testimony lasting

9     very long so we'll probably move right into Charles Johnson so

10    that's why we wanted to -- we wanted to set aside some time if

11    they have an objection or if there are know objections, we'll

12    just proceed in the normal course.

13             THE COURT:  Okay.  So I reviewed all three of the

14    individuals and the -- along with the transcript.  I went ahead

15    and, according to the list that was provided of -- that

16    explained which ones are the portions that were going to be

17    played and which ones were the portion that were not going to

18    be played, I went and I highlighted all the ones that were not

19    going to be played and I didn't highlight the ones that weren't

20    going to be played and I went through and read them and just

21    highlighted in a different color words here and there so that I

22    would remember what that particular area was about.  What I saw

23    that was redacted was essentially self-serving statements,

24    statements regarding family that, you know, could or -- could

25    be considered character, good character evidence that wouldn't

1    be admissible in this process.  There were also statements

2    about politicians.  There were statements that were unrelated

3    to this particular event.  One of them was Kent State, and

4    there were conversations that took place, seemed like off

5    camera, and some of them had to do with whether or not

6    Mr. Stewart was still interested in an interview because his

7    phone wasn't working, or the phone had been cut off, or he

8    changed phones, something to that effect and so, Mr. Parker

9    discussing with the interviewer how he could get in contact

10   with Mr. Stewart in order to enable the meeting and so forth.

11   And so, a lot of that which was redacted I found to be

12   reasonable.  So if there's a particular area that's redacted

13   that defense thinks should be played, and that is relevant and

14   admissible under the rules, I'm more than happy to go back and

15   take a look at it.  I've got it right here; I just pulled it

16   up.  So, we can either do that now or after lunch if you want

17   to . . .

18          MR. MARCHESE:  I'm ready to go right now, Your Honor,

19   but I don't want to -- I know some people are probably hungry,

20   so I'll just leave it up to the Court and everyone else.

21          THE COURT:  Okay.  Well, we can come back here at

22   1:10 and then you can let me know if there's specific things

23   that either are going to be played that you think should not be

24   played and then tell me why, or things that are not going to be

25   played that specifically you think should be played and not

1    redacted and then I can give you a ruling.

2              MR. MARCHESE:  It's more the things that I want to be

3    played.  I don't believe I can have my cake and eat it to.  If

4    they're going to be playing it, then --

5              THE COURT:  Okay.  Well, if you give me a legal basis

6    for it, then --

7              MR. MARCHESE:  Right.

8              THE COURT:  -- I'll grant it.

9              MR. MARCHESE:  I have some arguments to make and the

10   Court will rule and I'll live with it either way.

11             THE COURT:  Okay.  All right.  So be back here at

12   1:10.

13             COURTROOM ADMINISTRATOR:  Off record.

14        (Recess was taken at 12:12 p.m.)

15        (Outside the presence of the jury at 1:21 p.m.:)

16             COURTROOM ADMINISTRATOR:  All rise.

17             THE COURT:  Thank you.  You may be seated.

18             All right.  So the next witness is the one that is

19   going to be referring to some of these videotapes.  Did the

20   defense have any motions that they want to make at this time so

21   I can address them?

22             MR. LEVENTHAL:  The next witness is who?

23             THE COURT:  Regarding these videotapes?

24             MR. LEVENTHAL:  Well, I don't think he's next, is he?

25             MR. MARCHESE:  Well, I don't believe he's next but I

1    believe he is upcoming.

2              THE COURT:  Oh.  I'm sorry.  I thought he was next.

3    I misunderstood.

4              MR. MYHRE:  No, Your Honor.  He'll be second.

5    Agent Caputo is first.  That is a different matter than the

6    tapes you're about to discuss.

7              THE COURT:  All right.

8              MR. MARCHESE:  So, in reference to the -- my --

9              THE COURT:  Do you think we'll not get through the

10   first witness before Officer Johnson today?  Because then we

11   could to it at the end of the day after the jury leaves.

12             MR. MARCHESE:  I will leave it up to the Court.

13             MR. MYHRE:  I don't -- I think we'll get through the

14   witness fairly quickly, Your Honor.

15             THE COURT:  Okay.  So go ahead, Mr. Marchese.

16             MR. MARCHESE:  Okay.

17             THE COURT:  Let's see if we can at least take care of

18   one of them.

19             MR. MARCHESE:  Well, Your Honor, I did a brief motion

20   yesterday on what our position is and that is we believe that

21   the statement in its entirety should come in.  Government was

22   nice enough to give us a transcript with their proposed cuts.

23   It's a 102-page statement and I believe it was cut into

24   approximately -- and don't quote me on this -- 18 different

25   clips.  Of the 18 different clips, it's very difficult to get a

142

1    coherent story of the actual interview given the fact that it's

2    cut up so much.  You know, the entire statement in its entirety

3    is approximately two hours and I haven't boiled it down to

4    exactly the numbers of what the Government wants to -- proposes

5    to bring into evidence but, I would say, give or take, it's

6    only about half of it.  So based upon that, contextually, I

7    think it's going to be very difficult for the Government to

8    make the argument that it's not going to mislead the jury.

9              Specifically, one of the things they start with --

10   and I'll leave the first -- I think I spoke about it

11   yesterday -- the majority of the beginning of it is, in fact,

12   irrelevant.  It's just -- you'll see on the video, just them

13   setting up, it's small talk, a little bit about Idaho, and

14   Mr. Parker's family life.  I don't object to that not coming in

15   because it's irrelevant and it's a waste of time basically

16   evidentiary-wise.  However, one of the places that they start

17   up -- start off, excuse me, is . . . on Page 18 where they

18   start off, "So what was your thought process?  What made you

19   decide, Hey, I'm going down there?"  And then Mr. Parker starts

20   to talk about the first -- the free speech zones and whatnot.

21   However, if you go back before that, there is -- Mr. Parker

22   talking about many other reasons in which he went down there.

23   Specifically, he talks about the man getting Tased, which, as

24   we know from the evidence that's been proffered throughout the

25   trial, was Ammon Bundy.  Dogs, which I believe his -- was he

1      was alluding to that same incident with Ammon Bundy.  The

2      Margaret Houston incident, also talking about a lady looking --

3      on a dump truck, which I believe is also alluding to the

4      Margaret Houston interview.  He also talks about -- and I know

5      there was some pretrial motions on this -- but he does, in

6      fact, talk about Governor Sandoval.

7              So, it's very difficult, I think to me, for the

8      Government, on the one hand, to just start the video there --

9      and I understand probably why they cut it where it did because

10     it would -- it looks -- when you do the edit, it looks like

11     that's where it's beginning because obviously the Government

12     doesn't want it to look as if they're chopping this up and

13     leaving things out, but at the end of the day I don't see how

14     they get around it because when they say, Why did you go down

15     there, Eric gives six different reasons, but yet we're only

16     giving the jury one reason.  I would argue that that's not the

17     rule of completeness.  That's what the whole purpose of that

18     rule is.  We don't want to mislead the jury; we want to tell

19     the full and complete story.

20             I can keep going because, like I said, there's 18

21     cuts.  I don't know if -- I think this is Mr. Dickinson's

22     witness.  I don't know if he wants to respond or how the Court

23     wants me to proceed.

24             THE COURT:  All right.  So I think the part that

25     you're referencing is on Page 16 of the transcript.

1           MR. MARCHESE:  Correct.

2           THE COURT:  And I don't know if this is marked.  You

3    may want to mark it as an exhibit to your motion so that it's

4    visible on the record for whoever else needs to see is in the

5    future, but I'm looking at Page 16 and it begins on about Line

6    9 asking about how you first heard about the situation.  That's

7    where Eric Parker talks about he saw a video, talks about the

8    name of the video being "Man Tased BLM."  Made me mad.  I saw

9    they Tased Ammon, Bundy's son.  He talks about the barking at

10   people and growling.  But one lady had went and got on the

11   truck to see in the back of a dump truck.  Thought there were

12   dead cows in there and then one BLM pulled her off of there and

13   threw her on the ground and she's a 53-year-old lady.  And then

14   it goes -- well, and then on the next page, on Page 17, it

15   talks about -- no.  At the bottom of Page 16 it says, "I did a

16   little research into the situation."  And then on the top of 17

17   says, "I believe it was a Nevada governor that said the family

18   had the rights to the land, that they didn't own the land, but

19   they had water rights and foraging rights and that was enough

20   for me to look into it more, and I did," and then he starts to

21   talk about some other things with a Chinese company for a solar

22   farm and Harry Reid's son and things like that.  So, it doesn't

23   sound like you want to go that far; you just want to go to Line

24   24 on Page 17.

25           Is that your request?

1          MR. MARCHESE:  Well, I think I'm in a situation in

2     that I don't -- like I said earlier, I don't think I can have

3     my cake and eat it, too.  If he's going to talk about the

4     reasons he came down, I think he needs to talk about all the

5     reasons he came down.  I'm not trying to mislead the jury

6     either.  I mean, the whole purpose of these proceedings is to

7     get the truth out and if those are Eric's words, then he has to

8     live by them.

