1

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4    UNITED STATES OF AMERICA,        )
                                      )   Case No. 2:16-cr-046-GMN-PAL
5                    Plaintiff,       )
                                      )   Las Vegas, Nevada
6           vs.                       )   Thursday, March 23, 2017
                                      )   8:47 a.m., Courtroom 7C
7    ERIC PARKER, O. SCOTT            )
     DREXLER, RICKY LOVELIEN,         )   JURY TRIAL DAY TWENTY-TWO
8    STEVEN STEWART, TODD ENGEL       )
     and GREGORY BURLESON,            )
9                                     )
                     Defendants.      )
10   _____)   C E R T I F I E D   C O P Y

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13

     BEFORE:         THE HONORABLE GLORIA M. NAVARRO,
14                   UNITED STATES DISTRICT JUDGE, CHIEF

15

16

17

18   APPEARANCES:

19            See next page

20   COURT REPORTER:

21            Heather K. Newman, RPR, CRR, CCR #774
              United States District Court
22            333 Las Vegas Boulevard South, Room 1334
              Las Vegas, Nevada  89101
23            (702) 471-0002

24

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

2

1    APPEARANCES:

2    For the Plaintiff:

3            UNITED STATES ATTORNEY'S OFFICE
             BY:  STEVEN W. MYHRE
4                 ERIN M. CREEGAN
                  NADIA JANJUA AHMED
5                 NICHOLAS D. DICKINSON
             501 Las Vegas Boulevard South, Suite 1100
6            Las Vegas, Nevada 89101
             (702) 388-6336
7
     For Defendant Parker:
8
             LAW OFFICE OF JESS R. MARCHESE
9            BY:  JESS R. MARCHESE
             601 South Las Vegas Boulevard
10           Las Vegas, NV  89101
             (702) 385-5377
11
     For Defendant Drexler:
12
             LEVENTHAL AND ASSOCIATES
13           BY:  TODD M. LEVENTHAL
             626 South Third Street
14           Las Vegas, NV  89101
             (702) 472-8686
15
     For Defendant Lovelien:
16
             LAW OFFICE OF SHAWN R. PEREZ
17           BY:  SHAWN R. PEREZ
             626 South Third Street
18           Las Vegas, NV  89101
             (702) 485-3977
19
     For Defendant Stewart:
20
             TANASI LAW OFFICES
21           RICHARD E. TANASI
             601 South Seventh Street, 2nd Floor
22           Las Vegas, NV  89101
             (702) 906-2411
23

24

25

1    APPEARANCES (Con't):

2    For Defendant Engel:

3            JOHN G. GEORGE, Standby Counsel
             600 South Eighth Street
4            Las Vegas, NV  89101
             (702) 625-1183

5    For Defendant Burleson:

6            LAW OFFICE OF TERRANCE M. JACKSON
7            BY:  TERRENCE M. JACKSON
             624 South Ninth Street
8            Las Vegas, NV  89101
             (702) 386-0001

9

10   Also present:

11           Gwen Wilson
             Bryan Ginn
12           Christine Abbott

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          I N D E X

2     WITNESSES:                                              PAGE

3     Charles Johnson        Cross-Examination by Jackson -      25
                             Cross-Examination by Leventhal -    36
4                            Cross-Examination by Marchese -     61
                             Cross-Examination by George -       80
5                            Redirect-Examination by Dickinson - 81
                             Recross-Examination by Jackson -    84
6

7     Chad Simpkins          Direct Examination by Ahmed -       91
                             Cross-Examination by Marchese -    215
8                            Cross-Examination by George -      220
                             Cross-Examination by Jackson -     225
9

10

11

12                        E X H I B I T S
13                                                       RECEIVED
                                                            IN
14    EXHIBIT NO:                                        EVIDENCE

15       335A - I                                           20

16       469 (For demonstrative purposes only)             106

17

18

19

20

21

22

23

24

25

5

1          LAS VEGAS, NEVADA; THURSDAY, MARCH 23, 2017; 8:47 A.M.

2                                --oOo--

3                       P R O C E E D I N G S

4          (Outside the presence of the jury at 8:47 a.m.:)

5          COURTROOM ADMINISTRATOR:  All rise.

6          THE COURT:  You may be seated.  Good morning.

7          COURTROOM ADMINISTRATOR:  This is the time set for

8    Jury Trial Day Twenty-Two in Case Number 2:16-cr-046-GMN-PAL,

9    United States of America vs. Eric Parker, O. Scott Drexler,

10   Ricky Lovelien, Steven Stewart, Todd Engel, and Gregory

11   Burleson.

12         THE COURT:  All right.  Now, my understanding is that

13   Ms. Ahmed is not here, but that's all right.  We can proceed

14   without her; right?

15         MR. MYHRE:  Yes, Your Honor.

16         THE COURT:  Okay.  So before we bring in the jury,

17   just some preliminary remarks to remind everyone that this is a

18   courtroom; it's not a sporting event.  So you are not permitted

19   to display any expression of agreement or disagreement.  That

20   means no oral expression, no body language expression.

21         Also, the defendants are not to display any

22   distracting or inappropriate body language likewise.  We do

23   have the holding cell next door that has a audio feed.  So, if

24   anyone does need to be removed, they can still continue to hear

25   the remainder of the -- the day's progress from the holding

6

1    cell.

2          Let's see, there are no cell phones or electronic

3    devices that are permitted in the courtroom.  So please take a

4    moment to check and make sure you don't have a cell phone,

5    iPad, laptop, no electronic devices.  Even if they're in

6    vibrate mode or private mode, you're not permitted to have them

7    in court.  The marshals are aware of this and they're

8    authorized to remove either you or the device if they see you

9    with the device, again, even if it's turned off.  So please

10   make sure that you leave those all outside.

11         The attorneys and defendants do have electronic

12   devices, but that is for the purpose only of being able to

13   review evidence, videos, photos, et cetera, their notes, and to

14   present them here in court.  They are not permitted to record

15   any of the proceedings.  In federal court, no audio recordings

16   nor video recordings are permitted.

17         Let's see, everyone has a microphone at their desk,

18   what we call a long neck, so that you can still stand and be

19   heard on the microphone.  And I know everyone has a lot of

20   documents and things so you're welcome to stay at your desk if

21   you'd like to or you can come up to the podium to address the

22   Court or the witness.

23         I think that's . . . I think that's everything.

24         So, when the jury comes in, I'll have everyone put

25   your name on the -- place your name on the record.  At that

1    point then we'll have John George also stand up to say that

2    he's representing Mr. Engel.

3              If you want, I can tell the jury that you're going to

4    be representing Mr. Engel from here on out or do you want to

5    just go ahead and stand up and --

6              MR. GEORGE:  I was hoping I could give it another

7    shot to see if we could let Mr. Engel continue the trial.

8              THE COURT:  No.

9              MR. GEORGE:  No?

10             THE COURT:  No.

11             So do you want me to advise the jury that you are now

12   representing him or do you want to stand up and let them know

13   that you'll be representing?

14             MR. GEORGE:  You can advise the jury.

15             THE COURT:  All right.  I'll do that.

16             So let's go ahead and bring in the jury, Aaron.

17             MR. TANASI:  Your Honor, if I may, before we do that.

18             THE COURT:  Yes.

19             MR. TANASI:  I just want to address yesterday, the

20   issue regarding Mr. Burleson and kind of learning, at least

21   from the defense side, for the first time, that he was a -- at

22   some point a paid Government informant.  You know, that raises

23   kind of a host of issues as it pertains to the remainder of the

24   defendants here.  I see a *Brady* violation in that if we had

25   known this coming in, we would have cross-examined witnesses

1    that pertained to Mr. Burleson and Mr. Burleson's statements a

2    whole lot differently, in that we would have asked questions

3    related to potentially what the nature of his informant status

4    was, when did it start, when did it finish, what were the

5    dynamics, was there a proffer agreement of any kind, which then

6    kind of leads into a *Giglio* issue.  Again, I have no idea if

7    there was or if there wasn't.  When did the nature of the

8    relationship start?  When did it end?  Is it still on ongoing?

9    As we sit here today, is he still potentially an informant of

10   some kind?  Is it a situation where potentially there's an

11   agreement in place where, maybe at the end of the trial, you

12   know, he -- he bears the fruit of an agreement.  He takes a

13   deal before the case goes to the jury.  I don't know any of

14   that.  And what we have is a situation where this individual

15   who has, we know now, was a informant.  If he still is, he's

16   been in and around all of the other defendants in this case.

17   You know, is there going to be testimony from him at some point

18   related to anything that these folks have said to him under,

19   you know, whatever situation that they've been together in --

20   in -- while in the jail?

21          So, again, I see just a host of issues.  And I even

22   would say, Your Honor, it raises to the level of Government

23   misconduct to not even -- to let us even know that.  For us to

24   learn that for the first time while we're, you know, going

25   through live testimony.  Again, I think Agent Nixon is the one

1   that comes to mind that spoke a lot about Mr. Burleson's

2   Facebook.  And again, I think from what I understand, you know,

3   Agent Nixon was a handler, or at least had some interaction

4   with Mr. Burleson as well.  Again, that cross-examination would

5   have had questions along those lines as well.

6          Again, you have -- and as I've made the record, you

7   know, a few times with respect to severance and spillover

8   prejudice, it's a situation where I think it's pretty clear

9   that Mr. Burleson's statements in this case are completely

10  different than definitely my client, Mr. Stewart, Mr. Drexler,

11  and Mr. Parker, I think even Mr. Engel.  You have -- and

12  Mr. Lovelien.  I mean, you have a situation where Mr. Burleson

13  is saying things that are -- are really inflammatory.  And so,

14  is there a reason to say that stuff to kind of keep furthering

15  the conspiracy and keep implicating the rest of the people who

16  are in the conspiracy because again, he's a paid informant?

17  You know, there's just a host of questions that arise out of

18  that bombshell that I'd say we learned yesterday for the first

19  time.

20         So, in terms of remedies, Your Honor, the only ones I

21  can think of are dismissal, number one, mistrial, number two,

22  some -- some sort of limiting instruction that I -- you know, I

23  truthfully, just because I learned about it yesterday, have not

24  really been able to come up with an idea of what limiting

25  instruction would potentially cure any of this, and severance.

1        THE COURT:  All right.  Well, first we have to have a

2    violation.  You mentioned *Brady*, which applies to exculpatory

3    evidence.  So, I'm not sure that the explanation -- the factual

4    explanation given doesn't really relate to exculpatory

5    evidence.

6        MR. TANASI:  Well, and with that, Your Honor, I

7    would -- I would say I'm working with a very limited amount of

8    information to be able to develop whether or not this it is

9    exculpatory, whether or not there is more to the story, whether

10   or not there's more to his role as a paid informant.  Again, if

11   there was a 302 related to his statements that's out there that

12   we weren't given, you know, it's just one of those things where

13   it's -- I understand the Court's issue, and I get that, but

14   with only a limited amount of information it's hard to fashion,

15   you know, essentially that -- that factual argument.  That's

16   why I'm saying it's kind of a host of issues that I think arise

17   from it.  So, I -- I understand, you know, the Court's question

18   and I don't have a factual basis for that because I don't have

19   enough facts.

20       MR. JACKSON:  Your Honor --

21       THE COURT:  Okay.  Well, likewise --

22       MR. JACKSON:  -- could I respond just briefly?

23       THE COURT:  Well, just a minute.

24       So likewise, the Court doesn't have enough

25   information to be able to articulate a violation having been

1    found, let alone getting to what a remedy would be, but if

2    there is a limiting instruction -- and we'll have a week off so

3    you'll have some time -- if there is one that you think would

4    be appropriate, you know, feel free to draft it, circulate it,

5    and we can talk about it Monday morning and I'd be happy to

6    look at it.

7          Mr. Marchese, did you want to add something?

8          MR. MARCHESE:  Just briefly.

9          I know that -- I want to join in Mr. Tanasi's

10    argument.  Also, one of the first things that came to mind as

11    soon as I -- this information was elicited yesterday, it went

12    back to jury selection.  Juror No. 307 made some comments

13    during the voir dire process in which he articulated some

14    issues with undercovers.

15          Now, just knowing the limited information that we got

16    yesterday, my thought process on that particular juror would

17    have been significantly different if I had known that I had an

18    undercover in the same group with me charged as a co-defendant.

19    So based upon that, if we had known this information, I believe

20    that my jury selection and my questioning and a host of other

21    issues with my jury selection, and now an actual juror, would

22    have been significantly different.  So, that's another

23    prejudice that I believe goes to Mr. Parker and as well as all

24    other defendants here.

25          THE COURT:  All right.

1          MR. LEVENTHAL:  Just -- Mr. Drexler, we join.

2          THE COURT:  All right.

3          Mr. Myhre?

4          MR. MYHRE:  Yes, Your Honor.

5          There's nothing remotely resembling *Brady* in the

6    information that was adduced yesterday during the testimony.

7    The testimony was that Mr. Burleson was at some point, I

8    believe in 2012, opened as an informant and closed in 2013,

9    well before Bundy ranch.  There was no -- there is no evidence,

10   you know, that exists that shows that Mr. Burleson was at all

11   connected with remotely as an informant or any other -- any

12   other capacity with respect to the matters of Bundy ranch.  And

13   so there's -- there's nothing of record.  There's nothing in

14   our evidence that shows that Mr. Burleson was at all related to

15   the Government in any way, shape, or form that would give rise

16   to any *Brady* claim and as the defense has admitted, they have

17   no factual basis for a *Brady* claim.

18          The issue further with respect to voir dire

19   doesn't -- A), doesn't make it *Brady*, but B), Mr. -- the

20   testimony yesterday was that he was an informant, not an

21   undercover.  And so, again, nothing's related to Bundy ranch

22   with respect to the information that Mr. Burleson may or may

23   not have communicated when he provided information back in 2012

24   and 2013.

25          THE COURT:  And I think it's important to note that

1    it's not the Government's responsibility to advise the

2    defendants of every detail of the case.  The responsibilities

3    are specific as to exculpatory and other things that are --

4    that are raised and addressed in that format.  So, for example,

5    inculpatory information is not necessarily something that needs

6    to be disclosed.  So, in every trial there's going to be

7    information that unfortunately defense counsel hears for the

8    first time.  That doesn't mean that the defense had a right to

9    receive that from the Government prior to trial.  So that's why

10   I was trying to find out how -- how I could articulate a

11   finding that the new information to the defense was either

12   *Brady* violation or some other kind of violation, but it was

13   information that was required to be disclosed.  So it looks

14   like we're missing that link and, of course, you preserved your

15   objection for now and as -- as we will have some time off so

16   maybe the -- that will give you an opportunity to see if there

17   is any other information you want to share with the Court to

18   renew that motion, and again, if there's a limiting

19   instruction . . .

20           MR. MYHRE:  Yes, Your Honor.  We'd also add that that

21   information was not adduced by the Government on direct; it was

22   raised on cross-examination by Mr. Burleson's attorney.

23           THE COURT:  That's accurate.  That's true.

24           All right.  So let's go ahead then --

25           MR. JACKSON:  Well, can I -- can I add something to

1    this?

2              THE COURT:  Oh, yes.  Mr. Jackson.

3              MR. JACKSON:  I wanted to make clear a couple things.

4              THE COURT:  Okay.

5              MR. JACKSON:  Number one, I brought it out because I

6    wanted to show that my client, Mr. Burleson, had trust with

7    the -- with the agent.  He had worked with him, and it had do

8    with a murder case that he gave information to the agent down

9    in Arizona.  And then that was the reason why he made

10   certain -- he was willing to trust this agent when he made the

11   phone call to him.  It didn't have anything to do with the

12   Bundy case.  It wasn't -- it had do with the J.T. Ready case.

13   Maybe I should have spelled it out, but I didn't want to go

14   into detail about for that for tactical reasons.  Mr. Caputo

15   had worked with Mr. Burleson and actually paid him money as an

16   informant.  Now, whether that reflected illy on the other

17   defendants, I don't know if it did or not.  That wasn't my

18   concern when I asked the question.

19             Now, they -- it was in the interview with Caputo,

20   which I think they got in discovery, that he had been an

21   informant.  So I think counsel, maybe if they had seen that,

22   they would have been aware that he had at least assisted

23   Mr. Caputo in some investigations in the past.  Now, I don't

24   think anything was hidden.

25             I think I -- in a sealed motion I made to the Court I

1    did argue on the voluntariness of his statement, I mentioned

2    that.  I would -- haven't been trying to hide this information.

3    I was trying to argue towards the voluntariness of his

4    statement, which is something I can argue to the jury, even

5    though the Court had ruled that the statement is voluntarily,

6    but I wanted to bring up the relationship between my client and

7    Mr. Caputo as to whether or not the statement was voluntary or

8    not.  Didn't have anything to do with the acts of the anybody

9    in the Bundy situation at all.  And I certainly didn't want to

10   prejudice the rights of any of the other co-defendants because

11   that might adversely affect my client as well but . . . wasn't

12   any talk about him informing of any of the other defendants and

13   there wasn't -- hasn't been any proffer made concerning the

14   Bundy ranch to Mr. Myhre at any time.

15           MR. MYHRE:  And, Your Honor, we'd add that

16   Mr. Jackson is correct.  Now that he mentions it, it is in the

17   full version of the undercover interview, the -- that he

18   mentions that he had provided information as an informant -- or

19   during the Caputo interview.  I'm sorry.

20           Actually it wasn't an interview; it was a telephone

21   call.

22           THE COURT:  All right.  Well, I . . . like I said,

23   there's no information before the Court that is sufficient for

24   a finding that there's been any violation of any -- or any

25   failure to disclose information that is required.

1          The motion is denied, but like I said -- like you

2   said, you don't have all the information yet, you haven't had a

3   whole lot of time to process it so, you can reassert the issue

4   later if there's more information.

5          MR. TANASI:  Understood.  Thank you, Your Honor.

6          THE COURT:  All right.  So, can we go ahead and bring

7   in the jury now?

8          All right.  Let's go ahead and do that, Aaron.

9          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

10      (Brief pause in proceedings.)

11          COURTROOM ADMINISTRATOR:  All rise.

12      (Jury returned to courtroom at 9:05 a.m.)

13          THE COURT:  All right.  Everyone may be seated.

14          We're joined by the jury.

15          Will counsel please make your appearance for the

16   record, and I need to advise the jury that from here on out,

17   our standby counsel, Mr. John George, is going to be

18   representing Mr. Engel.

19          So the Government may go ahead and make its

20   appearance on the record.

21          MR. DICKINSON:  Good morning, Your Honor.

22   Nicholas Dickinson, Steve Myhre, and Erin Creegan for the

23   United States.

24          THE COURT:  Good morning.

25          MR. TANASI:  Good morning, Your Honor.  Good morning,

1    everyone.  Rich Tanasi for Steven Stewart.  Also with a us is

2    Gwen Wilson and Bryan Ginn.

3              Thank you.

4              MR. MARCHESE:  Good morning, everyone.  Jess Marchese

5    appearing on behalf of Eric Parker.

6              MR. LEVENTHAL:  Good morning, everyone.

7    Todd Leventhal on behalf of Mr. Drexler.

8              MR. GEORGE:  Good morning.  John George on behalf of

9    Todd Engel.

10             MR. PEREZ:  Good morning, everyone.  Shawn Perez on

11   behalf of Rick Lovelien.

12             MR. JACKSON:  Good morning, everyone.  Terry Jackson

13   on behalf of Greg Burleson.  Also with me is Christine Abbott.

14             THE COURT:  Good morning everyone.

15             All right.  So, Mr. Dickinson, you may continue now

16   with your direct examination of FBI Special Agent Johnson.

17

18             FURTHER DIRECT EXAMINATION OF CHARLES JOHNSON

19   BY MR. DICKINSON:

20   Q.   Good morning, Special Agent Johnson.

21   A.   Good morning.

22   Q.   When we left off yesterday, we finished watching the clips

23   of Exhibit 333, which was your interview for the documentary

24   with defendant Parker; correct?

25   A.   Yes.

18

1   Q.   After that, I'm going to take -- draw your attention to

2   October 24th, 2014.

3          Did a Gregory Burleson agree to an interview for the

4   purported documentary?

5   A.   Yes.

6   Q.   And where did that interview occur?

7   A.   In the Phoenix, Arizona, area.

8   Q.   And was your approach in interviewing Mr. Burleson similar

9   to what we saw with Mr. Parker and Mr. Drexler?

10  A.   Yes.

11  Q.   And again, what was that approach?

12  A.   To see if Mr. Burleson would be willing to come and talk

13  to us about his personal experiences that happened at the -- at

14  the -- at Bunkerville.

15  Q.   And where did this interview occur?

16  A.   It was in one of the -- it was in a hotel room where we

17  had a large enough space to be able to set up the cameras and

18  lights.

19          MR. DICKINSON:  And if we could bring up Government's

20  Exhibit 335, the exhibit is clips A through I.  If we could

21  bring up clip A.

22          Let's pause it.

23      (Photo displayed.)

24  BY MR. DICKINSON:

25  Q.   Do you recognize this, Special Agent Johnson?

1   A.   I do.

2   Q.   And what do you recognize this as?

3   A.   It's Mr. Burleson.

4   Q.   And is this part of your interview that you conducted with

5   Mr. Burleson on October 27th, 2014?

6   A.   It is.

7   Q.   And prior to coming to court, were you able to view these

8   clips?

9   A.   Yes.

10  Q.   And were they a fair and accurate representation of your

11  interview with Mr. Burleson on that day?

12  A.   Yes.

13          MR. DICKINSON:  Your Honor, the Government moves for

14  the admission of Exhibit 335A through I.

15          THE COURT:  Any objection to Exhibit 335A through I,

16  other than what's already been addressed?

17          MR. TANASI:  Nothing additional from Stewart,

18  Your Honor.

19          MR. MARCHESE:  Nothing additional from Parker.

20          MR. PEREZ:  Nothing from Lovelien.

21          MR. GEORGE:  Nothing.

22          MR. JACKSON:  Not other than have previously been

23  made, Your Honor.

24          THE COURT:  All right.  So Exhibit 335A through I

25  will be admitted.

1          (Government Exhibit 335A through I received.)

2               MR. DICKINSON:  May we publish, Your Honor?

3               THE COURT:  Yes, you may.

4               MR. DICKINSON:  Can you just bring up clip I and

5     pause real quick.

6          (Photo displayed.)

7     BY MR. DICKINSON:

8     Q.   Who is this individual we're seeing, Special Agent

9     Johnson?

10    A.   This is Mr. Burleson.

11              MR. DICKINSON:  And if we could proceed with clip A.

12         (Video played.)

13              MR. DICKINSON:  If you could publish clip B.

14         (Video played.)

15              MR. DICKINSON:  If we could publish clip C of 335.

16         (Video played.)

17              MR. DICKINSON:  If we could publish clip D.

18         (Video played.)

19              MR. DICKINSON:  If we could publish clip E.

20         (Video played.)

21              MR. DICKINSON:  If we could publish clip F of Exhibit

22    335.

23         (Video played.)

24              MR. DICKINSON:  If we could publish clip G from

25    Exhibit 335.

1          (Video played.)

2              MR. DICKINSON:  If we could publish clip H from 335.

3          (Video played.)

4              MR. DICKINSON:  And finally, if we could play clip

5     "I" of Exhibit 335.

6          (Video played.)

7     BY MR. DICKINSON:

8     Q.   Special Agent Johnson, just a couple questions about

9     Mr. Burleson's interview.

10             I believe either in clip A or B Mr. Burleson mentions

11    something about another shot?

12    A.   I'm sorry.  Say again.

13    Q.   I believe in either the end of clip A or B Mr. Burleson

14    mentioned something about another shot?

15    A.   Yes.

16    Q.   Did you have alcohol at the hotel room when you were

17    doing -- conducting your interview with Mr. Burleson?

18    A.   Yes.

19    Q.   And why is that?

20    A.   Again, when we set up to be a production site, it's common

21    to have refreshments, everything from water, coke, beers, mixed

22    drinks, also snacks, be it potato chips, M&Ms, just to have

23    things there.  You know, sometimes people are hungry, sometimes

24    they just want a snack, sometimes they want something to drink,

25    but that's often standard in a production-type setting.

1  Q.   And do you recall how many alcoholic drinks Mr. Burleson

2  had during your interview of him on that day?

3  A.   I believe he had two.  I believe he had one when he first

4  got in with just some general conversation walking into the

5  room and then I believe his second one was the one that you

6  reference in the clip where he asks for a second shot or

7  another shot.

8  Q.   And then regarding your interviews with Mr. Drexler and

9  Mr. Parker and Mr. Burleson, after you interviewed them in your

10  role as an undercover, again, did you have any further role in

11  investigating them related to the events --

12  A.   I did not.

13  Q.   -- surrounding April 12th of 2014?

14  A.   No, I did not.

15       MR. DICKINSON:  Thank you, Your Honor.  I'll pass the

16  witness.

17       THE COURT:  Cross?

18       MR. TANASI:  Your Honor, I don't have any questions.

19  I just would ask for a limiting instruction, given what we've

20  just heard in reference to continuing objection that we

21  discussed outside the presence and on balance those statements

22  in comparison to my client's statements that we've heard so far

23  through Facebook.  So again, I'd ask that those statements only

24  apply as to Mr. Burleson in this case and for a limiting

25  instruction in that fashion.

1          MR. MARCHESE:  Parker joins.

2          MR. LEVENTHAL:  Drexler joins.

3          MR. GEORGE:  Engel joins.

4          MR. PEREZ:  Lovelien joins.

5          THE COURT:  Mr. Dickinson, are these offered only

6     against those individuals or are these offered as evidence of

7     the conspiracy?

8          MR. DICKINSON:  Evidence of the conspiracy as we

9     discussed and litigated yesterday, Your Honor.

10         THE COURT:  All right.  So the motion for a limiting

11    instruction to only consider the statements of each person

12    against only themselves is denied.

13         Did you want to have any -- an opportunity -- oh, it

14    looks like Mr. Jackson is coming.  Are you going to go ahead

15    and do cross first, sir?

16         MR. JACKSON:  Is it -- are we getting close to break

17    time?

18         THE COURT:  You may.

19         That's actually a good idea.  It's five minutes away.

20    Let's go ahead and take a break and we'll take about a

21    15-minute stretch/bathroom break.

22         I do remind the jury during this time to please

23    remember you are not to discuss this case with anyone nor allow

24    anyone to discuss it with you.  Let the Court know right away

25    if anyone does attempt to speak to you about the case or if you

24

1    inadvertently overhear anything about the case.

2           Please do not listen to or -- or read anything that

3    touches upon this case, or view anything, and do not attempt to

4    perform any independent research or any investigation regarding

5    the issues in this case.  And please do not form any opinion.

6           We're going to go ahead and take 15 minutes.  So back

7    here at 10:15.

8           We'll stand for the jury as they are the judge of the

9    facts and after they exit, then we'll ask Special Agent

10   Johnson, you can take your stretch break/bathroom break, but I

11   need you to be back here by 10:15.

12       (Jury excused from courtroom.)

13           THE COURT:  All right.  Off record.

14       (Recess was taken at 9:57 a.m.)

15           COURTROOM ADMINISTRATOR:  All rise.

16           THE COURT:  You may be seated.

17       (Brief pause in proceedings.)

18           THE COURT:  Let's bring in the jury.

19       (Brief pause in proceedings.)

20           COURTROOM ADMINISTRATOR:  All rise.

21       (Jury returned to courtroom at 10:23 a.m.)

22           THE COURT:  All right.  Everyone may be seated.

23           We're joined by the jury.  We have Special Agent

24   Johnson back on the stand and, Mr. Jackson, you may continue

25   with your cross-examination.

1           MR. JACKSON:  Or begin.

2           THE COURT:  Or begin.  You're right.

3           MR. JACKSON:  Thank you.

4

5                CROSS-EXAMINATION OF CHARLES JOHNSON

6    BY MR. JACKSON:

7    Q.   Special Agent Johnson, you've worked for the FBI for what

8    is it, about 20 years?

9    A.   I'm in my 19th year, yes, sir.

10   Q.   All right.  And you got this plan do this production

11   company to work on this case because you thought it would be

12   helpful in the investigation; is that right?

13   A.   Not completely, sir.  I sat down with the case special

14   agents and they had asked that they were trying to gather

15   information, so it was between a conversation with the case

16   special agents and myself that with wanting to go out and

17   interview people to get their stories then that would be the

18   best way to do it.

19   Q.   So it was the case agents' idea that you set up this

20   production company plan in order to get statements from various

21   people; is that right?

22   A.   The general outline of the operation, yes, sir.

23   Q.   Yeah.  And this was basically designed to just get

24   statements from anybody that was at the Bunkerville area or the

25   Bundy ranch, or was it designed to get statements just from

1    people that the case agent thought might have done something

2    that they thought was improper?

3    A.    I think it was a combination of both.  Anyone that was

4    there would have been -- had their own personal firsthand

5    knowledge of the events, who was there and what happened, so I

6    would say it would be a combination of both.

7    Q.    So rather than call people in for an interview in the FBI

8    office, the scheme was to set up an undercover operation where

9    the individuals wouldn't know that you were working undercover,

10   you designed this so-called production company where people

11   thought they were making a documentary movie -- or you were

12   making a documentary movie; is that right?

13   A.    Yes.  That is what we purported, that we were filming a

14   documentary.

15   Q.    So you wanted to get people to make admissions or to give

16   you information that they otherwise might not give you if they

17   thought you were police officers or you were investigating a

18   crime; is that right?

19   A.    We asked them to give statements of what they did or what

20   they experienced.  If those were admissions, then yes.

21   Q.    All right.  Well, now, you had people sign some kind of

22   release or some kind of agreement before you filmed them?

23   A.    I believe we did for some, yes.

24   Q.    Well, did you have Mr. Burleson sign some kind of release

25   or agreement?

1   A.   I believe so.

2   Q.   Did that agreement give him the right to review what you

3   prepared?

4   A.   This -- the statements that we made to everyone we

5   interviewed is that they would be allowed to review what we

6   taped before it was ever produced or made into a documentary.

7   Q.   Did it give them a right to keep you from making that

8   documentary if he chose to keep you from making it?

9   A.   No, sir.  The whole point of the consent was that they

10  were speaking freely and allowing us to use that information.

11  Q.   So, basically he didn't have any right to say if I don't

12  like what you put on this tape, I can't tell you, no, I want

13  to -- you to cut that out or I want you -- I don't want that

14  published; is that right?

15  A.   He had that right by if he would have not shown up in the

16  first place.  It was his -- I mean, he had the right to say

17  whatever he wanted to in the interview.

18  Q.   But basically once you had that on tape, he couldn't say

19  no, I don't -- I don't like what I said there; I want to take

20  it back so . . . the agreement didn't give him that -- or the

21  release didn't give him that option of saying no, I really

22  didn't mean that; is that right?

23  A.   Yes.

24  Q.   All right.  Now, you went to -- you've gone to many

25  interrogation schools; is that right?

1    A.   I wouldn't say many interrogation schools.  I've had

2    classes on interview and interrogation, yes.

3    Q.   All right.  And did you have any special interrogation

4    schools that helped you with devising this scheme of

5    interrogation that you used at the Long Bow Production

6    facility?

7    A.   No.  This was very unique in that there was a standard set

8    of questions that we used so it wasn't about an interrogation,

9    it was just asking questions.

10   Q.   Well, you used the same kind of leading questions you use

11   in any kind of law enforcement interrogation.  Isn't that true?

