STEVEN W. MYHRE
Acting United States Attorney
District of Nevada
State Bar No. 9635
NICHOLAS D. DICKINSON
NADIA J. AHMED
Assistant United States Attorneys
ERIN M. CREEGAN
Special Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
steven.myhre@usdoj.gov
nicholas.dickinson@usdoj.gov
nadia.ahmed@usdoj.gov
erin.creegan@usdoj.gov

*Representing the United States*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 2:16-CR-00046-GMN-PAL |
| v. | **GOVERNMENT'S       SENTENCING MEMORANDUM** |
| GREGORY P. BURLESON, | |
| Defendant. | |

**CERTIFICATION**:  The undersigned certify that this pleading is timely filed.

Pursuant to LCR 32-1(d), the United States, by and through the undersigned, respectfully submits its Sentencing Memorandum in the above-captioned case.

## I.    Summary.

Gregory Burleson is a violent and dangerous man.  He openly expressed his desire to kill federal law enforcement officers.  He then traveled from Arizona to Nevada to participate in an unprecedented and violent attack on dozens of federal

officers as they were performing their official duties on April 12, 2014.   He coordinated with others to box the officers in and then advanced on them, all the while brandishing his firearm.   At times he pulled a mask over his face, at times he made gestures at the officers indicating he had eyes on them.   He forced those officers to leave their post in order to avoid bloodshed.   He forced those officers to leave behind cattle that had been seized by the United States pursuant to federal court orders.   Burleson celebrated the victory he had that day, sharing how he had a federal officer in his sights and how he had brought a katana sword with him so to chop the officers' heads off in the event he ran out of bullets.

Burleson was charged for his criminal conduct on April 12, 2014.   He was convicted by a jury of almost every count.   As a result of his violent actions on April 12, 2014, Burleson now faces up to life in prison.   The United States respectfully requests that the Court impose a sentence of 360 months as to Counts 5, 8, 12, 14, and 16; and a consecutive sentence of 57 years as to Counts 6, 9 and 15.   This recommendation falls squarely within the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") calculation and taken "as a whole" such a sentence is fully justified and warranted in light of the sentencing factors contained in 18 U.S.C. § 3553(a).   Such a sentence is necessary to impose a just punishment, to promote respect for the law and ultimately and most significantly will protect the community from this defendant.

## II.   Facts.

### A.   Procedural Posture.

Gregory P. Burleson ("Burleson"), 53, was charged in a Superseding Indictment returned on March 2, 2016, charging him with ten counts:

- Conspiracy to Commit an Offense Against the United States (Count 1 – 18 U.S.C. § 371);

- Conspiracy to Impede or Injure a Federal Officer (Count 2 – 18 U.S.C. §  372);

- Assault on a Federal Officer (Count 5 – 18 U.S.C. §§ 111(a)(1), (b) and 2);

- Use and Carry of a Firearm in Relation to a Crime of Violence (Counts 6, 8 and 15 – 18 U.S.C. §§ 924(c) and 2);

- Threatening a Federal Law Enforcement Officer and Aiding and Abetting (Count 8, 18 U.S.C. §§ 115(a)(1)(B) and 2);

- Obstruction of the Due Administration of Justice (Count 12 – 18 U.S.C. §§ 1503 and 2);

- Interference with Interstate Commerce by Extortion (Count 14 – 18 U.S.C. §§ 1951 and 2); and

- Interstate Travel in Aid of Extortion (Count 16, 18 U.S.C. §§  1952 and 2).

All of the charges arise from the events surrounding April 12, 2014, where federal law enforcement officers from the BLM and National Park Service suffered a massive armed assault and extortion by Cliven Bundy, his sons and followers, including defendant Burleson.

On March 21, 2016, Magistrate Judge Leen ordered Burleson detained

pending trial finding that the government had shown by clear and convincing evidence that Burleson is a danger to the community.  This decision was affirmed both by this Court and by the United States Court of Appeals for the Ninth Circuit.

On February 6, 2017, the Court commenced a joint jury trial of defendant Burleson and five other co-defendants on ten counts of the Superseding Indictment. On April 24, 2017, the jury returned guilty verdicts as to Burleson on Counts Five, Six, Eight, Nine, Twelve, Fourteen, Fifteen, and Sixteen, but announced that they were deadlocked on Counts One and Two.  On May 23, 2017, Counts One and Two were dismissed without prejudice under Federal Rule of Criminal Procedure 48(a). ECF No. 1998.

