—2:16-cr-46-GMN-PAL—

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEVADA

3  UNITED STATES OF AMERICA,      )  CASE NO. 2:16-CR-46-GMN-PAL
                                  )
4                 Plaintiff,      )  LAS VEGAS, NEVADA
                                  )  JULY 31, 2017
5         vs.                     )  9:14 A.M.
                                  )  COURTROOM 7C
6  ERIC J. PARKER (11),           )
   O. SCOTT DREXLER (12),         )  JURY TRIAL, DAY 12
7  RICHARD R. LOVELIEN (13),      )
   STEVEN A. STEWART (14),        )
8                                 )
                  DEFENDANTS.     )
9  _____)
                                  )
10                                )

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13           BEFORE THE HONORABLE GLORIA M. NAVARRO,
                UNITED STATES DISTRICT CHIEF JUDGE

14

15  APPEARANCES:
    FOR THE PLAINTIFF:
16
            STEVEN W. MYHRE, AUSA
17          NADIA JANJUA AHMED, AUSA
            ERIN M. CREEGAN, SAUSA
18          United States Attorney's Office
            501 Las Vegas Boulevard South, Suite 1100
19          Las Vegas, Nevada 89101
            (702) 388-6336
20  (continued next page)

21  Court Reporter:        Patricia L. Ganci, RMR, CRR, CCR 937
                           United States District Court
22                         333 Las Vegas Boulevard South, Room 1334
                           Las Vegas, Nevada 89101
23                         PG@nvd.uscourts.gov

24  Proceedings reported by machine shorthand.  Transcript produced
    by computer-aided transcription.
25

```
────────────────2:16-cr-46-GMN-PAL────────────────
```

1   APPEARANCES CONTINUED:

2   For Defendant Eric J. Parker:

3           JESS R. MARCHESE, ESQ.
            Law Office of Jess R. Marchese
4           601 Las Vegas Boulevard South
            Las Vegas, Nevada 89101
5           (702) 385-5377

6   For Defendant O. Scott Drexler:

7           TODD M. LEVENTHAL, ESQ.
            Leventhal and Associates
8           626 South Third Street
            Las Vegas, Nevada 89101
9           (702) 472-8686

10  For Defendant Richard R. Lovelien:

11          SHAWN R. PEREZ, ESQ.
            Law Office of Shawn R. Perez
12          626 South Third Street
            Las Vegas, Nevada 89101
13          (702) 485-3977

14  For Defendant Steven A. Stewart:

15          RICHARD E. TANASI, ESQ.
            Tanasi Law Offices
16          601 South 7th Street, 2nd Floor
            Las Vegas, Nevada 89101
17          (702) 906-2411

18
    Also Present:
19
            Sharon Gavin, Special Agent, FBI
20          Joel Willis, Special Agent, FBI
            Mike Abercrombie, FBI
21          Mamie Ott, Legal Assistant

22

23

24

25

─2:16-cr-46-GMN-PAL─

1                        INDEX OF EXAMINATIONS

2  TESTIMONY OF ROBERT HOWARD SHILAIKIS
     Redirect Examination by Ms. Creegan        8
3    Cross-Examination by Mr. Tanasi            32
     Cross-Examination by Mr. Marchese          42
4    Cross-Examination by Mr. Perez             65
     Cross-Examination by Mr. Leventhal         67
5    Redirect Examination by Ms. Creegan        91
     Recross-Examination by Mr. Marchese        97
6    Recross-Examination by Mr. Leventhal       98

7  TESTIMONY OF JOEL WILLIS
     Direct Examination by Mr. Myhre           102

8

9                     GOVERNMENT'S EXHIBIT INDEX

10 Exhibit No.                                Admitted
     26 & 27                                    14
11 28, 29A & B, 30                              19
     6A                                        112
12 19                                          118
     40                                        121
13 177                                         124
     147                                       128
14 137                                         134
     20                                        138
15 139                                         142
     141                                       145
16 142                                         148
     144                                       154
17 145                                         156
     146                                       160
18 24                                          168
     25                                        170
19 159                                         172
     171                                       176
20 161                                         180
     172                                       193
21 140                                         200
     162                                       204
22 163                                         207
     195                                       214
23 196                                         217
     168B                                      223
24 166A                                        229
     167A                                      233
25 169A                                        236
     169C                                      242

```
                    ─2:16-cr-46-GMN-PAL─
```

|   |   |   |
|---|---|---|
| 1 | 169D | 246 |
|   | 50 | 249 |
| 2 | 51 | 251 |
|   | 170 | 255 |

3

4              LAS VEGAS, NEVADA; MONDAY; JULY 31, 2017; 9:14 A.M.

5                                --oOo--

6                       P R O C E E D I N G S

7              THE COURT:  Thank you.  You may be seated.

8              COURTROOM ADMINISTRATOR:  This is the time for jury

9       trial, day 12, Case No. 2:16-cv-046-GMN-PAL, United States of

10      America versus Eric Parker, O. Scott Drexler, Rick Lovelein, and

11      Steven Stewart.

12             THE COURT:  All right.  Before we bring in the jury and

13      have counsel place their appearances on the record, I just want

14      to say a few words to remind everyone about proper conduct in a

15      courtroom and what is expected during the hearing.  It is a

16      courtroom; not a sporting event.  So it is important for

17      everyone to realize that you are not permitted to make any

18      expression of your opinion, whether it be verbally or through

19      body language or anything else that is distracting, no matter

20      how much you approve or disapprove with what is being said and

21      you are hearing.

22             In addition, please also double-check and remember you

23      are not permitted to have any electronic devices with you, so no

24      phones, laptops, pads, any of those things.  Even if they're in

25      the private mode or vibrate mode or turned off, they're still

1   not permitted in the courtroom.  There is no audio recording or

2   video recording that is permitted in the courtroom.  The

3   attorneys do have electronic devices so that they may review

4   discovery and their preparatory information and also to provide

5   that information into the court system so that we can display it

6   for the jury.  Likewise, the marshals and court security

7   officers have communication devices that are electronic so that

8   they may provide security.

9           We do have the podium towards the witness.  Did we

10  finish up with the witness last time?  We did.  Then we stopped

11  a little early, and so we could begin fresh with a new one.  I

12  think that's helpful for the jury as well to keep track.

13          Any other issues that you want me to address before we

14  bring them in?

15          The defendants, as I've told them every day for quite

16  some time now, we do have the same rules that apply to the

17  defendants.  And so if the defendants do exhibit any kind of

18  inappropriate conduct, distracting conduct, trying to

19  communicate with family or the jury or each other during the

20  sidebars or make any expressions of opinions, they will be

21  removed.  We do have the holding cell next door with the speaker

22  system so they can continue to hear the proceedings, but they

23  will not be physically present in the proceedings if they cannot

24  behave accordingly.

25          So should we bring them in?

1          MR. MYHRE:  Yes, Your Honor.  I just wanted to raise

2     one housekeeping matter very quickly.

3          THE COURT:  All right.

4          MR. MYHRE:  The Government intends to lead this morning

5     with Agent Shilaikis, and following him we will present Special

6     Agent Joel Willis from the FBI.  And as I alluded to last week,

7     we intend to present Agent Willis's testimony in two parts, just

8     bringing in documentary evidence in the first part and then

9     later in the trial he will be presenting his summary timeline

10    and so forth.  So I just wanted to alert the Court that that was

11    our intention.  I don't know if the Defense wants to reserve

12    cross or cross after his first part, but I just wanted to let

13    the Court know that's what our intention was.

14         THE COURT:  All right.  So I think the question is,

15    does the Defense want to cross twice?  So cross the first time

16    as to the portion of the direct the first time and cross the

17    second time as to the portion provided in the second direct, or

18    do you want to reserve and just cross the one time?

19         MR. TANASI:  I think we'll reserve, Your Honor.

20         MR. MARCHESE:  I concur, Parker.

21         MR. LEVENTHAL:  I'd reserve my reservation.  Can I do

22    that?  I don't know how it's going to come out.  So if I see the

23    need to cross him on his first testimony, then I'll inform the

24    Court.  If not, then I'll reserve, but ...

25         THE COURT:  All right.  So I'll just ask any cross now

———— 2:16-cr-46-GMN-PAL ————

1  and then you can reserve.

2         MR. LEVENTHAL:  Thank you, Your Honor.

3         THE COURT:  If that's what you want, or if not, you can

4  just come up and cross.  Mr. Perez?

5         MR. PEREZ:  I concur with Mr. Leventhal.

6         THE COURT:  All right.  Let's go and ahead bring in the

7  jury, Aaron.

8         COURTROOM ADMINISTRATOR:  Yes, Your Honor.

9         THE COURT:  And then I'll ask the counsel to make their

10  appearances on the record so the jury can remember who everyone

11  is.

12         (Whereupon jury enters the courtroom at 9:22 a.m.)

13         THE COURT:  Jury may go ahead and be seated.  Everyone

14  else may be seated as well.

15         And we welcome back the jury after a weekend break.

16  Will counsel please make their appearances on the record.

17         MR. MYHRE:  Good morning, Your Honor.  Good morning,

18  ladies and gentlemen.  Steve Myhre, Erin Creegan, Nadia Ahmed on

19  behalf of the United States.

20         THE COURT:  Good morning.

21         MR. TANASI:  Good morning, Your Honor.  Thank you.

22  Good morning, folks.  Rich Tanasi for Steven Stewart.  Also with

23  us at counsel table is Tori Bakken and Brian Glynn.  Thank you.

24         MR. MARCHESE:  Good morning, Your Honor.  Good morning,

25  ladies and gentlemen.  Jess Marchese appearing on behalf of Eric

—2:16-cr-46-GMN-PAL—

 1 | Parker.

 2 |         THE COURT:  Good morning.

 3 |         MR. LEVENTHAL:  Good morning, everyone.  Todd Leventhal

 4 | on behalf of Scott Drexler.

 5 |         THE COURT:  Good morning.

 6 |         MR. PEREZ:  Good morning, Your Honor.  Good morning,

 7 | everyone.  Shawn Perez on behalf of Rick Lovelein.

 8 |         THE COURT:  Good morning.

 9 |         All right.  We're going to begin now with a new witness

10 | this morning.  Government may call its next witness.

11 |         MS. CREEGAN:  Thank you, Your Honor.  The United States

12 | calls Special Agent Robert Shilaikis.

13 |         THE COURT:  Good morning, Agent Shilaikis.  Come on up.

14 | You're going to stay over here.  Please stay standing when you

15 | get to that chair.

16 |         THE WITNESS:  Good morning.

17 |         COURTROOM ADMINISTRATOR:  Please raise your right hand.

18 |         ROBERT HOWARD SHILAIKIS, having duly been sworn, was

19 | examined and testified as follows:

20 |         COURTROOM ADMINISTRATOR:  Thank you, sir.  You may be

21 | seated.  Please state your full name and spell your last name.

22 |         THE WITNESS:  My name is Robert Howard Shilaikis,

23 | S-H-I-L-A-I-K-I-S.

24 |                        DIRECT EXAMINATION

25 | BY MS. CREEGAN:

2:16-cr-46-GMN-PAL

1   *Q.*   Good morning, Agent Shilaikis.

2   **A.**   Good morning.

3   *Q.*   Agent Shilaikis, what is your current job or position?

4   **A.**   My current job is I'm a special agent with the Bureau of

5   Land Management Office of Law Enforcement and Security.

6   *Q.*   How long have you held that position?

7   **A.**   I've had it since 20 -- 2011.

8   *Q.*   How long have you been a law enforcement officer?

9   **A.**   This year makes about 29 years.  I started my law

10   enforcement career in 1988.

11   *Q.*   And just very briefly can you explain to the jury your law

12   enforcement experience?

13   **A.**   Yes.  I was with the Air Force Office of Special

14   Investigation was my first academy, and it was the Bolling Air

15   Force Base back in 1988.  I was a special agent active duty

16   along with -- as a civilian agent with OSI until 2007.  And I

17   held various jobs, done various types of investigations from

18   person-on-person crimes to property crimes to the

19   counter-intelligence/antiterrorism, those types of operations.

20   *Q.*   When you were with the Air Force, did you have occasion to

21   deploy abroad?

22   **A.**   Yes.  So I was deployed in four different war zones starting

23   with Desert Storm; from there to Bosnia, Afghanistan, and Iraq.

24   *Q.*   And just generally, I know you've had an extensive career,

25   but do you receive training as a law enforcement officer?

—2:16-cr-46-GMN-PAL—

1   **A.**   Yes.   Throughout my career I receive training, and currently

2   we do quarterly training and inservice training annually within

3   BLM.

4   *Q.*   Are you a sworn federal law enforcement officer?

5   **A.**   Yes, I am.

6   *Q.*   Are you familiar with an impoundment operation that was

7   occurring in Bunkerville, Nevada, in April of 2014?

8   **A.**   Yes, ma'am.

9   *Q.*   Were you assigned to that operation?

10   **A.**   Yes, I was.

11   *Q.*   What was your assignment?

12   **A.**   I was part of the investigative team.   There was

13   approximately 10 of us that were assigned to that.

14   *Q.*   Were you present at the Incident Command Post on April 12,

15   2014?

16   **A.**   Yes, ma'am.

17   *Q.*   Were you working in your official capacity at that time?

18   **A.**   Yes.

19   *Q.*   And what were your duties at that time?

20   **A.**   On the 12th it changed that we were to secure the -- what we

21   call the ICP, the Incident Command Post.   And that was a

22   location where the command was set up, with our dispatch, with

23   our personnel, both law enforcement and civilian, to take care

24   of the over -- the umbrella of gathering all of the cattle that

25   we were there under two federal injunctions.

2:16-cr-46-GMN-PAL

1   Q.  And what was the status of the operation on April 12, 2014,

2   in the morning?

3   A.  On the 12th the operation had ceased to gather cattle.  So

4   we were basically there to protect the Government property, the

5   personnel that there were there, and the cows that were in our

6   custody and control.

7   Q.  And when you started your morning on April 12, 2014, where

8   were you located?

9   A.  I was there at the ICP and then was told that we needed to

10  move up to Post 1, which was the access road into where ICP was

11  off the interstate of I15.

12  Q.  Did you have an understanding of why you were needed at Post

13  1?

14  A.  Yes, from what I was told through Special Agent Mike

15  Johnson --

16          MR. LEVENTHAL:  Objection, hearsay.

17          THE COURT:  Sustained.

18  BY MS. CREEGAN:

19  Q.  Just generally, did you have an understanding of what your

20  duties would be at Post 1?

21  A.  Yes.

22          MR. LEVENTHAL:  Same objection.  It would be

23  foundational, Judge.

24          MS. CREEGAN:  Just asking for his understanding of what

25  his duties were at Post 1.

———2:16-cr-46-GMN-PAL———

1          THE COURT:  Overruled.  He can testify as to what his

2   understanding was of his duty and purpose.

3          MR. LEVENTHAL:  Then I would ask for a foundation as to

4   where he got that understanding from, which would be hearsay.

5          THE COURT:  It wouldn't be hearsay because it wouldn't

6   be an out-of-court statement.  It's his understanding.  It's

7   not -- we can get the foundation as to who told him.  I think he

8   already said it was Officer Johnson.

9   BY MS. CREEGAN:

10  Q.  Did you receive an assignment from your supervisor?

11  A.  Yes.

12  Q.  What was your understanding of that assignment?

13  A.  My understanding was to secure Post 1.  We anticipated --

14  Cliven Bundy had called for the protestors and militia to come

15  and take back the cattle.  And we were to secure that location

16  to keep that from happening.

17  Q.  And while you were at Post 1, were there any investigative

18  steps that you took while you there?

19  A.  Yes.  Based on what was developing in front of me, I took

20  upon it myself to go ahead and start videoing that day, the

21  events that occurred that day.

22  Q.  Have you previously had an opportunity to review

23  Government's Exhibits 26 and 27?

24  A.  Yes, ma'am.

25  Q.  And are those videos that you took on April 12, 2014?

1  *A.*  Yes.

2  *Q.*  And were they taken at Post 1?

3  *A.*  They're a combination between Post 1 and then when I --

4  myself and Forest Service Law Enforcement Officer Jarvis moved

5  between Post 1 and what we called Post 2, which was the wash

6  area.  We moved to an advantage point so that we could cover

7  that because the main protest and militia were headed down into

8  the wash.

9  *Q.*  Before I ask you about videos taken at your second location,

10  were there some videos that you took at Post 1?

11  *A.*  Yes.

12  *Q.*  Would that include Exhibits 26 and 27?

13  *A.*  Yes, ma'am.

14  *Q.*  Do those fairly and accurately represent what you yourself

15  saw on April 12th, 2014?

16  *A.*  Yes, ma'am.

17         MS. CREEGAN:  Your Honor, the Government moves to admit

18  Exhibits 26 and 27.

19         THE COURT:  Any objection?

20         MR. TANASI:  None from Stewart, Your Honor.

21         MR. MARCHESE:  No, Your Honor.

22         MR. LEVENTHAL:  No, Your Honor.

23         MR. PEREZ:  No, Your Honor.

24         THE COURT:  All right.  Exhibits 26 and 27 will be

25  admitted.  You may go ahead and publish.

                          2:16-cr-46-GMN-PAL

1              MS. CREEGAN:  Thank you.

2              (Government's Exhibits 26 and 27 are admitted.)

3              MS. CREEGAN:  Thank you.  May we bring up 26, please.

4              (Video playing.)

5              MS. CREEGAN:  Can you stop that, please.  So stopping

6    at 21 seconds in Exhibit 26.

7    BY MS. CREEGAN:

8    Q.  And circling an individual in the center of the screen by an

9    American flag.  Did you observe this individual, Agent

10   Shilaikis?

11   A.  Yes, ma'am.

12   Q.  What did you observe about this individual?

13   A.  That he appeared to be militia based on his dress and attire

14   with its -- what appeared to be a tactical vest or bullet-proof

15   vest and what I thought to be a long arm and just in camouflage

16   attire.

17             MS. CREEGAN:  Can we keep playing, please.

18             (Video playing.)

19             MS. CREEGAN:  Can we back up till about 10 seconds and

20   play again, please.

21             (Video playing.)

22             MS. CREEGAN:  And stop there, please.  And just back

23   up, I'm sorry, just a couple seconds.  Sorry.  Can you play that

24   again, please.

25             (Video playing.)

1            MS. CREEGAN:  Stop there.  Thank you.

2    BY MS. CREEGAN:

3    Q.  And circling an individual on the right side of the screen

4    in front of a white truck, did you observe this individual at 15

5    seconds on Exhibit 26?

6    A.  Yes, ma'am.

7    Q.  What did you observe about this individual?

8    A.  Just the same, just kind of dressed with camouflage.

9            MS. CREEGAN:  And can you play for just about a second

10   or two.

11           (Video playing.)

12           MS. CREEGAN:  And just, sorry, one more second.

13           (Video playing.)

14           MS. CREEGAN:  Sorry.  Can you go back to 17, please.  I

15   apologize.

16   BY MS. CREEGAN:

17   Q.  So just circling an individual that appears on the right

18   side of the screen before a white sedan, did you observe this

19   individual on the day?

20   A.  Yes, ma'am.

21   Q.  What did you observe about this individual?

22   A.  The same thing, being tacked out, looked like he had a

23   bullet-proof vest, and he definitely had a long arm rifle.

24           MS. CREEGAN:  Thank you.  You can take that exhibit

25   down.  Can you bring up Exhibit 27, please.  And play from 1

—2:16-cr-46-GMN-PAL—

1 │ minute and 38 seconds on.

2 │         Sorry, 1 minute and 38 seconds.

3 │         (Video playing.)

4 │         MS. CREEGAN:  And stopping a few seconds back, about

5 │ 1:39 -- 1:38, actually.  Can you play.

6 │         (Video playing.)

7 │         MS. CREEGAN:  Stopping.  Thank you.

8 │ BY MS. CREEGAN:

9 │ *Q.* At 1:39, did you observe this individual who appears in the

10 │ center right of the screen right before a white pickup truck?

11 │ *A.* Yes, ma'am.

12 │ *Q.* What did you observe about this individual?

13 │ *A.* The same thing, that configuration of camouflage and just

14 │ what we call kidded up or tacked out, appeared to be militia.

15 │         MS. CREEGAN:  Thank you.  You can take that down.

16 │ BY MS. CREEGAN:

17 │ *Q.* And, Agent Shilaikis, you've already mentioned it, but did

18 │ there come a time when you changed positions?

19 │ *A.* Yes, ma'am.  Based on what we were seeing developing, the

20 │ amount of people were coming into Post 1, the access road, that

21 │ they were continuing down on the backside of I15 down into the

22 │ wash area.  So that's where -- from what I -- appeared to me as

23 │ protestors and appeared to be militia were diving down in the

24 │ bottom, people on horseback.  So we moved to a different area so

25 │ that I could capture that and video it to memorialize it.

———— 2:16-cr-46-GMN-PAL ————

1          MS. CREEGAN:  Can I bring up Exhibit 17, Clip 1, at

2   19:13:03.

3          (Video playing.)

4          MS. CREEGAN:  Thank you.  You can stop there.  This is

5   19:13:06.

6   BY MS. CREEGAN:

7   Q.  Special Agent Shilaikis, do you recognize what is depicted

8   in Exhibit 17 at 19:13:06?

9   A.  Yes, ma'am.

10  Q.  What's this general area that's depicted here?

11  A.  If you look down towards the bottom left-hand corner, that's

12  going towards the ICP.  That's the north and southbound lanes of

13  I15, but in this section of interstate that actually runs east

14  and west.  So the ICP was actually to the north of the

15  interstate.

16  Q.  Can you put an N on the northbound lane and an S on the

17  southbound lane.

18  A.  Yes.  Let me think about this for a second, yeah.  Does it

19  work?

20  Q.  Are you able to draw on the screen with your finger?

21  A.  No, ma'am.

22          COURTROOM ADMINISTRATOR:  Are you able to?

23          THE WITNESS:  I could tell you.

24  BY MS. CREEGAN:

25  Q.  Are you able to describe it to me?  And I'll mark it for

—2:16-cr-46-GMN-PAL—

1   you.  Can you describe to me which one of these bridges is the

2   northbound bridge?

3   *A.*  Yes, ma'am.  My understanding, the one that's up towards the

4   top of the screen is going to be your northbound.  The one

5   towards the bottom of your screen is going to be your southbound

6   lanes.

7   *Q.*  Is that accurate as I've marked it here?

8   *A.*  Yes, ma'am.

9   *Q.*  And, again, which direction is the ICP?

10  *A.*  It's going to be back towards the bottom left of that

11  photograph.

12  *Q.*  So I'm drawing an arrow.  Is this accurate to your

13  description?

14  *A.*  That direction.  That's the wash.  So it will be to -- as

15  I'm looking at it, to the right of that wash.  It's up out of

16  the wash, but just out of the sight of that photograph.

17  *Q.*  And do you see the area that you were located depicted here?

18  *A.*  Yes, I do.

19  *Q.*  And can you just generally describe it so that I can mark it

20  for the jury?

21  *A.*  Yes.  So you see the two vehicles that are by theirselves

22  towards the wash, the two closest to the wash.  That area right

23  there.

24  *Q.*  So this is in the bottom left-hand corner of the screen?

25  *A.*  Yes, ma'am.

——2:16-cr-46-GMN-PAL——

1    Q.  And did you take video from this location as well?

2    **A.**  I did.

3          MS. CREEGAN:  Thank you.  You can take that down.

4    BY MS. CREEGAN:

5    Q.  Have you previously reviewed Government's Exhibits 28, 29A

6    and B, and 30?

7    **A.**  Yes, I did.

8    Q.  Are those videos that you took at that location between Post

9    1 and Post 2?

10   **A.**  Yes, ma'am.

11   Q.  Do they fairly and accurately represent what you yourself

12   saw on April 12th, 2014?

13   **A.**  They do.

14          MS. CREEGAN:  Your Honor, the Government moves to admit

15   Exhibits 28, 29A and B, and 30.

16          THE COURT:  Any objection to Exhibit 28, 29A and B, and

17   Exhibit 30?

18          MR. TANASI:  None from Stewart, Your Honor.

19          MR. MARCHESE:  None from Parker, Your Honor.

20          MR. LEVENTHAL:  No, Your Honor.  Thank you.

21          MR. PEREZ:  None from Lovelein.

22          THE COURT:  All right.  Exhibit 28, Exhibit 29A and B,

23   and Exhibit 30 are admitted.  You may go ahead and publish.

24          MS. CREEGAN:  Thank you, Your Honor.

25          (Government's Exhibits 28, 29A and B, and 30 are

2:16-cr-46-GMN-PAL

 1  admitted.)

 2          MS. CREEGAN:  Can you bring up Exhibit 28, please.

 3          (Video playing.)

 4          MS. CREEGAN:  Can you stop that there, please.  Can you

 5  advance --

 6  BY MS. CREEGAN:

 7  *Q.*  Agent Shilaikis, about how long is this video?

 8  *A.*  I don't recall.  There's 15 segments I videoed.  So each one

 9  are a little bit different.

10  *Q.*  So I'm going to take your attention to some specific areas.

11  Okay?

12          MS. CREEGAN:  So can we advance this to 1 minute and 50

13  seconds.

14          (Video playing.)

15          MS. CREEGAN:  And stop there, please.

16  BY MS. CREEGAN:

17  *Q.*  And drawing your attention to an individual who's behind a

18  white SUV on the left side of the screen at 1 minute and 53

19  seconds.  Did you observe this individual on the day?

20  *A.*  Yes, ma'am.

21  *Q.*  What did you observe about that individual?

22  *A.*  The same thing as the others is that he was tacked out, you

23  know, in a bullet-proof or tactical vest, camouflage, definitely

24  had a long -- long gun or a rifle.

25  *Q.*  Okay.

—2:16-cr-46-GMN-PAL—

 1          MS. CREEGAN:  Can you advance to 3 minutes and 50

 2    seconds.

 3          (Video playing.)

 4          MS. CREEGAN:  And stop there, please.

 5    BY MS. CREEGAN:

 6    Q.  And at 3 minutes and 54 seconds, drawing your attention to

 7    an area on the center right-hand side of the screen.  Did you

 8    observe this on the day?

 9    A.  I did.

10    Q.  What did you observe in the area that I've indicated?

11    A.  The same thing.  That these guys were tacked out in that

12    same kind of configuration as militia, but they were squatted

13    down behind that barrier as if taking cover and concealment from

14    me.

15    Q.  So as a law enforcement officer, does this movement have

16    some significance to you?

17    A.  Yes, it does.

18    Q.  What significance is that?

19    A.  If you look right next to him, this couple in civilian

20    clothes, they're just standing up looking where they're taking

21    cover and concealment.  To me, that's a tactical movement,

22    whether it's in my military career or in law enforcement.

23    Q.  Did that give you concern for your safety?

24    A.  Absolutely.

25    Q.  Why is that?

2:16-cr-46-GMN-PAL

1   **A.**   Because I didn't know what their intentions were at the time

2   other than that they were giving these types of movements that

3   caused me some great concern.

4          MS. CREEGAN:  Can you play, please.

5          (Video playing.)

6          MS. CREEGAN:  Stop there, please.

7   BY MS. CREEGAN:

8   *Q.*  And stopped at 4:16.  Drawing your attention back to the

9   same individuals in front of a white SUV.  Did you observe a

10  change in their movements?

11  **A.**   No, the same two individuals were, you know, tucked down

12  behind that concrete barrier.  The other individual has

13  definitely got a long arm.  He's got it slung in front of him.

14         MS. CREEGAN:  Can you play, please.

15         (Video playing.)

16         MS. CREEGAN:  And stopping there at 4:30.

17  BY MS. CREEGAN:

18  *Q.*  And drawing your attention to an individual in the top left

19  corner of the screen.  Did you observe this individual on the

20  day?

21  **A.**   Yes, ma'am.

22  *Q.*  What did you observe about this individual?

23  **A.**   The same thing.  That he was in that type of configuration

24  with camouflage-type uniform, and that he was -- to me, he

25  didn't appear like a regular protestor.  He was in the back

—2:16-cr-46-GMN-PAL—

1  using his concealment as that edge of that barrier coming off

2  the interstate.

3  Q.  Did that give you any concern for your safety or for the

4  safety of other officers?

5          MR. TANASI:  Objection, leading.

6          THE WITNESS:  Yes.  Absolutely.  My training --

7          MR. LEVENTHAL:  Objection, leading.

8          THE COURT:  Overruled.  He can answer the question.

9          MS. CREEGAN:  Sorry.  I'll ask again.

10 BY MS. CREEGAN:

11 Q.  Did that give you any concern for your safety or for the

12 safety of other officers?

13 A.  Yes.  Absolutely.  Again, based on my training and

14 experience, both military and law enforcement, that he was, lack

15 of a better term, lurking in the shadows, moving.  He didn't

16 appear to be like a regular protestor.

17          MS. CREEGAN:  Can we advance to 8 minutes, please.

18          (Video playing.)

19          MS. CREEGAN:  And stopping there, please.

20 BY MS. CREEGAN:

21 Q.  Stopping at 8:07.  Bringing your attention to an individual

22 in the center of the screen before the red cab of a truck.  Did

23 you observe this individual on April 12th?

24 A.  Yes, ma'am.

25 Q.  What did you observe him to be doing?

2:16-cr-46-GMN-PAL

1    *A.*  The same thing, kidded up.  You know, he appeared to be a

2    militia type.  He had his weapon in what we call the low ready.

3    *Q.*  What's low ready?

4    *A.*  Basically, you know, with law enforcement and also my

5    military experience we're trained to keep our weapon at that low

6    ready, and then we could bring it up at a moment's notice, a

7    nanosecond, to engage targets.

8            MS. CREEGAN:  Can you play, please.

9            (Video playing.)

10           MS. CREEGAN:  And stopping there at 8:19.

11   BY MS. CREEGAN:

12   *Q.*  Drawing your attention to some individuals on the right side

13   of the screen.  Did you observe those individuals?

14   *A.*  I did.

15   *Q.*  What did you observe about them?

16   *A.*  The same is that they were using that concrete Jersey

17   barriers as cover and concealment.

18   *Q.*  Can you tell what this individual on the right-hand side

19   has, if anything?

20   *A.*  I'm not sure in this particular frame, but I'd seen him in

21   the past.

22   *Q.*  What had you seen him with in the past?

23   *A.*  In the video when I was reviewing it that he definitely had

24   a long arm.

25           MS. CREEGAN:  And can you advance to 11 minutes and 20

1   seconds, please.

2          (Video playing.)

3          MS. CREEGAN:  And stopping at -- can you go back to

4   about 11:25.

5   BY MS. CREEGAN:

6   Q.  And circling an individual who appears to be right before a

7   camper at 11:25.  What did you observe this individual to do?

8   A.  Could you repeat the question?

9   Q.  What did you observe this individual to do?

10  A.  It looked like he appeared to -- he pops up from that

11  position with his long arm.  I think it's later in this video

12  right here.

13         MS. CREEGAN:  Can you play, please.

14         (Video playing.)

15         MS. CREEGAN:  And stopping at 11:34.

16  BY MS. CREEGAN:

17  Q.  Over the course of the video since I last asked you, what

18  did you observe the individual to do?

19  A.  When he stood up, it appeared that he brought that weapon

20  around in front of him.

21         MS. CREEGAN:  And can you advance to 12 minutes and 50

22  seconds, please.

23         (Video playing.)

24         MS. CREEGAN:  And stopping at 13:02.

25  BY MS. CREEGAN:

1   *Q.*  Taking your individual -- your attention to two individuals

2   in the bottom right side of the screen.  Did you observe these

3   two individuals on the day?

4   *A.*  Yes, I did.

5   *Q.*  What did you observe about them?

6   *A.*  Again, these two appeared that they definitely knew each

7   other, talking to each other.  The one in the peach-colored

8   pants had a long arm.  You know, it's over his right shoulder.

9   The other one is, you know, same configuration with camouflaged

10  clothing with tack gear and a long arm and a booney hat.

11  *Q.*  What could you observe about the position that they were in?

12  *A.*  It's the same thing that they were not to me from what I was

13  seeing part of the regular protestors.  He was -- they were back

14  in the back using, you know, that area as cover and concealment,

15  walking back and forth.  So to me it was cause for concern.  I

16  didn't know what their intentions were.

17        MS. CREEGAN:  Can you play for a little bit, please.

18        (Video playing.)

19        MS. CREEGAN:  And can you advance to 16 minutes,

20  please.

21        (Video playing.)

22        MS. CREEGAN:  And stop it there, please.

23  BY MS. CREEGAN:

24  *Q.*  Bringing your attention to an individual who is right behind

25  the two people that you were just discussing at 16:08.  Did you

—2:16-cr-46-GMN-PAL—

1  observe that individual?

2  *A.*  Yes, I did.

3  *Q.*  What did you observe them to do?

4  *A.*  Again, it appeared to be part of the, you know, what I

5  believed to be a militia, but he was running down the side of

6  the hill to join these areas.

7  *Q.*  What did you think was significant about his position, if

8  anything?

9  *A.*  Again, he was back behind cover and concealment.  He was out

10  of my view from where my -- my vantage point was.  He was just

11  staying out in the shadows.

12         MS. CREEGAN:  Can you continue to play, please.

13         (Video playing.)

14         MS. CREEGAN:  And stopping it right there at 16:21.

15  BY MS. CREEGAN:

16  *Q.*  There is an individual who has just moved to the right of

17  those individuals.  Did you observe where that individual came

18  from?

19  *A.*  Yeah, it was back from -- based on what I'm looking at on

20  the screen, from left to right, so moving south.

21  *Q.*  Did it give you concern to see that individual?

22  *A.*  Anybody in that configuration caused me concern that day,

23  ma'am.

24  *Q.*  Why was that?

25  *A.*  I honestly thought they were coming to -- to start a fire

-2:16-cr-46-GMN-PAL-

1  fight with the Federal Government.

2  *Q.*  What was the reason that you thought that from your

3  observations?

4  **A.**  Based on their tactics.  You know, my training and

5  experience told me that.  The way they were moving, the way they

6  were communicating, the way they were using cover and

7  concealment, the configuration and gear that they had, all of

8  that came into play.

9          MS. CREEGAN:  Can we bring up Exhibit 30, please.

10         (Video playing.)

11         MS. CREEGAN:  And stopping at 8 seconds.

12  BY MS. CREEGAN:

13  *Q.*  So, Agent Shilaikis, have you just given a time?

14  **A.**  Yes, I did.

15  *Q.*  And what's that time in local Nevada time?

16  **A.**  It was local.

17  *Q.*  Is that military --

18  **A.**  To Nevada.

19  *Q.*  I apologize.  Is that military time that you've just given?

20  **A.**  Yes, ma'am.

21  *Q.*  Could you give it in civilian time?

22  **A.**  You have to repeat it again.  I will.

23         MS. CREEGAN:  Can we go back to the beginning and play.

24         (Video playing.)

25         THE WITNESS:  So the time would be 1:13.

2:16-cr-46-GMN-PAL

 1  BY MS. CREEGAN:

 2  *Q.*  Would that be a.m. or p.m.?

 3  *A.*  P.m.

 4  *Q.*  Do you know what was happening in the wash at that time?

 5  *A.*  Excuse me?

 6  *Q.*  What was happening in the wash at that time?

 7  *A.*  Again, I think everyone -- at this time I believe everybody

 8  was backing off.  We were told to stand down.

 9  *Q.*  When you say "everybody," are you referring to the BLM or

10  someone else?

11  *A.*  Referring to the BLM and those parts of the ICP that we were

12  standing down and we were going to be demobilizing and leaving

13  the area.

14          MS. CREEGAN:  Can you play, please.

15          (Video playing.)

16          MS. CREEGAN:  And stopping at 15 seconds.

17  BY MS. CREEGAN:

18  *Q.*  And circling an individual who appears to be before a dark

19  pickup truck on the right center of the screen.  Did you observe

20  that individual?

21  *A.*  I did.

22  *Q.*  What did you observe about that individual?

23  *A.*  The same deal.  It was how he was configured with tactical

24  gear and all that, and then he was standing up behind the Jersey

25  barrier.

1    *Q.*  Where did he appear to be in relation to the farther-away

2    Jersey barrier on the northbound lane?

3    *A.*  Oh, he was right up against it in the northbound lanes.  So

4    he was closest to me from -- if you were standing on the

5    interstate, that portion of the interstate.

6            MS. CREEGAN:  Can you play to the end, please.

7            (Video playing.)

8            MS. CREEGAN:  Thank you.  You can take that down.

9    BY MS. CREEGAN:

10   *Q.*  Agent Shilaikis, was there an incident command structure at

11   the Incident Command Post?

12   *A.*  Yes, there was.

13   *Q.*  What was the incident -- or the objective of the incident

14   command structure?

15   *A.*  Right, this incident command, the IC, was -- we do it for

16   everything.  We do it for fire.  We do it for big, you know,

17   operations.  This was specifically for the gathering of the

18   cattle, the cattle impoundment.

19   *Q.*  Was what occurred on April 12th, 2014, anticipated by the

20   incident command structure?

21           MR. TANASI:  Objection, leading.

22           THE COURT:  I don't -- well, overruled.

23   BY MS. CREEGAN:

24   *Q.*  Was the incident that the incident command structure was

25   designed to handle, was it what happened on April 12, 2014, or

—2:16-cr-46-GMN-PAL—

1  was it something else?

2  *A.*  No, the only design for the IC was to gather cattle.  No one

3  anticipated the 12th.

4  *Q.*  Were Metro or NHP a part of the incident command structure,

5  to your knowledge?

6  *A.*  I don't -- I'm not aware of that.

7  *Q.*  You took -- you mentioned you took some of these videos on

8  April 12th, 2014.  What was the reason for your doing that?

9  *A.*  Because in my experience, especially in law enforcement, the

10 best evidence is going to be a video or a photograph.  You know,

11 memories fade.  So I absolutely anticipated that there was going

12 to be gunfire that day.  That this militia groups -- that

13 somebody was going to shoot a round, and then there would have

14 been a lot of carnage; to document it.

15 *Q.*  Were you concerned for your safety on April 12th, 2014?

16 *A.*  Yes, ma'am.

17 *Q.*  Why was that?

18 *A.*  It's hard to describe.  I've been in four different war

19 zones.  I had clear missions down range.  We had clear

20 objectives, but what unrolled there, to see that transpire was

21 unnerving, especially to see people that had stopped on the

22 interstate, had no understanding of what was going on and the

23 magnitude of it.  That if there was rounds fired, there was

24 definitely going to be other people that were going to be killed

25 that day.  So it's unnerving.

