UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,           )<br>                                                           )<br>                           Plaintiff,      )<br>         vs.                                            )<br>                                                           )<br> GREGORY BURLESON,                  )<br>                                                           )<br>                           Defendant.  )<br>                                                           ) | Case No.: 2:16-cr-00046-GMN-PAL-16<br><br>**ORDER** |

Pending before the Court is Defendant Gregory P. Burleson's ("Defendant's") Motion for New Trial, (ECF No. 3422). The Government filed a Response, (ECF No. 3448), and Defendant filed a Reply, (ECF No. 3487).

Also pending before the Court is Defendant's Motion for Compassionate Release ("Mot. Comp. Rel."), (ECF No. 3522). The Government filed a Response, (ECF No. 3529), and Defendant filed a Reply, (ECF No. 3536).[1]

For the reasons discussed below, the Court **DENIES** Defendant's Motion for New Trial and **DENIES** Defendant's Motion for Compassionate Release.

**I.     BACKGROUND**

On March 2, 2016, a federal grand jury sitting in the District of Nevada returned a Superseding Indictment charging nineteen defendants with sixteen counts related to a confrontation on April 12, 2014, in Bunkerville, Nevada between Bureau of Land Management ("BLM") Officers and cattle rancher Cliven Bundy, his family, and supporters. (Superseding Indictment, ECF No. 27). The Court divided the defendants into three tiers in order to hold

---

[1] In the present Order, the Court will address Defendant's Motion for Compassionate Release, (ECF No. 3522), based on the COVID-19 pandemic. The Court will address Defendant's Motion for Sentence Reduction, (ECF No. 3541), by separate order.

three separate trials. (Order, ECF No. 1098). Defendant was grouped into Tier 3, which was the first tier of defendants that went to trial. (*Id.*). At the conclusion of Defendant's trial, the jury found Defendant guilty of seven counts: Count Five, Assault on a Federal Officer; Count Six, Use and Carry of a Firearm During and in Relation to a Crime of Violence; Count Eight, Threatening a Federal Officer; Count Nine, Use and Carry of a Firearm During and in Relation to a Crime of Violence; Count Twelve, Obstruction of the Due Administration of Justice; Count Fourteen, Interference with Interstate Commerce by Extortion; Count Fifteen, Use and Carry of a Firearm During and in Relation to a Crime of Violence; and Count Sixteen, Interstate Travel in Aid of Extortion. (Jury Verdict, ECF No. 1903). Defendant was sentenced to 819 months' imprisonment and is currently incarcerated USP Colman II. (J., ECF No. 2220); (Mot. Comp. Rel. 2:24–25, ECF No. 3522).

Subsequent to Defendant's trial, the Tier 1 defendants proceeded to trial. (Order, ECF No. 1098). On December 20, 2017, the Court declared a mistrial for the Tier 1 defendants, finding that the Government's failure to disclose evidence to the Tier 1 defendants resulted in numerous *Brady* violations. (Mins. of Proceedings, ECF No. 3041). Following the Court's mistrial declaration, the Court dismissed the case with prejudice with respect to the Tier 1 defendants. (Mins. of Proceedings, ECF No. 3116).

In the instant Motion, Defendant requests that the Court vacate his conviction and grant a new trial on the grounds that his trial was "marked by egregious prosecutorial misconduct involving numerous intentional misrepresentations" because "the newly discovered evidence was exculpatory as to [Defendant] for all the same reasons it was exculpatory to the Tier 1 defendants." (Mot. New Trial 22:28–23:1, 23:10–11, ECF No. 3422). Additionally, Defendant moves for immediate compassionate release due to the COVID-19 pandemic. (Mot. Comp. Rel. 12:12–19:18).

## II. LEGAL STANDARD

### A. Motion for New Trial

Federal Rule of Criminal Procedure 33 provides, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion for new trial based on new or newly discovery evidence must be filed within three years after the verdict. Fed. R. Crim. P. 33(b)(1). Although determining whether to grant a motion for a new trial is left to the district court's discretion, "it should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981) (internal quotation omitted). Moreover, the defendant bears the burden of persuasion. *United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989).