9          THE COURT:  All right.

10          Mr. Dickinson, your response?

11          MR. DICKINSON:  Your Honor, I don't believe the

12     portion that starts -- we start on Page 16 is -- the question

13     is, "Okay.  So what was your thought process?  What made you

14     decide, 'Hey, I'm going down there?"  "I decided to go down

15     there," and he goes into the speech zones.  The question before

16     on Page 14 is how you first heard about Bundy ranch, and he

17     talks about what he saw.  So I don't think that takes what made

18     him decide to go down there and then the clips after that out

19     of context and makes it misleading.

20          THE COURT:  Okay.  Well, the Court agrees that there

21     is a distinction there and the information on Pages 16 and 17

22     requested do seem to be inadmissible self-serving statements.

23          Was there another portion that you also wanted me to

24     look at?

25          MR. MARCHESE:  That's correct, Your Honor.  And also,

1    Your Honor had reminded me of something.

2            I would like Government's 333 put into evidence as a

3    Court exhibit, just for the record, so that way, you know -- if

4    for any appellate purposes.  I believe that's a full -- the

5    full interview.  Now, obviously they're going to be bringing

6    clips in, depending on what Your Honor's ruling is, but, just

7    for the record I would like that to happen.

8            THE COURT:  Okay.  So Exhibit 333 has already been

9    marked; is that right?

10           MR. DICKINSON:  Your Honor, it was attached to the

11   Government's filing as Attachment A, and I apologize.  I don't

12   have the docket number on me, but it was -- we made it part of

13   the record on Friday and it was all three of the full videos of

14   Mr. Parker, Mr. Burleson, and Mr. Drexler, as well as the

15   transcripts with the timing on them as well.

16           MR. MARCHESE:  Okay.

17           THE COURT:  Okay.  Yes.  That's a good idea.

18           MR. MARCHESE:  Once again, a similar portion.  If we

19   look on Page 30 to 31 and then 32, Mr. Parker is talking about

20   other reasons in which he went down.  Specifically talking

21   about to protect protestors and that people have the right to

22   protest.  I believe that this is another portion that should be

23   brought into the record as it -- to make the record complete

24   and not to mislead the jury.  It's another one of the reasons

25   that shows Mr. Parker's state of mind as to what his reasons

1    were going to Bunkerville were back in 2014.

2              THE COURT:  Okay.  I don't see that on Page 30.

3              I see about the match of force.  And he was watching

4    a video.  Is it a different page?

5              MR. MARCHESE:  It -- I --

6              THE COURT:  Oh, 31.  Top of 31.

7              "I thought we would be there armed, of course, and

8    stand our ground and make sure the protestors don't get pepper

9    sprayed and make sure that the illegal arrests stopped."

10             MR. MARCHESE:  And, Your Honor, on your transcript,

11   you say it's 31?

12             THE COURT:  Yeah.

13             Do we have a different -- yeah, it's Page 31, Lines

14   14 through 16?  Is that not --

15             MR. MARCHESE:  Well, I have 14 to 16 but it -- for

16   me, it's Page 30, and I see Mr. Dickinson with a puzzling look.

17   So I'm assuming it's the same for him.

18             MR. DICKINSON:  Correct.

19             MR. MARCHESE:  But regardless, the verbiage,

20   that's -- was the verbiage that I was looking at, Your Honor.

21             THE COURT:  Okay.

22             And Mr. Dickinson, what do you think about that?

23             MR. DICKINSON:  I think that's self-serving in this

24   clip.  This portion that the Government doesn't intend to play

25   also talks -- Mr. Parker also talks about my goal and purpose

1    was to stand for the Constitution; people had the right to do

2    that; they're getting peppered spray and Tased; wasn't about

3    the cows; goes down and talks about pepper spray again.  Again,

4    that's self-serving and doesn't -- if I -- doesn't put any of

5    the clips the Government intends to put into evidence, it

6    doesn't make those clips misleading or out of context, those

7    specific clips we intend to use.

8             THE COURT:  All right.  So that's -- that's what I

9    thought, too, that they were improper self-serving statements

10    that are not admissible in this format through a different

11    witness.

12             MR. MARCHESE:  In addition, Your Honor, it's about a

13    page -- at least for me -- it talks about page -- for me, at

14    the bottom of Page 42 to the -- about halfway down to 43.  I

15    don't know if it's the same on yours.  It begins with, "Right

16    now, let me ask you this.  Are you a part of any militia?"

17             MR. DICKINSON:  The time stamp would be 41:57,

18    Your Honor.

19             THE COURT:  Okay.  "Now let me ask you this.  Are you

20    a part of any militia."  "No."  "Okay."  "No."  "And I guess my

21    next question would be, but do you believe in the militia?"

22    "Sure."

23             MR. MARCHESE:  Yes.  That's where it's picking up.

24    But my issue is, is that the part that's cut out it says,

25    "Right."  "Now let me ask you this.  Are you a part of any

1   militia?"  It says no.  All that portion is cut out and then it

2   picks up again, "I do believe in the militia," I believe.

3            So, to me, that is the misleading the jury for the

4   fact that Mr. Parker is, in fact, part of a militia.

5            THE COURT:  Well, he does say later on in the part

6   that they're admitting that "I'm not in any militia, but I do

7   support them."  That's at time stamp 42:39:13.

8            "I did go down there with the thought that if

9   something happens, I'm going to be with the militia.  I'm not

10  in any militia, but I do support them."

11           MR. MARCHESE:  Well, correct.  Then if we're bringing

12  in those statements, I don't see any reason why the rest of it

13  shouldn't come in.

14           THE COURT:  Do you have any objection to that,

15  Mr. Dickinson?  Starting off at 42:04:377.

16           MR. DICKINSON:  Just to say that it doesn't make --

17  that portion that's not in there doesn't make the next portion

18  misleading because as the Court pointed out, it says he's not

19  in the militia.

20           THE COURT:  Yeah.  The majority of what is in that is

21  the interviewer asking a lot of questions and giving . . .

22  information, like, is it fair to say that you . . . this, that

23  and the other.  So I'm not sure if . . . and plus, "You go down

24  there probably a lot more prepared than others."

25           All right.  Well, I don't see that it's necessary.  I

1    also don't see that it's inadmissible.  How much trouble would

2    it be at this point to add that to the clip?

3              MR. DICKINSON:  We don't have the full one in the

4    courtroom today, Your Honor.

5              THE COURT:  What's that?

6              MR. DICKINSON:  I said it would be difficult to do on

7    the fly, Your Honor.

8              THE COURT:  All right.  Well, I won't order you to do

9    it.  I don't think that it's inadmissible, but I don't think

10   that it adds anything either.  I don't think the portion that

11   the Government is introducing is misleading and requires this

12   other portion to come in.  The only answers provided by Parker

13   are, "Are you part of the militia?" is the question.  He says

14   no.  And the interviewer says, "And I guess my next question

15   would be, but do you kind of believe in the militia?" and he

16   says, "Sure."  Then the rest is just the interviewer talking

17   about we wanted to camp with the militia, you agreed with them,

18   you understood what they were doing, you supporting them,

19   mindset, plus you go down there probably a lot prepared than

20   others.  And Mr. Parker says, "Sure."

21             So, I mean, his -- it doesn't really add anything.

22             All right.  What other portion, Mr. Marchese?

23             MR. MARCHESE:  If we look at Page 49, to make it

24   easier, would be about 49 minutes, 5 seconds in.  There's a

25   point in which Mr. Parker is talking about his state of mind,

1    that there was a lady from the news that jumped in his face,

2    started asking him questions, and his state of mind that

3    "They're going to kill people here, ma'am.  Can you give me a

4    minute?"  Then there's a portion, pretty much the middle of the

5    page, the 50-minute portion on for about 24 seconds or so which

6    the Government intends upon bringing into evidence.  However,

7    then it picks up at the bottom of Page 50 to 51, starting at

8    50:29, once again, asking more questions and Eric talking about

9    his state of mind, specifically, "Hey, they may be authorized

10   to shoot us," which the interviewer asks him, Eric agrees.

11   They start asking him questions about his target, et cetera.

12   And then it picks up again on -- about 51:58.  To me,

13   contextually, cutting it up in the short clips is going to be

14   very difficult and I believe that his state of mind does come

15   in.  It's not self-serving; it would serve as a exception to

16   the hearsay rule.

17            THE COURT:  Okay.  So you're talking about at

18   49:05.279 where it says, "I get to that point pretty easily,"

19   and that was in response to the question, "Do you think that

20   could happen?"

21            MR. MARCHESE:  Correct.

22            Eric says, you know, that they were authorized to use

23   lethal force if the protestors took another step so he got down

24   and then the rest of that . . .

25            THE COURT:  And he says, "I get to that point pretty

1    easily" -- and it's not clear what he's talking about, at what

2    point -- he said, "but when that situation on the bridge

3    happened and they said they were authorized -- authorized to

4    use lethal force if those protestors took another step, as soon

5    as I got down, the paparazzi started going, people's cameras,

6    Reuters.  I got down on the ground and then the Reuters lady

7    jumped in my face and took a picture and started asking me

8    questions.  I said, 'They're going to kill people out here,

9    ma'am.  Can you give me a minute?'  So it didn't register right

10   then, but like I said, my aunt called me, I was still . . . on

11   the bridge.  She said, 'You're on the front of FoxNews.com.'  I

12   said, 'I am not,' and she sent me the picture and it was me,

13   yeah, oh, yeah, and we were still there."  So that's the

14   portion that you want included?