12   A.   There may have been some leading questions, but they were

13   always prefaced with "please don't let me put words into your

14   mouth and if I'm saying anything that's inaccurate, please

15   correct that."

16   Q.   You tried to direct people to those things that you wanted

17   them to -- those areas that you wanted them to go into.  Isn't

18   that correct?

19   A.   Yes.

20   Q.   You had a -- you already had knowledge, before you

21   interviewed these people, of most of the facts that you wanted

22   to question them about; is that right?

23   A.   I don't know that I would say most of the facts, but we

24   did have -- we were provided some information that they were

25   there, that they were involved with the event.

1    Q.   All right.  So the case agent has said, you know, I want

2    you ask to Mr. Burleson this questions or some of these

3    questions and you kind of had an idea which way you were going

4    before you put Mr. Burleson on camera; is that right?

5    A.   It was not unique to Mr. Burleson.

6    Q.   All right.

7    A.   They were the same set of questions for everyone.

8    Q.   Now, what was unique to Mr. Burleson was that you were

9    feeding him alcohol before you started the questioning.  Isn't

10   that right?

11   A.   I would disagree with feeding him alcohol.  He was offered

12   and he had two drinks while he was there over the course of

13   probably two and a half to three hours.

14   Q.   Okay.  Do you know how many other drinks he had before he

15   got there?

16   A.   No, sir, I don't.

17   Q.   What time of day did you start the interview?

18   A.   It was in the evening.  I don't know the exact time.  I

19   believe probably between 6:00 and 7:00 p.m. possibly.

20   Q.   Okay.  Now, did you provide alcohol to the other

21   defendants in this case when you were interviewing them?

22   A.   Everyone that we interviewed were offered the same things,

23   yes.

24   Q.   Did you provide -- no.  The question is not whether you

25   offered; did you -- while they were being interviewed, were you

30

1  providing alcohol to Mr. Drexler?

2  A.   It was offered.  I don't believe Mr. Drexler or

3  Mr. Parker, either one, partook in any drinks.  I believe one

4  said that they didn't drink.

5  Q.   All right.  Now, you knew that Mr. Burleson had a problem

6  with alcohol.  Isn't that correct?

7  A.   I did not.

8  Q.   Did the case -- you didn't discuss that with the case

9  agent?

10  A.   I did not.

11  Q.   Okay.  You knew during the interview Mr. Burleson

12  mentioned that he had a problem with epilepsy; is that correct?

13  A.   He -- yes.

14  Q.   In fact, he had been rejected from the military because he

15  had epileptic seizures; is that right?

16  A.   Yes.

17  Q.   And you, as a police officer know, that someone that's

18  taking alcohol, if he has epilepsy, that can cause problems; is

19  that right?

20  A.   I don't know that I could speak to that directly, no.

21  Q.   Okay.  So, did you ever question him at all about whether

22  his intake of alcohol was affecting his ability to understand

23  your questions?

24  A.   Did not have -- no, sir.  Did not ask that question.

25  Q.   I noticed when you were questioning Mr. Burleson, at the

31

1    beginning, you asked him to count from 1 to 10; is that right?

2    A.   Yes, sir.  To do a sound check to get a sound level for

3    our audio for the camera.

4    Q.   I didn't see you do that on any of the other defendants.

5    I don't -- maybe I missed that.

6    A.   Sometimes we have them count.  Sometimes we have them make

7    statements.  We always do an audio check to make sure that the

8    levels don't have distortion.

9    Q.   It wasn't to see whether Mr. Burleson was too intoxicated

10   to understand what you were doing?

11   A.   No, sir.

12   Q.   Okay.  Did you notice anything about Mr. Burleson's body

13   language while he was answering your questions that suggested

14   he might be somewhat intoxicated?

15   A.   No, sir.  He just seemed animated and that was it.

16   Q.   He seemed animated.

17            After the interview was over, did you ever reduce it

18   to writing and ask Mr. Burleson to go over the written

19   statement?

20   A.   The written statement as --

21   Q.   Did you ever ask Mr. Burleson to -- let me rephrase that.

22            Did you ever ask Mr. Burleson to make a written

23   statement?

24   A.   No, I did not.

25   Q.   Do you know if the case agent asked him if -- of your own

1    knowledge.  Do you know if the case agent asked him to make a

2    written statement about his involvement in the Bundy ranch

3    matter?

4    A.   I don't know.

5    Q.   Okay.  In the release that you had Mr. Burleson sign, was

6    anything in that release -- did it say that he had a right to

7    independent legal advice before being involved in this

8    production of this video?

9    A.   I don't -- I don't have the release memorized.  It was

10   just a standard form from off the Internet.  So I can't speak

11   to it verbatim.

12   Q.   Well, you don't -- do you have a copy of the release with

13   you?

14   A.   I do not have one with me, no, sir.

15   Q.   Did you read it to him or did you show it to him?

16   A.   Handed it to him to allow him to read it at his own pace

17   and then to sign at the bottom.

18   Q.   I didn't see it being read to him on the tape that we --

19   that we taped; is that right?

20   A.   No, sir.  I did not read it to him.

21   Q.   Now, was there a substantial amount of conversation before

22   the actual filming began?  Was there talking back and forth

23   where you kind of prepped him for what you were going to talk

24   to him about?

25   A.   Very limited.  I guess just social conversation.  As

1   Mr. Burleson came to the room, introducing myself, kind of a

2   little explanation of what we were going to do, and then we

3   moved over for time sake to where we had the cameras and the

4   lights set up and started the interview.

5   Q.    Now, how many people were in the room?

6   A.    Counting Mr. Burleson, probably six, maybe seven.

7   Q.    And they were all FBI related people, either technicians

8   or FBI agents or people like that?

9   A.    Yes, sir.

10  Q.    Mr. Burleson didn't have any representatives representing

11  him, anybody that was either a legal representative or a friend

12  of his or anybody with him; is that right?

13  A.    No, sir.  Not in the room, no.

14  Q.    Now, did you or one of the agents go pick Mr. Burleson up?

15  Do you know how he got there?

16  A.    I believe he drove in his truck, which he references in

17  the video, and then he was met down in the lobby area.

18  Q.    Okay.  Now, was it you or someone else that reached out to

19  Mr. Burleson to get him to come in for this statement?

20  A.    That's usually done by our assistant director who, she did

21  all the scheduling.

22  Q.    Who was that?

23  A.    Anna.

24  Q.    And she -- she contacted him over the Internet or over the

25  phone?  How did she contact him?

1   A.   I'm not a hundred percent sure.  I would say it was either

2   telephonically or maybe even e-mail.

3   Q.   Well, how did she become aware -- was she -- was she told

4   by the case agent to contact Mr. Burleson?

5   A.   I believe he was one of the ones that had been initially

6   identified, so we looked for public source information to try

7   to make contact or information from other individuals that we

8   had interviewed.

9   Q.   So, Mr. Burleson just didn't voluntarily come in to make

10  this interview with Long Bow Productions; he was solicited for

11  this by someone in the FBI; is that correct?

12  A.   I would agree that he was solicited, but I would also say

13  that he voluntarily came.

14  Q.   But that was after someone from the FBI contacted him and

15  said would you like to be involved in this production; is that

16  right?

17  A.   Yes.  He was contacted by someone in -- another undercover

18  to ask if he would like to come in and speak.

19  Q.   All right.  And you weren't the one that made that

20  overture to him; it was someone else -- some other undercover

21  agent?

22  A.   Correct.

23  Q.   And you don't know exactly what they said to him?

24  A.   It was standard that, would you like to come in and be

25  interviewed for your personal experience that you had at

1    Bunkerville.

2    Q.    Well, now, did anybody promise him that he would get

3    money?

4    A.    No.

5    Q.    Was there even an implied promise that if he was on this

6    video, that maybe he would get some -- some money for the

7    production of the video or get some royalties or something like

8    that?

9    A.    No.

10   Q.    Wasn't suggested to him in any way?

11   A.    It wasn't suggested because the whole premise of a

12   documentary would be that in a business company, that

13   individual or that business would have to sell the documentary.

14   So, obviously we weren't going to make promises about any money

15   being paid.

16   Q.    Was it suggested to him that he would become famous or he

17   would get, you know, any kind of benefits from being on this

18   video?

19   A.    Not that we promised, no.

20   Q.    You don't know what the other agents said to him though?

21   A.    I do not.

22   Q.    Okay.  Did he mention any things like that when he showed

23   up to be involved in this production?

24   A.    Not that I recall about being famous.  He said he had been

25   interviewed before, but nothing about will this make him

1    famous.

2            MR. JACKSON:  The Court's indulgence for a minute.

3            THE COURT:  Yes.

4        (Counsel conferring.)

5            MR. JACKSON:  No further questions.  We'll pass the

6    witness.

7            Thank you all.

8            THE COURT:  Thank you.

9            Mr. Perez, any questions?

10            MR. PEREZ:  Nothing from Mr. Lovelien, Your Honor.

11            THE COURT:  Mr. Leventhal?

12            MR. LEVENTHAL:  Yes, Your Honor.

13

14            CROSS-EXAMINATION OF CHARLES JOHNSON

15    BY MR. LEVENTHAL:

16    Q.   Good morning.

17    A.   Good morning.

18    Q.   My name is Todd Leventhal.  I represent Mr. Drexler.

19            MR. LEVENTHAL:  Bryan, can we pull up 334-1.

20    BY MR. LEVENTHAL:

21    Q.   I'm going to pull up the interview of Mr. Drexler that you

22    went through yesterday.

23            COURTROOM ADMINISTRATOR:  Mr. Leventhal, you said

24    334-1.  You mean 334A?

25            MR. LEVENTHAL:  "A."  I apologize.  A, B, C, D.

1          (Video played.)

2                MR. LEVENTHAL:  There might be a problem.  I think

3     he's playing the whole video and not the clips, so let me just

4     make sure he knows what "A" is.

5                COURTROOM ADMINISTRATOR:  Sure.

6                MR. LEVENTHAL:  Court's indulgence.

7          (Counsel conferring.)

8          (Video played.)

9     BY MR. LEVENTHAL:

10    Q.   Okay.  So Agent, this is just the introduction and this is

11    the start of the taped interview; correct?

12    A.   Correct.

13    Q.   Okay.  And so, had you had a conversation with my client,

14    Mr. Drexler, prior to the taping going on, if you remember?

15    A.   If it was, it was very limited because as I remember, we

16    had pulled up to the cabin area and Mr. Parker and Mr. Drexler

17    had actually showed up a little earlier, so we went immediately

18    into kind of a production setup.

19    Q.   Okay.  Was the -- you indicated that you had just gotten

20    there though; right?

21    A.   Correct.

22    Q.   Okay.  So you had to move quickly in getting this all set

23    up; correct?

24    A.   Correct.

25    Q.   Okay.  And so you're trying to gain some type of personal,

1    you know, relationship with him at this point; right?  Asking

2    him where he's from; correct?

3    A.    Yes.

4    Q.    Okay.  And you discussed that you want to go through his

5    thoughts and his feelings on what happened; correct?

6    A.    Yes.

7    Q.    Okay.  And you're trying to gain some type of a

8    relationship of trust at this point, let him know what's going

9    on; correct?

10   A.    To establish a flow and explain what we were trying to --

11   the questions that we were going to be asking.

12   Q.    Okay.  And now, you indicated that you had set this up --

13   or you didn't.  Somebody else set this up; correct?

14   A.    Correct.

15   Q.    Okay.  And were you there when the other person set it up?

16   A.    I don't believe so.

17   Q.    And I believe that you said that was Anna?

18   A.    Yes.

19   Q.    So you wouldn't have any knowledge or information as to

20   how Mr. Drexler was contacted?

21   A.    Again, it was generally telephonic or e-mail, but

22   specifically, no, I do not.

23   Q.    Okay.  Was that telephone conversation recorded, if you

24   know?

25   A.    We tried to record every phone conversation that we had,

1    yes.

2    Q.    Okay.  So you recorded every phone conversation and you

3    set up a date and time.  And where did you come from?  Where

4    did you start?  Where did you originally come from before you

5    got to Idaho?

6    A.    I believe we were -- I believe we had started in Montana.

7    Q.    Montana.  Okay.  So then you drove out to Idaho?

8    A.    Correct.

9    Q.    Okay.  You and six other agents or -- I know you were

10   asked that question prior.  There were six other agents with

11   you?

12   A.    Yes.  The film crew.

13   Q.    Okay.  And you drove through Idaho and this was the date

14   and time that you were there to set it up so that you could set

15   this interview up; correct?

16   A.    Yes.

17   Q.    Interview, if you will.  It's a -- a fake documentary;

18   right?

19           MR. LEVENTHAL:  Okay.  If we can go to 334B.

20       (Video played.)

21           MR. LEVENTHAL:  Okay.  Stop right there.  Thank you.

22   BY MR. LEVENTHAL:

23   Q.    Okay.  So, early on you asked him how did he hear about

24   it; correct?

25   A.    Yes.

1    Q.   And he indicated that his buddy told him about it;

2    correct?

3    A.   Yes.

4    Q.   And then he indicated that -- and his answer was, "What's

5    the Bundy ranch"; right?

6    A.   Yes.

7    Q.   Okay.  So at that point he had no idea what the Bundy

8    ranch was; correct?  Or before he went down; correct?

9    A.   That's what he stated, yes.

10   Q.   Okay.  So -- I mean, and when I say "the Bundy ranch," he

11   wouldn't have known about cows or anything of that nature;

12   correct?

13         MR. DICKINSON:  Objection, Your Honor, speculation.

14   BY MR. LEVENTHAL:

15   Q.   Would you know?  Did you know?  Did you ask him about

16   that?

17   A.   I didn't ask him.  We asked, like I say, the standard

18   questions, so we start how did you find out and that was, I

19   mean, his statement, that he asked what was Bundy ranch.  So,

20   my assumption was that he probably didn't know about it before

21   he started investigating it.

22   Q.   Okay.

23         MR. LEVENTHAL:  If we could go to 1:09.

24         I'm not going to play the whole thing, because we

25   played it yesterday so . . .

41

1          (Video played.)

2                 MR. LEVENTHAL:  Okay.  Stop right there.

3     BY MR. LEVENTHAL:

4     Q.   Okay.  So now he's indicating that he's going down there

5     or his intent to go down there was to help people; correct?

6     A.   That's what he stated, yes.

7     Q.   That's what he said.

8                 Okay.  And he says he's got this idea if you help me

9     and I help you, if I need help, we'll all get through this

10    together; correct?

11    A.   Yes.

12    Q.   Okay.  He didn't indicate that he want down there because

13    any militia members told him to; correct?

14    A.   No.  Not at that statement, no.

15    Q.   He didn't indicate that he went down there because he

16    hated the federal government, did he?

17    A.   No.

18    Q.   He didn't indicated that he hated BLM, did he?

19    A.   No.

20    Q.   Okay.  That people needed help; correct?

21    A.   Correct.

22    Q.   Okay.

23                MR. LEVENTHAL:  Play that.

24          (Video played.)

25                MR. LEVENTHAL:  Okay.  Stop right there.

42

BY MR. LEVENTHAL:

Q.   Okay.  Now, your question now to him is, "Now you're fired up"; right?

A.   Yes.

Q.   Okay.  All he did was indicate that he went down there to go help people and now you're telling him he's fired up; correct?

A.   Yes.

Q.   Okay.  He didn't say he was fired up, did he?

A.   No.

Q.   No, he didn't.  Okay.

        MR. LEVENTHAL:  Go ahead.

     (Video played.)

        MR. LEVENTHAL:  Stop right there.

BY MR. LEVENTHAL:

Q.   All right.  So he indicated that he hadn't been down there for weeks prior to the 12th; correct?  He didn't indicate that -- I'm sorry.  There's somebody taking notes.

A.   Yes.  Yes.

Q.   Okay.  He indicated that he left pretty much April 11th; correct?

A.   Yes.

Q.   Yes.  Okay.

        And he arrived on April 12th; correct?  Correct?

A.   He was saying the day -- he didn't actually reference them

1   by the date; he was saying like the Saturday and then the next

2   day.  So, he wasn't actually saying the dates by numbers, but

3   yes.

4   Q.   Okay.

5          MR. LEVENTHAL:  Okay.  Go ahead.

6          (Video played.)

7          MR. LEVENTHAL:  Stop.

8   BY MR. LEVENTHAL:

9   Q.   Okay.  So he indicates how he got down there; correct?

10  A.   Yes.

11  Q.   He went with his two buddies; correct?

12  A.   Yes.

13  Q.   And he indicated that he didn't want one of them -- he

14  didn't know if one of the persons, it appears by the name of

15  Steve, wanted his name out; correct?

16  A.   Yes.

17  Q.   And you guys then told him, hey, we already know who Steve

18  is; right?

19  A.   Yes.

20  Q.   Okay.  And you also told him that it was Steve daughter's

21  birthday that day; correct?

22  A.   I believe that's what Anna said, yes.

23  Q.   Okay.  And so Steve couldn't make it; correct?

24  A.   Correct.

25  Q.   Okay.  And did you know if that was Steve Stewart?

44

1    A.    I did not know, no.

2    Q.    Okay.

3              MR. LEVENTHAL:   Go ahead.

4         (Video played.)

5              MR. LEVENTHAL:   Okay.   Stop.

6    BY MR. LEVENTHAL:

7    Q.    All right.   So you ask him, "What do you take down there

8    with you?"   He indicates he takes a sleeping bag; correct?

9    Yes?

10   A.    Yes.

11   Q.    He takes some -- a tent; correct?

12   A.    Yes.

13   Q.    He indicates that he takes a cooler full of food; correct?

14   A.    Yes.

15   Q.    And he indicates he takes a couple firearms; correct?

16   A.    Yes.

17   Q.    Now, you named this *American [sic] Reloaded*; correct?

18   That was the name of the documentary?

19   A.    The working title, yes.

20   Q.    Okay.   Which has some kind of connotation towards guns;

21   right?   Reloaded?

22   A.    Yes.

23   Q.    Yeah.   Okay.   So, now this fake company Long Bow has a

24   fake name of a documentary, *America Reloaded*; correct?

25   A.    Yes.

1    Q.   And it's designed to get people to talk about guns;

2    correct?

3    A.   It was designed to be a title that we believed would be

4    received by the people that we were going to interview.

5    Q.   Okay.  Well, you didn't call it *Til' the Cows Come Home*,

6    did you?

7    A.   We did not.

8    Q.   Okay.  Because that wouldn't have that same meaning of

9    *America Reloaded*; right?

10   A.   Correct.

11   Q.   Okay.  And so, when he lists off the things that he took

12   down there -- the sleeping bag, the tent, the cooler of food,

13   the couple of firearms -- your response then is, "Well, let's

14   work backwards.  Let's start with the firearms"; right?  Yes?

15   A.   Yes.

16   Q.   Okay.  Yeah.  You want the firearms; right?

17   A.   Well, that was the order that we had asked the questions.

18   We started with firearms and went to sleeping bags and food.

19   So that was kind of the standard order that we had gone in, so

20   because he listed them different, that's just the way that I

21   had been starting the interview.

22   Q.   I see.  So that's how it was scripted?  That was your

23   script.  You needed to stick to your script; right?  Because

24   this was all fake; right?

25   A.   They --

1    Q.   Right?  Yes or no?  You had a script?

2            MR. DICKINSON:  Objection, Your Honor.  He needs to

3    let the witness answer.

4    BY MR. LEVENTHAL:

5    Q.   Answer.  It's a yes or no.

6            THE COURT:  Sustained.

7            MR. DICKINSON:  And he doesn't get to choose --

8            THE COURT:  Ask the question again, Mr. Leventhal.

9            MR. DICKINSON -- how he wants the witness to answer.

10   BY MR. LEVENTHAL:

11   Q.   Did you have a script?

12   A.   We had questions to ask.  I would not call it a script.  A

13   script means that you cannot deviate.  Questions to ask in

14   order would mean yes, we had order in the questions, but it

15   wasn't scripted so much that we had no deviation.  If someone

16   would have -- would have given information that we thought was

17   valuable, we would have explored that obviously.  So it wasn't

18   scripted word for word, but it was questions in an order.

19           MR. LEVENTHAL:  Okay.  If we could go -- start it

20   back up.

21       (Video played.)

22           MR. LEVENTHAL:  Okay.  Stop right there.

23   BY MR. LEVENTHAL:

24   Q.   All right.  So now, you're asking about what weapons he

25   took.  He indicated he took an AR-15; correct?

47

1    A.    Yes.

2    Q.    He indicated he took a pistol; correct?

3    A.    Yes.

4    Q.    And you respond by saying, "So you take ARs and AKs."

5    That was your response; correct?

6    A.    Yes.  I'd asked --

7    Q.    Did you hear him say he took an AK?

8    A.    No.

9    Q.    But you said he took an AK, didn't you?

10   A.    I didn't say he did; I said so ARs, AKs, and pistols,

11   because I was giving a general statement of the responses we

12   had gotten in other interviews.  I didn't specifically say you

13   took an AK; I was just saying, in general, these are the

14   weapons that we have been told people take.

15   Q.    That's not -- but that's not what I heard there.  If you

16   want me to replay it, he said, I took an AR-15 and .45 pistol

17   and your response is, "Okay.  So, you took an AK -- an AR and

18   an AK."

19   A.    Yes.

20   Q.    Okay.  And you would agree there's a difference between an

21   AR and AK; correct?

22   A.    Correct.

23   Q.    Okay.

24            MR. LEVENTHAL:  Go ahead.

25        (Video played.)

48

1          MR. LEVENTHAL:  Stop right there.

2     BY MR. LEVENTHAL:

3     Q.   Okay.  So you ask him about sort of his planning to go

4     down to Bunkerville; correct?

5     A.   What items he was going to take, yes.

6     Q.   Yeah.  Okay.  And that was one of your stock questions;

7     correct?

8     A.   Yes.

9     Q.   Okay.  And he indicated that he took whatever was in his

10    car; correct?

11    A.   The things that he had in his car and I think he said food

12    for three days.

13    Q.   Okay.  All right.

14          MR. LEVENTHAL:  If we can go to 6 minutes and 3

15    seconds.

16         (Video played.)

17          MR. LEVENTHAL:  Stop.

18    BY MR. LEVENTHAL:

19    Q.   Okay.  So, what he now says is what was in his frame of

20    mind when he went down there was "to show support"; correct?

21    Those were his words; right?

22    A.   Yes.

23    Q.   Okay.  "To help others"; correct?

24    A.   Yes.

25    Q.   Okay.  And he had indicated that he had done a little

1   research; correct?

2   A.   Yes.

3   Q.   Okay.  And he indicated here that sometimes having a gun

4   brings civility to a situation; correct?

5   A.   Yes.

6   Q.   Okay.  He doesn't say that he went down there to go get a

7   man's cows back, did he?

8   A.   No.

9   Q.   He doesn't say that he's going down there to intimidate

10  any BLM officers; correct?

11  A.   No.

12  Q.   He didn't say he was going to go down there to assault

13  anybody; correct?

14  A.   No.

15  Q.   He said he was going to go support; correct?

16  A.   Yes.

17  Q.   Okay.

18          MR. LEVENTHAL:  Go ahead.

19      (Video played.)

20          MR. LEVENTHAL:  Stop.

21  BY MR. LEVENTHAL:

22  Q.   Okay.  So it brings -- he ends with "it brings civility to

23  certain things"; correct?

24  A.   Yes.

25  Q.   Now, you didn't know what he meant by "when people think

1   they can do whatever they want."  Did you know what he meant by

2   that?

3   A.   I did not.

4   Q.   Did you ask further questions regarding that?

5   A.   No.  I tried to let him continue his thought, his

6   statement.

7   Q.   Okay.  You -- do you know whether or not he was referring

8   to the BLM as doing whatever they want?

9   A.   I do not.  I mean, that's the people that were there and

10  that's where he was going, but he didn't state that.

11  Q.   Okay.

12          MR. LEVENTHAL:  If we can go to 10 minutes and 50

13  seconds.

14  BY MR. LEVENTHAL:

15  Q.   Now, I -- again, Agent, I'm going to move forward because

16  we don't have to hear it all, so I'm going to take you now to

17  when he went -- what happened the next morning.  Okay?  When he

18  got there.

19          MR. LEVENTHAL:  Go ahead.

20      (Video played.)

21          MR. LEVENTHAL:  Stop right there.

22  BY MR. LEVENTHAL:

23  Q.   Okay.  So, you're asking now Mr. Drexler what happened the

24  next morning that he got there; correct?

25  A.   Yes.

51

1    Q.   And he indicates he gets some coffee; correct?

2    A.   Correct.

3    Q.   Okay.  He got up and people were talking; correct?

4    A.   Yes.

5    Q.   Okay.  And he indicates that the plan -- the plan, the big

6    plan was to listen to Cliven speak to the sheriff.  Is that

7    what he said?

8    A.   Yes.  To go down and see what Cliven had to say and if the

9    sheriff was going to show up to support him.

10   Q.   Okay.  So there's some knowledge the sheriff apparently is

11   coming into town; correct?  The law enforcement; correct?

12   A.   Yes.

13   Q.   Okay.  And then he indicated that there was no other plan,

14   it was flowed and changed; right?

15   A.   Yeah.  That's all he had planned for that morning.

16   Q.   Yeah.  Okay.

17   A.   Yes.

18   Q.   Is that there really was no plan other than to listen to

19   the sheriff and Cliven; right?

20   A.   That's what he stated, yes.

21            MR. LEVENTHAL:  If we can go to 334C.

22        (Video played.)

23            MR. LEVENTHAL:  Stop.

24   BY MR. LEVENTHAL:

25   Q.   Okay.  Now your question is quite a long leading question

1   and it says, "What was your objective"; correct?

2   A.   Yes.

3   Q.   And you indicated, "What was your objective?" at least, I

4   think, three or four times; correct?

5   A.   Yes.

6   Q.   As a matter of fact, you indicated that "what was your

7   military strategy"; correct?

8   A.   I believe I said I don't know if it was a military

9   strategy, but is there or was there an objective.

10   Q.   Okay.  And this question is designed to bait the person

11   into talking about some kind of military strategy; correct?

12   A.   Oftentimes in an interview, a question is designed so

13   that -- and much like I say in the interviews -- if these are

14   not your words, correct me.  So, it's designed to if it's not

15   right, then correct me.

16   Q.   So you're starting a fake documentary.  You preface one or

17   two of your questions with "if these aren't your words, tell

18   me"; correct?

19   A.   Yes.

20   Q.   And then that's supposed to go throughout the whole

21   interview; correct?

22   A.   It's my intent, yes.

23   Q.   Okay.  Now, when you say "objective" -- and you say

24   objective over and over -- this was designed to ask more about

25   was there a conspiracy?  What's your objective; right?

53

1   A.   I don't know that I would say a conspiracy, but a plan.

2   What was the plan.  Was it -- were there multiple moving parts?

3   Were you involved in those parts?  You know, what was the plan?

4   What was -- just like we asked, What was your experience?

5   Q.   Well, you used the word "objective."

6   A.   Correct.

7   Q.   And the word "objective" is more like what was the

8   agreement, what was the conspiracy, what was the plan; correct?

9   A.   Yes.

10  Q.   Okay.  And that was designed to do that; right?  To bait

11  him into that?

12  A.   I would not say to bait, no.

13  Q.   Okay.

14  A.   It would just be to ask the question.

15  Q.   And he indicated that he was just down there to show the

16  authorities that we were there; correct?

17  A.   Yes.

18  Q.   Basically to be part of a protest; right?

19         MR. DICKINSON:  Objection, Your Honor.  That's not

20  what he said.  He says, "Basically the objective that I think

21  there was" --

22         MR. LEVENTHAL:  I'll move on.

23         MR. DICKINSON:  -- "was just a show of force."

24         MR. LEVENTHAL:  Go to 336, 3 minutes and 36 seconds.

25         MR. DICKINSON:  We're -- now we're skipping away from

54

1    what he just asked about.

2              THE COURT:  Yeah.  Mr. Leventhal, where are you

3    going?  Are you going back to --

4              MR. LEVENTHAL:  No.  To --

5              THE COURT:  -- correct the statement or are you

6    moving on?

7              MR. LEVENTHAL:  No.  I'm 3 minutes -- I stopped at 42

8    seconds.  I'm going to 3 minutes in the same video.  334C at 3

9    minutes, 26 seconds.

10             THE COURT:  In response to the objection or are you

11   withdrawing the question?

12             MR. LEVENTHAL:  I'm withdrawing the question.

13             THE COURT:  All right.

14         (Video played.)

15             MR. LEVENTHAL:  Stop right there.

16   BY MR. LEVENTHAL:

17   Q.   Okay.  So now, as you understand it, he's -- you're

18   discussing the time on April 12th; correct?

19   A.   The -- when the standoff happened and his arrival, yes.

20   Q.   Right.  I -- okay.  Sorry.  I didn't mean to cut you off.

21             His arrival; correct?

22   A.   At the -- at the wash area or where the overpass was.

23   Q.   Well, he indicated the parking lot; correct?

24   A.   That's where he said that he pulled off into, yes.

25   Q.   Okay.  And that's where he said that everyone was laughing

1   and joking and they thought they were -- is that what he said,

2   that everyone was laughing and joking and everyone was relaxed;

3   correct?

4   A.   Everyone was relaxed, yes.

5   Q.   Okay.  And then all of a sudden, he says, that somebody

6   started yelling, "We need help.  Somebody was pointing guns at

7   civilians"; correct?

8   A.   Yes.

9   Q.   That's what he says; right?

10   A.   Yes.

11   Q.   And you don't know whether or not that somebody was BLM.

12   Do you know?

13   A.   I do not.

14   Q.   Okay.

15        MR. LEVENTHAL:  If we can go to 6 minutes and 57

16   seconds.

17        (Video played.)

18        MR. LEVENTHAL:  Stop.

19   BY MR. LEVENTHAL:

20   Q.   So, that was an answer to your question on -- or what he

21   saw when he got there; correct?

22   A.   I believe so, yes.

23   Q.   Okay.  And he indicated that he saw BLM with full tactical

24   gear; correct?

25   A.   I didn't see the first part.  He said they were in full

56

```
 1   tactical gear in front of their vehicles.

 2   Q.   And pointing weapons at civilians.  You heard that?

 3   A.   Yes.

 4   Q.   Okay.

 5             MR. LEVENTHAL:  If we could go on and play.

 6        (Video played.)

 7             MR. LEVENTHAL:  Stop right there.

 8   BY MR. LEVENTHAL:

 9   Q.   Okay.  So now he tells you what his thought process was on

10   the 12th, that he saw snipers; correct?

11   A.   Yes.

12   Q.   That he saw helicopter and drones, or what he perceived to

13   be helicopters and drones; correct?

14   A.   Yes.

15   Q.   He saw BLM with Plexiglas; correct?

16   A.   Plexishields.

17   Q.   Plexishields.  Okay.  He said that they were fully armed,

18   BLM fully armed; correct?

19   A.   Yes.

20   Q.   And he indicated that it was a crazy situation; correct?

21   A.   Yes.  He said it was kind of crazy.

22   Q.   And he ends it with, "It was very confusing"; correct?

23   A.   Correct.

24   Q.   Okay.

25             MR. LEVENTHAL:  And 334D.
```

1        (Video played.)

2            MR. LEVENTHAL:  Okay.

3    BY MR. LEVENTHAL:

4    Q.   All right.  So, now he's indicating that he went back to

5    the Bundy ranch and he packed up and left; correct?

6    A.   Yes.

7    Q.   Okay.  Now, you never asked him whether or not he went

8    back to the Bundy ranch, did you?