**B.      The Facts Giving Rise to the Offense Conduct.**

Having presided over Trial 1, the Court is well-aware of the evidence as it relates to Cliven Bundy's failure to pay grazing fees for over twenty years, conduct that ultimately prompted the BLM to seek court orders authorizing the removal of Bundy's cattle from the public lands near Bunkerville, Nevada.  To thwart the removal, Bundy issued a call to arms across social media, appealing to like-minded anti-federal ideologues who believed that a superior show of force would back down the BLM.  This prompted hundreds of ideologues from across the country to travel to Bundy Ranch to support Bundy, bringing their weapons, body armor, and ammunition to Nevada in the hope of confronting federal agents.

By April 12, 2014 hundreds of Bundy supporters answered the calls-to-arms against the BLM.  As the gunmen arrived, Bundy and his co-conspirators organized

4

them into so-called "militia camps," deploying them from there into armed security checkpoints and patrols.

On April 12, Bundy rallied his Followers and commanded them to take his cattle back, unleashing them to converge upon and assault the BLM's impoundment site located in the Toquop wash, near Bunkerville. The evidence shows that officers confronted an angry array of more than 270 people in the wash, the group being backed by gunmen brandishing or carrying rifles and firearms in the wash, or perched on high ground in over-watch positions, or in concealed sniper positions aiming their assault rifles from a highway bridge. The officers were positioned on low ground in the wash, guarding a makeshift gate that had been erected under one of the highway overpasses, protecting the entrance to the impoundment site where the cattle were corralled.

The officers guarding the gate that day, almost to a person, thought either they, or unarmed civilians - including children brought by Bundy's followers to the wash - were going to die. Many of the officers, some of them combat veterans, remain profoundly affected to this day. Witnesses have described the level of violence as so intense that something as innocent as the backfire of vehicle would have set off a firefight with the gunmen.

Because of the dangerously high threat of violence, the officers were in an impossible situation and backed down from the gate – just as Cliven Bundy had planned. The federal officers then evacuated the site, leaving the impounded cattle to Bundy's followers, who released them back to Bundy.

### C.  Post-Assault:  Bundy's Followers Establish Security Around Bundy Ranch to Keep Federal Officers From Arresting Him.

Immediately after the assault, Bundy and his co-conspirators openly celebrated their use of force, showing the world that not only did they lack remorse for their violent criminal acts – they were proud of them.  In an interview posted to the Pete Santilli Show's YouTube channel on or about April 16, 2014, Cliven Bundy was interviewed by an individual named Peter Rense.  When asked whether the BLM still had officers in the area, Bundy stated, "We the people and the militia definitely rid this place of any of that kind of influence."  *See* https://www.youtube.com/watch?v=dI-3qYTMGgU (last visited February 11, 2016). In the same interview, Bundy expressed dismay that the BLM was allowed to leave with their weapons on April 12:  "we haven't won the war, we've just won one chapter of it."  *Id.*  Bundy's characterization of the assault as part of a larger "war" makes clear that his efforts to thwart and interfere with BLM law enforcement officers would carry on.

In the days following the assault, armed Bundy supporters continued to flock to Bundy Ranch ready to confront federal officers to prevent the arrest of Bundy. To that end, the supporters organized themselves into camps, engaged in reconnaissance missions, manned check points on public roads, and conducted armed patrols of the area around Bundy Ranch to ensure BLM officers were not present and would not return.  Bundy and his conspirators established a firing range on public land which his lead bodyguard used to train other gunmen to protect Bundy and his ill-gotten gains.

On April 17, 2014, a local Channel 8 news reported on the continued armed presence in the area and stated that "Armed protesters continue to surround the Bundy ranch and are even blocking a county road. Some of the supporters attempted Thursday to keep a Channel 8 news crew from entering the area, despite it being a public road. . . . The armed men say they'll be at the site for weeks to come to defend the Bundy family." The news segment included footage of a Bundy guard blocking access to a public road.

Organized patrols of the public lands continued all through the summer into the fall of 2014. Additionally, evidence shows that telephone lines with roster information were set up, donation pages on the internet continued to be utilized to solicit funds, and gunmen traveled back and forth from other states to do duty at the Ranch. The purpose of these missions was to ensure Cliven Bundy was not arrested and that BLM did not return to the public lands either to impound the cattle or for any other purpose.

Finally, Bundy and his followers continued to glamorize their April 12, 2014 "victory" over the federal government and continued to threaten any law enforcement entity that contemplated enforcing the Court Orders in Nevada.