—2:16-cr-46-GMN-PAL—

 1            MS. CREEGAN:  One moment.

 2            (Government conferring.)

 3            MS. CREEGAN:  Thank you, Agent Shilaikis.  Nothing

 4  further.

 5            THE COURT:  Cross?

 6            MR. TANASI:  Yes, Your Honor.  Thank you.

 7                      CROSS-EXAMINATION

 8  BY MR. TANASI:

 9  Q.  Good morning, Agent Shilaikis.

10  A.  Good morning.

11  Q.  I'm Rich Tanasi.  I represent Steven Stewart.  I have a few

12  questions for you on cross.  Okay, sir?

13  A.  Yes, sir.

14  Q.  All right.  You indicated on direct exam that the operation

15  had -- had ceased, correct, as of -- on the 12th, as of the

16  morning of the 12th, correct?

17  A.  The gathering of the cattle had ceased, yes.

18  Q.  The gathering of cattle had ceased, right?

19            And isn't it true that at least part of the reason that

20  the gathering of the cattle had ceased was because there was a

21  funeral for a helicopter pilot?

22  A.  Yes, that was part of it.

23  Q.  That was part of the reason, fair?

24  A.  Yes, sir.

25  Q.  All right.

1          MR. TANASI:  Brian, if you could bring up Exhibit 6 and

2   go to 29 seconds.

3          Okay.  Actually, we'll start right there for ...

4          Back up just a little, Brian, I apologize, 59 seconds.

5   Go ahead.  Play it.  I think the quality might be a little

6   better on the media player.

7          (Video playing.)

8          MR. TANASI:  Okay.  I apologize, Brian.  If you could

9   please back it up to the 1 minute mark.  Stop.

10  BY MR. TANASI:

11  Q.  The individual that we saw prior while I was kind of dancing

12  around with the time, who was that?

13  A.  Which one?  There was a couple, sir.

14  Q.  The very first individual we saw standing there.

15  A.  Could you back that up, please.

16  Q.  Sure.

17         MR. TANASI:  Brian, if you could back it up.

18         (Video playing.)

19  BY MR. TANASI:

20  Q.  Those folks there, what role in the command structure did

21  they play?

22  A.  These ones here?

23  Q.  Yes, sir.

24  A.  I have no idea.

25  Q.  Okay.

2:16-cr-46-GMN-PAL

1           MR. TANASI:  All right.  Keep playing it, Brian.

2           (Video playing.)

3           MR. TANASI:  Go ahead.  Stop.  Stop it where that one

4  individual kind of walks across the screen, Brian, if you could.

5  And go backwards.

6           (Video playing.)

7           MR. TANASI:  All right.  Stop it there, please.

8  BY MR. TANASI:

9  Q.  These folks here, who are they?

10  A.  Local law enforcement.  So it's going to either be a Nevada

11  Highway Patrol or Las Vegas Metro.

12  Q.  Okay.  What role, if any, did they play in the command

13  structure?

14  A.  They were at Post 1.  Their role, I don't know.  I didn't

15  have information on that.

16  Q.  Okay.

17           MR. TANASI:  Brian, if you could fast-forward it two

18  minutes.

19           Actually, since we're here, let's go back.  There's one

20  individual who crosses the screen roughly at the 1 minute mark.

21  That's what I'm trying to capture.

22           (Video playing.)

23           MR. TANASI:  Right there.  There you go.

24  BY MR. TANASI:

25  Q.  This individual here, sir, can't really see his head, but we

1  can see his body.  Who's he?

2  *A.*  Yeah, at the time that was Special Agent In Charge Dan Love.

3  He was the SAC out of Salt Lake City, Utah, for BLM Region 3.

4  *Q.*  Okay.

5       MR. TANASI:  Brian, if you could go to 2 minutes and 52

6  seconds, please.

7       (Video playing.)

8       MR. TANASI:  Okay.  Stop.

9  BY MR. TANASI:

10  *Q.*  All right.  Who are these two folks?

11  *A.*  The one on the right is Special Agent Dan Love.  The one on

12  the left is -- I don't know who he is.

13  *Q.*  Okay.  Did you overhear this conversation?

14  *A.*  Not from where I was standing, sir, no.

15  *Q.*  Okay.

16       MR. TANASI:  All right.  Brian, if you could go to

17  Exhibit 28, please, 7 minutes and 43 seconds in.

18       (Video playing.)

19       MR. TANASI:  Stop it there, Brian.  Maybe stop it on a

20  clearer picture.  There we go.  Thank you.

21  BY MR. TANASI:

22  *Q.*  All right.  So, sir, drawing on the screen, this is the

23  southbound bridge, correct?

24  *A.*  Yes, sir.

25  *Q.*  All right.  And now behind it is the northbound bridge,

1  correct?

2  **A.**  Yes.

3  *Q.*  Okay.  Would this demonstrate your view of the northbound

4  bridge from where you were standing on the 12th?

5  **A.**  Say this one more time.

6  *Q.*  Would this fairly and accurately depict your view of the

7  northbound bridge when you're standing there on the 12th?

8  **A.**  Yes.

9  *Q.*  So from this vantage point, is this with the naked eye?

10  This is what you would see, fair?

11  **A.**  Yes.

12  *Q.*  All right.

13          MR. TANASI:  All right, Brian.  If you could bring up

14  Exhibit 30, please.  And go to 43 seconds in.

15          Court's indulgence.

16          THE COURT:  Yes.

17          MR. TANASI:  I had 30 admitted, Your Honor.  I just

18  wanted to make sure before I play it.  Aaron, do you show that?

19  Do you show 30 as being admitted?

20          COURTROOM ADMINISTRATOR:  30 is admitted.

21          MR. TANASI:  All right.  Thank you.

22          All right.  43 seconds in please, Brian.

23  BY MR. TANASI:

24  *Q.*  All right.  So looking at this picture, sir, is this -- is

25  this a view of the southbound and northbound bridge?

—2:16-cr-46-GMN-PAL—

1    *A.*  It is.

2    *Q.*  It is.  Okay.  Do you know whose truck that is?

3    *A.*  I do not.

4    *Q.*  Okay, sir.

5          MR. TANASI:  Brian, if you could bring up 28 and go to

6    8:18 in.

7          (Video playing.)

8          MR. TANASI:  If we could maybe stop it where it's

9    clear.

10         (Video playing.)

11   BY MR. TANASI:

12   *Q.*  All right.  So you've -- on direct exam you pointed out that

13   there were individuals on the northbound bridge, fair?

14   *A.*  The what now?

15   *Q.*  On the northbound bridge you've pointed out different

16   individuals on direct exam, correct?

17   *A.*  Yes, I did.

18   *Q.*  Okay.  Now, do you see these two folks here that I'm

19   circling?

20   *A.*  Yes, sir.

21   *Q.*  Okay.  And do you see that there's one standing up?

22   Correct?

23   *A.*  Yep.

24   *Q.*  And then the one to the left, do you see a head there?  Do

25   you see that?

1  *A.*  I do.

2  *Q.*  Okay.

3        MR. TANASI:  Brian, if we could go to 11:20, please.

4        (Video playing.)

5        MR. TANASI:  Okay.  Go ahead and play it.

6        (Video playing.)

7        MR. TANASI:  All right.  Stop.

8  BY MR. TANASI:

9  *Q.*  All right.  Again, circling those two individuals we just

10 talked about at the 18 mark, correct?

11 *A.*  Yes, sir.

12 *Q.*  Okay.  Both of them are standing up, correct?

13 *A.*  Yes.

14 *Q.*  All right.  And isn't it true that the person here was the

15 person who was ducked down, correct?

16 *A.*  Yes.

17 *Q.*  And that person has a camera in their hand, fair?

18 *A.*  I can't tell right here.

19 *Q.*  Why don't we play it.

20        MR. TANASI:  Go ahead, Brian.

21        (Video playing.)

22        MR. TANASI:  Go ahead and stop.

23 BY MR. TANASI:

24 *Q.*  Does that appear to be a camera?

25 *A.*  It does.

—2:16-cr-46-GMN-PAL—

1          MR. TANASI:  All right.  Go ahead, Brian.  Play it.

2          (Video playing.)

3          MR. TANASI:  All right.  Stop.  Thank you.

4          Brian, if we could bring up 26 one more time, please.

5     And if you go to 15 seconds in and stop it at a clear point.

6     BY MR. TANASI:

7     Q.  All right.  On direct exam you identified this individual,

8     correct?

9     A.  Yes, I did.

10    Q.  Okay.  And the note I had is that that's an individual who

11    had camo, camouflage?

12    A.  If I said that, I was mistaken on that.  I was -- I actually

13    didn't pay attention on that one.

14    Q.  Didn't pay attention.  Okay.

15    A.  Well, I don't -- this one is not wearing camouflage right

16    now where you stopped that at this particular slide.

17    Q.  But on direct examination you said he had camouflage on,

18    fair?

19    A.  I did and I was mistaken.

20    Q.  All right.  Thank you.

21          All right.  Sir, you testified that you had some --

22    well, you testified that as to the events on the 12th you were

23    concerned that there would be a fire fight with the Federal

24    Government, correct?

25    A.  I did.

-2:16-cr-46-GMN-PAL-

1  Q.  Okay.  And isn't it true on April 15th, 2014, you authored a

2  report relative to the events that had occurred on the 12th?

3  Correct?

4  A.  I did.

5  Q.  And isn't it true you did not say in that report that you

6  were concerned that there would be a fire fight with the Federal

7  Government?  Isn't that true?

8  A.  Exactly.  That would have been my opinion.

9  Q.  You didn't put that in your report, fair?

10  A.  That's fair.

11  Q.  Okay.  You also testified that you had concern for your

12  safety here on direct exam this morning, correct?

13  A.  I did.

14  Q.  Okay.  Didn't put that in your report either, right?

15  A.  I did not, no.

16  Q.  Okay.  And you also testified this morning that it was

17  unnerving on the 12th.  It was unnerving.  Your words, right?

18  A.  Absolutely.

19  Q.  Didn't put those words into the report that you authored on

20  the 15th, three days after the event itself, correct?

21  A.  I did not.

22  Q.  Okay.  And you'd agree with me that report writing, it's an

23  important function of police work, correct?

24  A.  Yes.

25  Q.  You want to put everything that you're feeling, everything

—2:16-cr-46-GMN-PAL—

1  that you're thinking, everything that you're observing that's

2  important to your case in that report, fair?

3  *A.*  No.

4  *Q.*  You don't want to put everything in the report?

5  *A.*  Not what I'm feeling or anything because at the time I was

6  still a law enforcement officer.  So I looked through it through

7  that scope to write what was factually that happened that day.

8  I didn't negate to put my feelings in my report.

9  *Q.*  You didn't think it was important to put that you thought

10  there would be a fire fight with the United States Government,

11  didn't want to put that in your report, fair?

12  *A.*  I put the facts that happened that day.

13  *Q.*  Okay.  Prior to today's testimony, did you have an

14  opportunity to meet with the U.S. Attorneys Office?

15  *A.*  I did.

16  *Q.*  How many times?

17  *A.*  Counting yesterday?

18  *Q.*  Yes, please.

19  *A.*  For three years, I'm going to estimate four times.

20  *Q.*  Four times.  And how many times had you met with the FBI?

21  *A.*  The FBI?

22  *Q.*  Yes, sir.

23  *A.*  Outside of the U.S. Attorneys Office, none.

24  *Q.*  How about with the U.S. Attorneys Office?

25  *A.*  Every time.

1    Q.   Okay.

2         MR. TANASI:  Thank you, sir.  Nothing further.

3         THE WITNESS:  You're welcome, sir.

4         THE COURT:  Any from Parker?

5         MR. MARCHESE:  Thank you, Your Honor.

6         Okay.  We're going to start with Exhibit 28.  Aaron,

7    it's actually -- I just hooked it up to myself to make it easier

8    for Brian.

9                        CROSS-EXAMINATION

10   BY MR. MARCHESE:

11   Q.   And, sir, do you have Exhibit 28 on your screen?

12   A.   I have an exhibit.  I don't see where it's numbered.

13   Q.   Okay.  I'm just going to play it for a moment just to

14   acclimate you to the exhibit and then I'll stop.

15         (Video playing.)

16   BY MR. MARCHESE:

17   Q.   Okay.  And, sir, do you remember this particular video?

18   A.   Yes, that's the one I recorded.

19   Q.   Okay.  And just to be clear, this was the one that starts at

20   approximately 12:04 p.m.?

21   A.   Yes, sir.

22   Q.   Okay.  And in this particular video, you went over it on

23   direct examination, this was a video which you took of the

24   events on April 12, 2014, correct?

25   A.   It is.

1   Q.  And you had identified an individual on direct examination.

2   I'm going to go for the record to 1 minute and 30 seconds into

3   this.

4        Okay.  And I'm going to circle an individual on the

5   screen.  You recognize that individual, sir?

6   A.  Yeah, I don't know him.

7   Q.  Sure.

8   A.  But if you're asking me if I recognize this particular point

9   in the video, yes.

10  Q.  Okay.  And you've seen him throughout these videos, correct?

11  A.  Yes.

12  Q.  All right.  Now, for the purposes of these -- the

13  cross-examination, we'll call him Black Hat.  Is that fair

14  enough?

15  A.  Yes, sir.

16  Q.  Okay.  Because he's wearing a black hat, correct?

17  A.  Yes.

18  Q.  And it has a white insignia, correct?

19  A.  Yes, sir.

20  Q.  And he appears to be somewhere on the northbound bridge,

21  correct?

22  A.  Yes.

23  Q.  Okay.  Now, to his left, our right, of the screen I'm going

24  to put an X on a motor vehicle there.  Do you see that?

25  A.  Yes.

—2:16-cr-46-GMN-PAL—

1   Q.  Okay.  And that is some sort of a pickup with a camper

2   shell.  Is that right?

3   A.  Yes, it is.

4   Q.  Okay.  And in this particular screen shot, Black Hat just

5   appears to be kneeling, correct?

6   A.  Yes.

7   Q.  And looking to his left.  Is that right?

8   A.  Yes.

9         MR. MARCHESE:  Okay.  I'm going to fast-forward for the

10  record to 2 minutes and 12 seconds.

11  BY MR. MARCHESE:

12  Q.  Okay, sir.  Once again, we have this pickup that I've placed

13  an X on with the camper shell, correct?

14  A.  Yes.

15  Q.  Is it fair to say that that vehicle was parked, didn't move

16  throughout the video?

17  A.  This portion of it, yeah, looked like he was stopped right

18  there.

19  Q.  Okay.  And we have Black Hat once again.  I'm going to

20  circle him again for you.  You'd agree with me that that is him,

21  correct?

22  A.  Yes, sir.

23  Q.  Hasn't moved from the same general location as the last clip

24  that we stopped it at at 1:30, correct?

25  A.  Yes, sir.

—2:16-cr-46-GMN-PAL—

1  Q.  And it appears that he might be looking maybe to his right,

2  our left, of the screen?

3  A.  Yes.

4         MR. MARCHESE:  Okay.  And I'm going to move forward to

5  approximately 24 seconds to 2:36.

6  BY MR. MARCHESE:

7  Q.  Okay, sir.  Once again, we have this parked truck there on

8  the screen.  I put an X on it, correct?

9  A.  Yep.

10  Q.  I'm going to circle Black Hat once again.  You see him

11  there, correct?

12  A.  Yes, sir.

13  Q.  He appears to be kneeling, correct?

14  A.  Yes, sir.

15  Q.  Stayed in the same general vicinity as the last shot,

16  correct?

17  A.  Yes, sir.

18         MR. MARCHESE:  Move forward approximately 23 seconds to

19  2 minutes and 59 seconds.

20  BY MR. MARCHESE:

21  Q.  Okay, sir.  We have the pickup truck once again, correct?

22  A.  Yes, sir.

23  Q.  I'm going to circle the individual.  Probably a little bit

24  fuzzy on the screen, but it does appear that there might be

25  someone kneeling behind the barricade, possibly?

1   *A.*   Yeah, that's a real bad stop on that video.

2   *Q.*   Yeah.  But if you look and you focus on the middle, it does

3   appear that there is an individual there.  Would you agree with

4   me with that?

5   *A.*   If you could move it one frame up or one frame back.  I

6   can't really definitely see it right there.  I'm sorry, sir.

7   *Q.*   Nope.  It's tough.

8   *A.*   That's worse.

9   *Q.*   Yeah.  I'm trying.  Now we're off.

10          Okay.  May or may not be somebody there, fair enough?

11   *A.*   Yes, sir.

12          MR. MARCHESE:  Okay.  And we're going to move forward

13   to 3:54.  Actually, it's 3:53.

14   BY MR. MARCHESE:

15   *Q.*   This is a little bit better than the last one.  You'd agree

16   with me on that, right?

17   *A.*   Yes, sir.

18   *Q.*   Okay.  Got Black Hat here at the edge of this camper truck,

19   correct?

20   *A.*   Yes, sir.

21   *Q.*   Still hasn't moved, correct?

22   *A.*   Yes, sir.

23   *Q.*   Still appears to be in some sort of kneeling position,

24   squatting?

25   *A.*   Yeah.  This --

—2:16-cr-46-GMN-PAL—

1    Q.  Correct?

2    A.  -- particular stop does that show.

3    Q.  You can't see behind the barricade, but obviously he's --

4    he's taller than three feet or whatever that is, right?

5    A.  Yes.

6           MR. MARCHESE:  Okay.  And I'm just going to play it

7    actually for about three seconds here.

8           (Video playing.)

9           MR. MARCHESE:  Okay.  Back it up to 3:56 for the

10   record.  Okay.

11   BY MR. MARCHESE:

12   Q.  And he's still in that general vicinity, correct?

13   A.  Yes.

14   Q.  And it appears might have his left arm just kind of on top

15   of the Jersey barrier railing right there, right?

16   A.  He does.

17   Q.  Doesn't look like there's anything in his hand, though,

18   correct?

19   A.  Not in his left hand, sir, no.

20          MR. MARCHESE:  And we'll go to 4:15 for the record.

21   BY MR. MARCHESE:

22   Q.  Okay.  Same camper truck in the -- little bit to the left of

23   the middle of the screen, correct?

24   A.  Yes, sir.

25   Q.  And then we've got Black Hat here.  Now, he appears to be

—2:16-cr-46-GMN-PAL—

1  standing behind the Jersey barrier on the northbound bridge,

2  correct?

3  *A.*  Yes, sir.

4         MR. MARCHESE:  Okay.  And I'm going to play it until

5  about 4:19.

6         (Video playing.)

7  BY MR. MARCHESE:

8  *Q.*  Okay.  And here we are at 4:16.  He appears once again to be

9  standing and maybe has his arms crossed or something along those

10 lines.  Would you agree with that?

11 *A.*  Yeah, it appears he had that -- his long gun slung on his

12 right shoulder.

13 *Q.*  And then at 4:16, does it appear he might have something in

14 his hand?  He might be checking a phone, possibly?

15 *A.*  He's looking down at his hands.  I don't know what he's got

16 in his hands.

17 *Q.*  Sure.  It does appear, though, that there's something

18 brighter maybe in his hands than the rest of the backdrop?

19 *A.*  Yeah, it's a bright spot.  I don't know if that's the video

20 or what.

21 *Q.*  Sure.

22         MR. MARCHESE:  Move to 4:44 for the record.  Okay.

23 Once again, we have the camper in the middle.  I've placed an X

24 on it.  And I'm going to circle the two individuals there.

25 BY MR. MARCHESE:

1    *Q.* First off, these two individuals, they're still in the same

2    general vicinity at the end of that camper truck, correct?

3    *A.* Yes, sir.

4    *Q.* And it appears that -- would you agree with me that Black

5    Hat would be on the left of the screen to the individual closer

6    to the back of the pickup truck?

7    *A.* Yes, sir.

8    *Q.* Okay. And it appears he might be looking down into his

9    hands or something like that?

10    *A.* Yes.

11         MR. MARCHESE: Move to 5:09 for the record. Okay. And

12    this is 5:09 at the end.

13    BY MR. MARCHESE:

14    *Q.* Black Hat is all the way to the edge of the screen, same

15    general area as the camper shell, correct?

16    *A.* Yes, sir.

17    *Q.* Okay. He appears to have his hands cupped together. Would

18    you agree with that?

19    *A.* It appears that way.

20    *Q.* I'm going to move it up just one second. I think we lose

21    him after that. Okay.

22         And same depiction, would you agree with me, just more

23    fuzzy?

24    *A.* It's definitely a lot fuzzier.

25    *Q.* Yeah. Sorry, sir.

—2:16-cr-46-GMN-PAL—

1          You'd agree he's standing, correct?

2  *A.*  Yes.

3  *Q.*  Same area, right?

4  *A.*  Right.

5  *Q.*  And this is 5:10.  This one clears up a little bit.  First

6  one's probably the best, but he's still standing at the end of

7  the truck, correct?

8  *A.*  He is, sir.

9  *Q.*  Hands appear to be cupped together?

10  *A.*  Yes.

11          MR. MARCHESE:  And for the record, I'm going to go to

12  5:48.

13          These half frames are killing me.  All right.  We're

14  going to move ahead four seconds to 5:52.  There we go, or 5:51.

15  Sorry.

16  BY MR. MARCHESE:

17  *Q.*  Once again, we see Black Hat depicted at the end or the back

18  of the pickup truck with the camper shell, correct?

19  *A.*  Yes.

20  *Q.*  And I've circled him there in the middle, correct?

21  *A.*  Yes, sir.  You did.

22  *Q.*  He appears to be standing, correct?

23  *A.*  Yes.

24  *Q.*  He might even have his back to the wash area.  Is that fair

25  to say?

1  *A.*  Again, this one that you stopped it on is blurry, but it

2  appears that way.  So I can't say definitely.

3  *Q.*  Okay.  We'll move it up just a frame.

4  *A.*  No, that one's worse.

5  *Q.*  There we go.

6  *A.*  Yes.

7  *Q.*  Now we've got Black Hat all the way to the right of the

8  screen.  I just circled him.  He's probably a little bit clearer

9  on this one, right?

10  *A.*  Yeah, that's a lot clearer.  You see his long gun slung in

11  front of him.

12  *Q.*  Right.  But he appears to have his back actually to the wash

13  area, correct?

14  *A.*  This actually looks straight down the interstate, so to his

15  north.  Well, north lane looking south.

16  *Q.*  Okay.  So would it be your testimony he's facing this way?

17  *A.*  Yes.  Thank you.

18  *Q.*  Okay.  And the wash from the -- it's tough to see obviously

19  because of the hill, but the wash would be in this trajectory?

20  *A.*  Yes, sir.  Exactly.

21      MR. MARCHESE:  Okay.  Move up to 6:11.  6:11.  Okay.

22  BY MR. MARCHESE:

23  *Q.*  Now, obviously this is a little bit farther back in the

24  distance, correct?

25  *A.*  It is.

1  Q.  Okay.  And I'm going to circle an individual and the camper

2  shell truck, correct?

3  A.  Yes.

4  Q.  And that's all the way to the left of the screen, correct?

5  A.  It is, sir.

6  Q.  Now, to be fair, I mean, you can't really see what this

7  individual in the distance at the foot of the back of the truck

8  is doing, correct?

9  A.  Yes.

10  Q.  All right.  But he does appear to be standing, correct?

11  A.  He does.

12  Q.  And the area he's standing in is consistent with where Black

13  Hat has been throughout the last few screen shots we've shown?

14  A.  Say that one more time, please.

15  Q.  The area in which this individual in this -- at the 6:11

16  mark is standing tends to be consistent with where Black Hat has

17  been throughout these screen shots I've been showing you?

18  A.  Yes, sir.

19  Q.  Thank you.

20        MR. MARCHESE:  I'm going to go forward about one minute

21  to 7:11.

22  BY MR. MARCHESE:

23  Q.  Okay.  And at 7:11 you see Black Hat here.  He appears to be

24  maybe sitting down or -- he's not kneeling.  He's not standing.

25  He's kind of in between.  Would you agree with that?

———— 2:16-cr-46-GMN-PAL ————

1  *A.*  Yes.

2  *Q.*  Okay.  And same general area, at the foot of that pickup

3  truck, correct?

4  *A.*  Yes.

5  *Q.*  Appears to be looking same area he was before that you had

6  mentioned.  That would be in this general area that I've placed

7  an arrow to the right of the screen?

8  *A.*  Yes.

9       MR. MARCHESE:  I'm going to play it for about four

10 seconds.

11       (Video playing.)

12       MR. MARCHESE:  Okay.  And I'm going to back it up to

13 7:14.

14 BY MR. MARCHESE:

15 *Q.*  Okay.  So for those couple of seconds we just played, now

16 Black Hat has actually stood up and he continues to look down

17 the northbound interstate, correct?

18 *A.*  Yes, he does.

19       MR. MARCHESE:  Okay.  I'm going to fast-forward to

20 7:32.  This is one of those distant shots.

21 BY MR. MARCHESE:

22 *Q.*  Okay.  And in the center of the screen here we have that

23 truck again with the camper shell, correct?

24 *A.*  Yes.

25 *Q.*  Someone is standing.  You can't tell, it's too far away, if

1  it's Black Hat or not, correct?

2  *A.*  Yes.

3  *Q.*  But the individual that is standing is in the same general

4  location that Black Hat has been throughout these past screen

5  shots, correct?

6  *A.*  Correct.

7          MR. MARCHESE:  Move it up 12 seconds to 7:44.

8  BY MR. MARCHESE:

9  *Q.*  Okay.  And all the way to the right of the screen we have

10  that camper shell, correct, the pickup with the camper?

11  *A.*  Can you circle it, sir?

12  *Q.*  Let me move it up just a little bit.

13  *A.*  Okay.  That's better.

14  *Q.*  Is that better?

15  *A.*  Uh-hmm.

16  *Q.*  Do you see the circle?

17  *A.*  I do now.

18  *Q.*  Okay.  Once again, too far to tell who that is, right?

19  *A.*  Yes.

20  *Q.*  Appears to be someone standing at the -- near the bumper of

21  the camper shell, correct?

22  *A.*  It does.

23  *Q.*  Except this individual's on the northbound bridge and the

24  camper is on the southbound bridge, right?

25  *A.*  Yes.

—2:16-cr-46-GMN-PAL—

1  Q.  Okay.

2           (Video playing.)

3  BY MR. MARCHESE:

4  Q.  Okay, sir.  And I've stopped it at 7:56.

5           Somewhat in the distance once again so it's difficult

6  to tell what the individual's doing, other than maybe standing

7  in the same general area, correct?

8  A.  Yes.

9           MR. MARCHESE:  Move up to 8:16.

10  BY MR. MARCHESE:

11  Q.  Okay.  And on this screen shot, this is a better view.

12  Appears to be Black Hat again at the foot of this truck,

13  correct?

14  A.  Yes.

15  Q.  Appears to be kneeling or squatting behind this barrier at

16  this point, right?

17  A.  He is.

18           MR. MARCHESE:  Okay.  Play it for two, three seconds.

19           (Video playing.)

20  BY MR. MARCHESE:

21  Q.  Okay.  And same general area, kneeling at the foot of the

22  truck, correct?

23  A.  Right.  Didn't you just show me this earlier?

24  Q.  Maybe it was one of the other counsel.  I've just been going

25  chronologically.

 1  *A.*  Apologize.

 2  *Q.*  No, that's fine.

 3         MR. MARCHESE:  And go to 9:01 for the record.

 4  Actually, it's 9:02.

 5  BY MR. MARCHESE:

 6  *Q.*  Somewhat difficult to tell.  There is a head at the edge of

 7  the truck, correct, to the back of it?

 8  *A.*  Yes.

 9  *Q.*  Just popping over the barrier.  Maybe he has a hat on.

10  Would you agree with that?

11  *A.*  Yes.

12  *Q.*  Same general area as we've seen Black Hat depicted this

13  entire video, correct?

14  *A.*  Yes.

15         MR. MARCHESE:  Move up to 9:15.

16  BY MR. MARCHESE:

17  *Q.*  Okay.  And then we have Black Hat once again at the edge of

18  this truck, correct?

19  *A.*  Yes, sir.

20  *Q.*  Appears to be kneeling or squatting, correct?

21  *A.*  Yes.

22  *Q.*  You can see the top of the Jersey barrier right there,

23  correct?

24  *A.*  Yes.

25         MR. MARCHESE:  Play it just for a couple seconds.

—2:16-cr-46-GMN-PAL—

1          (Video playing.)

2          MR. MARCHESE:  Okay.  And we are at 9:17 right now for

3   the record.

4   BY MR. MARCHESE:

5   Q.  Black Hat doesn't appear to have moved, correct?

6   A.  You mean stood up moved or just moved around?

7   Q.  Same general area.  I'm sorry.

8   A.  Oh.  Yeah, he's in the same general area.

9   Q.  Still kneeling or squatting, correct?

10  A.  Yes.

11  Q.  Still see the top of the Jersey barrier right there,

12  correct?

13          I'm sorry if I put a line where I told you -- asked you

14  to see.

15          You can still see the top of the Jersey barrier right

16  there, correct?

17  A.  Yes.

18  Q.  Okay.  Sorry.  And I only got three more, sir.  So just bear

19  with me.

20          MR. MARCHESE:  And we're going to move up to 10:32 for

21  the record.  Okay.  Actually, move up just a tad more.

22  BY MR. MARCHESE:

23  Q.  Are you able to see the camper on the right of the screen,

24  sir?

25  A.  Is it at the very right?

—2:16-cr-46-GMN-PAL—

1    Q.  Yeah, it's where all of the -- the eraser and the pencil --

2    A.  I got a ...

3    Q.  No problem.  I can move it.

4    A.  The access to this computer screen is right there on the

5    right-hand side.

6    Q.  There we go.

7    A.  Yes.

8    Q.  OKAY.  Now I moved it into the screen, so now you can

9    actually see it.

10          All right.  So I'm making a circle at the end of the

11   camper truck and some sort of individual at the end of it.

12   You'd agree with, right?

13   A.  Yes, sir.

14   Q.  Tough to see.  Not quite as far as the other ones, but not

15   as close as some of the others as well, right?

16   A.  Correct.

17   Q.  Appears to be the individual's probably kneeling or

18   squatting at this point?

19   A.  It appears that way, sir.

20          MR. MARCHESE:  I'm just going to play it for about

21   seven seconds.

22          (Video playing.)

23   BY MR. MARCHESE:

24   Q.  Okay.  And tough to see what he's doing, but the individual

25   hasn't moved from that same general location, correct?

1   *A.*  Yes.

2          MR. MARCHESE:  Okay.  Move up to 11:23.

3   BY MR. MARCHESE:

4   *Q.*  In this particular screen shot you see Black Hat once again.

5   He's at the foot or the back of the camper shell squatting,

6   correct?

7   *A.*  Yes.

8   *Q.*  Now, on direct examination you were asked some questions

9   about this particular time frame.  This was the one where I

10  believe you stated that Black Hat popped up, I believe was your

11  testimony?

12  *A.*  Yeah.  If this is the same segment, then yes.

13  *Q.*  Yes.  He popped up and then -- isn't it true that in this

14  segment he actually adjusts his shoulder strap on his rifle?

15  *A.*  Run through it, sir, and I'll be able to tell you that.

16          (Video playing.)

17          THE WITNESS:  It's quick.  So from what I see is that

18  he's definitely, you know, bringing his gun around in front of

19  him.

20  BY MR. MARCHESE:

21  *Q.*  Okay.

22  *A.*  So whether, you know, on the shoulder strap, frame by frame

23  that will dictate that.

24  *Q.*  Okay.

25          MR. MARCHESE:  And, Brian, can you get up 5032-A

—2:16-cr-46-GMN-PAL—

 1  through E, please.

 2  BY MR. MARCHESE:

 3  Q.  Okay, sir.  In this particular -- these are just screen

 4  shots of what I have just shown you.  They've previously been

 5  marked and admitted into evidence.

 6          You see Black Hat there, correct?

 7  A.  Yes, sir.

 8  Q.  You agree he's kneeling down, squatting, something along

 9  those lines, correct?

10  A.  Say again.

11  Q.  He's kneeling or squatting at that point, correct?

12  A.  Yes.

13  Q.  Okay.

14  A.  You can refer to him as Mr. Parker if you'd like, sir,

15  instead of saying Black Hat.  It's kind of demoralizing.

16  Q.  Well, we've been doing Black Hat.  So let's just keep it

17  consistent for the record.

18  A.  Okay, sir.

19          MR. MARCHESE:  All right.  And we can go to B, please.

20  Okay, Brian.  And if you can -- yeah, there we go.  Thank you.

21  BY MR. MARCHESE:

22  Q.  And I'm going to circle him for you just to make it easier

23  for you.  That's Black Hat right there, correct?

24  A.  Yes, sir.

25  Q.  He appears to be just standing up at this point, correct?

1   *A.*   Yes.

2   *Q.*   You can see his left forearm next to his left hip area,

3   correct?

4   *A.*   Yes, sir.

5   *Q.*   Okay.

6          MR. MARCHESE:  We can go to C, as in Charlie.  All

7   right.  And if you could make that a little bigger, Brian, if

8   possible.

9   BY MR. MARCHESE:

10  *Q.*   Okay, sir.  And I'm going to circle Black Hat once again,

11  correct?

12  *A.*   Yes.

13  *Q.*   Little bit difficult to see the rifle in this picture due to

14  the coloring from the RV.  Is that fair to say?

15  *A.*   It is.

16  *Q.*   Appears that Black Hat's left arm is going up a little bit

17  towards his chest/neck area, correct?

18  *A.*   It appears that way, sir.

19          MR. MARCHESE:  D, as in David, Brian.

20  BY MR. MARCHESE:

21  *Q.*   And in this particular screen shot again we have Mr. Black

22  Hat right there.  Appears that you can see the skin from his

23  forearm in the middle there, correct?

24  *A.*   I do.

25  *Q.*   Okay.  Appears a little difficult to see, but that might be

1  the trajectory of the rifle.  Is that accurate?  Would you agree

2  with that?

3          I'll move it off, sorry.

4  **A.**  Whether it had it on there or not, it doesn't matter.  It's

5  blurry, but it appears to be that way, yes.  He's adjusted his

6  rifle slung, correct.

7  *Q.*  Okay.  And E, as in Edward.

8          Okay.  And this you can actually see something.  All

9  right.  I'm going to circle Black Hat.  You see his rifle a

10  little bit clearer now with the backdrop.  It appears to be

11  pointed not straight down, but, I don't know, maybe 15, 20

12  degrees.  Somewhat accurate, right?

13  **A.**  It appears that way, yes.

14  *Q.*  Okay.  And his left forearm and hand appear to be somewhere

15  near his left chin/ear area?

16  **A.**  It possibly can.  That's blurry.

17  *Q.*  Okay.  If you don't agree, you don't agree.  That's fine.

18          MR. MARCHESE:  And, Aaron, I'm going to go back to

19  Exhibit 28.  And for the record, this is Exhibit 28 at 14:46.

20  BY MR. MARCHESE:

21  *Q.*  And lastly, sir, I've circled Black Hat.  You'd agree with

22  me that's him?

23  **A.**  Yes.

24  *Q.*  He appears to be looking to his left which would be

25  northbound, correct?

—2:16-cr-46-GMN-PAL—

1  *A.*  He is.

2  *Q.*  And he's in the same general area at the end of the foot of

3  that camper or shell truck, correct?

4  *A.*  He is.

5        MR. MARCHESE:  Thank you, sir.  I've got no further

6  questions.

7        THE COURT:  All right.  Let's go ahead and take our

8  morning restroom break.  During this time I do remind the jury

9  that you are not to discuss this case with anyone nor permit

10 anyone to discuss it with you.  You may speak to your fellow

11 jurors about other things, but not about this trial.  Please do

12 not read or listen to or review anything that touches about this

13 case in any way nor attempt to perform any research or any

14 independent investigation.  And please do not form any opinion

15 regarding the issues in this case until after you have received

16 the jury instructions, heard the testimony, seen the evidence.

17 After that I will excuse you to begin your deliberation process,

18 but not until then.

19        So it's 10:37.  Let's go ahead and stand for the jury

20 and be back here 11?

21        COURTROOM ADMINISTRATOR:  Yes.

22        THE COURT:  All right.  We'll be back here at 11.  So

23 go ahead and excuse the jury.

24        And, Special Agent Shilaikis, after the jury exits,

25 then you may also take your stretch break, and we'll just need

1  you back here by 11 so we can resume.

2          THE WITNESS:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4          (Whereupon jury leaves the courtroom at 10:37 a.m.)

5          THE COURT:  Off record.

6          (Recess taken at 10:37 a.m.)

7          (Resumed at 11:08 a.m.)

8          THE COURT:  Thank you.  You may be seated.  Go ahead

9  and bring in the jury.

10         (Whereupon jury enters the courtroom at 11:11 a.m.)

11         THE COURT:  Jury may go ahead and be seated, and then

12 everyone else be may be seated as well.

13         Back on the record.  And we have Special Agent

14 Shilaikis back on the witness stand as well.  Thank you, sir.

15 So we can now continue with cross-examination.  I think,

16 Mr. Leventhal, were you next or Mr. Perez?

17         MR. LEVENTHAL:  Mr. Perez, Your Honor.

18         THE COURT:  All right.  Go ahead on behalf of

19 Mr. Lovelein.

20         MR. PEREZ:  Thank you.

21         COURTROOM ADMINISTRATOR:  And, Your Honor, the

22 witness's touch screen is now working.

23         THE COURT:  Oh, good.  All right.  So your touch screen

24 is working now.

25                    CROSS-EXAMINATION

—2:16-cr-46-GMN-PAL—

1  BY MR. PEREZ:

2  *Q.*  Good morning, Special Agent.  My name is Shawn Perez.  I

3  represent Mr. Lovelein.  I only have a couple of questions

4  concerning time.

5        In Exhibit 26, the video, you say it's 11:53 and, you

6  know, where you are, correct?

7  *A.*  Yes, there's 15 segments of it.  So each one has been ...

8  *Q.*  And you do that for each -- for each video, for each

9  exhibit?

10 *A.*  I attempted to, yes, sir.