Generally, "a defendant who seeks a new trial based on new or newly discovered evidence must show that (1) the evidence is newly discovered; (2) the failure to discover the evidence is not attributable to a lack of diligence by the defendant; (3) the evidence is material to the issues at trial; (4) the evidence is neither cumulative nor impeaching; and (5) the evidence indicates that a new trial would probably result in an acquittal." *United States v. Waggoner*, 339 F.3d 915, 919 (9th Cir. 2003) (citing *United States v. Jackson*, 209 F.3d 1103, 1106 (9th Cir. 2000)).

However, when a defendant seeks a new trial based on an alleged *Brady* violation, he must only prove the three elements of a standard *Brady* claim. *See United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009). First, "'the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching.'" *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Second, the evidence must have been "willfully or inadvertently" suppressed by the government. *United States v. Jernigan*, 492 F.3d 1050, 1053

(9th Cir. 2007). Finally, "the suppressed evidence must be material to the guilt or innocence of the defendant." *Id.*

"Evidence will not be deemed 'newly discovered' simply because it appears in a different light under a new theory. [A] party who desires to present his case under a different theory in which facts available at the original trial now first become important, will not be granted a new trial." *United States v. Hamling*, 525 F.2d 758, 759 (9th Cir. 1975).

### B. Compassionate Release

The compassionate release provision of 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018), authorizes the sentencing court to modify a term of imprisonment in limited circumstances, upon a motion by the defendant. 18 U.S.C. § 3582(c)(1)(A). The sentencing court may order compassionate release, "if after considering the factors set forth in 18 U.S.C. § 3553(a)," the defendant has demonstrated: (1) he has exhausted his administrative remedies; and (2) "extraordinary and compelling reasons" warrant a reduction in his sentence. 18 U.S.C. § 3582(c)(1)(A). The Court must also consider whether a reduction in sentence is consistent with applicable policy statements issued by the United States Sentencing Commission. *Id.* While there is currently no applicable policy statement for § 3582(c)(1)(A) motions filed by a defendant, "the Sentencing Commission's statements in U.S.S.G § 1B1.13," which apply to § 3582(c)(1)(A) motions filed by the Bureau of Prisons ("BOP"), "may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *United States v. Aruda*, No. 20-10245, 2021 WL 1307884, at *4 (9th Cir. April 8, 2021). Under U.S.S.G. § 1B1.13, "extraordinary and compelling reasons" include, among other things, age, terminal illnesses, and medical conditions "that substantially diminish[ ] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." Further, prior to reducing a sentence, U.S.S.G. § 1B1.13 directs courts to determine whether the

defendant is a danger to the safety of any other person in the community. *Id.* The court may also consider "other reasons" including a "reason other than, or in combination with" a reason specifically provided in the Sentencing Guidelines. *Id.* The decision to grant compassionate release is in the sentencing court's discretion. *See United States v. Wade*, 2:99-cr-00257-CAS-3, 2020 WL 1864906, at *5 (C.D. Cal. Apr. 13, 2020).

### III.   DISCUSSION

**A. Motion for New Trial**

Defendant claims that sixteen newly discovered pieces of evidence concerning the presence of snipers and surveillance activities in the days leading up to and including April 12, 2014, as well as threat assessments, and federal internal affairs reports and memos, justify a new trial. (*See generally* Mot. New Trial, ECF No. 3422).

The sniper evidence consists of the following documents: FBI 302 about BLM Special Agent Edward Delmolino, FBI 302 about National Parks Service Officer Ernesto Felix, FBI 302 about BLM Field Staff Ranger Curtis Racker, FBI Tactical Operations Center ("TOC") Activities Log, FBI 302 about BLM Special Agent Mark Brunk, and the Area of Operations Map (collectively, "Sniper Evidence"). (*Id.* 10:3–11:18).