15            MR. MARCHESE:  Correct, Your Honor.

16            THE COURT:  Mr. Dickinson?

17            MR. DICKINSON:  It's completely self-serving,

18   Your Honor.  It doesn't put anything else out of context.

19            THE COURT:  I don't see how it's misleading.  I know

20   you're saying that it's not hearsay because it's his state of

21   mind but it's . . . not his . . . what did you say?  Because

22   it's his present sense impression?

23            MR. MARCHESE:  Well, no.  It's talking about that

24   they -- state of mind.  He thought that they were going to use

25   lethal force.  I mean, it's the same -- we've heard a litany of

1     officers coming in and what they were told and how -- its

2     effect on the hearer, et cetera.  To me, it's the exact same

3     thing; why he did what he did based on, you know, what he was

4     perceiving in his environment around him at the time.

5           THE COURT:  Yeah.  So if it's his state of mind, then

6     it's a self-serving statement.  It doesn't come in this

7     process.

8           MR. MARCHESE:  Well, I'd actually argue the opposite.

9     If anything, I mean, it's an exculpatory statement given the

10    fact -- or inculpatory given the fact that, I mean, the

11    Government's whole case is we've seen picture after picture of

12    Mr. Parker pointing a rifle and he's basically, if anything,

13    bolstering the Government's case, saying -- that he's admitting

14    that he pointed the rifle.

15         THE COURT:  All right.  Well, I'm not saying that

16    it's irrelevant, but procedurally it's not admissible under the

17    Rules of Evidence because it is a self-serving statement, not

18    an admission against interest.

19         MR. MARCHESE:  And then lastly, Your Honor, I'm just

20    going to deal with two big bulks of -- it's basically Pages 63

21    to 70 and 72 to 82.  It's the whole incident.  It's basically

22    he's just talking about what happened.  So, to me, Your Honor,

23    he's explaining, you know, 80 percent of what the alleged

24    criminal activity here is and he's -- in my opinion, I would

25    say he's admitting to it.  So I would argue that this is

1  something that the jury needs to hear; that it's -- if it is

2  self-serving, then he shouldn't be here because no crime, in

3  fact, occurred.  So, based upon that, I think the whole thing

4  should come in; the jury should be able to hear it.

5         THE COURT:  Mr. Dickinson?

6         MR. DICKINSON:  I'm assuming this motion is being

7  made under the rule of completeness which would be the

8  Government can put in whatever clips it wants to put in and the

9  only way additional clips come is if the clip -- the specific

10  clip or clips the Government is putting in can be tied to

11  something else that makes those misleading, and none of this

12  does that.  It's, again, self-serving.  Talks about drones and

13  snipers and facial recognition, and I thought they were private

14  contractors, it looked like it was in Fallujah.  They've been

15  authorized to use lethal force if you take another step.  It

16  talks about Columbine, Kent State.  You know, somehow switch --

17  spinning it that the Government were the aggressors.  We were

18  pushed into a corner.  The militarized people were aggressive

19  with their show of aggression.  I mean, it's exactly what the

20  Government doesn't have to put in.  It's self-serving.

21         THE COURT:  Yeah.  I agree, I just --

22         MR. DICKINSON:  And again, under -- and under the law

23  -- I apologize, Your Honor.

24         THE COURT:  No.  Go ahead.

25         MR. DICKINSON:  And under *Dorrell*, as we cited in our

1    brief, 758 F.2d 427, it goes more to his political-type

2    motivations for his actions in some -- in some respects, a lot

3    of this stuff.

4         MR. MARCHESE:  And I don't necessarily so much care

5    about the political motivations that Mr. Parker may or may not

6    have had.  I'm more interested in what occurred and what his

7    state of mind was and why he did what he did on the events in

8    question.

9         THE COURT:  Well, again, it's not that this

10   information is not necessarily relevant.  The question is

11   whether it can be elicited by the defendant in a criminal case

12   when it's self-serving statements that are provided and not

13   admissions against interest, which are considered to have more

14   probative credibility value than a self-serving statement.

15   Hence, that's part of the basis for the rule.  So I don't see

16   how it could be admissible through the Government's witness.

17        MR. MARCHESE:  Okay.  So, all 18 clips come in as-is

18   and all my objections are overruled; correct?

19        THE COURT:  Well, I'm looking through the remainder

20   of the portions that you were asking me to consider sort of en

21   masse and where they talk about private -- he talks about

22   private contractors and that he believed they had machine guns.

23   He talks about the prayers.  He talks about Kent State

24   University.  He goes into being an aggressor and crossing the

25   line and his understanding of that, taking your kids to a

1    protest shouldn't be dangerous.  Again, he talks about them

2    having machine guns.  Helicopters flying around and Humvees.

3    So, that . . . the next portion is his contact with the Bundys

4    and how many times he talked to Cliven and his sons.  His

5    explanation of his understanding of his communications with the

6    Nevada state troopers and their intentions and . . . the

7    people -- the guy -- the guy dressed in blue that he thought

8    was a marine and giving people water.  Talking about Harry Reid

9    again and the National Defense Authorization Act and that they

10   don't have to give you due process if you're a terrorist.  Then

11   he talks about how he believed that Bundy was willing to pay

12   Clark County because he obviously believes that the land is

13   Clark County land, but they wouldn't take it.  And the BLM is

14   not a law enforcement agency; it's only a property management

15   agency.  He talks about his questioning of whether federal

16   cases are bought and paid for and other federal judge rulings.

17   Talks about . . . being extremely proud of the outcome and the

18   overstepping of authority of the government.  Talks about

19   St. Louis, Missouri, and a different event there and the

20   sovereign citizen movement.  The Texas --

21            MR. MARCHESE:  And, Your Honor --

22            THE COURT:  -- Red River --

23            MR. MARCHESE:  I hate to cut you off, but I'm

24   actually just trying to make your life a little bit easier.  At

25   least on my exhibit or transcript, from 82 to 100, I was not

1    asking for those clips to be brought in.

2              THE COURT:  Okay.  So his mention of TSA and Homeland

3    Security --

4              MR. MARCHESE:  No.  That -- I agree that that's

5    irrelevant --

6              THE COURT:  Okay.

7              MR. MARCHESE:  -- and I don't know if it's

8    necessarily self-serving, but it's certainly irrelevant to

9    these proceeding.

10             THE COURT:  All right.

11             All right.  So that's my ruling.  The only part

12   really that I thought is not inadmissible doesn't actually add

13   anything and isn't any different than what's already provided.

14   It's just a more complicated way of saying the same information

15   that's already in there, which is to say that he is not A

16   militia member.

17             So, that motion -- so the motion is denied.

18             Did any other defendant wish to be heard about their

19   interviews?

20             MR. TANASI:  Your Honor, I'll go next.

21             THE COURT:  Okay.

22             MR. TANASI:  And it's not particularly about

23   Mr. Stewart's interview because that's not at issue here but --

24             THE COURT:  Right.

25             MR. TANASI:  -- I would just take the opportunity, I

158

1   guess, essentially to renew my severance motion and the *Bruton*

2   issue that come out of the statements that are made by some of

3   his co-defendants in this case when they speak about Steven or

4   speak about things in terms of "we" and what "we're" doing and

5   what "our" plans were.  Again, I think there's a *Bruton* issue

6   at that level.  So, I just would lodge, I guess, essentially an

7   objection to all the statements coming in in their entirety.

8          THE COURT:  Okay.  And I did find there was four

9   different statements in the transcript of Mr. Parker regarding

10  Mr. Stewart, but I don't think any of them were highlighted as

11  ones that the Government planned to introduce.

12         Can you verify that for me?

13         MR. DICKINSON:  I think his . . . 121.

14  "Interviewers:  Who went with you?"  "Eric Parker:  My buddy

15  Scott and my buddy Steve."  I think that's the only one of

16  Mr. Parker's.

17         And Mr. Drexler's, "Interviewer:  Steve, we're going

18  to see him tomorrow."  I see . . . as far as discussing who he

19  went down with.  And then there's a point where Mr. Drexler

20  states he heard the woman yell, "We need help at the bridge.

21  They're pointing guns at civilians and so at that point I

22  turned around to Eric and said, 'Hey, Eric, we need to get

23  going' and he yelled back at Steve and so we took off in almost

24  a run down the freeway and got down to the bridge and the

25  overpass that we were on."

1        THE COURT:  Okay.  So Mr. Tanasi, that's what you're

2   referring to?

3        MR. TANASI:  Essentially, Your Honor, and then any

4   other, I guess, use of the words "we."  I know it's a little

5   bit more attenuated, but I think there's more of the "we" talk

6   in Mr. Burleson's statements and again, just inherently, given

7   the conspiracy, and inherently, given the fact that I won't

8   have a chance to cross-examine Mr. Burleson on "we" and what he

9   meant by those statements, I think it triggers the *Bruton* issue

10  as well.

11       THE COURT:  Okay.

12       Mr. Dickinson?

13       MR. DICKINSON:  Well, it's not a *Bruton* issue,

14  Your Honor, because it's made to an undercover.  It's not

15  testimonial.