9    A.   I don't believe so.

10   Q.   Okay.  All right.  Agent, let's start with your name --

11   the name of the video.  You indicated that you called it -- you

12   called your company, I believe you said, Long Bow; correct?

13   A.   Correct.  Long Bow Productions.

14   Q.   Okay.  And that's obviously a fake name; right?

15   A.   Yes.  It's a fake company.

16   Q.   You produced a bogus website; correct?

17   A.   Correct.

18   Q.   And did you produce bogus business cards?

19   A.   Yes.

20   Q.   And you all had fake titles?  You were president, CEO,

21   technician, a lot of fake titles?

22   A.   Not like -- not president, but it was we were a director

23   and assistant director and the actual titles of the working

24   crew.

25   Q.   Okay.  How far did you go with this?  Did you register

58

```
 1    your fake company or did you do anything like that with
 2    anybody, like the Better Business, did you pay taxes?  Did you
 3    do anything like that?
 4    A.    No.
 5    Q.    Or did you just set up a fake website?
 6    A.    Correct.
 7    Q.    Okay.  And you -- did you go out and did you actually
 8    purchase all the videos or the vans or did you get that through
 9    internal connections?
10    A.    Internal.
11    Q.    Okay.  So you had to get the van, because you said you
12    drove; correct?
13    A.    Correct.
14    Q.    Okay.  And you had to get, I guess, cameras; correct?
15    A.    Correct.
16    Q.    And you had to get lighting equipment; correct?
17    A.    Correct.
18    Q.    Okay.  And you had to get audio equipment; correct?
19    A.    Correct.
20    Q.    Okay.  And you indicated you had all these people with
21    you, six agents at any given time; correct?
22    A.    Correct.
23    Q.    Were you armed?
24    A.    No.
25    Q.    Were any of the agents armed?
```

59

1    A.    Not of our crew, no.

2    Q.    Okay.  And you drove around with all this alcohol in your

3    van so everybody can partake if they wanted to?

4    A.    No.  Usually we would buy it at the specific locations

5    because we were limited in space so . . .

6    Q.    Oh, okay.  And you indicated earlier you didn't have a

7    script; right?

8    A.    Correct.

9    Q.    Stock questions.  So you can ebb and flow with whatever

10   answers you were getting; correct?

11   A.    Correct.

12   Q.    Okay.  And the -- these questions, they were designed to

13   have these guys incriminate themselves; correct?

14   A.    They were designed to have them tell their story of what

15   they experienced.  If it was incriminating, then that was their

16   experience --

17   Q.    All right.

18   A.    -- but it was designed to just gather information.

19   Q.    Okay.  Did you rehearse your lines?

20   A.    I don't know that I would say rehearsed.  Obviously I read

21   over them and knew what the questions were that I would be

22   trying to ask through the interview.

23   Q.    Okay.  The Bundy -- as you call it -- standoff occurred in

24   April of 2014; is that correct?

25   A.    Yes.

60

1    Q.    And you interviewed my client in August 16 of 2014;

2    correct?

3    A.    Yes.

4    Q.    Were you aware that there were thousands of hours of video

5    in this case?

6    A.    Thousands of hours of videos?

7    Q.    Video of the 12th.

8    A.    I'm sorry.  Repeat that.

9    Q.    April 12th.  This standoff.

10   A.    From TV and personal video, yes.  I knew there was a lot.

11   I didn't know the volume.

12   Q.    And there are hundreds and hundreds of law enforcement

13   reports.

14          Were you aware of that?

15   A.    No.  I was not the -- I mean, I assumed there were, but I

16   was not the investigative agent of the case.  I was just asked

17   to come in and be a kind of a tool -- investigative tool of the

18   case.

19   Q.    Okay.  And with all that evidence you still had a need to

20   go out and interview after the fact; correct?

21          MR. DICKINSON:  Objection, Your Honor.  That assumes

22   when the evidence came in, when it was compiled.

23          MR. LEVENTHAL:  I have no further questions.  I'll --

24   thank you.

25          THE COURT:  Mr. Marchese?

61

1          MR. MARCHESE:  Yes.  Thank you, Your Honor.

2

3              CROSS-EXAMINATION OF CHARLES JOHNSON

4   BY MR. MARCHESE:

5   Q.   Good morning, sir.

6   A.   Good morning.

7   Q.   I'll try to keep it brief as Mr. Leventhal asked you a lot

8   of the same questions that I am going to ask about.

9          Just some brief background information.

10          So obviously you -- your role here was just to help

11   set up this fake documentary; correct?

12   A.   Correct.

13   Q.   And I think you said that your role was working as the

14   producer; correct?

15   A.   Director, but those titles can be synonymous.

16   Q.   Okay.  Now, whatever your title was, you had something do

17   with the video, obviously; correct?  Documentary?

18   A.   Correct.

19   Q.   We can hear you on the videos; correct?

20   A.   Yes.

21   Q.   You're doing most of the -- asking most of the questions

22   for the most part; correct?

23   A.   Yes.

24   Q.   I believe they said Anna was also asking some of the

25   questions as well?

1  A.   Yes.

2  Q.   Now in reference to Mr. Parker, obviously you had an

3  interview with Mr. Parker; correct?

4  A.   Yes.

5  Q.   And that was Exhibit 333.  We saw a bunch of different

6  clips, I think it was maybe 18 or so.  I'm not going to go

7  through all of them, but maybe if we can just break them down a

8  little bit.

9        You remember those obviously; right?

10 A.   Yes.

11 Q.   I believe you said yesterday on direct-examination that

12 you didn't have necessarily an investigatory role in this

13 particular case; is that correct?

14 A.   That is correct.

15 Q.   Your job was just to gain information based on the

16 documentary and once you did your documentary duties, that was

17 the end of your job.  Is that fair to say?

18 A.   Correct.

19 Q.   Okay.  Now, on this particular case you -- Mr. Jackson and

20 Mr. Leventhal had asked you some questions about your

21 preparation.  One of the things was which you had a certain

22 script of questions that you would ask; correct?

23 A.   Again, I don't call it a script.  There were a list of

24 questions, yes.

25 Q.   Okay.  Fair to say more bullet points than questions?

63

1   A.   General questions and then obviously to -- to let the

2   answers go where they will.

3   Q.   Okay.  But you're trying to elicit certain information.

4   Is that fair to say?

5   A.   Yes.

6   Q.   Some of that information would be to ask about guns;

7   correct?

8   A.   Correct.

9   Q.   In all the interviews you asked if all the individuals

10  were, in fact, armed; correct?

11  A.   I believe so.  Most all the interviews, yes.

12  Q.   Okay.  And the ones, if they did answer in the

13  affirmative, then you followed up and you asked what sort of

14  firearms that they had; correct?

15  A.   Yes.

16  Q.   All right.  You asked a lot of questions about militia;

17  correct?

18  A.   Yes.

19  Q.   All right.  That was another bullet point.

20          You also asked if the individuals who went to the

21  Bundy ranch area, you asked what sort of leadership there was;

22  correct?

23  A.   Yes.

24  Q.   You asked if -- what sort of planning that there was;

25  correct?

64

1    A.    I'm sorry.  What sort of what?

2    Q.    Planning.

3    A.    Yes.  Yes.

4    Q.    And you also asked who the individuals knew; correct?

5    A.    Who they knew, who was with them, who was there.

6    Q.    Okay.  And in my client's situation, Mr. Parker, he

7    indicated that he knew Mr. Drexler and Mr. Stewart; correct?

8    A.    Yes.

9    Q.    You didn't interview Mr. Stewart for whatever reason;

10   correct?

11   A.    Did not.

12   Q.    But you did obviously interview Mr. Drexler as we just saw

13   yesterday and today; correct?

14   A.    Yes.

15   Q.    All right.  You were able to ascertain from your

16   documentary questions that the three of them traveled from

17   Idaho down to Bunkerville together; correct?

18   A.    Yes.

19   Q.    All right.  Now, the first clip I'm not going to really

20   ask about it was just basically background information, Eric's

21   name, where he was born and things of that nature.  Just

22   general information.  Nothing really too incriminating.  Fair

23   to say?

24   A.    I mean, that's the way we started all the interviews was

25   just asking about the individual so . . .

1  Q.   Sure.  You want to build a rapport; correct?

2  A.   Correct.

3  Q.   Make them feel comfortable; correct?

4  A.   Correct.

5  Q.   Get the dialogue started?

6  A.   Correct.

7  Q.   Then in the second clip you got right into it and you

8  asked him, you said, well, what made him decide to go down,

9  something along those lines; right?

10 A.   As we asked everyone, yes.

11 Q.   Yes.

12      And one of the things that he brought up to you was

13 the free speech zones; correct?

14 A.   Free speech or protest zones, yes.

15 Q.   Okay.  And I don't know about the other individuals, but

16 Mr. Parker indicated that he was upset that there were these

17 free speech zones set up; correct?

18 A.   Yes.

19 Q.   Prior to you conducting this interview for the documentary

20 were you generally aware of what the individuals were referring

21 to?

22 A.   Yes.

23 Q.   Okay.  Because even though you weren't the case agent and

24 you didn't do any investigation prior to this, you had to at

25 least have a little bit of background knowledge as -- so you

1   would know the proper questions to ask.  Fair to say?

2   A.   Correct.  When we met with the case agents, we were given

3   an overview of the situation that had happened so that we could

4   then work together to create the scenario.

5   Q.   Right.  Because obviously if you're going in and you're

6   asking the wrong questions, your cover is going to be blown for

7   lack of a better term?

8   A.   Or you're just not going to make sense.  You're not going

9   to be credible as a documentary filmmaker.

10  Q.   Sure.  And you wanted to come off credible, of course?

11  A.   Yes, because we --

12  Q.   Right.  Because if you went in your capacity as an FBI

13  agent, wouldn't it be fair to say that you might get different

14  answers than if you were going as a documentary filmmaker?

15  A.   Very possible.

16       MR. MARCHESE:  So now turning to Exhibit 333C, Bryan,

17  and I'll get you the time here in a second.  If we can go

18  to . . . looks like it's about 27:41.

19       (Video played.)

20       MR. MARCHESE:  Bryan, you can stop.

21       The Court's indulgence.

22       THE COURT:  Yes.

23       (Counsel conferring.)

24       MR. MARCHESE:  Sorry, Agent.  Apparently my

25  transcript is a little off from the actual video.

1            Maybe you could continue to play it, Bryan, I guess.

2        (Video played.)

3            MR. MARCHESE:   Okay.  You can stop.

4    BY MR. MARCHESE:

5    Q.   So basically at this point Mr. Parker's talking more about

6    his reasons to go down; correct?

7    A.   Yes.

8    Q.   And apparently he saw some sort of video on the Internet

9    that he thought brought up a good point; correct?

10   A.   Yes.

11   Q.   And it was talking about a show of force; correct?

12   A.   Yes.

13   Q.   Well, which on its face, could sound scary when you're

14   talking about armed individuals; right?

15   A.   Yeah.  I believe he says a match of force to show equal

16   numbers.

17   Q.   Correct.  But at the end he said, "We're not coming to

18   fight"; correct?

19   A.   Yes.

20   Q.   And he says, "We don't want violence"; is that correct?

21   A.   Yes.

22   Q.   Okay.

23            MR. MARCHESE:   Now, Bryan, if you could go to 333G,

24   as in George.  And this is a little bit of a short clip so we

25   can just play the whole thing.

1            Bryan, you can just go ahead.

2       (Video played.)

3            MR. MARCHESE:  Okay.  You can stop right there.

4   BY MR. MARCHESE:

5   Q.   Okay.  So at this point Mr. Parker affirmatively says he

6   is not a member of any particular militia; correct?

7   A.   Yeah.  He said he's not a part of the militia, yes.

8   Q.   Okay.  He says, "I am not in any militia but I do support

9   them"; correct?

10  A.   Yes.

11  Q.   All right.

12           MR. MARCHESE:  Bryan, you can go ahead.

13      (Video played.)

14           MR. MARCHESE:  Okay.  You can stop.

15  BY MR. MARCHESE:

16  Q.   Now, once again, in that particular excerpt Mr. Parker,

17  once again, he says he's not a member of the militia; correct?

18  A.   Correct.

19  Q.   And he even gives a negative portrayal of -- portrayal --

20  excuse me -- of some militia.  Is that fair to say?

21  A.   In some instances, yes.

22  Q.   Right.  He says something to the effect of some militias

23  are fine and some are racist, crazy, scary people that want to

24  blow up the government.

25           Correct statement?

1   A.   Yes.

2   Q.   All right.

3        MR. MARCHESE:  And you can play the rest of it,

4   Bryan.

5        (Video played.)

6        MR. MARCHESE:  And you can stop that, Bryan.

7   BY MR. MARCHESE:

8   Q.   Now, once again in that particular segment he once again,

9   he doesn't say he's -- he's in the militia; correct?

10  A.   He doesn't say he's in the militia; he said he will stand

11  with them, but he's not in the militia, yes.

12  Q.   Correct.  So, in that colloquy between you guys you first

13  ask him are you part of any militia and he says no.  So he --

14  one time -- he says no.  And you agree with that, when you

15  first start that segment?

16  A.   Yes.

17  Q.   Okay.  And he does state that he believes in the militia.

18  And then once again, you ask him something to the effect

19  of . . . that he considers himself a militia of one.  You asked

20  that; correct?  Once again trying to get him to say that he's

21  in the militia; correct?

22  A.   No.  Not asking him to say, inquiring about the militia in

23  general.  He had made statements at the beginning of the clip

24  that he would -- he would stand with them, he wouldn't leave

25  and he supported them.  Then he also made additional statements

1    that you indicated that he didn't agree with some militias.  I

2    was just trying to get a further understanding of where he

3    stood; was it I'm not joining a militia because it will cost me

4    money, I'm not joining a militia because I don't believe in

5    them.  I'm just trying to get further clarification from him.

6    Q.   So when you asked, "So you're kind of like a militia of

7    one," you weren't trying to figure out if he was in the

8    militia.  Is that your testimony?

9    A.   I was trying to find out where he fell with the militia.

10   He said he was not a part of the militia, but he also said that

11   he would stand with the militia.  So to me, those were kind of

12   contradictory statements for this event so I was just trying to

13   get further information as to more exactly what he meant.  And

14   so I was asking are you an independent, because we had had

15   people say that they were independents before.  I was just

16   trying to get further clarification.

17   Q.   Okay.  So it was your -- it's your testimony then you

18   didn't get enough information to ascertain what his feelings on

19   the militia were; correct?

20   A.   Correct.

21   Q.   Okay.  But, he gave a statement where he says he sometimes

22   trains with them; correct?  He knows some people in the

23   militia; correct?

24   A.   Correct.

25   Q.   He feels that everybody should do some sort of defense

71

1  training; correct?

2  A.   Correct.

3  Q.   He said he never felt the need to actually join; correct?

4  A.   Correct.

5  Q.   Because he didn't like that the militias have -- he didn't

6  like to get involved with other people's agendas was what he

7  said; correct?

8  A.   Correct.

9  Q.   And then he said some militias are fine and some are bad;

10  correct?

11  A.   Correct.

12  Q.   And then you still -- it's your testimony that you still

13  needed more information as to his mindset on the militia at

14  that point?

15  A.   I was just asking further clarification questions.

16  Q.   Okay.

17  A.   He was obviously -- to me, there had been contradictory

18  statements.  I don't believe in the militia, but I will stand

19  with them.  I don't like this militias, but I train with them.

20  So, again, was just trying to get further clarification.  That

21  was just my thought.

22  Q.   Okay.

23           MR. MARCHESE:  And if you could turn to 333J, as in

24  John.  Give me a second here.

25           And if you could go to . . . you could just play it

1    from the beginning, actually, Bryan.

2         (Video played.)

3              MR. MARCHESE:  And you can stop it.

4    BY MR. MARCHESE:

5    Q.   And just to give a little bit of backstory so everyone

6    here isn't confused.  This is when Mr. Parker's up on the

7    bridge.  This is what you're talking about; correct?

8    A.   Yes.

9    Q.   And now when he -- after he hit the ground; correct?

10   A.   Yes.

11   Q.   Okay.

12             MR. MARCHESE:  And you can continue to play.

13        (Video played.)

14             MR. MARCHESE:  Okay.  You can stop it for a second.

15   BY MR. MARCHESE:

16   Q.   Okay.  And when he's saying "the guys that were with me,"

17   who are you -- in your mind, who do you think that that is?

18   A.   The two that he --

19             MR. DICKINSON:  Objection.  Speculation.

20             MR. MARCHESE:  In his mind it's not speculation.

21             THE COURT:  Well, either he knows or he doesn't know.

22   If he has personal knowledge.

23             Is that your question?

24             MR. MARCHESE:  So he can say yes or no.

25             ///

73

1    BY MR. MARCHESE:

2    Q.   Do you know, sir?

3    A.   No, I do not know definitively.

4    Q.   Okay.

5         MR. MARCHESE:  And you can continue to play, Bryan.

6         (Video played.)

7         MR. MARCHESE:  Okay.  You can stop it there.

8    BY MR. MARCHESE:

9    Q.   So at this point in time Mr. Parker's talking about his

10   thought process up on the bridge that day; correct?

11   A.   Yes.

12   Q.   He was saying that -- he was telling the other people and

13   thinking in his own mind that if a teargas cannister is shot

14   into the crowd, do not fire; correct?

15   A.   Yes.

16   Q.   Do not fire unless fired upon.  Fair to say?

17   A.   Yes.

18   Q.   Okay.

19        MR. MARCHESE:  And if you can go to 52:33, Bryan.

20        (Video played.)

21        MR. GINN:  Jess, 52:33?

22        MR. MARCHESE:  5-2-3-3.

23        (Video played.)

24        MR. MARCHESE:  Okay.  You can stop there.

25        ///

1   BY MR. MARCHESE:

2   Q.   And in that particular statement he said that his goal was

3   to have a peaceful end on that day; correct?

4   A.   Yes.

5   Q.   He didn't say he wanted to instigate anything; correct?

6   A.   Correct.

7   Q.   He didn't say he wanted to kill anyone; correct?

8   A.   Correct.

9   Q.   He didn't say he wanted to harm anyone; correct?

10  A.   Correct.

11  Q.   He wanted a peaceful end.

12        MR. MARCHESE:   You can continue to play, Bryan.

13        (Video played.)

14        MR. MARCHESE:   Okay.  You can stop there for a

15  second, Bryan.

16  BY MR. MARCHESE:

17  Q.   Now, and I don't know if you caught it because it was a

18  little bit choppy there at the beginning but, did you hear

19  where Mr. Parker said that nobody wanted to die that day;

20  correct?

21  A.   Correct.

22  Q.   All right.  And he also indicates in that particular

23  segment that no one -- that he didn't have any optics; correct?

24  A.   Correct.

25  Q.   In your mind what did that mean?

1    A.   That he did not have a scope on his rifle was my

2    assumption.

3    Q.   Okay.  And he also talks about the distance from where he

4    was; correct?

5    A.   He -- he references that with the optic, yes.

6    Q.   Right.  He doesn't use any exact figures or numbers, but

7    he says something to the effect of . . . from this distance he

8    wouldn't be able to make a shot or something along those lines;

9    correct?

10   A.   He said he would prefer to have an optic at that distance.

11   I don't think he said that the shot was not attainable, but

12   that you would prefer an optic.

13   Q.   Yes.  That's correct.  Actually the statement is, "A shot

14   at that distance, you would want optics."

15        That's -- that sounds accurate?

16   A.   Yes.

17        MR. MARCHESE:  And if you could go to 53:47, Bryan.

18        (Counsel conferring.)

19   BY MR. MARCHESE:

20   Q.   Now, once again, I'm referring to clip J.  Obviously it

21   seems like you have a very good knowledge and understanding and

22   recollection of what you asked that day, I would imagine.

23   A.   I've seen these clips a lot here recently.

24   Q.   Okay.  Went over the transcripts as well?

25   A.   Yes.

1   Q.   Okay.  So we're having some technically difficulties in

2   reference to the numbering on the transcript so I'm just going

3   to ask this directly off the transcript and it sounds like you

4   have the knowledge and the basis to do that.

5            Later in that colloquy you start asking Mr. Parker

6   more about what's going on on the bridge.  You said something

7   to the effect -- you're asking about cover fire and then Eric

8   goes on to say, "And it was tough.  It was tough.  But at that

9   time all you could really do was try to calm down and take it

10   as it came."

11           Do you remember that statement?

12  A.   I believe it was cover fire and then we clarified that if

13  he meant like suppressive fire and then he did say, yes, that

14  he was -- I believe he was shaking at some point.

15  Q.   Right.

16           Yes.  And he says, "Oh, man.  I'm in a sniper's

17  crosshairs right now," and he got down to the ground and his

18  hands were shaking.

19           Do you remember that?

20  A.   Yes.

21  Q.   Okay.  And he said he realized he might not be making it

22  home and he prayed.

23  A.   Yes.

24  Q.   Okay.  He mentioned that he isn't necessarily an overly

25  religious man, but in that particular case, because of the

77

1   situation, he prayed; right?

2   A.   I believe he said he prayed to quit shaking.

3   Q.   Correct.

4          MR. MARCHESE:  And Bryan, let's try this again.  If

5   we can go to 3330, as in Oscar.

6          (Video played.)

7          MR. MARCHESE:  You can stop it right there.

8   BY MR. MARCHESE:

9   Q.   You know, based on that clip, once again, Mr. Parker is

10  talking about when he's on the bridge; correct?

11  A.   Yes.

12  Q.   And I think sequentially this is a little bit later in

13  time.  This is when the BLM had started egressing from the wash

14  area; correct?

15  A.   Yes.

16  Q.   And you're aware of how all that went down?

17  A.   Generally, yes.

18  Q.   Generally.  Okay.  Because when I say "wash area," I'm not

19  sure what you know and what you don't, but you know what I'm

20  referring to; correct?

21  A.   Correct.  The underpass area of the wash area.

22  Q.   Right.

23          And in that particular statement by Mr. Parker

24  he's -- he indicates that he was pretty far away; correct?

25  A.   Well, he was still on the bridge, yes.

78

1  Q.   Right.  And that he was unable to really hear what was

2  going on from the wash; correct?

3  A.   Correct.

4  Q.   He could see that the BLM was backing up; correct?

5  A.   Yes.

6  Q.   And he made that statement that they still -- when they

7  were backing up, they had machine guns pointed at everyone;

8  correct?

9  A.   Correct.

10        MR. DICKINSON:  Objection, Your Honor.  That's not

11  what it says.  It says, "They left their machine guns facing

12  the crowd and backed up."

13  BY MR. MARCHESE:

14  Q.   Well, so you would agree that it says . . . well, we'll

15  move on.

16        He made a statement about machine guns; correct?

17        THE COURT:  Well, again, Mr. Marchese, are you

18  withdrawing the question then?

19  BY MR. MARCHESE:

20  Q.   Well, isn't it true they said, "They left their machine

21  guns facing the crowd and backed up"; correct?

22  A.   Yes.

23  Q.   Okay.  So whether they were pointing them or not, we can

24  leave that up to the jury to decide, but that was Mr. Parker's

25  statement; correct?

1    A.   Right.  He didn't --

2              MR. DICKINSON:  Objection, Your Honor.

3    Argumentative.

4              THE COURT:  Sustained.

5              MR. MARCHESE:  Well, it's the truth, but okay.

6    BY MR. MARCHESE:

7    Q.   You don't know what he was saying, but all he said was

8    that they were facing -- the machine guns were facing the

9    crowd; correct?

10   A.   They were facing.  He didn't say up, low ready, port arms.

11   He didn't give any adjectives to that, just the direction.

12   Q.   Okay.  Mr. Parker indicated that the BLM was possibly

13   scared; correct?

14   A.   I believe his statement was that they were all scared.

15   Q.   Okay.  And he also said that he was scared, they were all

16   scared as you just stated.

17   A.   Yes.

18   Q.   Okay.

19             MR. MARCHESE:  No further questions, Your Honor.

20   Thank you.

21             THE WITNESS:  Thank you.

22             THE COURT:  All right.  Mr. George, do you have any

23   cross-examination questions on behalf of Mr. Engel?

24             ///

25             ///

1                    CROSS-EXAMINATION OF CHARLES JOHNSON

2      BY MR. GEORGE:

3      Q.    Good morning.

4      A.    Good morning.

5      Q.    I have five brief questions for you.

6             How many people did you interview while you using the

7      pretense of Long Bow Productions?

8      A.    I don't know an exact number.  I mean, there were several.

9      Q.    Okay.  There are a lot more than several people at the

10     events that occurred on April 12th, 2014, though; correct?

11     A.    Yes.

12     Q.    So, you didn't interview everybody that was there;

13     correct?

14     A.    No, we did not.

15     Q.    Okay.  The people you interviewed were interviewed because

16     those persons were thought to have had participated in the

17     events on or around April 12 significantly enough to be of

18     interest; correct?

19     A.    That was the way it was relayed to me, yes.

20     Q.    Okay.  And my last question is a simple yes or no

21     question.  You did not interview my client, Mr. Engel, did you?

22     A.    I did not.

23             MR. GEORGE:  Thank you.

24             THE COURT:  All right.  Mr. Tanasi, any cross?

25             MR. TANASI:  No, ma'am.  Thank you.

1          THE COURT:  All right.  So I think that we have --

2     Mr. Perez, you waived, right?  Is that right?

3          MR. PEREZ:  Yes, ma'am.

4          THE COURT:  All right.  Redirect, Mr. Dickinson?

5       (Counsel conferring.)

6

7          REDIRECT EXAMINATION OF CHARLES JOHNSON

8     BY MR. DICKINSON:

9     Q.   Special Agent Johnson, just a couple questions.

10          You had some questions, I believe, regarding the

11    phone calls and the initial setup for the three interviews we

12    discussed here in court, Mr. Drexler, Mr. Parker, and

13    Mr. Burleson and I believe you said that most of those were

14    conducted by Anna?

15    A.   Yes.

16    Q.   During this operation, did you attempt to record all phone

17    calls with people that you interacted with?

18    A.   There was an attempt to make every -- record every phone

19    call.  Obviously with the way some systems are set up, if you

20    get a call in, you would normally try to call back so that you

21    could activate it but in some circumstances there could be an

22    instant, but I'm pretty confident we recorded everything.

23    Q.   And then you had some questions from -- regarding

24    Mr. Burleson and the consumption of alcohol.

25          You stated that -- well, you tell me.  Did he appear,

 1  based on your training and experience, to be impaired?

 2  A.   No.

 3          MR. LEVENTHAL:  Objection.  Calls for speculation.

 4          MR. JACKSON:  I'd join in that objection.

 5          MR. DICKINSON:  I'll lay a foundation.

 6  BY MR. DICKINSON:

 7  Q.   How long have you been a law enforcement officer?

 8  A.   For a little over -- almost 24 years.

 9  Q.   And can you estimate how many people you've interviewed in

10  your capacity as a law enforcement officer?

11  A.   Probably thousands.

12  Q.   Have you ever interviewed anybody that was impaired?

13  A.   Several.

14  Q.   And based on your training and experience, did

15  Mr. Burleson appear to be impaired by alcohol?

16          MR. LEVENTHAL:  Objection.  Same objection.

17          THE WITNESS:  He did not.

18          MR. LEVENTHAL:  What one person [sic] impairment does

19  not have to do with another.

20          MR. JACKSON:  I'd join in the objection.

21          THE COURT:  You want to lay a better foundation for

22  how many folks he's interviewed that were intoxicated?

23          MR. DICKINSON:  I'm sorry, Your Honor.  I didn't

24  hear.

25          THE COURT:  Oh.  Did you want to lay a foundation for

1   how many individuals he has interviewed that were intoxicated

2   versus not intoxicated?

3   BY MR. DICKINSON:

4   Q.   Can you estimate how many people you interviewed that you

5   determined were intoxicated as opposed to not intoxicated?

6   A.   As a local police officer, there was a great number of

7   people, so, maybe 20 or 30 percent at times.  As a federal

8   agent, not as many.  So, it wouldn't -- from a percentage

9   standpoint, it would be lower, but I was -- I interviewed

10  more -- had more interaction with individuals that were

11  intoxicated while I was a local police officer, obviously

12  driving under the influence, having to perform field sobriety

13  tests and things of that nature to determine if they met the

14  standard.

15  Q.   And in interviewing Mr. Burleson, did he appear to be

16  intoxicated or impaired by alcohol?

17  A.   No.

18  Q.   And I believe you stated, correct me, that you -- I

19  believe he had two drinks in front of you that day?

20  A.   Yes.

21  Q.   And would -- would there have been a reason why you would

22  not have done your best not to allow Mr. Burleson to become

23  intoxicated?

24  A.   Well, several reasons.  Number one, it could interview --

25  interfere with the interview.  We were on time schedules.

84

1    Number two, and probably more important, for safety and

2    security of the individuals there.  When someone shows up and

3    they're armed and you don't know maybe what their intent is,

4    you err on the side of caution for safety and security of the

5    people around you.

6    Q.   And you also referred to Mr. Burleson's demeanor during

7    the interview as "animated."

8              What did you mean by that?

9    A.   He seemed excited to tell his story.  In the video you can

10   see that he moves around in his chair and when you're trying to

11   actually take video, you want someone to be more stationary.

12   So he just seemed very excited to tell his story.

13             MR. DICKINSON:  Thank you.  No further questions,

14   Your Honor.

15             THE COURT:  Any further recross?

16             MR. JACKSON:  I'd like to recross.

17             THE COURT:  Okay.

18

19             RECROSS-EXAMINATION OF CHARLES JOHNSON

20   BY MR. JACKSON:

21   Q.   It's your opinion that Mr. Burleson wasn't under the

22   influence of alcohol when you did the video of him; is that

23   correct?

24   A.   It's my statement that he did not appear to be impaired.

25   Q.   All right.  And you said that he appeared to be agitated?

1   A.   I never said agitated.  I said animated and then I

2   described that as excited.

3   Q.   Okay.  So we're in a semantic discussion here about how he

4   was, but you didn't do any blood alcohol test on him to

5   determine whether he was under the influence of alcohol, did

6   you?

7   A.   I did not.

8   Q.   You said you thought there might be some danger, somebody

9   might be under the -- to prevent any danger you wanted to make

10  sure they weren't under the influence of alcohol; is that

11  correct?

12  A.   I did not want to continue to give alcohol where someone

13  could become impaired and then their judgment be impaired.

14  Q.   Okay.  But -- but you mentioned something they might --

15  you didn't want armed individuals to have alcohol; is that

16  correct?

17  A.   Yes.  We would never want anybody we're interviewing, who

18  is armed, to give them excessive amounts of alcohol to impair

19  their judgement.

20  Q.   All right.  Before you did this interview did you do a

21  pat-down search of the interview to make sure they weren't

22  armed?

23  A.   He had a pistol openly displayed on his hip.  So, and we

24  wouldn't do that.  A documentary wouldn't do a pat-down search

25  anyway.  That would -- would not make sense.

1   Q.   Okay.  Now, did you -- you had armed individuals -- you

2   said none of you were armed in this -- of the six FBI agents

3   there?

4   A.   No one else was armed in that room other than

5   Mr. Burleson.

6   Q.   Okay.  And but you gave him two alcoholic drinks while he

7   had a sidearm on him?

8   A.   That is correct.

9   Q.   Okay.  And he was talking -- the stuff he was talking

10  about, hating the government while you were giving him

11  alcoholic drinks?