**E.     Burleson's Role in the Offense.**

As the evidence established at trial, Burleson was a gunman in the wash on April 12. He learned of the Bundys' efforts to thwart the impoundment days prior to traveling. He posted a status update on Facebook prior to traveling to Bunkerville advising others to pack a gas mark or desert goggles and a good thick

face mask/bandana.  He posted another update seeking someone to braid his like "Ragnar's from Vikings…" because he was "going into 'battle'" and wanted to present Burleson's "adversary a beautiful scalp/trophy . . . if he can survive the journey to collect said trophy."

Burleson arrived in the area of the Toquop Wash on the morning of April 12, having traveled straight there from Arizona with other self-described militia members.  Burleson brought an AK-47, an AR-15, a shotgun, a .40 caliber handgun, a 9-millimeter handgun, 1,000 rounds of ammunition per weapon, a three-foot katana sword, a battle axe, body armor, and a gas mask.  The evidence shows that Burleson left Arizona with the express intent of joining Bundy in a violent confrontation with federal law enforcement officers and "fully expected to die." Burleson stated the following in his UCO interview:

> "I went there for the purpose of engaging rogue federal agents that were breaking the law, that were breaking their oath to the Constitution. I literally went there to put them six feet under. I was hell bent on killing federal agents that had turned their back on we the people, broke their oath to the Constitution and were acting in an extremely unlawful manner against private citizens."

Evidence introduced at trial, specifically video and photographic images, show that Burleson was in the wash, brandishing an assault rifle (with its clip inserted), during the assault on the gate.  Video images capture Ammon Bundy, a leader on the ground in the wash, motioning for Burleson, who held a tactical position behind a bush, to move.  Burleson then moved to higher ground where he would achieve a better tactical advantage over the law enforcement officers guarding the gate.

The law enforcement officers repeatedly told Burleson and his fellow gunmen to disperse and leave the area.  They refused.  Many of the victim officers have stated that the movement of the gunmen in the wash, in and out of the assault group, refusing to leave and taking tactically superior positions on the high ground, caused the officers to fear immediate bodily harm or death.  At one point, the officers at the gate called out that there were "more guns than they could count."  The movement of the gunmen, like Burleson, gave the assaulters an advantage and caused the officers to lose track of them, further endangering them.

Burleson was fully aware of his actions.  He told the UCO that:

> They (BLM OFFICERS) knew they were all dead meat once the first shot went off, no matter who shot it. They knew that they would have died. Why do you think they backed off? They were outnumbered. They were out positioned. They were boxed in. The only way that they had to go out was backwards, away from everybody else, and, in going backwards, away from everybody else, they had to give up their position so we could go and retrieve Mr. Bundy's cattle for him.

Immediately after the assault, Burleson openly celebrated his role in forcing the officers out of the area.  Burleson posted pictures of the assault on Facebook with the following comments:  "That right there is a True American Militia;" and "Today we drove BLM thugs from the battle, Drove 8 hours, no sleep for 24, got there, KICKED ASS and smoked a Cohiba ... Round one is ours, gonna go back in a couple days to make sure the Fed Bastards got the message."

During his UCO interview, Burleson stated that when he left Bundy Ranch, he wished law enforcement had pulled him over:

> I just engaged the federal government. I just engaged rogue federal agents that were assaulting and abusing their power on U.S. citizens. I

9

was wishing that one of them would be stupid enough to try to pull me over for some bullshit reason because I would have capped him.... I would have capped him, and I would have taken his badge and his guns and whatever else I could have, and I would have called up the FBI. I've been involved with them because of a situation that happened here in Arizona a couple of years ago. I would have called them up and said, I just got one of your boys. He fucked up.

Evidence further shows that Burleson returned to the Ranch after April 12, engaging in reconnaissance patrols and manning armed check points on public roads to prevent and deter law enforcement officers from taking further enforcement actions against Bundy and his co-conspirators.

After April 12, pictures and videos of Burleson assaulting law enforcement officers went viral both in mainstream media and within the so-called "Patriot" militia community.  On April 15, 2014, Burleson upload a photo to Facebook showing him in the wash during the April 12 assault.  In response to a comment asking what he was hunting for, Burleson responded, "Federal agents, they are pointing their weapons at me in this photo, I'm ready to take them out...."