11 *Q.*  Okay.  And so, like, for example, on Exhibit 28, if it were

12 eight minutes into the video and the video started at 12:04,

13 give or take, we're looking at, you know, 12:12 in the

14 afternoon, correct?  Would that be right?

15 *A.*  You're confusing me.  I'm trying to follow you.

16 *Q.*  Well, the time on the exhibits -- I'm sorry for talking over

17 you.

18        The time indicator on the video, I mean, I'm assuming

19 that that's like a minute and something seconds, right?

20 *A.*  Oh, I gather.  I'm following you now.  So, yes, I was using

21 my watch to time it every time that I would try to start a

22 segment and end a segment.

23 *Q.*  Okay.  So -- well, within a couple of minutes.  If you say

24 you're starting at 12:04, we can assume that's pretty correct?

25 *A.*  Yes, sir.

1   Q.  Okay.  And then so eight minutes into the video would be

2   12:12?

3   A.  I believe so.  Yes, sir.

4   Q.  Okay.  Now, one other thing, I just want to clarify where

5   someone was.

6         MR. PEREZ:  Brian, can you bring up Exhibit 30, please,

7   at 14 seconds.

8   BY MR. PEREZ:

9   Q.  I'm not sure if I heard this correct.  I just want to

10  clarify.  This individual in the center of the screen, now, did

11  you say they were on the -- closer to you or farther back, on

12  that side of the highway?

13  A.  Meaning what, sir?

14  Q.  Well, I mean, you said they were on the Jersey barrier.  On

15  the Jersey barrier closer to you on the northbound lane?

16  A.  No, I did not.  He's on -- I am following you now.  What I'm

17  saying on that particular lane of traffic, on that particular

18  highway, he's to the closest side of that Jersey barrier.

19  There's one behind him.  Make sense?

20  Q.  Okay.  But he's not on the -- I guess that would be the

21  eastern side of the --

22  A.  It's confusing in there, yes, sir, you know.

23  Q.  So you're saying he's on the eastern side of the northbound

24  lane?  So there wouldn't be any traffic passing in front of him,

25  correct?

2:16-cr-46-GMN-PAL

1  *A.*  No.

2  *Q.*  Okay.

3        MR. PEREZ:  Brian, can you just, like, back that up

4  slowly.  That truck, that's good right there.

5  BY MR. PEREZ:

6  *Q.*  So does that change your --

7  *A.*  It does, sir.  Thank you for that.

8        MR. PEREZ:  All right.  Thank you.  I have nothing

9  further.

10        THE COURT:  On behalf of Mr. Drexler, any cross?

11        MR. LEVENTHAL:  Yes.  Thank you.

12                    CROSS-EXAMINATION

13  BY MR. LEVENTHAL:

14  *Q.*  Good morning, sir.

15  *A.*  Good morning, sir.

16  *Q.*  My name is Todd Leventhal.  How are you today?

17  *A.*  Fine, sir.

18  *Q.*  Good.

19        MR. LEVENTHAL:  Brian, if we could get 17, Government's

20  Exhibit 17, at 40:56.

21  BY MR. LEVENTHAL:

22  *Q.*  What I'd like to do is just show you a map real quick and

23  where you were at.  I know you went through it on direct.

24        MR. LEVENTHAL:  It's 40:56.

25        Okay.  Back it up just a bit, just like a half a

—2:16-cr-46-GMN-PAL—

1   second.  Stop.  Perfect.

2   BY MR. LEVENTHAL:

3   Q.  All right.  Now, since you're a -- your video there or your

4   screen there works, if you could touch, just so we orient

5   ourselves, where the northbound bridge is.  Can you see it from

6   there?

7   A.  Do you want me to put an X there or an N?

8   Q.  An N, please, just so we -- perfect.  Okay.  And the

9   southbound bridge?

10          Okay.  Now, Agent Shilaikis, at some point you moved

11   positions, correct?

12   A.  I did, sir.

13   Q.  Okay.  And so where were you when you first started

14   videotaping?

15   A.  Approximately in this general location right there.

16   Q.  Okay.  That would be considered Post 1?

17   A.  This is considered Post 1, right there.

18   Q.  Okay.  Fair enough.

19          And you were in your vehicle?

20   A.  No.

21   Q.  Whose vehicle were you in?

22   A.  I wasn't in a vehicle.

23   Q.  So when you were filming, you were not in a vehicle at all?

24   A.  I was next to a light-all, so a big tower that could come up

25   and light Post 1 during the night.  I was next to that.

2:16-cr-46-GMN-PAL

1  Q.  Okay.  Now -- and we saw some videos from where you just put

2  that X, correct?

3  A.  Yes, sir.

4  Q.  Okay.  And those started at 11:53:15 seconds, correct?

5  A.  I started the video at 11:23, sir.

6  Q.  11:23?

7  A.  I believe so.  I'd have to go back and see the very first

8  segment of my video, the very first one.

9  Q.  Okay.  But you remember that your first video started at

10  11:23?

11  A.  I'd have to review it and make sure that date and time stamp

12  and what I did on my watch; because I started the video when I

13  filmed my watch and I said the time and the date.  And so I'd

14  have to see that.

15  Q.  Okay.

16  A.  Best of my knowledge, I think it was around -- it was after

17  11.

18  Q.  Okay.  So 11:23 is when you would have started is your

19  testimony, correct?

20  A.  I'm saying if you show it to me again, I'll tell you

21  exactly.

22  Q.  Very good.  Okay.  And you said that your watch would have

23  been in that video?

24  A.  It is.

25          MR. LEVENTHAL:  Okay.  If we could go to 26, Brian.

──────2:16-cr-46-GMN-PAL──────

1  And just start it and play it.  If you can back it up.

2          (Video playing.)

3          MR. LEVENTHAL:  Do we have sound, Brian?  Brian, you

4  can stop it.  Is there sound on there?

5          Okay.  Back it up to the beginning, please, Brian.

6  Thank you.  And if you want to hit that sound button on the far

7  right, that might work.  There you go.  Go ahead and play it.

8          (Video playing.)

9          MR. LEVENTHAL:  Stop there, Brian.  Thank you.

10  BY MR. LEVENTHAL:

11  Q.  Agent Shilaikis, did you see your hand with the watch in

12  that video?

13  A.  Not in this one, sir.

14  Q.  Okay.  So there's another one.  This one started at 11:15.

15  You indicated that there another's another video that you

16  started at 11:23?

17  A.  If you watch all 15 segments and the totality, you'll see me

18  periodically look at my watch.  But I'm reading off my watch

19  because I didn't know how that camera was set up at the time,

20  but I knew my watch was correct on the date and the time.

21  Q.  I understand that.  So your watch would have said 11:23 when

22  you filmed it, correct?

23  A.  Yes, sir.

24  Q.  Okay.  And that's not in this video, right?

25  A.  It is not, sir.

2:16-cr-46-GMN-PAL

1    Q.   Okay.  So this video is not the first video that you filmed,

2    correct?

3    A.   I viewed -- recorded 15 segments because I was worried about

4    the battery strength also because I just pulled this camera out.

5    I was worried about it dying.

6    Q.   I understand that, but my question was, this was not the

7    first video that you videotaped.  You videotaped at 11:23,

8    correct?

9    A.   Yes.  The segments -- if it was video segment 1, that would

10   be video segment 1.

11   Q.   Correct.  Okay.  So, again, there's a different segment

12   prior to 11:53, correct?

13   A.   Oh.  Gotcha.  Yes, sir.

14   Q.   Okay.  So this is the video that we're seeing for the first

15   time that says 11:53, correct?

16   A.   I'm following now, sir.  Thank you.

17   Q.   You are.  Okay.  And there's no watch?

18   A.   No.

19   Q.   Okay.  And you indicated at 11:23 you videotaped your watch?

20   A.   Yes, sir.

21        MR. LEVENTHAL:  Okay.  All right.  If we can go to --

22   just back it up a little bit at 14 seconds.  And play to 34

23   seconds.

24        (Video playing.)

25        MR. LEVENTHAL:  Okay.  Stop it there.  Now just back it

 1  up a bit.

 2  BY MR. LEVENTHAL:

 3  *Q.*  You were asked on direct examination if you were able --

 4          MR. LEVENTHAL:  Back it up just another second.

 5  BY MR. LEVENTHAL:

 6  *Q.*  If you were able to see this person that I am circling here

 7  in the middle.  Do you remember that question?

 8  *A.*  I do.

 9  *Q.*  Okay.  And you indicated that you remember seeing him,

10  correct?

11  *A.*  I did.

12  *Q.*  Okay.  And you remember seeing him on April 12th, 2014,

13  correct?

14  *A.*  Yes, sir.

15  *Q.*  Okay.  And you saw him while you were videotaping this,

16  right?

17  *A.*  Yes.

18          MR. LEVENTHAL:  Okay.  So if we can just keep going,

19  Brian.

20          (Video playing.)

21          MR. LEVENTHAL:  Stop right there, Brian.

22  BY MR. LEVENTHAL:

23  *Q.*  Okay.  Now, you kind of swung the camera past that

24  individual that you indicated that you saw that day, correct?

25  *A.*  I did.

1  Q.  Okay.  And you stopped at a person that you indicated was a

2  Ryan Bundy, right?

3  A.  That's who I believe he was, yes, sir.

4  Q.  Okay.  And you even sort of verbally acknowledged that while

5  you were filming, correct?

6  A.  I did.

7  Q.  Okay.

8       MR. LEVENTHAL:  If we can go back just to 17 seconds,

9  please.

10  BY MR. LEVENTHAL:

11  Q.  Now, this person here, on direct exam you said he was

12  militia, correct?

13  A.  You don't have anything circled, sir.

14  Q.  Oh, I'm sorry.  That person right there.

15  A.  Okay.  Yeah, I believed he was militia.  Yes, sir.

16  Q.  Okay.  And you indicated that it was his dress that gave you

17  the -- the indication that he was some kind of militia, correct?

18  A.  At that point with the totality of the circumstances that he

19  appeared to be, yes, sir.

20  Q.  Okay.  So let's talk about totality of the circumstances.

21  That's just a lot of facts that you're taking in as you're

22  observing, correct?

23  A.  From the start of this, absolutely, and the information I

24  had at hand prior to.

25  Q.  Okay.  You indicated that part of the totality of the

2:16-cr-46-GMN-PAL

1  circumstances would have been his dress, right?

2  **A.**  Yes, sir.

3  *Q.*  How he was dressed, right?  Okay.  He's wearing a blue

4  t-shirt, correct?

5  **A.**  Yes, sir.

6  *Q.*  Okay.  Also, you indicated that militia look in camouflage.

7  They come in camouflage of some sort, correct?

8  **A.**  All variations of dress, yes, sir.

9  *Q.*  All variations of dress?

10       I'm sorry?

11 **A.**  Do you want me to follow through with that, sir?

12 *Q.*  Yes.

13 **A.**  This gentleman has a blue shirt on and a tack vest and a

14 long gun.

15 *Q.*  Okay.  And that to you is an indication of an ideology or a

16 militia?

17 **A.**  An ideology, sir?

18 *Q.*  Yes.

19 **A.**  No.

20 *Q.*  Can you spot militia people just like that?

21 **A.**  With this individual with a long gun and the way he was

22 dressed with a tactical vest, yes, sir.  He would be a cause of

23 concern.

24 *Q.*  Okay.  He has a baseball cap on?

25 **A.**  Yes, sir.

1  Q.  It doesn't look to -- seem like he's got any kind of

2  helmets, does he?

3  A.  A helmet?

4  Q.  Yes.

5  A.  No, sir.

6  Q.  No ballistic helmet, correct?

7  A.  No, sir.

8  Q.  Okay.  Ballistic tack plates or anything of that sort?

9  A.  I don't know what he's wearing under that vest, sir.

10 Q.  Okay.  Were you able to discern whether he had multiple

11 weapons on him?

12 A.  Not at -- no, I did not.

13 Q.  Okay.

14        MR. LEVENTHAL:  If we can go to 58 seconds.

15 BY MR. LEVENTHAL:

16 Q.  Now, these gentlemen here, they have ballistic helmets on,

17 correct?

18 A.  They do.

19 Q.  They're in some sort of a --

20        MS. CREEGAN:  Objection, relevance.

21        MR. LEVENTHAL:  Was going to compare and contrast on

22 why he's calling people militia and what it is about their --

23 what they're wearing that causes him to label somebody in a

24 militia group.  He's testified on direct examination he has

25 spotted multiple people that he said was militia, and I'm just

2:16-cr-46-GMN-PAL

1  trying to figure out what is militia to him.

2          THE COURT:  And so how does the photograph of these

3  individuals have anything to do with the people that he called

4  militia?

5          MR. LEVENTHAL:  Well, if he's calling people militia

6  and he's indicating that they are -- he's indicating on direct

7  that they're wearing a certain type of uniform, if you will, and

8  the person that was not wearing it was not wearing it; yet,

9  these other people are wearing it.  I'm just trying to figure

10 out how he knows what a militia person is.  He's the one who

11 spotted them.  He's the one telling us.

12          If it's spotting someone who is a democrat versus a

13 republican because of the way they dress, that to me is the same

14 thing, but that's how he is discerning militia and a threat.

15          THE COURT:  Well, if you're trying to figure out how he

16 defines someone who is in the militia, you can ask him that

17 question.

18          MR. LEVENTHAL:  I did, Your Honor.  He said it was

19 camouflage and plates and --

20          THE COURT:  That doesn't have anything to do with this

21 photograph.  So the objection is sustained.

22          MR. LEVENTHAL:  Okay.

23          If we can go to 26, please.  And at 2:57.  We're at 26.

24 2:57.  Okay.  Stop right there.

25 BY MR. LEVENTHAL:

1  Q.  Now, you were asked on direct examination who these people

2  are, and you indicated this is Agent Dan Love, correct?

3  A.  Yes, Special Agent In Charge, at the time, Dan Love out of

4  Utah.

5  Q.  So he was in charge of the entire, sort of, cattle gather?

6  A.  No, he was not.

7  Q.  No, he was not.  Okay.

8         I notice that he's wearing a baseball cap, black, with

9  an insignia on it, correct?

10         MS. CREEGAN:  Same objection.

11         MR. LEVENTHAL:  Your Honor, they made a big deal about

12  pulling a cap backwards, a black cap, and whether or not

13  somebody wears it and what does that represent.

14         MS. CREEGAN:  That has no relevance to this picture.

15         THE COURT:  Sustained.

16         MR. LEVENTHAL:  All right.

17         You can go to 28, please.  And go just two seconds in.

18  BY MR. LEVENTHAL:

19  Q.  Okay.  Now, at this point you've switched positions,

20  correct?

21  A.  Yes, sir.

22  Q.  Okay.  And are you in a vehicle now or are you still behind

23  that white light, if you will?

24  A.  No.  When we moved up forward, there was a Forest Service

25  Law Enforcement vehicle there.  I asked that officer to stay

1   there so we'd have some type of cover and concealment.  So we

2   were on the side of the vehicle, the driver's side of the

3   vehicle.

4   Q.  Okay.  You were in concealment, but you never actually got

5   into the vehicle?

6   A.  No, sir.

7   Q.  Okay.  So you were outside of the vehicle.  Doors open?

8   A.  I did not -- I wasn't in the vehicle.  The doors were shut.

9   The law enforcement that belonged to that vehicle was inside of

10  it.

11  Q.  I see.  Were you leaning on the hood or were you leaning on

12  the trunk?

13  A.  The hood of it, sir.

14  Q.  The hood of it.  Okay.  All right.  And these individuals

15  here, these are, as you know it, BLM agents, correct?

16  A.  Yes, between BLM law enforcement officers and I knew Park

17  Police law enforcement officers were down in the wash.

18  Q.  Okay.  So that would be a mixture of -- these people here on

19  the left, that would be a mixture of law enforcement officers,

20  correct?

21  A.  Yes, sir.

22  Q.  Okay.

23          MR. LEVENTHAL:  If we could go to 14 seconds, please.

24  BY MR. LEVENTHAL:

25  Q.  Okay.  This area right here, what would you consider this

—2:16-cr-46-GMN-PAL—

1  area?  Would you consider this -- would you consider it the

2  fatal funnel?

3  *A.*  I would, sir.

4  *Q.*  Okay.  And that extends all the way through the whole wash,

5  correct?

6  *A.*  Yes, sir.

7  *Q.*  Okay.

8          MR. LEVENTHAL:  If we could go to 4:15, 4 minutes and

9  15 seconds.  Play it to 4:30.

10          (Video playing.)

11          MR. LEVENTHAL:  Just stop it right there.

12  BY MR. LEVENTHAL:

13  *Q.*  Were you able to discern who in this picture is a militia

14  member?

15  *A.*  I believe when I refer to my testimony, I said what appears

16  to be militia.  Did I actually say that they are militia?  I

17  have no idea.

18  *Q.*  Okay.

19          MR. LEVENTHAL:  Go ahead to 9:06, please.

20  BY MR. LEVENTHAL:

21  *Q.*  Now, while you were down there and you were noticing all of

22  these people up there, did you also notice other law enforcement

23  officers on the bridge?

24  *A.*  I did.

25  *Q.*  Okay.  So here you see -- does that seem to be like a law

2:16-cr-46-GMN-PAL

1  enforcement officer on the bridge?

2  *A.*  It is.

3  *Q.*  Okay.

4          MR. LEVENTHAL:  If we can go to 9:06 just one second

5  later.  And 9:30, if you will.

6  BY MR. LEVENTHAL:

7  *Q.*  Okay.  Does that seem -- I'm sorry.  Right in the middle of

8  the screen there, that's a vehicle driving on the bridge,

9  correct?

10 *A.*  It is.

11 *Q.*  And that looks to be like some kind of a Ranger or National

12 Park Service vehicle, correct?

13 *A.*  Yes.  It's green, so it's either Parks or Forest Service.

14 *Q.*  Okay.

15          MS. CREEGAN:  Your Honor, could we just get some

16 foundation?  Which bridge these are on.

17 BY MR. LEVENTHAL:

18 *Q.*  Do you know which bridge that is on?

19 *A.*  It's the one closest to me.  So it would be the northbound.

20 *Q.*  That would be north?

21 *A.*  Southbound.

22 *Q.*  That would be the southbound bridge?

23 *A.*  Yes, sir.

24 *Q.*  Okay.  So these people here, they're above and looking

25 almost straight down at BLM and Park Service law enforcement,

1  correct?

2  *A.*  They are.

3  *Q.*  Okay.

4          MR. LEVENTHAL:  If you could go to 9:59 -- 9:55 and

5  play to 10, please.

6          (Video playing.)

7          MR. LEVENTHAL:  Just keep going for a second.

8          (Video playing.)

9          MR. LEVENTHAL:  Stop right there.

10  BY MR. LEVENTHAL:

11  *Q.*  Did you hear what came over the radio there, sir?

12  *A.*  No, I didn't hear it.

13  *Q.*  Okay.

14          MR. LEVENTHAL:  Back it up for just a second, please.

15          (Video playing.)

16  BY MR. LEVENTHAL:

17  *Q.*  Did you hear that?

18  *A.*  I did.

19  *Q.*  Okay.  Was he saying:  All units with long guns sling your

20  long guns?

21  *A.*  He did.

22  *Q.*  Okay.  And he repeated it twice, correct?

23  *A.*  He did.

24  *Q.*  Okay.  Very good.

25          MR. LEVENTHAL:  Can we go to 10 minutes and 12 seconds,

2:16-cr-46-GMN-PAL

1  which would have been after what we just heard.

2          (Video playing.)

3          MR. LEVENTHAL:  Stop.

4          MS. CREEGAN:  Your Honor, what's the -- I'm going to

5  object on the relevance of this.

6          THE COURT:  You want to go to sidebar?

7          MR. LEVENTHAL:  Sure.

8          (Whereupon, the following sidebar conference was held.)

9          MS. CREEGAN:  Your Honor, a number of these questions

10 appear to be intended to ask about the dress of law enforcement

11 officers, I assume to attempt to portray them as aggressive.

12 There has just been an exhibit where it said:  Sling your long

13 guns, and I assume it's to show Swanson with his long gun in an

14 effort to say, I don't know, that they didn't follow that

15 instruction and that has some meaning.

16          But whether law enforcement officers followed that

17 instruction or not has nothing to do with any of the elements of

18 any of these charges or with any applicable defense.  So it

19 seems to be just an effort to try to divert the jury's attention

20 to things that are irrelevant or to blame the officers for being

21 assaulted.

22          THE COURT:  You want to respond?

23          MR. LEVENTHAL:  Sure, I'll respond exactly the way I

24 did before.  They've elicited testimony on direct examination,

25 the Government has, to indicate that this witness, while he was

1  filming, can point out militia members, non-militia members, and

2  what his threat level was.  At no time can you I think even

3  discern what a militia member is, and so I tried to get into

4  that.  That's irrelevant.

5        But now I'm talking about the difference between he's

6  indicated that a militia member is somebody who wears

7  camouflage, some kind of bullet-proof vest, some kind of -- kind

8  of a vest, a ballistic vest.  And I'm just comparing and

9  contrasting who's wearing the bullet-proof vest and who's

10  wearing that stuff.  Otherwise, it's left with the jury to think

11  that these guys -- this gentleman can figure out who's militia.

12  And it's an ideology.  It's not a look.  It's nothing else other

13  than a look.  It's an ideology.  It doesn't go to show that

14  anybody in particular is a militia considering that the guys

15  that he's picking out are not wearing the stuff that he's saying

16  that militia members wear.  And so I --

17        THE COURT:  If you can lower your voice, please.

18        MR. LEVENTHAL:  I'm sorry.  I apologize.

19        Going into that, it's ripe on cross-examination to test

20  this witness's credibility because he's already indicated in --

21  and I'll get to it -- in one of his MOAs that he didn't see any

22  of these people with guns.  He puts it right in his MOA, Judge.

23  He says, I didn't see it because I was too busy filming.

24        THE COURT:  That's a total different issue.

25        MR. LEVENTHAL:  Well, and I understand.

—2:16-cr-46-GMN-PAL—

1          THE COURT:  The issue is why it would be relevant to

2   show him photos and ask him --

3          MR. LEVENTHAL:  Credibility.

4          THE COURT:  -- about how the federal officers were

5   dressed.

6          MR. LEVENTHAL:  Goes to credibility.

7          THE COURT:  You haven't asked him why he thinks someone

8   is militia.  He explained to you he didn't know that they were

9   militia, that that was what they appeared to be to him, and you

10  don't ask him anything about -- you say you want to know why he

11  thinks that they're militia, but you don't.  What you're really

12  asking him is how did they look in contrast to the Government

13  officers so that you can show the jury that the Government

14  officers are armed or look in some way militaristic, which is

15  getting into the self-defense instruction.  That is not legally

16  cognizable.  So --

17         MR. LEVENTHAL:  And I'm not using --

18         THE COURT:  -- I agree with the Government that it's

19  not relevant.  The objection is sustained.

20         MR. LEVENTHAL:  May I make --

21         THE COURT:  And twice I saw Mr. Marchese's client

22  talking to Mr. Drexler from here, just so you're aware of that.

23         MR. MARCHESE:  Okay.

24         THE COURT:  All right.

25         (Sidebar conference was concluded.)

—2:16-cr-46-GMN-PAL—

1          THE COURT:  All right.  We're back on the record.  The

2    objection is sustained.  So, Mr. Leventhal, go ahead and move

3    on.

4          MR. LEVENTHAL:  Go to 10:27, please, and play to 10:36.

5          (Video playing.)

6          MR. LEVENTHAL:  Stop right there.

7    BY MR. LEVENTHAL:

8    *Q.*  Okay.  Sir, now, while you were filming this, this is a

9    direct view of the -- under obviously the southbound bridge,

10   correct?

11   *A.*  It is.

12   *Q.*  Okay.  And at this time that you were filming there is

13   nobody sort of on the skirt, correct?

14   *A.*  No, not in that area.  No, sir.

15   *Q.*  Okay.  And there's nobody in between -- no protestors in

16   between or underneath the southbound bridge, correct?

17   *A.*  From my view, I couldn't see anybody.  You're right, sir.

18   *Q.*  Okay.  And we can barely make it out, but this would be the

19   gate, correct?

20   *A.*  If you're talking the cattle panels that are across the wash

21   area?

22   *Q.*  Yes, sir.

23   *A.*  Yes, sir.

24   *Q.*  Okay.  That would be there, right?  We don't see any

25   individuals there, correct?

1  *A.*  No, sir.

2  *Q.*  And this light that you were talking about, would that be an

3  example -- that I'm circling right now.  Would that be an

4  example of the light that you were behind, something like that?

5  *A.*  At Post 1, yes.  That is what I call a light-all.

6  *Q.*  Okay.

7         MR. LEVENTHAL:  If we can go to 11:35, please.  Play it

8  until 11:40.

9         (Video playing.)

10        MR. LEVENTHAL:  Okay.

11 BY MR. LEVENTHAL:

12 *Q.*  Again, nobody's down approaching yet, correct?

13 *A.*  From my vantage point, I couldn't see anybody, sir.

14        MR. LEVENTHAL:  Okay.  If we can go to 12 minutes,

15 please.  Oh, no.  11:35, actually.  Go ahead -- oh, we just did

16 that.

17        All right.  Go to 12 minutes, please, 12:06.  Okay.

18 Now stop.

19 BY MR. LEVENTHAL:

20 *Q.*  Now, these people right here we didn't see just now.  People

21 are now approaching, protestors are now approaching the fence,

22 correct?

23 *A.*  Yes, sir.

24 *Q.*  Underneath the southbound bridge, which would be these

25 pillars, yes?

1   *A.*  Yes.

2   *Q.*  Okay.  These individuals here, they seem to have their hands

3   up, correct?

4   *A.*  They do.

5   *Q.*  This individual has his hands away from himself, correct?

6   *A.*  Yes, sir.

7   *Q.*  Okay.

8           MR. LEVENTHAL:  If you go to 12:20, please, Brian.

9   Just go ahead and play it.

10           (Video playing.)

11           MR. LEVENTHAL:  Stop.

12  BY MR. LEVENTHAL:

13  *Q.*  Okay.  This tree right here, what -- let me ask you about

14  the conditions that day.  Was it windy?

15  *A.*  It was breezy.

16  *Q.*  Breezy.  Okay.  It was hot?

17  *A.*  Yes.

18  *Q.*  Dusty?

19  *A.*  I wouldn't say dusty.

20  *Q.*  Okay.  This tree that seems to be blocking some of your

21  view, was that moving about?

22          If we can move back, can you watch that tree real quick

23  to see if it obstructed any of your view while you were

24  videotaping?

25          MR. LEVENTHAL:  Go forward.  Stop.  Go ahead and play

1    it.

2            (Video playing.)

3    BY MR. LEVENTHAL:

4    Q.  Would you agree -- stop please -- that tree did block some

5    of your view?

6    A.  I'd say it's waving in the video, yes, sir.

7    Q.  Okay.

8            MR. LEVENTHAL:  If we could go to 13:04.  Stop right

9    there.

10   BY MR. LEVENTHAL:

11   Q.  Okay.  You were asked on direct examination about this

12   individual right here.  Do you remember that?

13   A.  Yes.

14   Q.  Okay.  This individual has red pants, correct?

15   A.  I called them peach colored, sir.

16   Q.  Peach?  Okay.  Now, you've had extensive training in the

17   military, correct?

18   A.  I have.

19   Q.  Served four tours, correct?

20   A.  I served 20 years, sir.

21   Q.  20 years?  You ever wear red pants to go to any type of

22   combat or --

23   A.  Overseas, no, sir.

24   Q.  No?  How about here?

25   A.  To combat here?  Are you talking this day?

—2:16-cr-46-GMN-PAL—

 1  Q.  Yeah, I'm not sure why you prefaced it by saying "overseas."

 2  A.  Overseas in combat.  I haven't been in combat in the United

 3  States, sir.

 4  Q.  Okay.  Overseas you've never worn peach-colored pants?

 5  A.  No, I have not.  No, sir.

 6  Q.  Okay.

 7       You indicated that you were in fear that day, correct,

 8  Agent Shilaikis?

 9  A.  I did, sir.

10       MR. LEVENTHAL:  Okay.  If we could bring up 17 again.

11  Go to 40:56.  Stop right there.  No.  Actually, go forward.

12  Backwards.  40:56, please.

13       (Video playing.)

14       MR. LEVENTHAL:  Okay.  Stop right there.

15  BY MR. LEVENTHAL:

16  Q.  All right.  And you indicated -- and I'm going to put an X.

17  If I'm correct, that's where you started out, correct?

18  A.  Yes, sir.

19  Q.  And then at some point you moved to, I believe you indicated

20  where I'm putting an O, correct?

21  A.  Do you mind if I make a circle?

22  Q.  Yeah.  Go ahead.  You tell me where you were.

23  A.  I believe I was in this general area right here.

24  Q.  Over this area?

25  A.  Yes.

—2:16-cr-46-GMN-PAL—

1   Q.   Okay.  And you indicated there was a vehicle that you were

2   behind in that area, correct?

3   A.   Yes, sir.  So somewhere in that vicinity.  I was a little

4   bit pressured that day.  So somewhere in this vicinity I was at.

5   Q.   Okay.

6   A.   Next to a vehicle.

7   Q.   Okay.  Fair enough.

8        And you saw all of the law enforcement vehicles at Post

9   1 gathering, correct, Metro?

10  A.   Yes, sir.

11  Q.   You saw SWAT come in, correct?

12  A.   A SWAT vehicle?

13  Q.   Yes.

14  A.   Yes, sir.

15  Q.   You saw them all come in, right?

16  A.   Yes, sir.

17  Q.   You recognized NHP that was on the northbound bridge,

18  correct?

19  A.   I did.

20  Q.   They were in those green fluorescents?

21  A.   I believe so.

22  Q.   And you stayed up here in this area or in this area pretty

23  much for about how long?  An hour?

24  A.   Approximately, yes, sir.

25  Q.   Okay.  You never moved down towards the bridge or towards

—2:16-cr-46-GMN-PAL—

1  any of these people, correct?

2  **A.**  I did not.

3         MR. LEVENTHAL:  Thank you.  I have nothing further.

4         THE COURT:  Mr. Perez, did you cross?

5         MR. PEREZ:  Yes, Your Honor.

6         THE COURT:  Okay.  Any redirect?

7         MS. CREEGAN:  Briefly, Your Honor.

8                        REDIRECT EXAMINATION

9  BY MS. CREEGAN:

10  *Q.*  Agent Shilaikis, do you remember Mr. Marchese asking you

11  some questions about an individual he called Black Hat?

12  **A.**  Yes.  Referring to Mr. Parker?

13  *Q.*  Well, with Mr. Marchese's questions was he asking you about

14  an individual that he termed as Black Hat?

15  **A.**  Vaguely, ma'am, I'm sorry, with all of the testimony that's

16  gone on today.

17  *Q.*  Do you remember Mr. Marchese showing you a frame of the same

18  individual by the camper over and over?

19  **A.**  Yes, sir.  And the over and over about calling him Black

20  Hat.

21  *Q.*  Do you remember that?

22  **A.**  I do.

23  *Q.*  Those questions?

24         Were you focusing on Black Hat with your video camera?

25  Were you intending to follow him for the entire time?

1  *A.*  I did not.

2  *Q.*  About how many seconds or minutes of footage was that that

3  you reviewed with Mr. Marchese?

4  *A.*  It varied.  There wasn't very much.  It was frame by frame,

5  if that's what you're asking.  If it's how much video was on

6  Mr. Parker, who I know now, there wasn't much.  It was trying to

7  encompass everything that was going on.

8  *Q.*  I think you've just explained it, but what were you trying

9  to do with your video camera?

10  *A.*  Memorialize the entire event and then focus in; because in

11  my heart of hearts I thought there was going to be somebody

12  shooting from that side; that I could zero in on that to

13  memorialize it for any type of further investigation after the

14  fact.

15          MS. CREEGAN:  Thank you.

16          THE COURT:  Any recross?

17          MR. TANASI:  None from Stewart, Your Honor.

18          MR. MARCHESE:  None from Parker.

19          MR. LEVENTHAL:  No, Your Honor.

20          MR. PEREZ:  No, Your Honor.

21          THE COURT:  All right.  So at this time if any members

22  of the jury have questions for our witness, Special Agent

23  Shilaikis, go ahead and please write them down on the forms

24  provided.  Take your time.  Write neatly.  Try and be clear and

25  not use too many pronouns.  We don't need your name or your

—2:16-cr-46-GMN-PAL—

 1  signature or jury number.  Just your questions.

 2          Counsel, please join me at sidebar.

 3          (Whereupon, the following sidebar conference was held.)

 4          THE COURT:  All right.  Jury note No. 89, did anyone

 5  point a weapon at you?

 6          Any objection?

 7          MR. MARCHESE:  No objection.

 8          MR. TANASI:  None from Stewart.

 9          THE COURT:  Jury note 90:  When we heard the comment to

10  sling arms, did that apply only to BML -- they mean BLM, but

11  they wrote BML -- or to all armed federal law enforcement?

12          Any objection?

13          MR. TANASI:  None from Stewart.

14          MS. CREEGAN:  No, Your Honor.

15          THE COURT:  And then:  Who gave that command?

16          Any objection?

17          MR. TANASI:  None from Stewart.

18          MS. CREEGAN:  No, Your Honor.

19          MR. PEREZ:  None from Lovelein.

20          THE COURT:  And the second part of jury note 90 is:

21  Have you ever participated in or heard an after action report of

22  a fire fight with the Federal Government?

23          MR. MARCHESE:  Can you read that again?  I'm sorry.

24          THE COURT:  Have you ever participated in or heard an

25  after action report of a fire fight with the Federal Government?

1           MR. PEREZ:  After action?

2           MR. LEVENTHAL:  I would object on relevancy grounds.  I

3  think it's completely irrelevant if he's ever heard of one.  I

4  don't know if there even is one or not.  It's just it's not

5  relevant to whether or not my client was involved in it or not

6  involved with it; it's not them; it's not a protest.

7           MR. MARCHESE:  Parker joins.

8           MR. TANASI:  Stewart joins.

9           MR. PEREZ:  Lovelein joins.

10          MS. CREEGAN:  Just as an initial matter, I'm not sure I

11  even understand what the question's trying to ask.

12          MR. MARCHESE:  Parker, it's unintelligible.

13          THE COURT:  Well, it's not unintelligible.  It's just a

14  matter of this witness knows about an after action report and we

15  haven't heard of anything like that.  I don't know if there's --

16          MS. CREEGAN:  I think one way to understand the

17  question, and this may not be correct, is they're asking if

18  people normally refer to -- Agent Shilaikis was cross-examined

19  on whether he said he was afraid that there would be a fire

20  fight.  And this person might be attempting to find out if that

21  would be a normal part of a report or not, but I can't tell if

22  that's exactly what they're trying to ask.

23          MR. TANASI:  Is the question about this case or any

24  after action reports in general?  It seems very vague.

25          THE COURT:  All right.  So it sounds like the parties

—2:16-cr-46-GMN-PAL—

 1   don't want me to ask that question.  So I'll have to ...

 2          I don't know what an after action report is.

 3          MS. CREEGAN:  Just let them know we're not clear on it,

 4   and maybe phrase it a little more clearly in the future if they

 5   can.

 6          THE COURT:  All right.  Jury note No. 91:  Were you

 7   still concerned for your life when you noticed the presence of

 8   other law enforcement, NHP, Metro, and etc., next to the

 9   individuals with long guns?

10          MS. CREEGAN:  No objection.

11          MR. MARCHESE:  No objection Parker.

12          MR. TANASI:  None from Stewart.

13          MR. PEREZ:  None from Lovelein.

14          THE COURT:  And that's it.

15          (Sidebar conference was concluded.)

16          THE COURT:  All right.  Special Agent Shilaikis, I've

17   got a couple of jury questions here.  I'm going to go ahead and

18   read them into the record, but these are not my questions.

19   These are jury questions.  So when you respond, you may go ahead

20   and turn look at the jury.  All right?

21          THE WITNESS:  Yes, ma'am.

22          THE COURT:  So jury note No. 89 asks:  Did anyone point

23   a weapon at you?

24          THE WITNESS:  Not that I could see.  I was

25   concentrating on the video camera to basically, like I told you,

1   to memorialize the events of that day.  So if they did, I didn't

2   see it.

3           THE COURT:  Right.  Jury question No. 90:  When we

4   heard the comment to sling arms, did that apply only to BML --

5   BLM -- or to all armed federal law enforcement?

6           THE WITNESS:  To explain that, each individual officer

7   in law enforcement has to make the determination of what threat

8   that they are observing at that time.  The voice that you heard

9   was Acting State Chief Ranger Kelly Cole, and he made that

10  comment.  So he made the comment, but each individual officer as

11  they see something that was pointed at them can make that

12  determination based on what they purview the -- perceive the

13  threat to be.

14          THE COURT:  And then the next part of -- or the second

15  part of the question is:  Who gave that command?

16          THE WITNESS:  That was Acting State Chief Ranger Kelly

17  Cole.  He's the one that came over the radio.  Who told him, I

18  have no idea.

19          THE COURT:  All right.  And then the next question on

20  jury note No. 90 is about participating in or hearing an after

21  action report.  And the parties agree and I agree also that,

22  because we're not really sure what it's referring to, we're not

23  going to ask that question because it's just not clear to us

24  what the question is asking.

25          Jury note No. 91 asks:  Were you still concerned for

 1    your life when you noticed the presence of other law

 2    enforcement, NHP, Metro, etc., next to the individuals with the

 3    long guns?

 4              THE WITNESS:  Yes.  So to further expand on that, I

 5    wasn't only just worried about myself.  I was worried about all

 6    life that day.  Our mission was to go gather cows, to take them

 7    off our public lands that were in trespass.  We were not

 8    prepared that day.  So I was worried about any loss of life.

 9    Probably what affects me the most is the people that got stopped

10    there for no reason, they had no idea what was evolving in front

11    of them, and the potential that somebody just had to be in the

12    wrong spot at the wrong time.  That affects me to this day.

13              THE COURT:  Okay.  Any follow-up by the Government?

14              MS. CREEGAN:  No, Your Honor.

15              THE COURT:  Any follow-up by the Defense?

16              MR. TANASI:  None from Stewart, Your Honor.  Thank you.

17              MR. MARCHESE:  Just one question, Your Honor.

18              THE COURT:  All right.

19                         RECROSS-EXAMINATION

20    BY MR. MARCHESE:

21    Q.  You were asked about the command about slinging long guns.

22    Do you remember that?

23    A.  I do.

24    Q.  And I believe your testimony was that it was Kelly Cole that

25    made that?