The surveillance evidence consists of the following documents: FBI Law Enforcement Operations Order, FBI 302 Report about Electrical Technician Kevin Egbert, and FBI 302 about BLM Special Agent Scott Swanson (collectively, "Surveillance Evidence"). (*Id.* 11:19–12:5).

The threat assessment evidence consists of the following documents: 2012 FBI BAU Threat Assessment, 2012 Southern Nevada Counterterrorism Threat Assessment, FBI Law Enforcement Operations Order, Gold Butte Cattle Impound Threat Assessment, and BLM OLES Threat Assessment (collectively, "Threat Assessment Evidence"). (*Id.* 12:6–22).

The internal affairs evidence consists of the FBI Joint Task Force Report that documents internal affairs information regarding Special Agent in Charge Dan Love ("Internal Affairs Evidence"). (*Id.* 12:23–27).

Finally, Defendant identifies to "two lengthy and damning emails (often referred to in this case as memos)," ("Wooten Memos"), where former Special Agent in Charge ("SAC") Larry Wooten details the misconduct he uncovered during the BLM's internal investigation of the April 12, 2014 confrontation. (*Id.* 13:2–15:24). The Wooten Memos primarily document the BLM's failure to produce potentially exculpatory evidence to the U.S. Attorney's Office, ethical misconduct throughout the internal investigation, and workplace harassment that SAC Wooten personally experienced and observed. (*See* Wooten Memos, Ex. A to Mot. New Trial, ECF Nos. 3425–3426); (Wooten Memos, Ex. D to Reply to Mot. New Trial, ECF Nos. 3488–3491). Defendant claims that the Wooten Memos are newly discovered and exculpatory evidence warranting a new trial for Defendant. (Mot. New Trial 13:2–15:24).

The Court will first address Defendant's claims regarding the Sniper Evidence, Surveillance Evidence, Threat Assessment Evidence, and Internal Affairs Evidence under the standard for motions for new trial based on alleged *Brady* violations. However, the Wooten Memos do not implicate a *Brady* violation because they did not exist until after the completion of Defendant's trial.[2] Therefore, the Court will address Defendant's arguments for new trial based on the Wooten Memos under the *Waggoner* standard.

> 1. *Brady Violation Evidence: Sniper, Surveillance, Threat Assessment, and Internal Affairs Evidence*

Defendant claims that this evidence was "wrongfully and willfully" withheld by the prosecution, resulting in Defendant's inability to pursue the defense of self-defense/defense of

---

[2] Defendant's trial ended on April 24, 2017, and the first Wooten Memo was not sent until November 27, 2017.

others or to justify his sojourn to Nevada. (Mot. New Trial 15:27–16:2, 9:6–8). Defendant explains that, at the time of trial, self-defense/defense of others was not a viable argument because false representations by the government resulted in the exclusion of exculpatory evidence, such as evidence concerning the alleged snipers and surveillance cameras, because it "could not be proved." (*Id.* 6:10–20). However, Defendant now argues that the withheld evidence demonstrates that snipers and surveillance techniques were employed by the BLM to monitor the Bundy property, even though threat assessments stated that the Bundy family posed minimal risk of violence toward law enforcement officers. (*Id.* 7:16–23). Defendant also claims that the evidence reveals a pattern of BLM antagonization and provocation towards the Bundy family, as well as additional prosecutorial misrepresentations concerning BLM internal affairs reports about the operation. (*Id.*). Overall, Defendant concludes that this evidence establishes "the reasonableness of the Tier 3 and Tier 1 defendants' belief that the BLM was the aggressor and that their self-defense or defense of others theory was reasonable." (*Id.* 10:14–16, 21–23).

In response, the Government argues that Defendant erroneously imputes the Court's findings regarding the dismissal of the Tier 1 defendants to his own case. (Resp. 8:23–9:7, ECF No. 3448). The Government explains that Defendant "cannot prove that the discovery material was favorable to him or material to his counts of conviction." (*Id.*).