16       As far as -- obviously the Court would still have to,

17  like any evidence, evaluate it under 403, but the Government is

18  offering all three of these under 801(d)(2)(E).  They were --

19  essentially the undercover was styled as a documentary

20  filmmakers making a documentary film called *American Unloaded*

21  *[sic]* and the defendants were pitched that this would be a way

22  for them to get their messages out, specifically what occurred

23  there and how they succeeded in backing down the federal

24  government.  13 of our 19 defendants sat for interviews.  Off

25  the top of my head I know Mr. Parker, when he was first called,

1    by one of the undercovers, you know, they mentioned that, oh,

2    we've talked to Cliven Bundy, we've talked to Buddha, who is

3    co-defendant Brian Cavalier, Ryan Payne as well.  Mr. Parker

4    asked for -- said he had lost either Brian Cavalier's or Ryan

5    Payne's number and I want to call him.  Mr. Parker showed up

6    with Mr. Drexler.  They came together to the lodge where they

7    gave their statements, and essentially this was for them to get

8    their message out to -- you know, essentially -- partly to

9    evade responsibility by putting some of their spin on the

10   events to recruit members, the conspiracy was ongoing; to show

11   people -- because this was going to be, you know, proposed that

12   it was going to be disseminated widely that, you know, this can

13   work and what we did works and we don't want them coming back

14   to Bundy ranch; we want the BLM not to have law enforcement

15   authority, et cetera, et cetera.

16          Some of the case law, we cited *Yarborough*, which was

17   a case where one of the co-conspirators admitted to committing

18   a murder.  It's clearly in furtherance.  It's four months --

19   with Mr. Parker and Drexler, it's four months after the events

20   of April 12th.  With Mr. Burleson, it's in October.  So, six

21   months after?

22          THE COURT:  All right.  And so it's not unduly

23   prejudicial.

24          MR. DICKINSON:  And then Mr. -- and obviously

25   Mr. Drexler and Mr. Parker mention each other, but they came

together and there's -- almost coincide with the statements
that they played -- or with their statements, you know, almost
match up with what -- the recitation of what occurred was.

In Mr. Burleson's case, he mentions other what could
be considered unindicted co-conspirators, but does not mention
anybody else by name that's in trial in this case, although as
the Court well knows, Mr. Burleson does use rather aggressive
language about his intent on the 12th.  We cut out portions
that talk about things after the 12th.  For example, like, if
you went home and you were stopped by the police, we redacted
that.  We only kept in things that specifically focus on
Mr. Burleson's intent and the way he describes his actions on
the 12th.

THE COURT:  All right.

MR. TANASI:  Thank you, Your Honor.

THE COURT:  All right.  Thank you, Mr. Tanasi.

Anyone else want to be heard before we bring in the
jury?

All right.  Let's go ahead then and bring them in.

MR. JACKSON:  I just want to comment briefly,
Your Honor.

THE COURT:  Oh, yes.  Please, Mr. Jackson.  Go ahead.

MR. JACKSON:  This is Mr. Jackson speaking on behalf
of Mr. Burleson.

I don't know which part of the Long Bow incident

1   they're going to introduce to my client.  The -- I think there

2   need to be some redactions in that.

3           Has counsel furnished me with the redactions on that

4   60-some-page statement?

5           MR. DICKINSON:  We provided the -- I think we

6   initially provided that -- there was a transcript without the

7   timing, Your Honor, and then -- which was my bad.  That's what

8   we initially produced because my goal was to produce the timing

9   so we could do what we just did here in court.  I believe

10  yesterday we did produce the transcript to the defendants with

11  the timing, the same one we gave the Court on Friday, and the

12  timing of Mr. Burleson's cuts.

13          If Mr. Jackson doesn't have that in front of him

14  right now, I think I have an extra copy.

15          MR. JACKSON:  I have the 66-page statement, but I

16  don't know if that's the redacted copy or that's the --

17          MR. DICKINSON:  That's the full copy and then we

18  redacted.  There's no -- we redacted -- I don't even think

19  there was any sort of the types of issues that were in the

20  Facebook with anything approaching racial-type issues, but if

21  there were, they were redacted and anything regarding -- the

22  one specific thing I can think of that we redacted that we felt

23  would have been 403 was he was asked what -- what would have

24  happened if he was stopped on the way back from Nevada and he

25  gave a rather inflammatory answer and we cut that out.

1          THE COURT:  Okay.  So, I have it as -- on the docket

2     as 1727.  Of course that's a sealed exhibit, so I'm not sure if

3     Mr. Jackson would have had access to that but . . .

4          MR. JACKSON:  Well, maybe before they put that on

5     I'll get the copy from Mr. Dickinson of the redacted.

6          THE COURT:  Right.  And Mr. Myhre, what you're giving

7     him there is -- because he said he already has the transcript,

8     what he doesn't have is the segment list, or are you giving him

9     both?

10          MR. MYHRE:  I have the Government's proposed

11     redactions and the timing of the transcripts, Your Honor.

12          THE COURT:  Okay.  Thank you.

13          MR. MYHRE:  I'll hand those to counsel.

14          Will the record so reflect.

15          THE COURT:  Yes.

16          MR. JACKSON:  Thank you.

17          MR. DICKINSON:  Just to be clear, Mr. -- Your Honor,

18     for Mr. Jackson, where it says "Burleson," those are the -- not

19     the proposed redactions, but the proposed play times.

20          Mr. Jackson, it would be . . . cuts "A" through "I,"

21     so one, two, three, four, five, six, seven, eight, nine clips.

22          THE COURT:  All right.  So what I have for

23     Mr. Burleson that the Government's going to play is from 00012

24     to 4009 and then from 1109 to 1245, from 1444 to 1806, so

25     that's what you're talking about.  You gave him the same thing?

1          MR. DICKINSON:  Yes, Your Honor.

2          THE COURT:  Okay.  So it's one, two, three, four,

3     five, six, seven, eight, nine clips.

4          MR. JACKSON:  All right.  Thank you, counsel.

5          THE COURT:  And you said this was already previously

6     provided or is this the first time that Mr. Jackson is

7     receiving this?

8          MR. DICKINSON:  We had previously provided the -- we

9     provided the proposed UCO clips on Friday via e-mail and we

10    provided transcripts I think a week or two before, but

11    unfortunately they weren't the transcripts with the timing.

12         THE COURT:  All right.  So I remember that, that

13    there was something the Tuesday before that was provided, but

14    it didn't have the --

15         MR. DICKINSON:  Correct.  And then the full clips

16    that -- they've -- it was one of the first things we produced

17    in discovery, the first -- whatever the first date of discovery

18    production was.

19         MR. JACKSON:  I do have the full clip.

20         THE COURT:  Right.  So the video, he's had, but he

21    didn't know which portions were going to be played and which

22    were going to be cut, all right, until last Tuesday.

23         All right.  So, and that's not this witness, this is

24    the next one but --

25         MR. DICKINSON:  Correct, Your Honor.

1          THE COURT:  -- we just wanted to use our time

2   effectively.

3          Okay.  So, it's 2 o'clock.  We're not going to take,

4   I think, a break until, what, 3:05 or something like that,

5   Aaron?

6          COURTROOM ADMINISTRATOR:  Correct, Your Honor.

7          THE COURT:  Okay.  So let's go ahead and bring in the

8   jury and then we'll take another break at 3:05.

9       (Brief pause in proceedings.)

10         COURTROOM ADMINISTRATOR:  All rise.

11      (Jury returned to courtroom at 2:02 p.m.)

12         THE COURT:  All right.  Everyone may be seated.

13         We're back on the record.  The jury has joined us,

14  and the Government may call its next witness.

15         MS. CREEGAN:  Thank you, Your Honor.

16         The United States calls Special Agent Michael Caputo.

17

18                        MICHAEL CAPUTO,

19  called as a witness on behalf of the Government, having been

20  first duly sworn, was examined and testified as follows:

21

22         THE COURT:  Good afternoon, Special Agent Caputo.

23  Come on up.  You're going to be seated over here to my right.

24  Please be careful with the steps on your way up.

25         COURTROOM ADMINISTRATOR:  Please remain standing and

1    raise your right hand.

2           You do solemnly swear that the testimony you shall

3    give in the cause now before this Court shall be the truth, the

4    whole truth, and nothing but the truth, so help you God?

5           THE WITNESS:  I do.

6           COURTROOM ADMINISTRATOR:  Thank you.  You may be

7    seated.

8           Please state and spell your full name for the record.

9           THE WITNESS:  Okay.  My name is Michael Caputo.

10          You need me to spell that out?

11          THE COURT:  Yes, please.

12          THE WITNESS:  C-a-p-u-t-o.

13          THE COURT:  All right.  Thank you, sir.

14          Ms. Creegan, you may go ahead.

15          MS. CREEGAN:  And, Your Honor, before I elicit any

16   questions from Agent Caputo, can I ask for a limiting

17   instruction that his testimony be considered only as to

18   defendant Burleson.

19          THE COURT:  Yes.

20          MS. CREEGAN:  Thank you.

21          THE COURT:  So, just again, ladies and gentlemen of

22   the jury, as I've told you before, every once in a while you'll

23   receive a limiting instruction, so this is one of those

24   opportunities where you are being instructed that the following

25   testimony is only to be considered as against Mr. Burleson and

1    not against any of the other five defendants.

2              MS. CREEGAN:  Thank you.

3

4              DIRECT EXAMINATION OF MICHAEL CAPUTO

5    BY MS. CREEGAN:

6    Q.   Good afternoon, Special Agent Caputo.

7    A.   Good afternoon.

8    Q.   Could you please tell us your current position.

9    A.   Yes.  I'm the Assistant Special Agent in Charge for the

10   Phoenix field office of the FBI.

11   Q.   And what does that mean to be the Assistant Special Agent

12   in Charge?