12  A.   He was given one alcohol drink when he came in.  When we

13  started the interview, which I would say is probably 20 to 30

14  minutes later, he requested a second.  We provided a second.

15  And then he was not provided any more from that point forward

16  which was the course of another hour and a half to two hours.

17  Q.   Did you give him anything to eat during that time?

18  A.   I believe he may have had some -- the snacks.  Potato

19  chips, pretzels, whatever we had available.

20  Q.   Do you know how much Mr. Burleson weighs?

21  A.   I do not.

22  Q.   He's not a big man, is he?

23  A.   I guess -- I guess that's relative, sir.  I don't know how

24  much he weighs.

25  Q.   Well, he's not as big as you, is he?

87

1    A.    No, sir.

2    Q.    He's not as big as me, is he?

3    A.    I don't believe so.

4    Q.    Okay.

5           MR. JACKSON:  Let the record reflect I weigh about

6    180 pounds.

7           MR. DICKINSON:  Objection, Your Honor.

8           THE COURT:  I don't know that so I can't have the

9    record reflect that.

10          MR. JACKSON:  Well, I -- between 180 to 190 if I eat

11   a little bit too much for dinner.

12          THE COURT:  I'm sorry.

13   BY MR. JACKSON:

14   Q.    But Mr. Burleson is smaller than 180 pounds; right?  Would

15   you say that?

16   A.    I don't know that, sir.  If you're saying he's smaller

17   than you, then that would make sense, but I do not know.

18   Q.    Well, he's not a big man; right?

19          MR. DICKINSON:  Asked and answered.

20          MR. JACKSON:  All right.

21   BY MR. JACKSON:

22   Q.    Now, you also knew of his seizure disorder and you've also

23   mentioned that would affect maybe his -- how alcohol would

24   affect him; is that right?

25   A.    No, sir, I did not state that.

1   Q.   You didn't know that?

2   A.   I did not state that I knew it would affect him.  I stated

3   that I agreed that he mentioned that in the interview after he

4   had gotten his second drink and at no other point did he get

5   any other alcohol, but I did not state -- I said I wasn't

6   qualified to -- to testify to the interaction of alcohol and

7   epilepsy.

8   Q.   How -- how many FBI agents were there there?

9   A.   In the room, there were approximately six people.

10  Q.   And none of them would have any medical training, to your

11  knowledge?

12  A.   I -- I don't know.  Some may.  Some may not.

13  Q.   All right.

14           MR. JACKSON:  No further questions.

15           THE COURT:  All right.  Anyone else want to recross?

16           MR. TANASI:  No thank you, Your Honor.

17           MR. LEVENTHAL:  No, Your Honor.

18           MR. MARCHESE:  None from Parker.

19           MR. PEREZ:  None from Lovelien.

20           THE COURT:  Mr. George, any recross?

21           MR. GEORGE:  (Counsel shook head side to side.)

22           THE COURT:  All right.

23           Any redirect, Mr. Dickinson.

24           MR. DICKINSON:  No, Your Honor.

25           All right.  Well, Special Agent Johnson, thank you

89

1    for coming in.  You're excused.

2            We're going to go ahead and take our lunch break.  So

3    first I do need to remind the jury that you are not to discuss

4    this case with each other during the lunch break.  You can talk

5    about other things, but not about this case.

6            Please do not listen, or read, or view anything that

7    touches upon this case or attempt to perform any independent

8    research or investigation, and do not form any opinion.

9            It's 11:50, so we'll try to be back here by 12:50.

10   Let's go ahead and stand for the jury.

11       (Jury excused from courtroom.)

12       (Witness excused.)

13           THE COURT:  All right.  Off record.

14           COURTROOM ADMINISTRATOR:  Off the record.

15       (Recess was taken at 11:50 a.m.)

16           COURTROOM ADMINISTRATOR:  All rise.

17           THE COURT:  Thank you.  You may be seated.

18           All right.  Shall we call the jury in and then does

19   the Government have another witness to call?

20           MS. AHMED:  Yes, Your Honor.

21           THE COURT:  All right.  Any issues we need to address

22   before we do that?

23           MR. MYHRE:  None from the Government.

24           THE COURT:  All right.  Let's go ahead and call in

25   the jury.

```
 1            COURTROOM ADMINISTRATOR:  Yes, Your Honor.
 2        (Brief pause in proceedings.)
 3            COURTROOM ADMINISTRATOR:  All rise.
 4        (Jury returned to courtroom at 1:11 p.m.)
 5            THE COURT:  All right.  Everyone may be seated.
 6            We're back from the lunch break.  We're joined by the
 7    jury.  And the Government may call its next witness.
 8            MS. AHMED:  Thank you, Your Honor.
 9            The United States calls Special Agent Chad Simpkins.
10
11                         CHAD SIMPKINS,
12    called as a witness on behalf of the Government, having been
13    first duly sworn, was examined and testified as follows:
14
15            THE COURT:  Good afternoon, Special Agent Simpkins.
16    You're going to be seated right over here to my right.  Please
17    watch your step coming in.
18            COURTROOM ADMINISTRATOR:  Please remain standing and
19    raise your right hand.
20            You do solemnly swear that the testimony you shall
21    give in the cause now before this Court shall be the truth, the
22    whole truth, and nothing but the truth, so help you God?
23            THE WITNESS:  I do.
24            COURTROOM ADMINISTRATOR:  Thank you, sir.  You may be
25    seated.
```

1           THE WITNESS:  Yes.

2           THE COURT:  Please state and spell your full name for

3    the record.

4           THE WITNESS:  Chad Simpkins, C-h-a-d-S-i-m-k-i-n-s.

5

6                 DIRECT EXAMINATION OF CHAD SIMPKINS

7    BY MS. AHMED:

8    Q.   Good afternoon, Agent Simpkins.

9    A.   Good afternoon.

10   Q.   Where are you currently employed?

11   A.   I'm sorry.  What was that?

12   Q.   Where are you currently employed?

13   A.   Currently employed in Stafford, Virginia, at the FBI

14   academy.

15   Q.   And what is your current position with the FBI?

16   A.   I am a supervisory special agent in the Firearms Training

17   Unit.

18   Q.   And what is your current duty position in Virginia?

19   A.   Currently I'm teaching firearms to new agents out there

20   while I'm assigned to the Las Vegas Division.  I'm just in a

21   temporary duty status in Stafford.

22   Q.   And is that where the FBI's academy is for incoming FBI

23   agents?

24   A.   It is.

25   Q.   And so are you training incoming FBI agents with respect

92

1    to firearms currently in your current duty position?

2    A.   Yes.  All the new agents, before they become certified as

3    agents, go through our academy out in -- it's on the Marine

4    Corps base in Quantico, Virginia.  They go through the academy

5    that we provide there and my responsibility is to instruct them

6    in firearms.

7    Q.   How long have you been a special agent with the FBI?

8    A.   A little over 10 years.

9    Q.   Prior to becoming an agent did you also attend the FBI

10   academy?

11   A.   I did.

12   Q.   And did you successfully complete your time at the

13   academy?

14   A.   Yes.

15   Q.   And then did you, from that join the FBI in a particular

16   field office?

17   A.   Yes.  I was assigned to the Las Vegas Division, initially

18   up to the Reno resident agency.

19   Q.   While you were a special agent in Reno did you at some

20   point take on any additional responsibilities in addition to

21   being a special agent with the FBI?

22   A.   Yes.  I -- I'm assigned to the Las Vegas SWAT team as well

23   for the FBI.

24   Q.   And can you explain to the jury what the FBI -- what the

25   SWAT team is and its duties, generally.

93

1    A.   SWAT stands for Special Weapons and Tactics.  It's just a

2    tactical team that our division has here for serving high-risk

3    warrants and other operations.

4    Q.   And when did you first join the FBI SWAT team for the Las

5    Vegas Division?

6    A.   In April 2009.

7    Q.   Are you still a member of that team?

8    A.   I am.

9    Q.   Did you undergo any specialized training for the position

10   you have on SWAT?

11   A.   Yes.  Initially you go through a selection process to get

12   selected for the team.  After the selection process you go

13   through a SWAT basic school.  It's a two-week school, and then

14   another week of school for weapons of mass destruction-type

15   operation using hazardous material gear.  So I did those three

16   weeks and then I also focused on a couple other specialties

17   within the team.  I initially went through accreditation to be

18   a breacher, so I work as a breacher and also as a sniper

19   observer on the team.  I've been through our sniper school.

20   Q.   So, within the SWAT team you are specialized as a breacher

21   and a sniper spotter; is that correct?

22   A.   Correct.

23   Q.   In addition to being on the SWAT team, prior to your

24   current position, were you also a firearms instructor with the

25   FBI?

94

1   A.   Yes.

2   Q.   How long have you been a firearms instructor?

3   A.   Since 2012.

4   Q.   And did you have to undergo any specialized training to

5   become an instructor of firearms with the FBI?

6   A.   Yes.   There's a certification process.   I put in for the

7   school and went to our firearms instructor school.   At the

8   school you have to shoot qualifying scores on some different

9   firearms courses and then establish your ability to instruct as

10  well as take a written exam.

11  Q.   So, you've -- have you been a firearms instructor for the

12  fast five years then?

13  A.   Yes.

14  Q.   And who are you instructing, generally, during that --

15  this whole five-year period?

16  A.   While assigned here to Las Vegas I'm instructing other

17  agents.   Also assisting with firearms instructor schools for

18  other police agencies.

19  Q.   And generally speaking, what is it that you teach in this

20  firearms instructions school?

21  A.   Just marksmanship and handling, weapon maintenance for

22  pistols, carbines, and shotguns.

23  Q.   And prior to becoming an FBI agent did you have any other

24  law enforcement experience?

25  A.   No.

1    Q.   Did you have any work experience?

2    A.   Yeah.  I worked as an accountant for two years before

3    joining the FBI.

4    Q.   And do you have any undergraduate or graduate degrees

5    relating to accounting?

6    A.   Yes.  I have my bachelor's and master's degrees in

7    accounting and I'm currently a certified public accountant for

8    the state of Washington.

9    Q.   In your role as an agent with the FBI over the past 10

10   years have you -- do you have -- what would you describe in

11   terms of your handling of firearms.  How many have you --

12   different types do you -- have you trained on and handled?

13   A.   Within the FBI we primarily use a Glock handgun as our

14   primary weapon.  We start off with a Glock .22.  Currently I'm

15   assigned to carry a Glock 19M.  As far as the handgun goes,

16   carbines on the SWAT team.  We use the M4 as our primary

17   weapon.  It's a 5.56 caliber AR-15-style weapon.  As a sniper

18   observer I carry an HS precision HTR.  It's a .308 caliber

19   rifle built on a Remington 700 platform.  We used to carry,

20   prior to the M4s, when I initially came on the team, we also

21   carried a Heckler & Koch MP5 submachine guns, a 10 millimeter

22   submachine gun, and we also carry the Remington 870 shotguns.

23   I apologize.

24   Q.   Through your work and based on your training and

25   experience, have you been called upon to identify handguns and

1    long guns in investigations that you've participated in?

2    A.   Yes.

3    Q.   And in the fall of 2014 did you become involved in the

4    investigation of events taking place in and around Bunkerville

5    in April of 2014?

6    A.   Yes.

7    Q.   And what was your assignment in that investigation?

8    A.   I was assigned to review the evidence we had collected in

9    that case, looking for evidence of individuals who were

10   carrying firearms during the confrontation that occurred

11   between the individuals who were there following Cliven Bundy

12   and the Bureau of Land Management.

13   Q.   And what did you do to undergo this investigation -- what

14   steps did you take, if any?

15   A.   I -- I initially reviewed all the evidence that had been

16   collected thus far in the case looking for any images or videos

17   of the events that occurred that day on April 12th.  While

18   reviewing those videos I would just freeze frame it and look

19   and see what I could find, see if I could identify individuals

20   carrying holsters or individuals with long guns either in their

21   hands or slung.  Just looking for any evidence of weapons.  I'd

22   just go through a few segments at a time of videos,

23   freeze-framing it and seeing what I could see.  I also used any

24   images that we had collected.  Some of the images obviously --

25   you know, they came in varying degrees of quality, so I would

1   use different devices to help me look closely as those

2   photographs to examine them for evidence of individuals who

3   were carrying those weapons.

4   Q.   So, did you view particular categories or videos that you

5   had received from particular people?

6   A.   I did.

7   Q.   And can you describe some of those videos that you

8   reviewed.

9   A.   Sure.  The main sources of video and the photo collections

10  I looked at, what we refer to as the Flynn collection of videos

11  from Michael Flynn that he took while he was out there.  I

12  reviewed a bunch of videos and photos taken by Hugh Gourgeon.

13  Dennis Michael Lynch took several videos that I reviewed.  We

14  were able to also collect a bunch of photographs that were

15  posted to a Dropbox account online by Shannon Bushman.  I

16  reviewed those.  The FBI had a surveillance plane up at the

17  time monitoring what was happening and I reviewed that video

18  that was captured as well.  There were also several dash cam

19  videos that were captured that day by state troopers that were

20  out there and some individuals who were actually down in the

21  wash were recording videos that were later posted to YouTube

22  and I also reviewed those videos as well.

23  Q.   Did you also review photographs obtained from individuals

24  who had been passing through the area?

25  A.   Yeah.  There was a Forest Service employee, Trey Schillie,

1    who was stopped while he was passing through and took several

2    pictures from the Interstate 15 northbound overpass and so I

3    reviewed those photos as well.

4    Q.   And I think you touched upon this but can you explain --

5    you mentioned that you utilized certain tools in reviewing the

6    photos and videos and looking for firearms.  Can you explain to

7    the jury what -- what tools you used.

8    A.   I was referring to a loupe.  It's basically a magnifying

9    glass that you can set on a picture and move it around to

10   examine the photograph.

11   Q.   And did you review any -- did you take any steps in terms

12   of the photographs to help you better see them in terms of

13   printing larger ones or . . .

14   A.   Yes.  We have a photographer that works for our division

15   and so I asked her if she could print some just large

16   photographic quality copies of those pictures for me,

17   particularly the images taken by Mr. Schillie.  So she printed

18   off some, I believe they were 13 by 19 images, and I reviewed

19   those using that loupe to find evidence of individuals who were

20   carrying firearms.

21   Q.   Now, in terms of the time that you spent in investigating

22   and identifying individuals with firearms that had been present

23   on April 12th at the BLM impoundment site, how -- what estimate

24   would you give to that amount of time?

25   A.   Um . . . hundreds of hours.  Possibly a thousand hours or

1    more.

2    Q.   And in terms of your review of the photographs, were you

3    successfully able to identify people that had firearms in the

4    wash and on the bridges on April 12th, 2014?

5    A.   I was.

6    Q.   And were you able to do that utilizing the tools that you

7    just described?

8    A.   I was.

9    Q.   Would you have been able to see all of those without those

10   tools?

11   A.   No.

12   Q.   Were you asked to do anything with the findings that you

13   made in this investigation?

14   A.   Yes.  I was asked to essentially put together a PowerPoint

15   presentation for each individual who I had identified who was

16   armed and to attempt to timeline those photographs as best as

17   possible.  So I reviewed photographs and as I would find

18   photographs of the same individual, I would put copies of all

19   those photos into a single collection for that individual so we

20   could basically keep track of everything we had for each

21   individual we identified who was there who was armed.

22   Q.   And generally speaking, how were you able to find one

23   individual across several different media?

24   A.   So, what I would do is I'd try and identify, you know, the

25   time at which a certain video was taken.  We used the Flynn

videos as kind of our base timeline.  So, I would identify this
individual at a certain point in time and then there were other
video clips or photographs taken around the same time.  If they
were pointed -- if those images were taken in that same general
direction, I would try to find that individual again in the
other videos and pictures and by doing that I was able to track
individuals and their movements across time using the different
sources of video and photographic evidence that we had.

Q.   And specific to the individuals, how would you find them
in those videos, once you had located the general direction
that they were in?

A.   Each -- most -- pretty much every individual I looked at
was distinctive because of the different types of clothing they
were wearing or the weapons that they were carrying.  So I
would find just unique features, either, you know, their body
build or the shirt, jacket, buttons, patches, bandannas, hats,
whatever it was they were wearing that was distinctive and I
would use those things when the photographs were grainier or of
lesser quality to help track the movement.

Q.   With respect to the PowerPoint that you put together -- or
were you asked to put together a PowerPoint regarding your
findings?

A.   I was.

Q.   And were you asked to focus on any particular area or
event or was it just left open?

A.   Yes.  There were two periods ever time I was asked to focus on for presentation for today.  The two periods were approximately 11:55 a.m. to about 12:15 p.m.  That was the period of time in which that skirmish line -- is what we refer to it as -- was forming in the middle of the wash and then the second period of time I was asked to focus on was from the point in time when that skirmish line began moving up around approximately 12:16 p.m. until about approximately 10 minutes later.  Those two periods of time as that skirmish line moved up to the gate.

          MS. AHMED:  Your Honor, may we publish to the witness what's been previously admitted -- publish to everybody what's been previously admitted as Government's Exhibit 366?

          THE COURT:  Yes.  366.

          MS. AHMED:  Thank you.

          366.  I'm sorry.

          And can you go ahead and play it.

     (Video played.)

          MS. AHMED:  Can you pause it there.  Thank you.  Paused at 17 seconds.

BY MS. AHMED:

Q.   Agent Simpkins, is the skirmish line that you were just referencing?

A.   It is.

Q.   And is this at the earlier point in time or the later

1    point in time?

2    A.   The earlier point in time.

3          MS. AHMED:  And can we continue to play.

4       (Video played.)

5          MS. AHMED:  Can you advance it to the approximate 10

6    minute mark.  Right there.

7          And . . . can you go back to about 7:40.  Play it

8    there.

9       (Video played.)

10          MS. AHMED:  And you can pause it there.

11          Stopped at 7:50.  Thank you.

12   BY MS. AHMED:

13   Q.   Agent Simpkins, is that -- what we just saw, was that the

14   second period of time that you referenced that you focused on?

15   A.   It is.  You can see the crowd is pushed up to the gate at

16   this point.

17          MS. AHMED:  You can take that down.  Thank you.

18   BY MS. AHMED:

19   Q.   In your presentation did you focus just on the wash area

20   or did you look beyond the wash?

21   A.   I looked on the wash as well as in the area of the

22   overpasses.

23   Q.   And what, if anything, did you include in the presentation

24   that you put together?

25   A.   I took images of anybody I identified who was armed at

 1   either of those points in time, and a lot of cases both points

 2   in time, and I included an image of that person armed at that

 3   point in time.  For individuals where it's hard to identify the

 4   weapon just because I'm focused on that one point in time, I

 5   also included a third image or an additional image showing a

 6   clearer shot of the individual carrying a weapon.

 7   Q.   Did you -- in the presentation that you put together, did

 8   you utilize only exhibits that had already been admitted into

 9   evidence in this case?

10   A.   I did.

11   Q.   Did you also put together a summary of the number of guns

12   that you have identified?

13   A.   Yes.

14   Q.   Utilizing those images that you found?

15   A.   I did.

16   Q.   And again, was it just for those two periods of time?

17   A.   It was.

18   Q.   Did you include that in the presentation that you put

19   together?

20   A.   Yes.

21   Q.   And did you put anything else in the presentation that you

22   prepared?

23   A.   I also, at the end of the presentation, included a couple

24   of maps just providing a graphical representation of the

25   approximate locations of the individuals who were armed so you

1    can just visually see where the individuals were who were armed

2    at that time.

3    Q.    So, to be clear, you used photographs and video images

4    that were already in evidence and you identified the guns and

5    then you included a summary of the number that you had found

6    and then you plotted just the guns on a map; is that right?

7    A.    Correct.

8    Q.    And that's what's contained in your presentation?

9    A.    It is.

10   Q.    Did you alter the images that you included in any way?

11   A.    Some of the images were cropped or expanded a little bit

12   to show, you know, the more relevant portion of the image that

13   I'm looking at, but there was no effort made do any kind of

14   photo editing or clarifying of the image.

15   Q.    Did you superimpose anything on the images in this

16   presentation?

17   A.    I put a yellow arrow on the images just to draw your

18   attention to the point that I'm looking at.

19   Q.    And I'd like to draw your attention to what's been put in

20   front of you in the brown folder that's -- if you take that

21   out.  That's what's been marked for identification as

22   Government's Exhibit 469.  And you can take a moment to look at

23   that.

24   A.    (Witness complies).

25   Q.    Do you recognize what's contained in Exhibit 469?

1  A.    I do.

2  Q.    And is that, in fact, a presentation that you put together

3  that you were just describing?

4  A.    It is.

5  Q.    And does it look like -- exactly like what you put

6  together?

7  A.    It does.

8          MS. AHMED:  And, Your Honor, the Government would

9  request permission to publish to the jury Exhibit 469 which is

10  being offered for demonstrative purposes only.

11          THE COURT:  Any objection other than what we've

12  already addressed to Exhibit 469?

13          MR. TANASI:  I don't know if we've addressed it or

14  not, Your Honor, but I think it's cumulative.

15          THE COURT:  All right.  Well, we addressed it in

16  Order No. 1558, but not the cumulative effect.

17          Anyone else?

18          MR. MARCHESE:  Parker would join.

19          MR. LEVENTHAL:  Drexler would join.

20          MR. GEORGE:  Engel joins.

21          MR. PEREZ:  Lovelien joins.

22          MR. JACKSON:  Burleson joins.

23          THE COURT:  Ms. Ahmed?

24          MS. AHMED:  Your Honor, it's not cumulative in that

25  he's -- there's been no prior evidence where this information

1    has been provided to the jury and he's already explained that

2    this is something that was -- required him to go through a long

3    process to be able to find sufficiently.  Additionally, I would

4    note that the defense themselves have asked witnesses in this

5    case to pick out the gunmen in photos, specific photographs and

6    some of those photographs are included in this presentation

7    where he will identify where the guns are.

8            THE COURT:  All right.  So Exhibit 469 may be used

9    for demonstrative purposes.

10      (Government Exhibit 469 received for demonstrative

11      purposes.)

12          MS. AHMED:  And, Your Honor, may we publish that to

13    the jury?

14          THE COURT:  Yes, you may.

15      (Counsel conferring.)

16          MS. AHMED:  Your Honor, I apologize.  Some technical

17    difficulties.

18      (Brief pause in proceedings.)

19      (Slide displayed.)

20    BY MS. AHMED:

21    Q.  Agent Simpkins, you see on the screen in front of you

22    there's two boxes that appear; one on the left, one on the

23    right?

24    A.  Yes, ma'am.

25    Q.  So drawing your attention to the screen on the left, is

1   that the first page of your -- the PowerPoint presentation that

2   you put together?

3   A.   It is.

4          MR. AHMED:  And then can we go to slide 2.

5        (Slide displayed.)

6   BY MS. AHMED:

7   Q.   And, Agent Simpkins, can you explain what you have --

8   what's depicted in slide 2?

9   A.   There's a yellow arrow in slide 2 pointing to an

10  individual who is standing there with a slung long gun.

11  Q.   And at what point in time is this -- of those two general

12  points in time that you referenced, when is this image taken?

13  A.   This is when the skirmish line is forming.

14  Q.   And where is this individual located?

15  A.   On the I-15 northbound overpass, just off to the side of

16  it, just west of the overpass.

17  Q.   And did you see this individual again in the -- when the

18  skirmish line pushed forward?

19  A.   I did.

20         MS. AHMED:  And can we go to slide 3.

21       (Slide displayed.)

22  BY MS. AHMED:

23  Q.   And is that the same individual?

24  A.   Yes.

25  Q.   And can you just -- just so the jury is following, I'm

1    drawing a circle around an individual that has a yellow arrow.

2    Is that the person you're talking about?

3    A.   Yes, ma'am.

4    Q.   And can you explain to the jury where it is you see his

5    firearm.

6    A.   So you can see the black strap running across his chest

7    and then there's a long gun hanging off of that strap just on

8    his right side there.

9    Q.   Are these the only two images that you found of this

10   individual?

11   A.   No.

12   Q.   But why did you include these specific images?

13   A.   I included these two images because they show him at the

14   points in time that we were looking at specifically.

15            MS. AHMED:  And can we go to slide 5.

16        (Slide displayed.)

17   BY MS. AHMED:

18   Q.   And Agent Simpkins, can you explain what's depicted in

19   slide 5?

20   A.   This is a female.  She was standing down in the -- at the

21   front of the skirmish line in the wash.  You can see she has a

22   pistol holstered on her right hip.  She is distinctive because

23   of the vest she's wearing and her hat, jeans.

24   Q.   And where -- at what point does she fall in this first

25   picture that we're looking at, slide 5?

 1    A.   Which is when the skirmish line is formed down in the

 2    wash.

 3            MS. AHMED:  And then can we go to slide 6.

 4        (Slide displayed.)

 5    BY MS. AHMED:

 6    Q.   And -- Court's indulgence, Your Honor.

 7            MS. AHMED:  Your Honor, just so it's easier for

 8    everybody to see, if we could just take two minutes of the

 9    Court's time, we could fix it so it's just the main screen.

10            THE COURT:  Sure.

11            MS. AHMED:  Thank you.

12            THE COURT:  Yes.

13            MS. AHMED:  We'll just . . .

14        (Brief pause in proceedings.)

15            MS. AHMED:  Thank you, Your Honor.

16    BY MS. AHMED:

17    Q.   Now, Agent Simpkins, looking at the screen in front of

18    you, is this the 6th slide in your PowerPoint?

19    A.   It is.

20    Q.   And there's a box that I'm circling at the bottom.  Can

21    you just quickly explain what that is -- what's included in

22    that.

23    A.   So this is a screenshot taken from some of the Flynn video

24    that we captured.

25    Q.   And is that the exhibit number that it -- that is the

110

1    Flynn video is found in?

2    A.   Yes, it is.

3    Q.   And then where it says screenshot, does that -- what does

4    that mean?

5    A.   So, there was a video, a Flynn video and this is a

6    freeze-frame of that video that was introduced as Exhibit 366.

7    Q.   And is this a screenshot that you made once you identified

8    the individual with the firearm?

9    A.   It is.

10   Q.

11           MS. AHMED:  Now, can we just go back to slide 5

12   briefly.

13        (Slide displayed.)

14   BY MS. AHMED:

15   Q.   And again, can you circle where you see the individual

16   that you identified in this slide.

17   A.   (Witness complies).

18   Q.   And you discussed that there were distinctive features

19   about what she was wearing that you used to track her; is that

20   correct?

21   A.   Yes.

22           MS. AHMED:  Then going back to slide 6.

23        (Slide displayed.)

24   BY MS. AHMED:

25   Q.   Can you circle where you see her in slide 6.

1    A.    (Witness complies).

2    Q.    And what -- what features did you follow -- use to

3    identify her in this slide?

4    A.    You can see she has kind of a distinctive round green cap

5    on her head and she's got the vest with her arms exposed, same

6    build.   There's also -- as you watch the individuals in the

7    videos you can see them moving so I was able to track her

8    movements to here and easily identify that this is the same

9    individual.

10   Q.    And what kind of firearm did she have on her?

11   A.    She had a handgun on her right hip.

12   Q.    And slide 5 you had indicated earlier was when the

13   skirmish line was forming; is that correct?

14   A.    That's correct.

15   Q.    And in slide 6, when is this?

16   A.    This is once the line is pushed up to the gate.

17   They're -- currently in this photo she's underneath the

18   Interstate 15 southbound overpass.

19           MS. AHMED:   And then moving forward to slide 8.

20           (Slide displayed.)

21   BY MS. AHMED:

22   Q.    Can you circle where you've identified someone with a long

23   gun -- or with a rifle -- excuse me -- with a firearm.

24   A.    (Witness complies).

25           MS. AHMED:   And the witness has circled in the middle

1   of the screen.

2   BY MS. AHMED:

3   Q.   Now, did you use this photograph to find the individual

4   with the firearm originally?

5   A.   No.

6   Q.   So how did you find this person?

7   A.   This is an individual I identified earlier.  You were

8   correct.  He does have a long gun on.  Somebody I identified

9   and then looking at other videos I could tell this is

10  approximately where he was in the crowd.  So using that

11  magnifying glass, I was able to look for him in the crowd based

12  on his -- he had a distinctive shirt and hat and you can see a

13  little bit the sling on the neck it you zoom in.

14           MS. AHMED:  So, let's move forward to slide . . . 10.

15       (Slide displayed.)

16  BY MS. AHMED:

17  Q.   Do you see that same individual you were just talking

18  about here?

19  A.   I do.

20  Q.   Can you circle him.

21  A.   (Witness complies).

22  Q.   And this is a screenshot taken in one of the two general

23  times periods of skirmish line formation or when it moved

24  forward?

25  A.   No.

113

1    Q.    So why did you include this screenshot?

2    A.    Just to provide a better image of the weapon and the

3    individual carrying that weapon.

4    Q.    And you've already described the distinctive clothing and

5    firearms that you used to find him in other pictures; is that

6    right?

7    A.    Yes.

8              MS. AHMED:  So, going back to slide 8.

9         (Slide displayed.)

10   BY MS. AHMED:

11   Q.    At what point in time is this taken?

12   A.    When the skirmish line is formed.

13             MS. AHMED:  And then going to slide 9.

14        (Slide displayed.)

15             THE WITNESS:  This is once -- once the skirmish line

16   is pushed up to the gate now.

17   BY MS. AHMED:

18   Q.    And will you circle where you've identified him.

19   A.    (Witness complies).

20             MS. AHMED:  And the witness has circled to the

21   center, slightly right, an individual in that area on the

22   screen.

23             And then moving to slide 12.

24        (Slide displayed.)

25             ///

114

1    BY MS. AHMED:

2    Q.   Can you circle where you identified an individual with a

3    firearm.

4    A.   (Witness complies).

5    Q.   Now, can you see other individuals with firearms in this

6    screen?

7    A.   Yes.

8    Q.   You only have an arrow drawn on the one person.  Why is

9    that?

10   A.   That's just the individual we're focusing on for these

11   next frames.

12   Q.   And what kind of firearm did this individual have on them?

13   A.   He's carrying a sidearm on his right hip.

14   Q.   And at what point in time is this one taken, the

15   screenshot?

16   A.   This is when the skirmish line is forming.

17           MS. AHMED:  And then moving forward to slide 13.

18       (Slide displayed.)

19   BY MS. AHMED:

20   Q.   Do you see that same individual again?

21   A.   I do.

22   Q.   Can you circle where you've identified him.

23   A.   (Witness complies).

24   Q.   And in this -- can you see his firearm in this shot?

25   A.   No.

1    Q.   How did you know that he has a firearm here?

2    A.   Based on other images of the same individual showing with

3    his right side.  It's obscured because it's on his right hip in

4    this image.

5    Q.   Now . . . at what point in time is this taken?

6    A.   As the skirmish line is pushing forward.

7            MS. AHMED:  And then moving forward to slide 15 --

8    excuse me.  Going back to 14.

9       (Slide displayed.)

10   BY MS. AHMED:

11   Q.   Is that the same individual?

12   A.   It is.

13   Q.   Can you circle where you've marked him.

14   A.   (Witness complies).

15   Q.   And I see that there's a yellow arrow there.  What is that

16   pointing to?

17   A.   It's got -- you can see the outline of the handgun on his

18   right hip.

19           MS. AHMED:  And the witness circled in the middle of

20   the screen an individual.

21           And now moving forward to slide 16.  Thank you.

22      (Slide displayed.)