On May 5, 2014, Burleson shared a link on Facebook to the article "I-Team: Police say Bundy Ranch Protestors not off the Hook" with the message:

"WTF?!?!?!? The COPS were in fear of the lives! Those MUTHER FUCKERS pointed guns at unarmed men women and children and say THEY were in fear of their Lives!?!?!?!? ATTENTION LV Metro, I AM ONE OF THE GUYS WHO POINTED MY WEAPON AT YOU, If you'd like I can notify you when I go up to the ranch again, you can pull me over and TRY to arrest me, you ain't gonna like the outcome [...]"

On May 13, 2014, Burleson warned that he would use force and violence in retaliation for any law enforcement actions against his co-conspirators, sharing  an

article on Facebook titled "[Video] Metro PD: Militia at Bundy Ranch Who Pointed

Rifles at Officers May Still Face Charges" with the message:

> "They just don't get it. Okay, ATTENTION FBI, Arrest just ONE militia person for the Bundy situation and the rest of us will burn this whole damned thing to the ground. Understand? We The People have the RIGHT to defend our people, again one last Warning, Arrest even One of the militia from the Bundy Ranch Stand off and WE WILL Burn you to the ground, that includes your wives and children too..."

On May 16, 2014, Burleson stated on Facebook regarding the April 12

assault, "We had guns and were ready to die." The same day, he also stated:

> "The next stand off … let's just say it is going to go down … I'm not retraining myself. I must show people how it is done, they still won't follow my lead, but then again, they will be forced to defend themselves, and they will blame me for starting it, I won't care."

On June 3, 2014, Burleson messaged a person on Facebook the following:

> "Unfortunately I'm in Berserker mode, and will stay there, seems TPTB (The Powers That Be) aren't none too happy about my Nevada Safarai. But that's okay, they know I am in high alert mode, Scuttlebutt says, the party was supposed to start in Nevada but their minions lost their nerve when they realized they would go out in body bags. The next trigger has been squeezed …. So, cousin, we are gonna have a multi point war happen, Civil War, Race War, Religious War, Bolsheviks and so on and on. Local boys are trying to get me to soften up a little...Futile process, considering I have a target on my back. Soooo, I'm egging them on to make a move, testing their nerve against mine. Never mess with a man who lives to die in battle...."

On January 16, 2015, during a consensually recorded telephone call with an

FBI agent, Burleson discussed the April 12 assault. Burleson stated that "we

basically boxed in the BLM put them in a kill box. They had nowhere to go."

Burleson admitted that he "had sighted in a couple of guys." Burleson stated, "[W]e

were a fraction of a second away from a blood bath. . . . If a BLM Agent would have

shot a tear gas canister.  They all would have died." Burleson also admitted that he had the BLM SAC's "head right in my sights."

On December 15, 2015, Burleson shared a Facebook post from co-defendant Ryan Payne, stating:  "If I am a terrorist for upholding and defending the supreme law of the land and its supporters and upholders, then labels be damned. I'll continue to uphold the Constitution, support its defenders, and defend The People under any label which they attribute to those actions."

### III.    Legal Standard.

Proper sentencing procedure requires that, before imposing sentence, the district court: (1) correctly calculate the Sentencing Guidelines range; (2) treat the Guidelines as advisory; (3) consider the 18 U.S.C. § 3553(a) factors; (4) choose a sentence that is not based on clearly erroneous facts; (5) adequately explain the sentence; and (6) not presume that the Guidelines range is reasonable.  *United States v. Carty*, 520 F.3d 984, 991-93 (9th Cir. 2008).  When the court imposes a sentence within the Guidelines range, "'it is probable that the sentence is reasonable'" because the court's application of the § 3553(a) factors accords with the Sentencing Commission's independent application of those factors in the "mine run of cases." *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).

It would constitute procedural error, however, for the court to "attach [ ] a presumption of reasonableness to the Guidelines range or weight[ ] the Guidelines range more heavily than other § 3553(a) factors." *Carty*, 520 F.3d at 994.  The

"Guidelines should be the starting point and the initial benchmark," but the sentencing court must also consider the § 3553(a) factors "in determining the appropriate sentence." *Nelson v. United States*, 550 U.S. 350, 352 (2009).

## IV.   The PSR's Offense Level Computation is Correct.

### 1.   Counts 5, 8, 12, 14 and 16

The PSR correctly calculated the offense level for Counts 5, 8, 12, 14, and 16, before any upward departures, at 35.  Burleson did not file objections to these calculations; however, the government notes the following.  As to Count 5, both the adjustments under §2A2.2(b)(7), §111(B) conviction, and 3A1.2, official victim, apply because Congress instructed the Sentencing Commission to consider "the extent to which sentencing enhancements within the Federal guidelines and the authority of the court to impose a sentence in excess of the applicable guideline range are adequate to ensure punishment at or near the maximum penalty for the most egregious conduct covered by 18 U.S.C. §§ 111 and 115.  §2A2.2, comment (backg'd).