—2:16-cr-46-GMN-PAL—

1   A.   I believe it was based on his voice.  That's who I recognize

2   it to make that comment coming over the radio.

3   Q.   Okay.  And to your personal knowledge, was Mr. Cole in the

4   wash at the time on April 12th, 2014?

5   A.   I do not know where Chief Ranger Cole was at.

6   Q.   Okay.  Was -- he wasn't next to you, though, correct?

7   A.   He was not.

8        MR. MARCHESE:  Okay.  No further questions.

9        THE COURT:  Anyone else?

10                 RECROSS-EXAMINATION

11  BY MR. LEVENTHAL:

12  Q.   So, Agent Shilaikis, as I understand, Sling your long guns,

13  sling your long guns, what you've indicated is that's the

14  discretion of the people that were holding the long guns and

15  pointing the long guns on the BLM or the law enforcement side?

16  A.   I would say yes.  If there's an officer that is pointing his

17  gun at some thing, he sees that threat.  The totality of the

18  circumstances belongs to that officer and he made that choice.

19  Q.   So the order, Sling your long guns, sling your long guns, is

20  in fact not just that; it's at your discretion or if you want to

21  or if you don't feel safe, something along those lines, right?

22  A.   I cannot tell you what the determination of what that meant.

23  I know for myself that if I were seeing a threat where I had to

24  point my weapon at somebody and I heard that, I would not take

25  it off that person.

PATRICIA L. GANCI, RMR, CRR

1   *Q.*  Did you sling your long gun that day?

2   **A.**  I had the video camera.  My long gun was slung in front of

3   me, yes, sir.

4              MR. LEVENTHAL:  Thank you.

5              THE COURT:  Anyone else?  Any redirect?

6              MS. CREEGAN:  No, Your Honor.  Thank you.

7              THE COURT:  Okay.  Well, thank you, Special Agent

8   Shilaikis, for coming in this morning.  You are excused.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  Please be careful on the way down with

11  those steps.

12             And then the rest of us are going to go ahead and take

13  our one-hour lunch break today.  I do remind the jury during the

14  lunch break, please do not discuss this case with anyone, not

15  even your fellow jurors.  You may speak to them about other

16  things, but not about this case.  Also, please do not read or

17  listen to or review anything that touches upon this case in any

18  way nor attempt to perform any research or any independent

19  investigation.

20             If you do have a question, please write it down.  And

21  do not form any opinion until after you have heard all of the

22  testimony, reviewed the evidence.  I will provide you with the

23  written instructions of law to apply to the facts as you

24  determine the facts to be.  And then you will hear closing

25  arguments.  After that, I will excuse you to begin

1  deliberations.  That's when you will begin to discuss the case

2  with each other, express your opinions, and so forth, but not

3  until then should you begin your deliberation process.

4        So we'll go ahead and stand up for the jury and excuse

5  them for their lunch break.  We'll welcome them back at 1

6  o'clock.

7        (Whereupon jury leaves the courtroom at 12:01 p.m.)

8        THE COURT:  All right.  Before we go off record, I want

9  to address the -- you can go ahead and have a seat -- the

10  conduct of Defendant Parker during sidebar.  Twice I saw him

11  turn around and talking to Mr. Drexler.  I didn't see if

12  Mr. Drexler responded, but when Mr. Parker saw me, then he

13  turned his chair around so that his back was facing me.  And he

14  picked up a book and either put it on his lap or had it

15  somewhere where his elbows were bent.

16        So, Mr. Marchese, did you want to make any statement

17  for the record?

18        MR. MARCHESE:  I've addressed this with Mr. Parker.  He

19  indicated to me he was looking at the back screen.  Regardless,

20  I have instructed --

21        THE COURT:  He was not looking up at the back screen,

22  which is way above even the heads of the marshals that were

23  standing up.  He was looking straight at Mr. Drexler who was

24  sitting downward.

25        MR. MARCHESE:  I have no -- I don't have any personal

—2:16-cr-46-GMN-PAL—

 1  knowledge, Your Honor.  The position I was standing in, I would

 2  have to -- you know, the partition is right there.  But,

 3  regardless, I have instructed him at any further sidebars to

 4  either look down.  Do not move his chair in any way, shape, or

 5  form.  Just look forward.  Do not turn in any way, shape, or

 6  form towards Mr. Drexler or Mr. Stewart or Mr. Lovelein.

 7          THE COURT:  All right.  Well, I'm not going to allow

 8  Mr. Parker to return after the lunch break.  He can come back in

 9  after the afternoon bathroom break, but I'm not going to allow

10  him to be in the courtroom after lunch as a result of his

11  disobeying the Court's admonishment every day, day after day,

12  and he's well aware.

13          And the defendants have been getting closer and closer,

14  pushing that line.  Multiple times I've had to tell them to quit

15  it and cut it out with the writing things on the notebook and

16  turning it towards the juror and so forth.  And so I can't let

17  it go on because my fear actually is that if I don't do

18  something about it, they're going to do something even worse.

19          So I'm not going to let him return after the lunch

20  break.  He can come back after the bathroom stretch break in the

21  middle of the afternoon.

22          THE DEFENDANT:  Your Honor?

23          THE COURT:  No, you've got an attorney.  You speak

24  through him.  You don't want to speak to me directly, trust me.

25  Let's go ahead and take our lunch break.

—2:16-cr-46-GMN-PAL—

1          (Recess taken at 12:04 p.m.)

2          (Resumed at 1:19 p.m.)

3          THE COURT:  All right.  You may be seated.  Thank you.

4     Go ahead and call in the jury.

5          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

6          (Whereupon jury enters the courtroom at 1:22 p.m.)

7          THE COURT:  Jury may go ahead and be seated.  Everyone

8     else may be seated as well.

9          The Government may call its next witness.

10          MR. MYHRE:  Thank you, Your Honor.  The Government

11     calls Special Agent Joel Willis.

12          THE COURT:  Good afternoon, Agent Willis.

13          THE WITNESS:  Good afternoon.

14          THE COURT:  Come on up.  Please be careful with the

15     steps.

16          JOEL WILLIS, having duly been sworn, was examined and

17     testified as follows:

18          COURTROOM ADMINISTRATOR:  Thank you.  You may be

19     seated.  Please state your full name for the record and spell

20     your last name.

21          THE WITNESS:  Joel Willis, W-I-L-L-I-S.

22          MR. MYHRE:  Thank you, Your Honor.

23                         DIRECT EXAMINATION

24     BY MR. MYHRE:

25     Q.  Good afternoon, Agent Willis.

 1  *A.*  Good afternoon.

 2  *Q.*  You are currently a special agent with the Federal Bureau of

 3  Investigation.  Is that correct?

 4  *A.*  Yes.

 5  *Q.*  Where are you currently officed?

 6  *A.*  At the FBI office here in Las Vegas.

 7  *Q.*  How long have you been employed by the FBI?

 8  *A.*  13 and a half years.

 9  *Q.*  And all of that time as a special agent?

10  *A.*  Yes.

11  *Q.*  Was the Las Vegas office your first office?

12  *A.*  No, I was assigned to the Newark, New Jersey/Philadelphia

13  office for five years before here.

14  *Q.*  Now, in the course of your duties at the Las Vegas field

15  office, were you assigned an investigation into the events of

16  April 12th, 2014?

17  *A.*  Yes.

18  *Q.*  What was your assignment?

19  *A.*  To oversee all evidence collection, interviews, and

20  documentation of the investigation into the events of April

21  12th, 2014.

22  *Q.*  And was that essentially as a case agent?

23  *A.*  Yes.

24  *Q.*  Had you -- before being assigned as a case agent in this

25  investigation, had you been involved in other criminal

1  investigations as well?

2  **A.**  Yes.

3  *Q.*  Just ballpark how many.

4  **A.**  Between 50 and 100.

5  *Q.*  Aside from your entry into the FBI and going through the FBI

6  Academy, have you had other specialized training as well?

7  **A.**  Yes, I have.

8  *Q.*  In connection with this investigation in particular, have

9  you had training and experience with respect to reviewing social

10  media?

11  **A.**  Yes, we call it social media exploitation.  And it's

12  basically identifying information, digital information,

13  collecting that evidence, and documenting it into a case file.

14  *Q.*  And when I use the term "social media," what generally does

15  that mean for you?

16  **A.**  Information sharing through the Internet.

17  *Q.*  And we've talked about during the course of this trial

18  Facebook.  That qualifies as social media?

19  **A.**  Yes.

20  *Q.*  How about YouTube?

21  **A.**  Yes.

22  *Q.*  And I'm not sure we've talked much about YouTube, but what

23  generally is YouTube?

24  **A.**  YouTube is an Internet video-sharing platform or website.

25  *Q.*  Now, in the course of your investigation of the events of

—2:16-cr-46-GMN-PAL—

1  April 12, have you reviewed social media looking for images from

2  that date?

3  A.  Yes, I have.

4  Q.  And just generally, we'll drill down a little bit to more

5  specifics, but generally explain what type of investigative

6  technique, for example, you used when reviewing social media?

7  A.  Well, it's very simple.  I would typically go -- go onto the

8  Internet.  Do search terms.  If it was something to do with

9  Bundy or April 12, 2014, basically start there where anybody

10 else would start and then drill down into different social media

11 websites like Facebook and YouTube.  And I would then collect or

12 capture screen shots, capture and download photographs and

13 videos, and then I would document those things into our case

14 file.

15 Q.  Are you familiar with the term "public source"?

16 A.  Yes, very.

17 Q.  What generally does that mean?

18 A.  Public source or open source is something that is generally

19 available to the public.  You would not need a user name or a

20 password or any type of special permission to access this

21 information on the Internet.

22 Q.  So any member of the public could go onto one of those sites

23 and look for something?

24 A.  Yes.

25 Q.  That's what you refer to as open source?

1    **A.**   Yes.

2    *Q.*   So as part of your investigation, did you review reopen

3    source?

4    **A.**   Yes, I did.

5    *Q.*   Now, during the course of this trial thus far, we've heard

6    from an individual named Alex Ellis.  Are you familiar with

7    Mr. Ellis?

8    **A.**   Yes.

9    *Q.*   And he referred to a film that was obtained or captured,

10   excuse me, a video captured by an individual by the name of

11   Michael Flynn?

12   **A.**   Yes.

13   *Q.*   Are you familiar with that?

14   **A.**   Yes, I am.

15   *Q.*   In the course of your investigation, have you reviewed the

16   video that was captured by Mr. Flynn from April 12?

17   **A.**   Yes.

18   *Q.*   Did you, in fact, obtain that video from him?

19   **A.**   Yes, I did.

20   *Q.*   Now, we've also heard from an individual by the name of Trey

21   Schillie.  Do you recall that testimony?

22   **A.**   Yes.

23   *Q.*   Had you interviewed Mr. Schillie?

24   **A.**   Yes, I did.

25   *Q.*   And did you obtain images and data from Mr. Schillie as

─2:16-cr-46-GMN-PAL─

 1  well?

 2  **A.**  Yes.

 3  *Q.*  In the course of your investigation, have you reviewed all

 4  of that?

 5  **A.**  Yes, I have.

 6  *Q.*  We also heard from a Special Agent McEwen concerning aerial

 7  surveillance video.  Do you recall that testimony?

 8  **A.**  Yes.

 9  *Q.*  During the course of your investigation, have you reviewed

10  that aerial?

11  **A.**  Yes, I have.

12  *Q.*  And just generally speaking, when you say you reviewed it,

13  what are you referring to?

14  **A.**  I'm referring to reviewing the video by playing it on a

15  media player on a computer.  So I'm reviewing the digital

16  information that was collected from that aerial photography.

17  And oftentimes or actually throughout the entire video,

18  reviewing it numerous times frame by frame, slowing it down,

19  speeding it up, things like that.

20  *Q.*  Now, aside from that surveillance film, were there any other

21  surveillance films from the northbound 15 that day on April 12,

22  2014?

23  **A.**  As far as official surveillance?

24  *Q.*  Correct.

25  **A.**  No.

—2:16-cr-46-GMN-PAL—

1  Q.  So there were no, like, pole cameras out there or anything

2  by the Nevada State Highway Department out there that would

3  capture images?

4  A.  No, sir.

5  Q.  Now, during the course of your investigation, however, or

6  during the events of April 12th, 2014, on the northbound bridge,

7  were there other -- were there other people there capturing

8  images as well?

9  A.  Yes.

10  Q.  We already talked about Schillie and we've talked about

11  Flynn, correct?

12  A.  Yes.

13  Q.  But there were other individuals as well?

14  A.  Yes, there were.

15  Q.  As part of your investigation, was -- were you tasked with

16  trying to obtain the identity of some of the people who may be

17  capturing images out there?

18  A.  Yes, I was.

19  Q.  Now, have you also reviewed the video that Special Agent

20  Shilaikis captured that day?

21  A.  Yes.

22  Q.  And how about with respect to Sergeant Serena?

23  A.  Yes.

24  Q.  You reviewed that video as well?

25  A.  Yes, I did.

2:16-cr-46-GMN-PAL

1   Q.   And did you review the video that was captured by Trooper

2   Madsen's dash cam?

3   A.   Yes, I have.

4   Q.   Now, I also want to talk a little bit about the area out

5   there near Bunkerville at the northbound 15.  Did you -- have

6   you physically visited the site where the -- what we've referred

7   to as the ICP, where that was located?

8   A.   Yes, I have.

9   Q.   Approximately how many times have you visited that site?

10  A.   Approximately six times.  I'm pretty confident six times,

11  actually.

12  Q.   And as part of your investigation, have you walked that

13  ground where the ICP is?

14  A.   Yes, I have.

15  Q.   How about the area which people have identified, witnesses

16  have identified, as Post 1?

17  A.   Yes, I have.

18  Q.   How about the area that people have identified as Post 2?

19  A.   Yes, I have.

20  Q.   Have you been up on the northbound bridge?

21  A.   Yes, I have.

22  Q.   And have you been down in the wash?

23  A.   Yes, I have.

24  Q.   Now, how about the area that's south of Post 1 across the

25  freeway which we've identified and referred to as sort of the

—2:16-cr-46-GMN-PAL—

 1  parking area, makeshift parking area, or the assembly area?

 2  **A.**  Yes, I have been there.

 3  *Q.*  Also, in the course of your investigation, have you been to

 4  the area that -- where the stage was located on April the 12th,

 5  2014?

 6  **A.**  Yes.

 7  *Q.*  Have you walked through that area?

 8  **A.**  Yes.

 9  *Q.*  Are you familiar with the terrain in that area?

10  **A.**  Yes, I am.

11  *Q.*  Now, in the course of your investigation, does the name

12  Dennis Michael Lynch -- is that familiar to you?

13  **A.**  Yes.

14  *Q.*  And who is Dennis Michael Lynch?

15  **A.**  Dennis Michael Lynch was a photographer that was in the

16  Bunkerville area on April 12, 2014, representing Fox News.

17          MR. MYHRE:  And, Your Honor, may we draw up what's been

18  previously admitted as Exhibit 6A and just play the first

19  portion of that?

20          COURTROOM ADMINISTRATOR:  Did you say 6A?

21          MR. MYHRE:  Yes, Exhibit 6A.  Correct.  It should be --

22  it should be 6A.

23          Has 6A not been admitted?  Okay.  If you could just

24  draw up just for the witness -- Your Honor, permission just to

25  draw up for the witness only Exhibit 6A.

—2:16-cr-46-GMN-PAL—

```
1            THE COURT:  All right.  Just for the witness.

2            MR. MYHRE:  And that's fine.  Right there, 9 seconds

3    into 6A.

4    BY MR. MYHRE:

5    Q.  Agent Willis, is this image here from images captured on

6    April the 12th, 2014?

7            MR. LEVENTHAL:  Objection, calls for speculation.

8            MR. MARCHESE:  Parker joins.

9            MR. TANASI:  Stewart joins.

10           MR. PEREZ:  Lovelein joins.

11           THE COURT:  The objection was speculation.  Do you want

12   to lay a foundation for how he would know that this is --

13           MR. MYHRE:  Sure, Your Honor.

14           THE COURT:  -- the video?

15   BY MR. MYHRE:

16   Q.  Well, first of all, is this part of Exhibit 6 that has

17   already been admitted?

18   A.  Yes.

19   Q.  Okay.  And do you recognize an individual in this who's

20   wearing a blue shirt?

21   A.  Yes, I do.

22   Q.  In Exhibit 6A?

23   A.  Yes.

24   Q.  And is that individual -- who is that individual?

25   A.  Dennis Michael Lynch.
```

—2:16-cr-46-GMN-PAL—

 1   Q.  And, again, this is a portion of the video that's already

 2   been admitted into evidence, correct?

 3   A.  Yes, it is.

 4           MR. MYHRE:  We offer Exhibit 6A, Your Honor.

 5           THE COURT:  Any other objection?

 6           MR. LEVENTHAL:  As to foundation as to how he knows

 7   Mr. Lynch and he knows that's Mr. Lynch.

 8           MR. MYHRE:  I'll be glad to lay that, Your Honor.

 9           THE COURT:  All right.

10   BY MR. MYHRE:

11   Q.  So did you meet with Mr. Lynch?

12   A.  Yes.

13   Q.  Did he identify himself to you?

14   A.  Yes, he did.

15   Q.  Did you verify his identity?

16   A.  Yes, I did.

17           MR. MYHRE:  And, again, we offer 6A, Your Honor.

18           THE COURT:  Any other objection?

19           MR. MARCHESE:  None from Parker.

20           MR. TANASI:  None from Stewart, Your Honor.

21           MR. LEVENTHAL:  No, Your Honor.

22           MR. PEREZ:  No, Your Honor.

23           THE COURT:  All right.  Exhibit 6A is admitted.  You

24   may go ahead and publish it to the jury.

25           MR. MYHRE:  Thank you, Your Honor.

—2:16-cr-46-GMN-PAL—

```
 1              (Government's Exhibit 6A is admitted.)
 2              MR. MYHRE:  And I'm just going to play the first eight
 3    seconds.
 4              (Video playing.)
 5              MR. MYHRE:  And you can stop there.
 6    BY MR. MYHRE:
 7    Q.  And, Agent Willis, if you could just -- you see the
 8    individual there holding a camera?
 9    A.  Yes, I do.
10    Q.  Who is that?
11    A.  That's Dennis Michael Lynch.
12    Q.  Now, you've indicated that you met with him.  Is that
13    correct?
14    A.  Yes.
15    Q.  And you interviewed him?
16    A.  Yes, I did.
17    Q.  And as part of your investigation, did you issue a subpoena
18    to Mr. Lynch?
19    A.  Yes.
20    Q.  And just for record purposes, we're all sort of familiar
21    with it, but what is a subpoena?
22    A.  A subpoena is a -- for this video segment collection that
23    Dennis Michael Lynch provided to us.  It is a document that is
24    from the grand jury of a district court, Federal District Court,
25    that requests and compels a person to provide the information
```

—2:16-cr-46-GMN-PAL—

 1  requested within the -- one of the attachments for the subpoena.

 2  So, again, for this case it would have been the

 3  video/photographic evidence that he would have possessed from

 4  April 12, 2014, requesting that.

 5  Q.  And as a special agent of the FBI, are you authorized to

 6  serve subpoenas?

 7  **A.**  Yes, I am.

 8  Q.  And did you serve one to Mr. Lynch?

 9  **A.**  Yes, I did.

10  Q.  Did you receive a response from that subpoena?

11  **A.**  Yes, I did.

12  Q.  What did you receive back?

13  **A.**  Approximately 120 video segments that had been captured by

14  Mr. Lynch on April 12th, 2014.

15  Q.  And how were you able to verify that they were captured on

16  April 12th, 2014?

17  **A.**  By reviewing them, number one, but, more importantly, this

18  is what he provided to us and explained to us during the

19  interview --

20  Q.  I don't want to talk about the explanation.

21  **A.**  Oh.

22  Q.  That's what he provided in response to the subpoena?

23  **A.**  Yes.

24  Q.  And did the subpoena ask for video images from April 12,

25  2014?

—2:16-cr-46-GMN-PAL—

1  *A.*  Yes.

2  *Q.*  Now, when you reviewed the various videos, were you -- how

3  were you able to verify from looking at the video whether it was

4  from April the 12th, 2014?

5  *A.*  The video itself was -- did not include accurate metadata

6  that would tell me when that video was created, the correct date

7  and time.  So I used just my knowledge of other admitted

8  evidence and evidence -- video, photo, audio evidence that has

9  been collected to verify that the events depicted in Dennis

10  Michael Lynch's videos are consistent with other video, photo,

11  and audio that was captured on that day.

12  *Q.*  So all the things that we've talked about previously that

13  you reviewed, you used that base of knowledge to compare them to

14  what Mr. Lynch gave you?

15  *A.*  Yes.

16  *Q.*  When you say that there was no metadata there, to what are

17  you referring?

18  *A.*  Metadata is typically information within the properties of a

19  data file.  So if it's again an audio, video, photograph on a

20  computer, if you right click and go down to Properties, click

21  Properties, you can get information, including GPS information,

22  the type of camera that was used, and of course the date and

23  time that that image was created and/or modified.

24          MR. MYHRE:  Your Honor, so may we call up for the

25  witness only what's been marked as Exhibit 19, please?

---2:16-cr-46-GMN-PAL---

1          THE COURT:  Yes, you may.

2   BY MR. MYHRE:

3   Q.  And, Agent Willis, do you recognize what's been marked as

4   Exhibit 19?

5   A.  Yes, I do.

6   Q.  And you've seen this before, correct?

7   A.  Yes.

8   Q.  And what is Exhibit 19?

9   A.  This image right now is depicting the rally site or staging

10  area in Bunkerville, Nevada, on Riverside Road, which is also

11  State Route 170, on April 12, 2014.

12  Q.  And how do you know that it's, first of all, the stage area

13  at Riverside Road?

14  A.  Well, there is a stage, but also near that stage there are

15  two flagpoles with a banner strung in between them.  And I'm --

16  there's other things in the background of that image, the

17  terrain, the road, things like that that I'm familiar with based

18  on my review of other evidence.

19  Q.  And you walked that area as well?

20  A.  Yes, I have.

21  Q.  The images that are depicted there appear -- there appear to

22  be people gathered at that site.  Is that correct?

23  A.  That's correct.

24  Q.  Is that consistent with other images you viewed in terms of

25  the gathering on April 12th, 2014?

1  *A.*  Yes.

2  *Q.*  And what other types of images that -- for example, is it

3  consistent with the images you reviewed from the Michael Flynn

4  video?

5  *A.*  Yes.

6  *Q.*  And how is it consistent with the Flynn video?

7  *A.*  Well, the Flynn video would have been from a different

8  vantage point of this, but it's the same people in the crowd

9  that you can see in the Dennis -- I'm sorry -- in the Michael

10  Flynn videos.

11  *Q.*  But this video is taken from a different vantage point.  Is

12  that correct?

13  *A.*  Yes.

14       MR. MYHRE:  Your Honor, we offer Government's Exhibit

15  19 for identification.

16       THE COURT:  Any objection to Exhibit 19?

17       MR. TANASI:  Stewart objects on foundation, Your Honor.

18  I think he's testified it's based on inaccurate metadata that

19  he's piecing together.

20       MR. MARCHESE:  Parker joins.  He's not the individual

21  that took these videos nor was he there on the date and time.

22       MR. LEVENTHAL:  Drexler joins on those grounds.

23       MR. PEREZ:  Lovelein joins as well.

24       THE COURT:  He's not seeking to admit the metadata,

25  right?

—2:16-cr-46-GMN-PAL—

1        MR. MYHRE:  That's correct, Your Honor.  We're offering

2   these images under 901(b)(4), the specific characteristics that

3   the agent will be able to identify from his investigation and

4   from other known sources of media that he has reviewed such as

5   the Michael Flynn video.

6        THE COURT:  All right.  Well, 901(b)(4), Distinctive

7   Characteristics and the Like.  The appearance, contents,

8   substance, internal patterns, or other distinctive

9   characteristics of the item, taken together with all the

10  circumstances.

11       On that basis the objections are overruled and Exhibit

12  19 is admitted.

13       MR. MYHRE:  Thank you, Your Honor.  May we publish?

14       THE COURT:  Yes, you may.

15       (Government's Exhibit 19 is admitted.)

16       (Video playing.)

17       MR. MYHRE:  And if we could stop there at 32 seconds,

18  please.  And, Nicole, if you could back up to about 27 seconds,

19  please.

20       So the record should reflect that we stopped the video

21  at 32 and backed up to 27 seconds.

22  BY MR. MYHRE:

23  *Q.*  Agent Willis, do you see a truck in the foreground of this

24  image?

25  *A.*  Yes, I do.

—2:16-cr-46-GMN-PAL—

1  *Q.* Have you been able, during the course of your investigation,

2  to determine the registration for that truck?

3  **A.** Yes, I have.

4  *Q.* And have you done that by viewing images that are

5  consistent --

6          MR. LEVENTHAL:  Objection, leading.

7          MR. MYHRE:  Your Honor, this is purely foundational, as

8  counsel knows.

9          MR. LEVENTHAL:  Your Honor, it's not foundational in

10  terms of this picture shows no license plate.  So counsel's

11  leading him through.  Just ask him how does he know that.

12  That's one --

13          MR. MYHRE:  I'm not -- I can get there a different way,

14  Your Honor, if that's ...

15          THE COURT:  All right.  Go ahead and do it the long

16  way.

17  BY MR. MYHRE:

18  *Q.* Did you -- in the course of identifying the registration for

19  this vehicle, did you review other images?

20  **A.** Yes, I have.

21          MR. MYHRE:  Your Honor, may we call up for the witness

22  Exhibit 40, please?

23          THE COURT:  Yes.

24          (Video playing.)

25          MR. MYHRE:  And we can stop there.  And if you could

—2:16-cr-46-GMN-PAL—

1  just back it up a little bit, please.  Thank you.

2  BY MR. MYHRE:

3  Q.  Now, Agent Willis, looking at Exhibit 40, do you recognize

4  this image?

5  A.  Yes, I do.

6  Q.  Where did you -- did you obtain this image?

7  A.  Yes, I did.

8  Q.  How did you obtain it?

9  A.  This was on YouTube.com.  Doing a search similar to what I

10  was mentioning earlier with a Google search for Bundy Ranch

11  produced a number of results.  This was one of them.  And once I

12  discovered this video, I downloaded it off of YouTube and

13  documented it in our case file.

14  Q.  And does this image depict a vehicle in it?

15  A.  Yes, it does.

16  Q.  Is that consistent with the image that we viewed in Exhibit

17  19?

18  A.  Yes, it is.

19  Q.  Can you tell where this image was captured?

20  A.  Yes.

21  Q.  And where was that?

22  A.  This would be to the -- on the south portion of the staging

23  area or rally site in Bunkerville, Nevada.

24  Q.  And how do you recognize that?

25  A.  Again, the flagpoles with the banner between.  There's a

—2:16-cr-46-GMN-PAL—

1  camper to the right, the road, the terrain on either side of the

2  road.

3          MR. MYHRE:  Your Honor, we offer Exhibit 40.

4          THE COURT:  Any objection to Exhibit 40?

5          MR. TANASI:  Your Honor, same objection as before with

6  respect to the metadata and the issue that was raised prior.

7          MR. MARCHESE:  Parker joins.

8          MR. LEVENTHAL:  Drexler joins.

9          MR. PEREZ:  Lovelein joins.

10          THE COURT:  All right.  I didn't hear anything about

11  the metadata on this one.

12          MR. MYHRE:  It's not being offered for metadata, Your

13  Honor, just for the images that have been captured.

14          THE COURT:  And this is -- he testified he downloaded

15  it from YouTube.

16          MR. MYHRE:  That's correct, Your Honor.

17          THE COURT:  And publicly available.  All right.

18  Exhibit 40 -- objection's overruled.  Exhibit 40 is admitted.

19  You may go ahead and publish it.

20          MR. MYHRE:  Thank you, Your Honor.

21          (Government's Exhibit 40 is admitted.)

22          MR. MYHRE:  If we could just start from the beginning.

23          (Video playing.)

24          MR. MYHRE:  No audio.  Thank you.  And you can stop

25  there.  And the record should reflect we stopped at 12 seconds.

1  Now, if we could just back up back to the beginning, please.

2         And the record should reflect that we're back at the

3  very beginning of this segment.

4  BY MR. MYHRE:

5  Q.  In that brief segment we saw there, Agent Willis, again,

6  just describe for us what we're seeing in the image that is now

7  before the jury.

8  A.  Well, in the foreground is the back of a white-colored Ford

9  Ranger truck, pickup truck.  In the background is the two poles

10 with the banner in between.  It looks like there might be a

11 media truck in front of the Ranger pickup truck.  There's a

12 camper to the right of that.  There's a road, which is Riverside

13 Road, S.R. 71, a hill to the left, and terrain on the right that

14 I recognize.

15 Q.  Now, on this -- on the vehicle we see a license plate.  Is

16 that correct?

17 A.  That's correct.

18 Q.  And were you able to obtain registration information

19 pertaining to that license number?

20 A.  Yes, I was.

21        MR. MYHRE:  And, Your Honor, we offer -- excuse me.

22 May we call up for the witness Exhibit 177, please?

23        THE COURT:  Yes.

24 BY MR. MYHRE:

25 Q.  Do you see 177, Agent Willis?

—2:16-cr-46-GMN-PAL—

1  *A.*  Yes, I do.

2  *Q.*  And what is that?

3  *A.*  This is a report from a registration inquiry of the Montana

4  DMV.

5  *Q.*  Did you obtain this in the course of your investigation?

6  *A.*  Yes, I did.

7  *Q.*  And does it bear indicia that it's an official document?

8  *A.*  Yes.

9  *Q.*  And what indicia is that?

10 *A.*  It's notarized, and it's also -- it's -- I believe it's

11 notarized, and it's also signed by a -- I guess a Montana County

12 official, somebody from the -- representative from the DMV.

13 *Q.*  And in your training and experience, is this consistent with

14 other registration documents you've seen?

15 *A.*  Yes.

16          MR. MYHRE:  Your Honor, we offer Government Exhibit

17 177.

18          THE COURT:  Any objection?

19          MR. MARCHESE:  None from Parker.

20          MR. TANASI:  None from Stewart, Your Honor.

21          MR. LEVENTHAL:  None on behalf of Mr. Drexler.

22          MR. PEREZ:  None from Lovelein.

23          THE COURT:  All right.  Exhibit 177 is admitted.

24          MR. MYHRE:  And thank you, Your Honor.  And may we

25 publish as well?

—2:16-cr-46-GMN-PAL—

1          THE COURT:  Yes, you may.

2          (Government's Exhibit 177 is admitted.)

3   BY MR. MYHRE:

4   *Q.*  Does the information in Exhibit 177 correspond to the

5   license plate number that we saw in the previous image of

6   Exhibit 40?

7   **A.**  Yes, it does.

8   *Q.*  And can you point out, just generally circle, where that is.

9          And would you read into the record what the

10  registration -- excuse me -- the license number is?

11  **A.**  565491B, as in Bravo.

12  *Q.*  Does this document indicate the individual to whom that

13  vehicle is registered?

14  **A.**  Yes.

15  *Q.*  And who is that individual?

16  **A.**  Ricky Ray Lovelein.

17         MR. MYHRE:  And you can take that down.  Thank you.

18  BY MR. MYHRE:

19  *Q.*  Are you familiar with an individual by the name of Hugh

20  Gourgeon?

21  **A.**  Yes.

22  *Q.*  And who is Hugh Gourgeon?

23  **A.**  Hugh Gourgeon was an individual that was in the area of

24  Bunkerville, Nevada, and on the northbound I15 bridge on April

25  12, 2014.

 1            MR. LEVENTHAL:  Objection, foundation.

 2    BY MR. MYHRE:

 3    Q.  Were you able to meet Mr. Gourgeon?

 4    A.  Yes.

 5    Q.  Did you identify him?

 6    A.  Yes.

 7    Q.  And did you identify his photograph or images in or around

 8    the northbound 15?

 9    A.  Yes.

10            THE COURT:  All right.  Objection overruled.

11    BY MR. MYHRE:

12    Q.  Now, during the course of your investigation, you talked

13    about reviewing open source Facebook pages, correct?

14    A.  Yes.

15            MR. MYHRE:  And, Your Honor, may we show for the

16    witness what has been marked as Exhibit 147?

17            THE COURT:  Yes, you may.

18    BY MR. MYHRE:

19    Q.  You see Exhibit 147 before you?

20    A.  Yes, I do.

21    Q.  And what is 147?

22    A.  147 is a screen capture from the Facebook page of Hugh

23    Gourgeon.

24    Q.  Who captured that image?

25    A.  There was an agent assigned to this project that I oversaw,

—2:16-cr-46-GMN-PAL—

1   but it was another FBI agent in my field office.

2   Q.  And was this entered into evidence?

3   A.  Yes, it was.

4   Q.  Now, what is depicted in the exhibit?

5   A.  What's depicted is a -- from the vantage point of the

6   northbound I15 bridge, including part of a Jersey barrier --

7          MR. MARCHESE:  Your Honor, I'm going to object.  This

8   hasn't been entered into evidence.

9          MR. MYHRE:  Just ...

10          THE COURT:  Want just generally?

11          MR. MYHRE:  Yes, Your Honor.

12   BY MR. MYHRE:

13   Q.  Just generally, what's depicted in this image?

14   A.  The northbound and southbound I15 bridge in Bunkerville,

15   Nevada.

16   Q.  Was this image captured on or about April 12th or on April

17   12th, 2014?

18   A.  Yes, it was.

19   Q.  And are there distinctive characteristics in this image that

20   help you identify it as coming from April the 12th?

21   A.  Yes.

22   Q.  And can you identify for us some of those just generally

23   speaking?

24   A.  The individuals that are depicted in the photograph, the

25   vehicles, and the general activity that is taking place when

—2:16-cr-46-GMN-PAL—

1  this photograph was captured.

2  Q.  There appear to be vehicles on that southbound lane,

3  correct?

4  A.  Correct.

5  Q.  Are the images of those vehicles visible in other media that

6  you reviewed?

7  A.  Yes.

8  Q.  And what type of media?

9  A.  The aerial FBI plane footage.

10 Q.  So from the aerial FBI plane footage you were able to verify

11 that those vehicles were on that southbound bridge at that time?

12 A.  Yes, I am.

13 Q.  On April 12, 2014?

14 A.  Yes, I am.

15        MR. MYHRE:  Your Honor, we offer Exhibit 147.

16        THE COURT:  Any objection to Exhibit 147?

17        MR. MARCHESE:  Parker objects.  It's our position that

18 we don't even know if this individual, this Mr. Gourgeon, is the

19 one who took this photo.  Another agent apparently is the one

20 who took it off of a Facebook at some point around April 12th.

21 So it's our position, with all due respect to Agent Willis, he

22 cannot authenticate this particular document.

23        THE COURT:  Any other objection?

24        MR. TANASI:  Stewart joins, Your Honor.

25        MR. LEVENTHAL:  Drexler joins.

—2:16-cr-46-GMN-PAL—

1        MR. PEREZ:  Lovelein joins.

2        MR. MYHRE:  Same position, Your Honor.  The agent

3   made -- excuse me -- can authenticate through the specific

4   characteristics available and other known media and specifically

5   in this case the aerial photographs.  And whether the Hugh

6   Gourgeon portion of it is -- that's what is part of that image.

7        THE COURT:  All right.  So the objection's overruled

8   pursuant to Federal Rule of Evidence 901(b)(4).  This exhibit,

9   No. 147, is admitted.

10       MR. MYHRE:  Thank you, Your Honor.  And may we publish?

11       THE COURT:  Yes, you may.

12       (Government's Exhibit 147 is admitted.)

13  BY MR. MYHRE:

14  *Q.*  147 is now available to the jury as well.  And, Agent

15  Willis, would you please just on your screen there just circle

16  the portion of this image that identifies Mr. Gourgeon.

17  *A.*  Sorry.  The screen doesn't seem to be liking me.

18  *Q.*  I've circled for you.  Do you see where I've circled?

19  *A.*  Yes.

20  *Q.*  And in those two places it identifies Mr. Gourgeon, correct?

21  *A.*  Yes, it does.

22  *Q.*  And this was -- again, it appears to be from Facebook.  Is

23  that correct?

24  *A.*  Yes.

25  *Q.*  The image that is below this, you had -- you spoke about

—2:16-cr-46-GMN-PAL—

1  vehicles that you were able to verify, correct?

2  **A.**  Yes.

3  *Q.*  And just are you able to circle those that you --

4  **A.**  Yeah, I'll try it again.

5         No, it's not letting me circle.

6  *Q.*  Okay.  I'll do it.  Tell me if, you know, we're --

7  **A.**  Yes.

8  *Q.*  I just circled an image or a portion of the image on the

9  screen for you.  Do you see that?

10  **A.**  Yes, I do.

11  *Q.*  Okay.  So you were able to verify those through the aerial

12  images you reviewed?

13  **A.**  Yes.

14  *Q.*  Now, the individual in the lower portion of this -- of this

15  image, have you been able to identify that person?

16  **A.**  Yes, I have.

17  *Q.*  And who is that?

18  **A.**  That's Scott Drexler.

19  *Q.*  And how do you know that?

20  **A.**  By his hat, his hair, the vest that I could see, a portion

21  of his shirt that I can see, his rifle, the blanket that he is

22  leaning on, and when I've compared it to other admitted

23  photographic and video evidence.

24         MR. MYHRE:  And specifically, Your Honor, may we draw

25  up Exhibit 14, please?

2:16-cr-46-GMN-PAL

```
 1          THE COURT:  Yes.

 2          MR. MYHRE:  If we could advance to 1:27.

 3   BY MR. MYHRE:

 4   Q.  This is from what video?

 5   A.  This is an Alex Ellis or Michael Flynn video taking -- taken

 6   after the stand-off and before the cattle have been released on

 7   April 12, 2014.

 8          MR. MYHRE:  And, again, the record should reflect that

 9   we've drawn up Exhibit 14 at 1:27.

10   BY MR. MYHRE:

11   Q.  And who is the individual depicted in this image at that

12   time?

13   A.  Scott Drexler.

14   Q.  As we see Mr. Drexler in this image, is that -- the clothing

15   he's wearing is on what date?

16   A.  On April 12, 2014.

17          MR. LEVENTHAL:  Objection, foundation.

18   BY MR. MYHRE:

19   Q.  The date this image was taken was what?

20   A.  April 12th, 2014.

21          MR. LEVENTHAL:  Objection, hearsay.

22          MR. MYHRE:  This is an admitted exhibit.

23          THE COURT:  Well, the objection was foundation.  So how

24   does he know it's that date and not a different date?

25   BY MR. MYHRE:
```

2:16-cr-46-GMN-PAL

1  Q.  This exhibit has already been entered into evidence.  Is

2  that correct?