As discussed above, to sustain a claim for new trial based on a *Brady* violation, Defendant must demonstrate that (1) the evidence at issue is favorable to him, (2) the government suppressed the evidence, and (3) the suppressed evidence is material to his case. *See Jernigan*, 492 F.3d at 1053. However, because the parties do not dispute that the Government suppressed the sniper, surveillance, threat assessment, and internal affairs evidence, the Court will address only the favorableness of the evidence and its materiality.

//

*a. Favorableness to Defendant*

To establish the first element required to find a *Brady* violation, Defendant must show that the evidence suppressed by the prosecution is favorable to him. *See, e.g.*, *Williams v. Ryan*, 623 F.3d 1258, 1264 (9th Cir. 2010). However, in the present case, Defendant has not met his burden to show that the sniper, surveillance, threat assessment, and internal affairs evidence is favorable specifically to him.

While Defendant correctly points out that this Court found *Brady* violations against the Tier 1 defendants because the prosecution "willfully failed to disclose potentially exculpatory, favorable and material information," including the documents at issue in the present Motion, Defendant incorrectly assumes that the withheld evidence is automatically favorable to him as well. (Trans., 13:7–22, ECF No. 3122). (*See also* Mot. New Trial 22:28–23:1) ("The newly discovered evidence was exculpatory as to [Defendant] for all the same reasons it was exculpatory to the Tier 1 defendants."). To the contrary, the Court found a *Brady* violation in the Tier 1 defendants' trial because the withheld evidence was specifically relevant and favorable to the Tier 1 defendants. *See United States v. Engel*, No. 2:16-cr-00046-GMN-PAL, 2018 WL 3494849, at *3–4 (D. Nev. July 19, 2018). For example, the bulk of the evidence identifies potentially provocative conduct perpetrated by government agencies against the Bundy family and their supporters in the days leading up to the confrontation on April 12, 2014.[3] However, Defendant was only present in Bunkerville, Nevada on April 12, 2014, and only for about 90 minutes. (Mot. New Trial 5:11–12). Thus, the evidence proffered by Defendant is related to facts and events that took place prior to Defendant's involvement in the confrontation. To the extent that any of the withheld evidence is relevant to April 12, 2014,

---

[3] *See, e.g.*, FBI 302 about BLM Special Agent Edward Delmolino; Ex. B to Motion to Dismiss, ECF No. 2883-1 (detailing SA Delmolino's surveillance actions on April 5–7); FBI 302 about electrical Technician Kevin Egbert, Ex. A to Mot. Dismiss, ECF No. 2883-1 (explaining surveillance camera placement and disablement on April 6, 2014); FBI Tactical Operations Center Activities Log, Ex. M to Mot. Dismiss, ECF No. 2883-1 (reporting "snipers inserted" on April 8, 2014).

none of it specifically involves Defendant or any of the law enforcement officers that he came in contact with that day. Accordingly, because Defendant's sole argument for favorability is predicated on the favorableness of the withheld evidence to the Tier 1 defendants, Defendant has not met his burden to demonstrate how the sniper, surveillance, threat assessment, and internal affairs evidence is favorable as to his own self-defense/defense of others claim. *See also Engel*, No. 2:16-cr-00046-GMN-PAL, 2018 WL 3494849, at *3–4 (finding that a Tier 3 defendant could not base his new trial motion on the withheld evidence from the Tier 1 defendants' trial because he did not arrive at the confrontation until April 11, 2014).

### *b. Materiality to Defendant's case*

To establish the third element required to find a Brady violation, Defendant must show that the evidence suppressed by the prosecution was material to his case. *See, e.g.*, *Williams*, 623 F.3d at 1264. "Evidence is material if, had it been disclosed, 'there is a reasonable probability . . . the result of the proceeding would have been different.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). Here, Defendant claims that had he been able to offer a defense of self-defense/defense of others to the jury based on the withheld evidence, the outcome of his trial may have been different. (*See* Mot. New Trial 15:20–24).