13   A.   That means I am the Number 2 level in charge for the

14   office out there and I specifically oversee our criminal

15   programs for the state.

16   Q.   How long have you been with the FBI?

17   A.   It will be 18 years this May.

18   Q.   Before January of 2015 did you personally know

19   Gregory Burleson?

20   A.   I did.

21   Q.   And did you receive a call from him in mid-January of

22   2015?

23   A.   Early to mid-January, yes, I did.

24   Q.   And when you received that call, did you answer the call

25   or was it a voice mail that you received?

1    A.   As I recall, that was a voice mail.

2    Q.   And at that time when had you --

3            THE COURT:  I didn't catch that.  I got that it was

4    January, but I didn't catch the year.

5    BY MS. CREEGAN:

6    Q.   January of which year?

7    A.   2015.

8            THE COURT:  Okay.  Thank you.

9    BY MS. CREEGAN:

10   Q.   And at that time that you received this voice mail from

11   him when had you last spoken to him?

12   A.   It had been quite awhile before that.  My best guess is

13   the 2012 to early 2013 time frame.

14   Q.   Did you call him back?

15   A.   I did.

16   Q.   And when you did that, did you record that call?

17   A.   Yes.

18   Q.   And in that call did Mr. Burleson indicate to you whether

19   he had gone to the Bundy ranch for the confrontation which

20   occurred on April 12th, 2014?

21   A.   He did.

22   Q.   I'm going to ask you to please look in one of the many

23   exhibit binders that you have there for Exhibit 164.

24   A.   (Witness complies).

25            Okay.

1  Q.   And what do you see there at 164?

2  A.   I see a disk.

3  Q.   And is this disk -- does this disk contain a recording of

4  the conversation that you had with Mr. Burleson?

5  A.   To my knowledge, yes, it does.

6  Q.   And does this also include some shorter clips within that

7  conversation?

8  A.   Yes.

9       MS. CREEGAN:  Your Honor, Government would move to

10 admit clips A, as in alpha, D, as in delta, and E, as in

11 epsilon of Exhibit 164.

12      THE COURT:  Repeat those again, A --

13      MS. CREEGAN:  A, as in alpha, D, as in delta, and E,

14 as in epsilon.

15      THE COURT:  All right.  So any objection,

16 Mr. Jackson, to Exhibit 164A, D, and E?

17      MR. JACKSON:  For the reasons I have previously made

18 a written motion, I would move -- I would object to those

19 coming into evidence.

20      THE COURT:  All right.  So the objections in the

21 written motion are preserved and noted by the Court during the

22 trial and the ruling stands.

23      Exhibit 164A, D, and E will be admitted.

24    (Government Exhibit 164A, D, and E received.)

25      MS. CREEGAN:  And permission to publish clip A.

1              THE COURT:  Yes, you may.

2         (Audio played.)

3    BY MS. CREEGAN:

4    Q.   And Agent Caputo, in that conversation there's a person

5    asking questions and there's a person talking for the majority.

6    Who's the person asking questions?

7    A.   That would be my voice.

8    Q.   And who's the person answering those questions?

9    A.   That would be Mr. Burleson.

10   Q.   And you recognize this from your previous interactions

11   with him?

12   A.   I do.

13   Q.   In your conversation did Mr. Burleson mention whether he

14   brought a firearm with him?

15   A.   Yes, he did.

16             MS. CREEGAN:  Permission to publish clip D, as in

17   delta.

18             THE COURT:  Yes, you may.

19        (Audio played.)

20   BY MS. CREEGAN:

21   Q.   And Agent Caputo, in this recorded conversation did

22   Mr. Burleson also mention whether he pointed his firearm at

23   anyone or sighted them with his rifle?

24   A.   He did.  He said that he did point it at agents that were

25   there.

```
1          MS. CREEGAN:  And permission to publish clip E.

2          THE COURT:  Yes, you may.

3      (Audio played.)

4  BY MS. CREEGAN:

5  Q.   And Agent Caputo, in this call did Mr. Burleson also

6  indicate how he got to Bundy ranch?

7  A.   He did.

8  Q.   And what did he say?

9  A.   He told me that he had driven up his old blue Jeep

10 Cherokee.

11 Q.   And during this call did Mr. Burleson indicate what the

12 purpose of his call was?

13 A.   He initially stated that he had received information that

14 he thought he was on a watch list and wanted to tell me about

15 that.

16 Q.   And did he mention that once or more than once?

17 A.   More than once.

18 Q.   Did he ask you to take any action with respect to his

19 information that he was on a watch list?

20 A.   He did ask me to look into it if I could.

21 Q.   Did you get back to him on that?

22 A.   No.

23          MS. CREEGAN:  One moment, Your Honor.

24      (Counsel conferring.)

25          MS. CREEGAN:  Nothing further.  Thank you.
```

172

1          THE COURT:  Cross, Mr. Jackson?

2

3              CROSS-EXAMINATION OF MICHAEL CAPUTO

4    BY MR. JACKSON:

5    Q.   How long have you been associated with law enforcement,

6    Mr. Caputo?

7    A.   A total of about 24 years.

8    Q.   And when did you -- what was your first position in law

9    enforcement?

10   A.   I was a police officer.

11   Q.   And then you became a -- when did you first become

12   associated with the Federal Bureau of Investigation?

13   A.   1999.

14   Q.   And you have special training when you became an FBI

15   officer.  Isn't that correct?

16   A.   Yes.

17   Q.   And one of your trainings is how to interrogate suspects.

18   Isn't that correct?

19   A.   Yes.

20   Q.   You get special training in how to get information from

21   someone who might be a suspect; is that right?

22   A.   That's correct.

23   Q.   Now, you knew that Mr. Burleson may have been involved in

24   the Bundy ranch confrontation; is that correct?  When you got

25   the phone call from him in January of 2015?

1  A.   I was aware that he was up there, yes.

2  Q.   You had been made aware of that by other FBI agents that

3  you knew of; is that correct?

4  A.   That's correct.

5  Q.   In fact, you -- you had known Mr. Burleson for, you said,

6  several years going back to 2012 or 2013.  How long exactly

7  have you known him?

8  A.   I want to say it was 2012.  So, at that point it had been

9  probably three years, at least.

10  Q.   All right.  Now, Mr. Burleson actually had given

11  information to you in the past on certain criminal cases.

12  Isn't that correct, or at least one?

13  A.   Yes, that's correct.

14  Q.   He had been actually a paid informant for the FBI.  Isn't

15  that correct?

16  A.   That is correct.

17  Q.   And Mr. -- in fact, you were -- could be considered the

18  handler for Mr. Burleson.  Would that be fair to say?

19  A.   At one point in time, yes.

20  Q.   All right.  And Mr. Burleson, would you say -- it would be

21  fair to say that he trusted you.  Would that be fair to say?

22  A.   I believe he did.

23  Q.   And that's why he called you in January of 2015?  He

24  wanted your assistance in some matter?

25  A.   As far as your question, I heard two questions.

174

1    Q.    All right.  When he called you in 2015, at that time do

2    you believe he trusted you?

3              MS. CREEGAN:  Objection.  Speculative.

4              MR. JACKSON:  All right.  I'll withdraw the question.

5    BY MR. JACKSON:

6    Q.    Did -- he called you and asked you for a favor in 2015; is

7    that right?

8    A.    Yes.

9    Q.    And when you talked to him, did you advise him at that

10   time that he was being recorded when you -- when you called him

11   back?

12   A.    No.

13   Q.    Did you advise him that he was under suspicion for some

14   crime that the FBI was investigating?

15   A.    No.

16   Q.    Did you advise him that he had the right to an attorney

17   before he spoke to you?

18   A.    No.

19   Q.    You were trying to get information from him at that time

20   that would assist you in your investigation in the Bundy

21   matter.  Isn't that correct?

22   A.    The purpose of the phone call wasn't specifically for

23   that, but it certainly turned into that.

24   Q.    All right.  And, of course, when you were questioning him,

25   you were trying to get him to give you as much detailed

1  information as you could; is that right?

2  A.   I would say he certainly offered a lot of information.

3  There's certainly questions that I asked, but he -- he

4  certainly threw out a lot of information.

5  Q.   Were you still using Mr. Burleson as an informant in

6  various matters in January of 2015 or at any time near that

7  time?

8  A.   No.  No.

9  Q.   He still wasn't offering you information to assist the FBI

10  at that time, was he?

11  A.   No.

12  Q.   Well, had you rejected him or his services as an informant

13  on or before that time for any reason?

14  A.   In "rejected," I don't understand the question.

15  Q.   Well, did you stop using him because of -- for some reason

16  he was unreliable or his information was inaccurate?

17  A.   I don't know the exact reason that they stopped using him.

18  I passed him off to another agent.

19  Q.   All right.  Did Mr. Burleson have any problem with alcohol

20  or substance abuse?

21       MS. CREEGAN:  Objection.  Relevance.

22       MR. JACKSON:  I think it's relevant to what was

23  happening on this phone call conversation possibly.  I want to

24  ask him if he had a problem with it, if the agent knows.