23   BY MS. AHMED:

24   Q.   Did you identify another individual here with a firearm?

25   A.   I did.

1   Q.   What -- can you circle where that individual is.

2   A.   (Witness complies).

3   Q.   And what kind of firearm does that person appear to have?

4   A.   It's a -- looks like a magazine-fed bolt action long gun.

5   Q.   And, again, you're only focusing on just this individual

6   in this slide; is that correct?

7   A.   Yes.

8   Q.   Are there other individuals in this screen that also have

9   firearms?

10   A.   There are.

11   Q.   Now, at what point in time is this slide taken?

12   A.   As the skirmish line is forming.

13   Q.   And did you see this individual when the skirmish line

14   pushed forward?

15   A.   Yes.

16          MS. AHMED:  And can we advance to slide 16 -- 17,

17   excuse me.

18        (Slide displayed.)

19   BY MS. AHMED:

20   Q.   Is that the individual that you've drawn a yellow arrow

21   to?

22   A.   It is.

23   Q.   And can you just circle him.

24   A.   (Witness complies).

25   Q.   And is his firearm visible in this slide as well?

1   A.   It is.

2   Q.   And how do you know that this is when the skirmish line

3   has moved forward?

4   A.   Based on the time stamp of the video that we're watching.

5   Q.   Is there anything in this frame itself that also shows you

6   his location?

7   A.   Yeah.  You can see the concrete to the left there.  That's

8   the skirt of the west side of the southbound I-15 overpass.

9        MS. AHMED:  And then moving forward to the next

10  slide.

11       (Slide displayed.)

12  BY MS. AHMED:

13  Q.   Is this another individual that you identified that had a

14  firearm?

15  A.   It is.

16  Q.   And at what point in time is slide 19 -- what general time

17  period is that taken?

18  A.   As the skirmish line is forming.

19  Q.   And how do you know that the skirmish line is forming at

20  this time?

21  A.   This is another freeze-frame from a video taken by

22  Mr. Shilaikis and prior to this, as the video is moving up, you

23  can see the crowd gathering in the wash.  Based on the time

24  stamp as well, I know that that's when this is.

25  Q.   Now, can you circle where the individual is that you've

1    identified.

2    A.   (Witness complies).

3    Q.   And can you tell the jury what kind of firearm he has?

4    A.   He's carrying a long gun in his hands.

5         MS. AHMED:   And the witness has drawn a circle around

6    and individual toward the top right of the screen.

7    BY MS. AHMED:

8    Q.   What -- where is that individual located in this

9    screenshot?

10   A.   He's on the west side of the overpass, just west of the

11   overpass, the Interstate 15 northbound.

12   Q.   In the northbound lane?

13   A.   Yes, ma'am.

14   Q.   And then did you see this individual again when the

15   skirmish line had moved forward?

16   A.   I did.

17        MS. AHMED:   Could we advance to slide 20.

18        (Slide displayed.)

19   BY MS. AHMED:

20   Q.   And is he depicted in this image?

21   A.   Yes.

22   Q.   Can you circle.

23   A.   (Witness complies).

24   Q.   And how did you find -- again, how did you find this

25   person in slide 20?

1    A.   Looking again, following his movements through these other

2    videos and just by matching his clothing and body description I

3    was able to identify him here as well.  This time he's moved

4    further down the overpass so he's actually on the overpass at

5    this point.

6    Q.   He's on the bridge portion of it?

7    A.   Yes.

8            MS. AHMED:  And the witness drew a circle in the

9    middle of the screen.

10   BY MS. AHMED:

11   Q.   And again, is this the northbound lane?

12   A.   It is.

13   Q.   And at what point in time is this?

14   A.   When the skirmish line is pushed up to the gate.

15   Q.   Did you also see other images of this individual where he

16   had a firearm -- where he was holding a firearm?

17   A.   I did.

18   Q.   And was that on -- what was the source of the -- where you

19   saw this individual?

20   A.   Some of the dash cam footage from NHP.  He stopped and was

21   clearly holding his long gun in front of one of the dash cams.

22           MS. AHMED:  And can we advance to slide 22.

23       (Slide displayed.)

24   BY MS. AHMED:

25   Q.   Now, who are you focused on in this picture?

1    A.    This individual (indicating).

2    Q.    Again, are there other people with firearms in this

3    screenshot?

4    A.    Clearly.

5    Q.    And what kind of firearm is the individual that you

6    circled on the -- toward the left of the screen, what kind of

7    firearm does that person have?

8    A.    He's carrying a handgun on his right hip.

9    Q.    And where, generally, is this individual located?

10   A.    In this photo here this is back at the assembly area where

11   the vehicles were parking.

12   Q.    Did you include this to show the firearm clearly?

13   A.    I did.

14   Q.    So . . . moving to slide 22 -- excuse me -- 23.

15        (Slide displayed.)

16   BY MS. AHMED:

17   Q.    Did you find him later on?

18   A.    I did.

19   Q.    And where is -- is he depicted in slide 23?

20   A.    Right here (indicating).  To the left of that a little.

21   Q.    And is this -- at what period of time is this image taken?

22   A.    As the skirmish line is forming.

23   Q.    And how did you -- -- the witness drew a circle in the

24   middle of the screen.

25             How did you find this individual here?

1    A.   He was more easily identifiable because he's holding that

2    sign.  So, it's easy to read his sign and kind of follow him

3    throughout the wash, but you could see his clothing as well.

4             MS. AHMED:  And moving forward to the next slide.

5         (Slide displayed.)

6    BY MS. AHMED:

7    Q.   On slide 24 did you see that individual as well?

8    A.   I do.

9    Q.   And can you circle where he is.

10   A.   (Witness complies).

11   Q.   And at what period of time is this taken?

12   A.   As the -- as these followers are moving up to the gate.

13            MS. AHMED:  And the witness drew a circle to the

14   right middle of the screen.

15            And could we advance to the next slide.

16        (Slide displayed.)

17   BY MS. AHMED:

18   Q.   Here, on slide 26, have you identified another individual

19   with a firearm?

20   A.   Yes.

21   Q.   And is this at one of those two time periods or is this

22   earlier in the day?

23   A.   This is earlier in the day.

24   Q.   Can you circle where you identified that individual.

25   A.   (Witness complies).

1  Q.  And what did -- what kind of firearm did he have on him?

2  A.  He's carrying a handgun on his right hip.

3  Q.  And did you also find him in or around the wash during one

4  of those two time periods?

5  A.  On the overpasses.

6        MS. AHMED:  Can we advance to slide 27.

7     (Slide displayed.)

8  BY MS. AHMED:

9  Q.  Can you circle where you see him again there.

10 A.  (Witness complies).

11 Q.  And again, what did you use to find this individual?

12 A.  His clothing.  The red shirt, the black hat, and the body

13 build.

14        MS. AHMED:  And clearing the circle that the witness

15 has drawn on the far right middle, did you find him -- what

16 period of time is exhibit -- is slide 27 taken?

17        THE WITNESS:  This is when the skirmish line is

18 forming.

19        MS. AHMED:  And then moving to slide 28.

20     (Slide displayed.)

21 BY MS. AHMED:

22 Q.  Did you see him again?

23 A.  I do.

24 Q.  Can you circle where he is on slide 28.

25 A.  (Witness complies).

123

1    Q.   And at what point in time is this screenshot taken?

2    A.   Once the line is pushed up to the gate.

3              MS. AHMED:  And the witness has drawn a circle to the

4    far left.

5    BY MS. AHMED:

6    Q.   And again, what kind of firearm did he have on him?

7    A.   It's a handgun.

8    Q.   A handgun?

9    A.   A handgun.

10   Q.   Okay.

11             MS. AHMED:  And can we move forward to slide 30.

12        (Slide displayed.)

13   BY MS. AHMED:

14   Q.   Agent Simpkins, is this another individual that you

15   identified with a firearm?

16   A.   It is.

17   Q.   Can you circle where that individual is.

18   A.   (Witness complies).

19   Q.   And can you see from this slide, which appears to be a

20   screenshot, can you see that he had -- the weapon that he had

21   on him?

22   A.   Yes.  It's a handgun on his right hip.  You can see the

23   holster sticking out.

24   Q.   And is this a screenshot from a video?

25   A.   Yes.

1   Q.   And when you watch the video, can you also clearly see

2   that firearm?

3   A.   Yes.

4   Q.   And at what the point in time is this?

5   A.   As the skirmish line is forming.

6   Q.   And were you able to follow him in the wash as well?

7   A.   I was.

8           MS. AHMED:  Can we advance to slide -- the next

9   slide, 31.

10      (Slide displayed.)

11  BY MS. AHMED:

12  Q.   And can you indicate where on the screen he is.

13  A.   (Witness complies).

14  Q.   And how did you find this individual in this screenshot --

15  or this image?

16  A.   He's distinctive because of the t-shirt, the tan t-shirt

17  he's wearing, his ball cap, and he's got the strap around the

18  back of his neck as well.

19          MS. AHMED:  And the witness drew a circle on the left

20  middle of the screen.

21  BY MS. AHMED:

22  Q.   And what kind of firearm did he have?

23  A.   A handgun.

24          MS. AHMED:  And can we advance to the next slides.

25      (Slide displayed.)

125

BY MS. AHMED:

Q.   Did you identify another individual in the wash in this screenshot?

A.   Yes.

Q.   That had a firearm?

A.   Yes.

Q.   And is that a handgun?

A.   It is.

Q.   Can you circle where that individual is.

A.   (Witness complies).

Q.   And at what point in time is this screenshot taken?

A.   This is once the crowd is pushed up to the gate.  You can see that last individual as well to his right standing on that skirt.

Q.   Can you indicate where you see the individual that was in the previous slides.

A.   You can see his pistol there as well (indicating).

        MS. AHMED:  And the witness drew a circle on an individual on the far right.

BY MS. AHMED:

Q.   Now, did you see this individual that you originally circled with the arrow pointed to him, did you see him in other -- other video that you reviewed?

A.   No.  This is the only shot I have of him at this time but, I see him throughout the video.

1           MS. AHMED:  And then moving forward.

2      (Slide displayed.)

3  BY MS. AHMED:

4  Q.   Looking at the next slide, 35, did you find another

5  individual with a firearm here?

6  A.   Yes.

7  Q.   Can you circle where that individual is.

8  A.   (Witness complies).

9  Q.   And what kind of firearm did this individual have on them?

10  A.   He has a handgun in a holster on his right hip.  You can

11  see the -- the butt of the pistol leaning out from the holster.

12           MS. AHMED:  And clearing the circle that the witness

13  drew on the far left, at what period of time is he depicted

14  here?

15           THE WITNESS:  As the skirmish line is forming.

16           MS. AHMED:  And then moving to the next slide.

17      (Slide displayed.)

18  BY MS. AHMED:

19  Q.   Do you see him again in slide 36?

20  A.   Yes.

21  Q.   And can you indicate where he is.

22  A.   (Witness complies).

23  Q.   And at what point in time is this?

24  A.   As the skirmish line is pushed forward.

25           MS. AHMED:  And then moving forward.

1   BY MS. AHMED:

2   Q.   Now, looking at slide 38, at what period -- or where is

3   this image taken?

4   A.   This is back at the rally prior to the movement to the

5   wash.

6   Q.   Is this near State Route 170?

7   A.   Yes.

8   Q.   And so not near the BLM impoundment site?

9   A.   Nope.

10  Q.   Is this earlier in the day?

11  A.   It is.

12  Q.   And why did you include this in your presentation?

13  A.   It presents a clearer image of this individual carrying a

14  sidearm.

15  Q.   And can you also clearly see his attire in this as well?

16  A.   As well, yes.

17  Q.   And then did you see him in the skirmish line at any

18  point?

19  A.   I did.

20       MS. AHMED:   Can we move to the next slide.

21       (Slide displayed.)

22  BY MS. AHMED:

23  Q.   And can you circle where you see him in this.

24  A.   (Witness complies).

25  Q.   And again, how were you able to find this individual in

1    this image?

2    A.    Based on that yellow t-shirt, the tan shorts, and the hat.

3          MS. AHMED:   And clearing the circle that the witness

4    drew around someone in the center right of the screen.

5    BY MS. AHMED:

6    Q.    Now, when you were looking at these -- an image like slide

7    39, would you utilize any of -- would you look at it on your

8    computer or on printout?

9    A.    Both.

10   Q.    And when you're looking at it on your computer, would you

11   doing anything to help you find the image?

12   A.    I would just expand the image.  I would crop it down to

13   that one little spot where I thought I saw him and then expand

14   it so I could confirm that that was what I was looking at.

15   Q.    And before you decided that that was the same person you'd

16   seen earlier, would you have a certain amount of distinguishing

17   characteristics that you would look for?

18   A.    Yes.

19   Q.    And what is that?

20   A.    So, like, for example, this individual, I would look for

21   that t-shirt, the shorts, verify that he was wearing the same

22   clothing that I saw him in in that last image.

23   Q.    And is this when the skirmish line is in its formation

24   stage?

25   A.    Yes.

1   Q.   Did you also find him when the skirmish line moved

2   forward?

3   A.   I did.

4         MS. AHMED:  And could we advance to the next slide.

5     (Slide displayed.)

6   BY MS. AHMED:

7   Q.   Now, is he depicted here?

8   A.   He is.

9   Q.   Can you circle where you see him.

10   A.   (Witness complies).

11         MS. AHMED:  And the witness has drawn a circle in the

12   upper left corner.

13   BY MS. AHMED:

14   Q.   Clearing that circle, are you able to see the firearm that

15   he has on him in this shot as well?

16   A.   You can see the holster on the right hip.  It's dark

17   though.  It's hard to make it out very well in this image.

18   Q.   Again, is this taken from a video?

19   A.   It is.

20   Q.   And when you watch the video, are you able to see more?

21   A.   It is -- yes.  It's more clear in the video.

22         MS. AHMED:  And then moving forward.

23     (Slide displayed.)

24   BY MS. AHMED:

25   Q.   Is this another individual or the same individual that we

130

1    just saw?

2    A.   This is another individual.

3    Q.   And what kind of firearm, if any, did this person have?

4    A.   He's carrying a handgun in his back waistband.

5    Q.   And can you circle who you're talking about here.

6    A.   (Witness complies).

7           MS. AHMED:  And the witness has circled an individual

8    in the front foreground center.

9    BY MS. AHMED:

10   Q.   Now, at what stage in time is this screenshot captured?

11   A.   As the skirmish line is forming in the wash.

12   Q.   And were -- and is this taken of that skirmish line in the

13   wash?

14   A.   Yes.

15   Q.   And when you watch this video, do you see that skirmish

16   line in its full?

17   A.   I did.

18   Q.   And did you see this individual when the skirmish line

19   pushed forward?

20   A.   Yes.

21          MS. AHMED:  And can we advance to the next slide.

22       (Slide displayed.)

23   BY MS. AHMED:

24   Q.   And can you circle where you saw him.

25   A.   (Witness complies).

1          MS. AHMED:  And the witness has drawn a circle in the

2    left -- toward the left third of the frame, middle.

3    BY MS. AHMED:

4    Q.   Again, were you able to find this just looking at the

5    image like this at this size?

6    A.   No.

7    Q.   So what steps did you take to find them?

8    A.   I used like that last video, for example, to see where he

9    was exactly in the crowd and then I took this image and blew it

10   up and confirmed that he was there based on the clothing that

11   he was wearing.

12   Q.   And is this when the skirmish line has pushed forward?

13   A.   Yes.

14          MS. AHMED:  Can we go to slide 45.

15       (Slide displayed.)

16   BY MS. AHMED:

17   Q.   And can you explain to the jury what you depict in this

18   slide.

19   A.   There's an individual wearing a set of camouflage

20   clothing.  He's got his -- looks -- can I circle it here?

21          You can see on the right side here (indicating) what

22   appears to be the muzzle of his weapon sticking out.

23          MS. AHMED:  And the witness has drawn a circle around

24   the individual in the foreground of the picture and then a

25   smaller circle within that circle.

BY MS. AHMED:

Q.   Now clearing your circles, where is this individual located within the general area of the impoundment site?

A.   He's underneath the interstate northbound 15 overpass on the east side up high.  You can see the skirmish line is formed below him down in the wash.

Q.   And based on your training and experience, with SWAT and with firearms, what kind of position is he taking here?

A.   It's a good position where he's proned out.  It presents a minimal target of himself.

        MR. JACKSON:  Object to the conclusion.

        MR. TANASI:  Stewart joins.

        MR. MARCHESE:  Parker joins.

        MR. PEREZ:  Lovelien joins.

        THE COURT:  Ms. Ahmed.

        MS. AHMED:  Your Honor, he's just speaking to his training and experience with firearms and with tactical positions which he knows from his training with SWAT.

        THE COURT:  All right.  Overruled.

BY MS. AHMED:

Q.   Is this position higher than the BLM officers?

A.   Yes.

Q.   And were you able to find this individual -- any other images of this individual for your presentation?

A.   No.

1          MS. AHMED:  Now advancing to the next slide.

2      (Slide displayed.)

3   BY MS. AHMED:

4   Q.   Looking at slide 47, it -- just briefly going back to

5   slide 45.  I know you indicated where you saw what you

6   indicated was a firearm.  Can you explain to the jury what kind

7   of firearm that is.

8   A.   It's a long gun.

9          And just to clarify my last comment as well.  I --

10  there is another image of him sitting here where you can see

11  the gun across his lap as well, but at this particular point in

12  time the -- I don't have photos of him at other points in time

13  that I can see that are him, just at this point in time.

14  Q.   And is this -- at what point in point is this image taken?

15  A.   As the skirmish line is forming.

16         MS. AHMED:  And moving forward to exhibit -- or slide

17  47.

18     (Slide displayed.)

19  BY MS. AHMED:

20  Q.   Can you circle where you've identified an individual with

21  a firearm.

22  A.   (Witness complies).

23  Q.   And is this a screenshot from a video?

24  A.   Yes.

25         MS. AHMED:  The witness has drawn a circle in the

1    center of the screen.

2    BY MS. AHMED:

3    Q.   Clearing that, are there other individuals with firearms

4    in this screenshot?

5    A.   Yes.

6    Q.   And where is the individual that you originally circled,

7    where is he located at this time?

8    A.   So this is underneath that Interstate 15 northbound

9    overpass on the west side of the wash.  He's -- you can kind of

10   see a pillar that he's tucked in behind with a long gun raised

11   up, the muzzle pointing up.

12   Q.   And were you able to see other images of this individual?

13   A.   I did.

14   Q.   And were you able to see his weapon?

15   A.   Yes.

16   Q.   And at what point in time is this screenshot taken?

17   A.   As the skirmish line is forming.

18        MS. AHMED:  And moving forward to slide 48.

19        (Slide displayed.)

20   BY MS. AHMED:

21   Q.   There's an individual in the foreground in slide 48 that

22   you've indicated with a yellow arrow.  Is that the same

23   individual?

24   A.   It is.

25   Q.   And what does he appear to be holding?

135

1    A.    A long gun.

2    Q.    And at what point in time is this image taken?

3    A.    This is after the crowd has pressed back from the gate.

4    Q.    And so did you -- why did you include this image?

5    A.    Just to provide a better image of him carrying the firearm

6    so you could see what it was.

7              MS. AHMED:  Now, moving forward to the next slide.

8         (Slide displayed.)

9    BY MS. AHMED:

10   Q.    Is this also taken from that rally area that you had

11   indicated earlier?

12   A.    It is.

13   Q.    And so this is earlier in the day; correct?

14   A.    Yes.

15   Q.    Can you circle where you've identified the individual with

16   the firearm that you're focused on.

17   A.    (Witness complies).

18   Q.    And were you able to find this individual in the wash

19   later on?

20   A.    Yes.

21   Q.    And what kind of firearm does this person have?

22   A.    He's carrying a handgun on his right hip.

23             MS. AHMED:  And the witness has circled an individual

24   in the center of the screen.

25             Moving to slide 51.

1        (Slide displayed.)

2    BY MS. AHMED:

3    Q.   Did you find that same individual in this image?

4    A.   Yes.

5    Q.   And can you circle where you found him.

6    A.   (Witness complies).

7    Q.   And how were you able to locate this individual?

8    A.   He's got the same black cowboy hat on, white shirt, and

9    you can see the female in the teal-colored shirt to his side on

10   the left in this image.  They appear to be together throughout

11   the day.

12           MS. AHMED:  And the witness drew a circle in the left

13   center of the screen.

14   BY MS. AHMED:

15   Q.   Were you able to see other photos and videos of those two

16   individuals moving together?

17   A.   Yes.

18   Q.   And at what point in time is this image taken?

19   A.   That's as the skirmish line is formed.

20           MS. AHMED:  And moving to slide 51.

21           (Slide displayed.)

22   BY MS. AHMED:

23   Q.   Did you also find that same male with the cowboy hat in

24   this image?

25   A.   Yes.

1   Q.   And can you circle where you found him.

2   A.   (Witness complies).

3   Q.   And at what point in time is this taken?

4   A.   As the skirmish line is pushed up to the gate.

5          MS. AHMED:  And the witness drew a circle in the

6   center of the screen.

7          Moving on to the next slide.

8   (Slide displayed.)

9   BY MS. AHMED:

10  Q.   What is depicted in slide 54?

11  A.   It's a individual wearing a vest carrying a long gun

12  slung.

13  Q.   And what kind of vest does he appear to have on?

14  A.   Like a tactical vest.

15  Q.   And can you circle where you see the individual that

16  you're talking about.

17  A.   (Witness complies).

18  Q.   And where is his rifle in relation to his person in this

19  screenshot?

20  A.   In front of him.  He's holding on to it with his right

21  hand.

22          MS. AHMED:  And clearing the circle that the witness

23  drew in the center slightly right of the screen.

24  BY MS. AHMED:

25  Q.   Generally where is this -- where, in the area of the BLM

1   impoundment site, is this individual at this time?

2   A.   So this is located just west of Post 1 of that -- like the

3   parking area where the law enforcement officers were parked up

4   above on the Interstate 15 southbound.

5   Q.   And at what point in time is this image taken?

6   A.   As the skirmish line is forming.

7   Q.   And how did you determine that?

8   A.   Based on the time stamp of the video.  It's -- this is

9   also one of the Shilaikis videos so you can see him panning

10  around during the video and see the crowd forming as he comes

11  back over to see this individual.

12          MS. AHMED:  And advancing to the next slide.

13      (Slide displayed.)

14  BY MS. AHMED:

15  Q.   What is depicted here?

16  A.   An individual with a long gun walking into the wash.

17  Q.   And where, in relation to the BLM impoundment site, is

18  this individual?

19  A.   So he's walking up towards the skirmish line right now.

20  He's about to pass under the Interstate 15 northbound overpass.

21  Q.   And there only appears to be one individual that's

22  depicted in this, other than the people -- the people in the

23  top.  Is that the person that you're talking about?

24  A.   Yes.

25  Q.   The one I've just drawn a circle around.

1          Now, what kind of firearm did he have?

2     A.   He's carrying a long gun.

3     Q.   And how could you tell that from this image?

4     A.   You could see the muzzle pointing down as he's carrying it

5     in his right hand.

6     Q.   At what point in time is this image taken?

7     A.   As the skirmish line is forming.

8     Q.   And how did you know that?

9     A.   Based -- so this is from a series of images that were

10    taken by Mr. Schillie.  So based on the time stamps I

11    determined for his images, I was able to calculate the time

12    that this image was taken.

13          MS. AHMED:  And advancing to the next slide.

14       (Slide displayed.)

15    BY MS. AHMED:

16    Q.   Is this another individual that you found with a firearm

17    in the wash?

18    A.   Yes.

19    Q.   Can you circle where the individual is that you focused

20    on.

21    A.   (Witness complies).

22    Q.   What kind of firearm does this person appear to have?

23    A.   He has a handgun on his right hip.

24    Q.   And at what point in time is this screenshot taken?

25    A.   As the skirmish line is forming.

1           MS. AHMED:  And the witness drew a circle on the left

2      upper corner.

3      BY MS. AHMED:

4      Q.   And did you see this individual when the skirmish line

5      moved forward?

6      A.   No.

7      Q.   Is this the only image that you included of him?

8      A.   It is.

9           MS. AHMED:  Advancing to the next slide.

10          (Slide displayed.)

11     BY MS. AHMED:

12     Q.   Were you able to determine where that individual went?

13     A.   This individual here (indicating)?

14     Q.   In the last -- in the last slide.

15     A.   No, I was not.

16     Q.   Now, focusing on slide 60, can you circle where you've

17     identified an individual with a firearm.

18     A.   (Witness complies).

19     Q.   And what kind of firearm does this person have on them?

20     A.   He has a handgun on his right hip.

21     Q.   And at what point in time is this screenshot taken?

22     A.   As the skirmish line is forming.

23          MS. AHMED:  And the witness has drawn a circle

24     relatively in the center of the screen.

25               ///

BY MS. AHMED:

Q.   And did you see this individual move forward with the skirmish line?

A.   I did.

MS. AHMED:  Can we advance to 61.

(Slide displayed.)

BY MS. AHMED:

Q.   Can you circle where you saw him.

A.   (Witness complies).

Q.   And are you able to see his firearm in this screenshot?

A.   No.

Q.   Is this a screenshot from a video?

A.   It is.

Q.   Does the video allow you to see more movement of the individuals?

A.   Yes.

MS. AHMED:  And the witness has drawn a circle in the bottom right of the screen -- of the photograph.  Excuse me.

BY MS. AHMED:

Q.   And what kind of firearm did this person have?

A.   A handgun on his right hip.

Q.   And is this, 61, taken when the skirmish line has moved forward?

A.   Yes.

MS. AHMED:  And can we move to the next slide.

1          (Slide displayed.)

2               ///

3     BY MS. AHMED:

4     Q.   Looking at 63, did you identify another person with a --

5     with a firearm here?

6     A.   I did.

7     Q.   And can you circle that individual.

8     A.   (Witness complies).

9     Q.   And at what time is this image taken?

10    A.   This is back off of Route 170 at the rally.

11    Q.   And did you follow this -- did you find this person in the

12    wash later on?

13    A.   I did.

14    Q.   And what kind of firearm does this person have?

15    A.   He has a handgun on his right hip.

16              MS. AHMED:  And the witness has drawn a circle of an

17    individual in the center of the screen.

18              Clearing that, can we go to slide 64.

19         (Slide displayed.)

20    BY MS. AHMED:

21    Q.   Do you see that same individual in slide 64?

22    A.   I do.

23    Q.   Can you circle where he is.

24    A.   (Witness complies).

25    Q.   And what were you able to match of this individual that

1    allowed you to know it was the same person?

2    A.   The hat, shirt, jeans.

3    Q.   And at what point in time is this screenshot taken?

4    A.   As the skirmish line is forming.

5            MS. AHMED:  Clearing the circle that's in the upper

6    left corner.

7    BY MS. AHMED:

8    Q.   Do you see this individual when the skirmish line moved

9    forward?

10   A.   I did.

11           MS. AHMED:  Can we advance to the next slide.

12       (Slide displayed.)

13   BY MS. AHMED:

14   Q.   And can you circle where you see him.

15   A.   (Witness complies).

16           MS. AHMED:  And the witness has drawn a circle in the

17   bottom left of the image.

18   BY MS. AHMED:

19   Q.   And again, did you -- what did you -- how did you find

20   this person in this image?

21   A.   I was just searching for that clothing description and

22   that same body build again.

23   Q.   And were you able to locate the firearm that he had on

24   him?

25   A.   Yes.  Actually, if you blow this photo up, you can also

144

1    see a little bit of a dark spot there on his hip where that

2    firearm was.

3              MS. AHMED:  Now, moving forward.

4         (Slide displayed.)

5    BY MS. AHMED:

6    Q.   Did you identify another individual with a firearm in

7    exhibit -- in slide 67?

8    A.   Yes.

9    Q.   And can you circle where you found this person.

10   A.   (Witness complies).

11   Q.   And is this back at the rally site on State Route 170?

12   A.   It is.

13   Q.   Earlier in the day?

14   A.   Yes.

15   Q.   Were you able to find this person in the wash during the

16   time periods that you were focused on?

17   A.   Yes.

18             MS. AHMED:  Clearing the circle the witness has drawn

19   and moving to the next slide.

20   BY MS. AHMED:

21   Q.   Can you circle where you found that individual.

22   A.   (Witness complies).

23   Q.   And how did you identify her in this image?

24   A.   Again, she's with her companion, the guy with the black

25   cowboy hat and you can see her long brown hair coming out the

1    back of her hat and the teal shirt.

2            MS. AHMED:  And clearing the circle that the witness

3    has drawn in the center left.

4    BY MS. AHMED:

5    Q.   At what point in time is this image taken?

6    A.   As the skirmish line is formed.

7    Q.   Did you find this individual in any shots when the

8    skirmish line moved forward?

9    A.   I did.

10            MS. AHMED:  Can we advance to the next slide.

11            (Slide displayed.)

12   BY MS. AHMED:

13   Q.   And can you circle where, if at all, you found her.

14   A.   (Witness complies).

15            MS. AHMED:  And the witness has drawn a circle in the

16   center of the screen.

17            Clearing that circle.

18   BY MS. AHMED:

19   Q.   What kind of firearm did this person have on her?

20   A.   It was a handgun in her back waistband.

21   Q.   And at what point in time is this image taken?

22   A.   This is as the skirmish line is pushed back up to the

23   gate.

24            MS. AHMED:  And moving forward.

25            (Slide displayed.)

146

1   BY MS. AHMED:

2   Q.   What is depicted in slide 71?

3   A.   This individual here (indicating).

4   Q.   And at what point in time is this image taken?

5   A.   Prior to them entering the wash to form the skirmish line.

6   Q.   And what kind of firearm does the person that you've

7   circled have on him?

8   A.   He has a handgun on his right hip.

9   Q.   And this -- clearing the circle that the witness has drawn

10  on the far left.

11          Is that the only person in this image that you

12  determined had a firearm at this time?

13  A.   No.

14  Q.   Are there other people in this image that also have

15  firearms?

16  A.   Yes.

17  Q.   Now, moving to slide 72, did you find that same male that

18  you circled in the last slide over in slide 72?

19  A.   I did.

20  Q.   Can you circle where you found him.

21  A.   (Witness complies).

22  Q.   And at what point in time is slide 72 taken?

23  A.   As the skirmish line is formed.

24          MS. AHMED:  And clearing the circle that the witness

25  drew in the center of the screen.

1           Can we advance to 73.

2        (Slide displayed.)

3    BY MS. AHMED:

4    Q.   And did you find him again in slide 73?

5    A.   I did.

6    Q.   Can you circle where you see him.

7    A.   (Witness complies).

8           MS. AHMED:   Then the witness has drawn a circle at

9    the bottom of the image in the center of the screen.

10   BY MS. AHMED:

11   Q.   The circle that you've drawn, the person appears to be

12   wearing a cowboy hat; is that correct?

13   A.   Correct.

14   Q.   Did you see that cowboy hat in any of the earlier images?

15   A.   Yeah.  He's wearing it in 72 and then back in slide 71,

16   before they enter the wash, he has his hat in his hand.

17          MS. AHMED:   Clearing the circle.

18   BY MS. AHMED:

19   Q.   What kind of firearm did this person have?

20   A.   Handgun on his right hip.

21   Q.   And at what point in time is slide 73 taken?

22   A.   As the skirmish line is pushed up to the gate.

23          MS. AHMED:   And moving forward.

24       (Slide displayed.)

25   BY MS. AHMED:

1    Q.    What is depicted in slide 75?

2    A.    This individual kneeling has a handgun on his right hip.

3    Q.    And at what point in time is this screenshot taken,

4    generally, in terms of the events?