As to Counts 14 and 16, under §2B3.2(b)(2), "'loss to the victim' means any demand paid plus any additional consequential loss from the offense. §2B3.2 comment, n.4.  Thus §2B3.2(b)(2)'s definition of loss is more expansive that the loss definition under the general economic crime guideline, §2B1.1.  *See* Roger W. Haines, Frank O. Bowman III & Jennifer C. Woll, *Federal Sentencing Guidelines Handbook* at 522-23 (2016-17 ed.).  In this case, the minimum cost to the government related to the extortive demands is over $1.5 million as summarized

BLM Special Agent Kent Kleman's declaration provided to the United States Probation Office.

### B.    Counts 6, 9, and 15

The PSR correctly calculated the mandatory minimum sentence for Counts 6, 9, and 15, which must run consecutive to Counts 5, 8, 12, 14, and 16. A defendant who is convicted under 18 U.S.C. § 924(c) of using or carrying a firearm "during and in relation to any crime of violence" is subject to a 7-year mandatory minimum term of imprisonment if the firearm is brandished, 18 U.S.C. § 924(c)(1)(A)(ii), and a 25-year minimum term of imprisonment for any "second or subsequent" conviction, §924(c)(1)(C)(i).

In *Deal v. United States*, 508 U.S. 129 (1993), the Supreme Court held that "when the government charges more than one § 924(c) offense in a single indictment, each additional count is to be treated as a 'second or subsequent' conviction for purposes of 18 U.S.C. § 924(c)(1)(C)(i) and therefore carries a mandatory minimum sentence of twenty-five years." *United States v. Beltran-Moreno*, 556 F.3d 913, 915 (9th Cir. 2009). Moreover, because the statute demands that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed," § 924(c)(1)D)(ii), "each independent § 924(c) count in the indictment imposes a *consecutive* sentence in addition to any other sentence imposed, either under § 924(c) or under any other counts for which the defendant has been convicted." *Beltran-Moreno*, 556 F.3d at 915 (emphasis in original).

Under longstanding Ninth Circuit precedent, "a defendant may be convicted and sentenced for multiple violations of § 924(c) so long as 'each 924(c)(1) count [is] supported by a separate predicate offense.'" *Id.* at 916 (quoting *United States v. Smith*, 924 F.2d 889, 894 (9th Cir. 1991)) (alteration in original). "Whether or not one predicate offense is independent from another depends on whether the two offenses would be independent for double jeopardy purposes under the *Blockburger* test." *Id.*; *see Blockburger v. United States,* 284 U.S. 299 (1932). The *Blockburger* test focuses on the statutory elements of each offense and is satisfied if each statute "requires proof of a fact that the other does not . . . notwithstanding a substantial overlap in the proof offered to establish the crimes." *United States v. Wahchumwah*, 710 F.3d 862, 869 (9th Cir. 2013) (quoting *Albernaz v. United States*, 450 U.S. 333, 338 (1981)). For multiple § 924(c) charges, "if the elements of the . . . predicate offenses are different, each may form the basis of a firearm count notwithstanding that [the] offenses stem from the same set of facts." *United States v. Castaneda*, 9 F.3d 761, 765 (9th Cir. 1993) *overruled in other part by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000); *see also United States v. Andrews*, 75 F.3d 552, 558 (9th Cir. 1996) ("[C]rimes occurring as part of the same underlying occurrence may constitute separate predicate offenses if properly charged as separate crimes.").

Defendant Burleson was convicted of three § 924(c) offenses and is subject to a mandatory minimum sentence of 57 years' imprisonment on those counts. As Magistrate Judge Leen concluded in her Report and Recommendation recommending the denial of Defendant Ryan C. Bundy's Motion to Dismiss on

Grounds of Multiplicity, the three predicate offenses underlying the § 924(c) counts satisfy the *Blockburger* test.   ECF No. 1251 at 19–22 [hereinafter Report and Recommendation].   The three § 924(c) counts—counts six, nine, and fifteen—refer to the crimes of violence charged in counts five, eight, and fourteen.   *See* Superseding Indictment 42–47, 50–52.   Count five charges assault on a federal officer, in violation of 18 U.S.C. § 111(a)(1), (b); count eight charges a threat against a federal law enforcement officer, in violation of 18 U.S.C. § 115(a)(1)(B); and count fourteen charges Hobbs Act extortion, in violation of 18 U.S.C. § 1951.   These charges each require proof of an element not present in the others:

> [T]o prove forcible assault on a federal officer under § 111(b), the government must prove that defendants forcibly assaulted a federal officer. . . . No other offense requires proof of this fact. To convict under § 115(a)(1)(B), the government must prove that a defendant made a threat against a federal law enforcement officer, United States official or judge. No other offense requires proof of this fact. . . . To prove the extortion by force under § 1951, the government must prove that defendants obtained something of value from another with his consent induced by the wrongful use of force, fear, or threats. . . . No other offense requires proof of this fact. Although terms such as "assault," "threats," "obstruction," and "extortion" may appear similar, they are legally distinct concepts with specific definitions. The court's review of the elements reveals that the *Blockburger* test is satisfied.

Report and Recommendation at 20 (citations omitted).

Because the underlying predicate offenses supporting Burleson's conviction on three § 924(c) counts satisfy the *Blockburger* test, the court is obligated under § 924(c) to impose a 7-year mandatory minimum sentence for the first violation and consecutive 25-year mandatory minimums for the two additional violations.   *See*

*Beltran-Moreno*, 556 F.3d at 916.  The fact that these convictions arose out of the defendants' actions on a single day is irrelevant for purposes of the analysis. *See United States v. Zepeda*, 792 F.3d 1103, 1116 (9th Cir. 2015) (affirming consecutive sentences on four § 924(c) charges arising out of a single criminal episode as "the only sentence the district court could impose").

### C.     The Court should apply a Terrorism Adjustment Under Section 3A1.4.

The Court should apply an upward adjustment of 7 levels under U.S.S.G. § 3A1.4 as to Counts 5, 8, 12, 14, and 16.[1]  While § 3A1.4 applies expressly to federal crimes of terrorism enumerated under 18 U.S.C. §233(b)(g)(5), Commentary Note 4 to that section notes that "there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 3332b(g)(5)(B) . . . ."  This is clearly such case.

Burleson, through words and actions, demonstrated that his purpose in assaulting, threating, and extorting federal officials was to coerce the federal government.  Burleson's purpose in traveling from Phoenix-- to come to the aid of someone he never met, over cattle in which he had no interest, and spending his own funds in the process—was to contribute to Bundy's show of force.  As he

---

[1] USSG §2B3.2 anticipates harm to one or a few people, thus the application notes state that an upward departure may be appropriate in a case such as this, where there are numerous victims. §2B3.2 comment, n.7. Similarly, 2A6.2 comment, n.4(B) states that an upward departure may be warranted when there are multiple victims.

17

acknowledges, he was prepared to die in battle against federal law enforcement. But more than that - he was prepared to kill federal officers.  The reason Burleson celebrated his perceived victory over the federal government in such a public way was to send a message to federal officers that he and others who assaulted, threatened, and extorted them on April 12, 2014, were armed and prepared to confront them if they took any further actions.  Thus, Burleson's criminal conduct was aimed to influence and coerce the federal government.  Applying a seven-level adjustment under U.S.S.G. § 3A1.4 as to Counts 5, 8, 12, 14, and 16 would result in a Total Offense Level of 42.  A Level 42 and a Criminal History Category II results in a recommended Guideline sentence of 360 months to life in prison.  As set forth above the mandatory minimum sentence of 57 years (684 months) must run consecutive to the sentence as to Counts 5, 8, 12, 14, and 16.

## V.    The Equivalent of Life Imprisonment Is Consistent with the Section 3553(a) Factors.

Section 3553(a) requires the Court to impose a sentence "sufficient but not greater than necessary to comply" with the factors articulated in subparagraph 2. 18 U.S.C. § 3553(a).  The government submits that the overall nature of the offense and the characteristics of the offender, when combined with the circumstances under which the offense was committed, justify a sentence of that will result in Burleson serving the remainder of his life in prison.

18

### A.   The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense.

The recommended Guideline sentence, combined with the mandatory minimum consecutive sentence, is reasonable when considering the seriousness of the conduct at issue.  Burleson committed multiple crime of violence in concert with Cliven Bundy and his followers in order to threaten and coerce federal law enforcement officers from carrying out their lawful duties.  In so doing, he showed no respect for the law, for the rule of law, for law enforcement officers, for court orders, or for the community.  He was prepared and willing to kill law enforcement officers because they were enforcing the law.