3  A.  Yes.

4  Q.  And it was entered in by Mr. Ellis?

5  A.  Yes, it was.

6  Q.  And he testified he was out there on April 12th, 2014?

7  A.  Yes.

8  Q.  And verified the images as occurring on that date?

9  A.  Yes.

10       THE COURT:  All right.  Objection overruled.

11  BY MR. MYHRE:

12  Q.  Now, in terms of the clothing and how he's attired and so

13  forth, did you use this image as part of your ability to

14  identify images captured in other medium?

15  A.  Yes.

16  Q.  Including what we just looked at in Exhibit 147.  Is that

17  correct?

18  A.  That's correct.

19  Q.  Now, we talked about subpoenas earlier.  You met with

20  Mr. Gourgeon, correct?

21  A.  Yes.

22  Q.  And did you issue him a subpoena as well?

23  A.  Yes.

24  Q.  Just generally speaking, what was -- what did you seek in

25  the subpoena?

1   *A.*   I -- the same thing as Mr. Lynch was any photographic, video

2   evidence, audio evidence that he might have collected on April

3   12, 2014, in the Bunkerville area.

4   *Q.*   Did he respond to the subpoena?

5   *A.*   Yes, he did.

6   *Q.*   Did he provide anything to you?

7   *A.*   A thumb drive.

8   *Q.*   And what was contained on the thumb drive?

9   *A.*   Approximately 46 photographs and seven video segments,

10   digital files.

11   *Q.*   Did you review all of those?

12   *A.*   Yes.

13   *Q.*   Were they consistent or not consistent with images from

14   April 12th?

15   *A.*   They were consistent.

16         MR. MYHRE:  Your Honor, may we draw up what's been

17   previously marked as Exhibit 13?

18         THE COURT:  Yes, you may.

19         MR. MYHRE:  And if we could go to approximately 33

20   seconds in.  I'm sorry.  It would be 13A.

21         (Video playing.)

22         MR. MYHRE:  Back just a tad.  Okay.  Thank you.  We're

23   at 32 seconds on Exhibit 13A.

24   BY MR. MYHRE:

25   *Q.*   Now, do you see any images you recognize in this particular

1  segment of the video?

2  *A.*  Yes, I do.

3  *Q.*  And who do you recognize?

4  *A.*  I recognize a couple people in this image.  Let me see if my

5  screen's working.  That is Hugh Gourgeon in the yellow shirt.

6  And that is Trey Schillie.

7  *Q.*  Is that the same Mr. Schillie who testified in this

8  courtroom?

9  *A.*  Yes.

10  *Q.*  Excuse me.

11        And this image was again taken on April the 12th, 2014?

12  *A.*  Yes, it was.

13  *Q.*  By Mr. Flynn?

14  *A.*  Yes.

15        MR. MYHRE:  Thank you.  You may take that down.

16        Now, Your Honor, may we bring up for the witness what's

17  been marked as Exhibit 137?

18        THE COURT:  Yes, you may.

19  BY MR. MYHRE:

20  *Q.*  Do you see 137 before you, Mr. -- or excuse me -- Agent

21  Willis?

22  *A.*  Yes, I do.

23  *Q.*  What is this generally an image of?

24  *A.*  In general, it's people standing near the rally site/staging

25  area in Bunkerville, Nevada.  There's a hill in the background

2:16-cr-46-GMN-PAL

1  with several people on horseback on the hills.

2  *Q.*  Where did you obtain this image from?

3  **A.**  Hugh Gourgeon.

4  *Q.*  Was that part of the image that he -- those images he

5  provided you?

6  **A.**  Yeah, with -- from the subpoena response.

7  *Q.*  And you talked about -- you mentioned about the hill.

8  What's on top of the hill?

9  **A.**  On top of the hill is several people on horseback, a number

10  of them are holding flags, it appears.

11  *Q.*  And does this image contain the specific characteristics of

12  other known images that you've obtained from April the 12th,

13  2014?

14  **A.**  Yes, it does.

15          MR. MYHRE:  Your Honor, we offer Exhibit 137.

16          THE COURT:  Any objection to 137?

17          MR. MARCHESE:  None from Parker.

18          MR. TANASI:  None from Stewart, Your Honor.

19          MR. LEVENTHAL:  None on behalf of Mr. Drexler.

20          MR. PEREZ:  None from Lovelein.

21          THE COURT:  All right.  Exhibit 137 will be admitted.

22  You may go ahead and publish it to the jury.

23          MR. MYHRE:  Thank you, Your Honor.

24          (Government's Exhibit 137 is admitted.)

25  BY MR. MYHRE:

—2:16-cr-46-GMN-PAL—

1  Q.  And do you recognize any individuals in this particular

2  image?

3  A.  Yes, I do.

4  Q.  And who do you recognize?

5  A.  I recognize Mr. Ricky Ray Lovelein.  He's standing there

6  with I guess like an olive-colored shirt, brown shirt, a

7  wristwatch.  He has like a band around his waist, a handgun.

8  Q.  Are you able to circle his image?  Is your screen working

9  well enough?

10  A.  Yeah.  Let's see if ...

11  Q.  Thank you.

12  A.  It works this time.

13  Q.  How were you able to identify this individual as Ricky Ray

14  Lovelein?

15  A.  A couple things.  Based on other photographic and video

16  evidence from that day, but also based on his facial features

17  and his tattoo that's on his left forearm.

18  Q.  And if we could, could you just circle where the tattoo is

19  there.

20          Thank you.  And if we could draw a close-up on that.

21          You see the enlarged image in front of you,

22  Agent Willis?

23  A.  Yes, sir.

24  Q.  If you would just circle the tattoo again, please.

25          MR. MYHRE:  And, Your Honor, if we may draw up Exhibit

—2:16-cr-46-GMN-PAL—

1  130 -- what's been previously admitted as Exhibit 132, page 4.

2          And are we able to put those side-by-side?

3  BY MR. MYHRE:

4  *Q.*  And 132-4, page 4, is what, Agent Willis, the image to your

5  left?

6  *A.*  That is one of the booking photos after Mr. Lovelein was

7  arrested on --

8  *Q.*  But it's for -- it pertains to Mr. Lovelein?

9  *A.*  Yes.

10 *Q.*  And is that consistent or not consistent with the image to

11 the right?

12 *A.*  It's consistent.

13 *Q.*  Is that a point of identification that you've used to

14 identify Mr. Lovelein?

15 *A.*  Yes.

16          MR. MYHRE:  You can take those down.  Thank you.

17          Your Honor, may I show the witness what has been

18 previously marked as Exhibit 20, please?

19          THE COURT:  Yes.

20          (Video playing.)

21          MR. MYHRE:  And thank you.

22 BY MR. MYHRE:

23 *Q.*  Do you recognize the images captured in Exhibit 20?

24 *A.*  Yes, I do.

25 *Q.*  And what are those images of, generally speaking?

1   *A.*  Individuals standing near or in the staging area/rally site

2   in Bunkerville, Nevada, on April 12, 2014.

3   *Q.*  And is this from images received from Mr. Dennis Michael

4   Lynch?

5   *A.*  Yes.

6   *Q.*  You said it was the staging area.  Do you recognize specific

7   individuals in this image?

8   *A.*  Yes, I do.

9   *Q.*  And who are they?

10   *A.*  Ricky Ray Lovelein and Eric Parker.

11          MR. MYHRE:  Your Honor, we offer Exhibit 20 for

12   identification.

13          THE COURT:  Any objection to Exhibit 20?

14          MR. TANASI:  None from Stewart, Your Honor.

15          MR. MARCHESE:  Same objection, Parker.  This individual

16   is not the individual that took these particular videos.  It's

17   our position that Mr. -- the individual that took the video was

18   the only one that could authenticate it.

19          MR. LEVENTHAL:  I would object on the grounds of

20   foundation.  This witness has not testified as to what time this

21   was taken in.

22          MR. PEREZ:  Lovelein joins the previous objection.

23          THE COURT:  Government's response?  Is this offered

24   under 90 --

25          MR. MYHRE:  Yes, Your Honor.  Again, we're offering

 1  this under 901(b)(4).  So the specific person taking it does not

 2  have to testify.  The agent's identified specific individuals in

 3  this image.  I can ask a further foundational question.

 4  BY MR. MYHRE:

 5  Q.  Agent, looking at these images of the individuals that you

 6  recognize, is their clothing consistent with other known images

 7  from April the 12th, 2014?

 8  A.  Yes.

 9  Q.  And specifically with respect to Mr. Lovelein?

10  A.  Yes.

11       MR. MYHRE:  And we believe we've laid sufficient

12  foundation, Your Honor, for authenticity.

13       THE COURT:  Exhibit 20 will be admitted.  You may go

14  ahead and publish it to the jury.

15       MR. MYHRE:  Thank you, Your Honor.

16       (Government's Exhibit 20 is admitted.)

17       (Video playing.)

18       MR. MYHRE:  The record should reflect the segment

19  lasted approximately 16 seconds.  If we could back up to about 8

20  seconds, please.

21       I'm sorry.  A little bit further.  Maybe 5 seconds.

22  Thank you.

23       And the record should reflect the video stopped at 7

24  seconds.

25  BY MR. MYHRE:

—2:16-cr-46-GMN-PAL—

1   Q.  Now, Agent, you said you recognize Mr. Lovelein.  Could you

2   just circle where Mr. Lovelein is.

3            And is -- looking at this image to the person to the

4   right of Mr. Lovelein, do you know who that is?

5   A.  Yes.

6   Q.  And who is that?

7   A.  That's Eric Parker.

8   Q.  And how are you able to identify Mr. Parker?

9   A.  His facial features from the side, including his beard,

10  tactical vest, the shirt that he is wearing that he is seen in

11  in other photographic and video evidence and has been admitted,

12  things like that.  And his hat, black hat.

13  Q.  And with respect to Mr. Lovelein, does he appear to have

14  any -- well, what is he wearing aside from what you've

15  identified in the previous photo?

16  A.  He has a camouflage-pattern hat on, the

17  brownish-olive-colored shirt, dark band, and camouflage pants.

18  Q.  Does he appear to have anything in his ear?

19  A.  Yes.  It's a little bit hard to see from this image, but he

20  has a -- kind of an opaque or clear earpiece in that's coming

21  down his left side from his left ear.

22  Q.  If you could just circle that, please.  Whoops.

23            MR. MYHRE:  And just advance just one --

24            THE WITNESS:  Oh, sorry.

25            MR. MYHRE:  If we could advance one second and see if

—2:16-cr-46-GMN-PAL—

1  we can capture it.  No.  Go back.  I'm sorry.  Thank you.  Right

2  there.  Thank you.

3  BY MR. MYHRE:

4  Q.  Again, the image is stopped at 6 seconds.  If you could just

5  circle it -- circle what you believe to be a device in his ear.

6          MR. MYHRE:  And if we could zoom in on that a little

7  bit.  Now it's somewhat blurry in this image.

8  BY MR. MYHRE:

9  Q.  Is this consistent with other images that you've seen?

10 A.  Yes, it is.

11         MR. MYHRE:  Thank you.  You can take that down, please.

12         Your Honor, may we show the witness Exhibit 139?

13         THE COURT:  Yes, you may.

14 BY MR. MYHRE:

15 Q.  Do you have Exhibit 139 before you?

16 A.  Yes, I do.

17 Q.  Do you recognize this image?

18 A.  Yes, I do.

19 Q.  Where was this image obtained?

20 A.  Hugh Gourgeon.

21 Q.  Was this part of the images that you reviewed from what you

22 obtained from him?

23 A.  Yes.

24 Q.  And do you recognize this as -- from April the 12th, 2014?

25 A.  Yes, I do.

2:16-cr-46-GMN-PAL

1  Q.  And just generally speaking, what are the characteristics

2  that lead you to believe this is from April 12, 2014?

3  A.  The people standing on the roadway and the individual who is

4  laying down on the roadway.

5  Q.  And who's the individual laying down on the roadway?

6  A.  Eric Parker.

7  Q.  And you're able to from this image identify his clothing?

8  A.  Yes, I am.

9  Q.  Is it consistent with what he was wearing on April 12, 2014,

10  as seen in other images?

11  A.  Yes, it is.

12         MR. MYHRE:  Your Honor, we offer Exhibit 139.

13         THE COURT:  Any objection to Exhibit 39?

14         MR. MYHRE:  139.

15         THE COURT:  I'm sorry, 139.

16         MR. MARCHESE:  Same objection Parker.

17         MR. TANASI:  Same from Stewart, Your Honor.

18         MR. LEVENTHAL:  Same, Your Honor.  And I didn't hear if

19  this was an image or captured from a video.  So I would say

20  foundationally from that.

21         THE COURT:  Mr. Myhre, you want to clarify whether this

22  is a photograph or a video?

23         MR. MYHRE:  Thank you, Your Honor.

24  BY MR. MYHRE:

25  Q.  Do you know whether this was a photograph or a video that

—2:16-cr-46-GMN-PAL—

 1  was obtained from Mr. Gourgeon?

 2  *A.*   A photograph.

 3          THE COURT:  Any other objection?

 4          All right.  Government's response the same to the --

 5          MR. MYHRE:  Yes, Your Honor.

 6          THE COURT:  -- continuing objection?

 7          MR. MYHRE:  901(b)(4).

 8          THE COURT:  All right.  The objection is overruled.

 9  Exhibit 139 is admitted.  You may go ahead and publish it.

10          MR. MYHRE:  Thank you, Your Honor.

11          (Government's Exhibit 139 is admitted.)

12  BY MR. MYHRE:

13  *Q.*  Agent Willis, we talked about again -- for each of these

14  we're going to go over certain characteristics so that you are

15  able to explain to the jury how it's from April the 12th, 2014.

16          Could you identify for the jury what -- the

17  characteristics from this image that you find consistent with

18  known images that you viewed from April 12, 2014?

19  *A.*   Yes.  So Mr. Parker laying in the prone position with his

20  black hat, his black vest, his pattern plaid-type shirt, his

21  pants.  He has a large knife on his right side, as well as other

22  individuals on that bridge, including a couple photographers or

23  a few photographers, and other people that I have observed in

24  other video and photographic evidence.

25  *Q.*  Well, while we're talking about photographers, have you

—2:16-cr-46-GMN-PAL—

1  identified individuals as photographers in this image?

2  *A.*  Yes.

3  *Q.*  And who are those individuals?

4  *A.*  This individual is Jim Urquhart, Urquhart.

5        MR. MYHRE:  And the record should reflect that the

6  witness has circled the individual -- the image of an individual

7  to the left-hand side of the screen.

8  BY MR. MYHRE:

9  *Q.*  Who is he again?

10  *A.*  Jim Urquhart.

11  *Q.*  And who does -- does Mr. Urquhart work for someone?

12  *A.*  He's a photographer for primarily Reuters.

13  *Q.*  And how about the individual to the right of where you've

14  circled Mr. Parker?

15  *A.*  I do not know the identity of this person, but this

16  person -- their photographs were located by me on a Facebook

17  page titled Citizens Action Network.

18  *Q.*  The individual you've just circled now to the right of

19  Mr. Parker, is that -- does that person appear in other images

20  that we will see?

21  *A.*  Yes.

22        MR. MYHRE:  Now, just to go back just so the record is

23  clear with respect to Mr. Parker.  Your Honor, may we draw up

24  Exhibit 14 at 18 seconds?

25        THE COURT:  Yes, you may.

—2:16-cr-46-GMN-PAL—

1          MR. MYHRE:  That's good.  And the record should reflect

2   we're at Exhibit 14, 18 seconds.

3   BY MR. MYHRE:

4   Q.  And we've seen this image before, but is this one of the

5   images that you've used to verify the clothing Mr. Parker was

6   wearing that today?

7   **A.**  Yes, it is.

8   Q.  And this Exhibit 14 again is from whom?

9   **A.**  Michael Flynn and Alex Ellis.

10  Q.  Just for record purposes, if you could just describe --

11  first of all, point out Mr. Parker in this image.

12          MR. MYHRE:  And the record should reflect the agent has

13  circled the individual wearing the black hat with the white

14  insignia.

15  BY MR. MYHRE:

16  Q.  And just for record purposes, describe generally again the

17  clothing from this known image.

18  **A.**  His black hat with the white emblem on the front, facial

19  hair, his shirt, and his black tactical vest he's wearing.

20          MR. MYHRE:  Thank you.  You can bring that down.

21          Your Honor, may we draw up Exhibit 141, please?

22          THE COURT:  Yes, you may.

23          MR. MYHRE:  For the witness only.

24  BY MR. MYHRE:

25  Q.  And do you recognize Exhibit 141?

—2:16-cr-46-GMN-PAL—

1  *A.*  Yes, I do.

2  *Q.*  Generally speaking, what is depicted in that exhibit?

3  *A.*  Eric Parker laying in the prone position on a roadway.

4  *Q.*  And was this -- where was this image obtained from?

5  *A.*  Hugh Gourgeon.

6  *Q.*  Is it consistent with the clothing that Mr. Parker was

7  wearing on April 12, 2014?

8  *A.*  Yes, it is.

9  *Q.*  And where was this image taken?

10  *A.*  This was taken face --

11  *Q.*  Just location.  Was it --

12  *A.*  Oh.  Northbound.

13  *Q.*  Northbound 15?

14  *A.*  Northbound I15 bridge near Bunkerville, Nevada.

15          MR. MYHRE:  Your Honor, we offer Exhibit 141.

16          THE COURT:  Any objection to Exhibit 141?

17          MR. MARCHESE:  Continuing objection Parker.

18          MR. TANASI:  Stewart joins, Your Honor.

19          MR. LEVENTHAL:  Drexler joins.

20          MR. PEREZ:  Lovelein joins.

21          MR. MYHRE:  Same response, Your Honor.

22          THE COURT:  All right.  Same ruling.  Exhibit 141 will

23  be admitted.  You may go ahead and publish it to the jury.

24          MR. MYHRE:  Thank you, Your Honor.

25          (Government's Exhibit 141 is admitted.)

—2:16-cr-46-GMN-PAL—

1  BY MR. MYHRE:

2  *Q.*  Now, Agent Willis, you talked about metadata.  When you

3  received the images from Mr. Gourgeon, was there metadata

4  contained in there?

5  *A.*  Yes.

6  *Q.*  And you already described generally what that is, but from

7  that metadata were you able to derive also dates that these

8  images were taken?

9  *A.*  Yes.

10  *Q.*  And that would have been April the 12th?

11  *A.*  Yes.

12  *Q.*  Were you also able to derive specific times?

13  *A.*  Yes, on his images, his photographs, I was.

14  *Q.*  And is that visible in this image we see here?

15  *A.*  No.  You would need to review the original image that was

16  provided to us, to the FBI, by Mr. Gourgeon.  And again go

17  through that same process of right clicking, going to the

18  Properties, and reviewing the metadata information within that

19  image.

20  *Q.*  Now, in the course of your investigation, have you been

21  asked to construct a timeline?

22  *A.*  Yes.

23  *Q.*  And in that timeline did you use the metadata to derive

24  specific times that these images were taken?

25  *A.*  Yes.

1  Q.  And have you compiled the results of your investigation and

2  analysis into an exhibit -- into an exhibit?

3  A.  Yes, I have.

4  Q.  And we're not going to talk about that now, but I just

5  wanted to raise that with you now.

6          While this image does not contain the time, you were

7  able to derive the time at -- through the process you just

8  described, correct?

9  A.  Yes, I was.

10  Q.  And in the process of pulling together this other exhibit,

11  you've indicated the times.  Is that right?

12  A.  Yes.

13          MR. MYHRE:  And, Your Honor, may we draw up Exhibit 142

14  for the witness only?

15          THE COURT:  Yes, you may.

16          MR. MYHRE:  142.  Thank you.

17  BY MR. MYHRE:

18  Q.  Agent Willis, I'm going to go through the same series of

19  questions with you for all of these that are going to be

20  following.

21          Do you recognize Exhibit 142?

22  A.  Yes, I do.

23  Q.  And was this obtained from Mr. Gourgeon?

24  A.  Yes, it was.

25  Q.  Do you recognize the individual in this image?

1   *A.*  Yes, I do.

2   *Q.*  Does the date and time appear on this image?

3   *A.*  No, it does not.

4   *Q.*  But it does appear in the metadata?

5   *A.*  Yes, it does.

6   *Q.*  And is the individual in this image -- who is that?

7   *A.*  That is Scott Drexler.

8   *Q.*  And you were able to identify him how?

9   *A.*  By his attire, his clothing, his tactical vest, boots, and

10  his rifle.

11  *Q.*  Based on your understanding of that area and your

12  investigation, where was this image captured?

13  *A.*  This is captured on the northbound I15 bridge near

14  Bunkerville, Nevada.

15          MR. MYHRE:  Your Honor, we offer Exhibit 142.

16          THE COURT:  Any objection to 142?

17          MR. TANASI:  Same continuing objection Stewart, Your

18  Honor.

19          MR. MARCHESE:  Parker joins.

20          MR. LEVENTHAL:  Join.

21          MR. PEREZ:  Lovelein joins.

22          MR. MYHRE:  And the same response, Your Honor.

23          THE COURT:  Same ruling.  Exhibit 142 will be admitted.

24  You may go ahead and publish it to the jury.

25          MR. MYHRE:  Thank you, Your Honor.

— 2:16-cr-46-GMN-PAL —

```
1              (Government's Exhibit 142 is admitted.)

2   BY MR. MYHRE:

3   Q.  And, Agent Willis, do you use this image later in your

4   timeline?

5   A.  Yes, I do.

6              MR. MYHRE:  Your Honor, may we call up for the witness

7   Exhibit 143?

8              THE COURT:  Yes, you may.

9   BY MR. MYHRE:

10  Q.  And what's been previously admitted as Exhibit 143, thank

11  you, is ...

12             M. MYHRE:  If I could have just one moment, Your Honor.

13             THE COURT:  Yes, you can.

14             (Government conferring.)

15             MR. MYHRE:  Thank you, Your Honor.

16  BY MR. MYHRE:

17  Q.  Now, looking at 143, you recognize Mr. Parker in this image,

18  correct?

19  A.  Yes, I do.

20  Q.  And just indicate where he is.

21             The individual to his right, do you recognize that

22  individual?

23  A.  Yes, I do.

24  Q.  And have you been able to identify that person?

25  A.  Yes.
```

1   Q.   And who have you identified him as?

2   A.   Steven Stewart.

3   Q.   What -- and how is it that you're able to identify that

4   image as the image of Mr. Stewart?

5   A.   Right there he has a blue shirt with a design on the back,

6   his jeans, he has a large knife on his left side, and also the

7   butt of the rifle that is leaning up against the Jersey barrier

8   in front of Mr. Stewart.

9           MR. MYHRE:   And, Your Honor, may we draw up what's been

10   previously admitted as Exhibit 14 at 47 seconds?

11           THE COURT:   Yes, you may.

12           (Video playing.)

13           MR. MYHRE:   Thank you.   And the record should reflect

14   that Exhibit 14 is up at 47 seconds.

15   BY MR. MYHRE:

16   Q.   Do you see Mr. Stewart depicted in this image?

17   A.   Yes, I do.

18   Q.   And circle him, please.

19           And you've viewed Mr. Stewart in other images we're

20   going to see in the future, correct?

21   A.   Yes.

22   Q.   If you could just point out some of the features -- and this

23   is -- again, Exhibit 14 is from Ellis Flynn [sic].   Is that

24   correct?

25   A.   Yes.

—2:16-cr-46-GMN-PAL—

1  Q.  And this is the interview on the bridge, right?

2  A.  Yes.

3  Q.  If you could just please point out some of the features or

4  the distinctive characteristics of Mr. Stewart that you've used

5  to identify not only the image that we saw, but future images as

6  well?

7  A.  His hair, his facial features, the blue shirt, and from this

8  vantage point it's from the front, but I believe it's some type

9  of like Orange County Choppers or something like that shirt with

10  a similar emblem on the front.  His blue jeans, his tatoos, and

11  again the butt of the rifle that's in his right hand.  In this

12  picture he has a backpack on.  In the last picture he did not.

13          MR. MYHRE:  And, Your Honor, may we draw up Exhibit 5A

14  at 2 seconds as well?

15          THE COURT:  Yes.

16          MR. MYHRE:  Thank you, Your Honor.  At about 2 seconds.

17  If you could play it forward from there, please.

18          (Video playing.)

19          MR. MYHRE:  And just go back one last time to 2.  Thank

20  you.

21  BY MR. MYHRE:

22  Q.  And do you see Mr. Stewart in this image here at about 1

23  second?

24          MR. TANASI:  Objection, leading.

25          THE COURT:  Well, it's not leading.  There's 30 people

1    in that picture, and he's asking if he can see Mr. Stewart.

2    It's overruled.  He can answer the question.

3            THE WITNESS:  Yes, I can.  Circle him right here.

4            MR. MYHRE:  And he's circling.

5    BY MR. MYHRE:

6    Q.  And do you see anything that Mr. Stewart is wearing that's

7    distinctive to you?

8    A.  Yes, my red line is kind of over it, but his shirt, blue

9    shirt, with the design on the back, his blue jeans.  In this

10   image he's wearing a dark-colored hat, but he has the large

11   knife in a sheath, looks like a brown or leather sheath, with a

12   fluorescent pink label on it on his left side of his left thigh.

13   Q.  And could we just focus on that area where --

14           MR. MYHRE:  The record should reflect, first of all,

15   that the witness has circled an individual at about the 2 second

16   interval of Exhibit 5A.  If we could just enlarge that portion,

17   please.

18           And the record should reflect that image has been

19   enlarged.

20   BY MR. MYHRE:

21   Q.  If you would, Agent Willis, identify what you previously

22   identified as the knife by circling it.

23           And is this consistent with the last image we saw at

24   Exhibit 143?

25   A.  Yes.

—2:16-cr-46-GMN-PAL—

1  Q.  "This" being the knife?

2  A.  Yes.

3  Q.  And are the blue jeans consistent with the jeans in 143?

4  A.  Yes, they are.

5        MR. MYHRE:  Thank you.  You can bring that down.

6        Your Honor, may we call up for the witness Exhibit 144?

7        THE COURT:  Yes, you may.

8        MR. MYHRE:  Thank you, Your Honor.

9  BY MR. MYHRE:

10  Q.  Do you have 144 before you, Agent?

11  A.  Yes, I do.

12  Q.  Generally speaking, what is this?

13  A.  This is an image of Mr. Scott Drexler laying in the prone

14  position on a roadway.

15  Q.  And was this obtained from Mr. Gourgeon?

16  A.  Yes, it was.

17  Q.  The clothing of Mr. -- the individual we identified as

18  Mr. Drexler, is that consistent with the clothing we've seen in

19  other images?

20  A.  Yes, it is.

21        MR. MYHRE:  Your Honor, we offer --

22  BY MR. MYHRE:

23  Q.  Other images from April the 12th, 2014?  From April the

24  12th, 2014?

25  A.  Yes, yes.  I'm sorry.

—2:16-cr-46-GMN-PAL—

```
 1   Q.  No, my bad.  My apologies.

 2           MR. MYHRE:  Your Honor, the Government offers Exhibit

 3   144.

 4           THE COURT:  Any objection to Exhibit 144?

 5           MR. MARCHESE:  Continuing objection Parker.

 6           MR. TANASI:  Stewart joins.

 7           MR. LEVENTHAL:  Drexler joins.

 8           MR. PEREZ:  Lovelein joins.

 9           MR. MYHRE:  And same response, Your Honor.

10           THE COURT:  Same ruling.  Exhibit 144 will be admitted.

11   You may go ahead and publish it to the jury.

12           MR. MYHRE:  Thank you, Your Honor.

13           (Government's Exhibit 144 is admitted.)

14   BY MR. MYHRE:

15   Q.  And, Agent Willis, this image at 144, this is taken from

16   where?

17   A.  The northbound I15 bridge near Bunkerville, Nevada.

18   Q.  And this image had embedded within it metadata?

19   A.  Yes, it did.

20   Q.  And it showed from April the 12th, correct?

21   A.  Yes.

22   Q.  And a particular time?

23   A.  Yes.

24   Q.  Do you use this image later in the timeline you've

25   constructed?
```

1  *A.*  Yes, I do.

2        MR. MYHRE:  Your Honor, may we call up for the witness

3  Exhibit 145?

4        THE COURT:  Yes, you may.

5  BY MR. MYHRE:

6  *Q.*  And do you have 145 before you?

7  *A.*  Yes, I do.

8  *Q.*  What is depicted in this image?

9  *A.*  This is a number of individuals walking on or standing to

10 the side of northbound I15 on the bridge near Bunkerville,

11 Nevada.

12 *Q.*  This was obtained from Mr. Gourgeon?

13 *A.*  Yes, it was.

14 *Q.*  And metadata was embedded in this image as well?

15 *A.*  The -- this is a screen shot or still shot of a video that

16 was provided by Mr. Gourgeon.  His videos did not have metadata

17 that were consistent or accurate with the date and time that

18 this was taken on April 12th.

19 *Q.*  Do you recognize the clothing -- well, first of all, do you

20 recognize Mr. Drexler and Mr. Parker in that image?

21 *A.*  Yes, I do.

22 *Q.*  Is it consistent with the clothing that they were wearing

23 April 12th, 2014?

24 *A.*  Yes.

25 *Q.*  Do you see vehicles in the background?

— 2:16-cr-46-GMN-PAL —

1  *A.*  Yes, I do.

2  *Q.*  And were you able to identify vehicles that are in the

3  background of this photo and verify them with aerial shots?

4  *A.*  Yes.  This -- yes, I was.  I'll explain later.

5  *Q.*  Did you use other -- did you use the aerial shots to verify

6  this -- by "aerial shots," I mean the aerial surveillance film.

7  Were you able to use that to verify other aspects of this image?

8  *A.*  Yes, I was.

9  *Q.*  And what were those?

10  *A.*  Again, the vehicles traveling on the northbound I15 bridge

11  that were visible in the aerial photography or footage.

12          MR. MYHRE:  And, Your Honor, we offer Exhibit 145.

13          THE COURT:  Objections to 145?

14          MR. TANASI:  Same continuing objection Stewart, Your

15  Honor.

16          MR. MARCHESE:  Parker joins.

17          MR. LEVENTHAL:  Drexler joins.

18          MR. PEREZ:  Lovelein joins.

19          THE COURT:  Same response from the Government?

20          MR. MYHRE:  Yes, Your Honor.

21          THE COURT:  All right.  Same ruling, 901(b)(4).  The

22  Exhibit No. 145 will be admitted.  You may go ahead and publish

23  it to the jury.

24          MR. MYHRE:  Thank you, Your Honor.

25          (Government's Exhibit 145 is admitted.)

—2:16-cr-46-GMN-PAL—

1   BY MR. MYHRE:

2   Q.  The image now that we see at 145?

3   A.  Yes.

4   Q.  Does this image appear later in your timeline as well?

5   A.  Yes, it does.

6   Q.  Just -- and, again, if you would circle where Mr. Drexler is

7   located.

8          MR. MYHRE:  And the witness is circling the individual

9   in approximately the middle of the screen.

10  BY MR. MYHRE:

11  Q.  And Mr. Parker as well?

12         MR. MYHRE:  And the witness has circled an individual

13  to the right of the individual he's identified as Mr. Drexler.

14  BY MR. MYHRE:

15  Q.  And, again, this is on the northbound, correct?

16  A.  Yes, it is.

17         MR. MYHRE:  Your Honor, may we offer or, excuse me,

18  show the witness what's been marked as Exhibit 146?

19         THE COURT:  Yes, you may.

20  BY MR. MYHRE:

21  Q.  Do you see 146?

22  A.  Yes, I do.

23  Q.  Was this obtained from Mr. Gourgeon?

24  A.  Yes, it was.

25  Q.  Is this also a screen shot from his video?

—2:16-cr-46-GMN-PAL—

1  *A.*  Yes.

2  *Q.*  What's depicted in this screen shot?

3  *A.*  Three individuals standing on a roadway as well as Mr. Scott

4  Drexler in a prone position with his rifle pointed in between a

5  gap in the -- in Jersey barriers on the bridge.

6  *Q.*  And with respect to Mr. Drexler, is his clothing consistent

7  with other known images from April the 12th, 2014?

8  *A.*  Yes.

9  *Q.*  Aside from his clothing, what other aspects of this

10  photograph were you able to identify as specific to April the

11  12th, 2014?

12  *A.*  There was individuals on the embankment of the southbound

13  I15 bridge that I've identified in other video and photographic

14  evidence.

15  *Q.*  And is that evidence from April the 12th, 2014?

16  *A.*  Yes.

17        MR. MYHRE:  Your Honor, we offer Government's Exhibit

18  146.

19        MR. LEVENTHAL:  I'm going to object on new grounds as

20  to cumulative.  This is the same picture just being shown over

21  and over, Your Honor, from a different angle.  It's cumulative.

22        MR. MARCHESE:  Parker joins.

23        MR. PEREZ:  Lovelein joins.

24        MR. TANASI:  Stewart joins.

25        THE COURT:  Mr. Myhre?

-2:16-cr-46-GMN-PAL-

1          MR. MYHRE:  Thank you, Your Honor.

2    BY MR. MYHRE:

3    Q.  Is this image captured at a different time from the previous

4    images that we have previously seen?

5    A.  It is captured at a different time, but this image depicts

6    other characteristics of the bridge, of the area, of the people

7    around that is unique to this image compared to the other image.

8    Q.  And, specifically, with respect to the three individuals you

9    previously testified about, is that unique to this particular

10   image?

11   A.  Yes.

12   Q.  Just -- we're just up now just for the Court.  If you would

13   just circle for the Court the image of the three individuals to

14   which you refer.

15          And those individuals you've identified from other

16   media?

17   A.  Yes.

18   Q.  And that's from April the 12th, 2014?

19   A.  Yes.

20   Q.  And, specifically, what media or images are you referring

21   to?

22   A.  To the Michael Flynn videos, to the Dennis Michael Lynch

23   videos, through other Hugh Gourgeon photographs.

24          MR. MYHRE:  Again, Your Honor, we offer Exhibit 146.

25   It's unique.

—2:16-cr-46-GMN-PAL—

 1            THE COURT:  All right.  The objection's overruled.

 2   Exhibit 146 is admitted.

 3            (Government's Exhibit 146 is admitted.)

 4            MR. MYHRE:  And may we publish?

 5            THE COURT:  Yes, you may.

 6   BY MR. MYHRE:

 7   *Q.*  Again, Agent, if you'd circle Mr. Drexler, please.

 8            Now, the individuals about whom you just testified that

 9   were on the south -- or the embankment on the southbound, would

10   you circle those individuals.

11   *A.*  Yes.

12   *Q.*  And describe for the record what you've just circled there.

13   *A.*  I've circled three individuals who are crouching on the

14   non-road side of the southbound I15 bridge.  So that would just

15   be the beginning of the embankment before the concrete or cement

16   skirt would begin and leads down into the wash.

17            I note from reviewing this image that they're all

18   wearing some type of camouflage clothing and hats.

19            MR. MYHRE:  And if we could enlarge on that particular

20   portion.  Just draw it up a little bit, more perspective on it.

21   Draw a larger area.  There we go.  Thank you.

22   BY MR. MYHRE:

23   *Q.*  So now in this larger image if you could just draw little

24   lines to those individuals.

25   *A.*  I'll put a line under each person.

—2:16-cr-46-GMN-PAL—

1   Q.  And in this image, this is taken from, again, what bridge?

2   A.  This is taken from the northbound bridge.

3   Q.  And it's looking in which direction?

4   A.  North, towards the southbound bridge.

5           MR. MYHRE:  If you could take that down, please.

6           And, Your Honor, may we draw up what's been previously

7   marked as Exhibit 21 at approximately 6:21?

8           THE COURT:  Yes.

9           (Video playing.)

10          MR. MYHRE:  And if I could get a time.  There we go.

11   Thank you.  If you would go back just two seconds.  Thank you.

12   BY MR. MYHRE:

13   Q.  Now, we've heard this image is in front of the stage.  Is

14   that correct?

15   A.  Yes.

16   Q.  And we've heard testimony about this, but generally when was

17   this taken?

18   A.  This would have been taken around 9:40 a.m. in the morning

19   on April 12, 2014.

20   Q.  And during what event?

21   A.  This would have been the -- when -- the time when Sheriff

22   Douglas Gillespie was on stage with Cliven Bundy and they both

23   spoke.

24   Q.  Now, do you see -- you see some uniformed individuals in the

25   foreground here.  Is that correct?

—2:16-cr-46-GMN-PAL—

1  *A.*  Yes.

2  *Q.*  And were you able to -- from these uniforms, based on your

3  investigation and your training and experience, are you able to

4  identify any particular organizations these individuals belonged

5  to?

6  *A.*  Yes, I was.

7  *Q.*  And what organization is that?

8  *A.*  The Arizona State Militia.

9  *Q.*  And I believe that Mr. Ellis testified earlier that he

10  thought these people were Oath Keepers --

11          MR. LEVENTHAL:  Objection as to commenting on someone

12  else's testimony.

13  BY MR. MYHRE:

14  *Q.*  Do you recall that testimony?

15  *A.*  Yes, I do.

16          MR. LEVENTHAL:  Same objection, Your Honor.

17          THE COURT:  That's not a legal objection.  You can ...

18          MR. LEVENTHAL:  You can comment on other people's

19  testimony?

20          THE COURT:  You're not questioning the credibility of

21  the testimony, are you?

22          MR. MYHRE:  No, Your Honor.  I was just asking whether

23  he had recalled that testimony.  He was present during the

24  testimony.

25          THE COURT:  That's overruled.  He can't ask him to say

2:16-cr-46-GMN-PAL

1  whether or not another witness was lying or telling the truth.