The defense of self-defense/defense of others is available against a federal law enforcement officer when the defendant is reasonably resisting excessive force by such an officer. *See United States v. Span*, 970 F.2d 573, 576–578 (9th Cir. 1992). A defendant will succeed with a self-defense claim by showing that his response to an officer's use of excessive force (1) is based on a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) used no more force than was reasonably necessary under the circumstances. *United States v. Acosta-Sierra*, 690 F.3d 1111, 1126 (9th Cir. 2012).

In the present case, the Court has previously explained that "the pointing of [a] weapon when people are not cooperating and obeying legitimate orders and directions to leave the area, to move back, and so forth, could not be excessive force." (Trans. 26:18–21, ECF No. 2267). Further, since there were no "law enforcement officer[s] putting hands on any of the individuals, no attempts, no attempts to arrest, no batons used, [and] no violence" the Court could not "define the force used as being excessive" or find "that there's any evidence that a jury could reasonably find that there was excessive force." (*Id.* 26:23–27:4). Accordingly, the withheld evidence cannot be material to Defendant's case because, without a showing that law enforcement officers used excessive force on August 12, 2014, the self-defense/defense of others defense is not available to Defendant.[4] As the withheld evidence is neither favorable to Defendant, nor material to his case, the Court finds that Defendant has not established a *Brady* violation, and thus, the sniper, surveillance, threat assessment, and internal affairs evidence do not provide grounds for a new trial.

//

//

---

[4] Defendant repeatedly asserts that the social media postings he viewed prior to his participation in the confrontation are probative to his self-defense/defense of others claim because the voracity of the social media postings was confirmed by the "newly discovered" and withheld evidence. (Mot. New Trial 5:1–2, ECF No. 3422); (Reply 10:23–11:4, ECF No. 3487). Essentially, Defendant claims that the withheld evidence would demonstrate that his motivation for traveling to Nevada was "to help defend what he believed were peaceful ranchers under unlawful attack by rogue agents." (Reply 11:1–4). Had Defendant been responding to excessive force used against him or others by law enforcement officers, then Defendant may have been able to offer this evidence to demonstrate that he had a reasonable belief that the use of force was necessary to defend himself or another against an imminent threat of unlawful force. *See United States v. Span*, 970 F.2d 573, 576–578 (9th Cir. 1992). However, because the Court has determined that the BLM officers did not use excessive force against Defendant or the protestors on April 12, 2014, self-defense/defense of others is not an available theory of defense, and thus the reasonability of Defendant's allegedly defensive actions is not relevant. Further, Defendant viewed the social media postings days before he actually traveled to Nevada, which does not demonstrate the imminent threat necessary to justify a theory of self-defense/defense of others. *See, e.g.*, *Wilkins v. Lynch*, No. 19-cv-06119-YGR, 2021 WL 949425, at *26 (N.D. Cal. Mar. 12, 2021) ("Fear of future harm—no matter how great the fear and no matter how great the likelihood of harm—will not suffice [as an imminent threat]."); *Sidhu v. State*, 472 P.3d 192, 192 (Nev. 2020) (recognizing that imminent harm does not include future harm; imminent harm requires "urgent and pressing danger").

### 2. *Wooten Memos*

Defendant argues that the Wooten Memos demonstrate "an ongoing *pattern* of excessive force" and "deliberate provocation and aggression [on the part of the BLM] that began before the wash incident." (Mot. New Trial 14:9–11). As such, Defendant claims that the Wooten Memos present crucial evidence to the trial theory of self-defense/defense of others. (*Id.*). In response, the Government argues that the Wooten Memos do not present newly discovered evidence, but merely cumulative evidence. (Resp. 14:12–15:4). Further, the Government claims that the allegations concerning use of force in the Wooten Memos document incidents that occurred prior to or separate from the events in Bunkerville on April 12, 2014. (*Id.* 15:5–11). Finally, the Government argues that this evidence cannot be used as impeachment evidence alone under the *Waggoner* standard. (*Id.* 15:12–16).