25       ///

```
1    BY MR. JACKSON:

2    Q.   Just, do you know whether or not he had that problem?

3              MS. CREEGAN:  Same -- same objection.

4              THE COURT:  I'm -- he said that -- okay.  So this

5    witness said that he had only dealt with him back in 20 . . .

6              MR. JACKSON:  All right.  Well, let me ask another

7    question then.

8              THE COURT:  2012-2013 time frame.

9    BY MR. JACKSON:

10   Q.   Were you aware of another interview that Mr. Burleson had

11   with --

12             MS. CREEGAN:  Objection.  Relevance.

13             MR. JACKSON:  I haven't even finished the question.

14             Let me ask the question and then she can make her

15   objection.

16             THE COURT:  Well, not if you're going to be -- in the

17   question if you're saying something you're not supposed to say.

18             MR. JACKSON:  No.  I don't think I'm saying anything

19   I'm not supposed to say; I just want to know if he was aware of

20   another interview that Mr. Burleson may have had with another

21   FBI agent before you had the phone conversation with him.

22             THE WITNESS:  That's -- that's a very open-ended

23   question.  I'm not sure -- I'm not aware of any specific

24   interviews.  Is there a specific agent that --

25             ///
```

1  BY MR. JACKSON:

2  Q.   Did you speak to any FBI agents concerning Mr. Burleson's

3  communications with them?

4  A.   No.

5  Q.   Okay.  During your dealings with Mr. Burleson, did he ever

6  have any problems with alcohol?

7           MS. CREEGAN:  Same objection.

8           THE COURT:  I'll allow it.

9  BY MR. JACKSON:

10 Q.   Did he -- while you were dealing with him, did he ever

11 have any problems with alcohol?

12 A.   I don't -- I don't know about problems.  Can you be more

13 specific?

14 Q.   All right.  Did he have any problems with alcohol such as

15 that he drank on a regular basis?

16 A.   I don't know the answer to that.

17 Q.   All right.  Did he have problems with alcohol such that it

18 affected his ability to understand what was going on?

19 A.   Never in any of my interactions.

20 Q.   On the interview that you just -- or the taped recording

21 that you just played in court here for the jury, did he appear

22 agitated to you?

23 A.   Not -- no.  I don't think he did.

24 Q.   Was that his normal tone of voice or his normal demeanor

25 when he spoke to you?

1   A.   Yes.

2   Q.   Okay.  He didn't seem a little bit excited to you or a

3   little bit anxious in that interview?

4   A.   No.

5   Q.   Okay.  Did Mr. Burleson have any tendency to exaggerate or

6   be a little bit indiscreet when he was talking to you?

7           MS. CREEGAN:  Objection.  Vague.  Compound.

8   Argumentative.

9   BY MR. JACKSON:

10  Q.   All right.  Did he tend to exaggerate in describing things

11  to you?

12          MS. CREEGAN:  Objection.  Speculative.

13  BY MR. JACKSON:

14  Q.   Well, when you -- when he discussed with you his exploits,

15  did he exaggerate them?

16          MS. CREEGAN:  Same objection.

17          THE COURT:  Well, if he knows the answer, he can

18  answer it.  I -- it's -- it's a little vague, but the witness

19  did say that he had dealings with Mr. Burleson prior to this.

20  I think the witness said he was the handler for Mr. Burleson

21  when he was an informant, a paid informant.  So I think he can

22  answer the question.

23          THE WITNESS:  My previous dealings with Mr. Burleson,

24  he had always provided what appeared to be credible

25  information.  So, the answer to your question would be no.

179

BY MR. JACKSON:

Q.   Did he want to impress you that he was a tough guy?

        MS. CREEGAN:  Objection.  Speculative.

BY MR. JACKSON:

Q.   Did he try to -- well, he wanted to keep working for you

as an informant, didn't he?

        MS. CREEGAN:  Objection.  Speculative.

BY MR. JACKSON:

Q.   Did he want to get more money from you?

        MS. CREEGAN:  Objection.  Speculative.

        MR. JACKSON:  Well, he can say if he knows.

        THE COURT:  Yeah.  He can ask about the money.

        THE WITNESS:  I -- I have no idea.  Like I said, sir,

I passed him off in 2013 and really had no interactions with

him after that.

BY MR. JACKSON:

Q.   So -- so he did go to another FBI handler after you worked

with him?

A.   He did, yes.

Q.   So, did he want to apparently impress people in law

enforcement of his abilities so he could keep working with the

FBI handlers; is that right?

        MS. CREEGAN:  Objection.  Speculative.

BY MR. JACKSON:

Q.   What was --- all right.  Let me ask you this.  Who was the

180

1    FBI handler that took him after you, if you know?

2    A.   I do know the answer to that.

3    Q.   Who was that?

4    A.   Special Agent Adam Nixon.

5    Q.   Okay.  And that's the same Adam Nixon that's testified in

6    this case; is that right?

7    A.   That is correct.

8    Q.   Now, do you know how long he worked for Special Agent

9    Adam Nixon?

10   A.   I do.  It was a very short time after I handed him off and

11   Special Agent Nixon closed him.

12   Q.   Okay.  Now, was Mr. Burleson having any physical problems

13   when you worked with him, to your knowledge?

14   A.   Not -- not to my knowledge, no.

15            MR. JACKSON:  Court's indulgence for a minute.

16        (Counsel conferring.)

17            MR. JACKSON:  Your Honor, I'll pass the witness.

18            THE COURT:  Redirect?

19            MS. CREEGAN:  No redirect, Your Honor.  Thank you.

20            THE COURT:  All right.  Thank you, Special Agent

21   Caputo for coming in.  You're excused.  Please be careful on

22   the way down with those steps.

23            THE WITNESS:  Thank you.

24        (Witness excused.)

25            THE COURT:  Government may call its next witness.

1          MR. DICKINSON:  Government calls Charles Johnson.

2

3                    CHARLES JOHNSON,

4    called as a witness on behalf of the Government, having been

5    first duly sworn, was examined and testified as follows:

6

7          COURTROOM ADMINISTRATOR:  Please remain standing and

8    raise your right hand.

9          You do solemnly swear that the testimony you shall

10   give in the cause now before this Court shall be the truth, the

11   whole truth, and nothing but the truth, so help you God?

12         THE WITNESS:  I do.

13         COURTROOM ADMINISTRATOR:  Thank you.  You may be

14   seated.

15         Please state and spell your full name for the record.

16

17              DIRECT EXAMINATION OF CHARLES JOHNSON

18   BY MR. DICKINSON:

19   Q.   Good afternoon, Special Agent Johnson.

20   A.   How are you today?

21   Q.   Good.

22         Can you spell you name for the record.

23   A.   It's Charles Johnson, J-o-h-n-s-o-n.

24   Q.   Special Agent Johnson, where do you work?

25   A.   I work for the FBI.

182

1    Q.   How long have you worked for the FBI?

2    A.   Almost 19 years.

3    Q.   Did you have any prior law enforcement experience before

4    the FBI?

5    A.   I was a local police officer for about four years prior to

6    the FBI.

7    Q.   And just generally, what types of assignments have you had

8    over your 19-year FBI career?

9    A.   Multiple investigative responsibilities, violent crime,

10   bank robberies, white collar crime, domestic terrorism, a

11   little bit of everything.

12   Q.   Now, I want to take you back to April/May/June 2014.

13        Did you become involved in an FBI undercover

14   operation involving the investigation of events that occurred

15   on April 12th, 2014, in Bunkerville, Nevada?

16   A.   I did.

17   Q.   How did you become involved?

18   A.   I was contacted by agents here in the Las Vegas Division

19   asking questions about a possible undercover scenario and if I

20   would be interested or was available to participate.

21   Q.   And were you available to participate?

22   A.   I was.

23   Q.   And did you travel to Las Vegas and have discussions with

24   the agents?

25   A.   I did.

1   Q.   And, in general, what was discussed?

2   A.   I was given a brief overview of what was going on and

3   asked input on possible scenarios or how we would be able to

4   put together an undercover operation to try to gather

5   information.

6   Q.   And was the information you were asked to try and gather,

7   was it unique in any respect as it -- in relation to other

8   undercover operations you may have known about?

9   A.   Very much so.  It was unique and it was, I guess, a little

10  bit different to create because generally in an undercover

11  operation, you believe there's maybe something that's going to

12  happen or you're trying to see if something's going to happen.

13  This was kind of post-event, so it was much more after-the-fact

14  where something had already happened and still trying to get --

15  gather information about that event as opposed to being before.

16  Q.   And after discussing -- after your discussions with the

17  agents did you come up with what type -- what you needed to get

18  out of an undercover operation?

19  A.   Well, basically from the information provided to me that

20  we were asked would there be a way that we could go out and

21  capture information, gather information on things that had

22  happened, things that people had already said or posted to

23  social media and how we could go directly get that information

24  ourselves.  So it was, again, unique because we were trying to

25  capture things that had already happened and a lot of it that

184

1  was basically already in social media or there had been

2  statements about it or posts about it.

3  Q.   And in your role as an FBI agent did you help develop an

4  undercover -- an undercover operation for what the agents in

5  Las Vegas were looking for?

6  A.   Yes.  Basically when we came to the conclusion that if you

7  wanted to go gather information of something that's already

8  happened, that would be consistent of like a documentary-type

9  gathering of information, so we came up with a scenario where

10  we would get information that would be used for a documentary.