5    A.    Prior to entering the wash.

6    Q.    And is this another vantage of that same person that we'd

7    seen in the previous slide?

8    A.    It is.

9    Q.    What kind of firearm does the individual you just circled

10   in the center of the screen have?

11   A.    Appears to have a handgun.

12   Q.    And did you observe this individual in the wash, either

13   when the skirmish line formed or when it moved forward?

14   A.    Not when it formed.  I saw him when it moved forward.

15          MS. AHMED:  And can we advance to slide 76.

16        (Slide displayed.)

17   BY MS. AHMED:

18   Q.    And can you indicate where you found him.

19   A.    (Witness complies).

20   Q.    And what did you use to locate him in this screen?

21   A.    Based on the yellow hat, the t-shirt, the jeans, the

22   build.  He was the only individual I saw dressed in that

23   regard.

24          MS. AHMED:  And clearing the circle the witness drew

25   in the bottom right of the screen.

1  BY MS. AHMED:

2  Q.   You were not able to locate that individual when the

3  skirmish line was formed; is that right?

4  A.   Correct.

5  Q.   Do you -- through your investigation, were you able to

6  determine where he went, out -- if he went outside the wash?

7  A.   No.

8  Q.   Now turning to slide 78, did you identify another

9  individual here with a firearm?

10  A.   Yes.

11  Q.   And can you circle him.

12  A.   (Witness complies).

13  Q.   And what kind of firearm did this person have?

14  A.   He has a handgun on his right hip.

15          MS. AHMED:   And clearing the circle that the witness

16  has drawn in the center right of the screen.

17  BY MS. AHMED:

18  Q.   At what point in time is this screenshot taken?

19  A.   The same period of time before they entered the wash.

20  They were in a circle.

21  Q.   And based on your investigation, is this when they were

22  in -- a prayer was said at this time period?

23  A.   Yes.

24  Q.   Now, did you observe this individual when the skirmish

25  line was formed and moved forward?

1  A.   Yes.

2            MS. AHMED:  Can we turn to slide 79.

3       (Slide displayed.)

4  BY MS. AHMED:

5  Q.   And can you circle where you found him.

6  A.   (Witness complies).

7  Q.   And at what point in time is slide 79?

8  A.   As the skirmish line is forming.

9            MS. AHMED:  And clearing the circle that the witness

10 has drawn in the center of the screen.

11 BY MS. AHMED:

12 Q.   On this image were you able to see his firearm?

13 A.   No.  I don't believe so.

14 Q.   And then how did you determine that it was the same

15 individual?

16 A.   He's distinctive because of his build, the t-shirt, and

17 you can see also see the black gloves on his hands in here that

18 he had on the last slide.

19 Q.   Did you see him when the skirmish line pushes forward as

20 well?

21 A.   Yes.

22            MS. AHMED:  And can we turn to slide 80.

23       (Slide displayed.)

24 BY MS. AHMED:

25 Q.   Do you see that individual here?

1    A.   I do.

2    Q.   Can you circle him.

3    A.   (Witness complies).

4    Q.   On this image can you see his firearm?

5    A.   No.

6         MS. AHMED:  And clearing the circle the witness has

7    drawn in the center of the screen.

8    BY MS. AHMED:

9    Q.   What amount of time had passed between that circle that we

10   saw and then this time period?

11   A.   This is once the crowd is -- all these guys have pushed up

12   to the gate.

13   Q.   So about how much time?

14   A.   Several -- several minutes later.  I guess, maybe 20

15   minutes.

16   Q.   So from when you first saw him kneeling, to this time

17   period, it's approximately 20 minutes?

18   A.   30 minutes maybe.

19   Q.   And based on the clothing you determined that it was the

20   same person with that firearm; is that correct?

21   A.   Correct.

22        You can see the bandanna on his head in this image

23   that he was wearing previously.

24        MS. AHMED:  And turning to slide 82.

25        (Slide displayed.)

1   BY MS. AHMED:

2   Q.   Is this another individual that you found with a firearm?

3   A.   Yes.

4   Q.   And where is this image taken?

5   A.   In that same prayer circle.

6   Q.   And can you circle the firearm.

7   A.   (Witness complies).

8   Q.   The individual with the firearm.

9        So that you -- you've circled a female in the center

10  of the screen and what kind of firearm did you circle within

11  that circle -- larger circle?

12  A.   Appears to be a pink-handled sidearm.

13       MS. AHMED:   Clearing the witness' drawings.

14  BY MS. AHMED:

15  Q.   Did you see her later in the wash?

16  A.   I did.

17       MS. AHMED:   Can we advance to 83.

18       (Slide displayed.)

19  BY MS. AHMED:

20  Q.   Can you circle where you found her.

21  A.   (Witness complies).

22  Q.   And again, how were you able to determine this individual

23  was located there?

24  A.   In the last image you could see she had that tan hat in

25  her right hand.  In this image she's now wearing the tan hat

1    with the teal shirt and the jean shorts.

2              MS. AHMED:  And clearing the circle that the witness

3    drew in the center left of the screen.

4    BY MS. AHMED:

5    Q.   Is this when the skirmish line was forming?

6    A.   It is.

7    Q.   And then did you see her later on as well?

8    A.   I did.

9              MS. AHMED:  Can we move to slide 84.

10        (Slide displayed.)

11   BY MS. AHMED:

12   Q.   And can you circle where you found this individual.

13   A.   (Witness complies).

14   Q.   And can you describe to the jury where she's located in

15   this screen.

16   A.   This is on the eastern skirt of the Interstate 15

17   southbound overpass.

18   Q.   And where is this in relation to the BLM officers?

19   A.   You can see the gate just to the front of her there on the

20   other side of that gate.

21             MS. AHMED:  And clearing the circle that the witness

22   has drawn in the upper right side.

23   BY MS. AHMED:

24   Q.   Based on your investigation, is the individual next to her

25   also armed?

1    A.   He is.

2    Q.   And what kind of firearm did he have with him?

3    A.   He had a long gun.

4           MS. AHMED:  And moving forward.

5        (Slide displayed.)

6    BY MS. AHMED:

7    Q.   Can you circle where you identified an individual with a

8    firearm here.

9    A.   (Witness complies).

10   Q.   And can you describe what -- how this individual appears

11   to be dressed?

12   A.   He's dressed head to toe in a camouflage uniform with a

13   boonie hat.

14   Q.   And what kind of firearm does this individual have?

15   A.   He has a rifle.

16          MS. AHMED:  And clearing the circle the witness has

17   drawn in the bottom right of the image.

18   BY MS. AHMED:

19   Q.   What kind of firearm is that?  I'm sorry?

20   A.   It's a long gun.

21   Q.   And at what point in time is this screenshot taken?

22   A.   As the skirmish line was forming in the wash.

23          MS. AHMED:  And moving to 87.

24       (Slide displayed.)

25   BY MS. AHMED:

1   Q.   Did you see that same individual in 87?

2   A.   I did.

3   Q.   And can you circle where you found him.

4   A.   (Witness complies).

5          MS. AHMED:  And clearing the circle the individual

6   has drawn in the bottom right of the screen.

7   BY MS. AHMED:

8   Q.   How did you identify this person in this screenshot?

9   A.   Based on that camouflage uniform and you can see the

10  muzzle pointing down.

11  Q.   And at what point in time is this image taken?

12  A.   As the skirmish line is pushed up to the gate.

13  Q.   And I said screenshot earlier, but this is actually a

14  photograph; is that right?

15  A.   It's an image, yes.

16  Q.   And were you able to follow this individual's movements in

17  the wash?

18  A.   I did.

19  Q.   And where -- did you determine that he moved from this

20  location at any point?

21  A.   Yes.  So he continued pushing up here and then he went up

22  high on the that skirt, on that eastern skirt of the 15

23  southbound overpass while the BLM officers were at the gate.

24          MS. AHMED:  And moving to 80 -- the next one.  89.

25          (Slide displayed.)

1    BY MS. AHMED:

2    Q.   Can you circle where you identified an individual here

3    with a firearm.

4    A.   (Witness complies).

5    Q.   And how is this individual dressed?

6    A.   He's also in a camouflage uniform with a vest on, like a

7    green tactical vest and a ball cap.

8    Q.   And what kind of firearm did you determine this individual

9    had?

10   A.   He has a long gun.

11   Q.   And can you see it in this image?

12   A.   Yes.

13   Q.   Where is it in relation to his person?

14   A.   He's carrying it just on his -- the front of his person.

15   He appears to have his right hand on the weapon.

16   Q.   And again, is this a screenshot from a video?

17   A.   Yes, it is.

18   Q.   And when you watched the video, can you also clearly see

19   the firearm?

20   A.   Yes.

21            MS. AHMED:   Clearing the circle that the witness has

22   drawn on the -- on the left camouflaged individual.

23   BY MS. AHMED:

24   Q.   At what point in time is this screenshot taken?

25   A.   As the skirmish line is forming in the wash.

1  Q.   And did you see this individual when the skirmish line

2  pushed forward as well?

3  A.   I believe I see him but not as the skirmish line is

4  pushing forward.  It's after that point in time.

5         MS. AHMED:  And moving to the -- so, you did not

6  include any subsequent images that you found of him?

7         THE WITNESS:  Not as the skirmish line pushes

8  forward.

9  BY MS. AHMED:

10 Q.   Were -- and you saw him later on in the wash; is that

11 correct?

12 A.   Correct.

13        MS. AHMED:  And moving on to 91.

14     (Slide displayed.)

15 BY MS. AHMED:

16 Q.   Can you circle the individual you identified with a

17 firearm here.

18 A.   (Witness complies).

19 Q.   And where is this person located?

20 A.   This is the Interstate 15 northbound overpass.

21        MS. AHMED:  And clearing the circle that the witness

22 has drawn in the front enter of the screen.

23 BY MS. AHMED:

24 Q.   What kind of firearm does this person appear to have?

25 A.   He has a long gun.

1    Q.   And where is he positioned -- excuse me.  What -- at what

2    point in time is this screenshot captured?

3    A.   As the skirmish line is forming.

4         You can also see he has a sidearm on his right hip

5    sticking out.

6    Q.   So he has both a long gun and a --

7    A.   Pistol, yes.

8    Q.   And a pistol.

9         And what point in time is this taken?  I'm sorry.

10   A.   As the skirmish line is forming.

11   Q.   And did you see this individual again later?

12   A.   I did.

13   Q.   And did you indicate what bridge this person is standing

14   on, or squatting on?

15   A.   The -- yes, the Interstate 15 northbound overpass.

16   Q.   And again, based on your -- well, does he appear to be

17   standing or squatting?

18   A.   He appears to be squatting in this image.

19   Q.   And is there anything in front of him?

20   A.   He's got the Jersey barrier in front of him.

21        MS. AHMED:  And moving to 92.

22        (Slide displayed.)

23   BY MS. AHMED:

24   Q.   Did you find that same individual in the subsequent image?

25   A.   Yes.

1   Q.   And can you circle where you found him.

2   A.   (Witness complies).

3   Q.   And how were you able to determine that that was the same

4   person?

5   A.   Based on the shirt and that handgun sticking out again, as

6   well as other images and videos taken at the . . .

7   Q.   And clearing the circle that the witness last drawn in the

8   center -- upper center of the screen.

9   BY MS. AHMED:

10   Q.   Do you see that handgun that he has in his back hip in

11   this image?

12   A.   I do.

13   Q.   And can you just circle it.

14   A.   (Witness complies).

15          MS. AHMED:  And the witness has drawn a small circle

16   in the center, upper center of the screen.

17   BY MS. AHMED:

18   Q.   And you indicated you had also determined his location

19   through other videos and photographs you saw; is that correct?

20   A.   I did.

21   Q.   And at what point in time is slide 92 taken?

22   A.   This is as the skirmish line is pushed up to the gate.

23   Q.   And how did you know that -- or how do you know that?

24   A.   Based on the time stamp for this image.

25   Q.   Is this a photograph that you reviewed?

1    A.   Yes.  Well, it was an image taken by Trey Schillie.

2    Q.   Now, moving on to 94.

3         (Slide displayed.)

4    BY MS. AHMED:

5    Q.   Can you circle where you identified an individual with a

6    firearm here.

7    A.   (Witness complies).

8    Q.   And where is this individual located generally?

9    A.   This is in the wash as the skirmish line is forming.

10        MS. AHMED:  And clearing the circle the witness has

11   drawn in the center of the screen.

12   BY MS. AHMED:

13   Q.   What kind of firearm did this individual have?

14   A.   He has a long gun.

15   Q.   Do you see other images of this person, did you, through

16   your investigation?

17   A.   Yes.

18   Q.   Were you able to see images of him from the front?

19   A.   I did.

20   Q.   And were you able to see the firearm that he was holding?

21   A.   Yes.

22   Q.   And -- but at this point in time that you've captured,

23   this is when he's in the skirmish line; is that correct?

24   A.   Correct.

25        MS. AHMED:  And then moving to the next slide.

161

1          (Slide displayed.)

2               ///

3     BY MS. AHMED:

4     Q.   Did you also locate him when the skirmish line had pushed

5     forward?

6     A.   I did.

7     Q.   Can you circle where you see him.

8     A.   (Witness complies).

9     Q.   And again, how were you able to find the individual in

10    this photograph?

11    A.   Distinctive for the blue shirt, black cap, and I was able

12    to just follow his movements through the other videos to get

13    him to that point.

14              MS. AHMED:  And clearing the small circle the witness

15    drew in the center left of the screen.

16    BY MS. AHMED:

17    Q.   Again, did you say that he had -- what kind of firearm he

18    had with him?

19    A.   It's a long gun.

20              MS. AHMED:  And moving forward to the next slide.

21         (Slide displayed.)

22    BY MS. AHMED:

23    Q.   Did you identify another individual in Exhibit 116 that

24    had a firearm?

25    A.   I did.

1   Q.   Or slide -- excuse me.  Slide 97.

2           MS. AHMED:  And the witness has drawn a circle in the

3   left center of the screen.

4   BY MS. AHMED:

5   Q.   How did you find that individual?

6   A.   Through other images of him.  He's wearing a light

7   t-shirt, green pants, and he's got a thigh holster, tactical

8   holster on his right leg with two straps that you can

9   distinguish in this image if you blow it up.

10          MS. AHMED:  And moving forward to 99.

11          Oh, going back to 98.

12      (Slide displayed.)

13  BY MS. AHMED:

14  Q.   Can you see that same individual more clearly in this --

15  98?

16  A.   Yes.

17  Q.   Can you circle where you see him.

18  A.   (Witness complies).

19  Q.   And can you just mark where you see the thigh holster.

20  A.   (Witness complies).

21          MS. AHMED:  And the witness has drawn a circle within

22  a circle on the right center of the screen.

23  BY MS. AHMED:

24  Q.   Clearing your circles, going back to 97, is this when the

25  skirmish line is in its formation stage?

1    A.   It is.

2           MS. AHMED:   And then going to 98.

3        (Slide displayed.)

4    BY MS. AHMED:

5    Q.   Is this when it has now pushed forward?

6    A.   Yes.

7           MS. AHMED:   And moving to slide 100.

8        (Slide displayed.)

9    BY MS. AHMED:

10   Q.   Can you describe what you have captured here.

11   A.   Yes.  This is an individual, you can clearly see his long

12   gun hanging down here (indicating).  He's dressed in a

13   camouflage uniform wearing a black vest.

14   Q.   And in slide 100 where is this individual located?

15   A.   This is at the assembly area, just to the west of the

16   wash.

17   Q.   And is this a screenshot or an image?

18   A.   This is a screenshot of a video.

19   Q.   And so, was this actually taken from a video then?

20   A.   Yes.

21   Q.   And were you able to see more of this individual in the

22   video?

23   A.   Not his head in this particular video, but in other

24   videos, yes.

25   Q.   So, were you able to follow this video's movements?

164

1    A.   I was.

2            MS. AHMED:   And going to slide 101.

3        (Slide displayed.)

4    BY MS. AHMED:

5    Q.   Did you see that individual again here?

6    A.   Yes.

7    Q.   Can you circle where you saw him.

8    A.   (Witness complies).

9    Q.   And how were you able to identify this as the same

10   individual?

11   A.   Based on the same uniform that he's wearing and that same

12   vest, as well as the long gun in his arms.  He's also in the

13   same location.

14   Q.   So is this also in the assembly area?

15   A.   It is.

16   Q.   And at what point in time is this image 101 taken?

17   A.   As the skirmish line is forming.

18   Q.   And again, how do you know that from this?

19   A.   Based on the time stamp from that video that it's taken

20   from.

21   Q.   Is this the Shilaikis video?

22   A.   Yes.  You can also see the crowd in the wash as he pans

23   over.

24           MS. AHMED:   And clearing the circle that the witness

25   has drawn in the right center of the screen.

1          Can we move to the next slide.

2      (Slide displayed.)

3  BY MS. AHMED:

4  Q.   So, did you only identify that individual when the

5  skirmish line was forming?

6  A.   Yes.

7  Q.   Not when it pushed forward?

8  A.   Not when it had moved up.

9  Q.   Okay.

10          MS. AHMED:  So moving to 103, slide 103.

11      (Slide displayed.)

12  BY MS. AHMED:

13  Q.   Can you circle generally the area where you identified an

14  individual with a firearm.

15  A.   (Witness complies).

16  Q.   At what time is this screenshot taken?

17  A.   This is when the skirmish line is forming.

18  Q.   And what kind of firearm does the person that you circled

19  have?

20  A.   You can see a handgun on his right hip.

21          MS. AHMED:  And clearing the circle on bottom center.

22  BY MS. AHMED:

23  Q.   Did you see this individual when the skirmish line pushed

24  forward as well?

25  A.   Yes.

1           MS. AHMED:  Can we go to the next slide.

2       (Slide displayed.)

3   BY MS. AHMED:

4   Q.   Can you circle where you see him.

5   A.   (Witness complies).

6   Q.   And is this when the skirmish line is now moved under

7   the -- the people have now moved under the southbound bridge?

8   A.   Correct.

9           MS. AHMED:  And clearing the circle that the

10  individual -- the witness drew in the far right.

11          Can we move to the next slide.

12      (Slide displayed.)

13  BY MS. AHMED:

14  Q.   Did you identify an individual with a firearm in this

15  screenshot?

16  A.   Yes.

17  Q.   And can you circle for the jury where this person is.

18  A.   (Witness complies).

19  Q.   And can you describe to the jury how this individual was

20  dressed.

21  A.   He's also wearing a camouflage uniform with a distinct

22  boonie hat.  It's rolled.  He's got a backpack on carrying a

23  long gun.

24  Q.   And were you able to track this individual's movements

25  through the wash?

1   A.   Yes.

2   Q.   And at -- was this particular screenshot taken when the

3   skirmish line is in its formation stage?

4   A.   Correct.

5           MS. AHMED:   Clearing the circle that the witness drew

6   in the bottom right.

7           Can we go to 107.

8      (Slide displayed.)

9   BY MS. AHMED:

10  Q.   Do you see that same individual with the long gun in this

11  screenshot?

12  A.   I do.

13  Q.   And can you circle -- or -- excuse me -- in this image.

14  Can you circle where you found him.

15  A.   (Witness complies).

16  Q.   And what does he appear to be doing in this image?

17  A.   He appears to be kneeling down using his hands for

18  something and he has the long gun across his lap.

19  Q.   And where is he located in this image?

20  A.   That's the eastern skirt of the Interstate 15 southbound

21  overpass.

22  Q.   Is this the overpass closer to the BLM?

23  A.   Correct.

24  Q.   And is this when the skirmish line has pushed forward?

25  A.   Yes.

1          MS. AHMED:  Clearing the circle that the witness has

2     drawn in the upper center.

3          Can we move to the next slide.

4        (Slide displayed.)

5     BY MS. AHMED:

6     Q.   And can you indicate which individual you're focused on

7     here that has a firearm.

8     A.   (Witness complies).

9     Q.   And what kind of firearm does this person appear to have?

10    A.   He's carrying a long gun.

11    Q.   And is it a rifle?

12    A.   Yes.

13    Q.   And were you able to track this individual, his movements

14    around the impoundment site?

15    A.   I did.

16          Just to clarify, he's carrying a sidearm as well on

17    his right hip.

18    Q.   So -- clearing the circle that the witness has drawn on

19    the individual to the farthest left.

20          Can you circle where he has that sidearm.

21    A.   (Witness complies).

22          MS. AHMED:  And the witness has drawn a circle around

23    that individual's hip area.

24          Clearing that.

25    BY MS. AHMED:

1  Q.   Where is this screenshot taken?

2  A.   This is back at that assembly area again just west of the

3  wash.

4  Q.   And at what point in time is this screenshot taken?

5  A.   Prior to them entering the wash.  Estimate around 11:30,

6  11:40.

7  Q.   And were you able to track this individual into the wash?

8  A.   I did.

9        MS. AHMED:  And can we move to slide 110.

10       (Slide displayed.)

11  BY MS. AHMED:

12  Q.   And can you circle where, if you at all, can see him in

13  this slide.

14  A.   (Witness complies).

15  Q.   And how were you able to identify this individual in the

16  wash?

17  A.   He's pretty distinctive with the skinny red pants that

18  he's wearing, flannel shirt.

19  Q.   And were you able to determine that he had a firearm in

20  the wash with him as well?

21  A.   Yes.

22       MS. AHMED:  And clearing the circle on the bottom

23  left that the witness has drawn on the image.

24  BY MS. AHMED:

25  Q.   At what point in time is this 110 taken?

1  A.   As they're forming the skirmish line.

2  Q.   And then moving to slide 111, do you see him in slide 111?

3  A.   Yes.

4  Q.   And can you circle where he is.

5  A.   (Witness complies).

6  Q.   And is this the same ramp that we've just previously seen?

7  A.   Yep.  That eastbound -- I'm sorry.  The east side skirt of

8  the 15 southbound overpass.

9  Q.   And does he -- is this a screenshot from a video?

10  A.   It is.

11  Q.   And can you tell from watching the video that he has his

12  firearm with him?

13  A.   Yes.

14       MS. AHMED:  Clearing the circle that the witness has

15  drawn in the center of the screen.

16       Can we move to slide 113.

17  (Slide displayed.)

18  BY MS. AHMED:

19  Q.   And can you circle the individual that you're focused on

20  with the firearm here.

21  A.   (Witness complies).

22  Q.   And what kind of firearm does this individual appear to

23  have?

24  A.   He has a long gun.

25  Q.   And does he have anything else with him?

171

1   A.   He's got his German Shepherd with him.

2   Q.   And at the point in time is this screenshot taken?

3   A.   As the skirmish line is forming in the wash.

4          MS. AHMED:   And clearing the circle that the witness

5   has drawn in the left center of the screen.

6   BY MS. AHMED:

7   Q.   Did you see this individual in the wash in later -- at a

8   later period of time?

9   A.   I did.

10          MS. AHMED:   Could we advance to 114.

11          (Slide displayed.)

12   BY MS. AHMED:

13   Q.   Did you see him in 114?

14   A.   Yes.

15   Q.   Can you circle where you see him.

16   A.   (Witness complies).

17   Q.   And does he -- can you tell if he still has his firearm in

18   114?

19   A.   Yes, he does.

20   Q.   And at what point in time is this screenshot taken?

21   A.   As the skirmish line is pushed up to the gate.

22          MS. AHMED:   And clearing the circle that the witness

23   has drawn in the right center of the screen.

24          Can we advance to 116.

25          (Slide displayed.)

172

1   BY MS. AHMED:

2   Q.   Can you circle the individual you're focused on in 116.

3   A.   (Witness complies).

4   Q.   And what kind of firearm did this individual have on him?

5   A.   He has a handgun on his right hip.

6   Q.   And at what point in time is 116 taken?

7   A.   This is as the -- you can see the horses come into the

8   wash.  They're getting ready to move forward and form the

9   skirmish line.

10  Q.   And did you observe this individual at a later time in the

11  wash as well?

12  A.   Yes.

13       MS. AHMED:  Clearing the circle the witness last had

14  drawn in the center of the screen.

15       Can we advance to 117.

16       (Slide displayed.)

17  BY MS. AHMED:

18  Q.   Can you circle where you found that individual in the wash

19  later.

20  A.   (Witness complies).

21  Q.   And where is this individual located in this slide?

22  A.   He's higher up on that east side skirt of the Interstate

23  15 southbound overpass.

24  Q.   And what is his position relative to the BLM officers?

25  A.   He's above the BLM.

1          MS. AHMED:  Clearing the circle the witness has drawn

2     in the right middle of the screen.

3     BY MS. AHMED:

4     Q.   Is this when the skirmish line has pushed forward?

5     A.   Yes.

6          MS. AHMED:  Can we move to slide 119.

7          (Slide displayed.)

8     BY MS. AHMED:

9     Q.   Can you circle where you've identified an individual with

10    a firearm here.

11    A.   (Witness complies).

12    Q.   And what kind of firearm did this individual have on them?

13    A.   He's carrying a sidearm on his right hip.

14    Q.   And can you see it in this image?

15    A.   Not in this image.

16    Q.   Were you able to see the sidearm in other images --

17    A.   Yes.

18    Q.   -- and videos?

19         At what point in time is this screenshot captured?

20    A.   As the skirmish line is forming in the wash.

21         MS. AHMED:  Clearing the circle in the center of the

22    screen.

23         Can we go to slide 120.

24         (Slide displayed.)

25    BY MS. AHMED:

174

1    Q.   Do you see that same individual here?

2    A.   I do.

3    Q.   Can you circle where you see him.

4    A.   (Witness complies).

5    Q.   And can you see his firearm in this image?

6    A.   Yes.  It's visible on his right hip.

7    Q.   And does he have a -- some kind of thigh holster in this

8    image as well?

9    A.   Yes.

10          MS. AHMED:  Clearing the circle that the witness has

11   drawn in the left center of the screen.

12   BY MS. AHMED:

13   Q.   Is this when the skirmish line has moved forward?

14   A.   It is.

15          MS. AHMED:  And can we move to slide 122.

16   BY MS. AHMED:

17   Q.   And can you circle where you've identified an individual

18   with a firearm here.

19   A.   (Witness complies).

20   Q.   And based on your investigation, who is the individual

21   you've circled?

22   A.   Greg Burleson.

23   Q.   And where is he in this image?

24   A.   He's on the west side of that skirmish line in the wash.

25   Q.   And at what point in time is this image taken?

1   A.   As the skirmish line is formed.

2   Q.   And in this image is he armed?

3   A.   Yes.

4   Q.   What kind of firearm does he have?

5   A.   He has his long gun.

6           MS. AHMED:   And clearing the circle the witness has

7   drawn in the left center, upper center of the screen.

8           Can we advance to the next slide.

9   BY MS. AHMED:

10   Q.   Do you see that same individual here?

11   A.   I do.

12   Q.   Can you circle where he is?

13   A.   (Witness complies).

14   Q.   At what the point in time is this screenshot captured?

15   A.   As the skirmish line is pushed forward to the gate.

16   Q.   And can you explain to the jury his location in relation

17   to the BLM.

18   A.   He's just at the base of the west skirt of the I-15

19   southbound overpass just in front of the BLM.

20   Q.   And does he appear to have his firearm with him in this

21   screenshot?

22   A.   He does.

23   Q.   What kind of firearm does he have with him?

24   A.   A long gun.

25           MS. AHMED:   And clearing the circle that the witness

176

1    has drawn in the bottom left of the screen.

2              Can we move to the next slide.  125.

3         (Slide displayed.)

4    BY MS. AHMED:

5    Q.   And can you circle where you've identified an individual

6    with a firearm here.

7    A.   (Witness complies).

8    Q.   And based on your investigation, who is this individual

9    that you've circled?

10   A.   Scott Drexler.

11   Q.   And is this -- and -- what -- where does he appear to be

12   in this image?

13   A.   This is on the Interstate 15 northbound overpass.

14   Q.   And what kind of firearm does he appear to have with him?

15   A.   A long gun.

16   Q.   And do you know that --

17   A.   And you can he see his sidearm on his right hip.

18   Q.   So you can see a sidearm on his right hip in this image?

19   A.   Yes.

20   Q.   From your investigation, do you know that he also has a

21   long gun with him?

22   A.   I do.

23   Q.   And at what point in time is this image taken?

24   A.   As the skirmish line is forming in the wash.

25   Q.   And what bridge is this?

1  A.   The Interstate 15 northbound overpass.

2          MS. AHMED:  And clearing the circle in the center of

3  the image.

4          Can we move to 126.

5      (Slide displayed.)

6  BY MS. AHMED:

7  Q.   Is that -- do you see the same individual that you just

8  circled here?

9  A.   It is.

10 Q.   Can you -- well, you haven't circled him.

11         Is that also -- who is that?

12 A.   Scott Drexler.

13 Q.   And what kind of firearm does he appear to have here?

14 A.   A long gun.

15 Q.   And what is his position in this screenshot?

16 A.   He's standing on the Interstate 15 northbound overpass.

17 Q.   And at what the point in time is this image captured?

18 A.   This is after the crowd that was down in the wash has now

19 pulled back.

20 Q.   And why did you include this image?

21 A.   Just to clearly illustrate the weapon that he was

22 carrying, the long gun.

23         MS. AHMED:  And moving forward.

24     (Slide displayed.)

25 BY MS. AHMED:

178

1   Q.   Looking at slide 128, have you identified an individual

2   with a firearm here?

3   A.   Yes.

4   Q.   And can you circle where that individual is.

5   A.   (Witness complies).

6   Q.   And based on your investigation, who have you identified

7   this individual to be?

8   A.   Todd Engel.

9   Q.   And where is he located in this screenshot?

10  A.   This is just west of that overpass on Interstate 15 north.

11  Q.   And at what point in time is this screenshot taken?

12  A.   As the skirmish line is forming.

13  Q.   And how do you know that the skirmish line is forming

14  from -- during this time period?

15  A.   Based on the video that was taken here as well as the time

16  stamp of it.

17          MS. AHMED:   And clearing the circle that the witness

18  has drawn in the left . . . a little bit lower than center of

19  the screen.

20  BY MS. AHMED:

21  Q.   Does the individual that you circled appear to be holding

22  a firearm?

23  A.   He does.

24  Q.   And what kind of firearm?

25  A.   A long gun.

1        MS. AHMED:  Now, moving to slide 129.

2      (Slide displayed.)

3  BY MS. AHMED:

4  Q.   Is -- do you see that same individual here?

5  A.   I do.

6  Q.   And can you circle where you've located him.

7  A.   (Witness complies).

8  Q.   And again, who -- from your investigation, who did you

9  determine this individual to be?

10  A.   Todd Engel.

11  Q.   And where is he now in this screenshot?

12  A.   He's on the Interstate 15 northbound highway just west,

13  again, of that overpass.

14  Q.   And at what time period is this in terms of those two

15  events that you were focused on?

16  A.   As the skirmish line is pushed up to the gate.

17  Q.   And again, how do you know that -- that this screenshot

18  was captured when they have moved forward?

19  A.   Based off that time stamp.

20  Q.   And is this taken from a NHP dash cam?

21  A.   It is.

22  Q.   And how did you utilize the time stamp to figure out what

23  the events were?

24  A.   We were able to observe those traffic patterns and sync it

25  up with the footage from the surveillance plane to determine

1    the time stamp that corresponded to the Flynn time.

2          MS. AHMED:  And clearing the circle that the witness

3    has drawn on the left of the screen.