Burleson was highly motivated to commit the crime and to confront law enforcement officers with violence.  As set forth above, Burleson stated he was coming to Nevada to engage with law enforcement.  He then travelled to Nevada with an arsenal of weapons and in fact assaulted, threated and extorted federal officers.   And if that was not enough, Burleson continued to threaten law enforcement and glorify his lawlessness up through the Superseding Indictment in this case.  Like Bundy, Burleson became a law unto himself and he was determined to use force and threats of force to enforce his view of the law.

Burleson's violent conduct greatly affected the victims in this case.  During trial, the Court heard from 15 federal officers, who all testified about their fear on April 12, 2014, and many of whom testified to experiencing trauma after the assault.  *See* PSR at 69-70.  The Court also heard from five local law enforcement officials, including now Sheriff Lombardo, who similarly testified regarding their

fear on April 12.  In addition, the Court has detailed victim impact statements from four federal officers describing the deep trauma they suffered as a result of the April 12, assault.  *See* PSR at 21-30.

### B.    Burleson's History and Characteristics.

Burleson has a history of violent conduct and threats.  Before April 12, 2014, Burleson was active in the so-called militia movement in Arizona for several years. He claimed to be a member of AIM, the Arizona Independent Militia, of which he was the only member.  However, he associated with many other self-described militia groups in Arizona, such as the Sonoran Desert Patrol, and the Arizona First Pathfinders.  After receiving a DUI on February 6, 2012, and subsequently losing his job, Burleson made several comments that he was going to harm or kill law enforcement officers if they messed with him further.

This type of violent rhetoric increased in frequency and severity leading up to his involvement in the assault and extortion of federal law enforcement officer in April 2014.  For example, on March 22, 2014, Burleson shared a link on Facebook and posted, "It's time to start shooting cops... FACT: Nation Wide all LEO's are outnumbered by street gangs 6:1 (2011 FBI official stats) Nationwide We the People Outnumber Gangs 1000:1. We the People do NOT NEED COPS, They need us. Just remember that."

On January 5, 2015, Burleson was arrested and charged by the Pinal County Attorney's Office with Aggravated Assault for brandishing a handgun at another driver during a road rage incident.  Inside his vehicle, Burleson had two handguns

with two loaded magazines, an AK-47 with 13 loaded magazines, 20 additional boxes of 7.62 x 39mm ammo, brass knuckles with spikes, camouflage tactical gear, and a handcuff key.  On October 22, 2015, Burleson pleaded guilty to Disorderly Conduct with a deadly weapon (ARS 13-2904), which is a Class 6 uncharacterized, and was sentenced to two years' probation.  On December 11, 2015, after Burleson pleaded guilty to charges related to the road rage incident, he took to Facebook to complain about his case and publicly identified his victim and the victim's city of residence and posted the Facebook page of the victim's business.

Burleson was an active presence on social media showing his violent disdain for people of the Islamic faith.  On May 29, 2015, Burleson attended a "protest rally" for "freedom of speech" and a "draw Mohammed" contest staged in front of the Islamic Community Center of Phoenix (ICCP).  During the protest, Burleson wore a hatchet on his hip and associated with numerous other self-described militia members dressed in full camouflage who were armed with handguns and assault rifles.

On June 5, 2015, Burleson posted the following on Facebook: "And so it begins, a call from a Filthy muslim to curtail FREE SPEACH.  Note to all muslims, assimilate to OUR CULTURE, Leave or DIE, your choice."  On July 16, 2015, Burleson posted the following on Facebook: "Need to pay another visit to that mosque by the freeway... Muslim filth kills Marines in Tennessee...ARE YOU MAD YET?!  Do we have the moral ground to wipe them from our lands yet?"  On December 14, 2015, Burleson posted the following on Facebook:



Burleson has also taken to Facebook to post violent rants and threats against then President Obama.  On March 29, 2014, Burleson posted the following on Facebook: "That's ok, he's a walking dead man anyways. HEY FBI and DHS! If this stupid n[****] comes back to Arizona I WILL KILL IT. Try and stop me Bitches. Seriously, you have a One Mile radius to cover, in the WILD WEST.  Yes I am dedicated to KILL yer N[*****] and anybody who is on his 'Team'. ~ American Militia, Patriot and BERSERKER, you won't be able to stop me."

On June 3, 2014 Burleson posted the following on Facebook:  "Here it IS! Impeach this illegal alien Halfrican, or should we just call him a Islamic N[****]? anyways, Do we get to hang him from a lamp post now?"