2  Those kind of comments on testimony are not permitted, but just

3  to --

4          MR. MYHRE:  I'm just -- all I'm doing --

5          THE COURT:  Elicit it, yeah, as foundational for a

6  different question, that's permitted.  Overruled.

7          MR. LEVENTHAL:  If I may be heard just briefly.  I

8  think he is going because he asked about Arizona State Militia,

9  and I think Mr. Ellis testified this was a different group.  So

10 it would go towards that.

11         MR. MYHRE:  Your Honor, I was just going to say

12 basically what was previously identified as Oath Keepers and ask

13 him to describe how he understands these to be Arizona State

14 Militia.

15         MR. LEVENTHAL:  That goes to credibility.

16         THE COURT:  All right.  Well, if it does -- if you

17 are -- if you are impeaching Mr. Ellis, then it is -- then the

18 objection is sustained to that extent.

19         MR. MYHRE:  Well --

20         THE COURT:  If you're asking a different question

21 without respect to the testimony of Mr. Ellis, then that would

22 be appropriate.

23         MR. MYHRE:  Thank you, Your Honor.  And I'll just -- we

24 can strike that answer, and I will move to strike it.  We'll

25 just move on from there.

 1  BY MR. MYHRE:

 2  Q.  With respect to the individuals that were in front of that

 3  stage, okay, you indicated that you've identified them as

 4  belonging to the Arizona State Militia?

 5  A.  Yes.

 6  Q.  What type of indicia did you look for in order to make that

 7  identification?

 8  A.  A patch or something on their chest that would indicate an

 9  affiliation with a militia, specifically the Arizona State

10  Militia.

11  Q.  Now, based on your review of Exhibit 146, was that

12  consistent -- the image is that of the three individuals up on

13  the embankment on southbound?

14  A.  Yes.

15  Q.  Is that consistent or inconsistent with your identification

16  of Arizona State Militia?

17  A.  Well, I couldn't see their patches from that image obviously

18  because it's so far away, but I know that all of those

19  individuals are also lined up --

20          MR. LEVENTHAL:  Objection, nonresponsive.

21          THE WITNESS:  -- in front of this stage.

22          MR. LEVENTHAL:  Objection, nonresponsive.

23          MR. MYHRE:  The nonresponsive objection, Your Honor,

24  belongs to the questioner, but irrespective of that, the -- he

25  was responding to the question of how he knows the individuals

 1  on the southbound were Arizona State Militia.

 2          THE COURT:  All right.  He may answer that question.

 3          THE WITNESS:  Again, all of those individuals are lined

 4  up in front of the stage in close proximity to these other

 5  people.  And I can see just from this image that one of the

 6  people who I have -- we have identified is actually wearing an

 7  Arizona State Militia patch on his chest.

 8  BY MR. MYHRE:

 9  Q.  On this image?

10  A.  Yes.

11  Q.  And if you could just circle that.

12          MR. MYHRE:  And the record should reflect that the

13  image is at 6:21, circling a patch on the individual who's

14  wearing camouflage and is about the left center of this screen.

15          And if we could just play forward of this a little bit.

16          (Video playing.)

17          MR. MYHRE:  And back up -- just stop there and just

18  back up just a little bit.  Play forward, please.  Thank you.

19          (Video playing.)

20          MR. MYHRE:  And stop there.

21  BY MR. MYHRE:

22  Q.  This individual in the foreground here with the hat, were

23  you able to identify that individual?

24  A.  Yes, I was.

25  Q.  And how were you able to identify him?

—2:16-cr-46-GMN-PAL—

1   *A.*  By his activities on April 12th, 2014, including his vehicle

2   that is seen transporting other individuals which he would later

3   end up with on the embankment on the southbound I15 bridge in

4   Bunkerville.

5          MR. MYHRE:  If we could take that down for the time

6   being.

7          And if we could, Your Honor, may I show the witness

8   what's been previously marked as Exhibit 24?

9          THE COURT:  You may.

10         (Video playing.)

11  BY MR. MYHRE:

12  *Q.*  And do you recognize Exhibit 24?

13  *A.*  Yes, I do.

14  *Q.*  Was that obtained from Mr. Gourgeon?

15  *A.*  Yes.

16  *Q.*  And what is it?

17  *A.*  This is a video segment from which we had collected the

18  earlier screen shot.  It includes Eric Parker in the prone

19  position with his rifle between the gap in the Jersey barrier

20  and Scott Drexler kneeling with his rifle in the low ready

21  position looking over the Jersey barrier north into the wash.

22  *Q.*  And was -- this video you indicated was used to obtain the

23  screen shots we looked at, Exhibit 146?

24  *A.*  Yes.

25  *Q.*  And, again, it's consistent with April the 12th, 2014, the

 1  other images you've seen, correct?

 2  *A.*   Correct.

 3  *Q.*   It was with all of the items that Mr. Gourgeon provided to

 4  you, correct?

 5  *A.*   Yes.

 6  *Q.*   There are other images in the Gourgeon materials that are

 7  time stamped with April 12, 2014, correct?

 8  *A.*   Yes.

 9  *Q.*   And we see a number of vehicles in the video.  Is that

10  correct?

11  *A.*   Yes.

12  *Q.*   Are those -- were you able to also identify those vehicles

13  from the aerial surveillance film?

14  *A.*   Yes, I was.

15          MR. MYHRE:  Your Honor, we offer Exhibit 24.

16          THE COURT:  Any objection to Exhibit 24?

17          MR. LEVENTHAL:  Same objection as to cumulative, Your

18  Honor.  It's the same picture that we've seen before.

19          MR. MARCHESE:  Parker joins, also authentication.

20          MR. TANASI:  Stewart joins.

21          MR. PEREZ:  Lovelein joins.

22          MR. MYHRE:  With respect to cumulative, Your Honor.

23  BY MR. MYHRE:

24  *Q.*   Agent Willis, was this used to time stamp other images in

25  your timeline?

—2:16-cr-46-GMN-PAL—

1  **A.**  Yes, it was.

2          THE COURT:  And the Court also doesn't find it to be

3  cumulative because the lady with a diamond shirt is in a

4  different location in each of these pictures.

5          All right.  Exhibit 24 will be admitted.  You may go

6  ahead and publish it.

7          MR. MYHRE:  Thank you, Your Honor.

8          (Government's Exhibit 24 is admitted.)

9          (Video playing.)

10          MR. MYHRE:  And the record should reflect that the

11  video stopped at 12 seconds.

12  BY MR. MYHRE:

13  **Q.**  Is that generally how you received it?

14  **A.**  Yes.

15  **Q.**  The images that we saw there, again, are from where?

16  **A.**  These are from the northbound I15 bridge --

17  **Q.**  From the perspective -- oh, I'm sorry.

18          The perspective of?  Which direction are we looking?

19  **A.**  Specifically, we would be looking northwest.

20  **Q.**  And, again, in these images do we see Mr. Drexler and

21  Mr. Parker?

22  **A.**  Yes, we do.

23  **Q.**  Now, the vehicles we saw -- you saw vehicles go through in

24  this video, correct?

25  **A.**  Yes.

1  Q.  Did you use those vehicles to assist you in putting together

2  the timeline to time stamp some of these images that we've just

3  reviewed?

4  A.  Yes, I did.

5          MR. MYHRE:  And, Your Honor, may we show the witness

6  Exhibit 25?

7          THE COURT:  Yes, you may.

8  BY MR. MYHRE:

9  Q.  And did you see that, Agent Willis?

10  A.  No, I'm sorry.  Can you play it again?

11          (Video playing.)

12  BY MR. MYHRE:

13  Q.  And that image lasts about one second?

14  A.  Yes.

15  Q.  And was that the video you obtained from Mr. Gourgeon?

16  A.  Yes, it is.

17  Q.  And is that identical to the image that we've looked at in

18  Exhibit 146?

19  A.  Yes.

20  Q.  And this image contains, again, the individuals on that

21  embankment on the southbound?

22  A.  Yes, it does.

23          MR. MYHRE:  And, Your Honor, we offer Exhibit 20.

24          THE COURT:  It is 20 or 25?  25.

25          MR. MYHRE:  25, Your Honor.

—————2:16-cr-46-GMN-PAL—————

1            THE COURT:  Yes, Exhibit 25.  Any objection?

2            MR. TANASI:  Same continuing objection, Your Honor.

3            MR. MARCHESE:  Parker joins.

4            MR. LEVENTHAL:  Same objection as to cumulative.  It's

5   the same picture that we've seen already three times -- four

6   times now.

7            MR. PEREZ:  Lovelein joins.

8            MR. MYHRE:  Again, Your Honor, it's a video.  It's not

9   the same -- same photograph.

10           THE COURT:  All right.  Exhibit 25 will be admitted.

11  You may go ahead and publish it to the jury.

12           MR. MYHRE:  Thank you, Your Honor.

13           (Government's Exhibit 25 is admitted.)

14           (Video playing.)

15  BY MR. MYHRE:

16  *Q.*  And again, Agent Willis, did this video assist you in

17  constructing your timeline?

18  *A.*  Yes.

19  *Q.*  Now, did you also have an opportunity to review images that

20  were captured from a Dropbox?

21  *A.*  Yes.

22  *Q.*  And did you -- you were present for Agent Seyler's

23  testimony.  Is that correct?

24  *A.*  Yes, I was.

25  *Q.*  And he discussed the Dropbox belonging to someone named

2:16-cr-46-GMN-PAL

 1  Shannon Bushman?

 2  **A.**  Yes.

 3  *Q.*  And did you review that Dropbox in the course of your

 4  investigation for images that would assist you in putting

 5  together this timeline?

 6  **A.**  Yes, I did.

 7          MR. MYHRE:  And, Your Honor, may we show the witness

 8  what's been marked as Exhibit 159?

 9          THE COURT:  Yes, you may.

10  BY MR. MYHRE:

11  *Q.*  Do you see 159?

12  **A.**  Yes, I do.

13  *Q.*  And what is generally depicted in 159?

14  **A.**  A number of individuals standing at the staging area/rally

15  site in Bunkerville, Nevada, on April 12, 2014.

16  *Q.*  And do you recognize individuals depicted in this image?

17  **A.**  Yes, I do.

18  *Q.*  And do you see -- do you see any of the defendants in this

19  image?

20  **A.**  Yes, Ricky Ray Lovelein and Eric Parker.

21  *Q.*  And what date does this appear to be taken?

22  **A.**  April 12th, 2014.

23  *Q.*  Now, in the Shannon Bushman photographs that were in --

24  obtained from the Dropbox, was metadata contained within those?

25  **A.**  Yes.

1  Q.  And did the metadata reflect images that these images were

2  taken on April the 12th, 2014?

3  A.  Yes.

4  Q.  And is the clothing worn by the Defendants Parker and

5  Lovelein consistent with the clothing we've seen in other known

6  videos that have already been introduced into evidence?

7  A.  Yes.

8          MR. MYHRE:  Your Honor, we offered Exhibit 159.

9          THE COURT:  Any objection to Exhibit 159?

10          MR. MARCHESE:  Same objection as to authentication.

11  This witness has no personal knowledge of what transpired on the

12  dates in question.  He was not present.

13          MR. TANASI:  Stewart joins.

14          MR. LEVENTHAL:  Drexler joins.

15          MR. PEREZ:  Lovelein joins.

16          MR. MYHRE:  Same response, Your Honor.

17          THE COURT:  Same response.  Same ruling.  It's

18  admissible pursuant to Federal Rule of Evidence 901(b)(4).

19  Exhibit 159 is admitted.  You may publish it to the jury.

20          MR. MYHRE:  Thank you.

21          (Government's Exhibit 159 is admitted.)

22  BY MR. MYHRE:

23  Q.  Now, if you could, Agent Willis, you said the defendants are

24  indicated or, excuse me, depicted in this image.  If you would

25  just for record purposes identify who they are.

—2:16-cr-46-GMN-PAL—

1  *A.*  Eric Parker and Ricky Ray Lovelein.

2  *Q.*  Now, in this image with --

3        MR. MYHRE:  And the record should reflect that the

4  witness has -- has put circles around two individuals in the

5  right portion of the screen.  One wearing a black hat.  Another

6  one wearing a camouflage hat.

7  BY MR. MYHRE:

8  *Q.*  Now, focussing on the individual identified as Mr. Lovelein,

9  from this image are you able to see whether there's any

10 communication device in Mr. Lovelein's ear?

11 *A.*  Yes.  He has an earpiece in his ear, and there's also a

12 hand-held radio on his left hip.

13       MR. MYHRE:  And if we're able to focus in on that,

14 please.  And the record should reflect we've enlarged the image.

15 BY MR. MYHRE:

16 *Q.*  And, again, if you would point those out, please.

17 *A.*  Earpiece in his left ear and hand-held radio on his left

18 hip.

19 *Q.*  Now, based on your training and experience, what type of

20 device is it that you've just circled?  Not necessarily the make

21 and model.  What are those devices typically used for?

22 *A.*  It's a communications device, just person to person or a

23 number of people can use them as long as everybody's on the same

24 radio frequency.

25       MR. MYHRE:  And if we could go back to the broader

—2:16-cr-46-GMN-PAL—

1  image, please.

2  BY MR. MYHRE:

3  Q.  Now, we talked about individuals with the Arizona State

4  Militia, correct?

5  A.  Yes.

6  Q.  Do you see individuals in this image affiliated with Arizona

7  State Militia?

8  A.  Yes, I do.

9  Q.  And are you able to point them out?

10  A.  Yes, there's an individual there, an individual there.

11  Q.  And is this -- and how are you able to discern that they

12  belong to the Arizona State Militia?

13  A.  Based on other video and photo evidence, including the Flynn

14  and Lynch videos.

15  Q.  Now, did you in the course of your investigation also review

16  conventional media like newspapers and network television shows

17  and so forth?

18  A.  Yes, I did.

19  Q.  And your purpose in doing so was again to find images that

20  were relevant to your investigation of April 12th, 2014?

21  A.  Correct.

22          MR. MYHRE:  And, Your Honor, may we show the witness

23  171?

24          THE COURT:  Yes, you may.

25  BY MR. MYHRE:

2:16-cr-46-GMN-PAL

1   *Q.* And do you see Exhibit 171?

2   **A.** Yes, I do.

3   *Q.* And where was this image obtained?

4   **A.** This was obtained from a Las Vegas Review Journal article

5   that was on the Internet.  I believe it was published in March

6   of 2016, I believe.

7   *Q.* And what -- are any of the defendants depicted in this

8   image?

9   **A.** Yes.

10  *Q.* And specifically which one?

11  **A.** Ricky Ray Lovelein and Eric Parker.

12  *Q.* And is this consistent with the images -- other images we

13  viewed from April 12th, 2014?

14  **A.** Yes.

15  *Q.* And is it consistent by the clothing being worn?

16  **A.** Yes.

17  *Q.* And is this simply a different angle from other images that

18  we've seen before?

19  **A.** Yes.

20  *Q.* And was this useful to you in constructing your timeline?

21  **A.** Yes, it was.

22          MR. MYHRE:  Your Honor, we offer Exhibit 171.

23          THE COURT:  Any objection to 171?

24          MR. TANASI:  Stewart objects on authenticity, Your

25  Honor, and chain of custody, and that the origin is unknown,

───── 2:16-cr-46-GMN-PAL ─────

1   passes through to a media outlet, and then ultimately to the

2   FBI.

3           MR. MARCHESE:  Parker joins.

4           MR. LEVENTHAL:  Drexler joins.

5           MR. PEREZ:  Lovelein joins.

6           THE COURT:  Government's response?

7           MR. MYHRE:  Same response, Your Honor.  The unique

8   characteristics of this image more than qualifies it as

9   authentic from April 12, 2014.

10           THE COURT:  Admissible pursuant to 901(b)(4).  Exhibit

11  No. 171 is admitted.  You may go ahead and publish it to the

12  jury.

13           MR. MYHRE:  Thank you, Your Honor.

14           (Government's Exhibit 171 is admitted.)

15  BY MR. MYHRE:

16  *Q.*  Again, Agent, if you would, just identify Mr. Lovelein for

17  us.

18  *A.*  That's Ricky Ray Lovelein.

19  *Q.*  And in this --

20           MR. MYHRE:  And the record should reflect the witness

21  has circled an image to the far left of the screen.

22  BY MR. MYHRE:

23  *Q.*  And in the image do you see any firearms that Mr. Lovelein

24  is carrying at all?

25  *A.*  Yes, he has a handgun on his right hip.

─ 2:16-cr-46-GMN-PAL ─

 1  *Q.*  And if you would circle that, please.

 2        And, again, with respect to his ear, do you see

 3  anything there?

 4  **A.**  Yes, he has the earpiece that would be used for a

 5  communications device such as this hand-held radio that's on his

 6  left hip.

 7        MR. MYHRE:  So the record should reflect that within

 8  the circle drawn around Mr. Lovelein the witness has drawn a

 9  circle around the right hip area of Mr. Lovelein which appears

10  to be a firearm, as well as the left ear with the device affixed

11  to the left ear, as well as the left hip which appears to be

12  another device.

13  BY MR. MYHRE:

14  *Q.*  Taking that down, if you would circle the person you

15  identified as Mr. Parker.

16        MR. MYHRE:  The record should reflect that the witness

17  has circled an individual to the right of Mr. Lovelein.

18  BY MR. MYHRE:

19  *Q.*  And in this image do you see whether Mr. Parker is carrying

20  a firearm or not?

21  **A.**  Yes, he has a handgun I just circled on his right thigh.

22        MR. MYHRE:  And the record should reflect the witness

23  has, indeed, circled what appears to be a firearm on the right

24  thigh of the individual.

25  BY MR. MYHRE:

—2:16-cr-46-GMN-PAL—

1   Q.   And what is that next to the left of the firearm?

2   **A.**   He has a large knife in a sheath.

3   Q.   Where is this -- based on your investigation and based on

4   your knowledge of that area, again, where is this image

5   captured?

6   **A.**   This is at the staging area or rally site in Bunkerville,

7   Nevada.

8   Q.   Would that have been on April the 12th?

9   **A.**   Yes.

10   Q.   Would it have been morning or afternoon?

11   **A.**   This is morning.

12   Q.   And how are you able to tell that?

13   **A.**   Based on the review of other video and photo evidence that

14   is time stamped, I could tell by the positioning of not only the

15   defendants that are in the picture, but other individuals where

16   they're standing.

17           MR. MYHRE:   And we can take that down.

18   BY MR. MYHRE:

19   Q.   Are you familiar with a website or a Facebook page called

20   Citizens Action Network?

21   **A.**   Yes.

22   Q.   What is that, just generally?

23   **A.**   It's a Facebook page that seems to post things that -- any

24   type of -- I don't know -- an array of different things, but it

25   included an album for the Bundy Ranch and it included all of

2:16-cr-46-GMN-PAL

1   photographs -- that album had photographs of April 12th, 2014,

2   and those events.

3   Q.  How were you able to find this particular site?

4   A.  It's as simple again as like a Google search, but instead of

5   on Google doing a Facebook search for terms, including Bundy

6   Ranch.  And this is a result that came up based on that search.

7   Q.  And what you viewed was available to the general public?

8   A.  Yes.

9   Q.  This is what you referred to previously as open source?

10  A.  Yes.

11          MR. MYHRE:  May we show Exhibit 161 to the witness,

12  Your Honor?

13          THE COURT:  Yes, you may.

14  BY MR. MYHRE:

15  Q.  And what is Exhibit 161?

16  A.  This is an image of Scott Drexler kneeling with his -- with

17  a rifle low slung, but leaning on his left leg and he appears to

18  be on northbound I15 bridge looking north.

19  Q.  Was this an image you obtained from the -- your review of

20  the Citizens Action Network Facebook?

21  A.  Yes.

22  Q.  Is the clothing that Mr. Drexler's wearing consistent with

23  April 12th, 2014?

24  A.  Yes, it is.

25  Q.  Are there other images in this image that we've captured

—2:16-cr-46-GMN-PAL—

1 here that are consistent with known images you viewed from April

2 12th, 2014?

3 *A.* Yes.

4 *Q.* And what are those?

5 *A.* The -- well, the people in their position to Mr. Drexler's

6 left, but also the dark gray Dodge Ram pickup truck that is in

7 front of a gold-colored semi-truck with a white trailer that's

8 in the background of the image on I15.

9 *Q.* Okay. And where were you able to see those images?

10 *A.* Through the aerial footage.

11       MR. MYHRE: Your Honor, we offer Government's Exhibit

12 161.

13       THE COURT: Same objection to 161?

14       MR. TANASI: Yes, Your Honor. Thank you.

15       MR. MARCHESE: Yes, Your Honor.

16       MR. LEVENTHAL: Yes, Your Honor. Thank you.

17       THE COURT: Same response?

18       MR. MYHRE: Yes, Your Honor.

19       THE COURT: All right. So Exhibit 161 is admitted

20 under the same ruling. You may publish it to the jury.

21       MR. MYHRE: Thank you, Your Honor.

22       (Government's Exhibit 161 is admitted.)

23 BY MR. MYHRE:

24 *Q.* Looking at 161 now, Agent Willis. Now this is before the

25 jury. Was this image time stamped within the Facebook page?

1   *A.*  No, it was not.

2   *Q.*  Were you able, however, to time stamp it?

3   *A.*  Yes, I was.

4   *Q.*  And as part of the time stamping, did you use this image and

5   incorporate it into the timeline which we will later present?

6   *A.*  Yes.

7   *Q.*  And in this image does Mr. Drexler appear also to be

8   carrying a handgun?

9   *A.*  Yes, on his right hip.

10          MR. MYHRE:  We can take that down for the time being.

11          May I show the witness Exhibit 172?

12          THE COURT:  Yes, you may.

13  BY MR. MYHRE:

14  *Q.*  Do you recognize 172, Agent?

15  *A.*  Yes, I do.

16  *Q.*  Was this an image captured from Citizens Action Network?

17  *A.*  Yes, it was.

18  *Q.*  And, generally, where was this -- were you able to use

19  special characteristics observed in this image to identify it as

20  an image from April 12th, 2014?

21  *A.*  Yes.

22  *Q.*  And what characteristics did you review in making that

23  determination?

24  *A.*  The position of Mr. Eric Parker, the position of the people

25  in the wash, of the BLM Law Enforcement vehicles in the wash,

—2:16-cr-46-GMN-PAL—

 1 and of the National Park Service and BLM employees that are on

 2 the other side of the cattle gate.

 3 Q. So you've identified the individual in this photo as

 4 Mr. Parker?

 5 A. Yes.

 6 Q. And that's based upon his clothing?

 7 A. Yes.

 8 Q. With respect to the other characteristics you mentioned, the

 9 people, for example, in the wash, was that verified from the

10 aerial surveillance?

11 A. Yes, it was.

12 Q. How about with respect to the BLM vehicles?

13 A. Yes.

14        MR. MYHRE:  Your Honor, we offer Exhibit 172.

15        THE COURT:  Continuing objection?

16        MR. TANASI:  Yes, Your Honor.  And I'd also add to it

17 hearsay.

18        MR. MARCHESE:  The writing in the upper right-hand

19 corner, it's irrelevant.  It's hearsay.

20        THE COURT:  Can we cover that up, Mr. Myhre?

21        MR. MYHRE:  I believe we could.  If we can just have a

22 moment in Court, Your Honor, we could --

23        THE COURT:  Well, yes.  How about if we go ahead and

24 take a bathroom break, and that way you can cover it up before

25 we continue.  All right?

—2:16-cr-46-GMN-PAL—

1          MR. MYHRE:  Sure.

2          THE COURT:  So during this break, I am reminding the

3     jury, please, do not discuss this case with anyone, not even

4     your fellow jurors.  You may speak to them about other things,

5     but not about this case.  Please do not attempt to read or

6     listen to or view anything that touches upon this case in any

7     way, and do not perform any independent research or any

8     investigation about the case.  Please go ahead and keep writing

9     down your questions for us.

10          We are going to go ahead and take a 15-minute break.

11     It's 3:01.  We'll plan to be back here about 3:16.  So let's

12     stand for the jury, and they can be excused.

13          And, Special Agent Willis, we'll just need you to be

14     back here at 3:15 as well, sir.

15          THE WITNESS:  Thank you.

16          THE COURT:  Thank you.

17          (Whereupon jury leaves the courtroom at 3:02 p.m.)

18          THE COURT:  Oh, okay.  So this is jury note -- oh,

19     boy -- 91?  92?

20          All right.  Jury note No. 92 makes a good point.  There

21     is a one- to two-second delay between when it is published.  Can

22     the attorney please be sure the jury can see the full exhibit

23     for more than two seconds?

24          MR. MYHRE:  Okay.

25          THE COURT:  Okay.  So even though we can see it the

—2:16-cr-46-GMN-PAL—

 1  first time around while the witness is laying the foundation,

 2  the jury doesn't see it right when we say, yes, it may be

 3  published.  It takes a little while for the monitor to bring it

 4  up, and then when you say you can take it down, apparently

 5  they're not always having enough time to see it.

 6          MR. MYHRE:  Will do, Your Honor.

 7          THE COURT:  So let's keep that in mind.

 8          All right.  Let's everyone take your bathroom break.

 9  And, marshals, you can bring in Mr. Parker for the second half

10  of the afternoon.

11          (Recess taken at 3:03 p.m.)

12          (Resumed at 3:31 p.m.)

13          THE COURT:  All right.  Thank you.  You may be seated.

14          So everybody's back.  We're on the record.  Before we

15  call the jury back in, we did receive another jury note.  This

16  one would be 93, Aaron?  Is that right?

17          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

18          THE COURT:  Okay.  No. 93, it asks:  Is it possible to

19  instruct the jurors to not use military or law enforcement terms

20  in their questions?  There are times some of us don't know what

21  those terms mean.

22          So I'll go ahead and read that to them when we get

23  around to jury questions again, or should I read it now, when

24  they come back.  I don't know that we're going to get to jury

25  questions with Agent Willis, are we?

———— 2:16-cr-46-GMN-PAL ————

1          MR. MYHRE:  I'll do my best, Your Honor.

2          THE COURT:  All right.  Yes.  Let's go ahead and call

3    them back in.

4          (Court conferring with courtroom administrator.)

5          THE COURT:  All right.  So we're going to bring in a

6    juror.  She received apparently an unsolicited text -- I mean,

7    from someone she knows, but she wasn't -- it doesn't look like

8    they were discussing -- I don't know.  I guess she'll tell us

9    what it is.  She's very upset.  And she's very scared that she's

10   going to get disciplined, I guess, or kicked off the jury.

11         And so she received a text from someone who said:  You

12   have two hours more to finish -- to finished, past tense.  You

13   have two hours more to finished.  Pass death sentence on these

14   prisoner.

15         So I think that we need to question her about that.

16   And you guys can think about it if you want me to do something

17   about it at the end.  But I don't think there's anything else we

18   can do, but just ask her -- I mean, I can assume a lot.  I'm

19   sure all of us can start thinking about all different

20   possibilities, but the best way probably to address this is have

21   her come in and tell us as much of the circumstances as she can.

22         This is juror No. 1, by the way.

23         MR. TANASI:  Which number, Your Honor?

24         THE COURT:  No. 1.

25         COURTROOM ADMINISTRATOR:  All rise.

```
1              (Whereupon juror No. 1 enters the courtroom.)

2              THE COURT:  All right.  Everybody else may be seated.

3              So, first of all, juror No. 1, thank you very much for

4    bringing it to our attention.  I do always try to remind the

5    jurors that if they do hear something inadvertently that they

6    should bring it to the Court's attention right away.  So thank

7    you, first of all, for doing that.

8              So, secondly, it looks like the text was sent to you by

9    someone that you know.  Is that right?

10             A JUROR:  Yes.

11             THE COURT:  Okay.  So it's not unusual for people to

12   know that you're in trial or what trial you're in because it's

13   such a long trial and people have to know so they know not to

14   talk to you about it.

15             So do you have -- have you discussed with this other

16   person -- well, how much about this case have you discussed with

17   this other person?

18             A JUROR:  Nothing at all.  He just knows that I'm on

19   jury duty.

20             THE COURT:  All right.  So is it a coworker?  Friend?

21   Neighbor?  Family?

22             A JUROR:  A friend.

23             THE COURT:  A friend.  Okay.  And so how often do you

24   speak to this friend?

25             A JUROR:  Before yesterday, it was probably once a
```

—2:16-cr-46-GMN-PAL—

1   week.  He just got my number so started texting me yesterday.

2          THE COURT:  Okay.  So yesterday was the first text that

3   you received from him?

4          A JUROR:  Yes.  Correct.

5          THE COURT:  Ever or in a while?

6          A JUROR:  Ever.

7          THE COURT:  Ever.  Oh.  Okay.  So is this a new friend?

8          A JUROR:  Well, we know each other through a mutual

9   friend.  He dated a mutual friend of mine that ... so ...

10         THE COURT:  Okay.  And all right.  So obviously he

11  knows that you are on -- you're a juror and that you are on this

12  trial.  Is there anything else about this case that you've

13  discussed with him?

14         A JUROR:  No, not at all.  I don't even think he knows

15  what trial because I have not told him; just that I'm a

16  federal -- a juror on a federal trial.  That's it.  He doesn't

17  know anything at all about the case, at least not from me, or he

18  hasn't ever expressed that he's heard anything in the news or

19  said anything that he knows what case I'm on or anything at all.

20  He just knows I'm a juror.

21         THE COURT:  But from the language used in the text it

22  seems that he knows that it's a criminal case; not a civil case.

23         A JUROR:  I don't know how he would.

24         THE COURT:  What about the friend that you have in

25  common?  Could that person have told him?

— 2:16-cr-46-GMN-PAL —

 1          A JUROR:  No, she's not speaking to me anymore.  So she

 2    doesn't even know I'm a juror.

 3          THE COURT:  Oh, okay.  Does he know other folks that

 4    know you, like coworkers or someone else, that would know that

 5    you are here for a lengthy period of time?  Family?

 6          A JUROR:  Not that I know of.  I mean, they may go to

 7    the casino.  I don't really know that they know him, no.

 8          THE COURT:  All right.

 9          Do the parties have any other questions you could think

10    of that I should ask as sort of ...  Probably just as surprised

11    as everyone else.  So go ahead and take some time.

12          MR. TANASI:  Thank you, Your Honor.

13          (Defense counsel conferring.)

14          A JUROR:  Your Honor, can I say something?

15          THE COURT:  Yes.

16          A JUROR:  I was just shocked and completely taken aback

17    to have received that text, like, so completely out of the blue

18    that my first thought was, I need to talk to Aaron.

19          THE COURT:  No, I appreciate that.  That was the right

20    decision to make, definitely.

21          MR. MYHRE:  And, Your Honor, the Government would just

22    ask if the Court could inquire as to whether there's anything

23    about that text that --

24          THE COURT:  Right, and that's my last question, but

25    before I asked the last question, I wanted to know if there was

PATRICIA L. GANCI, RMR, CRR

—2:16-cr-46-GMN-PAL—

 1   anything -- any discovery-type questions that we needed to ask

 2   to get more information.  But ultimately, yes, I'll ask her.

 3          MR. TANASI:  I don't think -- Your Honor, there's no

 4   additional questions from the Defense.

 5          THE COURT:  All right.

 6          MR. TANASI:  Thank you.

 7          THE COURT:  So, juror No. 1, just to make sure I got

 8   this clear.  So it's a new friend -- or a preexisting friend,

 9   but a new texting friend, a new person who has just started

10   texting recently within the week?

11          A PROSPECTIVE JUROR:  Right.

12          THE COURT:  And you have not discussed with him this

13   case?

14          A PROSPECTIVE JUROR:  No, I have not.

15          THE COURT:  And you don't even know how he knew that

16   you were in this particular case?

17          A PROSPECTIVE JUROR:  No, I do not.

18          THE COURT:  And the only friend that you have in common

19   is one that you're not even speaking to anymore?

20          A PROSPECTIVE JUROR:  Correct.

21          THE COURT:  Okay.  Well, so can you put out of your

22   mind the recommendation or suggestion that your friend is making

23   to you?  Whether he's serious or joking around and thinks he's

24   funny, can you put that out of your mind?

25          A PROSPECTIVE JUROR:  Absolutely.

 1          THE COURT:  And do you think that you can continue to

 2   be fair and impartial in this trial?

 3          A PROSPECTIVE JUROR:  Yes, I do.

 4          THE COURT:  Now, is this friend someone that, you know,

 5   aside from this unfortunate incident, that you would like to

 6   have a long-term relationship with?  Is this something where

 7   you're going to feel some sympathy or some mixed feelings about

 8   whether he would like for you to do something, you know, vote a

 9   particular way?  Is it that kind of a friend?

10          I'm trying not to pry into your personal life, but I

11   apologize that I have to.

12          A PROSPECTIVE JUROR:  No, that's fine.  No, he's not.

13   And, no, it will not affect me in any way.  His -- that text

14   will not affect me in any way, or my ability to be impartial and

15   remain impartial.

16          THE COURT:  All right.  Okay.  So I think that's all

17   the information that we can think of getting at this point.  If

18   we think of something else, we'll let you know.  Okay.  Thank

19   you again for bringing that to our attention.

20          And, Aaron, you can go ahead and bring everybody else

21   in, too.

22          COURTROOM ADMINISTRATOR:  Yes, Your Honor.

23          (Whereupon juror No. 1 leaves the courtroom.)

24          THE COURT:  So we can at least get going.  We'll go

25   ahead and proceed with Special Agent Willis, and then at the end

 1  of the day if anyone wants to make any record or make any other

 2  comments, we'll have some time to do that.

 3          MR. MYHRE:  Thank you, Your Honor.

 4          (Whereupon jury enters the courtroom at 3:48 p.m.)

 5          THE COURT:  Jury can go ahead and be seated.  Everyone

 6  else can be seated as well.

 7          We're back on the record.  We have Special Agent Willis

 8  back on the witness stand.  Thank you, sir.

 9          And, Mr. Myhre, you may continue with your direct

10  examination.

11          MR. MYHRE:  Thank you, Your Honor.  I believe we were

12  showing the witness Exhibit 172.

13  BY MR. MYHRE:

14  *Q.*  Now, Agent Willis, you have 172 before you, correct?

15  *A.*  Yes.

16  *Q.*  And we talked about, again, this individual depicted in this

17  is Mr. Parker, right?

18  *A.*  Yes.

19  *Q.*  And we talked about people in the wash as well.  Now, at the

20  top right portion of that, is this -- does this indicate where

21  this is derived from?

22  *A.*  Yes, the Citizens Action Network Facebook page.

23  *Q.*  That's the Facebook page where you received this?

24  *A.*  Yes.

25  *Q.*  This was not time stamped at the time you received it?

—2:16-cr-46-GMN-PAL—

 1  *A.*  That's correct.

 2  *Q.*  Or downloaded, I should say.

 3  *A.*  Yes.

 4  *Q.*  You actually physically downloaded it from the Internet,

 5  correct?

 6  *A.*  Yes.

 7  *Q.*  Were you able, however, through extrinsic evidence able to

 8  authenticate this -- excuse me -- to time stamp this at some

 9  later portion?

10  *A.*  Yes, I was.

11  *Q.*  And is this image documented and incorporated in your

12  timeline that you constructed?

13  *A.*  Yes, it is.

14          MR. MYHRE:  Your Honor, we offer Exhibit 172.

15          THE COURT:  Any objection to Exhibit 172?  The

16  redaction's been made.

17          MR. MARCHESE:  No objection Parker.

18          MR. TANASI:  None from Stewart, Your Honor.

19          MR. LEVENTHAL:  Foundationally he indicated that he

20  could time stamp it, but he didn't indicate how he time stamped

21  it.  He's been able to time stamp other pictures through I guess

22  vehicles and things of that nature.  Just foundationally I

23  didn't hear how he did it.

24          MR. MYHRE:  Your Honor --

25          MR. LEVENTHAL:  That's my objection is to the

 1  foundational ...

 2          MR. MYHRE:  Your Honor, the --

 3          THE COURT:  Well, the foundation was that he found it

 4  from the Citizens Action Network.  So Exhibit 172 is admissible,

 5  and it is admitted.  You may publish it, but it would be helpful

 6  to know whether or not this can be time stamped, and if so, how

 7  was that determined.

 8          MR. MYHRE:  Thank you, Your Honor.

 9          THE COURT:  Not necessarily for admissibility, but it

10  is a good question just for the weight of the evidence.

11          MR. MYHRE:  And may we publish, Your Honor?

12          THE COURT:  Yes, you may.

13          (Government's Exhibit 172 is admitted.)

14          COURTROOM ADMINISTRATOR:  The projector turned off.

15  It's on its way back up.

16          THE COURT:  Please raise your hand if the jury can't

17  see the image.

18          All right.  So there's -- their screens are working.

19  It's just the big projector sometimes takes a little while to

20  warm up.  There it goes.

21          MR. MYHRE:  Thank you, Your Honor.

22  BY MR. MYHRE:

23  Q.  So, Agent Willis, looking at 172 that's been published,

24  would you just circle the portion on this image that shows the

25  individuals in the wash.

2:16-cr-46-GMN-PAL

1          And Agent --

2          MR. MYHRE:  Excuse me.  The record should reflect that

3    the witness has circled individuals at the top of this image.

4    BY MR. MYHRE:

5    Q.  And if you would also circle the individual identified as

6    Mr. Parker.

7          MR. MYHRE:  The record should reflect that the witness

8    has circled an individual and that image identifies Mr. Parker.

9    BY MR. MYHRE:

10   Q.  And if you would just sort of point out for us where the BLM

11   vehicles are located.

12   A.  They're on the other side of the cattle gate, so ...

13   Q.  Now, you -- we talked about -- oh, I'm sorry.  You --

14         MR. MYHRE:  The witness has marked with vertical lines

15   the images of trucks and vehicles on the other -- north of the

16   cattle gate.

17   BY MR. MYHRE:

18   Q.  That is in the northbound direction.  Is that correct?

19   A.  Yes.

20   Q.  You indicated that you were able to time stamp this,

21   correct?

22   A.  Yes, I was.

23   Q.  And you used the time-stamped version of this image in your

24   timeline?

25   A.  Yes, I do.

—2:16-cr-46-GMN-PAL—

1  Q.  What other -- what type of evidence did you use in order to

2  derive a time?