Similar to the withheld evidence discussed above, the Court finds that the Wooten Memos are not material to Defendant's case because they discuss alleged incidents of misconduct unrelated to Defendant's personal involvement in the April 12, 2014 confrontation. (*See* Wooten Memos, Ex. A to Mot. New Trial, ECF Nos. 3425–3426); (Wooten Memos, Ex. D. to Reply to Mot. New Trial, ECF Nos. 3488–3491). Additionally, besides bald accusations, the Wooten Memos provide no evidence that excessive force was used by BLM officers on April 12, 2014. (*Id.*). To the extent that the Wooten Memos would be used for the purposes of impeachment, the fourth *Waggoner* element, which requires that the new evidence must be non-impeaching, is not satisfied. *See Waggoner*, 339 F.3d at 919 (citing *United States v. Jackson*, 209 F.3d 1103, 1106 (9th Cir. 2000)) ("A defendant who seeks a new trial based on new or newly discovered evidence must show that . . . the evidence is neither cumulative nor impeaching"). Finally, even if the Wooten Memos were introduced as evidence at trial for non-impeachment purposes, the extensive evidence stacked against Defendant does not indicate that a new trial would likely result in an acquittal. *See United States v. Kenny*, 645 F.2d 1323, 1344

(9th Cir. 1981) (affirming a district court's denial for a new trial because the newly discovered evidence "lacked sufficient probative force to acquit").  At trial, the Government presented overwhelming evidence supporting Defendant's convictions, including, but not limited to, photographs and video of him during the April 12, 2014 confrontation, along with his own admissions on internet postings. *See also Engel*, No. 2:16-cr-00046-GMN-PAL, 2018 WL 3494849, at *4.

### B. Compassionate Release

As an initial matter, the parties do not dispute whether Defendant properly exhausted his administrative remedies.  Accordingly, the Court's discussion will center on whether Defendant has met his burden to establish extraordinary and compelling reasons for release, as required by 18 U.S.C. § 3582(c)(1)(A)(i).  In the present motion, Defendant argues for: (1) a sentence reduction from 819 months to 387 months because he was sentenced prior to the enactment of the 2018 First Step Act, which modified sentencing guidelines for 924(c) convictions; and (2) immediate compassionate release because Defendant's disabilities expose him to an increased danger of severe illness from COVID-19. (Mot. Comp. Rel. 4:14–16:20).  The Court will first address Defendant's Motion for Compassionate Release based on the COVID-19 pandemic and will address Defendant's Motion for Sentence Reduction by separate order.

#### 1. COVID-19

Defendant argues that the COVID-19 pandemic provides "extraordinary and compelling reasons" for his early release because he is an alcoholic, blind, experiences seizures, and is a former smoker. (Mot. Comp. Rel. 16:4–5).  Defendant's medical records confirm that he suffers from blindness in both eyes, epilepsy, and a moderate alcohol disorder. (Medical Records, Ex. 4 to Mot. Comp. Rel., ECF No. 3522-4).

Extraordinary and compelling reasons for compassionate release may exist when a defendant demonstrates he is suffering from a severe medical condition. *See* U.S.S.G. §

1B1.13. When considering "extraordinary and compelling reasons" for release based on a medical condition in light of the COVID-19 pandemic, courts have looked to the safety of the defendant's current detention institution compared to release, as well as whether the defendant's medical conditions elevate the risk of severe illness from COVID-19. *See, e.g.*, *United States v. Kauwe*, No. 3:14-cr-00044-MMD-WGC-1, 2020 WL 2926460, at *2 (D. Nev. June 3, 2020); *United States v. Walters*, No. 216CR00011JADPAL, 2020 WL 3104049, at *2 (D. Nev. June 11, 2020); *United States v. Delgado*, No. 3:18-CR-17-(VAB)-1, 2020 WL 2464685, at *6 (D. Conn. Apr. 30, 2020).