11  Q.   And just in general, can you tell the jury what the

12  premise of this documentary undercover was.

13  A.   In general, the premise was we wanted to go out and gather

14  information.  By definition, a documentary is you're gathering

15  information to try to get the true facts of what happened in an

16  event or a situation.  So, we wanted to go out, try to make

17  contact with individuals who were at the event to talk to them

18  directly to gather their personal experiences, what they saw,

19  what they heard to get -- to get their firsthand account

20  because they were the individuals that were there.

21  Q.   And how did you go about doing this?

22  A.   We tried to develop ways to make contacts with individuals

23  that were there.  Most of that was gathered through things that

24  we could find in social media, ways that we could contact the

25  individual to then just ask them point blank if they would be

1   interested in telling their story.

2   Q.   And did you come up with a scenario regarding the

3   documentary film or the documentary company?

4   A.   Yes.  We -- obviously if you're going to reach out to

5   someone and say that you're doing a documentary, you have to

6   have things in place that would represent that you are.  So, we

7   created a website, we created e-mail addresses, we created

8   phone numbers so that when we made contact, if people wanted to

9   get back in touch with us if they decided that they wanted to

10  talk to us, that they had the means to do it, that they could

11  see a website, they could contact us directly from the website

12  through an e-mail, or directly an e-mail, or directly via

13  phone.

14  Q.   And what was the name of the documentary -- was there a

15  name of a company?

16  A.   We created a company named Long Bow Productions.

17  Q.   And in general, when you were able to -- when you were

18  able to contact somebody, what was your pitch?

19  A.   In general, we just went out and wanted to ask them what

20  their experience was; what happened, what they saw, what they

21  did, what their thoughts were, and then obviously we would ask

22  if there were other people that they knew that might want to

23  speak to us as well.  They would sometimes refer us to other

24  people or give us a contact number or have them contact us.

25  So, we -- we basically gave the pitch we want to get your story

1  because it seems that in social media that everybody wants to

2  tell their story, we would like to do that cumulatively and get

3  everybody's story together to get a good and accurate

4  representation of everyone's experience.

5  Q.   And did you represent what you were going to do with these

6  representations -- or these interviews or these representations

7  from the people?

8  A.   Well, obviously the premise that if we were a company, we

9  were a company that was -- would be trying to make a profit to

10  sustain so, we would create a documentary and hope that we

11  could sell it to someone that they could then publicize it,

12  distribute it, put it on TV, sell it as DVDs, but that's

13  generally how in the business of a documentary it would work.

14  So, we were under the same premise that we were a for profit

15  organization so we would want to sell it and put it out.

16  Q.   And did you represent the name of what this proposed

17  documentary was going to be?

18  A.   The proposed name as a working title was *America Reloaded*.

19  Q.   And how did you sell -- how did you hold yourself out as?

20  A.   I was the kind of producer/director.  I was in charge of

21  running the crew so to speak to make sure that we were set up.

22  I did the interviews.  I asked the questions.  I was kind of

23  the individual in charge.

24  Q.   And was there another agent who -- who was portrayed as

25  primarily your assistant?

1    A.    An assistant/assistant director and they were the ones

2    that made -- they predominately did the logistics, made the

3    contacts, e-mails, phone calls, and most of the scheduling to

4    set up the times and places for the interviews.

5    Q.    And does she go by the first name Anna, or Anna?

6    A.    Yes.

7    Q.    Now, if somebody agreed to meet with you, did you, in

8    fact, then do an interview?

9    A.    Yes.

10    Q.    And how was that done?

11    A.    It was set up like a -- like any production -- documentary

12    production filming was done.  We had cameras, lights, sound,

13    and we would set up to get an environment that would give us a

14    good visual interview from the video aspect and then we used

15    professional sound equipment as well to capture the audio and

16    we did a full production of the interviews.

17    Q.    Now, prior -- or before April 2014, or when you started

18    this -- participated in this undercover operation, did you have

19    any personal experience or training in filmmaking?

20    A.    Yes.

21    Q.    And what was that?

22    A.    I've had -- been personally into photography for several

23    years and I'd also gone to some professional video training.

24    Q.    Now, when somebody agreed to talk to you about their

25    experience related to the Bundy incident, April 2014, did you

1  have a general approach in asking questions?

2  A.   It was a general approach.  We wanted to be consistent

3  with the questions that we asked everyone, but it was -- we

4  would ask questions that would give a linear -- kind of a

5  linear representation of what their involvement was from how

6  they became -- or how they first got knowledge of the event up

7  until the time that they were -- were done or had left the

8  event.

9  Q.   And your role in the case, your role was as an undercover;

10  correct?

11  A.   Correct.

12  Q.   Did you have any investigatory role in the case?

13  A.   No.  Mine was -- all of us that were involved with any of

14  the interviews were basically just to go out, ask the

15  questions, gather the information, and turn it over to the case

16  agents.

17  Q.   So, if -- just as an example.  If someone it were to say,

18  you know, "X" happened on April 11th, did you have any role in

19  investigating if "X" actually happened?

20  A.   No.  We just provided the information back.

21  Q.   You've alluded to this.  Were you provided information

22  generally regarding the events surrounding April 12th, close in

23  time, before and after?

24  A.   In an overview-type.  We didn't really want the people

25  that were involved with the interview, we didn't -- we did not

1    want specific information because we wanted to be able to go

2    into the interview and not be -- have any other knowledge, kind

3    of going around in our brain so to speak.  We wanted to focus

4    just on the questions.  So from an overview of the events what

5    had happened, yes, but not down to the specifics of necessarily

6    individuals' involvements.

7    Q.   And again, generally, because you did have some knowledge,

8    if you were interviewing somebody and they stated something

9    that you, based on what you had been provided, knew to be

10   false, would you -- how would you deal with that situation?

11   A.   We -- it was basically no challenge.  We were just asking

12   the questions to get their responses.  So if we did, indeed,

13   know something that was contrary to what they told us, that was

14   not our -- our point to challenge that or question it.

15   Q.   Now, I want to take you to August 16th, 2014.

16          Did you -- did Eric Parker and Scott Drexler agree to

17   be interviewed by Long Bow Productions?

18   A.   Yes.

19   Q.   And did that occur in Red Fish, Idaho?

20   A.   Yes.

21   Q.   And where in Red Fish, Idaho?

22   A.   At the Red Fish Lake Lodge.

23   Q.   And prior to April 16, 2014, had they been contacted and

24   sort of given the pitch that you've generally talked about?

25   A.   Yes.

1    Q.   And do you know if, on April 16th, they -- how they

2    arrived?  Do you know if they arrived together?

3    A.   I do not know.  I think they were together but I don't

4    know --

5               MR. LEVENTHAL:  Objection.  Calls for speculation.

6               THE COURT:  Sustained.

7    BY MR. DICKINSON:

8    Q.   When did you first encounter Mr. Parker and Mr. Drexler on

9    August 16th, 2014?

10   A.   As we were coming into the lodge and parking the vehicle,

11   we were just getting into our little cabin and they had come

12   up -- I guess they had seen us pull in in our -- in the motor

13   home and they came and approached us.

14   Q.   Together?

15   A.   Correct.

16   Q.   I take it you introduced yourself?

17   A.   Yes.  I mean, it was a little unexpected because we would

18   normally get -- have everything set up prior for just

19   continuity and to save time, but yes, we introduced ourselves

20   and pretty much went into production mode at that point.

21              MR. DICKINSON:  If we could pull up Exhibit 334A just

22   for the witness, and the Court, and counsel.

23              COURTROOM ADMINISTRATOR:  Just a second, Nicole.

24              Go ahead.

25              MR. DICKINSON:  Just pause it.

1   BY MR. DICKINSON:

2   Q.   Do you recognize this, Agent Johnson?

3   A.   Yes.

4   Q.   And what do you recognize this as?

5   A.   This was one of the interviews that we did with

6   Mr. Drexler there at Red Fish Lake.

7   Q.   And Government Exhibit 334 has clips that are numbered --

8   of the interview numbered "A" through "F."  Have you reviewed

9   those clips prior to coming to court?

10  A.   Yes.

11  Q.   And are they a fair and accurate representation of the

12  interview that you conducted?

13  A.   Yes.

14  Q.   On -- with Mr. Drexler on August 16th, 2014?

15  A.   Yes, they are.

16          MR. DICKINSON:  All right.  I'd move for the

17  admission of Government's Exhibit 334A through F.

18          THE COURT:  Any other objection to Exhibit 334A

19  through F other than what's been previously addressed?

20          MR. LEVENTHAL:  No, Your Honor.

21          MR. TANASI:  No, Your Honor.

22          MR. MARCHESE:  None from Parker.

23          THE COURT:  All right.  So Exhibit 334A through F

24  will be admitted.

25      (Government Exhibit 334A through F received.)

1        MR. DICKINSON:  Permission to publish, Your Honor?

2        THE COURT:  Yes, you may.

3        MR. DICKINSON:  All right.

4        Keep it stopped.

5        Stop for a moment, Nicole.  Thank you.

6   BY MR. DICKINSON:

7   Q.   What are we looking at here, Special Agent Johnson?

8   A.   This was just the location on the back of the cabin where

9   we had set up to do the interview and put a chair and set the

10  cameras up, lights, and just -- this is where we set the

11  interview up.