4    BY MS. AHMED:

5    Q.   In this -- is this a screenshot from a video?

6    A.   It is.

7    Q.   And can you see in this screenshot his firearm?

8    A.   Yes.

9    Q.   And when you watch the video, can you also clearly see the

10   firearm?

11   A.   Yes.

12         MS. AHMED:  And moving forward.

13      (Slide displayed.)

14   BY MS. AHMED:

15   Q.   Can you circle where you have identified an individual

16   with a firearm here.

17   A.   (Witness complies).

18   Q.   And based on your investigation, have you identified who

19   this individual is?

20   A.   Yes.

21   Q.   Who is it?

22   A.   Ricky Lovelien.

23   Q.   And where in this screenshot does he appear to be located?

24   A.   This is over at the assembly area.

25   Q.   And where, generally, was that located in relation --

1  A.   Just west on Interstate 15 northbound, west of the wash.

2  Q.   And at what time period is this screenshot taken?

3  A.   As the skirmish line is forming.

4       MS. AHMED:  And clearing the circle in the center of

5  the screen that the witness has drawn around an individual.

6  BY MS. AHMED:

7  Q.   Again, how do you know that the skirmish line is forming

8  at this time period?

9  A.   Again, based on the video.  You can see the crowd in the

10  wash and then using the time stamp as well.

11       MS. AHMED:  And then moving forward.

12       (Slide displayed.)

13  BY MS. AHMED:

14  Q.   Have you identified that same person from the last slide

15  in this slide?

16  A.   Yes.

17  Q.   Can you circle where you see him.

18  A.   (Witness complies).

19  Q.   And, again, who is this, based on your investigation?

20  A.   Ricky Lovelien.

21  Q.   And where does he appear to be located?

22  A.   This is on the Interstate 15 northbound, again, just west

23  of the overpass.

24  Q.   And is this overlooking the wash area generally?

25  A.   It is.  It's east of where the NHP vehicles were parked.

182

1   Q.   And at what general time period is this screenshot

2   captured?

3   A.   As the skirmish line is pushed forward to the gate.

4   Q.   And again, how do you know that that's what's happening in

5   the wash at this time?

6   A.   Again, based on the time stamp of that dash cam.

7          MS. AHMED:   And clearing the circle the witness has

8   drawn on the left of the screen.

9          Can we move to the next slide.

10  (Slide displayed.)

11  BY MS. AHMED:

12  Q.   And can you circle where you've identified an individual

13  with a firearm here.

14  A.   (Witness complies).

15  Q.   And through your investigation, have you identified this

16  individual?

17  A.   I have.

18  Q.   And how is that?

19  A.   Steven . . . I'm sorry.  I'm drawing a blank.  I have to

20  review my notes.

21  Q.   Do you have them with you?

22  A.   I do not.

23  Q.   Would your -- did you make notes reviewing this

24  presentation in advance of your testimony today?

25  A.   I did.

183

1    Q.   In reviewing them, would they help you refresh your

2    recollection?

3    A.   Yes.

4              MS. AHMED:   Your Honor, may I approach?

5              THE COURT:   Yes, you may.

6         (Brief pause in proceedings.)

7              THE WITNESS:   I apologize.   I don't have his name

8    written in my notes.

9    BY MS. AHMED:

10   Q.   Did you observe that this individual in slide 134 was

11   carrying a firearm of some sort?

12   A.   I did.

13   Q.   And you recall that his first name is Steven; is that

14   correct?

15   A.   Yes.

16   Q.   And is it Steven Stewart?

17   A.   It is Steven Stewart.

18             MS. AHMED:   Clearing the circle in the center of the

19   screen that the witness has drawn.

20   BY MS. AHMED:

21   Q.   What kind of firearm did you determine that this

22   individual had?

23   A.   He had a long gun.

24   Q.   And did you see him in other photos and videos through

25   your investigation?

1  A.   Yes.

2  Q.   And, again, where is he positioned in this screenshot?

3  A.   He's kneeling on the Interstate 15 northbound overpass.

4  Q.   And what is going on, if you know, in the wash below at

5  this time?

6  A.   The skirmish line is forming.

7          MS. AHMED:  And moving to 135.

8       (Slide displayed.)

9  BY MS. AHMED:

10 Q.   Do you see that same individual in this screenshot -- or

11 this slide.  Excuse me.

12 A.   Yes.

13 Q.   And can you circle where you see him.

14 A.   (Witness complies).

15          MS. AHMED:  And the witness has circled an individual

16 on the right in this image.

17          Clearing that circle.

18 BY MS. AHMED:

19 Q.   How did you recognize this as the same person?

20 A.   Based on his shirt.  He's got that distinctive pattern on

21 the back of it as well as that scabbard on his left hip and the

22 pistol on his right hip and blue jeans.

23 Q.   And again, who is this?

24 A.   Steven Stewart.

25 Q.   And where is he located?

1    A.    This is on the Interstate 15 northbound overpass.

2    Q.    And at what period of time is this taken?

3    A.    As the skirmish line is pushed up to the gate.

4    Q.    And you indicated just now that he has a firearm on his

5    right hip.  A handgun, is that what you said?

6    A.    Correct.

7    Q.    And does he also -- based on your review of this image,

8    does he appear to have a long gun with him as well?

9    A.    Yes.  He's -- in this image his long gun, you can see the

10   butt of it resting on the ground with the muzzle up.

11   Q.    And can you circle where you see that.

12   A.    (Witness complies).

13         MS. AHMED:  And the witness has drawn a circle to the

14   slight right and in front of the individual on the right.

15         Clearing that.

16         Can we move to the next slide.

17   (Slide displayed.)

18   BY MS. AHMED:

19   Q.    And can you circle where you've identified an individual

20   with a firearm here.

21   A.    (Witness complies).

22   Q.    Through your investigation, have you identified who that

23   individual is?

24   A.    Yes.

25   Q.    And who is that?

1  A.   Eric Parker.

2  Q.   And in this screenshot where does he appear to be

3  positioned?

4  A.   He's on the Interstate 15 northbound overpass.

5  Q.   And where is he in relation to the bridge part?

6  A.   He's just left -- just west of center on the overpass.

7  Q.   And at what point in time is this screenshot taken?

8  A.   As the skirmish line is forming in the wash.

9          MS. AHMED:  And clearing the circle that the witness

10  has drawn in the upper right.

11  BY MS. AHMED:

12  Q.   Do you observe that he has a firearm with him in this

13  screenshot?

14  A.   I do.

15  Q.   What kind of firearm did you observe?

16  A.   It's a long gun.

17  Q.   And what is going on in the wash below at this time

18  period?

19  A.   The skirmish line is forming.

20  Q.   I think you said that.  Sorry.

21          And how do you know that that's what's going on in

22  this image?

23  A.   Based on the video in totality as well as the time stamp

24  of that video.

25          MS. AHMED:  And then moving forward to 138.

1       (Slide displayed.)

2           ///

3   BY MS. AHMED:

4   Q.   Is this the same individual that you just saw in slide

5   137?

6   A.   It is.

7   Q.   And again, who is that?

8   A.   Eric Parker.

9   Q.   And where is he in slide 138?

10  A.   This is, again, on the Interstate 15 northbound overpass

11  just west of the center of the bridge.

12  Q.   And does he appear to have a firearm with him?

13  A.   He does.  He has his long gun.

14  Q.   And what does he appear to be doing with that firearm at

15  this time?

16  A.   He appears to be using that weapon and looking through the

17  crack in that barrier.

18  Q.   And what is going on -- through your investigation, do you

19  know what is going on in the wash below at this time?

20  A.   Yeah.  The skirmish line has pushed forward to the gate.

21  Q.   And again, how do you know that that is what's taking

22  place at this time period?

23  A.   Based upon the time stamp of this image.

24  Q.   And did you also review other photos and videos to

25  determine that?

1    A.    Yeah.   I reviewed other images in the same series to

2    obtain the time stamp that was allowed -- that allowed me to

3    figure that out.

4    Q.    And then is that the last of the gun people that you

5    included in this presentation?

6    A.    It is.

7    Q.    The photos of the individuals that you saw?

8    A.    Correct.

9    Q.    Once you included all of those images did you summarize

10   them in some fashion?

11   A.    Yes.

12   Q.    And what did -- what was that summary?

13   A.    There's a slide I prepared that has a count of individuals

14   carrying handguns and individuals carrying long guns at the two

15   periods of time that we've been looking at.

16            MS. AHMED:   And can we move to slide 139.

17   BY MS. AHMED:

18   Q.    Well, before we get there, can you explain to the jury

19   what's depicted in slide 139.

20   A.    This slide and the next slide, they're images we've

21   already seen in the presentation.   These are just images of the

22   skirmish line when it was formed and then the next one is when

23   it has pushed up and all the yellow arrows just depict

24   individuals from these particular images that I can see where

25   there's armed people in the crowd.

1          MS. AHMED:  So moving back to 139.

2      (Slide displayed.)

3   BY MS. AHMED:

4   Q.   Is this -- at what point in time is this image -- at what

5   point in time does this image capture?

6   A.   This was captured as the skirmish line formed.

7   Q.   And the arrows are where you identified individuals with

8   firearms just in this image?

9   A.   Yes.

10  Q.   Now, based on what we've just seen and your investigation,

11  are these -- is this the total number of firearms that are in

12  the wash at this time?

13  A.   No.

14  Q.   And so, again, these are arrows depicting what?

15  A.   These are just -- this is just a portion of the armed

16  individuals at that point in time that you can see in this one

17  image.

18          MS. AHMED:  And then moving to 130 -- 140.  Excuse

19  me.

20      (Slide displayed.)

21  BY MS. AHMED:

22  Q.   At what point in time is this image taken?

23  A.   As that skirmish line is pushed forward to the gate.

24  Q.   And again, what do the arrows indicate?

25  A.   Individuals I've identified who are armed in that crowd in

1    the wash.

2    Q.   And just that you can see in this particular image; is

3    that correct?

4    A.   Yes.

5    Q.   Based on your investigation, are there more or less or the

6    same number of firearms as you have arrows in the wash at this

7    time period?

8    A.   Several more.

9         MS. AHMED:  And moving to slide 141.

10        (Slide displayed.)

11   BY MS. AHMED:

12   Q.   Is this the summary that you just described that you then

13   tallied up based on your investigation?

14   A.   Yes.  This summarizes all the individuals we just saw

15   through the slides.

16   Q.   And so, during that time period that you described of the

17   skirmish line formation, how many handguns did you observe that

18   you included in this presentation in the wash?

19   A.   20.

20   Q.   And how many long guns did you observe that you've

21   included in this presentation in the wash?

22   A.   21.

23   Q.   21.

24        How many total firearms in the wash then when the

25   skirmish line is in that formation period?

1    A.    41.

2    Q.    And then how many handguns did you observe -- excuse me --

3    is this just in the wash or is this on the bridges as well?

4    A.    This includes the bridges as well.

5    Q.    So, how many handguns did you observe in the wash and on

6    the bridges when the skirmish line pushed forward?

7    A.    It's the 21 handguns.

8    Q.    And how many long guns did you observe that you included

9    in this presentation on the bridges and in the wash when the

10   skirmish line pushed forward?

11   A.    16 long guns.

12   Q.    Now, based on your investigation, are these numbers -- is

13   this the exact number that you know of firearms that were in

14   the wash or are there more or less, in and around the wash?

15   A.    I would assume there were many more.

16   Q.    And so why do you only have these numbers in your count?

17   A.    These are the only -- so, for example, if there was an

18   individual carrying a gun that was in the wash but I saw him,

19   you know, 20 minutes after they had moved up, I didn't include

20   that individual in my count.  So there were other armed

21   individuals present that day, but working within those specific

22   parameters of, you know, 10 minutes here when the line is

23   forming and 10 minutes after they push up, this is the count

24   that I came up with in those particular periods of time.

25   Q.    Now, did you -- taking the photographs that we've just

1  walked through and this information on this slide, did you then

2  do anything with that information in terms of putting it on a

3  map?

4  A.   Yes.

5  Q.   What did you do?

6  A.   I took an image of the wash and I superimposed dots on

7  that image just graphically depicting where these people were

8  located that we just saw the images of in that PowerPoint.

9  Q.   So you essentially were just plotting the firearms and

10  removing all the unarmed people from the wash?

11  A.   Correct.

12  Q.   So, turning to slide 142 . . .

13       (Slide displayed.)

14  BY MS. AHMED:

15  Q.   What is this?

16  A.   This is a key for the two maps that I prepared; one map

17  showing the period of time when the skirmish line formed, the

18  next map showing the period of time when the crowd had moved up

19  to the gate.

20  Q.   So, yellow indicates what, yellow dot?

21  A.   Yellow dot is an individual armed with a long gun.  Blue

22  is an individual armed with a handgun, and then the black dot

23  is a long gun but that person is located under the bridge.  So

24  even though that black dot might be on top of the bridge, it

25  indicates that that's a long gun underneath the bridge, and the

1    white circle with a black ring around it, that's a handgun

2    under the bridge.

3              MS. AHMED:  And then moving forward to slide 143.

4         (Slide displayed.)

5    BY MS. AHMED:

6    Q.   Can you explain to the jury what is depicted here.

7    A.   Sure.

8              So the yellow dots on here are the individuals who

9    were armed with long guns, the blue dots are the handguns, and

10   you can see on the Interstate 15 northbound overpass there's

11   two black dots.  Those were the individuals armed with long

12   guns underneath that overpass.

13   Q.   Now, is -- this is during the formation of the skirmish

14   line period; is that right?

15   A.   Correct.

16   Q.   Drawing your attention to a dot -- a yellow dot that I'm

17   circling on the top left of the screen, can you just remind the

18   jury what person this was that they just saw.

19   A.   This was the individual who was located further west down

20   the highway that was walking carrying the long gun in the

21   direction of the overpass.  He was located just west of the

22   Post 1.  Then same goes for the two dots down below that on the

23   northbound overpass.

24   Q.   So, clearing the circle that I drew and circling these two

25   dots that are on the bottom left (indicating), so that bottom

1    freeway lane, what freeway is that?

2    A.   That's the Interstate 15 northbound freeway.

3    Q.   And these two dots (indicating), do you actually know

4    which individual either of these dots are?

5    A.   Yes.

6    Q.   And who are these two dots?

7    A.   One individual I didn't name in here and the second one on

8    the right is Ricky Lovelien.

9    Q.   And what did you base this data on that the jury saw in

10   your presentation?

11   A.   Based on the images of Ricky Lovelien back in that

12   assembly area.  That assembly area is located just a little

13   further west down the highway here.

14   Q.   And then just clearing the second circle that I've drawn.

15   Looking at this image, there appear to be vehicles on both

16   lanes.  Is this taken from April 12th, 2014?

17   A.   It is.

18            I'm sorry.  This image here is not.  This image, it's

19   just a Google Map image that I captured to use for graphic

20   illustration purposes only.

21   Q.   So you used Google Maps to capture an image of the wash

22   area and the interstate area?

23   A.   Yes.

24   Q.   And then whatever vehicles happened to be captured were

25   just what was there that day?

1   A.   Correct.

2   Q.   Now, again, what do the yellow dots indicate on this

3   slide?

4   A.   Yellow dots indicate long guns.

5   Q.   And what do the blue dots indicate?

6   A.   Handguns.

7   Q.   And then moving forward to your next slide.

8        Do you see the movement of those dots from that last

9   slide to this slide?

10  A.   Yes.  This is the time period after the crowd is now moved

11  up to the gate.

12  Q.   And, again, looking at this, are there -- I'm circling

13  some white dots with black circles.  Can you explain to the

14  jury what those circles are.

15  A.   Sure.

16       Those are individuals armed with handguns down there.

17  There's also a black circle on the left side there.  That's an

18  individual who was armed with a long gun under the bridge.  All

19  of those individuals are located underneath that overpass.

20       MS. AHMED:  And clearing the circle that I've drawn.

21  BY MS. AHMED:

22  Q.   Again, where did you derive these dots -- from where did

23  you derive these dots?

24  A.   Based on the images that we just reviewed.

25  Q.   And these were the images where you indicated that the

196

1    skirmish line had now pushed forward; is that right?

2    A.   Yes.

3           MS. AHMED:  Now, going back to slide 143 -- 143.

4        (Slide displayed.)

5    BY MS. AHMED:

6    Q.   You indicated -- can you mark by drawing a circle where

7    you just described Ricky Lovelien's location at the time of the

8    skirmish line formation.

9    A.   (Witness complies).

10   Q.   And do you -- based on the images that we saw, do you also

11   know where Todd Engel's location is represented on this?

12   A.   Yes.

13   Q.   Can you circle that.

14   A.   (Witness complies).

15          MS. AHMED:  So the witness has drawn a circle on the

16   far left indicating Ricky Lovelien and then just right of that,

17   Todd Engel.

18   BY MS. AHMED:

19   Q.   Can you draw another -- clearing those.  Can you circle

20   where, based on the images that you used, Greg Burleson is

21   located in this image.

22   A.   Yes.  (Witness complies).

23          MS. AHMED:  And the witness has drawn a circle in the

24   center of the screen.

25   BY MS. AHMED:

1    Q.   And clearing that, can you draw a circle around the dot

2    that represents Eric Parker in this.

3    A.   Yes.  (Witness complies).

4          MS. AHMED:  Clearing the circle the witness has drawn

5    in the bottom center of the screen.

6    BY MS. AHMED:

7    Q.   Can you draw a circle around the dot that represents

8    Scott Drexler in this.

9    A.   Yes.  (Witness complies).

10          MS. AHMED:  The witness has drawn a circle just to

11    left to the previous one.

12    BY MS. AHMED:

13    Q.   Clearing that, can you draw a circle around where

14    Steven Stewart is located in this diagram.

15    A.   Yes.  (Witness complies).

16          MS. AHMED:  The witness has drawn a circle of an

17    individual to the immediate left of the last circle.

18    BY MS. AHMED:

19    Q.   Now, moving forward to slide 144, can you now indicate on

20    this map where Ricky Lovelien is at this time period.

21    A.   Yes.  Mr. Lovelien has now moved up to this location here

22    (indicating).

23          MS. AHMED:  And the witness has drawn a circle the

24    farthest left dot on the -- and what bridge is that again?

25          THE WITNESS:  That's the highway, the Interstate 15

1   northbound highway.

2           MS. AHMED:  Of the northbound bridge.

3   BY MS. AHMED:

4   Q.  Clearing that, can you indicate where Todd Engel is

5   depicted on this.

6   A.  Yes.

7           MS. AHMED:  The witness has circled a dot just to the

8   right of the last one.

9   BY MS. AHMED:

10  Q.  Can you circle the dot that represents Mr. Burleson.

11  A.  Yes.  (Witness complies).

12          MS. AHMED:  And the witness has drawn a circle in the

13  upper center.

14  BY MS. AHMED:

15  Q.  Clearing that, can you draw a circle where Mr. Stewart is

16  located.

17  A.  Yes.  (Witness complies).

18          MS. AHMED:  And the witness has drawn a circle in the

19  lower center of the screen.

20  BY MS. AHMED:

21  Q.  Clearing that, can you draw a circle where Mr. Drexler is

22  located.

23  A.  Yes.  (Witness complies).  It's this right dot there

24  (indicating).

25          MS. AHMED:  And the witness has drawn a circle in the

1  kind of right center.

2          THE WITNESS:  I'm -- I'm sorry.  That was Drexler.

3          MS. AHMED:  Drexler.

4          THE WITNESS:  I'm sorry.  Drexler was right here

5  (indicating).  This dot I just circled was Mr. Stewart.

6          MS. AHMED:  All right.  So let's clear everything.

7  Can you indicate where Mr. Drexler's dot is located.

8          THE WITNESS:  Mr. Drexler is located right here

9  (indicating).

10  BY MS. AHMED:

11  Q.   And that's based on a photograph that you just reviewed

12  with the jury?

13  A.   Yes.

14          MS. AHMED:  And clearing that dot -- circle the

15  witness has drawn in the center bottom.

16  BY MS. AHMED:

17  Q.   Can you indicate now where Mr. Stewart was located.

18  A.   Mr. Stewart's located right here to Mr. Parker's right

19  (indicating).

20          MS. AHMED:  And the witness has drawn a circle around

21  a dot that's in the right bottom center.

22  BY MS. AHMED:

23  Q.   And then can you draw -- circle where Mr. Parker is

24  located.

25  A.   Right here (indicating).

1    Q.   Now, having reviewed the -- and the witness has drawn a

2    circle in the bottom center right of the screen.

3              Clearing that.

4              Having gone through this, can you locate, looking at

5    an image of the northbound bridge, where Mr. Parker,

6    Mr. Drexler, and Mr. Stewart were on the bridge based on this

7    information?

8    A.   I can.

9              MS. AHMED:   And, Your Honor, may we publish to the

10   jury what's been previously admitted as Government's Exhibit

11   366?

12             THE COURT:   Yes.

13       (Video played.)

14             MS. AHMED:   Pause at 13.

15             Could we advance it to 7:40.

16             You can play it from there.   Playing from 7:39.

17       (Video played.)

18             Can we go back to 7:43 and pause it.

19             Well, can you go back to 7:42 and try to pause it

20   with a clear.   There.

21   BY MS. AHMED:

22   Q.   Agent Simpkins, looking at Exhibit 366 at the 7:42 mark,

23   can you indicate, based on your investigation, where that dot

24   that you indicated was Mr. Parker, where it's -- where he's

25   located at that time.

1  A.   Yes.  It's -- you can see a crack right here (indicating)
2  above that post on the bridge.
3  Q.   And can you write a "P" above that just to indicate
4  Mr. Parker.
5  A.   (Witness complies).
6  Q.   And are you also able to, utilizing this screenshot,
7  indicate where Mr. Drexler was at the time of the dot you
8  indicated?
9  A.   Yes.  Mr. Drexler you can see his head popping up here
10  (indicating).
11  Q.   And can you draw -- or write a "D" above that.
12  A.   (Witness complies).
13  Q.   Do you want to play this again or . . . can you draw a "D"
14  above where Mr. Drexler is located.
15  A.   Oh, I'm sorry.  I'm trying to read it.
16  Q.   And can you -- are you able to indicate where Mr. Stewart
17  is located at this time based on the graph that you just used?
18  A.   Mr. Stewart's not visible, but he's located approximately
19  here (indicating).  I'll put an "S" on here for you.
20        MR. TANASI:  Objection, Your Honor.  Move to strike.
21        MS. AHMED:  Your Honor, may I inquire how the witness
22  knows that?
23        THE COURT:  Yes.
24  BY MS. AHMED:
25  Q.   And can you explain to the jury how you know that

1    Mr. Stewart is located -- general location at this time?

2    A.   So, based on the time that this video is being taken right

3    now, which is 12:18 and 45 seconds, based on that and then the

4    time stamps of the images we have of Mr. Stewart lined up on

5    the bridge there with Mr. Parker and Drexler, you can see where

6    he is in relation to them.

7              MS. AHMED:  Your Honor, may we --

8              MR. TANASI:  Same objection, I guess, foundation as

9    far as time stamps and -- I mean, just to be more specific.  I

10   don't --

11             MS. AHMED:  Your Honor, I'm going to ask to clear

12   this so we can talk to -- I can lay some more foundation, I

13   believe.

14             Can we clear the -- clearing the marks that the

15   witness has just indicated.

16   BY MS. AHMED:

17   Q.   Did you do anything -- did you look at the individuals

18   around the three people that you just marked to help you locate

19   them?

20   A.   I did.

21   Q.   Through this video and other videos?

22   A.   Yes.

23             MS. AHMED:  Your Honor, may we publish to the jury

24   what's been previously admitted as Government's Exhibit 150A?

25             THE COURT:  Yes.

1          (Photo displayed.)

2               ///

3     BY MS. AHMED:

4     Q.   And is this an image that you used to help you locate

5     Mr. Stewart in the place that you just indicated?

6     A.   It is.

7     Q.   And can you explain to the jury what, in this image, did

8     you utilize to help you locate him?

9     A.   You can see this -- the crack in the Jersey barrier right

10    here (indicating), that he's located in front of as well as

11    this individual (indicating) in the white shirt located to his

12    right with the red beard.

13    Q.   Okay.

14              MS. AHMED:   And then clearing the circles that the

15    witness has drawn in the relative center of the screen.

16              Can we publish what's been previously admitted as

17    Government's Exhibit 151B?

18              THE COURT:   Yes.

19              MS. AHMED:   This is not what I'm looking for.  Moving

20    on to -- can we publish what's been previously admitted as

21    Government's Exhibit 151A?

22         (Photo displayed.)

23    BY MS. AHMED:

24    Q.   So utilizing 151A, did you also -- did you also use this

25    image to determine Mr. Stewart's location?

1    A.    I did.   You can see that he's still located in front of

2    this crack here (indicating).   You can see a little bit of this

3    individual with the white shirt behind him here (indicating),

4    and then in the forefront, this is an individual (indicating)

5    we also identified with the floppy hat and the purple shirt who

6    is also visible in that image.

7    Q.    Is there anyone else in this image that you --

8    A.    Further down you can see Mr. Drexler right here

9    (indicating) as well.

10              MS. AHMED:   And then clearing the circles,

11   Your Honor, may we go back to Exhibit 366 at the 7:40 mark?

12              THE COURT:   Yes.

13       (Photo displayed.)

14   BY MS. AHMED:

15   Q.    Do you -- I realize this is blurry but, are you able to

16   see some -- those same people in this image?

17   A.    Yeah, you can.   You can identify the individual with the

18   white shirt here with the red beard (indicating).   It's

19   difficult to make out, but the crack is right here (indicating)

20   in the barrier behind which Mr. Stewart was sitting.   Over here

21   (indicating) closer to Mr. Parker, you can also see this

22   individual (indicating) who you'll see in other videos, he's

23   the Reuters photographer wearing the blue shirt.   And then you

24   can see the floppy hat right here (indicating) belonging to the

25   individual located to Mr. Stewart's left.

1          MS. AHMED:  The witness has drawn a series of circles

2     on that going from the right third of the bridge to the right

3     side.

4     BY MS. AHMED:

5     Q.   Is that the process by which you were able to locate

6     Mr. Stewart in the screenshot?

7     A.   Yes.

8     Q.   Now, did you -- you can take that down.  Thank you.

9          MR. TANASI:  Your Honor, same objection as to lack of

10    foundation.

11         THE COURT:  Overruled.  There's sufficient

12    foundation.

13    BY MS. AHMED:

14    Q.   Did you -- in the course of your investigation did you

15    also travel out to the impoundment site?

16    A.   I did.

17    Q.   And what, if anything, did you do in terms of the

18    investigation while you were out there?

19    A.   I took measurements of the distances.

20    Q.   And --

21         THE COURT:  All right, Ms. Ahmed.  This looks like

22    we're moving on to a different area.  Can we go ahead and take

23    our afternoon break?

24         MS. AHMED:  Yes, Your Honor.

25         THE COURT:  All right.

1          So I remind the jury, please do not discuss this case

2    with anyone.

3          Do not read, or listen to, or review anything that

4    touches upon this case in any way.

5          Do not attempt to perform any research or independent

6    investigation, and do not form any opinions.

7          It's 3:05, so be back here at 3:20.

8          We'll stand for the jury, and Special Agent Simpkins,

9    after the jury leaves, then you can go ahead and also step down

10   and take your afternoon break --

11              THE WITNESS:  Thank you.

12              THE COURT:  -- use the restroom, get some more water,

13   whatever you need to do.  We just need you to be back here by,

14   what did I say?

15              COURTROOM ADMINISTRATOR:  3:20.

16              THE COURT:  3:20.

17              THE WITNESS:  Thank you, Your Honor.

18        (Jury excused from courtroom.)

19              THE COURT:  Off record.

20        (Recess was taken at 3:06 p.m.)

21              COURTROOM ADMINISTRATOR:  All rise.

22              THE COURT:  All right.  Let's go ahead and bring in

23   the jury.

24        (Brief pause in proceedings.)

25              COURTROOM ADMINISTRATOR:  All rise.

1          (Jury returned to courtroom at 3:27 p.m.)

2               THE COURT:  All right.  Everyone may be seated.

3               We're joined by the jury.  Special Agent Simpkins is

4     back on the witness stand.  Thank you, sir.

5               And Ms. Ahmed, you may continue with

6     direct-examination.

7               MS. AHMED:  Thank you, Your Honor.

8

9               FURTHER DIRECT EXAMINATION OF CHAD SIMPKINS

10    BY MS. AHMED:

11    Q.   Agent Simpkins, in the course of your investigation did

12    you travel out to the BLM impoundment site?

13    A.   I did.

14    Q.   And what did you do when you went there?

15    A.   I took some measurements of the area.

16    Q.   Did you walk through the whole area on foot?

17    A.   Yes.

18    Q.   And what -- what areas did that include that you walked

19    through?

20    A.   I walked from the assembly area down into the wash.  I

21    also walked across the Interstate 15 northbound overpass and

22    took some measurements looking down from the top of that

23    overpass to the ground as well as from the overpass to the gate

24    where the BLM was.

25    Q.   Now, in terms of the measurements that you took, how did

208

1  you take those measurements?

2  A.   I had a laser range finder that I was using.

3  Q.   And can you explain to the jury how it works, generally.

4  A.   Sure.

5       It's like a set of binoculars, a range finder.  You

6  look through it and there's a radical or a dot and you aim that

7  at what you're trying to measure the distance to, push a

8  button, shoots a laser and it comes back and tells you what the

9  distance is to that spot.

10 Q.   And is that how you took measurements when you were at the

11 impoundment site?

12 A.   It is.

13 Q.   And did you measure -- did you make a measurement of the

14 distance between the top of the northbound bridge to where the

15 gate was under the southbound bridge on April 12th, 2014?

16 A.   I did.

17 Q.   And how did you mark that area under the gate -- under the

18 southbound bridge?

19 A.   There was a rock that I placed down there, approximately

20 where that gate was underneath Interstate 15 southbound

21 overpass and I measured to that spot.

22 Q.   And where were you when you took that measurement?

23 A.   Standing in approximately the middle of the Interstate 15

24 northbound overpass.

25 Q.   Of the middle of the bridge area?

1    A.    Yes.

2    Q.    And what was the measurement that you derived when you

3    measured that distance?

4    A.    It was 122 yards.

5    Q.    Did you also take measurement of the distance from that

6    area where the gate has -- the gate was located under the

7    southbound bridge to where the skirmish line had been set up on

8    April 12, 2014?

9    A.    Yeah.  I measured from the skirmish line standing

10   approximately where that skirmish line was in the center of the

11   wash to the gate.

12   Q.    And what, if any, landmarks did you use to help determine

13   where the skirmish line had been located?

14   A.    In all those pictures and videos of the skirmish line you

15   can see where that road comes in from the east and drops down

16   into the wash.  They were just -- just south of where that road

17   came into the wash at.  So from that position where they were

18   at in the wash to the gate, I measured that distance as well.

19   Q.    And what was that measurement?

20   A.    Approximately 64 yards.

21           MR. JACKSON:  Objection to that as a conclusion.

22   There's no skirmish line out there when he went out there.

23   There's no line in the desert, no line that he could measure

24   accurately where it is.  It's just an approximation.

25           He can --

1          THE COURT:  Ms. Ahmed.

2          MS. AHMED:  Your Honor, he just testified as to how

3     he approximated where the skirmish line was located utilizing

4     that dirt road that came into the wash and the pictures and

5     videos that he --

6          MR. JACKSON:  All right.  He measured the dirt road.

7          THE COURT:  All right.  Well, the previous pictures

8     we saw where the skirmish line was formed and then where it

9     moved to.  So which one of those two, or somewhere in between,

10    is being used, or do you have a photograph that can help us

11    understand what he's using as his beginning point?