On June 16, 2014, Burleson posted the following on Facebook:

"ATTENTION Obamabot Trolls and ALphabete agencies... Ahem.. Barry Sotero, AKA Barach Obama is an illegal alien, a spy for foreign nations, he is a Islamic PIECE OF SHIT. Obama is a Half breed N[*****] and one day I HOPE to CHANGE this situation by Stringing that fucking POS Halfbreed socialist islamic n[*****] from a lamp post in front of the whitehouse as I burn DC to ASH. Now come and get me, I fucking dare ya... pussies."

On November 29, 2015, Burleson posted the following on Facebook:

**Greg Burleson**
November 29, 2015 ·

Okay people, for those who know me in person.
FAIR WARNING
ATTN:FBI TERRORIST THREAT ASSESSMENT: Greg Burleson has been
prescribed Steroids by his eye doctor.
APPROACH WITH EXTREME CAUTION:
BEST TO STEAR CLEAR AND NOT MAKE AGGRESSIVE CONTACT:
That is all 😊

On December 20, 2015, Burleson posted to Facebook that, "I'm on the terrorist watch list. It's a badge of honor."

It appears Burleson's eyesight began to deteriorate in late 2015.  Despite any loss of vision, however, Burleson continues to be a danger to the community.

### C.    The Need for the Sentence to Promote Respect for the Law and to Afford Adequate Deterrence.

The recommended sentence will promote respect for the law and afford an adequate deterrence to others.  Burleson was very public in flaunting his disrespect for the law.  Burleson has long affiliated with the so-called Militia and Patriot Movements, which ascribe to the belief that the federal government is an enemy of the constitution that must be dealt with by force.  Burleson has confirmed this belief system by his actions and words.

General deterrence is one of the prescribed goals of every sentencing.  18 U.S.C. § 3553(a)(2)(B); *see also United States v. Onuoha*, 820 F.3d 1049, 1055 (9th Cir. 2016 (noting that the government has "an interest in gaining a trial conviction to show others that such conduct will result predictably in conviction and a serious penalty of incarceration"); *United States v. Dyer*, 216 F.3d 568, 570 (7th Cir. 2000)

23

(noting one principal objective of criminal punishment is deterrence).   General deterrence is a significant factor in the present case.   Further, general deterrence depends upon the public seeing some consequence for criminal conduct - not only among potential wrongdoers who may be deterred from committing crimes, but also among law-abiding citizens who need assurance that the criminal justice system will do its utmost to protect law enforcement from harm.

Burleson's convictions are grounded not only in violence and his lawless acts, but also in his complete disregard for the rule of law.   Burleson came to Bunkerville for the express purpose of engaging federal law enforcement officers and brought weapons and ammunition with him.

The inescapable corollary is that Burleson will do it again – whether by himself and/or by inciting and encouraging others to act. His rhetoric and his conduct relating to these charges make clear that he has not changed his mind about the federal government, federal law enforcement authorities, or the law.   As demonstrated above, Burleson has essentially declared a personal war against the federal government and wishes to die in battle – and take others with him.   There has been no evidence adduced during this massive investigation, or during the lengthy trial, to suggest that he has changed his mind about any of that.

The sentence in this case should send a clear message that the Bundy Ranch standoff is a felony crime of violence, not a patriotic act that others should emulate. Burleson placed numerous law enforcement and federal officials' lives in jeopardy by his armed participation in the violent confrontation orchestrated by Bundy.   A

24

lengthy guideline sentence of imprisonment will send the appropriate message that the Court will not tolerate individuals using violence to impede and thwart legitimate law enforcement activities and Orders of the Court.

**WHEREFORE**, for all the foregoing reasons, the Court should impose a sentence of 360 months as to Counts 5, 8, 12, 14, and 16; and a consecutive sentence of 57 years as to Counts 6, 9 and 15.

**DATED** this 19rd day of July, 2017.

Respectfully,

STEVEN W. MYHRE
Acting United States Attorney

*/s/ Steven W. Myhre*

_____
NICHOLAS D. DICKINSON
NADIA J. AHMED
Assistant United States Attorneys
ERIN M. CREEGAN
Special Assistant United States Attorney

*Attorneys for the United States*

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the United States Attorney's Office.  A copy of the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was served upon counsel of record, via Electronic Case Filing (ECF).

**DATED** this 19th day of July, 2017.


*/s/ Steven W. Myhre*

_____
STEVEN W. MYHRE
Acting United State Attorney