3  A.  Well, as I said earlier, the BLM vehicles on the other side

4  of the cattle gate and the people, they are depicted in the

5  aerial footage, but also through the Trey Schillie photographs

6  as well as the Hugh Gourgeon photographs.  Knowing what the

7  photographer for the Citizens Action Network looks like and was

8  wearing on that day on the bridge as well as also seeing her in

9  the Shilaikis footage from Post 1, I could track her movements

10  and estimate the time when she stops and takes this picture with

11  her camera from all of those things combined.

12        MR. MYHRE:  So, Your Honor, may we bring up Exhibit

13  151?

14        THE COURT:  Yes, you may.

15  BY MR. MYHRE:

16  Q.  Do you see -- this has been previously admitted -- Agent

17  Willis, 151?

18  A.  Yes.

19  Q.  Now, is this a different angle of that same image that we

20  just viewed in Exhibit 172?

21  A.  Yes, taken at approximately the same time.

22  Q.  Approximately the same time.  Now, you indicated that you

23  could identify the photographer for Citizens Action Network?

24  A.  Yes.

25  Q.  Could you please using this image draw a circle around that

—2:16-cr-46-GMN-PAL—

 1  individual.

 2  *A.*  It's the woman with the short black hair with the black top

 3  on, and she has a neck strap for her Cannon camera around her

 4  neck, and you can see Cannon.

 5  *Q.*  And for record purposes, in this imagine where is she

 6  located relative to where Mr. Parker is located?

 7  *A.*  She would just be just to his right side or east of him on

 8  the northbound I15 bridge.

 9  *Q.*  And which way is she faced?

10  *A.*  She's facing west.

11          MR. MYHRE:  And, Your Honor, may we bring up image --

12  excuse me -- Exhibit 139, please?

13          THE COURT:  Yes, you may.

14  BY MR. MYHRE:

15  *Q.*  And this has been previously admitted as Exhibit 139?

16  *A.*  Yes.

17  *Q.*  Do you recognize the person who's the photographer in this

18  image?

19  *A.*  Yes.  So here's the woman with the black top on and the dark

20  pants.  I believe at this moment she's actually taking the

21  photograph.  And then Jim Urquhart, he later -- who is on the

22  left side will later move around to Mr. Parker's left.  And then

23  that's where we saw the previous photo Mr. Schillie took.

24  *Q.*  Now, just focusing for a moment on the individual that

25  you've drawn a circle around.

1    *A.*  Yes.

2    *Q.*  Which way is that person now faced relative to Mr. Parker's

3    position?

4    *A.*  She would be facing Mr. Parker, but facing northwest.  So

5    north looking over the Jersey barrier, but capturing Mr. Parker

6    and the Jersey barrier.

7          MR. MYHRE:  Now if we could go back to 172.

8    BY MR. MYHRE:

9    *Q.*  Would this have been from the direction she was faced, this

10   image?

11   *A.*  Yes.

12   *Q.*  Now, knowing those images of the individual in black who

13   took the photograph, does that person appear in other images

14   that you were able then to time stamp?

15   *A.*  Yes.

16   *Q.*  And which images were those?

17   *A.*  The Shilaikis video, the Trey Schillie photographs.

18   *Q.*  And the Hugh Gourgeon?

19   *A.*  And Hugh Gourgeon.

20   *Q.*  Okay.  So Exhibit 139 was from Gourgeon.  Is that correct?

21   *A.*  Yes.

22   *Q.*  Those were time stamped?

23   *A.*  Yes.

24   *Q.*  Correct?

25   *A.*  Yes.

1   Q.  Metadata?

2   **A.**  Yes.

3   Q.  And Exhibit 151 was from Trey Schillie, correct?

4   **A.**  Yes.

5   Q.  And that was time stamped as well?

6   **A.**  Yes.

7   Q.  And that's how you were ultimately able to derive the time

8   stamp for this exhibit?

9   **A.**  Yes.

10  Q.  And that will be incorporated in your timeline which we will

11  visit later?

12  **A.**  Yes.

13          MR. MYHRE:  And, Your Honor, if I could go back, I

14  neglected one exhibit.  If I could go back to show the witness

15  Exhibit 140, please.

16          THE COURT:  Yes, you may.

17  BY MR. MYHRE:

18  Q.  And do you see 140 there, Agent Willis?

19  **A.**  Yes, I do.

20  Q.  Was this also from Mr. Gourgeon?

21  **A.**  Yes.

22  Q.  Was this image -- when you received it, did it have metadata

23  time stamping it?

24  **A.**  Yes, it did.

25  Q.  And was it time stamped for April 12th?

2:16-cr-46-GMN-PAL

1  **A.**  Yes.

2  *Q.*  And do you recognize the individual in this image?

3  **A.**  Yes, I do, Eric Parker.

4  *Q.*  And how do you recognize him?

5  **A.**  By his hat, his rifle, his shirt, his tactical vest, the

6  knife, his pants.

7  *Q.*  And does his -- does he have a firearm?

8  **A.**  Yes, he has a rifle that he is pointing through the gap in

9  the Jersey barrier.

10  *Q.*  Was that -- is the position of that rifle consistent or not

11  consistent with the image we just viewed in 172?

12  **A.**  It is consistent.

13          MR. MYHRE:  Your Honor, we offer Exhibit 140.

14          THE COURT:  Any objection to Exhibit 140?

15          MR. TANASI:  Same objection Stewart, Your Honor, and

16  also to add cumulative.

17          MR. MARCHESE:  Parker joins.

18          MR. LEVENTHAL:  Drexler joins.

19          MR. PEREZ:  Lovelein joins.

20          MR. MYHRE:  I didn't catch the last part of

21  Mr. Tanasi's objection.

22          MR. TANASI:  Cumulative, Your Honor.

23          MR. MYHRE:  Your Honor, this is a different time,

24  different angle, of Mr. Parker on the northbound bridge, and is

25  consistent or -- excuse me -- is integral to the timeline that

—2:16-cr-46-GMN-PAL—

 1 | will be later introduced.

 2 |          THE COURT:  All right.  Exhibit 140 is admitted over

 3 | objection.  You may go ahead and publish it to the jury.

 4 |          (Government's Exhibit 140 is admitted.)

 5 | BY MR. MYHRE:

 6 | *Q.*  And, Special Agent Willis, in the course of your

 7 | investigation, were you able to determine -- we see here in this

 8 | image the gap in the Jersey barrier, correct?

 9 | *A.*  Yes.

10 | *Q.*  In that concrete barrier.  And you've walked that bridge.

11 | Is that correct?

12 | *A.*  Yes, I have.

13 | *Q.*  In the course of your investigation, based on the

14 | photographic images that we've seen, were you able to locate

15 | where that gap is in that bridge?

16 | *A.*  Yes.

17 | *Q.*  And will that be discussed within your timeline?

18 | *A.*  Yes.

19 | *Q.*  Okay.

20 |          MR. MYHRE:  And, Your Honor, if I could go back for a

21 | moment to Exhibit 171.

22 |          THE COURT:  Yes.

23 | BY MR. MYHRE:

24 | *Q.*  With 171, Agent Willis, we described Mr. Lovelein and his

25 | earpiece.  Is that correct?

———— 2:16-cr-46-GMN-PAL ————

1   *A.*   Yes.

2   *Q.*   And if you would circle that again for us.

3          MR. MYHRE:  Now, Your Honor, may we call up Exhibit 21

4   at approximately 2 seconds?

5          THE COURT:  Yes.

6          (Video playing.)

7          MR. MYHRE:  Right there.

8   BY MR. MYHRE:

9   *Q.*   Now, do you see an individual in the foreground of this

10  image at Exhibit 21 at approximately 2 seconds?

11  *A.*   Yes, I do.

12  *Q.*   And what is depicted in that image?

13  *A.*   Well, the individual in the foreground is wearing a digital

14  camo-type pattern hat, and he has an earpiece for a

15  communications device in his left ear.

16  *Q.*   If you could just circle that, please.

17         Is that consistent or not consistent with the earpiece

18  we just looked at in Exhibit 171?

19  *A.*   Consistent.

20  *Q.*   Now, this individual depicted in this image at the 2 second

21  mark, where is he located -- well, first of all, the individual

22  in the center of the screen is who?

23  *A.*   The individual on the stage is Ammon Bundy.

24  *Q.*   Where is the individual for record purposes located relative

25  to Mr. Bundy in this image?

PATRICIA L. GANCI, RMR, CRR

—2:16-cr-46-GMN-PAL—

1   A.  Directly in front of Mr. Bundy.

2   Q.  Does he appear to be wearing a uniform of some sort?

3   A.  Yes.

4   Q.  And what type of uniform?

5   A.  It's a camouflage uniform, but he is also bearing insignia

6   that would indicate that he's part of the Arizona State Militia.

7   Q.  And this image is taken approximately when during the day?

8   A.  This would be in the morning prior to Sheriff Gillespie and

9   Cliven Bundy speaking on stage.

10          MR. MYHRE:  Okay.  We can bring that down, please.

11          And, Your Honor, may I show the witness Exhibit 162?

12          THE COURT:  Yes, you may.

13  BY MR. MYHRE:

14  Q.  Now, you talked, Agent Willis, about reviewing other public

15  media.  Did you also review images posted by Reuters and the

16  Washington Post?

17  A.  Yes.

18  Q.  And what is Reuters?

19  A.  Reuters is just a news publication, news outlet, and they do

20  articles and stories on stuff.

21  Q.  And are those -- are those published or posted publicly?

22  A.  Yes, on the Reuters.com or .org website, I believe.  It's

23  just open to the public.  Anybody can access them.

24  Q.  And how about with respect to the Washington Post?

25  A.  It's the same thing.  They have an Internet website that you

—2:16-cr-46-GMN-PAL—

1   can go on and read articles published by the Washington Post.

2   *Q.*   Now, the exhibit at 162 do you -- first of all, do you

3   recognize this image?

4   **A.**   Yes, I do.

5   *Q.*   And what is it generally?

6   **A.**   This is an image of Scott Drexler, Steven Stewart, and Eric

7   Parker on the northbound I15 bridge in Bunkerville.

8   *Q.*   Does this have a date stamp with it?

9   **A.**   No, it does not.

10   *Q.*   Were you able to derive the date?

11   **A.**   Yes, I was.

12   *Q.*   And how were you able -- what -- did you look at specific

13   characteristics in this image to get the date?

14   **A.**   Yes, I did.   I looked at the position of the vehicles in the

15   background on the I15 northbound bridge and compared that to the

16   aerial footage.

17   *Q.*   And when you compared it, did it -- were you able to make

18   consistent identifications?

19   **A.**   Yes, I was.

20   *Q.*   Identifications of these distinctive characteristics?

21   **A.**   Yes, I was.

22           MR. MYHRE:   Your Honor, we offer Exhibit 162.

23           THE COURT:   Any objection to 162?

24           MR. TANASI:   Continuing objection, authenticity, Your

25   Honor.

2:16-cr-46-GMN-PAL

1          MR. MARCHESE:  Parker joins.

2          MR. LEVENTHAL:  Drexler joins.

3          MR. PEREZ:  Lovelein joins.

4          THE COURT:  Same response?

5          MR. MYHRE:  Same response, Your Honor.

6          THE COURT:  Same ruling.  162 will be admitted.  You

7  may go ahead and publish it.

8          MR. MYHRE:  Thank you, Your Honor.

9          (Government's Exhibit 162 is admitted.)

10  BY MR. MYHRE:

11  *Q.*  Now, this image was downloaded from Reuters?

12  **A.**  Yes, sir.

13  *Q.*  And do you recognize Steven Stewart in this image?

14  **A.**  Yes, I do.  He's standing in the image.  He's holding a

15  rifle above the Jersey barrier pointed -- pointed upward.

16  *Q.*  If you could just circle his image, please.

17          And you've identified a firearm as well, correct?

18  **A.**  Yes.

19  *Q.*  If you could just identify that just for record purposes.

20          MR. MYHRE:  And the record should reflect that he's

21  circled an individual he's identified as Steven Stewart and also

22  identified an object that appears to be a firearm.

23  BY MR. MYHRE:

24  *Q.*  Is he also carrying any other firearms?

25  **A.**  He has a handgun on his right hip.

————2:16-cr-46-GMN-PAL————

 1   Q.  If you would circle that, please.

 2         Now, the clothing that this individual's wearing, is

 3   that consistent with other images of Mr. Stewart?

 4   A.  Yes, it is.

 5   Q.  Is that consistent with those images for April 12th, 2014?

 6   A.  Yes.

 7   Q.  In which direction does Mr. Stewart appear to be facing in

 8   this image?

 9   A.  He looks to be facing north or northwest and looking down

10   into the wash area.

11   Q.  Which bridge is this located on from your investigation?

12   A.  Northbound I15 bridge.

13   Q.  Now, in the foreground, you recognize that individual?

14   A.  Yes, that's Scott Drexler.  He's kneeling.  Appears to be

15   drinking out of a jug of water.

16   Q.  And --

17   A.  Go ahead.

18   Q.  And in this image where is he in relation to Mr. Stewart?

19   A.  He's to Mr. Stewart's right.

20   Q.  Now, you mentioned that this did not come with a time stamp

21   on it.  However, were you able to time stamp this?

22   A.  Yes, I was.

23   Q.  And how did you do that?

24   A.  This small silver SUV with the person, the hand out,

25   appearing to be either holding a camera or cell phone out.  And

1  behind that in the second furthest lane, but behind is a white

2  truck and then it's passing a dark vehicle.  From the aerial

3  footage I can find -- I found that -- that specific point in

4  time with that SUV, with the white truck, and it's consistent

5  also with the location of the people that are on the bridge, but

6  from the aerial footage perspective.

7  *Q.*  Was this image then incorporated into your timeline?

8  *A.*  Yes, it was.

9       MR. MYHRE:  Take that down.

10       Your Honor, may we show the witness 163?

11       THE COURT:  Yes.

12  BY MR. MYHRE:

13  *Q.*  Agent, do you see 163?

14  *A.*  Yes, I do.

15  *Q.*  What is this?

16  *A.*  This is a Reuters.com photograph, also captured by Jim

17  Urquhart, as was the last one.  Eric Parker is in this image.

18  He's kneeling against the Jersey barrier and holding a rifle

19  pointed down.

20  *Q.*  Was this time stamped when you obtained this image?

21  *A.*  It did not include metadata, but I was able to determine the

22  time.

23  *Q.*  And, again, how did you do that?

24  *A.*  Again, to the aerial footage.  The people on the concrete

25  skirting, I know the identity of one of those people, and I've

—2:16-cr-46-GMN-PAL—

1  tracked their movements throughout the day on April 12th, 2014,

2  especially in the wash.  And then also the tractor-trailer being

3  followed by that white car, I can see that in the aerial

4  footage.

5  *Q.*  And that's the aerial footage from April 12th, 2014?

6  *A.*  Yes.

7       MR. MYHRE:  Your Honor, we offer Exhibit 163.

8       THE COURT:  Continuing objection?

9       MR. TANASI:  Yes, Your Honor.  Thank you.

10      THE COURT:  Same response?

11      MR. MYHRE:  Yes, Your Honor.

12      THE COURT:  Same ruling.  Exhibit 163 will be admitted.

13 You may go ahead and publish it to the jury.

14      MR. MYHRE:  Thank you, Your Honor.

15      (Government's Exhibit 163 is admitted.)

16 BY MR. MYHRE:

17 *Q.*  Agent, you -- in your testimony you indicated that you were

18 able to time stamp this by following movements of individuals in

19 the wash.  Is that correct?

20 *A.*  Yes.

21 *Q.*  Would you -- are you able to identify in this image the

22 individuals you were able to track in the wash?

23 *A.*  Yes.  Specifically -- I'll try to draw an arrow.  Not a very

24 good arrow, but that individual right there with the backpack on

25 and the light-colored shirt.

—2:16-cr-46-GMN-PAL—

1  Q.  So you were able to view other known video from April 12th

2  where that individual appears.  Is that correct?

3  A.  Yes.

4  Q.  Now, you also identified some vehicles in this image that

5  helped you time stamp from the aerial.  Is that correct?

6  A.  Yes.

7  Q.  If you would just identify those.

8  A.  This tractor-trailer truck followed by this white vehicle

9  behind it.

10       MR. MYHRE:  And the record should reflect that the

11  witness has drawn an arrow to an individual image that appears

12  below the barrier into the wash and then has drawn two circles

13  in the upper left portion of the exhibit, one of a truck

14  trailer -- truck trailer, excuse me, and another vehicle behind

15  that.

16  BY MR. MYHRE:

17  Q.  Now, you indicated Mr. Parker is in this image, correct?

18  A.  Yes, he is.

19  Q.  If you could circle him as well.

20       And you know him by his -- by what?

21  A.  By his clothing, his hat, his rifle, and his facial

22  features.

23  Q.  Do you see -- have you been able to identify any other

24  defendants in this image?

25  A.  Behind -- well, I'm sorry.  In the background of this image

 1  and to Mr. Parker's left Mr. Stewart is crouched down.  And you

 2  can see his blue shirt with the design on the back next to the

 3  guy in the white shirt.

 4          MR. MYHRE:  And the witness -- the record should

 5  reflect that the witness has drawn an arrow or line, excuse me,

 6  above an image of an individual with a blue shirt.

 7  BY MR. MYHRE:

 8  *Q.*  You've identified that individual as Defendant Stewart?

 9  *A.*  Yes.

10  *Q.*  And you were able to, as you described, time stamp this.

11  Did you then incorporate this image into your timeline?

12  *A.*  Yes, I did.

13          MR. MYHRE:  Thank you.  Your Honor, may we then move to

14  Exhibit 164?

15          THE COURT:  Yes, you may.

16  BY MR. MYHRE:

17  *Q.*  And do you see Agent -- excuse me.  Agent Willis, do you see

18  164 before you?

19  *A.*  Yes, I do.

20  *Q.*  Where was this image obtained from?

21  *A.*  This was obtained from Washington -- the Washington Post.com

22  website.

23  *Q.*  And who obtained this image?

24  *A.*  I did.

25  *Q.*  And how did you do that?

—2:16-cr-46-GMN-PAL—

1   *A.*   Accessed their website and downloaded the image.

2   *Q.*   And based on the distinctive characteristics in this image,

3   were you able to determine that it was taken on April 12th,

4   2014?

5   *A.*   Yes.

6   *Q.*   If you could just recite for us a few of those

7   characteristics that you used.

8   *A.*   Well, knowing that this photo, because of the caption within

9   the Washington Post website, was also taken by Jim Urquhart, and

10  I can track his movements.  I could compare it to the Hugh

11  Gourgeon photography -- photographs with Hugh Gourgeon's

12  movements on the bridge.  But on the top of the image there is a

13  tractor-trailer truck carrying a dark -- what looks like a dark,

14  I guess, load on its trailer.  And I can track that as well as

15  other vehicles on the bridge as they pass by on the southbound

16  I15 bridge heading west.

17  *Q.*   Again, using the aerial surveillance from April 12th?

18  *A.*   Yes.

19  *Q.*   And those were consistent with those images?

20  *A.*   Yes.

21  *Q.*   And this image appears to be Mr. Parker as well, correct?

22  *A.*   That is correct.

23  *Q.*   And how are you able to identify him?

24  *A.*   Again, his hat, his tactical vest, shirt, pants, knife,

25  firearm.

2:16-cr-46-GMN-PAL

 1          MR. MYHRE:  Your Honor, we offer Exhibit 164.

 2          THE COURT:  Any objection to 164?

 3          MR. TANASI:  Same objection.

 4          MR. MARCHESE:  Parker joins.

 5          MR. PEREZ:  Lovelein joins.

 6          MR. LEVENTHAL:  Drexler joins.

 7          MR. MYHRE:  Same response, Your Honor.

 8          THE COURT:  Same ruling.  164 will be admitted.  You

 9  may go ahead and publish it to the jury.

10          MR. MYHRE:  Thank you.

11          THE COURT:  Can I just have the witness clarify?

12  Because he keeps calling it a tractor-trailer, and I think that

13  may be a term that's used, but not one that I've used.  So maybe

14  just to clarify what you're talking about.

15          MR. MYHRE:  Yes, Your Honor.

16          THE WITNESS:  Sorry.  That's just what I grew up

17  calling it.  So it's like a semi-truck, a 16 wheeler.

18  BY MR. MYHRE:

19  Q.  If you would draw a circle around the image that you

20  referred to as a tractor-trailer.

21          MR. MYHRE:  And the record should reflect the witness

22  has drawn a circle around an image of what appears to be a truck

23  on the top center portion of the image.

24  BY MR. MYHRE:

25  Q.  That's what you're referring to as a tractor-trailer?

—2:16-cr-46-GMN-PAL—

1  *A.*  Yes.

2  *Q.*  It's also known, perhaps, as a semi?

3  *A.*  Yes.

4        THE COURT:  Thank you.

5  BY MR. MYHRE:

6  *Q.*  And that was -- assisted you in time stamping this

7  particular image?

8  *A.*  Yes, sir.

9  *Q.*  Now, just generally speaking, you indicated that Mr. -- you

10  believe Mr. Urquhart appears somewhere in this image or in

11  another image?

12  *A.*  His shadow is in this image on the bottom.  And based on the

13  Hugh Gourgeon photograph of the Citizens Action Network

14  photographer in the black taking the photo with Hugh Gourgeon

15  right next to her, I can approximate, again comparing that to

16  the aerial, of the exact time when this photograph was taken.

17  *Q.*  So I may have misspoken.  So the shadow that you've circled

18  there in the bottom portion of the image, that's of Citizens

19  Action Network?

20  *A.*  No, that's of Hugh -- Hugh Gourgeon and his camera.  So you

21  can see somebody holding a camera, and the sun creating --

22  casting a shadow in the picture.

23  *Q.*  And you're able to verify that through -- well, let's take a

24  look at Exhibit 139.

25        Does that assist you at all?

—2:16-cr-46-GMN-PAL—

1   **A.**   Yes.

2   *Q.*   And this is -- oh, excuse me.

3         And this is the image taken by Mr. Gourgeon, correct?

4   **A.**   Yes.  And this would be Mr. Urquhart and his shadow.

5   *Q.*   So the shadow that you drew before was of Mr. Urquhart?

6   **A.**   That's what I believe, yes.

7   *Q.*   And that image now in 139 was captured by Mr. Gourgeon?

8   **A.**   139 is?

9   *Q.*   Yes.

10  **A.**   Yes.

11  *Q.*   So going back -- if we go back to 164, now looking over to

12  your left, is that -- which image do you believe is the shadow

13  of Urquhart?

14        And from this you were able to time stamp this

15  particular image?

16  **A.**   Along with the aerial photography with the semi-truck

17  passing on the southbound bridge.

18        MR. MYHRE:  And, Your Honor, may we show Exhibit 195 to

19  the witness?

20        THE COURT:  Yes, you may.

21  BY MR. MYHRE:

22  *Q.*   And do you see 195, Agent?

23  **A.**   Yes, I do.

24  *Q.*   Where was this obtained?

25  **A.**   This was obtained from Reuters.com.

-2:16-cr-46-GMN-PAL-

1  Q.  And what is depicted in this image generally?

2  A.  Eric Parker in the prone position with his rifle between the

3  gap in the Jersey barriers.

4  Q.  And you recognize him by his clothing?

5  A.  Yes, I do.

6  Q.  And you recognize this image as taken on April the 12th,

7  2014?

8  A.  Yes.

9  Q.  And do you see any other individuals in this image that you

10  recognize?

11  A.  Yes, I do.

12  Q.  And who is that?

13  A.  Trey Schillie and Hugh Gourgeon.

14  Q.  And you knew them to be on the bridge on April 12, 2015?

15  A.  Yes.

16         MR. MYHRE:  Your Honor, we offer Exhibit 195.

17         THE COURT:  Continuing objection?

18         MR. TANASI:  Yes, Your Honor.  Thank you.

19         MR. MARCHESE:  Yes, Your Honor.

20         MR. PEREZ:  Yes, Your Honor.

21         MR. LEVENTHAL:  Yes.

22         MR. MYHRE:  Same response, Your Honor.

23         THE COURT:  All right.  Same ruling.  Exhibit 195 is

24  admitted.  You may go ahead and publish it to the jury.

25         (Government's Exhibit 195 is admitted.)

─2:16-cr-46-GMN-PAL─

1  BY MR. MYHRE:

2  *Q.*  So this image, 195, in which direction are we looking now

3  from the photographer's standpoint?

4  *A.*  We're looking east on the northbound I15 bridge.

5  *Q.*  And east at this point would actually be going northbound,

6  correct?

7  *A.*  Yes, that would be correct.

8  *Q.*  It would be going with traffic?

9  *A.*  Yes.

10  *Q.*  You indicated you recognize Mr. Schillie in this photo?

11  *A.*  Yes, I do.

12  *Q.*  And if you would circle the image of that individual.

13         MR. MYHRE:  And the record should reflect that the

14  witness has drawn a circle around an individual appears to be in

15  a blue shirt about the center of the screen.

16  BY MR. MYHRE:

17  *Q.*  Is this the same individual you know to be Trey Schillie who

18  testified in court?

19  *A.*  Yes, it is.

20  *Q.*  Clearing that.

21         Now, you also said you recognized Mr. Gourgeon?

22  *A.*  Yes.

23  *Q.*  And if you would circle his image.

24         MR. MYHRE:  And the record should reflect the witness

25  has circled an image about the center of the screen.

—2:16-cr-46-GMN-PAL—

1  BY MR. MYHRE:

2  *Q.*  The individual appears to be in a yellow shirt?

3  *A.*  Yes.

4  *Q.*  And from those images -- excuse me.

5      When you downloaded this image, did it have a time

6  stamp?

7  *A.*  No, it was just from a public website.

8  *Q.*  Were you able to time stamp it?

9  *A.*  Yes, I was.

10  *Q.*  And how did you derive a time?

11  *A.*  Based on the Hugh Gourgeon photography and the known

12  time-stamping information on those photos.

13      MR. MYHRE:  And, Your Honor, may we show 196 to the

14  witness?

15      THE COURT:  Yes.

16  BY MR. MYHRE:

17  *Q.*  Agent Willis, do you see 196?

18  *A.*  Yes, I do.

19  *Q.*  What is this an image of generally?

20  *A.*  This is an image of several people standing at the entrance

21  to the assembly area/parking area off of northbound I15.

22  *Q.*  Where was this image obtained from?

23  *A.*  This is also a Reuters/Jim Urquhart photo -- photograph.

24  *Q.*  So this came from the Reuters.com?

25  *A.*  Yes.

—2:16-cr-46-GMN-PAL—

1  *Q.*  Who downloaded this image?

2  **A.**  I did.

3  *Q.*  So you actually saw it on the website?

4  **A.**  Yes, I did.

5  *Q.*  Is this taken from April 12th, 2014?

6  **A.**  Yes, it was.

7  *Q.*  And how were you able to derive that?

8  **A.**  By the activities happening, the Metro officers moving

9  across the I15 roadway/highway, and as well as the other

10  individuals that are in that area compared to other video and

11  photo evidence.

12  *Q.*  And who appears in this image?

13  **A.**  Eric Parker.

14          MR. MYHRE:  Your Honor, we offer Exhibit 196.

15          MR. MARCHESE:  No objection Parker.

16          MR. TANASI:  None from Stewart, Your Honor.

17          MR. LEVENTHAL:  No objection, Your Honor.

18          MR. PEREZ:  None from Lovelein.

19          THE COURT:  Exhibit 196 will be admitted.  You may go

20  ahead and publish it.

21          MR. MYHRE:  Thank you, Your Honor.

22          (Government's Exhibit 196 is admitted.)

23  BY MR. MYHRE:

24  *Q.*  Now, the image that's before the jury, Agent Willis, for

25  record purposes, please draw a circle around Mr. Parker.

―2:16-cr-46-GMN-PAL―

1          And where is this image taken with respect to location

2   on the ground?

3   *A.*  This image was taken from the median on the north side of

4   the northbound I15 highway or interstate looking south, facing

5   south.

6   *Q.*  Now, I've cleared the circle you've drawn.  There are law

7   enforcement officers in this image as well, correct?

8   *A.*  Yes.

9   *Q.*  And who are those -- not by name, but who are those officers

10  affiliated with?

11  *A.*  Las Vegas Metropolitan Police Department.

12  *Q.*  If you could just draw a circle around them.

13          MR. MYHRE:  The record should reflect the witness has

14  drawn a circle around several officers in the right-hand portion

15  of the screen.

16  BY MR. MYHRE:

17  *Q.*  And do you see anyone -- do you recognize anyone in this

18  image to be Sheriff Lombardo?

19  *A.*  Sheriff Lombardo, you can't see his face, but his head is

20  right there.  He's -- at this time he's preparing to walk across

21  the highway, and he's facing back to the individuals on the side

22  of I15.

23  *Q.*  Now, for record purposes, where is he in relation to

24  Mr. Parker in this image?

25  *A.*  He would be almost directly to his north or in front of

———— 2:16-cr-46-GMN-PAL ————

1   Mr. Parker.

2          MR. MYHRE:  Now, Your Honor, may we refer back to

3   Exhibit 160, please?

4          THE COURT:  Yes.

5   BY MR. MYHRE:

6   Q.  And this was earlier introduced through Sheriff Lombardo?

7   A.  Yes.

8   Q.  And you see Sheriff Lombardo in this image as well?

9   A.  Yes, I do.

10  Q.  Is this as well in the approximate area where the -- that we

11  just viewed in Exhibit 196?

12  A.  Yes.

13  Q.  Now, does -- are there any other defendants that appear in

14  this image?

15  A.  Yes.  Scott Drexler in the background behind that

16  dark-colored pickup truck.

17  Q.  Would you circle that image, please.

18         MR. MYHRE:  And the record should reflect the witness

19  circling an image of an individual in the top right portion of

20  the Exhibit 160.

21  BY MR. MYHRE:

22  Q.  How are you able to identify this as Mr. Drexler?

23  A.  By his hat, his tactical vest, and his shirt, and his hair

24  also.

25  Q.  Now, this Exhibit 160 was from the Bushman Dropbox.  Is that

—2:16-cr-46-GMN-PAL—

1  correct?

2  **A.**  That's correct.

3  *Q.*  So you were able to time stamp that image.  Is that right?

4  **A.**  Yes, I was.

5          MR. MYHRE:  Go back to 196, please.

6  BY MR. MYHRE:

7  *Q.*  And what other -- did you use 160 to help you time stamp

8  this particular image?

9  **A.**  Yes, the approximate time.  So this would be taking place --

10  I would approximate it at one minute after that Bush -- that

11  Shannon Bushman photograph was taken after Sheriff Lombardo had

12  completed or finished his conversation with Dave Bundy, turned

13  around, and began walking across I15.

14  *Q.*  Is this image at 196 incorporated in your timeline?

15  **A.**  Yes, it is.

16  *Q.*  So we will revisit this image later.

17  **A.**  Yes.

18  *Q.*  Did you also review local network broadcasts as well?

19  **A.**  Yes, I did.

20  *Q.*  And, specifically, did you look at Fox News?

21  **A.**  Yes.

22  *Q.*  And how about with respect to Channel 8?

23  **A.**  Yes.

24  *Q.*  In the course of your review of that media, did you also

25  find relevant images captured from conventional reporters?

—2:16-cr-46-GMN-PAL—

1   *A.*  Yes.

2         MR. MYHRE:  Your Honor, may we show the witness Exhibit

3   168?

4         THE COURT:  Yes, you may.

5         (Video playing.)

6         MR. MYHRE:  Thank you.  That's fine right there.

7   BY MR. MYHRE:

8   *Q.*  And do you recognize 168?

9   *A.*  Yes, I do.

10  *Q.*  And what is that?

11  *A.*  This is a Fox News live broadcast.  I believe this was aired

12  on April 13th, 2014.

13  *Q.*  And if -- and from that news broadcast were you able to find

14  relevant photos of defendant?

15  *A.*  Yes.

16         MR. MYHRE:  And may I show the witness 168B, Your

17  Honor?

18         THE COURT:  Yes, you may.

19  BY MR. MYHRE:

20  *Q.*  Do you see 168B?

21  *A.*  Yes, I do.

22  *Q.*  What is that an image of?

23  *A.*  It's an image of Eric Parker laying in the prone position on

24  I15 bridge.  Several people are in the wash in the background.

25  *Q.*  And this image was taken from that news broadcast?

──────2:16-cr-46-GMN-PAL──────

1   **A.**   Yes, it was.

2   *Q.*   And there's a banner below it that indicates -- so

3   indicates.  Is that correct?

4   **A.**   Yes.

5   *Q.*   In this image what is -- have you identified specific

6   characteristics in this image that identified April 12th, 2014?

7   **A.**   Yes.

8   *Q.*   And specifically what types of characteristics?

9   **A.**   The individuals in the wash, the northbound and southbound

10  I15 bridges, and Eric Parker and his positioning on the bridge.

11  *Q.*   And his clothing as well?

12  **A.**   Yes.

13          MR. MYHRE:  Your Honor, we offer 168B.

14          MR. MARCHESE:  Parker objects --

15          THE COURT:  Any objection?

16          MR. MARCHESE:  -- to the commentary writing at the

17  bottom.

18          THE COURT:  The white or the yellow letters?

19          MR. MARCHESE:  I guess both, but mainly the white as to

20  hearsay and relevance.

21          MR. MYHRE:  I believe we can redact these, Your Honor.

22          THE COURT:  Well, I was going to say, it's a picture

23  and not a video.  So we should be able to redact it, right?

24          MR. MYHRE:  Yes, Your Honor.

25          THE COURT:  Okay.  Any other objections?

—2:16-cr-46-GMN-PAL—

1         MR. MARCHESE:  None from Parker.

2         MR. TANASI:  Stewart joins, Your Honor.

3         THE COURT:  Anything else?

4         MR. LEVENTHAL:  No objection.

5         THE COURT:  All right.  So Exhibit 168B will be

6  admitted with that redaction eliminating the yellow and white

7  letters.

8         (Government's Exhibit 168B is admitted.)

9         MR. MYHRE:  If I could just for the witness only 168B,

10  please.

11         And, Your Honor, we have the redacted version there.

12  I'm not sure if there are any further objections based on the

13  redactions.

14         MR. TANASI:  Nothing further from Stewart, Your Honor.

15  Thank you.

16         MR. MARCHESE:  None from Parker.

17         THE COURT:  All right.  So Exhibit 168B, as in bravo,

18  is admitted.  You may go ahead and publish it now.

19         MR. MYHRE:  Thank you, Your Honor.

20  BY MR. MYHRE:

21  *Q.*  Well, 168B now is in front of the jury.  And if you would

22  describe for us Mr. Parker's position relative to the wash.

23  *A.*  He is in the prone position, laying down on the northbound

24  I15 bridge.  He would be -- he's facing north over the wash

25  towards the southbound I15 bridge and the BLM vehicles.

─2:16-cr-46-GMN-PAL─

 1  *Q.*  For record purposes, can you see which way his head is

 2  turned in this image?

 3  **A.**  Oh.  He is -- he is facing east down the highway.

 4  *Q.*  So he would be facing --

 5  **A.**  To his right.

 6  *Q.*  His head would be facing sort of with traffic on the

 7  northbound?

 8  **A.**  Yes.

 9  *Q.*  Does there appear to be an object under his elbow?

10  **A.**  Yes.  It is a backpack, it appears to be.

11  *Q.*  When you downloaded this image, did it have a time stamp

12  with it?

13  **A.**  No, it did not.

14  *Q.*  And were you able to later time stamp this?

15  **A.**  Yes.

16  *Q.*  If you would describe the methodology you generally went

17  through for that.

18  **A.**  In a photograph that we reviewed earlier from Reuters.com

19  with Scott Drexler drinking out of the jug of water, I described

20  a silver SUV driving by and how I determined the time stamping

21  from the aerial footage for that SUV.  This photograph, because

22  of -- due to the way he is facing, his position on the bridge,

23  and I can match that up to the Reuters photograph of Mr. Drexler

24  taking the chug of water and Mr. Stewart holding his rifle.

25          I believe that the silver SUV with the person holding

— 2:16-cr-46-GMN-PAL —

1   the camera or the phone out had taken this photo as they were

2   driving by a moment before the photograph was taken with the

3   water and the gun, which again I time stamped through the aerial

4   photography footage.

5   Q.  So the image we saw earlier with the vehicle driving by?

6   A.  Yes.

7   Q.  Was that individual, based on your review, affiliated then

8   with Fox?

9   A.  Yes, that vehicle had been in the median between the north

10  and southbound I15 bridges earlier.  They had been on the

11  northbound I15 bridge earlier in that day.  It appeared to be

12  some type of news outlet representative or representatives.  So

13  I can track that vehicle and reach the conclusion that those

14  individuals as they were passing by and appearing to be leaving

15  the area were taking this photo -- this photo.

16        MR. MYHRE:  So if we could go back to 162 briefly.

17  BY MR. MYHRE:

18  Q.  Do you see the vehicle to which you refer?

19  A.  Yes.  So here's the vehicle.  Here's the camera or phone

20  that I had described.  And I believe that that picture was taken

21  moments before as that vehicle --

22        MR. LEVENTHAL:  I'm going to object to speculation.

23        THE WITNESS:  -- passed by.

24        MR. LEVENTHAL:  Objection, speculation.

25        MR. MYHRE:  Well --

 1          THE COURT:  Overruled.  That's what he's explaining is

 2   how he determined the time.

 3          MR. LEVENTHAL:  And, Your Honor, I would just say that

 4   he indicated that it's his belief.  He's not -- it's a belief.

 5          MR. MYHRE:  I can drill down further on that, Your

 6   Honor.

 7          THE COURT:  All right.  Go ahead.

 8   BY MR. MYHRE:

 9   *Q.*  So you've drawn -- the record should reflect you've drawn a

10   line directly above what appears to be someone's hand outside a

11   window of a vehicle, correct?

12   *A.*  Yes.

13   *Q.*  And what does that individual appear to be doing based on

14   what you observed in this image?

15   *A.*  Taking a photograph or video.

16   *Q.*  Do you see Mr. Parker in this image?

17   *A.*  Yes, I do.

18   *Q.*  And would you circle him?

19   *A.*  He's right here looking to his right in the prone position

20   with his rifle pointed through the Jersey barrier.

21   *Q.*  Do you see his arm braced on anything?

22   *A.*  Yes, same as the last image where his arm is resting on a

23   backpack.

24   *Q.*  And if you'd just draw a little line toward the arm toward

25   that backpack.