      Here, Defendant has not demonstrated that his medical conditions create a heightened risk of severe complications from COVID-19. Current CDC guidelines do not designate blindness[5] or epilepsy as COVID-19 risk factors. *See* CDC, "Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html, (last visited June 7, 2021). Further, the CDC explains that drug users or people with another substance abuse disorder, such as alcoholism, can be more likely to become severely ill from COVID-19 because they likely also have "underlying medical conditions that put them at increased risk for severe illness from COVID-19," such as heart disease, or because they use drugs in "congregate (group) settings." *See* CDC, "COVID-19 and People Who Use Drugs or Have Substance Use Disorder," https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/other-at-risk-populations/people-who-use-drugs/QA.html, (last visited June 7,

---

[5] Defendant argues that his blindness prohibits him from being able to properly socially distance, which places him at a higher risk of contracting COVID-19. (Mot. Comp. Rel. 14:17–15:12). However, USP Coleman II reports that Defendant is assigned a "full-time companion" to assist him in safely ambulating around the complex. (*See* Response to Inmate Request, Ex. 2 to Mot. Comp. Rel., ECF No. 3522-2). Further, as will be discussed below, USP Coleman II has no active cases of COVID-19. *See* Federal Bureau of Prisons, "COVID-19 Cases," https://www.bop.gov/coronavirus/ (last visited June 7, 2021). Thus, the Court is not convinced that Defendant is unable to remain safe in a correctional setting or that USP Coleman II is unable to manage the COVID-19 risks, if any, to Defendant.

2021). While Defendant has historically abused alcohol, he suffers from no other underlying medical conditions that are also COVID-19 risk factors, and he does not claim to be consuming alcohol in congregate settings while incarcerated. Accordingly, the Court is satisfied that Defendant's history of substance abuse does not present an "extraordinary and compelling reason" for release.

The CDC does indicate that "being a current or former smoker can make you more likely to get severely ill from COVID-19." *See* CDC, "Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions." However, evidence of smoking alone does not provide the "extraordinary and compelling reasons" necessary to justify early release, especially when considering that USP Coleman II is currently reporting zero active cases of COVID-19. *See, e.g.*, *United States v. Slate*, Cr. No. 15-00893 (01) JMS, 2020 WL 4722382, at *3 (D. Haw. Aug. 13, 2020) (denying compassionate release when an inmate had no other medical conditions, besides smoking, placing him at an elevated risk of COVID-19, and COVID-19 cases at his detention facility were decreasing). [6] *See also* Federal Bureau of Prisons, "COVID-19 Cases," https://www.bop.gov/coronavirus/ (last visited June 7, 2021). Therefore, Defendant has not met his burden to demonstrate extraordinary and compelling reasons for release because his detention facility and medical conditions do not place him at a higher risk of becoming severely ill from COVID-19.

---

[6] Defendant lists a "plethora of federal cases," claiming that "Judges have released inmates with similar or even lesser conditions than [Defendant]." (*See* Mot. Comp. Rel. 16:18–18:26). To the contrary, most of these cases are not remotely analogous to Defendant's situation. In the cases listed by Defendant, compassionate release was granted because each inmate suffered from a medical condition, such as heart disease, asthma, diabetes, hypertension, or obesity (or a combination thereof), that the CDC designated as a COVID-19 risk factor. Defendant suffers from none of these medical conditions. Defendant only provided one case example, *United States v. Williams*, where the court recognized smoking as a risk factor, but that court granted release because the inmate suffered from other COVID-19 risk factors (hypertension and race) in addition to smoking. *United States v. Williams*, No. 4:17-cr-310-5-RLW, 2020 WL 7392875, at *8 (E.D. Mo. Nov. 25, 2020); (Mot. Comp. Rel. 17:4–6). As determined above, smoking alone is not a risk factor great enough to demonstrate the extraordinary and compelling circumstances required to justify a grant of compassionate release, and the cases cited by Defendant do not support a decision to the contrary.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's Motion for New Trial, (ECF No. 3422), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Compassionate Release, (ECF No. 3522), is **DENIED**.

**DATED** this __14__ day of June, 2021.

_____
Gloria M. Navarro, District Judge
United States District Court