12  Q.   All right.

13       (Video played.)

14  BY MR. DICKINSON:

15  Q.   And the voice asking the questions?

16  A.   That's mine.

17       (Video played.)

18        MR. DICKINSON:  Go to clip B.

19       (Video played.)

20  BY MR. DICKINSON:

21  Q.   Special Agent Johnson, we just heard a female voice there.

22  Who was that?

23  A.   That was Anna.

24  Q.   And she was portrayed as your assistant, assistant

25  director?

1    A.    Assistant director, yes.

2            MR. DICKINSON:  If we could publish clip C.

3        (Video played.)

4            MR. DICKINSON:  Publish clip D.

5            THE COURT:  We're going to go ahead and take a break

6    first.

7            All right.  So I remind the jury that during this

8    recess you are not to discuss this case with anyone nor permit

9    anyone to discuss it with you.

10           Please do not read, or listen to, or view anything

11   that touches upon this case in any way.

12           Please do not research or make any independent

13   investigation, and do not form any opinion.

14           It's 3:05.  Aaron, what time can we be back?

15           COURTROOM ADMINISTRATOR:  3:30, Your Honor.

16           THE COURT:  All right.  So we'll be back at 3:30.

17           Let's stand for the jury.

18           And Agent Johnson, after the jury leaves, then you

19   make take your stretch/bathroom break.  Just please be back

20   here by 3:30, sir.

21           THE WITNESS:  Okay.

22       (Jury excused from courtroom.)

23           THE COURT:  All right.  Off record.

24           You can go ahead and go.

25       (Recess was taken at 3:06 p.m.)

1          COURTROOM ADMINISTRATOR:  All rise.

2          THE COURT:  Thank you.  You may be seated.

3          Will you go ahead and bring in the jury, Aaron.

4          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

5          THE COURT:  Can we proceed without Ms. Ahmed?

6          MR. MYHRE:  Yes, Your Honor.

7          THE COURT:  All right.

8     (Brief pause in proceedings.)

9          COURTROOM ADMINISTRATOR:  All rise.

10    (Jury returned to courtroom at 3:42 p.m.)

11         THE COURT:  All right.  Everyone may be seated.

12  We're joined by the jury with Special Agent Johnson on the

13  stand, and Mr. Dickinson, you may continue.

14         MR. DICKINSON:  Thank you, Your Honor.

15

16         FURTHER DIRECT EXAMINATION OF CHARLES JOHNSON

17  BY MR. DICKINSON:

18  Q.   Good afternoon, Agent Johnson.

19         I believe where we left off we were about to play

20  clip D of your Long Bow interview with defendant Drexler.

21         MR. DICKINSON:  If we could publish clip D,

22  Your Honor?

23         THE COURT:  Yes.  334D.

24         MR. DICKINSON:  Yes.

25    (Video played.)

1        MR. DICKINSON:  And if we could publish 334, clip E.

2     (Video played.)

3        MR. DICKINSON:  Finally, with -- your conversation

4  with Mr. Drexler, if we could publish Exhibit 334, clip F.

5     (Video played.)

6        MR. DICKINSON:  If we could bring up Exhibit 333A,

7  just for the Court, Special Agent Johnson, and the defense.

8  BY MR. DICKINSON:

9  Q.    Do you recognize Exhibit 330A -- 333, clip A, Special

10  Agent Johnson?

11  A.    I do.

12  Q.    And what do you recognize this as?

13  A.    This was the interview of Mr. Parker there at the same

14  location.

15  Q.    Was that on the same day, on August 16th, 2014?

16  A.    Yes.

17  Q.    And have you reviewed on -- prior to coming to court,

18  Government's Exhibit 333, clips A through R?

19  A.    I have.

20  Q.    And are those clips a fair and accurate representation of

21  your conversation you had with Mr. Parker on August 16th, 2014?

22  A.    It is.

23        MR. DICKINSON:  Your Honor, I'd move for the

24  admission of Government's Exhibit 333A through R.

25        THE COURT:  Any objections to Exhibit 333A through R,

1   other than what have already been addressed?

2               MR. TANASI:  Nothing additional Stewart, Your Honor.

3               MR. MARCHESE:  Nothing Parker.

4               MR. LEVENTHAL:  No, Your Honor.

5               THE COURT:  All right.  So Exhibit 333A through R

6   will be admitted.

7       (Government Exhibit 333A through R received.)

8               MR. DICKINSON:  Permission to publish?

9               THE COURT:  Yes.

10  BY MR. DICKINSON:

11  Q.   And for the record, Special Agent Johnson, who are we

12  looking at here?

13  A.   Mr. Parker.

14              MR. DICKINSON:  Clip A.

15      (Video played.)

16              MR. DICKINSON:  And if we could publish clip B.

17      (Video played.)

18              MR. DICKINSON:  Publish clip C.

19      (Video played.)

20              MR. DICKINSON:  If we could publish clip D.

21      (Video played.)

22              MR. DICKINSON:  Publish 333, clip E.

23      (Video played.)

24              MR. DICKINSON:  Publish 333, clip F.

25      (Video played.)

197

1          MR. DICKINSON:  Publish 333, clip G.

2      (Video played.)

3          MR. DICKINSON:  Go to clip H.

4      (Video played.)

5          MR. DICKINSON:  Okay.  Clip I.

6      (Video played.)

7          MR. DICKINSON:  If we can publish 333, clip J.

8      (Video played.)

9          MR. DICKINSON:  If we could publish 333, clip K.

10     (Video played.)

11         MR. DICKINSON:  Publish clip L from 333.

12     (Video played.)

13         MR. DICKINSON:  Clip M.

14     (Video played.)

15         MR. DICKINSON:  Clip N.

16     (Video played.)

17         MR. DICKINSON:  Publish clip O.

18     (Video played.)

19         MR. DICKINSON:  Clip P.

20     (Video played.)

21         MR. DICKINSON:  And clip Q.

22     (Video played.)

23         MR. DICKINSON:  And finally, Exhibit 333, clip R.

24     (Video played.)

25         MR. DICKINSON:  Your Honor, that's the end of

1   Mr. Parker Exhibit 333 and we're at 4:30.

2            THE COURT:  Okay.  Yes.

3            MR. DICKINSON:  I'd be moving on to a --

4            THE COURT:  Yes.  We're going to go ahead and take

5   our overnight break.

6            During this break I do remind the jury that you are

7   not to discuss this case with anyone nor permit anyone to

8   discuss it with you.  If anyone should attempt to speak to you

9   about the case or if you inadvertently overhear anything about

10  the case, remember that you are required to let the Court know

11  right away.

12           Also, do not read, or listen to, or view anything

13  that touches upon this case in any way.

14           Do not attempt to perform any research or any

15  independent investigation, and please do not form an opinion

16  about the issues in this case until after you have heard all

17  the testimony, seen all the evidence.  I will give you the

18  written jury instructions of law to assist you.  Then you'll

19  hear closing arguments.  After that, I will excuse you to begin

20  your deliberation process.  Then you can start talking to each

21  other about your opinions and the case and so forth and not

22  until then.

23           So we'll go ahead and stand for the jury.  And then

24  after they leave, Mr. Johnson, if you'll just hold on and wait

25  after they leave, then you may take your overnight break as

1    well.  We'll need you back here at 8:30 a.m. tomorrow morning.

2         THE WITNESS:  Yes, ma'am.

3       (Jury excused from courtroom.)

4         THE COURT:  All right.  So we're still on the record,

5    but the jury has left the room.  Is there anything that you all

6    want to talk about today or tomorrow morning that you

7    anticipate?

8         MR. MARCHESE:  The only thing I anticipate is not

9    necessarily a -- it's more of a housekeeping matter.  I might

10   be slightly late tomorrow.  I have to be in state court, but

11   I'll boogie over as fast as I can.

12        THE COURT:  Okay.

13        Same thing, Mr. Leventhal.

14        MR. LEVENTHAL:  No.  I just think it's wrong.

15   Mr. Marchese --

16        MR. MARCHESE:  If he'd like to make my appearance,

17   I'd love it.

18        THE COURT:  All right.  But we can start without you;

19   right?

20        MR. LEVENTHAL:  Apparently, he doesn't like that.

21        THE COURT:  All right.  So when do you think --

22   you'll be here by 9:00 for sure?

23        MR. MARCHESE:  Oh, no.  It will be sooner than that.

24        THE COURT:  Okay.

25        MR. MARCHESE:  Yeah.  I'll get there early.  I'll be

200

1    first called.

2           THE COURT:  Okay.  All right.  Then we'll see you at

3    8:35 tomorrow morning.

4           COURTROOM ADMINISTRATOR:  All rise.

5           Off record.

6        (Proceedings adjourned at 4:33 p.m.)

7

8                            --oOo--

9                   COURT REPORTER'S CERTIFICATE

10

11          I, Heather K. Newman, Official Court Reporter, United

12   States District Court, District of Nevada, Las Vegas, Nevada,

13   do hereby certify that pursuant to Section 753, Title 28,

14   United States Code, the foregoing is a true, complete, and

15   correct transcript of the proceedings had in connection with

16   the above-entitled matter.

17

18   DATED:  4-3-2017          /s/ Heather K. Newman
                             Heather K. Newman, CCR #774
19                           OFFICIAL FEDERAL REPORTER

20

21

22

23

24

25