12         MS. AHMED:  Well --

13         MR. JACKSON:  Your Honor, can I make an objection.

14    There's no such thing as a skirmish line.  There's no line in

15    the desert.  There's no such visible line.  I -- he can say

16    that he measured from a certain spot in the desert or a certain

17    rock or a certain part of the cement or something like that,

18    but he can't say that he measured to the skirmish line because

19    there's no such thing.  It's a construct that they've developed

20    in this talking to the jury --

21         THE COURT:  Mr. Jackson, he was -- he said where the

22    skirmish line was.

23         MR. JACKSON:  Well, he can say what --

24         THE COURT:  But I agree with you that he needs to be

25    more detailed as to which particular location, either through

1   landscaping or photographs, something that's more precise since

2   we've already heard testimony that that line moved back and

3   forth.

4           MS. AHMED:  Yes, Your Honor.

5   BY MS. AHMED:

6   Q.   So, when you -- when you were talking about the

7   measurement that you took regarding a skirmish line, first of

8   all, what skirmish line are you talking about?

9   A.   I was talking about the point in time when that line

10  initially formed before moving forward, approximately in the

11  middle of the wash between the two overpasses.

12  Q.   Now, did you take a measurement from where you

13  approximated that line initially formed and held to --

14  A.   I did.

15  Q.   -- where you understood the BLM had set up its gate

16  underneath southbound 15?

17  A.   Yes.

18  Q.   And again, what, if anything, did you utilize when you

19  were out there to help you determine where the skirmish line

20  had been located when it was first formed in the wash on

21  April 12, 2014?

22  A.   I used my range finder again.

23  Q.   And what landmarks, if any, did you help -- use to help

24  you find where the skirmish line had been located in the wash?

25  A.    Again, I had a rock approximately where that gate was

1    underneath the Interstate 15 southbound overpass.

2    Q.   And was it -- did you utilize that dirt road that you had

3    previously described to help you determine where the skirmish

4    line had formed, initially?

5    A.   I did.

6    Q.   And, so, between -- where did you stand when you took this

7    measurement?

8    A.   I stood in the center of that wash between the two

9    bridges, approximately where I estimated that skirmish line to

10   be.

11   Q.   And what did you measure to?

12   A.   To that rock underneath the Interstate 15 southbound

13   overpass.

14   Q.   And what was the distance that you measured?

15   A.   64 yards.

16   Q.   While you were on the northbound bridge, did you take any

17   other measurements from that location?

18   A.   Yes.  I measured just from standing on the overpass

19   straight down to the ground below.

20   Q.   And what did you use to take a measurement -- that

21   measurement?

22   A.   Again, the range finder.

23   Q.   And what was the measurement that you obtained?

24   A.   45 feet.

25   Q.   Now, through your investigation and your review of the

1    photos and videos did you -- were you able to estimate how many

2    people were in the wash during the skirmish line formation

3    period on April 12th, 2014?

4    A.    Yes.

5    Q.    How many people were in the wash and on the bridges in

6    that area?

7    A.    Between the wash and both overpasses, I estimated

8    approximately 410 people to be in that wash at the time of the

9    skirmish line.

10   Q.    And what did you use to derive that number, generally?

11   A.    I used video from Flynn showing the people in the wash and

12   I used those Shilaikis videos showing the individuals on the

13   overpasses.

14   Q.    And did you determine how many horse people were in the

15   wash in the skirmish line when it first formed?

16   A.    Yes.  Of the 410 individuals that I counted in the wash

17   and on the overpasses, I counted 42 individuals on horseback in

18   the wash.

19   Q.    Through your review of the photos and videos were you also

20   able to derive an estimate as to the number of officers, BLM

21   and other law enforcement officers, in the wash when the

22   form -- when the skirmish line formed on April 12, 2014?

23   A.    Yes.  Again, using the videos that were out there I

24   estimated there to be approximately 25 BLM officers at that

25   what we refer to as Post 2 on the other side of that gate at

1    the time that the skirmish line was formed and then at the time

2    the skirmish line moved forward to the gate I counted

3    approximately 29 officers in that location.

4    Q.   And when you say "BLM officers," are you limiting that

5    number just to the BLM or is it all law enforcement officers?

6    A.   It's all the law enforcement officers that were there.

7    Thanks.

8    Q.   So when the skirmish line first formed, you estimated that

9    there were approximately 410 people in the wash and on the

10   bridges?

11   A.   Yes.

12   Q.   And approximately 25 officers on the other side?

13   A.   Correct.

14           MS. AHMED:  Your Honor, may I have the Court's

15   indulgence?

16           THE COURT:  Yes.

17      (Counsel conferring.)

18           MS. AHMED:  Your Honor, nothing further.  I'll pass

19   the witness.  Thank you.

20           THE COURT:  Cross?

21           MR. TANASI:  I have no questions.  Thank you, Your

22   Honor.

23           THE COURT:  Mr. Marchese?

24           MR. MARCHESE:  Um . . . yeah.  Just briefly,

25   Your Honor.

1          <u>CROSS-EXAMINATION OF CHAD SIMPKINS</u>

2    BY MR. MARCHESE:

3    Q.    Good afternoon, sir.  I just have some questions in

4    reference to the last line of questioning, when you went to the

5    wash and you took your measurements and everything.

6    A.    Yes, sir.

7    Q.    So you -- you indicated on direct-examination that you did

8    some estimates based on the number of people in the wash and

9    the bridge; correct?

10   A.    Are you talking about the measurements now?

11   Q.    I'm talking about the last half.  Yeah.  Well, the last

12   line of questioning was the number of people.

13   A.    Oh, during -- okay.  Regarding the number of people, yes.

14   Q.    Right.  And I believe the number was 410, give or take;

15   correct?

16   A.    Correct.

17   Q.    And that 410 people was comprised of what?  The number of

18   people in the wash and on the bridge?

19   A.    Yeah.  So, approximately 200 -- I believe I counted 267

20   off the top of my head in the wash.

21   Q.    Okay.

22   A.    And then the remainder, the bulk of those on the

23   Interstate 15 northbound overpass and the few individuals as

24   well on the southbound overpass.

25   Q.    Okay.  And of those people, the 410 or so people, what was

216

1   the total number of handguns and rifles that you had?

2   A.   At the time the skirmish line was formed I believe we

3   counted a total of 41; 21 handguns and 20 rifles that I saw

4   visible in that specific period of time.

5   Q.   Okay.  So of the 410 people, your estimate was that 41 of

6   them had some sort of a firearm; is that correct?

7   A.   Correct.

8   Q.   Okay.  Now, when you use that number, you have the people

9   in the wash, so, I know what area you're referring to there,

10  but now we also have the northbound bridge as well; correct?

11  A.   Correct.

12  Q.   Did you count the southbound bridge?

13  A.   Individual -- individuals on that bridge?

14  Q.   Correct.

15  A.   Yes, I did.

16  Q.   Okay.  So it was both bridges?

17  A.   Both bridges.

18  Q.   All right.  Now, you also indicated that two numbers of

19  law enforcement; the first was 25 officers and the second was

20  29 officers.

21  A.   Correct.

22  Q.   All right.  And the first number that you came up with was

23  that -- would that be where the -- the line of people was;

24  correct?

25  A.   When the skirmish line initially formed in the wash

1    that's where I got that count of 25.

2    Q.   Okay.  And when you say a line, it wasn't necessarily a

3    straight line; it was -- it wasn't -- no one put a --

4    A.   It wasn't a line painted in the desert.

5    Q.   Right.  Right.  So it's -- you just use "line" more as a

6    term of art than an actual physical line; correct?

7    A.   Correct.

8    Q.   Some areas people were closer to the gate; some areas

9    people were further.  You'd agree with that?

10   A.   The bulk of the people were massed in a fairly uniform

11   line in the center and then behind them were additional

12   individuals as well --

13   Q.   Right.  Now --

14   A.   -- with the horses towards the front.

15   Q.   Now, when you're counting officers, you're counting

16   Post 2, which is the gate; correct?

17   A.   Correct.

18   Q.   Now, how far back are you counting with those officers?

19   A.   I was counting as far as back as I could see with the

20   video that was available to me.  So, not looking at the command

21   post that was approximately half a mile up the wash, just

22   looking at the individual officers who were located, you know,

23   within a couple hundred yards of that gate.

24   Q.   Okay.  So you're just using the tools that were available

25   to you, so that would be the videos; correct?

1    A.    Correct.

2    Q.    And pictures.  The Shannon Bushman photos would be a good

3    example; correct?

4    A.    Correct.

5    Q.    All right.

6    A.    If I could clarify, sir.  Again, when I'm looking at these

7    videos, I mean, this is what I can see.  It's not exactly

8    what's present.  So when I'm estimating 25 officers, there may

9    have been a couple horses that weren't visible at the time,

10   just like the handguns.  I mean, I counted 42 but, I mean,

11   that's what I saw visible at the time.  I'm sure there were --

12   I know there were other armed individuals present in the wash

13   at the time.  That's just my estimation based on what I can

14   actually see.

15   Q.    You're doing the best that you can with the information

16   you have available?

17   A.    Absolutely.

18   Q.    Okay.  Now, you didn't mention Post 1.  Are you familiar

19   with Post 1?

20   A.    Yes.  Post 1 was the area above on the -- prior to getting

21   on the interstate prior to getting to the overpass, just west.

22   Q.    Okay.  And you've obviously traveled out there so you know

23   that area; correct?

24   A.    I do.

25   Q.    And that particular area, you didn't count any of those

219

1    particular officers; correct?

2    A.   At Post 1?

3    Q.   Correct.  Correct.

4    A.   I don't have a count in front of me of those officers.

5    Q.   Okay.  Are you -- are you aware, based on your

6    investigation, that there were officers in between Post 1 and

7    Post 2?

8    A.   Like, on the road in between or just --

9    Q.   Right.  You've obviously been out there so you're aware

10   that when you go from Post 1, there's a dirt road --

11   A.   Yeah.  There's a road that travels from Post 1 to Post 2.

12   Q.   Right.  That will take you down into the wash; correct?

13   A.   Yes.

14   Q.   And are you aware, based on your investigation, that there

15   were officers in that particular area?

16   A.   I know there were officers up at Post 1.  I can't speak

17   specifically about on that road at that time.

18   Q.   Okay.

19   A.   I'd have to go back and review the -- review my notes and

20   review the video that was available.

21   Q.   Okay.  And those particular officers, if there were any,

22   they would not have been in your count of officers at Post 2;

23   correct?

24   A.   Correct.  My count of Post 2 was strictly Post 2.

25   Q.   Okay.  Did you count any of the Las Vegas Metropolitan

220

1    police officers in the staging area in your count?

2    A.   The ones that were in the middle -- in the median?

3    Q.   Right.  Between the north and the southbound lanes by Post

4    1.

5    A.   That's not counted in the count for Post 2.

6    Q.   Okay.  Did you count any of the NHP officers on the

7    northbound lane of the I-15 in your count?

8    A.   No.  Again, my count of Post 2 was strictly the officers

9    at Post 2.

10   Q.   Okay.  And once again, any of the NHP officers on the

11   southbound lane of the I-15, were they counted in your count?

12   A.   Negative.

13   Q.   Okay.

14              MR. MARCHESE:  Thank you.  Have a good day.

15              THE WITNESS:  Thank you.

16              THE COURT:  Mr. George?

17

18              CROSS-EXAMINATION OF CHAD SIMPKINS

19   BY MR. GEORGE:

20   Q.   Good afternoon.

21   A.   Good afternoon, sir.

22   Q.   So, just for demonstrative purposes, I'm going to pull up

23   some of the photos in your PowerPoint and ask you some

24   questions about each one.

25              MR. GEORGE:  Bryan, can you blow up Number 16,

221

1    please.

2          (Slide displayed.)

3    BY MR. GEORGE:

4    Q.   Okay.  So this individual was close to the skirmish line;

5    is that correct?

6    A.   In the red shirt?

7    Q.   Yes.

8    A.   Yes, sir.

9    Q.   And do we know who that person is?

10   A.   I don't have a name for him, sir.

11   Q.   Okay.  But that person has not been indicted; correct?

12   A.   Correct.

13   Q.   Okay.

14          MR. GEORGE:  Bryan, Number 49, please.

15          (Slide displayed.)

16          MS. AHMED:  Your Honor, I'd move to strike the last

17   question.  Relevance.

18          THE COURT:  Sustained.

19          And it's Exhibit 469-16, right, is what we're looking

20   at?  Is that right?  Not Exhibit 16.

21          MS. AHMED:  It's Exhibit 469 is the demonstrative.

22          THE COURT:  Okay.  So it's Page 16.  Not Exhibit 16.

23          Yeah.  So the jury will disregard that last question

24   and answer.

25   BY MR. GEORGE:

222

1   Q.   Okay.  Same here.  This gentleman is close to the skirmish

2   line as well?

3   A.   This is actually at a period of time after that skirmish

4   line is pushed back, so it's -- if you're asking if that's in

5   the location where that skirmish line was initially formed?

6   Q.   Correct.

7   A.   He's close to it.

8   Q.   Okay.

9        MR. GEORGE:  All right, Bryan, Number 86, please.

10       (Slide displayed.)

11  BY MR. GEORGE:

12  Q.   And same here.  The individual identified is also down in

13  the wash close to the skirmish line; correct?

14  A.   Yes, sir.

15  Q.   Okay.  And how many people with long guns were identified

16  in the wash?

17  A.   I would have to revisit that number to see what it was,

18  but between the wash and the bridges I could give you an

19  answer.

20  Q.   Okay.  But the -- but the individuals with long guns close

21  to the skirmish line -- or persons on the bridge were further

22  away than those close to the skirmish line; correct?

23  A.   Correct.  They were in an elevated position above BLM at a

24  greater distance sitting on top of the bridge.

25  Q.   And in the course of your investigation you -- are you --

1    were you aware of where everybody was at all times?

2    A.   Certainly not.

3    Q.   Okay.  During the course of your investigation were you

4    aware of where Mr. Engel was throughout this day?

5    A.   I've seen a lot of video footage of him throughout the

6    day.  My focus was on the period of time of that skirmish line

7    and while they're pushing up to the gate and that chunk of

8    time.  During that period of time there is quite a bit of video

9    of Mr. Engel.  If -- are you asking if I can account for where

10   he was at every second?  I couldn't account for every second,

11   just several minutes of his time.

12   Q.   Okay.  But, are you aware that his -- did he ever leave

13   the bridge during that time of the formation of the skirmish

14   line?

15   A.   Yes.

16          So, when the skirmish line was forming, there's a

17   Flynn video where you can see Mr. Flynn is standing just west

18   of the overpass and Mr. Engel is -- is pretty nearby him, just

19   a few people down from him.  At that point Mr. Engel moves

20   west.  If you refer to my -- that map that I showed earlier

21   with the dots, he's the yellow dot that had moved a little bit

22   further down the highway towards the west.  From his location,

23   he was then in a position where he could see the -- see the

24   gate from where he was at without being in the middle of the

25   bridge.

224

1    Q.    Okay.  But the whole time he was on the bridge; correct?

2    A.    Not on the bridge, sir.

3    Q.    Okay.  But up -- up on the level of the bridge?

4    A.    Yes, sir.

5    Q.    Okay.  He was nowhere near the skirmish line; correct?

6    A.    Not on the skirmish line, no.

7    Q.    Okay.  And also during the course of your investigation

8    are you aware that he came into contact with Nevada Highway

9    Patrol officers?

10   A.    I'm aware of that, sir.

11   Q.    Okay.  Are you aware of what the interaction that he had,

12   what the content of that interaction was?

13   A.    I was a case agent on this investigation as well as so I'm

14   familiar with the interview 302s that were conducted with those

15   officers and the --

16           MS. AHMED:  Objection, Your Honor, as to eliciting

17   hearsay.

18           THE COURT:  Sustained.

19   BY MR. GEORGE:

20   Q.    Are you aware of . . . were you -- were you sitting in

21   this courtroom for the prior testimony?

22   A.    No, sir.

23   Q.    So . . . are you aware of any suggestions that Mr. Engel

24   cooperated with the highway patrol --

25           MS. AHMED:  Objection.  Vague.

1          MR. GEORGE:  -- throughout the course of your

2     investigations?

3          MS. AHMED:  Argumentative as to suggestions.

4          THE COURT:  Sustained.

5          MR. GEORGE:  That's all I have.

6          THE WITNESS:  Thank you, sir.

7          THE COURT:  Mr. Leventhal?

8          MR. LEVENTHAL:  No, Your Honor.  Thank you.

9          THE COURT:  Mr. Perez?

10         MR. PEREZ:  Nothing, Your Honor.

11         THE COURT:  And Mr. Jackson?

12         MR. JACKSON:  The Court's indulgence for a moment.

13         (Brief pause in proceedings.)

14         MR. JACKSON:  I just have one question.

15

16              CROSS-EXAMINATION OF CHAD SIMPKINS

17     BY MR. JACKSON:

18     Q.   Special Agent Simpkins, you've testified that at least --

19     there were at least 40 armed civilians at the Bunkerville area

20     on 4-12-14; is that correct?

21     A.   Between the wash and those bridges, yes, sir.

22     Q.   At least 40.  And to your knowledge, not one shot was

23     fired; is that correct?

24     A.   Yes, sir.

25         MR. JACKSON:  Thank you.  No further questions.

1          THE COURT:  Redirect?

2          MS. AHMED:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  You're excused, Special Agent

4    Simpkins.  Thank you for coming in this afternoon.  Please be

5    careful on your way down with those steps.

6          THE WITNESS:  Thank you, Your Honor.

7       (Witness excused.)

8          THE COURT:  Does the Government have another witness

9    to call today or are we going to go into April?

10         MR. MYHRE:  And, Your Honor, that concludes the

11   Government's case.  We are prepared to rest.  However, before

12   doing so formally, we would request time just to review our

13   exhibit list and our exhibits given the volume of evidence

14   introduced, but we intend to rest formally at the next court

15   session.

16         THE COURT:  All right.  Thank you.

17         So we'll go ahead and let the jury go for their

18   break.  We're going to be back here on Monday, April 3rd, at

19   8:30 a.m.

20         I do remind the jury during this longer break that

21   you are not to discuss this case with anyone nor permit anyone

22   to discuss it with you.  So that means that if you choose to go

23   back to work or if you're just doing some other activity with

24   family and friends, remember, you are not permitted to talk to

25   them about the case.  If they ask you anything, feel free to

227

1    let them know that I will hold someone in contempt if necessary

2    so you don't want to accidently talk to anybody and please

3    don't talk to me or even try to talk to me anymore about the

4    case.  And so, you can make me the heavy.  That's fine.

5          Also, do not try to listen to, or view, or read

6    anything that touches upon this case in any way.  If you

7    inadvertently hear something, you are required to let the Court

8    know right away.  Likewise, if anyone attempts to speak to you

9    about the case, other than a colleague saying "is it over yet"

10   or something like that or your employer wanting to know but

11   they actually want to talk to you about the case, you are

12   required to let me know.

13         And also do not attempt to research or make any

14   independent investigation regarding any of the issues in this

15   case.

16         Do not form an opinion.  We still have more

17   testimony.  We will have more evidence.  And you need to wait

18   until after I provide you with the written jury instructions.

19   Then you will hear closing arguments and then you can begin

20   your deliberation process.

21         So we'll go ahead and stand for the jury and thank

22   them for their patience.  We'll welcome them back on Monday,

23   April 3rd, at 8:30 a.m.

24       (Jury excused from courtroom at 3:50 p.m.)

25         THE COURT:  All right.  Jury has left the courtroom.

228

1    We've got a couple of minutes left if anybody has any issues

2    that you want me to address so that you know or at least have

3    some time to present anything.

4            MR. MYHRE:  Nothing from the Government, Your Honor.

5            MR. TANASI:  Not from the defense, Your Honor.

6            THE COURT:  All right.  How about for the defense?

7            MR. MARCHESE:  No, Your Honor.

8            THE COURT:  Are we going to go in a particular order?

9    For example, should I ask a particular person first if you

10   have -- you know, like I did with the Government.  Government

11   call its next witness.  Should I just say "defense call the

12   next witness" or do you want me to actually say Mr. Leventhal,

13   do you have any witnesses and then Mr. Tanasi, do you have any

14   witnesses?  Could you have a plan?

15           MR. MARCHESE:  I believe stylistically what we did

16   was -- Mr. Tanasi, myself and Mr. Leventhal -- we all filed a

17   joint witness list.  So, we'll probably, in the next week or

18   so, assign the witnesses as, you know, as we see necessary.

19           MR. LEVENTHAL:  As we've been interviewing.

20           MR. MARCHESE:  Yeah.  And then I don't know.  I don't

21   want to speak obviously on behalf of the other three.

22           THE COURT:  Right.  Okay.  So then you want me to

23   call on just -- so I would say Mr. Marchese, do you have any

24   defense witnesses to call --

25           MR. TANASI:  I think if you say defense witnesses --

1          THE COURT:  -- and then you'd call someone?

2          MR. TANASI:  -- that would --

3          THE COURT:  Or do you want me to just say defense

4    witnesses and you all will --

5          MR. MARCHESE:  Yeah.  That would be perfect.

6          MR. TANASI:  I think that's fine, Your Honor.

7          THE COURT: -- organize yourselves?

8          Is that all right, Mr. Jackson --

9          MR. JACKSON:  That's fine.

10         THE COURT:  -- Mr. Perez and Mr. George?

11         MR. JACKSON:  That's fine.  Whatever order they wish

12   to call the witnesses.  I don't think I'm calling anybody yet

13   on behalf of Mr. Burleson.  It depends on what witness comes

14   forward but, however they wish to proceed is fine.

15         THE COURT:  All right.  Well, I don't have a

16   preference.  I just don't want it to be more awkward than it

17   has to be in front of the jury so that's why I'm inquiring now

18   how you want me to call on you so that it looks a little bit

19   more smooth.

20         MR. LEVENTHAL:  We'll be organized.  We'll be ready.

21   We'll be organized and ready.  We don't know -- I apologize.

22         We don't know, in terms of their scheduling, our

23   witnesses, at this point.  We're putting that all together.

24   So, we can't definitively say to the Court we're going to go in

25   this order, but we will definitely know so if the Court just

230

 1    calls on defense calls the next witness, then that person will

 2    jump up and know exactly who's coming in.

 3            THE COURT:  All right.

 4            MR. LEVENTHAL:  If that's okay.

 5            THE COURT:  And Mr. George, is that all right with

 6    you?

 7            MR. GEORGE:  Yes.

 8            THE COURT:  Okay.  Well, you know, if you change your

 9    mind and we come back on April 3rd and you want to actually be

10    called individually to present a particular -- because I don't

11    know if there will be a witness that someone wants to call that

12    someone else --

13            MR. MARCHESE:  We'll let the Court know.

14            THE COURT:  -- doesn't want to be associated with.  I

15    don't know.  So, you may not want to -- have the jury think

16    that these are all witnesses that you all agree should be

17    called if, in fact, you don't or something.

18            You know, I can't anticipate what it's going to be

19    and I'm not asking you to tell me.  I just want to make sure

20    that you know that you have a preference, let me know and I'll

21    call you that way.

22            MR. MARCHESE:  Thank you.

23            MR. JACKSON:  I don't think we have any choice if we

24    don't want them to call certain witnesses.  I think they have a

25    right under the Constitution --

1            THE COURT:  No.  But if you don't want to be

2    associated with having called that witness.  So if I say the

3    defense may call its next witness and Mr. Leventhal calls

4    someone that you don't think he should have called and you

5    don't want to be associated with that, or vice versa --

6            MR. JACKSON:  Maybe they think --

7            THE COURT:  -- and instead you prefer I just call

8    Mr. --

9            MR. JACKSON:  -- should call witnesses they wish to

10   call --

11           COURT REPORTER:  Wait.  Wait.  Wait.  Wait.

12           MR. JACKSON:  I'm sorry.

13           COURT REPORTER:  Let her finish, please.

14           THE COURT:  And so instead if you just prefer that I

15   said, Mr. Leventhal, call a witness so you're not associated,

16   that -- those are just issues that sometimes come up in these

17   multiple defendant cases so I just want to make sure that you

18   know that I will call on you however you want to but you need

19   to let me know.

20           MR. JACKSON:  It's my request that the witness -- the

21   attorney that wishes to call a witness states this is a witness

22   called by, you know, Attorney X and that way the jury will know

23   it's called on behalf of such-and-such a witness, in case I

24   wish to -- you know, it's going to come out, but I may or may

25   not wish to associate with a certain witness.  I don't know for

1   sure.

2            THE COURT:  Right.

3            MR. MARCHESE:  That's fair.

4            THE COURT:  Right.  So if Mr. Leventhal or Mr. Tanasi

5   wants to say this next witness is being called on behalf of

6   Mr. Parker and Mr. Stewart or whoever the grouping is, that's

7   fine with me.  I just wanted to raise that so you can think

8   about it.

9            Also, as to the 29(a) motion, so are you going to be

10  contesting all of the elements of all of the charges or can we

11  focus on the ones -- you know, the particular elements that you

12  think haven't been met or do you want -- I'm just trying to

13  plan out for time-wise whether we should -- now that I've

14  already told the jury to leave, now I'm sorry I did that and

15  I'm thinking I should have had them come back at 11:00 instead

16  of 8:30 if we're going to be arguing for a lengthy period of

17  time.

18           But I think, Aaron, you can call them, right, and

19  tell them --

20           COURTROOM ADMINISTRATOR:  I can, Your Honor.

21           THE COURT:  -- to come later?

22           So what time do you anticipate we can have them back?

23  How long do you think it will take?

24           MR. TANASI:  I think 11:00 would be reasonable.

25           MR. LEVENTHAL:  I believe so.  I think we are going

1    to attack all of the charged crimes and the counts and all of

2    the elements at this point.

3           So, it might be until 11:00, 11:15, so . . .

4           THE COURT:  Okay.  So you want to do that, Aaron?  Do

5    you mind?

6           COURTROOM ADMINISTRATOR:  Your Honor, they're still

7    here.

8           THE COURT:  Okay.

9           COURTROOM ADMINISTRATOR:  So we can actually let them

10    know --

11           THE COURT:  Yeah, let's do that.

12           COURTROOM ADMINISTRATOR:  -- to come in at 11:00 on

13    April 3rd.

14           THE COURT:  Yes.  Okay.

15           Let's see what else I wanted to ask.

16           Okay.  And obviously the Government doesn't know yet

17    if you're going to be calling any rebuttal witnesses until

18    after you hear what the defense evidence is.

19           MR. TANASI:  Your Honor, I guess I do have one kind

20    of housekeeping request with request -- request -- respect,

21    rather, to the transcripts.

22           I know that there was a filing at some point I think

23    by Mr. Rasmussen to essentially have all the transcripts made

24    available as opposed to the rough draft transcripts, at least

25    one transcript made available and then that could be

1   disseminated by the lawyers as I have been doing now with the

2   rough draft transcripts and as we're getting closer to closing

3   I don't know -- I don't really know where it is in the process

4   in terms of getting the actual transcript, one transcript that

5   can then be disseminated to all parties.  I think that request

6   has been made.  I just don't know where kind of in the request

7   process that is.  And so I guess I would just ask the Court if

8   there's a way to expedite that in any way and if there's

9   anything else that the Court needs from us or if it's something

10  I need to just go speak with Sharon about on the CJA side of

11  things, but I know it's kind of something that we could all

12  benefit from, especially with the week off.

13          THE COURT:  Yeah.  And the person that we have here,

14  Heather, she's not actually coordinating that.  I think it's

15  Kathy -- Kathy?  Is it?

16          I think it's Kathy, but yes, I've been in contact

17  with her and Sharon and it does have to go through the approval

18  process, but, I'm aware of it and people are assigned to be

19  working on it.

20          MR. TANASI:  Sure.  Sure.

21          THE COURT:  So, that's -- I think that's all I know

22  right now for sure.

23          MR. TANASI:  Okay.  Thank you.

24          PRO SE ENGEL:  Your Honor, if I may get on the

25  record?

1          THE COURT:  Yeah.

2          PRO SE ENGEL:  Mr. George just cross-examined on my

3    behalf and I want it on the record that that was -- he deviated

4    so far that that was ineffective counsel.

5          THE COURT:  So, you mean because he didn't ask any of

6    the questions that you wanted him to ask --

7          PRO SE ENGEL:  He is my counsel and --

8          THE COURT:  -- or similar questions?

9          PRO SE ENGEL:  -- yes, ma'am.  He deviated so far

10   from what we had talked about that that is absolute ineffective

11   counsel.  And I beg you to let me back.  Please.

12         THE COURT:  All right.  Well, I don't have any

13   evidence that there was any questions that weren't asked that

14   were appropriate to ask.  I know he started off down the road

15   on -- on a question to elicit and my guess is that he had

16   planned for, according to your wishes, to call up every

17   photograph where there's an individual that's been identified

18   with a firearm that had not been indicted, but that is not

19   relevant --

20         PRO SE ENGEL:  No.  Yeah.  I did not --

21         THE COURT:  -- because for a conspiracy agreement,

22   it's just an agreement by two or more persons.  It doesn't even

23   have to be people that we know.  It can be known or unknown,

24   and they don't have to be indicted.  So it's not relevant to

25   the charge whether or not someone is or is not indicted that

1  also happens to have a firearm in the photograph so . . .

2          PRO SE ENGEL:  I agree with Your Honor and I did

3  not --

4          THE COURT:  If he can't ask a question because it's

5  improper, then he can't ask it and it's not ineffective just

6  because you wanted him to ask it.

7          PRO SE ENGEL:  And that's the --

8          THE COURT:  That's not just in your case, that's in a

9  lot of cases.

10          PRO SE ENGEL:  Your Honor, and that --

11          THE COURT:  There are only three things that the

12  defendant gets to choose; whether or not to go to trial or take

13  a deal is number one, whether or not to testify is number two,

14  and whether or not to appeal is number three and all the other

15  decisions are considered strategic attorney decisions.

16          So, you can give him the questions and I'm glad that

17  you're still involved in giving him questions, but it's still

18  ultimately up to him whether they're appropriate questions that

19  can be asked according to the Rules of Evidence and . . . he

20  can't ask a question that's inappropriate when I sustain the

21  objection and say no, you can't ask that question.

22          PRO SE ENGEL:  And, Your Honor, that's --

23          THE COURT:  We're done, Mr. Engel.  We're done.

24          All right.  So, is there anything else that you need

25  to me to address?

237

1          All right.  So we'll see you back here at 8:30 but we

2     don't have the jury come in until 11:00.

3               MR. LEVENTHAL:  Thank you, Your Honor.

4               MR. TANASI:  Thank you, Your Honor.

5               COURTROOM ADMINISTRATOR:  All rise.

6               Off record.

7          (Proceedings adjourned at 4:00 p.m.)

8

9                         --oOo--

10                  COURT REPORTER'S CERTIFICATE

11

12          I, Heather K. Newman, Official Court Reporter, United

13     States District Court, District of Nevada, Las Vegas, Nevada,

14     do hereby certify that pursuant to Section 753, Title 28,

15     United States Code, the foregoing is a true, complete, and

16     correct transcript of the proceedings had in connection with

17     the above-entitled matter.

18

19     DATED:  4-4-2017          ____/s/ Heather K. Newman___
                                 Heather K. Newman, CCR #774
20                               OFFICIAL FEDERAL REPORTER

21

22

23

24

25