2:16-cr-46-GMN-PAL

1          MR. MYHRE:  The record should reflect that the witness

2    has drawn a circle around an image he believes to be -- he's

3    identified as Mr. Parker as well as a line underneath an object

4    he has identified as a backpack.

5    BY MR. MYHRE:

6    Q.  Now, you say that based on your review of this that the

7    individual in this car took the image of Mr. Parker.  Is that

8    correct?

9    A.  That's correct.

10   Q.  And from what angle would that image have been taken?

11   A.  The previous image?

12   Q.  Based on the travel of this car, yes.

13   A.  It would have been taken from right behind and slightly to

14   Mr. Parker's right as the vehicle was passing by.

15   Q.  And so based on your review of this image, what has caused

16   you to observe that this vehicle would have taken that image of

17   Mr. Parker?

18   A.  Again, the person with the hand out, the camera, and the

19   position of Mr. Parker in the exact -- almost exact same

20   position as the previous Fox News photograph looking to his

21   right on the backpack with his rifle pointed between the Jersey

22   barriers.

23   Q.  Thank you.

24          And so from all of that, you were able to ultimately

25   derive a time stamp, correct?

—2:16-cr-46-GMN-PAL—

1   *A.*  That's correct.

2   *Q.*  And that's incorporated in your timeline?

3   *A.*  Yes, it is.

4          MR. MYHRE:  Your Honor, may we show Exhibit 166A?

5          THE COURT:  Yes, you may.

6   BY MR. MYHRE:

7   *Q.*  Do you see 166A, Agent Willis?

8   *A.*  Yes, I do.

9   *Q.*  What is depicted in that image?

10  *A.*  This is Steven Stewart kneeling on the northbound I15 bridge

11  holding a rifle in front of him pointed upward.

12  *Q.*  Where was this image obtained?

13  *A.*  This was obtained from the 8 News NOW I-Team broadcast.  I

14  believe this was broadcast on May -- well, it says it actually.

15  May 8th, 2014.

16  *Q.*  And with respect to this broadcast, did you review that

17  broadcast?

18  *A.*  Yes, I did.

19  *Q.*  And did you obtain this image from that broadcast?

20  *A.*  Yes, I did.

21  *Q.*  You identified it as Mr. Stewart, but the image itself has

22  embedded within it a date.  Is that correct?

23  *A.*  Yes.

24  *Q.*  What is that date?

25  *A.*  May 8th, 2014.

—2:16-cr-46-GMN-PAL—

1   Q.  Off to the right of Mr. Stewart, do you see a date there?

2   A.  Yes, it says April 12th.

3   Q.  Now, the clothing Mr. Stewart's wearing, is that consistent

4   or not consistent with what he's wearing in known images of

5   April 12th?

6   A.  It's consistent.

7           MR. MYHRE:  Your Honor, we offer 166A.

8           THE COURT:  166A.  Any objection?

9           MR. TANASI:  Continuing objection from Stewart, Your

10  Honor.

11          MR. MARCHESE:  Parker joins.

12          MR. LEVENTHAL:  Drexler joins.

13          MR. PEREZ:  Lovelein joins.

14          MR. MYHRE:  Same response, Your Honor.

15          THE COURT:  All right.  Same ruling.  166A will be

16  admitted.  You may go ahead and publish it to the jury.

17          MR. MYHRE:  Thank you.

18          (Government's Exhibit 166A is admitted.)

19  BY MR. MYHRE:

20  Q.  Agent Willis, the jury now has before it 166A.  Would you

21  for record purposes just please circle the individual you

22  identified as Mr. Stewart.

23          And do you see objects that are consistent -- objects

24  and clothing that's consistent with previous images, known

25  images, of Mr. Stewart?

─ 2:16-cr-46-GMN-PAL ─

1  *A.*  Yes.

2  *Q.*  And just please identify those as well.

3  *A.*  As we saw Mr. Stewart at the rally site/staging area, his

4  hat, his blue shirt with the design on the back, his large knife

5  on his left thigh with the leather or brown sheath and the

6  fluorescent pink label on it.

7  *Q.*  Does he appear to be holding anything?

8  *A.*  Yes, he's holding a rifle.

9  *Q.*  And where approximately is he located in this image?

10  *A.*  He is on the northbound I15 bridge facing north.

11  *Q.*  What's in front of him?

12  *A.*  A Jersey barrier and the wash.

13  *Q.*  And where is the firearm in relationship to the Jersey

14  barrier?

15  *A.*  It is maybe the tip of the barrel.  The first part of the

16  barrel is slightly above the Jersey barrier pointed up.  And the

17  rest of the rifle is below the Jersey barrier in front of him.

18       MR. TANASI:  Objection, Your Honor.  I move to strike.

19  That's speculation, and the best evidence rule, the picture

20  speaks for itself as to where the barrel of the rifle is.

21       MR. MYHRE:  Your Honor, he's entitled to testify as to

22  what he observed in the image based on his investigation.

23       THE COURT:  Objection overruled.

24  BY MR. MYHRE:

25  *Q.*  And would you also -- Agent Willis, do you see Mr. Stewart

—2:16-cr-46-GMN-PAL—

1  carrying any other objects on his left hip?

2  *A.*  He has the knife on his left hip.

3  *Q.*  And if you could circle that.

4        MR. MYHRE:  Witness indicating an object on

5  Mr. Stewart's left hip he's identified as a knife.

6  BY MR. MYHRE:

7  *Q.*  And you've seen that in previous images.  Is that correct?

8  *A.*  Yes.

9  *Q.*  Were you able to time stamp this image?

10  *A.*  Yes, I was.

11  *Q.*  Did you use other images to assist you in doing that?

12  *A.*  Yes.

13        MR. MYHRE:  Your Honor, may we show Exhibit 167A?

14        THE COURT:  Yes, you may.

15  BY MR. MYHRE:

16  *Q.*  Do you see 167A?

17  *A.*  Yes.

18  *Q.*  What is depicted in this image?

19  *A.*  This is a pulled-back view, slightly pulled-back view, of

20  the image that we just saw.  This is -- this includes part of

21  the Toquop Wash and also northbound I15 bridge facing east.

22  *Q.*  East or northbound, correct?

23  *A.*  Or northbound, correct.

24  *Q.*  Where was this image obtained?

25  *A.*  This was obtained from 8 News NOW.

—2:16-cr-46-GMN-PAL—

1    *Q.*  From the -- was this broadcast in April of 2014?

2    **A.**  Yeah, April 13th, 2014 -- April 30th, 2014.  Excuse me.

3    *Q.*  And does it appear to be from the same footage as the

4    earlier image we saw?

5    **A.**  Yes.

6    *Q.*  You downloaded or you captured this image from that

7    broadcast?

8    **A.**  Yes, I did.

9    *Q.*  And you observed the broadcast?

10   **A.**  Yes, I did.

11   *Q.*  Now, is Mr. -- in this image is Mr. Stewart in the same or

12   in a different position?

13   **A.**  He's in a slightly different position.  He's moved his gun

14   down behind the Jersey barrier, and now he's fully kneeled.  It

15   appears that he's kneeling on the ground with both knees looking

16   over the Jersey barrier into the wash.

17   *Q.*  And what he's wearing there is consistent with the previous

18   image?

19   **A.**  Yes.

20   *Q.*  Is it consistent with everything on April 12?

21   **A.**  Yes.

22           MR. MYHRE:  Your Honor, we offer Exhibit 167A.

23           THE COURT:  Any objection to 167A?

24           MR. TANASI:  Same objection Stewart, Your Honor.

25           MR. MARCHESE:  Parker joins.

─2:16-cr-46-GMN-PAL─

1          MR. LEVENTHAL:  Join, Drexler.

2          MR. PEREZ:  Lovelein joins.

3          MR. MYHRE:  Same response, Your Honor.

4          THE COURT:  All right.  Same ruling.  Exhibit 167A will

5   be admitted.  You may go ahead and publish it to the jury.

6          (Government's Exhibit 167A is admitted.)

7   BY MR. MYHRE:

8   *Q.*  Looking now at 167A, Agent Willis, you described that

9   Mr. Stewart changed positions, correct?

10  ***A.***  Yes.

11  *Q.*  And would you please circle his image.

12          MR. MYHRE:  The record should reflect the witness is

13  circling an image identified in the center of the screen that

14  he's identified as Mr. Stewart.

15  BY MR. MYHRE:

16  *Q.*  Did you use this image to assist you in time stamping the

17  previous image?

18  ***A.***  Yes, I did.

19  *Q.*  And you could time stamp this as well.  Is that correct?

20  ***A.***  Yes.

21  *Q.*  And you described the location, but if you could just again

22  describe where were you -- where were you looking up and --

23  excuse me -- where we are looking, which direction, and where on

24  the bridge we're looking.

25  ***A.***  We're looking east on northbound I15.

—2:16-cr-46-GMN-PAL—

1    Q.  And is this on the bridge itself?

2    A.  Yeah.  I'm sorry.  On the bridge.

3    Q.  Clearing that.

4            Now, with respect to time stamping, are there images

5    depicted in this particular exhibit that assisted you in time

6    stamping?

7    A.  Yes.

8    Q.  What are those?

9    A.  So from the aerial footage, not only the position of the

10   people in the wash, but more importantly in the background there

11   is a -- like a Can-Am Spyder trike motorcycle that's driving by

12   on the first lane.  At the same time there's a dark-colored

13   vehicle driving by this white vehicle over here.  And behind

14   that vehicle is this white pickup truck that has a steel or

15   metal toolbox in the bed of the truck.  I could see all of those

16   vehicles proceeding northbound on northbound I15 bridge over the

17   bridge at this time in the aerial footage.

18   Q.  And is this image incorporated in your timeline?

19   A.  Yes.

20   Q.  And it will depict in your timeline the time that you were

21   able to derive while looking at the aerial surveillance?

22   A.  Yes.

23           MR. MYHRE:  Your Honor, may we show the witness Exhibit

24   169A?

25           THE COURT:  Yes, you may.

1  BY MR. MYHRE:

2  Q.  Now, Agent Willis, were you able also to -- you talked about

3  reviewing public media.  Did you also review any documentaries

4  that had been published about the Bunkerville events?

5  A.  Yes.

6  Q.  And was one of those called -- published by PBS?

7  A.  Yes.

8  Q.  And what was that documentary?

9  A.  American Patriot.

10  Q.  And was that by a particular show affiliated with PBS?

11  A.  Frontline.

12  Q.  And approximately when did that show air?

13  A.  On May 16th, 2017.

14  Q.  Did you review the entire documentary?

15  A.  Yes.

16  Q.  And based on your review, did you capture images that

17  pertain and are relevant to the events of April 12th, 2014?

18  A.  Yes.

19  Q.  Looking at 169A.  What is this an image of?

20  A.  This is an image of Scott Drexler.

21  Q.  And how are you able to determine that?

22  A.  The image include -- it does not include his face, but I

23  have determined that this is Scott Drexler from his tattoo on

24  his arm, his firearm, his camouflage pants, his handgun, his

25  shirt, and his tactical vest.

—2:16-cr-46-GMN-PAL—

1  *Q.* And those are consistent with known images of April 12th,

2  2014?

3  *A.* Yes.

4  *Q.* Do you know where in terms of the events of April 12th,

5  2014, this image was captured?

6  *A.* Yes, this would be -- would have been taken at the entrance

7  to the assembly area/parking area off of northbound I15 across

8  from the BLM Post 1 entrance to the ICP.

9          MR. MYHRE:  Your Honor, we offer Exhibit 169A.

10          THE COURT:  Same objection?

11          MR. TANASI:  Yes, Your Honor.  Thank you.

12          MR. LEVENTHAL:  Yes, Your Honor.  Drexler joins.

13          THE COURT:  Same response?

14          MR. MYHRE:  Same response.

15          THE COURT:  Same ruling.  Exhibit 169A is admitted.

16  You may go ahead and publish it for the jury.

17          MR. MYHRE:  Thank you, Your Honor.

18          (Government's Exhibit 169A is admitted.)

19  BY MR. MYHRE:

20  *Q.* Okay.  I believe that's up before the jury now, Agent

21  Willis.  169A, if you would just circle the individual

22  identified as Mr. Drexler.

23          MR. MYHRE:  And the record should reflect the witness

24  is circling the image of an individual directly in the center of

25  the exhibit.

—2:16-cr-46-GMN-PAL—

1  BY MR. MYHRE:

2  Q.  And if you would just point out for the jury what

3  characteristics of this image you used to identify it as

4  Mr. Drexler?

5  A.  His shirt, his tactical vest, his rifle, his handgun, and

6  his camouflage pants.

7  Q.  You indicated that this was taken near the assembly area.

8  Is that right?

9  A.  That's correct.

10  Q.  And how can you -- can you tell from this image that it was

11  taken near the assembly area?

12  A.  Yes, I'm familiar with the location of the cars that had

13  parked in that area and the times when they were -- they had

14  arrived as well as the other individuals in the area, including

15  the individual behind Mr. Drexler with the handgun and the

16  individual in front of him with the long gun and the peach or

17  salmon-colored pants.

18  Q.  So there's an individual also with a blue shirt, correct?

19  A.  Yes.

20  Q.  And could you circle that image, please.

21      And is there another individual with a blue shirt

22  there, too, as well?

23  A.  Yes.

24  Q.  And so those two images that you've circled --

25      MR. MYHRE:  And the record should reflect the witness

1  has circled two images of individuals in blue shirts about the

2  right portion of Exhibit 169A.

3  BY MR. MYHRE:

4  *Q.* Did you use those images in assisting you to time stamp this

5  particular ...

6  *A.* I did, along with other admitted evidence.

7  *Q.* Now, I neglected to ask that predicate question, but was

8  this image time stamped when you derived it?

9  *A.* No, it was not.

10  *Q.* But you were able to do so.  Is that correct?

11  *A.* Yes.

12       MR. MYHRE:  Your Honor, may we show the witness Exhibit

13  160?

14       THE COURT:  Yes, you may.

15  BY MR. MYHRE:

16  *Q.* This was previously identified as the exhibit from the

17  Bushman Dropbox, right?

18  *A.* Yes.

19  *Q.* We've looked at it before?

20  *A.* Yes.

21  *Q.* Did you use this image in assisting you to time stamp?

22  *A.* Yes, I did.

23  *Q.* And how did this assist you in that process?

24  *A.* The image we just -- we previously saw, just saw, would have

25  been taken at approximately the same time based on the position

1  of Mr. Drexler as well as the person standing next to him with

2  his arms crossed in the blue shirt.

3  Q.  If you would circle that individual, please.

4        Circling an individual in the blue shirt?

5  A.  Yes.

6  Q.  And you used that image to assist you in time stamping what

7  we just looked at as 169A?

8  A.  Yes.

9  Q.  Now, the Bushman photo that we're looking at here at 160,

10 again, this was time stamped, correct?

11 A.  Yes, it was.

12 Q.  Now, obviously with this image, but with 169A, that image

13 you incorporated in your timeline?

14 A.  Yes, I did.

15 Q.  Which will be shown later.  Is that correct?

16 A.  Yes.

17        MR. MYHRE:  Your Honor, may we show the witness 169C?

18        THE COURT:  Yes, you may.

19        MR. MYHRE:  169C.

20        May I have just a moment, Your Honor?

21        THE COURT:  Sure.

22        (Prosecution conferring.)

23        MR. MYHRE:  I'm sorry.  I think I -- Your Honor, may we

24 go back to 160?

25        THE COURT:  Yes.

2:16-cr-46-GMN-PAL

1          MR. MYHRE:  I think I may have brought it down before

2    the jury was able to see it.  I apologize for that.

3    BY MR. MYHRE:

4    *Q.*  Okay.  160 now appears before the jury.  If you could again,

5    Agent Willis, identify the individuals that assisted this -- how

6    this image assisted you in time stamping 169A?

7    *A.*  So in the previous image where we just see Mr. Drexler from

8    pretty much the collarbone down where he's standing slightly

9    turned to his left, that's where he would be here.  And he's

10   standing next to a person with their arms crossed in a

11   short-sleeved blue shirt, and that's this individual here.

12          MR. MYHRE:  Again, the record should reflect that the

13   witness has drawn two circles.  One -- both individuals -- both

14   circles to the right side, right half of Exhibit 160.  The

15   individual to the left identified as Mr. Drexler.  The

16   individual to the right identified as an individual with the

17   blue shirt, arms crossed.

18   BY MR. MYHRE:

19   *Q.*  And is that individual that -- or that image that assisted

20   you in time stamping 169A?

21   *A.*  Yes.

22   *Q.*  And that's -- and both of these are incorporated in your

23   timeline, correct?

24   *A.*  Yes.

25          MR. MYHRE:  Thank you.  Now, if we could bring up 169C,

1   Your Honor, just for witness and counsel only.

2           THE COURT:  Yes.

3   BY MR. MYHRE:

4   Q.  Do you see 169C?

5   A.  Yes, I do.

6   Q.  Where was this exhibit derived from?

7   A.  The American Patriot Frontline documentary.

8   Q.  Same program as 169A that we just looked at?

9   A.  Yes.

10  Q.  Where is -- what is generally depicted in 169C?

11  A.  It is Scott Drexler in the foreground appearing to be

12  kneeling.  To his right and with his rifle pointed between the

13  Jersey barriers on northbound I15 is Mr. Eric Parker.

14  Q.  Do both individuals -- are they wearing clothing consistent

15  with known images that you reviewed for April 12, 2014?

16  A.  Yes.

17  Q.  And approximately where is this image taken with respect to

18  the events of April 12th?

19  A.  This would be taken facing east or northbound on the

20  northbound I15 bridge in Bunkerville.

21          MR. MYHRE:  And, Your Honor, we offer Exhibit 169C.

22          THE COURT:  Continuing objection to 169C?

23          MR. TANASI:  Yes, Your Honor.

24          MR. LEVENTHAL:  Yes, Your Honor.

25          MR. MARCHESE:  Correct, Your Honor.

—2:16-cr-46-GMN-PAL—

1          THE COURT:  Same response, Mr. Myhre?

2          MR. MYHRE:  Yes, Your Honor.  Thank you.

3          THE COURT:  All right.  Same ruling.  Exhibit 169C will

4  be admitted.  You may go ahead and publish it to the jury.

5          MR. MYHRE:  Thank you, Your Honor.

6          (Government's Exhibit 169C is admitted.)

7  BY MR. MYHRE:

8  Q.  And, Agent Willis, 169C now appears to be in front of the

9  jury.  Again, would you circle Mr. -- for record --

10          MR. MYHRE:  Oh.  It is not apparently in front of the

11  jury.

12          A JUROR:  Some.

13          THE COURT:  Do we have it now?

14  BY MR. MYHRE:

15  Q.  Now 169C appears to be in front of the jury.  Would you

16  please for record purposes identify Mr. Drexler.

17          MR. MYHRE:  Witness circling an image he identifies as

18  Mr. Drexler, bottom half toward just right center of the

19  exhibit.

20  BY MR. MYHRE:

21  Q.  And would you please also circle Mr. Parker.

22          MR. MYHRE:  Witness has circled an individual

23  approximately center screen of Exhibit 169C he's identified as

24  Mr. Parker.

25  BY MR. MYHRE:

2:16-cr-46-GMN-PAL

1  Q.  Now, when you obtained this image, was this time stamped?

2  A.  No.

3  Q.  Were you able to do so?

4  A.  Yes.

5  Q.  And using other exhibits?

6  A.  Yes.

7  Q.  And do you see within this exhibit itself other images that

8  assisted you in time stamping this particular image?

9  A.  Yeah.  So the positioning of the people in general on the

10  bridge, but also what we had done previously with the Hugh

11  Gourgeon photo where you could see Jim Urquhart, who is here,

12  and then the Citizens Action Network lady, who is right next to

13  him, I was able to approximate the time that this was taken.

14  Q.  And is that from the Gourgeon photo?

15  A.  Yes.

16        MR. MYHRE:  Just for purposes of refreshing

17  recollection, can we go back to 139, please.

18        MR. LEVENTHAL:  I'm going to object.  His recollection

19  has not been impaired in any way at this point.

20        MR. MYHRE:  Just for point of reference, Your Honor,

21  may we see Exhibit 139?

22        THE COURT:  So not to refresh recollection, but just

23  for point of reference visually.  Is that what you're saying?

24        MR. MYHRE:  Yes, Your Honor.

25        THE COURT:  All right.  Go ahead.  Objection overruled.

—2:16-cr-46-GMN-PAL—

1  BY MR. MYHRE:

2  *Q.*  And do you see the individuals again you mentioned in this

3  image?

4  *A.*  Yes.

5  *Q.*  Did this image from 139 assist you then in time stamping

6  169C?

7  *A.*  Yes, as well as the Gourgeon video that we had discussed

8  earlier with the similar positioning of both Mr. Parker and

9  Drexler as the vehicles are passing by, short segment video.

10  *Q.*  And from that video, those vehicles were -- you were able to

11  derive -- or excuse me -- compare to aerial surveillance?

12  *A.*  Yes, sir.  Yes.

13  *Q.*  And the aerial surveillance is time stamped and you used

14  that?

15  *A.*  Yes.

16          MR. MYHRE:  So if we could go back to 169C.

17  BY MR. MYHRE:

18  *Q.*  So this image will be incorporated in your summary timeline?

19  *A.*  Yes.

20  *Q.*  And will have the time stamp on there that you've derived?

21  *A.*  Yes.

22          MR. MYHRE:  Your Honor, may we show the witness 169D?

23          THE COURT:  Yes, you may.

24  BY MR. MYHRE:

25  *Q.*  And, Agent Willis, showing you 169D.  What does that appear

─ 2:16-cr-46-GMN-PAL ─

1  to be?

2  **A.**  This appears to be an image of Scott Drexler kneeling down

3  with his rifle slung in front of him on the northbound I15

4  bridge.

5  *Q.*  And you know it to be Mr. Drexler how?

6  **A.**  Based on his clothing, his facial features, and his rifle.

7  *Q.*  And where was this image derived from?

8  **A.**  This is, again, the American Patriot Frontline documentary.

9  *Q.*  And from this image were you able to identify specific

10  characteristics that allowed you to correlate it to April 12,

11  2014?

12  **A.**  Yes.

13  *Q.*  And what were those?

14  **A.**  Well, the positioning of the people on the northbound I15

15  bridge, but also when comparing it in the same methodology as I

16  had mentioned in the previous photograph through the Gourgeon --

17  Hugh Gourgeon photographs, I was able to determine an

18  approximate time stamping for this photograph.

19  *Q.*  And it's April 12, 2014, correct?

20  **A.**  Yes.

21          MR. MYHRE:  Your Honor, we offer Exhibit 169D.

22          THE COURT:  Continuing objection?

23          MR. TANASI:  Yes, Your Honor.  Thank you.

24          MR. MARCHESE:  Yes, Your Honor.

25          MR. LEVENTHAL:  Yes, Your Honor.

—2:16-cr-46-GMN-PAL—

1           MR. PEREZ:  Yes, Your Honor.

2           MR. MYHRE:  Same response, Your Honor.

3           THE COURT:  All right.  Same ruling.  169D will be

4     admitted.  You may go ahead and publish it.

5           (Government's Exhibit 169D is admitted.)

6     BY MR. MYHRE:

7     Q.  And 169D appears to be before the jury.  And for record

8     purposes, would you please circle the individual who appears to

9     be Mr. Drexler.

10          MR. MYHRE:  And the record should reflect the witness

11    circling an individual in the right center of the image.

12    BY MR. MYHRE:

13    Q.  And does Mr. Drexler appear to be holding anything?

14    **A.**  Yes, he's holding a rifle in front of him.

15    Q.  Now, we just saw 169C.  Is there a correlation between 169C

16    and 169D?

17    **A.**  Yes, it would have been taken around the same time.  Jim

18    Urquhart is actually kneeling at this point to Mr. Drexler's

19    right.  He's in the blue shirt holding the camera down to his

20    left.

21    Q.  If you would circle Mr. Urquhart, please.

22          MR. MYHRE:  And the record should reflect witness is

23    circling an individual to the far right portion of Exhibit 169D

24    wearing a blue shirt, appears to be holding a camera.

25    BY MR. MYHRE:

—2:16-cr-46-GMN-PAL—

1  Q.  And did that image assist you in time stamping this

2  particular image?

3  A.  Yes, along with the Gourgeon video and photographs.

4  Q.  So the same images and media that you reviewed for 169C

5  assisted you with 169D in terms of time stamping?

6  A.  That is correct.

7  Q.  And both of those images, including this one, will be

8  incorporated in your summary timeline?

9  A.  Yes.

10 Q.  And that will reflect the time that you derived?

11 A.  Yes.

12        MR. MYHRE:  Your Honor, may we show Exhibit 50 to the

13 witness?

14        THE COURT:  50 or 150?

15        MR. MYHRE:  50, Your Honor.

16        THE COURT:  50.  Thank you.  You may.

17 BY MR. MYHRE:

18 Q.  Do you see Exhibit 50?

19 A.  Yes, I do.

20 Q.  Where was Exhibit 50 -- well, first of all, what is depicted

21 in Exhibit 50?

22 A.  It is a screen capture from a Facebook page for David Lee

23 Williams.

24 Q.  Was this a public posting or private posting?

25 A.  Public.

2:16-cr-46-GMN-PAL

1  Q.  How -- who derived this image or who obtained this image?

2  A.  This was done by one of my fellow agents, this screen

3  capture in particular.  But this image, the actual photograph,

4  is available today.  I viewed it a day ago on Mr. Williams'

5  Facebook page.

6  Q.  So this image is available publicly.  Is that correct?

7  A.  Yes.

8  Q.  And, generally speaking, what's depicted in that image?

9  A.  Again, it's a screen shot of a Facebook page, but the image

10 within that is a photograph of the northbound I15 bridge facing

11 the southbound I15 bridge.  And Eric Parker is in the prone

12 position with his rifle pointed between the Jersey barriers.

13 And Steven Stewart is crouched down, and he's -- he has his

14 rifle leaned up against the Jersey barriers.

15 Q.  Was there a time stamp associated with this image?

16 A.  No.

17 Q.  Were you able to time stamp it?

18 A.  Yes.

19 Q.  And how did you do that?

20 A.  By the vehicles on the southbound I15 bridge, I was able to

21 time this as those vehicles are passing by.

22 Q.  Using the aerial surveillance?

23 A.  Yes.

24 Q.  So this correlates to April 12, 2014?

25 A.  Yes, it does.

—2:16-cr-46-GMN-PAL—

1          MR. MYHRE:  Your Honor, we offer Government's Exhibit

2    50.

3          THE COURT:  Same objection?

4          MR. TANASI:  Yes, Your Honor.

5          MR. MARCHESE:  Parker joins.

6          MR. PEREZ:  Lovelein joins.

7          MR. LEVENTHAL:  Drexler joins.

8          MR. MYHRE:  Same response.

9          THE COURT:  Same ruling.  Exhibit 50 will be admitted.

10   You may go ahead and publish it to the jury.

11         MR. MYHRE:  Thank you, Your Honor.

12         (Government's Exhibit 50 is admitted.)

13   BY MR. MYHRE:

14   Q.  And Exhibit 50 is before the jury now, Agent Willis.  And if

15   you would, please, identify again for record purposes Mr. Parker

16   in this exhibit.

17         MR. MYHRE:  Witness is circling an individual in the

18   lower-left portion of the exhibit.

19   BY MR. MYHRE:

20   Q.  And Mr. Stewart.

21         And you know them based upon the clothing -- known

22   clothing they wore that day, correct?

23   A.  Yes.

24   Q.  And just circle the images that you used to help you to time

25   stamp this.

1           MR. MYHRE:  And, again, witness indicating on the

2   exhibit vehicles that appear in about the center portion of the

3   exhibit, but above the images that he's described as Mr. Parker

4   and Mr. Stewart.

5   BY MR. MYHRE:

6   Q.  And is this image used in your timeline as well?

7   A.  Yes.

8   Q.  And is -- does that reflect the time that you derived

9   correlating it to the aerial images?

10  A.  Yes, it does.

11          MR. MYHRE:  And lastly, Your Honor, may we show the

12  witness Exhibit 51?

13          THE COURT:  Yes.

14  BY MR. MYHRE:

15  Q.  Do you see Exhibit 51?

16  A.  Yes, I do.

17  Q.  And what is depicted there?

18  A.  This is a -- another screen shot from a Facebook page.  This

19  time from the page of Eric Dahlen, the Third.  In the image on

20  the screen capture is Scott Drexler with his rifle pointed

21  between the gap in the Jersey barriers in a prone position on

22  northbound I15.

23  Q.  Was this image on Mr. Dahlen's Facebook page, was this

24  available publicly?

25  A.  Yes, and it still is after -- I mean, as of a day or two

————2:16-cr-46-GMN-PAL————

 1  ago.

 2  Q.  Oh, I'm sorry.  I didn't mean to speak over you.

 3  A.  I'm sorry.

 4  Q.  But this was an image then that you were able to physically

 5  observe on the public posting?

 6  A.  Yes.

 7  Q.  And you recognize Mr. Drexler from clothing?

 8  A.  Yes.

 9  Q.  And you recognize the position of his body?

10  A.  Yes.

11  Q.  And is it consistent with other known photos you've derived

12  of Mr. Parker on April 12, 2014?

13  A.  Yes.

14          MR. MYHRE:  Your Honor, we offer Exhibit 51.

15          THE COURT:  Same objection continuing?

16          MR. TANASI:  Yes, Your Honor.

17          MR. MARCHESE:  Yes, Your Honor.

18          MR. TANASI:  Thank you.

19          MR. LEVENTHAL:  Yes, Your Honor.

20          THE COURT:  Same response?

21          MR. MYHRE:  Same response.

22          THE COURT:  All right.  Same ruling.  Exhibit 51 is

23  admitted.  You may go ahead and publish it to the jury.

24          MR. MYHRE:  Thank you, Your Honor.

25          (Government's Exhibit 51 is admitted.)

1  BY MR. MYHRE:

2  *Q.*  It appears now that the image is before the jury.  Looking

3  at Exhibit 51, again, for record purposes draw a circle around

4  Mr. Drexler.

5          Did this image --

6          MR. MYHRE:  And the record should reflect that the

7  witness has drawn a circle around the image about the center

8  portion of the exhibit he's identified as Mr. Drexler.

9  BY MR. MYHRE:

10  *Q.*  Did this image come with a time stamp?

11  **A.**  No, it did not.

12  *Q.*  And were you able to derive a time?

13  **A.**  Yes, I was.

14  *Q.*  And how did you do that?

15  **A.**  From the Hugh Gourgeon photographs and video.

16          MR. MYHRE:  Your Honor, may I draw up 146?

17          THE COURT:  Yes.

18  BY MR. MYHRE:

19  *Q.*  And do you see 146?

20  **A.**  Yes, I do.

21  *Q.*  Is this -- did this assist you in deriving a time stamp for

22  Exhibit 51?

23  **A.**  Yes, along with the -- this is a screen shot from Hugh

24  Gourgeon's video, but the photograph from Hugh Gourgeon that is

25  time stamped with this similar imagery in.  So those two things,

——2:16-cr-46-GMN-PAL——

1  the screen shot from the video and the photograph, helped me

2  approximate a time for the Eric Dahlen, the Third, Facebook

3  photo.

4  Q.  And was -- for the Eric Dahlen, which was Exhibit 51?

5  A.  Yes.

6  Q.  Is that incorporated in your timeline?

7  A.  Yes, it is.

8  Q.  And did you indicate the time that you derived following

9  this methodology?

10  A.  Yes.

11          MR. MYHRE:  May I have just one moment, Your Honor?

12          THE COURT:  Yes.

13          (Prosecution conferring.)

14          MR. MYHRE:  And, Your Honor, I did say lastly before,

15  but this time, lastly, may I show Exhibit 170?

16          THE COURT:  Yes.

17          MR. MYHRE:  This will be the last one for today.  I

18  know we're coming up to the ...

19          THE COURT:  Yes.

20  BY MR. MYHRE:

21  Q.  Do you see Exhibit 170 before you?

22  A.  Yes, I do.

23  Q.  Where was this derived?

24  A.  This was -- so the American Patriot Frontline video

25  documentary, that was linked to a PBS.com article that included

—2:16-cr-46-GMN-PAL—

1  this photograph.  So this is just a still photograph that was

2  embedded within a PBS article.

3  Q.  And if you would just -- and do you recognize the images

4  captured in that article?

5  A.  Yes, I do.

6  Q.  And what are they?  What is it, I should say?

7  A.  Eric Parker in a prone position with his rifle between the

8  Jersey barrier gap.

9  Q.  And is this at a different time than the previous photos

10  we've seen of this?

11  A.  No, this would be a similar time as the other Frontline

12  screen captures from the video.

13  Q.  And is this consistent with the other Frontline screen

14  captures?

15  A.  Yes, it is.

16          MR. MYHRE:  Your Honor, we offer Exhibit 170.

17          THE COURT:  Any objection to 170?

18          MR. TANASI:  Same objection Stewart, Your Honor.

19          MR. MARCHESE:  Parker joins.

20          MR. LEVENTHAL:  I would also object to the cumulative

21  nature of this one picture that we've seen over and over.

22          MR. MARCHESE:  It appears to be the same photo as 169C.

23          THE COURT:  Mr. Myhre?

24          MR. MYHRE:  With respect to --

25  BY MR. MYHRE:

— 2:16-cr-46-GMN-PAL —

1   Q.  Well, Agent, looking at this photograph, is this the same or

2   a different image that appeared in 169C?

3   A.  This would be different.  This is a still shot, slightly

4   zoomed in than 169C.

5   Q.  So this is a more close-up view of Mr. Parker than from

6   169C?

7   A.  Yes.

8          THE COURT:  All right.  The objection's overruled as to

9   cumulativeness, and the same ruling on the other objection,

10  901(b)(4).  Exhibit 170 is admitted.  You may go ahead and

11  publish it, and then we'll take our overnight break.  So go

12  ahead.

13          (Government's Exhibit 170 is admitted.)

14  BY MR. MYHRE:

15  Q.  And again, Agent Willis, it's now before the jury and just

16  for record purposes circle Mr. Parker.

17          MR. MYHRE:  The record should reflect witness circling

18  170 approximately the middle of the image an individual

19  identified as Mr. Parker.

20  BY MR. MYHRE:

21  Q.  And in terms of time stamping this, did you use other

22  extrinsic evidence to time stamp this image?

23  A.  Yes, I did.

24  Q.  This image did not come with the time stamp embedded in it?

25  A.  That's correct.

─2:16-cr-46-GMN-PAL─

1    *Q.*  But you've used this image in constructing your timeline?

2    **A.**  Yes.

3    *Q.*  Thank you.

4           MR. MYHRE:  I believe those are all of the questions

5    that the Government has at this time, Your Honor.  We will be

6    recalling Agent Willis later in the trial to work on the

7    timeline.

8           THE COURT:  All right.  So go ahead and take our

9    overnight break.  During this time, I do remind everyone, all of

10   the jurors, that you are not to discuss this case with anyone,

11   not even your fellow jurors.  And please remember also do not

12   listen to or view or read -- view, listen, read anything that

13   has to do with this case.  Please do not perform any independent

14   research or any investigation.

15          And please do not form any opinion until after you have

16   heard all of the testimony, been provided with all of the

17   exhibits.  Then I will provide you with the jury instructions

18   that are the legal instructions that you will apply to the facts

19   as you determine them to be.  Then you will hear the closing

20   arguments by all of the parties explaining to you what they

21   believe you have just seen and what that means.  Then you will

22   begin your deliberation process, which is when you finally have

23   an opportunity to speak to each other about your opinions,

24   beliefs, findings.  And then that will be the deliberation

25   portion when you finally discuss the case.  In fact, you have a

—2:16-cr-46-GMN-PAL—

1  duty to discuss the case with each other.

2       So we'll go ahead and take our break.  I think tomorrow

3  it's different ...

4       COURTROOM ADMINISTRATOR:  10 a.m.

5       THE COURT:  10 a.m.  All right.  So we'll see you back

6  here at 10 a.m. tomorrow morning.  And let's go ahead and stand

7  for the jury.  We'll go ahead and excuse them and welcome them

8  back at 10 a.m. tomorrow morning.

9       And, Special Agent Willis, we'll have you come back at

10 10 a.m. tomorrow morning, too, and see if there's any

11 cross-examination.

12       (Whereupon jury leaves the courtroom at 5:10 p.m.)

13       THE COURT:  All right.  You may be excused, Special

14 Agent Willis.  But before we go off record, do we want to

15 discuss juror No. 1 or do you want to do that tomorrow morning?

16       I'm conflicted myself about her.  If you want to take a

17 seat.  I find it hard to believe that this gentleman, whoever he

18 is, new friend, didn't know that she was on -- a juror in this

19 trial, but sent her that text.

20       And I double-checked her jury questionnaire.  She's

21 separated from her ex-husband who is a U.S. Park Service Ranger.

22       MR. MYHRE:  We show that her former spouse was not law

23 enforcement, Your Honor, was with Park Service, but not

24 necessarily -- Park Service?  Park Service, but not a ranger

25 with the Park Service.

2:16-cr-46-GMN-PAL

1          (Defense conferring.)

2          MR. TANASI:  Your Honor, I think --

3          THE COURT:  Does the Defense wish to make a motion or

4  sleep on it?

5          MR. LEVENTHAL:  If we could have the night to think

6  about it, if that would be okay.  I think we need to

7  get-together based upon what, you know, she's indicated here and

8  now that -- I mean, I understand that she has family who's been

9  in the Park Service.  I think that changes things.  If we could

10  just have the night to think about it and come in tomorrow?

11          THE COURT:  Sure.

12          MR. LEVENTHAL:  That would be great.  Thank you.

13          MR. MARCHESE:  Thank you.

14          THE COURT:  Can we get the exact wording of that text

15  for tomorrow?  I mean, I read it into the record.  So will we

16  have that, Patty?  Can we get that?

17          (Court reporter responding affirmatively.)

18          THE COURT:  All right.  So that we can -- in case we

19  need to discuss it some more in the morning.  All right.  Then

20  let's go ahead and talk about it tomorrow morning at 10 a.m.

21  we'll be back here.  Off record.

22          MR. TANASI:  Thank you, Your Honor.

23          (Whereupon the proceedings concluded at 5:12 p.m.)

24

25

2:16-cr-46-GMN-PAL

--oOo--

COURT REPORTER'S CERTIFICATE


I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


Date:  August 6, 2017.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR

CCR #937